James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

   - and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM**
**AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION**
**CLAIMS OF CRITICAL VENDORS AND SECTION 503(B)(9) CLAIMS,**
**APPROVING RELATED PROCEDURES, AND GRANTING RELATED RELIEF**

The Great Atlantic & Pacific Tea Company, Inc. ("*A&P*") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "*Debtors*"),[1] file this motion (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC

"**Motion**") for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order substantially in the form attached hereto as **Exhibit B** (the "**Final Order**"):  (a) authorizing, but not directing, the Debtors to pay prepetition claims (collectively, the "**Critical Vendor Claims**) held by vendors essential to the Debtors' ongoing business operations (collectively, the "**Critical Vendors**"), and certain claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "**Section 503(b)(9) Claims**," and the "**Bankruptcy Code**," respectively); (b) approving related payment procedures; and (c) granting related relief.   In support of the Motion, the Debtors submit the (a) Declaration of Frederic F. Brace, Chief Administrative Officer and Chief Restructuring Officer of The Great Atlantic & Pacific Tea Company, Inc., in Support of Debtors' Chapter 11 Pleadings and First Day Motions and (b) the Declaration of Frederic F. Brace in Support of Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief (collectively, the "**Brace Declarations**") filed concurrently herewith.   In further support of the Motion, the Debtors respectfully state as follows:

---

(9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

## Jurisdiction

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

3.     The statutory bases for the relief requested herein are sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## Background

4.     On the date hereof (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested joint administration of their chapter 11 cases, and no official committees have been appointed.

5.     As set forth more fully in the Brace Declaration, the Debtors are one of the nation's leading food and drug retailers.  The Debtors operate 395 supermarkets, combination food and drug stores, liquor stores, and limited assortment food stores across eight Northeastern states and the District of Columbia.

6.     In the twelve months ended September 11, 2010, the Debtors reported revenues of $8.4 billion.  As of September 11, 2010, the Debtors reported total assets of $2.5 billion and liabilities of $3.2 billion.

7.     The Debtors currently employ approximately 41,000 employees.  Approximately 91 percent of the Debtors' employees are covered by collective bargaining agreements, and approximately 68 percent of the Debtors' employees are employed on a part-time basis.

K&E 18123813.3

## Preliminary Statement

8.　　As operators of well-known grocery store chains in the Northeast, the Debtors rely on certain Critical Vendors to stock them with essential items that their customers fully expect to be found on the shelves.　Many of these essential items are high turnover inventory such as eggs, butter, and milk that must be replaced quickly to ensure that the Debtors' shelves suddenly do not go barren.　Others carry iconic brand names.　The Debtors also operate a number of stand-alone beer, wine, and liquor stores under the Best Cellars and A&P Liquors brands. These stores depend on inventory supplied by vendors holding unique state law rights under which the Debtors' failure to pay any one vendor can require all such vendors to impose immediate cash on delivery terms in a particular jurisdiction.[2]　Without these essential products, the Debtors' business simply could not function, let alone generate cash to implement a restructuring plan.　Thus, as the Debtors enter the chapter 11 process, it is of the utmost importance that their supply chain remain intact.

9.　　The Debtors request critical vendor relief received by other distressed companies (e.g., grocery stores, other retailers, and auto supply companies) heavily reliant on supply chain continuity as part of a "first day" motion package to preserve their viability of a going-concern enterprise.　The Debtors receive approximately 70 percent of their goods from C&S Wholesale Grocers, Inc. ("*C&S*") pursuant to a long term contract.　The remaining essential products and services on which the Debtors rely come from vendors who conduct business with the Debtors in a classic trade vendor sense—i.e., on an invoice by invoice basis without long-term performance

---

[2]　　*See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list.").

requirements.[3]   These vendors, many of whom are referred to as DSD (or "direct store delivery") vendors, supply the Debtors' stores with product on trade terms.  As is typical in distressed situations, vendors have been increasingly unwilling to extend trade credit..

10.     Anticipating this situation, the Debtors took painstaking efforts to ensure their supply chain stability prior to commencing these chapter 11 cases—including implanting a narrowly-tailored critical vendor program.  The development process involved a monumental effort to design, structure, and execute a mechanism under which a core, centralized executive team—guided by turnaround professionals and subject to personal supervision by the Debtors' Chief Restructuring Officer—will authorize payment only to those suppliers critical to the Debtors' operations and subject to the vendors' own obligations to provide Customary Trade Terms (as defined herein).  This process was developed through meetings and dialogue between the Debtors' senior management, Huron Consulting Group, and Kirkland & Ellis LLP.

11.     The Debtors focused on four primary items to develop and implement their proposed critical vendor program.

- First, the Debtors and their professionals rigorously scrutinized more than 7,600 open accounts (covering more than 5,000 separate vendors) and approximately $212 million in trade payables.  Areas of focus included:

  - the goods or services at issue, the Debtors' ability to find alternative sources of supply, and the potential disruption or lost revenues while a supplier was re-sourced;

  - whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

  - the Debtors' ability to compel contractual performance.

- Through this analysis, the Debtors identified a highly select group of vendors holding

---

[3]   By way of reference, 30 percent of the Debtors' cost of goods sold was approximately $1.8 billion in fiscal 2009 (net of depreciation and amortization).  *See* The Great Atlantic & Pac. Tea Co., Inc. (Form 10-K), at 48, 53 (May 6, 2010).

approximately $62 million in prepetition claims (approximately 63 of such vendors may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code) absolutely essential to operations.[4]

- <u>Second</u>, the Debtors designated a centralized, high-level team, with the guidance and supervision of their professionals, to review, assess, and potentially authorize payment to a Critical Vendor after obtaining an acceptable *quid pro quo*.

- <u>Third</u>, the Debtors and their professionals began implement a detailed protocol to route all requests for "Critical Vendor treatment" through this core group and to educate lower-level procurement, payables, and operations personnel on the process.[5]

- <u>Fourth</u>, the Debtors incorporated a mechanism to provide information on actual Critical Vendor payments on a confidential basis to interested parties such as the United States Trustee, their proposed postpetition secured lenders, and the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases.

The Debtors believe this deliberative process, combined with their comprehensive Payment Protocol, justifies the relief requested herein.[6] And, to be clear, vendors with long term contracts are not part of the Debtors' proposed program. Instead, the Debtors will enforce their rights in court if such vendors use these chapter 11 filings or the Debtors' financial condition as an excuse to suspend shipments, modify payment terms, or otherwise impair the Debtors' rights.

12. Finally, to ensure that the Debtors' liquidity is preserved as they transition their supply chain into chapter 11, the *quid pro quo* for the Debtors' payment of a Critical Vendor's prepetition claim will be that vendor's commitment to provide trade credit consistent with historical practices. The Debtors will not pay any prepetition obligation pursuant to the relief

---

[4] The Debtors reserve all rights to revise, remove, update, or supplement those parties identified as Critical Vendors during the pendency of these chapter 11 cases.

[5] A redacted form of the Debtors' internal payment protocol is attached hereto as **Exhibit D** (the "***Payment Protocol***").

[6] The Debtors' process to identify critical suppliers of goods and services, coupled with the high level of senior control and oversight over all potential Critical Vendor payments, is consistent with this Court's view that a debtor should have discretion in ultimately selecting its "critical vendors," provided the debtor also exercises a high degree of executive and professional supervision as to how—or if—such payments are ultimately made. *See, e.g.*, *In re The Reader's Digest Ass'n, Inc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 25, 2009), Hr'g Tr. at 35.

requested herein without a vendor's agreement to provide goods or services on terms consistent with their past practice.

**Relief Requested**

13.     By this Motion, the Debtors seek authority to pay, in their sole discretion, up to $62 million in Critical Vendor Claims (the "***Critical Vendor Cap***").  In addition, the Debtors request (a) authority to pay up to $5 million in Section 503(b)(9) Claims and (b) that payments made on account of such Section 503(b)(9) Clams shall not count against the Critical Vendor Cap.[7]

14.     The Debtors propose to pay Critical Vendor Claims and Section 503(b)(9) Claims pursuant to the payment procedures substantially in the form attached hereto as **Exhibit C** (collectively, the "***Payment Procedures***").[8]  The Debtors will make such payments only to the extent necessary to preserve business stability and maintain liquidity or access to inventory.[9]

15.     In return for paying Critical Vendor Claims or Section 503(b)(9) Claims, the Debtors will require the applicable Critical Vendor or holder of a Section 503(b)(9) Claim (a "***Section 503(b)(9) Claimant***") to provide favorable trade terms in line with historical practice for the postpetition delivery of goods and services or otherwise continue supplying the Debtors

---

[7]  Contemporaneously herewith, the Debtors have sought authority, but not direction, to pay certain claims held by warehousemen and other lien holders pursuant to the *Debtors' Motion for Entry of Interim And Final Orders (A Authorizing Debtors to pay Prepetition Claims Of Warehousemen and Miscellaneous Lien Claimants, (B) Authorizing the Debtors to Grant Administrative Expense Priority to All Undisputed Obligations for Merchandise Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business and (C) Approving the PACA Procedures and Authorizing the Debtors to Pay Allowed PACA Claims* (the "***Warehousemen, Lienholders, and PACA Motion***").  By this Motion, the Debtors do not seek authority to pay prepetition claims that may be paid pursuant to the Warehousemen, Lienholders, and PACA Motion.

[8]  The attached Payment Procedures are substantially similar to those previously approved by this Court on a first day basis.  *See In re The Reader's Digest Ass'n, Inc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No. 27].

[9]  Nothing in this Motion should be construed as a waiver of any of the Debtors' rights to contest any invoices or amounts otherwise claimed as owed by any Critical Vendor under applicable law.

7

with essential goods and services for the duration of these chapter 11 cases. The Debtors therefore request authority to condition payment upon such party's written agreement to continue supplying goods or services to the Debtors in accordance with the trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, product mix, availability, and other programs) in place in the 120 days prior to the Commencement Date (collectively, the "*Customary Trade Terms*").

16.     In particular, the Debtors will condition the payment of Critical Vendor Claims or Section 503(b)(9) Claims upon such party's agreement to continue supplying goods or services on Customary Trade Terms for the duration of these chapter 11 cases by executing trade agreements substantially in the form attached to the Payment Procedures as **<u>Exhibit 1</u>** (each a "*Trade Agreement*"). Such Trade Agreements, once agreed to and accepted by a Critical Vendor or Section 503(b)(9) Claimant, shall be the legally binding contractual arrangement between the parties governing the commercial trade relationship as provided therein.

17.     The Debtors also seek limited authority to pay Critical Vendor Claims or Section 503(b)(9) Claims in the event that no Trade Agreement has been executed if the Debtors determine, in their business judgment, that a formal Trade Agreement is unnecessary to ensure such vendor's continued performance on Customary Trade Terms; *provided that* if any party accepts payment pursuant the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms (regardless of whether or not a Trade Agreement has been executed), then: (a) such payment may be deemed to be an improper postpetition transfer, and therefore, immediately recoverable by the Debtors in cash upon written request and (b) upon recovery of the payment by the Debtors, the Critical Vendor Claim or

Section 503(b)(9) Claim shall be reinstated as if the payment had not been made. If there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

18. To the extent payments made hereunder are dishonored by the Debtors' financial institutions, the Debtors also request authority for such financial institutions to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein, solely to the extent the Debtors have sufficient funds standing to their credit with such financial institution, and such financial institution may rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

### The Debtors' Supply Chain

19. Much of the Debtors' inventory is perishable in nature. Moreover, the Debtors, like all supermarket operators, must keep a tremendous variety of inventory readily available to satisfy relentless customer demand. The Debtors therefore experience significantly higher rates of inventory turnover when compared to retailers in other industries. On average, the Debtors grocery stores will sell approximately 25,000 different stock-keeping units in a given week.[10] Convenience stores, by comparison, will typically offer less than 1,500 SKUs—clothing retailers even less. As a result, the Debtors must constantly re-stock food, produce, dairy, beverage, and

---

[10] Stock-keeping units (or "*SKU*") are commonly used metrics for classifying and tracking separate inventory types in the retail industry. For example, 24 can packages of America's Choice Diet Cola™, 12 can packages of America's Choice Diet Cola™, and 6 can packages of America's Choice Diet Cola™ are each assigned unique SKUs in the Debtors' inventory management system.

9

other products as a function of both perishability and customer demand—even for products that are frozen or otherwise shelf-stable. Simply put, the Debtors shelves will run empty without a near-continuous stream of inventory, and the Debtors cannot function without inventory to sell.

20. The Debtors rely on a carefully designed inventory system through which their hundreds of store locations take delivery of perishable, branded, or otherwise in demand goods on a daily basis. In recent months, however, the Debtors' supply relationships have grown increasingly strained as the Debtors have faced a combination of contracting trade terms and falling operational liquidity. And, as noted above, seven Critical Vendors have already informed the Debtors that they will not deliver inventory on Monday. The Debtors anticipate this run on the bank will accelerate without immediate authority, but not direction, to engage these vendors with the carrot and stick provided by their requested critical vendor program.

21. The Debtors' ability to stock high quality, fresh foods, beverages, wine, beer, and other products is absolutely critical to their ability to retain customer support in the highly competitive supermarket space. Customer uncertainty about the quantity, quality, or safety of products sold through the Debtors' stores could materially and irreparably harm the Debtors' brands and their opportunity for a successful reorganization along with it. As a result, the Debtors' inability to maintain a stable supply chain would have catastrophic results for their operations, liquidity, and, their ultimate ability to reorganize.

### The Critical Vendors

22. With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink

their market share, reduce their enterprise value, and/or impair going-concern viability. In this process, the Debtors considered a variety of factors, including:

- customer purchasing trends;

- whether a vendor is a sole- or limited-source or high-volume supplier for branded and "in demand" inventory due to particular local, regional, or national customer preferences;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or other customer preferences prevent the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

The Debtors do not, by this Motion, seek to honor prepetition obligations arising under enforceable, long-term contractual relationships.

23. Following this analysis, the Debtors identified approximately 63 vendors plus their beer, wine and liquor suppliers as Critical Vendor candidates for purposes of the relief requested herein—out of an active vendor universe covering approximately 7,600 separate

K&E 18123813.3

accounts and more than 5,000 active vendors, suppliers, and service providers.[11]   As of the Commencement Date, the Debtors believe they owe the Critical Vendor candidates approximately $62 million, including claims totaling approximately $55 million that may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code.   The $62 million of requested relief is approximately 29 percent of the Debtors' accrued payables of approximately $212 million.   These Critical Vendor candidates generally include:  (a) DSD Merchandisers; (b) Private Label Suppliers; (d) Advertisers and Printers; and (e) Miscellaneous Service Providers (each as defined below).   These Critical Vendors are discussed in turn.

### 1.     DSD Merchandisers.

24.     Like many large-scale grocers, the Debtors rely on an extensive network of food and beverage companies to supply their stores on a monthly, weekly, and daily basis.   These merchandisers directly supply a variety of branded non-branded products including baked goods, frozen foods and desserts, carbonated beverages and water, cookies and salty snacks, ethnic foods, as well as beer, wine, and liquor, to the Debtors' store locations via direct-store-delivery or similar supply processes (collectively, the "***DSD Merchandisers***").   Such products include Doritos chips, Poland Spring water, and Tombstone frozen pizzas.   The DSD Merchandisers also include certain suppliers of fresh and perishable foodstuffs, including suppliers of meat, poultry and deli products, as well as eggs and dairy products.   Inventory supplied by the DSD Merchandisers is typically high turnover, requiring weekly and, in many instances, daily deliveries directly to the Debtors' stores.   For example, many high-traffic stores require daily egg and dairy deliveries to satisfy customer demand and guaranty product freshness.

---

[11]   The Debtors' schedule of potential Critical Vendors has been provided on a confidential basis to the United States Trustee.   The Debtors reserve all rights to revise, remove, update, or supplement those parties identified as Critical Vendors during the pendency of these chapter 11 cases.

25.     Despite their reliance on the DSD Merchandisers, the Debtors have limited ability to compel vendor performance on commercially reasonable terms.  The Debtors do not hold long term supply agreements with the DSD Merchandisers.  Instead, inventory is typically supplied on an order-by-order, week-by-week, and even day-by-day basis.  In many instances, the Debtors simply cannot obtain the branded products supplied from the DSD Merchandisers from third party suppliers.  Indeed, many of the Debtors' beer, wine, and liquor distributors hold exclusive distribution rights to a particular geographic region—effectively requiring the Debtors to utilize these merchandisers as sole source providers in those areas.  Many nominally distinct DSD Merchandisers may also be formally affiliated or otherwise related through ongoing operating and corporate relationships.  The Debtors' failure to pay one such DSD Merchandiser could result in that merchandiser's affiliates or business partners cutting-off or otherwise impeding the Debtors' access to necessary inventory on commercially reasonable terms.

26.     In certain jurisdictions, beer, wine, and liquor distributors also possess special rights under non-bankruptcy law.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list.").  The Debtors' failure to timely pay a single beer, wine, or liquor distributor in these jurisdictions may therefore cause merchandisers to "post" the Debtors' account to the applicable regulatory agency in that jurisdiction, requiring all other beer, wine, or liquor distributors in that jurisdiction to put the Debtors on immediate, cash on delivery terms.  The Debtors' need for alcoholic beverage inventory is particularly acute given that (a) the Debtors' A&P Liquor and Best Cellars locations rely almost exclusively on such inventory; and

13

(b) alcoholic beverage sales is the one category in which the Debtors generate consistent revenue growth.

### 2. Private Label Suppliers.

27.     The Debtors carry an extensive selection of store-brand or "private label" merchandise across their separate banners, under brands including America's Choice, Via Roma, Hartford Reserve, and Green Way.  Although private label goods may, in certain cases, may not be as recognizable as branded goods supplied by the DSD Merchandisers, the Debtors believe their store-brand goods retain a loyal customer following based on their reputation for high quality and affordability.  And, in many instances, private label products provide the Debtors with higher margin sales when compared with alternative, branded inventory.  The Debtors rely on certain third party brokerage firms and other entities to supply their private label needs (collectively, the "***Private Label Suppliers***").  As with merchandise acquired from the DSD Merchandisers, however, the Debtors do not have long term supply relationships with the Private Label Suppliers, and the Debtors cannot quickly re-source their private label manufacturing, packaging, and distribution needs.

### 3. Advertisers and Printers.

28.     Prior to the Commencement Date, the Debtors streamlined operations by, among other things, transitioning the substantial majority of their printing and advertising capability to third-party service providers and vendors (collectively, the "***Advertisers and Printers***") and increased their focus on core retail competencies.  As a result, however, the Debtors depend on the advertising materials (including store coupons, in-store tags, print media displays, and related goods) and support services supplied by the Advertisers and Printers.  These relationships are not governed by long term contracts.  Instead, products and services are generally provided on an order by order or project by project basis, and the Debtors' agreement with a major Advertiser

and Printer is also terminable at will.

### 4.    Miscellaneous Service Providers.

29.    Critical Vendors also include certain "on-site" service providers whose services are essential to the Debtors' stores and facilities—as well as the cleanliness and appearance of the Debtors' stores and facilities. These service providers include vendors who perform services such as refrigeration repair and maintenance, compression, plumbing, electrical, janitorial and pest-control services. These services must be performed on a regular and, in certain cases, daily basis. While the amounts owed to such vendors may be small in many instances, the continued goodwill and trade support of these vendors cannot be underestimated. In many cases, these services are performed by local or regional service providers who are intimately familiar with the Debtors' particular store locations or facilities. As a result, the Debtors believe it could be prohibitively difficult to replace such vendors on a timely basis and without risking substantial disruption to their operations, particularly given the Debtors' acute need to use many of these service providers on a 24/7 basis.

### The Debtors' Payment Protocol

30.    Following their prepetition identification of their Critical Vendors, the Debtors and their professionals developed and implemented a comprehensive postpetition process to examine, review, and challenge any payment requested or proposed on account Critical Vendor payment or Section 503(b)(9) Claims. The Debtors' Payment Protocol can be generally summarized as follows:[12]

- Requests for "Critical Vendor" treatment (i.e., any payment on account of prepetition claims) will be routed through a centralized control center staffed by specifically-identified executives and advisors, including Huron Consulting Group and Kirkland

---

[12]    The Debtors reserve all rights to amend, supplement, revise, or modify the Payment Protocol in their reasonable business judgment.

& Ellis LLP.

- All aspects of any proposed payment to a Critical Vendor will be scrutinized for, among other things: (a) the amount of payment at issue; (b) the terms offered by the particular vendor; and (c) the business need for the goods or services at issue.

- Material business terms (including proposed payments) require written approval by specifically-designated executives, following review and oversight by the Debtors' professionals.

- All proposed payments over $100,000 require personal approval from the Debtors' Chief Restructuring Officer.

- All proposed payments must be documented pursuant to an executed Trade Agreement in accordance with the Payment Procedures, with any specific exception from this requirement to be made only by the Debtors' Chief Restructuring Officer.

- Payment may only be physically executed by one, specifically-designated member of the Debtors' treasury staff when the Payment Protocol has been completed and upon presentation of completed documentation.

31.    And although the Debtors have effectively "pre-screened" certain vendors who have satisfied the criteria for "Critical Vendor" treatment, the Debtors are keenly aware they must be prepared to address new or additional exigencies should they emerge—particularly given the size and scope of their operations.  Thus, the Debtors' Payment Protocol includes specific processes by which specific vendors may be designated as "Critical Vendors" on a case-by-case basis.  But, again, this process will be routed through the Debtors' centralized control center with executive level of approvals required—in addition to the approvals required for any vendor ("pre-screened" or otherwise) to receive payment on account of a prepetition claim.

32.    The Debtors have educated senior personnel (i.e., those individuals tasked with engaging or screening such vendors) on their Payment Protocol prior to the Commencement Date, and are also educating "rank and file" personnel on critical vendor issues across their 41,000 employee enterprise.  But, at the end of the day, the "faucet" of Critical Vendor dollars will be controlled by a core group of executives operating under significant professional

16

oversight and the ultimate control of the Debtors' Chief Restructuring Officer.

**Basis for Relief**

A. **The Court Should Authorize of Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code as Provided Herein**

33.     Section 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm of a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment on account of the Section 503(b)(9) Claims and Critical Vendor Claims relating to claims entitled to priority under section 503(b)(9) (approximately 92 percent of the Critical Vendor Cap) will only accelerate the timing of payment to which these parties are otherwise entitled under the Bankruptcy Code. Conversely, the Debtors' failure to pay these claims could raise significant concerns among the Debtors' vendors regarding the Debtors' prospects as a going-concern, perpetuating the reactionary, "run on the bank" mentality gripping key business partners.

34.     The Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:22 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).

35.     The Debtors' ongoing ability to obtain goods as provided herein is key to their

survival and necessary to preserve the value of their estates. Absent payment of these claims—which process is subject to oversight and approval by the Debtors' senior executives, professionals, and Chief Restructuring Officer—the Debtors could be unable to maintain sufficient levels of inventory with the variety, freshness, and quality required by their customers. The Debtors cannot risk even the perception that their stores will offer anything but the highest level of food and beverage quality and quantity for the duration of these chapter 11 cases, and the Debtors require vendor support to achieve goal. And, as noted above, the Debtors' failure to timely pay certain vendors could accelerate payment terms as a matter of law or regulation. Consequently, the Debtors' authority to honor Critical Vendor Claims and the limited amount of Section 503(b)(9) Claims as provided herein is both consistent with the priorities established by the Bankruptcy Code and necessary to preserve the value of their business.

36. In addition, courts in this district and others have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See, e.g.*, *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 31, 2009) (authorizing payment of claims entitled to administrative priority pursuant to section 503(b)(9) up to $46.3 million); *In re Chrysler LLC*, No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 20, 2009) [Docket No. 1318] (authorizing debtors to pay uncapped "claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) . . . in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate," subject to the terms of debtors' DIP facility ); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 23, 2009) [Docket No. 95] (authorizing debtors to "pay claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) . . . in the ordinary course of business and on such terms as the Debtors deem

K&E 18123813.3

appropriate, subject to the terms of the Debtors' DIP facility"); *see also In re Visteon Corp.*, Case No. 09-11786 (Bankr. D. Del. June 19, 2009) (authorizing debtor to pay $33.9 million in critical vendor claims, including $12.1 million in claims entitled to priority treatment under section 503(b)(9) of the Bankruptcy Code). This Court can and should follow suit by authorizing the Debtors to pay the Section 503(b)(9) Claims and Critical Vendor Claims (to the extent such claims entitled to priority pursuant to section 503(b)(9)) as provided herein. But unlike *Lyondell* or *Chrysler*, the Debtors do not request authority to pay all claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. Rather, the Debtors seek only to pay a limited pool of Section 503(b)(9) Claims in addition to those claims otherwise entitled to priority under section 503(b)(9) of the Bankruptcy Code held by their Critical Vendors, and the Debtors will condition any pre-confirmation payment of such claims upon completion of their Payment Protocol and receipt of Customary Trade Terms.

**B.      Authority Supports Payment of the Critical Vendor Claims as Provided Herein**

37.      Courts in this district and others recognize that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) , 363(b), 1107(a) and 1108 of the Bankruptcy Code support the payment of prepetition claims as provided herein.

38.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in

19

possession are fiduciaries holding the bankruptcy estate and operating the business for the benefit of creditors and, if the value justifies, equity owners. *See CoServ,* 273 B.R. at 497. Consistent with such fiduciary duties, courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

39. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court (commonly referred as the "necessity of payment" rule or the "doctrine of necessity"), further empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Precedent in this district clearly establishes that the doctrine of necessity allows payment on account of a prepetition obligations where such payments are critical to the reorganization process. *See, e.g.*, *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991); *Ionosphere Clubs*, 98 B.R. at 177 ("[T]he rationale for the 'necessity of payment' rule, i.e. facilitating the continued operation and rehabilitation of the debtor in railroad reorganization cases, is also a paramount goal of Chapter 11.").

40. The real or perceived decline in the either the quality or availability of food, beverage, and other products sold through the Debtors' stores could result in an acute crisis of consumer confidence. Adverse publicity about the quality of the Debtors' food products, in

particular, would almost certainly reduce foot traffic and sales. Competitors may also use the perception of an "off the tracks" restructuring to steal market share at the Debtors' expense. Similarly, the Debtors' inability to guaranty appropriate sanitation and quality standards in their stores could irreparably harm their various brand names. In short, the Debtors must ensure an appropriate level of supply chain stability and vendor support at all times during these chapter 11 cases.

41. Allowing a debtor to honor a prepetition obligation pursuant to all or some of the above-referenced provisions is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concerns and maximizing creditor recoveries. *See Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Recognizing that, as here, payment of certain prepetition claims may be required to achieve these goals, courts in this district have regularly granted relief consistent with the relief requested herein for similarly-situated debtors. *See*, *e.g.*, *In re The Readers Digest Ass'n, Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Sept. 17, 2009) (authorizing payment of up to $25 million on account of claims held by critical vendors); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Jan. 23, 2009) [Docket No. 360] (authorizing payment of up to $30 million on account of claims held by critical vendors); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) [Docket No. 30] (authorizing payment of up to $20 million on account of claims held by critical vendors); *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 197] (authorizing payment of up to $90 million on account of claims held by critical vendors); *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. July 22, 2002) [Docket No. 64] (authorizing payment of up to $70 million on account of claims held by critical vendors).

K&E 18123813.3

**C.** **The Debtors May be Subject to Contracted Trade Terms by Law or Regulation If They Fail to Timely Pay Certain Claims**

42.     Absent the relief requested herein, generally applicable state laws and regulations governing the purchase and sale of certain goods may potentially impose contracted trade terms upon the Debtors as a matter of law.  For example, certain states in which the Debtors operate impose regulations that provide that a purchaser's failure to timely pay a beer, wine, or liquor supplier may automatically require other such vendors to supply on a COD-only basis until the delinquency is cured.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list."); *accord* Conn. Agencies Regs. § 30-6-A37a; Md. Code Regs. 03.02.01.04(7); N.J. Admin Code § 13:2-24.4(c)(2); *see also* 204 Mass. Code Regs. § 2.13 (setting forth procedures governing notices of credit delinquency).[13]

43.     The unique rights available to alcoholic beverage vendors, in particular, has justified payment of their prepeititon claims in comparable supermarket bankruptcies.  *See, e.g.*, *In re Bi-Lo, LLC,* Case No. 09-02140 (Bankr. D.S.C. March 3, 2009) (granting debtors motion to pay alcoholic beverage vendors' prepetition claims); *In re Bruno's Supermarkets, LLC*, Case No. 09-00634 (Bankr. N.D. Ala. Feb. 13, 2009) (granting debtors' emergency motion to pay

---

[13]     Similar laws require dairy suppliers to impose COD terms in the event a purchaser fails to timely pay a single vendor in the applicable jurisdiction.  *See, e.g.*, N.Y. Agric. & Mkts. Law § 258-b(2)(e) ("No milk dealer or cooperative shall sell or deliver milk, except on a cash on delivery basis, to any wholesale purchaser who has failed to make full payment within the period prescribed in regulations promulgated by the commissioner pursuant to this paragraph."); *see also* Conn. Gen. Stat. § 22-242b ("All dealers . . . shall pay all accounts promptly and in full for milk or milk products purchased from one another but in no case later than ten days prior to the date on which final payments by dealers must be made to producers or an association of producers for milk," otherwise, "the Commissioner of Agriculture may hold a hearing, upon at least ten days notice, on the revocation of the license of such dealer."); *see also, e.g.,* 7 Pa. Code § 143.12 (requiring milk dealers to make payment "not later than the 26th day of each month and the 17th day of the following month").

alcoholic beverage vendors' prepetition claims). The Debtors believe the relief requested herein is justified and required by their need to avoid potentially immediate and severe contraction in trade terms or penalties otherwise arising under the applicable statutory or regulatory provisions.[14]

**D.     Payment of the Critical Vendor Claims as Provided Herein Will Benefit These Estates**

44.     The Debtors' stores must carry tens of thousands of shelf-stable and perishable SKUs at all times. The Debtors therefore require seamless coordination across their supply chain to provide customers with the high standards of freshness and quality their customers have come to expect. In this process, the Debtors rely on purveyors, meat processors, repairmen, and other vendors and service providers. Many of the vendors may be beneficiaries of "vendor friendly" statutory or regulatory schemes. *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6. .

45.     The Debtors' authority to satisfy their Critical Vendor Claims in the initial days of these cases will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are both willing and, importantly, able to conduct business as usual in chapter 11. The Debtors will also use this authority to secure Customary Trade Terms from these vendors. Absent such relief, Critical Vendors may have no incentive to continue to provide the Debtors with trade credit or, in some cases, may be legally prohibited from providing trade credit, as discussed above. Further contractions could be catastrophic for the Debtors, their estates, and all stakeholders. In contrast, the preservation of working capital through the retention or reinstatement of trade credit in sufficient amounts and on favorable terms will conserve liquidity, stabilize the Debtors' business operations, and facilitate their return to

---

[14]    The Debtors reserve all rights to contest the application of such laws or regulations given their status as debtors in possession or for any other reason.

financial health.

**E.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfer Requests**

46.     The Debtors believe they have sufficient availability of funds to satisfy their payment obligations as described herein by virtue of cash reserves, expected cash flows from ongoing business operations and their proposed debtor-in-possession financing.   Also, under the Debtors' existing cash management system, the Debtors represent that they can readily identify checks or wire transfer requests as relating to an authorized payment made pursuant to a Critical Vendor Claim. Accordingly, the Debtors believe that checks or wire transfer requests made on account of prepetition obligations, other than those relating to the these claims or as otherwise permitted by the Court will not be honored inadvertently.  The Debtors therefore request that the Court that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein, solely to the extent the Debtors have sufficient funds standing to their credit with such financial institution, and such financial institution may rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

## The Requirements of Bankruptcy Rule 6003 are Satisfied

47.     Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate

and irreparable harm" in relation to Bankruptcy Rule 4001); *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) ("The Advisory Committee commentary to [Bankruptcy Rule 6003] plainly suggests that courts rely on the procedures and advanced case law under [Bankruptcy] Rule 4001(b)(2) and (c)(2) for implementation of new [Bankruptcy] Rule 6003."). And, as noted above, courts consistently recognize that a debtor's legitimate business need to pay certain general unsecured claims or claims entitled to priority under section 503(b)(9) of the Bankruptcy Code is a compelling justification for relief under Bankruptcy Rule 6003.

48.     The Debtors' reorganization depends on their immediate ability to transition their operations into chapter 11. This obligation, in turn, depends on the Debtors' ability to maintain reasonably sufficient levels of trade credit, liquidity, and inventory. These terms do not come free of charge. Non-payment of Critical Vendor Claims could jeopardize reorganization before it has even begun, exposing the Debtors to immediate and irreparable harm far in excess of the relief requested herein. Accordingly, the Debtors submit they have satisfied the requirements of Bankruptcy Rule 6003 to support the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

49.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Motion Practice

50.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## No Prior Request

51.     No prior motion for the relief requested herein has been made to this or any other court.

## Notice

52.     The Debtors have caused notice of this Motion to be provided by electronic mail, facsimile, and/or by overnight mail to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims; (c) counsel to the agent for the Debtors' proposed postpetition secured lender; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) the indenture trustee for each of the Debtors' secured and unsecured outstanding bond issuances; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

K&E 18123813.3

WHEREFORE, for the reasons set forth herein, in the Brace Declarations, the Debtors respectfully request that the Court (a) enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

New York, New York
Dated:  December 12, 2010

/s/ Paul M. Basta
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

K&E 18123813.3

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA | ) Case No. 10-_____ (___) |
| COMPANY, INC., *et al.* | ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## INTERIM ORDER AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND SECTION 503(B)(9) CLAIMS, APPROVING RELATED PROCEDURES, AND GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc. and

certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[2] for

entry of an interim order (this "***Order***") and final order (a) authorizing the Debtors to pay certain

Critical Vendor Claims and Section 503(b)(9) Claims, (b) approving related procedures, and

(c) granting related relief; and upon the Brace Declarations; and the Court having found that this

---

[1]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645

Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having found that no other or further notice need be provided; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "*Hearing*"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that relief requested in the Motion is necessary to prevent immediate and irreparable harm; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      A final hearing to consider entry of the Final Order shall be held on _____, 2010 at ___:___ a.m./p.m. Prevailing Eastern Time.  Any objections or responses to the Motion shall be filed on or before _____, 2010 at ___:___ a.m./p.m. Prevailing Eastern Time and served on parties in interest as required by the Local Rules.

3.      The Payment Procedures, substantially in the form attached to the Motion as **Exhibit C**, are approved in their entirety.

4.      The form of Trade Agreement, substantially in the form attached to the Payment Procedures as **Exhibit 1**, is approved in its entirety.

2

5.     The Debtors are authorized, but not directed, to pay Critical Vendor Claims in accordance with the Payment Procedures; *provided that* such payments shall not exceed $62 million (the "***Critical Vendor Cap***").  The Debtors' payment of Critical Vendor Claims shall not exceed the Critical Vendor Cap unless otherwise ordered by the Court after notice and a hearing.

6.     The Debtors are authorized, but not directed, to pay up to $5 million in Section 503(b)(9) Claims.  Payments made on account of such Section 503(b)(9) Clams shall not count against the Critical Vendor Cap.

7.     The Debtors shall condition payment of Critical Vendor Claims and Section 503(b)(9) Claims upon the execution of a Trade Agreement except as otherwise provided by the Payment Procedures, and the Debtors are authorized to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their sole reasonable business judgment, that it is appropriate to do so.

8.     Regardless of whether a Trade Agreement has been executed, if any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with the trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, product mix, availability, and other programs) in place historically, prior to the Commencement Date (collectively, the "***Customary Trade Terms***"), then (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors and (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made.

K&E 18123813.3

9. If there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

10. Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Critical Vendor or Section 503(b)(9) Claimant. The Debtors do not concede that any claims satisfied pursuant to this Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims.

11. In accordance with this Order (or other order of this Court), each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in the Motion are authorized to (a) receive, process, honor and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts solely to the extent the Debtors have sufficient funds standing to their credit with such bank and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on or subsequent to the Commencement Date, and have no duty to inquire otherwise and without liability for following the Debtors' instructions.

K&E 18123813.3

12. The Debtors are authorized to issue postpetition checks or to make additional electronic payment requests with respect to payment of a Critical Vendor Claim in the event prepetition checks or electronic payment requests are dishonored or rejected.

13. The Debtors shall maintain a matrix summarizing the name of each Critical Vendor and Section 503(b)(9) Claimant paid on account of their respective claims, the amount paid to each party on account of its respective claim, and a brief description of the goods or services provided by such Critical Vendor or Section 503(b)(9) Claimant, and shall, upon reasonable notice, provide such matrix at least every other week, as well as reasonable and timely access to information sufficient to enable such parties to monitor payments made, obligations satisfied and other actions taken pursuant to this Order to: (a) the United States Trustee for the Southern District of New York; (b) any professionals retained by the official committee of unsecured creditors appointed in these chapter 11 cases (the "*Committee*"); *provided that* the Committee's professionals shall keep the matrix confidential and shall not disclose any of the information in the matrix to any party, including any member of the Committee, without obtaining prior written consent from the Debtors; and (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; *provided that* such counsel keep the matrix confidential in accordance with the confidentiality provisions of the applicable credit agreements to which the Debtors are party.

14. To the extent that there may be any inconsistency between the terms of the *Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, ( II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364 and (III) Scheduling Final*

5

*Hearing Pursuant To Bankruptcy Rules 4001(b) and (c)* (the "**Interim DIP Order**") or the *Final*

*Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§*

*105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash*

*Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition*

*Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364 and (III) Scheduling Final*

*Hearing Pursuant To Bankruptcy Rules 4001(b) and (c)* (the "**Final DIP Order**") if and when

entered, and this Order, the terms of the Interim DIP Order or Final DIP Order, as applicable,

shall govern.

15.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant

to this Order, shall be deemed or construed as an admission as to the validity or priority of any

claim against the Debtors, an approval or assumption of any agreement, contract or lease

pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall

impair the ability of the Debtors, to contest the validity and amount of any payment made

pursuant to this Order.

16.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the

contents of the Motion.

17.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the

contents of the Motion.

18.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), or

otherwise, the terms and conditions of this Order shall be immediately effective and enforceable

upon its entry.

19.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of

the Motion.

K&E 18123813.3

20.	The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

21.	This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

White Plains, New York
Date: _____, 2010

_____
United States Bankruptcy Judge

K&E 18123813.3

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## FINAL ORDER AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND SECTION 503(B)(9) CLAIMS, APPROVING RELATED PROCEDURES, AND GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc. and

certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[2] for

entry of a final order (this "***Order***") and final order (a) authorizing the Debtors to pay certain

Critical Vendor Claims and Section 503(b)(9) Claims, (b) approving related procedures, and

(c) granting related relief; and upon the Brace Declarations; and the Court having found that this

---

[1]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having entered the Interim Order [Docket No. ___]; and the Court having found that no other or further notice need be provided; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "*Hearing*"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that relief requested in the Motion is necessary to prevent immediate and irreparable harm; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.     The Motion is granted on a final basis to the extent set forth herein.

2.     The Payment Procedures, substantially in the form attached to the Motion as **Exhibit C**, are approved in their entirety.

3.     The form of Trade Agreement, substantially in the form attached to the Payment Procedures as **Exhibit 1**, is approved in its entirety.

4.     The Debtors are authorized, but not directed, to pay Critical Vendor Claims in accordance with the Payment Procedures; *provided that* such payments shall not exceed $62 million (the "*Critical Vendor Cap*"). The Debtors' payment of Critical Vendor Claims shall not exceed the Critical Vendor Cap unless otherwise ordered by the Court after notice and a hearing.

2

5.     The Debtors are authorized, but not directed, to pay up to $5 million in Section 503(b)(9) Claims.  Payments made on account of such Section 503(b)(9) Clams shall not count against the Critical Vendor Cap.

6.     The Debtors shall condition payment of Critical Vendor Claims and Section 503(b)(9) Claims upon the execution of a Trade Agreement except as otherwise provided by the Payment Procedures, and the Debtors are authorized to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their sole reasonable business judgment, that it is appropriate to do so.

7.     Regardless of whether a Trade Agreement has been executed, if any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with the trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, product mix, availability, and other programs) in place in the 120 days prior to the Commencement Date (collectively, the "***Customary Trade Terms***"), then (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors and (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made.

8.     If there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition

K&E 18123813.3

obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

9.      Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Critical Vendor or Section 503(b)(9) Claimant.  The Debtors do not concede that any claims satisfied pursuant to this Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims.

10.      In accordance with this Order (or other order of this Court), each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in the Motion are authorized to (a) receive, process, honor and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts solely to the extent the Debtors have sufficient funds standing to their credit with such bank and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on or subsequent to the Commencement Date, and have no duty to inquire otherwise and without liability for following the Debtors' instructions.

11.      The Debtors are authorized to issue postpetition checks or to make additional electronic payment requests with respect to payment of a Critical Vendor Claim in the event prepetition checks or electronic payment requests are dishonored or rejected.

12.      The Debtors shall maintain a matrix summarizing the name of each Critical

Vendor and Section 503(b)(9) Claimant paid on account of their respective claims, the amount paid to each party on account of its respective claim, and a brief description of the goods or services provided by such Critical Vendor or Section 503(b)(9) Claimant, and shall, upon reasonable notice, provide such matrix at least every other week to: (a) the United States Trustee for the Southern District of New York; (b) any professionals retained by the official committee of unsecured creditors appointed in these chapter 11 cases (the "*Committee*"); *provided that* the Committee's professionals shall keep the matrix confidential and shall not disclose any of the information in the matrix to any party, including any member of the Committee, without obtaining prior written consent from the Debtors; and (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; *provided that* such counsel keep the matrix confidential in accordance with the confidentiality provisions of the applicable credit agreements to which the Debtors are party.

13. To the extent that there may be any inconsistency between the terms of the *Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, ( II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364 and (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c)* (the "***Interim DIP Order***") or the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364 and (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c)* (the "***Final DIP Order***") if and when

K&E 18123813.3

entered, and this Order, the terms of the Interim DIP Order or Final DIP Order, as applicable, shall govern.

14.　　Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

15.　　The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

16.　　The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

17.　　Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

18.　　The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

19.　　The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

20.　　This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

White Plains, New York
Date: _____, 2010

_____
United States Bankruptcy Judge

K&E 18123813.3

**EXHIBIT C**

**[PAYMENT PROCEDURES]**

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

   - and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

**PAYMENT PROCEDURES**

On **[TO COME]** (the "***Commencement Date***"), The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[1] each filed a voluntary petition for relief under title 11 of the United States Code (the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale

"**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). On the Commencement Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief* [Docket No. __] (the "**Motion**").[2]

On **[TO COME]**, 2010, the Court entered an order [Docket No. __] (the "**Order**") authorizing the Debtors, in their reasonable business judgment, to pay all or part of certain amounts due and owing to certain Critical Vendors and Section 503(b)(9) Claimants.[3]

To ensure the continued postpetition delivery of goods and services on favorable terms, including credit terms, and facilitate orderly negotiations relating thereto, the Bankruptcy Court approved the procedures set forth herein (these "**Payment Procedures**") for the payment of prepetition claims of certain Critical Vendors and Section 503(b)(9) Claimants the Debtors determine, in their sole discretion based on their sound business judgment, are essential to their ongoing business operations and who agree to, among other things, provide postpetition goods and/or services to the Debtors on Customary Trade Terms (as defined herein).

1. <u>Customary Trade Terms</u>. The Debtors will condition the payment of Critical Vendor Claims and Section 503(b)(9) Claims on the agreement of individual Critical Vendors and Section 503(b)(9) Claimants to supply goods and/or services to the Debtors in accordance with the trade terms at least as favorable as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, product mix, availability, and other programs) in place in the 120 days prior to the Commencement Date (collectively, the "**Customary Trade Terms**") as provided herein.

2. <u>Trade Agreement</u>. The Debtors are authorized, but not directed, to enter into trade agreements with Critical Vendors and Section 503(b)(9) Claimants substantially in the form attached hereto as **<u>Exhibit 1</u>** (each, a "**Trade Agreement**"), which agreements shall constitute a legally binding contractual arrangement among the parties; *provided that* the Debtors may agree to implement such modifications to the form of Trade Agreement the Debtors deem necessary or advisable in the reasonable exercise of their business judgment to obtain Customary Trade Terms from the applicable Critical Vendor or Section 503(b)(9) Claimant. Subject to the Order, the Debtors are authorized to pay Critical Vendor Claims and Section 503(b)(9) Claims in

---

Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2]   Capitalized terms used but not defined herein shall have the meaning set forth in the Motion.

[3]   In the event of any inconsistency between these Payment Procedures and the Order, the Order shall control in all respects.

the event that no Trade Agreement has been executed if the Debtors determine, in their business judgment, that a formal Trade Agreement is unnecessary to ensure such Critical Vendor's continued performance on Customary Trade Terms.

3.      Termination.    All Trade Agreements will terminate upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. Further, if a Critical Vendor breaches its respective Trade Agreement, the Debtors may declare, in their discretion and without further order of the Bankruptcy Court or action by any person or entity, that the respective Trade Agreement is terminated and that payments received by the breaching Critical Vendor or Section 503(b)(9) Claimant on account of such claim will be deemed to have been in payment of then outstanding postpetition obligations owed.  Upon such declaration, the breaching Critical Vendor or Section 503(b)(9) Claimant shall immediately repay the Debtors any payments made to it on account of its Critical Vendor Claim to the extent such payment exceeds postpetition amounts owed, if any, to the Critical Vendor or Section 503(b)(9) Claimant outstanding at that time, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims or otherwise.

4.      Reinstatement.    To the extent a Trade Agreement is terminated on account of breach of the terms or conditions thereof by a Critical Vendor or Section 503(b)(9) Claimant, such terminated Trade Agreement may nevertheless be reinstated as the result of one or more of the following:  (a) after notice and a hearing (following a motion filed by the respective Critical Vendor or Section 503(b)(9) Claimant), the Bankruptcy Court reverses the Debtors' decision to terminate the Trade Agreement for good cause shown that the Debtors' determination was materially incorrect; (b) the Critical Vendor or Section 503(b)(9) Claimant fully cures the underlying default of the Trade Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or (c) the Debtors, in their sole discretion, reaches a commercially acceptable agreement with the breaching party.

5.      Reservation of Rights.    Nothing contained herein, in the Order or as a result of any payment made pursuant thereto, is intended to or should be construed as an admission of the validity, priority or extent of any claim or lien against the Debtors, a waiver of the Debtors' rights to dispute any claim or lien or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve the right to contest any demand for payment made with respect to the subject matter of these Payment Procedures pursuant to the Bankruptcy Code, any order of the Court, or applicable non-bankruptcy law.  Any payment made pursuant to these Payment Procedures is not intended to and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' right to dispute such claim subsequently.

6.      Effect of Acceptance.    Any party who accepts payment from the Debtors pursuant to the relief granted in the Order or these Payment Procedures (regardless of whether or not a Trade Agreement has been executed) shall be deemed to have agreed to the terms and provisions of the Order and these Payment Procedures and shall be deemed to have waived, to the extent so paid, (a) any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and members and any funds and other property held in trust by the Debtors that do not constitute "property of the estate" under section 541 of the Bankruptcy Code and (b) the right to demand a lump-sum payment for amounts

outstanding but not yet payable upon consummation of the Debtors' plan of reorganization.

New York, New York
Dated: _____, 2010

James H.M. Sprayregen, P.C.
Ray C. Schrock
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

4

# EXHIBIT 1

## [FORM OF TRADE AGREEMENT]

# TRADE AGREEMENT

The Debtors (as defined herein) and **[SUPPLIER]** ("*Supplier*") hereby enter into the following trade agreement (this "***Trade Agreement***") dated as of this **[DATE]**.

## Recitals

WHEREAS on **[DATE]** (the "***Commencement Date***"), The Great Atlantic & Pacific Tea Company, Inc. and certain affiliated entities (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Court***").

WHEREAS on **[DATE]**, the Court entered the *Interim Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief* (the "***Critical Trade Order***") [Docket No. ____] authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain suppliers, including Supplier, subject to the terms and conditions set forth therein.[1]

WHEREAS pursuant to the Critical Trade Order, the Court approved certain payment procedures, substantially in the form attached to the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, Approving Related Procedures, and Granting Related Relief* [Docket No __] as **Exhibit C** (the "***Payment Procedures***").

WHEREAS the Debtors and Supplier (collectively, the "***Parties***") agree to the following terms as a condition of payment on account of certain prepetition claims Supplier may hold against the Debtors.

---

[1]   Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Trade Order.

## **Agreement**

1.     The Parties hereby agree that Supplier is a [**Critical Vendor/Section 503(b)(9) Claimant**] (as defined in the Critical Trade Order).

2.     The balance of Supplier's aggregate [**Critical Vendor Claims/Section 503(b)(9) Claim**] is, $[•] (the "***Agreed Vendor Claim***").

3.     Following execution of this Trade Agreement, the Debtors will pay Supplier $[•] on account of the Agreed Vendor Claim.  The Payment will be applied to invoices previously received by the Debtors on account of the Agreed Vendor Claim as such invoices become due and payable.

4.     Supplier shall supply goods **[and/or]** services to the Debtors based on the following "***Customary Trade Terms***:" the trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, product mix, availability, and other programs) in place in the 120 days prior to the Commencement Date.

5.     Supplier agrees that it shall not require a lump-sum payment upon confirmation of a plan in the Debtors' bankruptcy cases on account of any outstanding administrative claims Supplier may assert.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.

6.     Supplier will not separately seek payment from the Debtors on account of any prepetition claim outside the terms of the Critical Trade Order, this Trade Agreement, or a confirmed plan in the Debtors' bankruptcy cases, except as each of the foregoing may be modified by further order of the Court.

7.     The Parties further agree, acknowledge and represent that:

(a)     the Parties have reviewed the terms and provisions of the Critical Trade

2

Order, the Payment Procedures, and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Critical Trade Order;

(b)     any payments made on account of the Agreed Supplier Claims shall be subject to the terms and conditions of the Critical Trade Order and the Payment Procedures, including any orders of the Court granting the relief requested in the Critical Trade Order on a final basis, as applicable

(c)     if Supplier refuses to supply goods or services to the Debtors as provided herein or otherwise fail to perform any of their obligations hereunder, the Debtors may exercise all rights and remedies available under the Critical Trade Order, the Bankruptcy Code, or applicable law;

(d)     the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

8.     Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, Supplier agrees to hold in confidence and not disclose to any party: (a) any and all payments made by the Debtors pursuant to this Trade Agreement; (b) the terms of payment set forth herein; and (c) the Customary Trade Terms (collectively, the "Confidential Information"); *provided that* if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Debtors with prompt written notice so that the Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided further that* if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

K&E 18123813.3

9.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[The Great Atlantic & Pacific Tea Company, Inc.]**          **[SUPPLIER]**

_____          _____

# EXHIBIT D

## [REDACTED FORM OF PAYMENT PROTOCOL]



*Critical Vendor Payment Approval Process*

## Business Process: Critical Vendor Payment Approval Process

### Objective
- Understand the purpose of the proposed Critical Vendor Program
- Determine if a supplier meets the criteria
- Understand the payment approval process for paying a Critical Vendor

### Critical Vendor Schedule
- The Company has already identified and prepared a listing of specific, pre-qualified critical vendors.  All discussions with these pre-qualified parties regarding critical vendor status or payments will be conducted or directed by [Party A], [Party B], the executive team and its advisors.

- All requests for "critical vendor" treatment for vendors not on the above pre-qualified critical vendor schedule must be routed through the Turnaround Command Center, including the individuals set forth on Exhibit A, and the Company's advisors, with a completed request form (see attached).

### Supplier Criteria for Additional Critical Vendors
There are several tests or criteria for determining if a vendor can be paid for its pre-petition claims under the Critical Vendor Motion.  In addition, the supplier must commit to continuing to supply goods or services under normal credit terms (i.e. not pre-payment or cash on delivery).

Criteria for such treatment generally include:

- The supplier supplies goods or services not under contract;
- The goods or services are only available from that vendor;
- The cost to switch suppliers is high relative to the claim; and
- A relatively significant increase to costs or decrease to revenue could arise.

## REQUEST FOR CRITICAL VENDOR DESIGNATION

If the supplier has the Company's property in their possession OR the supplier has partially completed a service, please **do not complete this form.**

**Please check the appropriate box:**
☐ NO products/services are under contract
☐ SOME products/services are under contract
☐ ALL products/services are under contract (Contact Merchandising Rep before proceeding.)

## List the Company the Supplier provides goods or services to:

_____

**Please check the scenario(s) applicable to this supplier:**
☐ The supplier is a sole source provider.
☐ The supplier is a Domestic US based company.
☐ Replacement of the vendor would cause the company to incur significantly higher costs and the costs are disproportionate to the claim of the supplier. Additional cost estimate is $_____.
☐ Failure to pay the claim would cause the company to lose sales or future revenues. Explain.

| | |
|---|---|

## Supplier Information

| | |
|---|---|
| Supplier: | |
| Supplier Contact Name: | |
| Supplier Phone Number: | |
| Supplier Fax Number: | |
| Supplier Email Address: | |
| Supplier's Preferred Communication Method: | ☐ Fax ☐ E-mail ☐ Phone |

**Email your requests for critical vendor designation to [Party A] and copy the Turnaround Command Center (turncc@aptea.com).**

[REDACTED]

**Store Operations Vendor Response Process**
Before any vendor related issues are elevated for critical vendor consideration, Store Managers or the Manager in Charge ("MIC") will attempt resolution "in the ordinary course of business." If a vendor issue cannot be resolved at the store level and is determined to be the result of the Company's bankruptcy filing, the issue is presented to the Company's Store Operations Center and Merchandising Group for consideration.

Below is a summary of the steps that occur before a vendor issue is elevated to the Turnaround Command Center for consideration as a potential critical vendor.



## PROCESS OVERVIEW

**Paying a Critical Vendor – Life Cycle**
Following designation as a vendor eligible for critical vendor treatment, all proposed payments must be submitted for review and approval at the Turnaround Command Center in the process set forth below. All proposed transactions must be approved by the applicable Company personnel identified on Exhibit A, after review by Huron and Kirkland & Ellis. All transactions involving payments in excess of $100,000 on a pre-petition claim <u>require executive approval</u> by Mr. Frederic F. Brace, Chief Restructuring Officer. <u>All</u> payments require an executed agreement setting forth the terms. Any exceptions from these requirements require authorization from the applicable individual set forth on Exhibit A and Mr. Brace, after review by Huron and Kirkland & Ellis, before any payment can be made. <u>(Also See Flowchart)</u>:

1. Request
2. Evaluate
3. Negotiate
4. Pay

| Request For Paying Supplier | Evaluate Request Information | Negotiate Supplier Settlement | Pay Approved Amount |
|---|---|---|---|

### *Request*
All request forms must be funneled through the approval process. In a Chapter 11 situation, authorization for paying any pre-petition claims must adhere to this process to ensure compliance with the court order.

### *Evaluate*
The evaluation will require a joint effort by the Requestor, Merchandising, Accounts Payable and the Turnaround Command Center. While time is of the essence, the appropriate information must be gathered to gain approval. For example, is the amount of money the supplier believes it is owed the same as the amount in the payables system? In addition, various alternatives will be considered.

### *Negotiate*
After evaluating the request, a verbal or written offer will be made to the supplier for settling pre-petition claims in exchange for continued supply of goods or services under normal terms. If agreed upon, an executed contract is required defining the exact terms of the agreement. Kirkland & Ellis will advise the company on the settlement agreements.

### *Pay*
Assuming a settlement in principle is reached by the parties, the material terms must be approved by the parties identified above. Rigorous documentation of the entire chain of events will be recorded and filed for validation by interested parties.

**Critical Vendor Payment Life Cycle**          **Critical Vendor Payment Process**



| | | |
|---|---|---|
| **REQUEST FOR PAYING SUPPLIER** | 1 | Identify Critical Vendor (certain vendors pre-qualified) |
| | 2 | Send Request to Merchandising and copy the TCC [1] |
| **EVALUATE REQUEST INFORMATION** | 3 | Merchandising evaluates Request and Makes Recommendation for Critical Vendor — Merchandising compares against Critical Vendor List and reviews 503(b)(9) amount |
| | 4 | TCC assesses Merchandising's Recommendation and approves Critical Vendor designation |
| **NEGOTIATE SUPPLIER SETTLEMENT** | 5 | Merchandising, or others approved by TCC negotiates verbal settlement with supplier |
| | 6 | TCC reviews settlement for approval / disapproval & obtains confirmation and documentation from supplier — Settlement must obtain approval from applicable Company personnel per Exhibit A and Mr. Brace, as required, after review by Huron and K&E |
| **PAY APPROVED AMOUNT** | 7 | TCC sends negotiated payment amount to A/P |
| | 8 | TCC communicates final settlement to Requestor |
| | 9 | TCC updates tracking database |

Footnote:

(1) Email your requests for critical vendor designation to [Party A] and copy the Turnaround Command Center (turncc@aptea.com).

**Critical Vendor Payment Process**

1. **Requestor identifies Potential Critical Vendor**

   In order for a supplier to be considered a Critical Vendor, the following criteria must be considered:

   - The purchase is not pursuant to a contract, and
   - The supplier is a sole source provider, or
     - I. The Company must be able to demonstrate the cost to switch suppliers is high relative to the claim, or
     - II. The Company must be able to demonstrate a significant increase to costs or a significant decrease in revenue.

   Once you have determined that a supplier with a pre-petition claim is a Critical Vendor based on the criteria above, you must complete the "Request To Pay a Critical Vendor" form. All requests forms must be funneled through the approval process.

2. **Requestor sends Completed Request for Critical Vendor Designation to Merchandising**

   The Requestor must provide the form to the appropriate Merchandising associate.

3. **Merchandising Evaluates Request and Makes Recommendation to Turnaround Command Center**

   Merchandising will evaluate the request to validate that the supplier meets applicable criteria. In addition, the review will include assessing the importance of the product/service and a comparison of Supplier versus Accounts Payable records of outstanding debt. After the review process is complete, Merchandising will document the findings of its analysis, and send it to the Turnaround Command Center.

4. **Turnaround Command Center Assesses Merchandising's Recommendation**

   The Turnaround Command Center will assess Merchandising's findings and determine if the vendor should be considered a Critical Vendor.

5. **Merchandising, or others approved by the TCC, negotiates verbal settlement agreement in principle with Supplier**

   If the vendor is designated a Critical Vendor, a pre-petition settlement amount may be negotiated by Merchandising. The designated negotiator will work with the supplier to agree on a pre-petition claim settlement. The settlement's material terms must be approved by the applicable individual set forth on Exhibit A after review by Huron and Kirkland & Ellis. The material terms must include:

   (1) Amount of claim to be paid;
   (2) Timing and payment (e.g. ordinary course);
   (3) Trade terms received/confirmed; and
   (4) Other.

6. **Turnaround Command Center reviews negotiated settlement, approves/disapproves and obtains written confirmation from Supplier for approved settlements**

   After receiving the updated Critical Vendor Recommendation form from the designated negotiator, Turnaround Command Center will review the draft settlement agreement and approve/disapprove. If the settlement is approved, the Turnaround Command Center will confirm the details of the agreement with the supplier in writing. The supplier must then acknowledge and confirm agreement in writing. If the settlement is disapproved, the

Turnaround Command Center will notify the designated negotiator to continue negotiations or take the appropriate next steps.

7. **Turnaround Command Center hands off negotiated payment amount to Accounts Payable**

After the Turnaround Command Center receives written confirmation of the negotiated settlement from the supplier and the requesting party has completed the Executive Approval Form (attached as Exhibit B), the Turnaround Command Center will transmit the completed Executive Approval Form to [Party A] and [Party B] in Accounts Payable.  Upon receipt of the completed Executive Approval Form, Accounts Payable will transmit payment per the agreement.

8. **Turnaround Command Center follows up with Stakeholders**

Turnaround Command Center will e-mail the executed settlement document to the original Requestor and Merchandising.

9. **Turnaround Command Center updates Critical Vendor payment tracking database**

Turnaround Command Center will update the tracking database with the check number, check amount, date issued, etc.

# CRITICAL VENDOR PAYMENT - EXECUTIVE APPROVAL MATRIX

**Critical Vendor Payment**
**Approval Matrix**

| Area | Person | Title | Approval Level | Excess Approval |
|------|--------|-------|----------------|-----------------|
| Merchandising | [Party A] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| Supply Chain | [Party A] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| Marketing | [Party A] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| Store Services | [Party B] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| Finance | [Party C] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| Legal | [Party D] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| HR | [Party E] | [REDACTED] | $ 100,000 | Frederic F. Brace |
| IT | [Party F] | [REDACTED] | $ 100,000 | Frederic F. Brace |

# EXHIBIT B
# CRITICAL VENDOR PAYMENT - EXECUTIVE APPROVAL FORM

Vendor Name: _____

Designated as Critical Vendor:   Yes / No

Company Contact Person: _____

Phone #: _____

---

**CRITICAL VENDOR PAYMENT**

Amount of Pre-Petition Claim to be Paid:   ------------>   $ _____
*(amount to be paid)*

Payment Date:   ------------>   _____

Open A/P Balance as of Petition Date:   ------------>   $ _____

Trade Terms Received:   ------------>   _____

Other:   ------------>   _____

---

Confirm Huron / Kirkland & Ellis Review:   Yes / No

**Requestor** x _____   **Date** _____

**Designated Area Lead** x _____   **Date** _____

**Executive** x _____   **Date** _____
(for over payments over $100,000)

**Attach the executed agreement or provide executed waiver**