James H.M. Sprayregen P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

    - and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF FREDERIC F. BRACE
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION
CLAIMS OF CRITICAL VENDORS AND SECTION 503(B)(9) CLAIMS,
APPROVING RELATED PROCEDURES, AND GRANTING RELATED RELIEF**

I, Frederic F. Brace, hereby declare under penalty of perjury:

1. I am the Chief Administrative Officer and Chief Restructuring Officer of The Great Atlantic & Pacific Tea Company, Inc., one of the above-captioned debtors and debtors in possession.  I offer this declaration to place before the Court evidence in support of the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain*

*Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief* filed contemporaneously herewith (the "***Critical Trade Motion***").[1]

2. I served as a director of A&P from August 4, 2009 until my appointment as Chief Administrative Officer in August 2010. I was appointed as Chief Restructuring Officer of A&P on December 9, 2010. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age and competent to testify.[2] I am authorized to submit this Declaration on the Debtors' behalf. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information learned from my review of the relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called as a witness, I would testify consistent with the facts as set forth herein.

3. The Debtors rely on certain vendors essential to their ongoing business operations (collectively, the "***Critical Vendors***") to provide essential goods and services, to keep their stores stocked with essential items, including dairy, eggs, fresh fruit, iconic brand name food products, and other high turnover inventory. In addition, the Debtors operate 22 beer, wine, and liquor stores that rely primarily on inventory supplied by regional or national distributors of alcoholic beverages.

4. The Debtors receive approximately 70 percent of their goods from C&S Wholesale Grocers, Inc. ("***C&S***") pursuant to a long term contract. As a result, the Debtors do

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Trade Motion.

[2] My background and qualifications are set forth more fully in the *Declaration Of Frederic F. Brace (A) In Support Of Debtors' Chapter 11 Petitions And First Day Motions And (B) Pursuant To Local Rule 1007-2*, filed contemporaneously herewith.

not seek authority to pay any prepetition amounts that may be owing to C&S by the program set forth in the Critical Trade Motion.

5.  The remaining essential products and services on which the Debtors rely come from vendors who conduct business with the Debtors in a classic trade vendor sense—*i.e.*, on an invoice by invoice basis without long-term performance requirements. I believe that the Debtors' business could not function, let alone generate the cash required to implement a restructuring plan, if the Debtors were cut-off from inventory supplied by their Critical Vendors. It is also my opinion that the Debtors' operations could be materially impaired if they were denied access to trade credit from these parties, and the Debtors could be subject to immediate and perhaps irreparable harm without the limited ability to honor certain prepetition obligations provided by the Critical Trade Motion.

6.  Recognizing the importance of supply chain stability to their overall restructuring, the Debtors undertook an extensive process to identify those truly "mission critical" vendors and to seek an appropriate level of relief through a limited critical vendor program. This planning has proven to be essential. As is typical in many of the distressed situations in which I have been involved, many vendors have been increasingly unwilling to extend trade credit.

7.  Anticipating this, the Debtors were careful to build in processes to ensure supply chain stability at the outset of their in-court restructuring efforts. This process involved both the identification of the Debtors' major "mission critical" business partners, as well as building processes to ensure that any payments would be made only for an appropriate *quid pro quo*. To this end, the Debtors designed, structured, and began to execute a mechanism under which a core, centralized high-level team—guided by turnaround professionals and subject to my personal supervision—will authorize payment only to those suppliers critical to the Debtors'

3

K&E 18123960.4

operations and subject to the vendors' own obligations to provide Customary Trade Terms. This process was developed through meetings and continuous dialogue between the Debtors' senior management, Huron Consulting Group, and Kirkland & Ellis LLP.

8. To ensure the Debtors' ability to transition their supply chain into chapter 11, the Debtors, in consultation with their advisors, developed their proposed critical trade program—through which the Debtors both identified vendors to be candidates for the program and developed an internal process to maintain significant control over the negotiation and execution of any agreements related to this process.

9. The Debtors focused on four primary items to develop and implement their proposed critical vendor program.

- First, the Debtors, and their professionals rigorously scrutinized more than 7,600 open accounts (covering more than 5,000 separate vendors) and approximately $212 million in trade payables. Areas of focus included:

  - the goods or services at issue, the Debtors' ability to find alternative sources of supply, and the potential disruption or lost revenues while a supplier was re-sourced;

  - whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

  - the Debtors' ability to compel contractual performance.

  - Through this process, the Debtors identified a highly select group of vendors holding approximately $62 million in prepetition claims (approximately 63 of such vendors may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code) absolutely essential to operations.[3]

- Second, the Debtors designated a core group of hand-picked senior executives, with the guidance and supervision of their professionals, to review, assess, and potentially authorize payment to a Critical Vendor after negotiating an acceptable *quid pro quo*.

- Third, the Debtors and their professionals implemented a detailed protocol to route all

---

[3] The Debtors reserve all rights to revise, remove, update, or supplement those parties identified as Critical Vendors during their chapter 11 cases.

4

requests for "Critical Vendor treatment" through this core group and to educate lower-level procurement, payables, and operations personnel of the process.

- Fourth, the Debtors incorporated a mechanism to provide information on actual Critical Vendor payments on a confidential basis to interested parties such as the United States Trustee, their proposed postpetition secured lenders, and the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases.

10. I believe this deliberative process, combined with the high level of executive and professional oversight built into the Debtors' Payment Protocol, justifies the relief requested herein. To be clear, vendors with long term contracts are not part of the Debtors' proposed program. Instead, the Debtors intend to enforce their rights in court if such vendors use these chapter 11 filings or the Debtors' financial condition as an excuse to suspend shipments, modify payment terms, or otherwise impair the Debtors' rights.

A. **Understanding and Identifying Potential Critical Vendors**

11. Much of the Debtors' inventory is perishable in nature. Moreover, the Debtors, like all supermarket operators, must keep a tremendous variety of inventory readily available to satisfy customer demand. The Debtors therefore experience significantly higher rates of inventory turnover when compared to retailers in other industries. On average, the Debtors grocery stores will sell approximately 25,000 different stock-keeping units in a given week.[4] Convenience stores, by comparison, will typically offer less than 1,500 SKUs—clothing retailers even less. As a result, the Debtors must constantly re-stock food, produce, dairy, beverage, and other products as a function of both perishability and customer demand—even for products that are frozen or otherwise shelf-stable. Simply put, the Debtors shelves will run empty without a near-continuous stream of inventory, and the Debtors cannot function without inventory to sell.

---

[4] Stock-keeping units (or "*SKU*") are commonly used metrics for classifying and tracking separate inventory types in the retail industry. For example, 24 can packages of America's Choice Diet Cola™, 12 can packages of America's Choice Diet Cola™, and 6 can packages of America's Choice Diet Cola™ are each assigned unique SKUs in the Debtors' inventory management system.

5

12. With the assistance of their advisors, the Debtors spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and/or impair going-concern viability. In this process, the Debtors considered a variety of factors, including:

- customer purchasing trends;

- whether a vendor is a sole- or limited-source or high-volume supplier for branded and "in demand" inventory due to particular local, regional, or national customer preferences;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or other customer preferences prevent the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

K&E 18123960.4

The Debtors do not, by the Critical Trade Motion, seek to honor prepetition obligations arising under enforceable, long-term contractual relationships.

13. In terms of dollars, as of the Commencement Date, the Debtors believe they owe the Critical Vendor candidates approximately $62 million, including claims totaling approximately $55 million that may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code. The $62 million of requested Critical Vendor relief is approximately 29 percent of the Debtors' accrued trade payables of $212 million.[5]

14. These potential Critical Vendors identified to date generally include the following: (a) DSD Merchandisers; (b) Private Label Suppliers; (c) Advertisers and Printers; and (d) Miscellaneous Service Providers (each as defined below).

15. **DSD Merchandisers** are those entities that directly supply the Debtors with a variety of branded and non-branded products including baked goods, frozen foods and desserts, carbonated beverages and water, cookies and salty snacks, ethnic foods, as well as beer, wine, and liquor. The DSD Merchandisers also include certain suppliers of fresh and perishable foodstuffs, including suppliers of meat, poultry and deli products, as well as eggs and dairy products. Inventory supplied by the DSD Merchandisers is typically high turnover, requiring weekly and, in many instances, daily deliveries directly to the Debtors' stores.

16. The Debtors do not hold long term supply agreements with the DSD Merchandisers. Instead, inventory is typically supplied on an order-by-order, week-by-week, and even day-by-day basis. In many instances, the Debtors cannot obtain the branded products supplied by the DSD Merchandisers from third party suppliers. The DSD Merchandisers include beer, wine, and liquor vendors. It is my understanding that such parties may hold unique legal or

---

[5] The Debtors reserve all rights to contest the extent, validity, or priority of all such claims.

regulatory rights, under which the Debtors' failure to pay a certain vendor can trigger cash on delivery demands by all similarly situated vendors in that jurisdiction. I believe this result could materially weaken the Debtors' operations in this segment.

17. The **Private Label Suppliers** are those entities that provide the Debtors store-brand or "private label" merchandise across their separate banners, under brands including America's Choice, Via Roma, Hartford Reserve, and Green Way. The Debtors enjoy significant margins on these products and believe these goods retain a loyal customer following based on their reputation for high quality and affordability. As with merchandise acquired from the DSD Merchandisers, the Debtors do not have long term supply relationships with the Private Label Suppliers. In many instances, private label products provide the Debtors with higher margin sales when compared with alternative, branded inventory. As with merchandise acquired from the DSD Merchandisers, however, the Debtors do not have long term supply relationships with the Private Label Suppliers, and the Debtors cannot quickly re-source their private label manufacturing, packaging, and distribution needs.

18. The **Advertisers and Printers** are those entities that provide the Debtors with, for example, advertising materials (including store coupons, in-store tags, print media displays, and related goods) and related support services. I believe the Debtors depend on the advertising materials (including store coupons, in-store tags, print media displays, and related goods) and support services supplied by the Advertisers and Printers to efficiently conduct marketing operations. These relationships are not governed by long term contracts. Instead, products and services are provided on an order by order or project by project basis, and it is my understanding that the Debtors' agreement with a major Advertiser and Printer is also terminable at will.

K&E 18123960.4

19. The **Miscellaneous Service Providers** that the Debtors have identified as potential critical vendors consist of those entities that provide certain "on-site" services essential to the Debtors' stores and facilities. These service providers include vendors who perform services such as refrigeration repair and maintenance, compression, plumbing, electrical, janitorial and pest-control services. These services must be performed on a regular and, in certain cases, daily basis. While the amounts owed to such vendors may be small in many instances, the continued goodwill and trade support of these vendors cannot be underestimated. In many cases, these services are performed by local or regional service providers who are intimately familiar with the Debtors' particular store locations or facilities. As a result, it could be prohibitively difficult to replace such vendors on a timely basis and without risking substantial disruption to the Debtors' operations given the Debtors' need to use many of these service providers on a 24/7 basis.

20. Finally, as explained in the Critical Trade Motion, the Debtors suspect that, as the chapter 11 cases develop, they will become aware of additional suppliers and service providers that need to be classified as critical vendors and the Debtors will have to respond to this class of vendors on an expedited and emergency basis. Accordingly, the Debtors will also be seeking relief with respect to this class of vendors in the motion.

B. **The Payment Protocol**

21. Following their prepetition identification of their Critical Vendor candidates, the Debtors and their professionals developed and implemented a comprehensive postpetition process to examine, review, and challenge any payment requested on account of a Critical Vendor or Section 503(b)(9) Claim. The Debtors' Payment Protocol, which is attached to the

9

Critical Trade Motion as **Exhibit B**, can be generally summarized as follows:[6]

- Requests for "Critical Vendor" treatment (i.e., any payment on account of prepetition claims) will be routed through a centralized control center staffed by specifically-identified executives and advisors, including Huron Consulting Group and Kirkland & Ellis LLP.

- All aspects of any proposed payment to a Critical Vendor will be scrutinized for, among other things: (a) the amount of payment at issue; (b) the terms offered by the particular vendor; and (c) the business need for the goods or services at issue.

- Material business terms (including proposed payments) require written approval by specifically-designated executives, following review and oversight by the Debtors' professionals.

- All proposed payments over $100,000 require my personal approval.

- All proposed payments must be documented pursuant to an executed Trade Agreement in accordance with the Payment Procedures, with any specific exception from this requirement to be made with my express approval.

- Payment may only be physically executed by one, specifically-designated member of the Debtors' management when the Payment Protocol has been completed and upon presentation of completed documentation.

22. And although the Debtors have effectively "pre-screened" certain vendors who have satisfied the criteria for "Critical Vendor treatment," the Debtors are keenly aware they must be prepared to address new or additional exigencies should they emerge—particularly given the size and scope of their operations. Thus, the Debtors' Payment Protocol includes specific processes by which specific vendors may be designated as "Critical Vendors" on a case-by-case basis. But, again, this process will be routed through the Debtors' centralized control center with executive level of approvals required—in addition to the approvals required for any vendor ("pre-screened" or otherwise) to receive payment on account of a prepetition claim.

---

[6] The Debtors reserve all rights to amend, supplement, revise, or modify the Payment Protocol in their reasonable business judgment.

23. The Debtors have educated senior personnel (i.e., those individuals tasked with engaging or screening such vendors) on their Payment Protocol prior to the Commencement Date, and are also educating "rank and file" personnel on critical vendor issues. But, at the end of the day, the "faucet" of Critical Vendor dollars will be controlled by a core group of executives operating under significant professional oversight and my ultimate control, including the experience and familiarity I bring to the in-court restructuring process.

C.   **Flow of Information**

24. The Debtors understand that it is important to keep third parties, like the United States Trustee of the Southern District of New York (the "*Trustee*") and the Unsecured Creditors' Committee and its professionals, in the loop as to the status of critical vendor claims and payments.

25. With that in mind, the Debtors have developed procedures for giving notice to all appropriate third parties with regard to critical vendor issues. To that end, the Debtors will track (a) the name of each Critical Vendor and Section 503(b)(9) Claimant paid on account of its respective claim, (b) the amount paid to each party on account of its respective claim, and (c) a brief description of the goods or services provided by such Critical Vendor or Section 503(b)(9) Claimant. *Second*, the Debtors will provide updates on such payments, as requested, to the United States Trustee for the Southern District of New York and any professionals retained by the unsecured creditors committee appointed in these chapter 11 cases, subject to customary confidentiality restrictions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 12, 2010

Respectfully submitted,

/s/ *Frederic F. Brace*
Frederic F. Brace
Chief Administrative Officer and Chief Restructuring Officer, The Great Atlantic & Pacific Tea Company, Inc.,