James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

   - and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THEIR EXISTING CASH
MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS,
(B) MAINTAIN EXISTING INVESTMENT PRACTICES, (C) CONTINUE
INTERCOMPANY TRANSACTIONS AND (D) PROVIDE POSTPETITION
INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY**

The Great Atlantic & Pacific Tea Company, Inc. ("*A&P*") and certain of its affiliates, as debtors and debtors in possession (collectively, the "*Debtors*"), [1] file this motion (the "*Motion*") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, authorizing the Debtors to (a) continue using their existing cash management system, bank accounts and business forms, (b) maintain their existing investment practices, (c) continue performing ordinary course intercompany transactions and (d) provide postpetition intercompany claims administrative expense priority. In support of the Motion, the Debtors submit the Declaration of Frederic F. Brace, Chief Administrative Officer and Chief Restructuring Officer of The Great Atlantic & Pacific Tea Company, Inc., in Support of First Day Pleadings (the "*Brace Declaration*"). In further support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

K&E 18124426

## Jurisdiction

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this Court under 28 U.S.C. § 1408.

3. The statutory bases for the relief requested herein are sections 345, 363, 364, 503 and 507 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## Background

4. On the date hereof (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of their chapter 11 cases, and no official committees have been appointed.

5. As set forth more fully in the Brace Declaration, the Debtors are one of the nation's leading food and drug retailers. The Debtors operate 395 supermarkets, combination food and drug stores, liquor stores, and limited assortment food stores across eight Northeastern states and the District of Columbia.

6. In the twelve months ended September 11, 2010, the Debtors reported revenues of $8.4 billion. As of September 11, 2010, the Debtors reported total assets of $2.5 billion and liabilities of $3.2 billion.

7. The Debtors currently employ approximately 41,000 employees. Approximately 95 percent of the Debtors' employees are covered by collective bargaining agreements, and approximately 68 percent of the Debtors' employees are employed on a part-time basis.

K&E 18124426

## The Cash Management System, Business Forms and Investment Practices

**A.      Description of the Debtors' Cash Management System**

8.      As described in the Brace Declaration, the Debtors utilize an integrated, centralized cash management system, in the ordinary course of business, to collect, transfer, disburse and invest funds generated by their operations (the "***Cash Management System***").  The Debtors maintain current and accurate accounting records of all daily cash transactions with third parties and by and between Debtor entities.

9.      The Cash Management System is specifically tailored to meet the Debtors' operating needs as an operator of six supermarket chains and other retail food businesses — enabling the Debtors to centrally control and monitor corporate funds and available cash, invest excess cash, comply with the requirements of their financing agreements, reduce administrative expenses and obtain accurate account balances and presentment information.  Maintaining the Cash Management System in its current state is crucial to the Debtors' operations given the significant volume of cash transactions managed through the Cash Management System every day.

10.      Given the substantial economic scale and geographic reach of the Debtors' business operations, any disruption to the Cash Management System would unnecessarily disrupt the Debtors' complex day-to-day operations and thereby impede the prospects of a successful reorganization.

K&E 18124426

## B.    The Debtors' Bank Accounts and Flow of Funds

11.    The Cash Management System is comprised of approximately 57 bank accounts at various financial institutions   (the "***Banks***")[2] primarily to accommodate different business divisions and to collect, organize and track various forms of customer receipts (collectively, the "***Bank Accounts***").[3]   The Cash Management System is designed to effectively manage the inflow of various forms of receipts from the Debtors' broad customer base, and accommodates the Debtors reliance upon third-party providers who process customer payments or other receipts.    It is critical that the Cash Management System remain intact to ensure seamless customer experiences and continued collection of revenues for the Debtors' estates.

12.    Approximately $70 million to $80 million flows through the Cash Management System on a daily basis.  As part of their daily operations, the Debtors collect cash, checks, wire payments, and credit card payments from their supermarket operations and related retail food operations.  This revenue is deposited into a series of deposit accounts (the "***Deposit Accounts***"), which are designated by (a) type of receipts (e.g., credit card receipts, pharmacy receipts, lottery

---

[2]     The Debtors' Banks include: Bank of America, N.A. ("***Bank of America***"), Capital One Financial Corporation ("***Capital One***"), Citibank ("***Citibank***"), Double Rock Corporation ("***Double Rock***"), The Goldman Sachs Group, Inc. ("***Goldman Sachs***"), JPMorgan Chase Bank ("***JPMC***"), Lake Region State Bank ("***Lake Region***"), OneUnited Bank ("**OneUnited**"), PNC Bank ("***PNC***"), Valley National Bank ("***Valley National***"), Wells Fargo Bank, N.A. ("***Wells Fargo***"), and Wells Fargo Heritage ("***Wells Fargo Heritage***").

[3]     As part of entering into the certain credit agreement to secure an $800 million debtor-in-possession financing facility (the "***DIP Facility***"), the Debtors agreed to implement certain modifications of their Cash Management System.  The modifications of the Cash Management System, as more fully described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and (B) to Utilize Cash Collateral Pursuant to  11 U.S.C. §§ 361, 362, 363, and 364; and (II)Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (C)*, enhance the safety and transparency of certain Debtors' Bank Accounts.  The increased oversight of the Debtors' operations and finances from their postpetition secured lenders will provide the Court with additional assurance that the Debtors' management of their finances will be prudent and maximize the value of the Debtors' estate for the benefit of all creditors/stakeholders

proceeds, receipts for beer, wine and spirits sales, etc.), (b) brand of supermarket/store (e.g., A&P, SuperFresh, Waldbaum's, etc), and (c) geographic location.

13.     Before the end of every business day, the Debtors transfer the funds in the Deposit Accounts--either through wire payments, Automated Clearing House payments ("**ACH Payments**"), or zero-balance accounts ("**ZBAs**")--into a main concentration account (the "**Main Concentration Account**") at JPMC.   The Debtors seek to maintain a balance of approximately $150,000 in the Main Concentration Account at the end of every business day. The Debtors use the funds in the Main Concentration Account to fund their ongoing operations via a series of disbursement accounts (the "**Disbursement Accounts**").   The Disbursement Accounts are designated by type of disbursement (e.g., payroll, accounts payable, employee medical benefits, etc.)

14.     At the end of the business day, the Debtors use any excess cash (a) to pay down their loans (including their revolving line of credit (the "**Revolver**") provided for in the Amended and Restated Credit Agreement with Banc of America Securities LLC and Bank of America, N.A. as the co-lead arranger) and (b) to invest in certain money market accounts (the "**Money Market Accounts**").   During the Fiscal Year 2010, the average aggregate balance in the Money Market Accounts has been approximately $52 million.   If the ending balance for the Main Concentration Account is negative, the Debtors borrow the difference on the Revolver.

15.     A list of the Bank Accounts is attached hereto as **Exhibit C**.   The Debtors' Bank Accounts and the transfer of funds through the Cash Management System are described below and illustrated in the flow chart attached hereto as **Exhibit D** and incorporated by reference herein.

    a.      **Main Concentration Account.**  The focal point of the Cash Management System is the Debtors' Main Concentration Account (Account No.

[xxx7436]) at JPMC, which serves as the ultimate collection point for all funds moving through the Cash Management System, except for funds in the Standalone Accounts (defined below). Over the last three months, the average balance in the Main Concentration Account was approximately $870,000.

b. **Deposit Accounts.** The Debtors maintain a series of Deposit Accounts to collect a wide range of receipts from the Debtors' operations. As explained above, receipts are deposited into the Deposit Accounts based on the following characteristics: (a) type of receipts (e.g., credit card receipts, pharmacy receipts, receipts for beer, wine and spirits sales, etc.), (b) brand of supermarket/store (e.g., A&P, SuperFresh, Waldbaum's, etc), and (c) geographic location. Certain of these accounts, specified below, also disburse funds used in operations with lottery organizations, Coinstar, Inc. ("*Coinstar*"), transit authorities, and credit card companies, among others.

i. *Bank of America Office Account* (Account No. [xxx4381]). Revenue generated from the Debtors' Pathmark pharmacy operations is deposited in two zero-balance accounts ("*ZBAs*") (Account Nos. [xxx0681] and [xxx3938]). Funds in these ZBAs are automatically swept into the Bank of America Office Account on a daily basis. Also, the State lottery organizations in New York and Connecticut periodically debit their share of lottery sale proceeds from a third account (Account No. [xxx8641]) under the Bank of America Office Account.

ii. *Bank of America Consolidated Lockbox Account* (Account No. [xxx3973]). The Debtors maintain five lockbox accounts at Bank of America (Account Nos. [xx26], [xx30], [xx34], [xx49], and [xx53]) that collect miscellaneous payments, such as sublease rental income. The lockbox accounts provide a secure and convenient collection process for business customer's checks, ACH Payments and wire transfers. Bank of America processes deposits in these lockbox accounts and then transfers available funds to the Bank of America Consolidated Lockbox Account.

iii. *Bank of America NY, NJ, CT A&P Stores Account* (Account No. [xxx2570]). Funds are swept into this account from five ZBAs related to the Debtors' stores in New York, New Jersey and Connecticut, which include A&P Cafeteria, Waldbaum's, The Food Emporium, Food Basics, and A&P Liquor (Account Nos. [xxx6470], [xxx4915], [xxx4338], [xxx1880], and [xxx4397]). Also, the Debtors use this account to fund a separate account which the New York Transit Authority periodically debits to collect its share of proceeds from transit card sales (Account No. [xxx5474].

7

iv. _Bank of America Best Cellars Account_ (Account No. [xxx16-99]). The Debtors maintain this account to collect revenue from certain of their Best Cellars operations, which sell beer, wine, and spirits.

v. _PNC Bank Best Cellars Account_ (Account No. [xxx6292]). The Debtors maintain this account to collect revenue from their Best Cellars operations, which sell beer, wine, and spirits.

vi. _Capital One Pathmark Stores Account_ (Account No. [xxx1751]). The Debtors maintain this Bank Account as the main deposit account for their Pathmark stores. Also, funds in this account are swept in from a ZBA related to the Coinstar self-service kiosks located in certain Pathmark stores (Account No. [xxx1785]). Specifically, Coinstar collects the coins deposited in the self-service kiosks and deposits a percentage of such funds in the ZBA. Also, State lottery organizations periodically debit their share of lottery sale proceeds from a separate lottery account (Account No. [xxx1777]) under the Capital One Pathmark Stores Account.

vii. _Wells Fargo Deposit Account_ (Account No. [xxx5374]). Revenue generated from the Debtors' Pathmark and Superfresh operations, located in Delaware, Maryland, New Jersey, Pennsylvania, and Washington D.C., are deposited in three ZBAs (including one devoted to Coinstar operations) (Account Nos. [xxx7612], [xxx5286], and [xxx3936]). Funds in these accounts are automatically swept to the Wells Fargo Concentration Account on a daily basis. The Debtors also use the Wells Fargo Concentration Account to replenish a separate account from which funds are disbursed to lottery organizations in Pennsylvania, Delaware, and Maryland (Account No. [xxx1064]).

viii. _JPMC EBT Settlement Account_ (Account No. [xxx2348]). The Debtors maintain this account to collect deposits related to Electronic Benefit Transfer cards (also known as food stamp cards).

ix. _JPMC Credit/Debit A&P Liquor Account_ (Account No. [xxx3248]). The Debtors maintain this account to collect and disburse funds from seven zero-balance credit accounts (Account Nos. [xxx3255], [xxx3263], [xxx3297], [xxx3271], [xxx3289], [xxx3305], and [xxx3213]). The Debtors maintain merchant accounts with several credit card and debit card companies, including, American Express Company, Discover Financial Services, MasterCard Inc, and Visa, Inc. Payments to

8

and from these merchant accounts are disbursed to, and deposited from, the zero-balance credit card accounts.

c.  **Disbursement Accounts.**  The Debtors pay accounts payable, payroll, tax payments, and certain other disbursements primarily through 12 Disbursement Accounts.  Disbursements are made in the form of checks, ACH Payments, wire transfers and ZBAs.

     i.  *Wells Fargo Master Funding Account* (Account No. [xxx6346]).  The Debtors maintain this account to manage all payroll and accounts payable disbursements.  Funds from the Master Funding Account are disbursed through three separate accounts associated with different disbursements: (a) payroll disbursements (Account No. [xxx8274]); (b) accounts payable disbursements via Electronic Funds Transfer ("***EFT***") or Electronic Data Interchange ("***EDI***") (Account No. [xxx6353]); and (c) accounts payable disbursements via checks (Account No. [xxx8255]).

     ii.  *JPMC Bottle Accounts* (Account Nos. [xxx6030] and [xxx6048]).  The Debtors maintain these two accounts (one in New York and one in Connecticut) to pay state redemption authorities proceeds from refundable bottle deposits that are charged on sales of soda, beer and other bottled drinks.

     iii.  *JPMC A&P Bermuda Ltd.* Account (Account No. [xxx9383]).  The Debtors maintain this bank account to fund operating costs at certain foreign affiliate entities.

     iv.  *Lake Region State Bank (Consolidated Returns)* Account (Account No. [xxx5646]).  The Debtors maintain this account to manage non-sufficient funds checks ("***NSF Checks***") provided by customers.  NSF Checks are debited against this consolidation account, which is in turn replenished from the Main Concentration Account.

     v.  *Citibank CIGNA INS* Account (Account Nos. [xxx7048], [xxx7427], and [xxx0178]).  The Debtors maintain these accounts to manage their employees' medical and dependent care flexible spending accounts.

     vi.  *JPMC Tax Account* (Account No. [xxx4891]).  The Debtors maintain this account to manage disbursements to all applicable taxing authorities.

d.   **Standalone Accounts.**  The Debtors maintain several Bank Accounts that are not directly connected to the Main Concentration Account (the "*Standalone Accounts*").

  i.   *Money Market Accounts*.  The Debtors maintain three Standalone Money Market Accounts with Double Rock (Account No. [xxx3511]),[4] Goldman Sachs (Account No. [xxx5715], and Wells Fargo (Account No. [xxx1425]) (the "***Money Market Accounts***"). During the Fiscal Year 2010, the average aggregate balance in the Money Market Accounts has been approximately $35 million.

  ii.   *EPA Trust Account (Account No. [xxx55-00])*.   The Debtors maintain a Standalone Environmental Protection Agency ("***EPA***") trust Account with Valley National Bank to fund remediation work.

  iii.   *Charitable Benefit Accounts*.   The Debtors maintain three Standalone Accounts with JPMC and PNC Bank to fund charitable disbursements for certain pension benefits (Account No. [xxx8336]), certain employee benefits (Account No. [xxx5202]), and certain charitable donations to employees suffering through severe hardships.

  iv.   *Marketing Account*.   The Debtors marketing department administers a Standalone Account to manage certain marketing-related projects (Account No. [xxx3712]).

e.   **Accounts to be Closed.**  The Debtors are in the process of closing several Deposit Accounts and Disbursement Accounts at the Bank of New York. The Deposit Accounts are scheduled to close by the end of December 2010 and the Disbursement Accounts are scheduled to close by January 2011.

## C.   Intercompany Claims and Inter-Debtor Transactions

16.   In the ordinary course of business, the Debtors maintain business relationships with their Debtor and non-Debtor affiliates, including foreign affiliates, which result in

---

[4]   The Double Rock Money Market Account recently failed to maintain a one dollar-a-share net asset value and is being liquidated.

intercompany receivables and payables (the "***Intercompany Claims***") arising from the following types of transactions (the "***Intercompany Transactions***"):

- *Expense Allocations*. In the ordinary course of business, the Debtors and certain non-Debtor affiliates incur centrally-billed expenses, including insurance premiums, workers' compensation obligations, payroll and benefit costs, and information technology costs. The Great Atlantic & Pacific Tea Company, Inc. ("***Parent Debtor***") often pays these expenses and then allocates them to the appropriate affiliates.

- *Revenue Allocations*. As described above, in the ordinary course of business, the operating company Debtors ("***OpCo Debtors***") transfer their revenue to the Main Concentration Account. This creates Intercompany Claims for Parent Debtor to the OpCo Debtors.

- *Intercompany Loans*. The Debtors also maintain a well-documented system of intercompany loans and capital contributions to facilitate cash flow between Debtors.[5]

17. The costs and revenues associated with the Intercompany Transactions are allocated among the legal entities resulting in Intercompany Claims. Indeed as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the Main Concentration Account), there may be, at any given time, Intercompany Claims owed by one Debtor affiliate to another in connection with the disbursement of funds.[6]

18. The Debtors maintain records of all Intercompany Transactions (including fund transfers) and, therefore, can ascertain, trace and account for the Intercompany Transactions. At

---

[5] Two notable Intercompany Loans are: (a) a loan in the approximate amount of $250 million funded from a federal government refund for an overfunded pension in 1984; and (b) a loan in the approximate amount of $94 million funded from the proceeds of a 2005 dividend transaction.

[6] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their business as debtors in possession.

the same time, if the Intercompany Transactions were to be discontinued, the Cash management System and related administrative controls would be disrupted.

**D.     The Debtors' Existing Business Forms and Checks**

19.     In the ordinary course of business, the Debtors use a multitude of check types. Additionally, the Debtors use a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders and invoices.

20.     In order to minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Commencement Date, without reference to the Debtors' status as debtors in possession; *provided*, *however*, that in the event that the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.[7]

21.     Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity of these cases, the press releases issued by the Debtors, and additional press coverage.  Moreover, the Debtors will provide notice of the commencement of these cases to creditors and other parties-in-interest.

22.     Changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such

---

[7]     Although the UST Requirements would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtors do not believe that they impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

K&E 18124426

changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. For these reasons, the Debtors request that they be authorized to use existing check stocks and all correspondence and business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

**E.     The Debtors' Investment Practices**

23.     The Debtors adhere to certain prudent investment practices with rigorous controls (the "***Investment Practices***"). Such Investment Practices are designed with the primary goal of protecting principal and a secondary goal of maximizing yield and liquidity. Specifically, the Debtors have adopted a cash investment policy (the "***Cash Investment Policy***"). Currently, the Debtors only invest their excess cash in the Money Market Accounts described herein. Pursuant to the Cash Investment Policy, the Debtors may only invest in a money market account that (a) is eligible under Rule 2a-7 of the Investment Company Act of 1940 and (b) maintains a one dollar-a-share net asset value.

<u>**Relief Requested**</u>

24.     By this Motion, the Debtors seek entry of an order authorizing them to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Commencement Date, without reference to their status as debtors in possession, *provided*, *however*, that in the event the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors in Possession"; (d) implement changes to the Cash Management System in the ordinary course of business, including without limitation, the

13

opening of any new bank accounts ("***New Bank Accounts***") and the closing of any existing Bank Accounts as they may deem necessary and appropriate; *provided*, *however*, that the Debtors shall (i) provide notice to the relevant Bank and to the Administrative Agent (defined below) of any closing of any Bank Accounts or any opening of any New Bank Accounts and (ii) obtain the prior consent of the Administrative Agent to all requests to close any Bank Accounts or open any New Bank Accounts; *provided*, *further*, *however*, that the Debtors shall provide notice to the U.S. Trustee; (e) maintain their existing Investment Practices; (f) continue, in their business judgment and at their sole discretion, performing Intercompany Transactions in the ordinary course of business subject to the limitations contained in the Debtor-in-Possession Credit Agreement, dated as of December 12, 2010, among A&P, as borrower, the other borrowers party thereto, the guarantors party thereto, and JP Morgan Chase Bank, N.A., as administrative agent (in such capacity, the "Administrative Agent") and as collateral agent (in such capacity, the "Collateral Agent"); and (g) provide postpetition intercompany claims administrative expense priority.

       25.     The Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Commencement Date; (ii) checks or other items deposited in the Bank Accounts prior to the Commencement Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Commencement Date; and (iii) undisputed, outstanding service charges owed to the Banks

as of the Commencement Date on account of the maintenance of the Debtors' Cash Management System, if any.

26.     The Debtors also request that the Order be entered on an interim basis, and, in the absence of objections to the interim relief granted, become final on the date specified in the Order.

<u>**Basis for Relief**</u>

**I.     The Court Should Approve the Debtors' Continued Use of the Cash Management System.**

**A.     The Cash Management System is Essential To the Debtors' Ongoing Operations and Restructuring Efforts.**

27.     The Debtors' businesses and financial affairs are exceedingly complex, requiring the collection, disbursement and movement of funds through numerous bank accounts. Thus, the Debtors should be allowed to continue their well-managed cash management system rather than opening new bank accounts to ensure the seamless operation of their enterprise.

28.     The U.S. Trustee Guidelines require, among other things, that unless the Court orders otherwise, a debtor:  (a) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor in possession accounts, (c) maintain a separate debtor in possession account for cash collateral, (d) obtain checks that bear the designation "debtor in possession" and (e) reference the bankruptcy case number and the type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Commencement Date. Strict enforcement of those guidelines in these chapter 11 cases, however, would severely disrupt the

K&E 18124426

ordinary financial operations of the Debtors, reducing efficiencies and causing unnecessary expense.

29.     Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, a chapter 11 case involves affiliated debtors with complex financial affairs. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, a bankruptcy court entered an order authorizing the debtor and 43 of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id.* at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621.

30.     Likewise, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom*, *Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 510 U.S. 1110 (1994); *see also In re US Airways, Inc.*, Case No. 04-13819 (Bankr. E.D. Va. Sept. 14, 2004); *In re NTELOS, Inc.*, Case No. 03-32094 (Bankr. E.D. Va. March 4, 2003). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge

16

administrative burden and economically inefficient." *In re Columbia Gas*, 997 F.2d 1039, 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

31.     In other large, complex and/or well-publicized chapter 11 cases, such as this, courts in this District routinely waive certain U.S. Trustee Guideline requirements and allow the continued use of cash management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. *See, e.g., In re Reader's Digest Ass'n*, Case No. 09-23529 (Bankr. S.D.N.Y. Nov. 23, 2009); *In re ION Media Networks, Inc.,* Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009); *In re Charter  Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. April 15, 2009);  *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. April 21, 2008); *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. March 29, 2006).  The courts recognize that when applied in complex chapter 11 cases, the U.S. Trustee Guidelines are often impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts and, therefore it is common to replace the U.S. Trustee Guidelines with an alternative procedure that provides the same protection.

**B.     Opening New Accounts Will Cause Substantial Disruption to the Debtors' Businesses.**

32.     Given the substantial economical scale and geographic reach of the Debtors' business operations (covering eight states and the District of Columbia), a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of the

Debtors' value as a going concern, simply cannot be achieved if the Debtors' Cash Management System is substantially disrupted and their Bank Accounts closed.

33.     If the Debtors were required to open separate accounts as debtors in possession and modify the Cash Management System, it would necessitate opening new accounts for collections, cash concentration and disbursements.  In fact, the Debtors would need to open dozens of new bank accounts and coordinate at each of their more than 390 locations channeling funds to such accounts.  Thus, the Debtors' treasury, accounting and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, working on the ground with each store location, instead of on their daily responsibilities during this critical Juncture of the Debtors' chapter 11 cases.  The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow.  Most importantly, delays that would result from opening new accounts, revising cash management procedures and instructing customers to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

34.     Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, all as generally would be required by the U.S. Trustee Guidelines.  *See* U.S. Trustee Guidelines, at pp. 2-3.

**C.     Maintaining the Existing Cash Management System Will Facilitate a Smooth Transition Into These Chapter 11 Cases and Will Not Harm Parties in Interest.**

35.     The Debtors' continued use of the Cash Management System will greatly facilitate their transition into these chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition

18

debts. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Commencement Date. Specifically, with the assistance of their professionals, the Debtors have implemented internal protocols that prohibit payments on account of prepetition debts, including, among others, prepetition accounts payable payments and prepetition intercompany debts, without the prior approval of their treasury department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

36. Moreover, the Cash Management System provides the Debtors with the ability to: (a) quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

**II. The Debtors Should Be Granted Authority To Use Existing Business Forms and Checks Until They Are Depleted.**

37. To minimize expenses to their chapter 11 estates, the Debtors request authority to continue to use all correspondence and business forms (including letterhead, purchase orders, invoices, and the like) as such forms were in existence immediately before the Commencement Date, without reference to the Debtors' status as debtors in possession. The Debtors also request authorization to use their existing check stock without the "debtor in possession" label for checks that they manually write until such check stock runs out. As soon as practicable after the

Commencement Date, the Debtors will include "debtor in possession" on the checks they print electronically.

38.     By virtue of the nature and scope of the Debtors business operations and the large number of suppliers of goods and services with whom the Debtors transact on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein.  Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicized nature of these chapter 11 cases and the communications and notice of commencement the Debtors' are distributing to such parties, changing business forms is unnecessary and unduly burdensome.

39.     In other large, complex or well publicized cases, this Court has allowed debtors to use their prepetition check forms without the "debtor in possession" label, at least until the debtors' existing check stock was depleted.  *See, e.g., In re Reader's Digest Ass'n*, Case No. 09-23529 (Bankr. S.D.N.Y. Nov. 23, 2009); *In re ION Media Networks, Inc.,* Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. April 21, 2008);  *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 26, 2006); *In re Tower Auto., Inc.*, Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 3, 2005) (holding U.S. Trustee's requirement prohibiting issuance of checks without "debtor in possession" designation to be unenforceable).

### III. The Debtors Should Be Authorized to Continue Using Debit, Wire and ACH Payments.

40. The Debtors request further relief from the requirement in the U.S. Trustee Guidelines that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH Payments or other similar methods would likely interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors.

### IV. Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code.

41. Prior to the Commencement Date, the Debtors invested funds in accordance with the Cash Investment Policy. Currently, the Debtors only invest their excess cash in the Money Market Accounts described herein, which must be (a) eligible under Rule 2a-7 of the Investment Company Act of 1940 and (b) maintain a one dollar-a-share net asset value. The Debtors request authority to continue their Investment Practices, *provided*, *however*, that the Debtors will only invest their excess cash in either (a) funds that invest in U.S. Government-backed securities, or (b) in banking institutions that are designated as authorized depositories by the U.S. Trustee Guidelines.

42. Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). While section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than

investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the court to dispense with this limitation "for cause." 11 U.S.C. § 345(b).

43.     The Debtors submit that cause exists in the chapter 11 cases for the Court to allow the Debtors to continue their Investment Practices of investing excess funds in accordance with their Cash Investment Policy.   The Debtors further request that the applicable banking institutions be authorized, on an interim basis, and, in the absence of objections to the interim relief granted, final basis on the date specified in the order, to accept and hold or invest such funds in accordance with the Debtors' Cash Investment Policy, without the need for any additional agreements not otherwise utilized prior to the Commencement Date.

44.     Before the Commencement Date, the Debtors invested their cash with the primary goal of protecting principal and the secondary goal of maximizing yield and liquidity.   The Debtors submit that the investment accounts provide sufficient protection for their cash and that it would be in the best interest of their estates and creditors for the Debtors to continue to follow this practice for investment of cash.

45.     After considering transaction costs and fees, the yield on investments in the investment accounts is likely to be greater than mandatory investment in government securities. Therefore, this strategy could result in substantially greater returns for the Debtors' estates over time.   Moreover, a bond secured by undertaking of a corporate surety would likely be unduly expensive, assuming such a bond were available, and could offset much of the financial gain derived from investing in the investment accounts.   The Debtors submit that their assets will be

invested in a manner that preserves capital, provides liquidity and generates returns relative to prevailing market conditions.

46.     The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code.  The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates.  The purpose is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate.  Under current law, all investments are required to be FDIC insured, collateralized or bonded.  While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors.  This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994).

*In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

47.     In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

(a)     the sophistication of the debtor's business;

(b)     the size of the debtor's business operations;

(c)     the amount of the investments involved;

(d)     the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(e)     the complexity of the case;

(f)     the safeguards in place within the debtor's own business of insuring the safety of the funds;

23

(g)    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)    the benefit to the debtor;

(i)    the harm, if any, to the estate; and

(j)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Serv. Merch.*, 240 B.R. at 896.

48.    Here, the Debtors submit that any risk to the funds does not require strict adherence to the requirements of section 345(b) of the Bankruptcy Code.  Moreover, if granted a waiver, the Debtors will not be burdened with the significant administrative difficulties and expenses relating to opening new accounts in a manner that ensures all of their funds are fully insured or invested strictly in accordance with the restrictions established by section 345 of the Bankruptcy Code.

49.    In other large, complex or well-publicized chapter 11 cases, this Court has liberally construed the requirement of section 345(b) of the Bankruptcy Code that the debtor in possession obtain a bond from any entity with which their money is deposited or invested.  In those instances, this Court has waived the requirements of section 345(b) of the Bankruptcy Code and replaced them with alternative procedures.  *See, e.g., In re Reader's Digest Ass'n*, Case No. 09-23529 (Bankr. S.D.N.Y. Nov. 23, 2009); *In re ION Media Networks, Inc.,* Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009); *In re Charter Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. April 1, 2009) (interim order); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 26, 2006); *In re Musicland Holding Corp.*, Case No. 06-10064 (Bankr. S.D.N.Y. Jan. 17, 2006); *In re Tower*

*Auto., Inc.*, Case No. 05-10578 (Bankr. S.D.NY. Feb. 3, 2005). Cause exists for a similar waiver in these cases.

## V.  The Debtors Should Be Authorized to Continue Performing Under the Intercompany Transactions Involving Debtors and Non-Debtors.

50.     As described herein, the Debtors' businesses are operationally and functionally linked to those of their non-Debtor affiliates. In order to permit ordinary course operations of the Debtors' business and to preserve the value of their investments in their non-Debtor subsidiaries, the Intercompany Transactions with foreign subsidiaries must be preserved to the degree requested herein. If the Intercompany Transactions were discontinued, a number of services currently provided and currently maintained by the Debtors would be disrupted. The Debtors have already modified certain intercompany functions to limit the degree and scope of certain transactions between Debtors and non-Debtors. Any further modifications would be counterproductive in that they would risk causing serious operational and business disruptions for the Debtors, their non-Debtor subsidiaries, or both. Accordingly, the Debtors respectfully submit that the continuation of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such Intercompany Transactions.

51.     At any given time, there may be balances due and owing between and among Debtor affiliates. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. Thus, the Debtors respectfully request the authority, in their sole discretion, to continue performing under the Intercompany Transactions, as described herein, in the ordinary course of business without need for further Court order. Aside from permitting the Debtors and their non-Debtor affiliates to offset mutual prepetition obligations related to the Intercompany

25

Transactions in accordance with their established netting practices, the Debtors are not seeking authority to pay any prepetition claims of non-Debtor affiliates. In addition, the Debtors seek the authority to make loans or capital contributions in non-Debtor affiliates only up to a limited amount specified in and expressly permitted by the DIP Facility.

52.     Courts have routinely granted such authority in other complex multi-debtor chapter 11 cases to continue in place ordinary course intercompany transactions and, in some circumstances, funds flows. *See, e.g.*, *In re Reader's Digest Ass'n*, Case No. 09-23529 (Bankr. S.D.N.Y. Nov. 23, 2009); *In re ION Media Networks, Inc.,* Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009); *In re Charter Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. April 1, 2009) (interim order); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. April 1, 2008); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. April 21, 2008); *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007); *In re M. Fabrikant & Sons, Inc.*, Case No. 06-12737 (Bankr. S.D.N.Y. Jan. 19, 2007). For the reasons discussed herein, the Debtors submit that this Court should authorize them to continue to perform under the Intercompany Transactions.

## VI.    Granting Administrative Priority Status to Postpetition Intercompany Claims Is Necessary to Protect the Debtors' Claims.

53.     The Debtors' funds are commingled in the Cash Management System, and the individual Debtors' rights with respect to funds input into that system are documented by intercompany book entries reflecting intercompany claims, dividends and investments among the participants in the Cash Management System in the ordinary course. The Debtors track all fund

26

transfers electronically in their accounting system and can ascertain, trace and account for all Intercompany Transactions.  If the Intercompany Transactions that permit use of the Cash Management System were to be discontinued, that system and related administrative controls would be disrupted to the Debtors' detriment.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

54.     To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor or a non-Debtor affiliate arising after the Commencement Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status.  If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

55.     Administrative expense treatment for intercompany transactions, as requested here, has been granted in other comparable chapter 11 cases in this district.  *See, e.g.*, *In re ION Media Networks, Inc.,* Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009); *In re Charter Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. April 1, 2009) (interim order);  *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. April 1, 2008); *In re DJK Residential LLC*, Case No. 08-10375 (Bankr.

S.D.N.Y. Feb. 5, 2008); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007); *In re M. Fabrikant & Sons, Inc.*, Case No. 06-12737 (Bankr. S.D.N.Y. Jan. 19, 2007).

**Requirements of Bankruptcy Rule 6003 Satisfied**

56.     Under Bankruptcy Rule 6003, the Court may authorize the Debtors to continue using the Cash Management System because such relief is necessary to avoid immediate and irreparable harm.   Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); *see also* Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

57.     The Cash Management System is crucial to the Debtors' continued operations. Without the Cash Management System, payments may not be made in a timely manner and the Debtors would be unable to track incoming receipts efficiently.   Late payments may cause the Debtors to face suppliers unwilling to provide necessary goods and services.   Moreover, the lack of an integrated cash management system would make the tracking of cash movements and balances much more difficult, potentially causing the Debtors to lack critical information on current liquidity.   Such situations could cause a diminution in the value of the Debtors' estates (including the equity value of their non-Debtor subsidiaries) to the detriment of all parties in interest.   As a result, it is clear that immediate and irreparable harm would result without the relief requested herein being granted.

K&E 18124426

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

58.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Motion Practice

59.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

60.     The Debtors have caused notice of this Motion to be provided by electronic mail, facsimile, and/or by overnight mail to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 40 Largest Unsecured Claims; (c) counsel to the agent for the Debtors' proposed postpetition secured lender; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) the indenture trustee for each of the Debtors' secured and unsecured outstanding bond issuances; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the Banks.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## No Prior Request

61.     No prior motion for the relief requested herein has been made to this or any other court.

*[Concluded On Following Page]*

K&E 18124426

WHEREFORE, for the reasons set forth herein and in the Brace Declaration, the Debtors respectfully request that the Court (a) enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

New York, New York
Dated:  December 12, 2010

*/s/ Paul M. Basta*
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

K&E 18124426

## EXHIBIT A

## Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA | )    Case No. 10-_____ (___) |
| COMPANY, INC., *et al.* | ) |
| | ) |
| Debtors. | )    Joint Administration Requested |
| | ) |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THEIR EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS, (B) MAINTAIN EXISTING INVESTMENT PRACTICES, (C) CONTINUE INTERCOMPANY TRANSACTIONS AND (D) PROVIDE POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY**

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc.

("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"***Debtors***"),[2] for entry of an interim order authorizing the Debtors to (a) continue using their

---

[1]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper (Continued…)

existing cash management system, bank accounts and business forms, (b) maintain their existing investment practices, (c) continue performing ordinary course intercompany transactions and (d) provide postpetition intercompany claims administrative expense priority; and upon the Declaration of Frederic F. Brace Chief Administrative Officer and Chief Restructuring Officer of The Great Atlantic & Pacific Tea Company, Inc., in Support of First Day Pleadings (the "***Brace Declaration***"); and the Court having found that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having found that no other or further notice need be provided; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that relief requested in the Motion is necessary to prevent immediate and irreparable harm; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.      The Motion is granted on an interim basis to the extent set forth herein, subject to becoming a final order as provided herein.

---

Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

2.      The Debtors are authorized to continue using their integrated cash management system as described in the Motion (the "***Cash Management System***").

3.      The Debtors are authorized to: (a) continue to use, with the same account numbers, all of the bank accounts in existence as of the Commencement Date, including, without limitation, those accounts identified on **Exhibit C** to the Motion (the "***Bank Accounts***"); (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) use, in its present form, all correspondence and business forms (including, but not limited to, letterhead, purchase orders and invoices), as well as checks and other documents related to the Bank Accounts existing immediately before the Commencement Date, without reference to their status as debtors in possession; *provided, however*, that in the event the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors in Possession."

4.      The Debtors are authorized to implement changes to the Cash Management System in the ordinary course of business, including without limitation, the opening of any new bank accounts ("***New Bank Accounts***") and the closing of any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided*, *however*, that the Debtors shall provide the U.S. Trustee with notice of any New Accounts; and *provided*, *further*, that the Debtors shall obtain the prior consent of the Administrative Agent to all requests to close any Bank Accounts or open any New Bank Accounts.

5.      The Debtors are authorized, but not required, to continue their Investment Practices, *provided*, *however*, that the Debtors will only invest their excess cash in either (a) funds that invest in U.S. Government-backed securities, or (b) in banking institutions that are designated as authorized depositories by the U.S. Trustee Guidelines.

K&E 18124426

6.     The Debtors are authorized, but not required, in their business judgment, to continue performing under and honoring the Intercompany Transactions; *provided, however,* that the Debtors shall (a) keep records of any postpetition intercompany transfers and services that occur during the chapter 11 cases, (b) put in place accounting procedures to identify and distinguish between pre-petition and post-petition intercompany transactions and to track post-petition intercompany transactions and (c) provide reasonable access to such records and procedures to the Administrative Agent.

7.     All Intercompany Claims arising after the Commencement Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code.

8.     The relief, rights, and responsibilities provided for in this Interim Order shall be deemed to apply to any and all Bank Accounts maintained in the Debtors' names, whether or not such Bank Accounts are listed on **Exhibit C** to the Motion and including, without limitation, any New Accounts.

9.     Except as otherwise expressly provided in this Interim Order, all banks at which the Bank Accounts are maintained (collectively, the "***Banks***") are authorized to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires and ACH Payments issued and drawn on the Bank Accounts by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank,  after the Commencement Date by the holders or makers thereof, as the case may be; *provided*, *however*, the Banks shall not be liable to any party on account of (a) following the Debtors' representations, instructions, or presentations as to any order of the Court (without any

K&E 18124426

duty of further inquiry), (b) the honoring of any prepetition checks, drafts, wires or ACH Payments in a good faith belief or upon a representation by the Debtors that the Court has authorized such prepetition check, draft, wire or ACH Payments or (c) an innocent mistake made despite implementation of reasonable handling procedures.

10.     The Banks are authorized to charge and the Debtors are authorized to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with Debtors.  The Debtors shall reimburse the Banks for any claim arising prior to or after the Commencement Date in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Bank resulting from returned checks or other returned items, and the Debtors are authorized to pay any fees and expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

11.     The Debtors are authorized to direct the Banks, and the Banks are authorized and directed, to pay obligations in accordance with this or any separate order of this Court; *provided*, *however*, that the Banks have no duty to inquire as to whether such payments are authorized by an order of this Court, and each Bank has no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

12.     Any payment from a Bank Account at the request of the Debtors made by any of the Banks prior to the Petition Date (including any ACH Transfer such Bank is or becomes obligated to settle), or any instruments issued by any of the Banks on behalf of any Debtor

pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

13.     All obligations of the Debtors and any of their non-Debtor subsidiaries or affiliates incurred to any of the Banks or the Debtors' proposed postpetition secured lenders or any of their respective affiliates (each a "*Senior Obligee*") before or after the Petition Date that result from ordinary course transactions under the Cash Management System shall continue to be secured by any cash collateral to the extent provided for in any account agreements between the Debtors and any Senior Obligee.

14.     Any and all accounts opened by the Debtors on or after the Petition Date at any Bank shall, for the purposes of this Order, be deemed a prepetition Bank Account (as if it had been opened prior to the Petition Date and listed in **Exhibit C**), any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

15.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

16.     To the extent any of the Banks have valid and enforceable rights of setoff or liens in cash present in a Bank Account on the Commencement Date (the "*Commencement Date Cash*"), and to the extent such cash is thereafter used by such Debtor subject to further agreement between the Debtor and such Bank, such Bank is hereby granted (i) a replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and priority as such Bank's interest, as of the Commencement Date, in the Commencement Date Cash subsequently used by the Debtors; and (ii) an administrative expense claim to the extent of any diminution of Commencement Date Cash after the Commencement Date.

K&E 18124426

17.     To the extent that there is any inconsistency between this Order and the terms of the DIP Facility or any Order of this Court approving such DIP Facility, the DIP Facility and the Order approving the same shall control.

18.     Except as otherwise provided in this Interim Order or in a separate order of this Court, all Banks provided with notice of this Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued prior to the Commencement Date.

19.     As soon as practicable after the entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on those Banks that make disbursements pursuant to the Debtors' Cash Management System and on counsel for the Administrative Agent.

20.     Any objections to the relief requested in the Motion on a final basis must be filed no later than _____, 2010 at ___:___ a.m./p.m. (Prevailing Eastern Time) (the "*Objection Deadline*") and served on the following parties:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 40 Largest Unsecured Claims; (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) counsel to the indenture trustee for the Debtors' senior subordinated notes; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the Banks.

21.     If an objection is timely filed and served so as to be received on or before the Objection Deadline, such objection shall be set for hearing on _____, 2010 at __:__ a.m./p.m. (Prevailing Eastern Time).  This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection.

22.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

23.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

24.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

25.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

26.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors or an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

27.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

29.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

White Plains, New York
Date: _____ __, 2010

_____
United States Bankruptcy Judge

K&E 18124426

**EXHIBIT B**

**Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA | ) Case No. 10-_____ (___) |
| COMPANY, INC., *et al.* | ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

---

**FINAL ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THEIR
EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS
FORMS, (B) MAINTAIN EXISTING INVESTMENT PRACTICES, (C) CONTINUE
INTERCOMPANY TRANSACTIONS AND (D) PROVIDE POSTPETITION
INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY**

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc.

("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"***Debtors***"),[2] for entry of a final order (the "***Final Order***") authorizing the Debtors to (a) continue

---

[1]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

using their existing cash management system, bank accounts and business forms, (b) maintain

their existing investment practices, (c) continue performing ordinary course intercompany

transactions and (d) provide postpetition intercompany claims administrative expense priority;

and upon the Declaration of Frederic F. Brace, Chief Administrative Officer and Chief

Restructuring Officer of The Great Atlantic & Pacific Tea Company, Inc., in Support of First

Day Pleadings (the "*Brace Declaration*"); and the Court having found that this Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that

venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408;

and the Court having found that the relief requested in the Motion is in the best interests of the

Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing

adequate and appropriate under the circumstances; and the Court having found that no other or

further notice need be provided; and the Court having reviewed the Motion and having heard

statements in support of the Motion at a hearing held before the Court (the "*Hearing*"); and the

Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and the Court having found that relief

requested in the Motion is necessary to prevent immediate and irreparable harm; and any

objections to the relief requested herein having been withdrawn or overruled on the merits; and

after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors are authorized to continue using their integrated cash management

system as described in the Motion (the "*Cash Management System*").

K&E 18124426

3.     The Debtors are authorized to: (a) continue to use, with the same account numbers, all of the bank accounts in existence as of the Commencement Date, including, without limitation, those accounts identified on **Exhibit C** to the Motion (the "***Bank Accounts***"); (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) use, in its present form, all correspondence and business forms (including, but not limited to, letterhead, purchase orders and invoices), as well as checks and other documents related to the Bank Accounts existing immediately before the Commencement Date, without reference to their status as debtors in possession; *provided, however*, that in the event the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors in Possession."

4.     The Debtors are authorized to implement changes to the Cash Management System in the ordinary course of business, including without limitation, the opening of any new bank accounts ("***New Bank Accounts***") and the closing of any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided*, *however*, that the Debtors shall provide the U.S. Trustee with notice of any New Accounts; and *provided*, *further*, that the Debtors shall obtain the prior consent of the Administrative Agent to all requests to close any Bank Accounts or open any New Bank Accounts.

5.     The Debtors are authorized, but not required, to continue their Investment Practices, *provided*, *however*, that the Debtors will only invest their excess cash in either (a) funds that invest in U.S. Government-backed securities, or (b) in banking institutions that are designated as authorized depositories by the U.S. Trustee Guidelines.

6.     The Debtors are authorized, but not required, in their business judgment, to continue performing under and honoring the Intercompany Transactions; *provided, however,* that

K&E 18124426

the Debtors shall (a) keep records of any postpetition intercompany transfers and services that occur during the chapter 11 cases, (b) put in place accounting procedures to identify and distinguish between pre-petition and post-petition intercompany transactions and to track post-petition intercompany transactions and (c) provide reasonable access to such records and procedures to the Administrative Agent.

7.      All Intercompany Claims arising after the Commencement Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code.

8.      The relief, rights, and responsibilities provided for in this Final Order shall be deemed to apply to any and all Bank Accounts maintained in the Debtors' names, whether or not such Bank Accounts are listed on **Exhibit C** to the Motion and including, without limitation, any New Accounts.

9.      Except as otherwise expressly provided in this Final Order, all banks at which the Bank Accounts are maintained (collectively, the "***Banks***") are authorized to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires and ACH Payments issued and drawn on the Bank Accounts by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank,  after the Commencement Date by the holders or makers thereof, as the case may be; *provided*, *however*, the Banks shall not be liable to any party on account of (a) following the Debtors' representations, instructions, or presentations as to any order of the Court (without any duty of further inquiry), (b) the honoring of any prepetition checks, drafts, wires or ACH Payments in a good faith belief or upon a representation by the Debtors that the Court has

4

authorized such prepetition check, draft, wire or ACH Payments or (c) an innocent mistake made despite implementation of reasonable handling procedures.

10.     The Banks are authorized to charge and the Debtors are authorized to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with Debtors.  The Debtors shall reimburse the Banks for any claim arising prior to or after the Commencement Date in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Bank resulting from returned checks or other returned items, and the Debtors are authorized to pay any fees and expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

11.     The Debtors are authorized to direct the Banks, and the Banks are authorized and directed, to pay obligations in accordance with this or any separate order of this Court; *provided*, *however*, that the Banks have no duty to inquire as to whether such payments are authorized by an order of this Court, and each Bank has no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

12.     Any payment from a Bank Account at the request of the Debtors made by any of the Banks prior to the Petition Date (including any ACH Transfer such Bank is or becomes obligated to settle), or any instruments issued by any of the Banks on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

13.     All obligations of the Debtors and any of their non-Debtor subsidiaries or affiliates incurred to any of the Banks or the Debtors' proposed postpetition secured lenders or any of their respective affiliates (each a "***Senior Obligee***") before or after the Petition Date that result from ordinary course transactions under the Cash Management System shall continue to be secured by any cash collateral to the extent provided for in any account agreements between the Debtors and any Senior Obligee.

14.     Any and all accounts opened by the Debtors on or after the Petition Date at any Bank shall, for the purposes of this Order, be deemed a prepetition Bank Account (as if it had been opened prior to the Petition Date and listed in **Exhibit C**), any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

15.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

16.     To the extent any of the Banks have valid and enforceable rights of setoff or liens in cash present in a Bank Account on the Commencement Date (the "***Commencement Date Cash***"), and to the extent such cash is thereafter used by such Debtor subject to further agreement between the Debtor and such Bank, such Bank is hereby granted (i) a replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and priority as such Bank's interest, as of the Commencement Date, in the Commencement Date Cash subsequently used by the Debtors; and (ii) an administrative expense claim to the extent of any diminution of Commencement Date Cash after the Commencement Date.

K&E 18124426

17.     To the extent that there is any inconsistency between this Order and the terms of the DIP Facility or any Order of this Court approving such DIP Facility, the DIP Facility and the Order approving the same shall control.

18.     Except as otherwise provided in this Final Order or in a separate order of this Court, all Banks provided with notice of this Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued prior to the Commencement Date.

19.     As soon as practicable after the entry of this Final Order, the Debtors shall serve a copy of this Final Order on those Banks that make disbursements pursuant to the Debtors' Cash Management System and on counsel for the Administrative Agent.

20.     Except as otherwise provided in this Final Order or in a separate order of this Court, all Banks provided with notice of this Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued prior to the Commencement Date.

21.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

22.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors or an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

23.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors or any statutory committee appointed in these chapter 11 cases, or shall impair the ability of the Debtors

7

or any statutory committee appointed in these chapter 11 cases, to contest the validity and amount of any payment made pursuant to this Final Order.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

25.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


White Plains, New York                    _____
Date: _____, 2010                         United States Bankruptcy Judge

## Exhibit C

## List of Bank Accounts

| Debtor | Financial Institution | Purpose | Account Number |
|---|---|---|---|
| The Great A&P Tea Co. Inc. | Bank of America | Deposit | 4381 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Medicaid EFT | 0681 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Rx Lockbox | 3938 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Lottery | 8641 |
| The Great A&P Tea Co. Inc. | Bank of America | Consolidated Lockbox | 3973 |
| The Great A&P Tea Co. Inc. | Bank of America | Lockbox | xx26 |
| The Great A&P Tea Co. Inc. | Bank of America | Lockbox | xx30 |
| The Great A&P Tea Co. Inc. | Bank of America | Lockbox | xx34 |
| The Great A&P Tea Co. Inc. | Bank of America | Lockbox | xx49 |
| The Great A&P Tea Co. Inc. | Bank of America | Lockbox | xx53 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - NY/NJ/CT Stores | 2570 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Food Basics | 2567 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - A&P Liquor | 2554 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Waldbaum's | 2541 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Food Emporium | 2538 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - NY Transit | 2525 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - A&P Cafeteria | 2512 |
| The Great A&P Tea Co. Inc. | Bank of America | Deposit - Best Cellars | 1699 |
| Pathmark Stores Inc. | Capital One (North Fork Bank) | Deposit | 1751 |
| Pathmark Stores Inc. | Capital One (North Fork Bank) | Deposit - Lottery | 1777 |

| Debtor | Financial Institution | Purpose | Account Number |
|---|---|---|---|
| Pathmark Stores Inc. | Capital One (North Fork Bank) | Deposit - Coinstar | 1785 |
| The Great A&P Tea Co. Inc. | Citibank | Disbursement - CIGNA Health Insurance | 7048 |
| The Great A&P Tea Co. Inc. | Citibank | Disbursement - CIGNA Reimbursement | 7427 |
| The Great A&P Tea Co. Inc. | Citibank | Disbursement - CIGNA CT General Life Insurance | 0178 |
| The Great A&P Tea Co. Inc. | Double Rock Corp (Reserve) | Money Market | 3511 |
| The Great A&P Tea Co. Inc. | Goldman Sachs | Money Market | 5715 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Main Concentration Account | 7436 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - EBT | 2348 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Credit Cards | 3248 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - A&P Credit Cards | 3255 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Waldbaum's Credit Cards | 3263 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Food Emporium Credit Cards | 3297 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - SuperFresh Credit Cards | 3271 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Food Basics Credit Cards | 3289 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Pathmark Credit Cards | 3305 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - Pathmark SAC Credit Cards | 3313 |

K&E 18124426

| Debtor | Financial Institution | Purpose | Account Number |
|---|---|---|---|
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Disbursement - Tax | 4891 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Disbursement - Bottles | 6030 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Disbursement - Bottles | 6048 |
| The Great A&P Tea Co. Inc. | JPMorgan Chase Bank | Deposit - A&P Bermuda | 9383 |
| Delaware County Dairies Inc. | JPMorgan Chase Bank | Charitable Benefits | 8336 |
| Delaware County Dairies Inc. | JPMorgan Chase Bank | Charitable Benefits | 5202 |
| The Great A&P Tea Co. Inc. | Lake Region State Bank | Consolidated Returns | 5646 |
| Pathmark Stores Inc. | OneUnited Bank | Marketing Account | 3712 |
| Best Cellars Inc. | PNC Bank | Deposit | 6292 |
| Pathmark Stores Inc. | PNC Bank | Charitable Benefits | 0352 |
| The Great A&P Tea Co. Inc. | Valley National Bank | EPA Trust | 55-00 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Deposit | 5374 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Deposit - Super Fresh | 7612 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Deposit - Coinstar | 5286 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Deposit - Pathmark SAC | 1064 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Deposit - Lottery | 3936 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Disbursement - Master | 6346 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Disbursement - Payroll | 8274 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Disbursement - A/P EDI/EFT | 6353 |
| The Great A&P Tea Co. Inc. | Wells Fargo | Disbursement - A/P Check | 8255 |
| The Great A&P Tea Co. Inc. | Wells Fargo Heritage | Money Market | 1425 |

# EXHIBIT D

## Cash Management System Diagram

# Bank Account Structure



w:\treasury\cash mgmt\CashInfo.vsd 12/3/2010  10:02:30 AM