James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

   - and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (II) SCHEDULING
FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

The Great Atlantic & Pacific Tea Company, Inc. (**"*A&P*"**) and certain of its affiliates, as

debtors and debtors in possession (collectively, the "***Debtors***"),[1] file this Motion (the "***Motion***")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW

for entry of an interim and final order, substantially in the form attached hereto as **Exhibit A**, (the "***Interim Order***") authorizing the Debtors to, among other things: (a) enter into a credit agreement (the "***DIP Agreement***"), on substantially the same terms as the commitment letter attached hereto as **Exhibit B** (the "***Commitment Letter***," and together with the DIP Agreement and any other related agreements, the "***DIP Documents***"),[2] to secure an $800 million debtor-in-possession financing facility, consisting of (i) a $350 million term loan facility to refinance the Debtors' prepetition senior secured credit facility and provide approximately $187 million in incremental liquidity and (ii) a $450 million revolving facility, including access to a $250 letter of credit sublimit and (b) grant adequate protection to the Debtors' secured lenders. The Debtors also request that the Court schedule a hearing to consider approval of the DIP Agreement on a final basis (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***").[3]

---

Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2]   The Debtors intend to file the DIP Agreement in advance of the hearing on the Motion. In the event there is a conflict between the terms of this Motion, the DIP Orders (as defined below) and the DIP Documents, the terms of the DIP Documents shall govern.

[3]   In further support of this Motion, the Debtors submit the declaration of Stephen Goldstein, the Vice President of Lazard Frères & Co. LLC ("***Lazard***") the Debtors' proposed financial advisor and investment banker, attached hereto as **Exhibit D** (the "Goldstein Decl.").

K&E 18124617.1

## Jurisdiction

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this Court is proper pursuant to 28 U.S.C. § 1408.

3.     The statutory bases for the relief requested herein are sections 361, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 364(e) of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local Rules for the Southern District of New York (the "***Local Rules***").

## Preliminary Statement

4.     The Debtors have obtained a commitment for a fully underwritten, $800 million credit facility from JPMorgan, following a competitive process (the "***DIP Financing***"). The DIP Financing commitment is a remarkable endorsement of A&P and its reorganization efforts. The facility is unique for a retailer in chapter 11—namely, the facility provides significant availability, competitive pricing, and an 18-month maturity date, all without burdensome case controls. With immediate access to $187 million under a term loan facility and $200 million in letters of credit under a revolving facility, the DIP Financing will allow the Debtors to utilize chapter 11's tools to reorganize in a controlled and deliberate manner and provide the Debtors with liquidity through emergence from chapter 11. More immediately, however, the Debtors' customers, their approximately 41,000 employees and all of the Debtors' constituents are depending on access to the DIP Financing so that the Debtors may continue operating.

5.     As described in this Motion, several compelling reasons justify approval of the DIP Financing. Those reasons include the following:

- **The DIP Financing is the Key to the Debtors' Reorganization Efforts**.  The Debtors operated prepetition with minimal cash and access to their revolving credit facility.  The Debtors must have immediate access to the DIP Financing to continue operating.  Moreover, immediate access to cash through the DIP Financing is especially critical in the supermarket business, which depends on the timely delivery of goods to ensure that the Debtors' loyal and invaluable customers will find the products they come to expect on the Debtors' shelves.  The liquidity provided by this DIP Financing will be a major asset of the estates around which a reorganization can be structured.

- **The DIP Financing is the Key to Maintaining Employee and Vendor Support**.  The Debtors had approximately $200 million to $250 million of trade credit at any one time prior to entering chapter 11, along with over 6,700 trade vendor accounts.  As one of the nation's largest grocers, vendor and employee relationships are the life-blood of the enterprise.  Employees would view the backing of JPMorgan and a substantial financing package as a very positive message about the Debtors' prospects and their stable employment.  Furthermore, the support from their trade vending partners in the form of continued trade credit and continued relationships is crucial to maintaining the Debtors' operations and maximizing the value of the business.  Putting approximately $187 million on the Debtors' balance sheet on day one with JPMorgan's backing of the Debtors shows the Debtors' vendors that A&P is reorganizing, open for business and a trusted trade partner who should be extended credit.

- **The DIP Financing is the Superior Result of a Competitive Process**.  With the assistance of their investment banker, Lazard, the Debtors' management team engaged in a competitive process to procure the best available financing to ensure sufficient liquidity to execute their restructuring while maintaining their valuable trade credit through the filing of these cases.  This process resulted in competing DIP financing proposals.  The best was the DIP Financing, which had superior pricing, an 18-month structure, and greater access to liquidity.  The other potentially viable alternative was a DIP loan from a group led by the Debtors' prepetition first lien lenders (the "***Prepetition Lenders***"), which offered over $100 million less in liquidity on a "best efforts"—as opposed to fully committed—basis and at higher overall interest costs.  The facility proposed by the Prepetition Lenders also contemplated a roll up of the prepetition facility.  The covenants and case controls in the competing facility were inferior and could have hampered the Debtors' reorganization prospects.  Moreover, unlike a defensive proposed roll-up facility, the proposed DIP Financing offers fresh capital, reinforcing the confidence in the Debtors' supermarket banners.

- **The Prepetition Lenders are Oversecured**.  Two compelling facts support this conclusion.  First, JPMorgan, a lender with a relatively small position under the Debtors' prepetition credit facilities, has fully underwritten the DIP Financing.  The fact that a new lender, and one of the most respected financial institutions in the world, has agreed to underwrite this loan is unquestionable proof of the collateral proposed to secure the DIP Loan.  Second, immediately before the commencement of these cases, there was approximately $96 million of availability under the prepetition credit agreement— evidencing that the prepetition facility is overcollateralized.

4

- **The DIP Financing's Collateral Includes Significant Unencumbered Collateral**. The Debtors have valuable and presently unencumbered leases. Those leases were proposed to serve as collateral for the last-out term loan discussed above. Those leases also gave JPMorgan confidence to loan an additional amounts above the refinancing on the first day of these chapter 11 cases.

- **The DIP Financing's Structure is Required by the Business Needs of the Debtors and JPMorgan, and the Structure Mitigates Concerns Normally Associated With a "Roll Up" DIP Financing**. Under the DIP Financing, JPMorgan has agreed to put fresh capital to work and to take the full risk of syndicating the DIP Financing away from the Debtors and on to JPMorgan's balance sheet. Having a fully underwritten facility is demonstrative of JPMorgan's commitment to the Debtors and provides substantial benefits for the Debtors' reorganization efforts. This is a not a defensive "roll up" where concerns are normally present associated with conversion of prepetition debt into postpetition debt (and which would be present in the Debtors' only other potential DIP financing alternative). Instead, under the DIP Financing, JPMorgan has agreed to refinance the Debtors' prepetition facility and provide significant incremental liquidity to the Debtors, which, coupled with the other facts cited earlier, demonstrate that the value of the collateral at issue is greater than the value of the outstanding loans. For JPMorgan to take the risk associated with an underwritten DIP loan, it has required that the prepetition facility be paid off so that the loan may be syndicated more easily. Moreover, the Prepetition Lenders receiving proceeds of the DIP Financing will remain subject to the challenge period under the DIP Order. In other words, if a successful challenge to the prepetition lenders is brought, the financial institutions that received the DIP Financing proceeds would have to disgorge such proceeds as appropriate. Accordingly, unsecured creditors of the Debtors are protected through the challenge mechanism in the DIP Order, while at the same time receiving the substantial benefits of the DIP Financing to allow the Debtors to maximize value.

- **The DIP Financing Terms, Refinancing of the Debtors' Prepetition Credit Facilities and the Accompanying Adequate Protection Package is Specifically Permitted by the Intercreditor Agreement**. Under the terms of a prepetition intercreditor agreement, the second lien lenders (the "*Senior Lien Lenders*") are subordinated to "first lien debt" of up to approximately $815 million.[4] The second lien lenders also agreed to not object to any DIP financing or use of cash collateral, as well as an adequate protection package consisting of replacement liens if the Prepetition Lenders consent to the DIP financing. The DIP Financing thus complies with the terms of the Intercreditor Agreement.

---

[4] The intercreditor agreement among the Prepetition Lenders and the Second Lien Lenders, dated August 4, 2009 and attached hereto as **Exhibit C** (the "*Intercreditor Agreement*"), provides that the maximum revolving debt that the second lien lenders shall be subordinated to is equal to the greater of: (i) $850,000,000 less, without duplication, the amount of any permanent repayments or permanent reductions and (ii) the borrowing base of the prepetition senior secured notes. Using this calculation, the Debtors believe the maximum revolving debt is equal to approximately $815 million.

K&E 18124617.1

## Relief Requested

6.     By this Motion, the Debtors respectfully request that the Court grant the following relief as provided in the DIP Orders:

- **The DIP Financing**:  authority to enter into the DIP Agreement for a $800 million debtor-in-possession ("***DIP***") financing facility, which shall:

  - Repay approximately $135.5 million outstanding under the prepetition first lien credit facilities (the "***Prepetition Credit Facilities***") upon entry of the Interim Order;

  - provide approximately $187 million in incremental liquidity to fund the Debtors' operations through a secured superpriority priming senior term loan facility (the "***Term Facility***") upon entry of the Interim Order and approximately $263 million of incremental liquidity upon entry of the Final Order; and

  - provide a $450 million secured superpriority priming senior revolving borrowing base facility (the "***Revolving Facility***") with approximately $200 million in letters of credit available upon entry of the Interim Order and the remainder of the Revolving Facility available upon entry of the Final Order;

- **DIP Liens**:  authority to grant:

  - a first-priority, fully perfected lien on all unencumbered assets (primarily consisting of certain of the Debtors' leasehold interests) (the "***Unencumbered Collateral***");

  - a first-priority, fully perfected, priming lien on all assets of the Debtors subject to the lien securing the notes ("***Secured Notes***") issued by A&P under the indenture dated as of August 4, 2009 (the "***Prepetition Collateral***") pursuant to section 364(d);[5] and

  - a fully perfected junior lien on all property subject to other pre-existing, validly perfected, non-avoidable liens existing as of the date of the Debtors' chapter 11 filing (the "***Commencement Date***") pursuant to section 363(c)(3) of the Bankruptcy Code.

---

[5]    The DIP Agreement only primes the liens held by the Second Lien Lenders to the extent the facilities are drawn in excess of the funded debt currently senior to the liens held by the Second Lien Lenders.

K&E 18124617.1

- **Adequate Protection:** approval of the form and manner of adequate protection to be provided to the Senior Lien Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code.[6]

- **DIP Claims**: authority to grant a superpriority administrative claim with respect to all loans made and obligations incurred by the Debtors on or after the Commencement Date pursuant to the DIP Agreement, subject only to the Carve Out set forth in the DIP Orders, pursuant to section 364(c)(1) of the Bankruptcy Code.

- **Cash Collateral**: authority to use cash collateral ("***Cash Collateral***") within the meaning of section 361 of the Bankruptcy Code;

- **Automatic Stay**: authority to modify the automatic stay to the extent necessary to effectuate the provisions of the DIP Orders; and

- **Final Hearing**: schedule a date for a hearing on the Motion to consider entry of the Final Order, to be held no sooner than 15 days after the date of this Motion, and no later than 35 days after entry of the Interim Order.

## Concise Summary of the DIP Financing Terms

7.     In accordance with Bankruptcy Rules 4001(b) and (d), the following summarizes the significant terms of the DIP Agreement and Interim Order. Included in this summary is a description of each of the provisions required to be highlighted by Local Bankruptcy Rule 4001-2. The Debtors believe that the following provisions of the DIP Agreement and the Interim Order are justified and necessary in the context and circumstances of these cases.[7]

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Borrowers**<br>*Bankruptcy Rule* | A&P and certain of the other Debtors. *See* **DIP Agmt. § 1.01, Interim Order Intro.** |

---

[6]  Specifically, the DIP Agreement provides for granting the Second Lien Lenders replacement liens with respect to the Prepetition Collateral and fully perfected, junior liens with respect to the Unencumbered Collateral. This form of adequate protection expressly complies with section 6.3 of the Intercreditor Agreement, which provides that a subordinate lien on the collateral pledged to the first lien lenders constitutes adequate protection.

[7]  This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents or the DIP Orders, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents, the provisions of the DIP Document shall control. Any terms used but not defined in the chart shall have the meanings ascribed to such terms in the DIP Agreement.

K&E 18124617.1

| | |
|---|---|
| *4001(c)(1)(B)* | |
| **Guarantors**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | All the Debtors other than the Borrowers. ***See* DIP Agmt. § 1.01, Interim Order Intro.** |
| **DIP Lenders**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | A syndicate of banks, financial institutions and other entities, including JPMorgan Chase Bank, N.A. arranged by the Lead Arranger, J.P. Morgan Securities LLC (collectively, the "***Lenders***"). ***See* DIP Agmt. § 1.01, Interim Order Intro.** |
| **Administrative Agent**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | JPMorgan Chase Bank, N.A., (the "***Administrative Agent***," or "***JPMorgan***"). **See DIP Agmt. § 1.01, Interim Order Intro.** |
| **Use of Proceeds**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Financing shall be used (i) to finance the working capital needs/for general corporate purposes of the Debtors, (ii) to pay the fees, costs and expenses incurred by the Debtors in connection with the chapter 11 cases, (iii) to refinance the Prepetition Credit Facilities. ***See* DIP Agmt. § 5.11, Interim Order ¶¶ 3(d), 5(a), 12(b).** |
| **Revolving Facility**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(1)* | The Revolving Facility is a $450 million secured superpriority priming revolving facility with a $250 million letter of credit sublimit. The amounts available for Revolving Loans are subject to a borrowing base, which shall be generally based upon the a percentage of the value of (i) inventory; (ii) credit card accounts receivable; (iii) Coinstar accounts receivable; (iv) insurance provider accounts receivable; (v) scripts; (vi) real estate; minus (vii) certain reserves established by the Administrative Agent in its discretion as set forth in the DIP Agreement. ***See* DIP Agmt. § 2.01, Interim Order Intro, ¶ 5.** |
| **Term Facility**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(1)* | The Term Facility is a $350 million secured superpriority priming term facility to be drawn in full upon entry of the Interim Order, subject to satisfaction of the terms set forth therein and in the DIP Agreement. The Term Facility is subject to a collateral amount determined by the value of certain categories of assets, less reserves, and including leaseholds. ***See* DIP Agmt. 2.01, Interim Order Intro, ¶ 5.** |
| **Maturity and Termination Date**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | **Maturity Date:** 18 months after the Closing Date. ***See* DIP Agmt. §1.01, Interim Order ¶ 11.**<br><br>**Termination Date:** The earliest of: (i) the Maturity Date; (ii) 40 days after the entry of the Interim Order if the Final Order has not been entered prior thereto; (iii) the substantial consummation of a confirmed plan of reorganization; and (iv) the acceleration of the Loans and the termination of the Commitment in accordance with the DIP Agreement. ***See* DIP Agmt. § 1.01, Interim Order ¶ 11.** |

K&E 18124617.1

| | |
|---|---|
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(3)* | **Underwriting, Incentive, and Other Fees:** As set forth in the fee letter between JPMorgan and the Debtors. **Interim Order ¶ 5(b).**<br><br>**Administrative Agent Fees:** The fees and other charges payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent. *See* **DIP Agmt. 2.11(a), Interim Order ¶ 5(b).**<br><br>**Letter of Credit Fee:** 3.00% on the daily maximum amount to be drawn under all letters of credit. *See* **DIP Agmt. § 2.11(d), Interim Order ¶ 5(b).**<br><br>**Unused Fee:** 0.50% per annum on the average daily unused portion of the Revolving Facility. *See* **DIP Agmt. § 2.11(b), Interim Order ¶ 5(b).** |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **Interest Rate.** The Debtors may elect either the (a) Alternative Base Rate or (b) Adjusted LIBO Rate, in each case plus the Applicable Margin. These terms are defined as follows in the DIP Agreement:<br><br>• "*Alternate Base Rate*" means the greatest of (i) the prime rate of interest announced from time to time by JPMorgan, changing when and as said prime rate changes (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus 0.50% and (c) the Adjusted LIBO Rate for a one month interest period appearing on the Reuters Page LIBOR01 (or on any successor or substitute page) on such day plus 1.00%.<br><br>• "*Adjusted LIBO Rate*" means the rate per annum (adjusted for statutory reserve requirements for eurocurrency liabilities) for Eurodollar deposits for a period equal to one or two weeks, or one, two, three or six months (as selected by the Borrowers) appearing on Reuters Page LIBOR01 (or on any other service providing comparable rate quotations) at approximately 11:00 a.m., London time, two business days prior to the first day of the applicable interest period; provided that solely with respect to the Term Loans, the Adjusted LIBO Rate shall in no event be less than 1.75%.<br><br>• "*Applicable Margin*" means a margin of:<br><br>    • 2.00% in the case of Revolving Loans at the Alternative Base Rate;<br><br>    • 3.00% in the case of Revolving Loans at the Adjusted LIBO Rate;<br><br>    • 6.50% in the case of Term Loans at the Alternative Base Rate; and<br><br>    • 7.50% in the case of Revolving Loans at the Adjusted LIBO Rate. *See* **DIP Agmt. §§ 1.01, 2.12.**<br><br>**Default Interest Rate.** 2.0% per annum above the then applicable rate. *See* **DIP Agmt.§ 2.12(b).** |
| **Prepayments**<br>*Local Rule 4001-2(a)(13)* | **Optional Prepayment:** The Borrowers may, upon irrevocable notice to the Administrative Agent, voluntarily prepay any loans in whole or part without premium or penalty, provided, however, that the Borrowers may not prepay any portion of Term Facility until all of the Revolving Facility has been paid in accordance with the terms of the DIP Agreement. *See* **DIP Agmt. §§ 2.10(b), 2.10(c).** |

K&E 18124617.1

| | |
|---|---|
| | **Mandatory Prepayment**: Mandatory prepayments are required, subject to the terms of the DIP Agreement, upon the occurrence of certain events, including: (i) a Revolving Borrowing Base Shortfall and (ii) in the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any other letters of credit, such Loan Party shall, within one Business Day after such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to such Net Proceeds. *See* **DIP Agmt. § 2.10.** |
| **Collateral and Priority**<br>*Bankruptcy Rule 4001(c)(1)(B)(ii);*<br>*Local Rule 4001-2(a)(4)* | The DIP Financing shall be secured by: (i) a first-priority, fully perfected lien on the Unencumbered Collateral; (ii) a first-priority, fully perfected, priming lien on all of the Prepetition Collateral pursuant to section 364(d); and (iii) a fully perfected junior lien on all property subject to pre-existing validly perfected, non-avoidable liens existing as of the Commencement Date pursuant to section 363(c)(3) of the Bankruptcy Code. *See* **DIP Agmt. § 1.01, Interim Order ¶¶ 6, 7, 8.** |
| **Carve-Out**<br>*Local Rule 4001-2(a)(5)* | "*Carve Out*" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $100,000 and (iii) at any time after the first business day after the occurrence and during the continuance of a C/C Event of Default and delivery of notice thereof to the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"), Debtors' counsel, and the Creditors' Committee (the "*Carve Out Notice*"), to the extent allowed at any time, whether before or after delivery of a Carve Out Notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses incurred by persons or firms retained by the Debtors and the Creditors' Committee (but excluding fees and expenses of third party professionals employed by such members) and allowed by this Court (collectively, the "*Professional Fees*"), in an aggregate amount not exceeding $15,000,000 (the "*Carve Out Cap*"), which amount may be used subject to the terms of this Order (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the day immediately following the business day after delivery of the Carve Out Notice). Immediately upon delivery of a Carve Out Notice, the Debtors shall be required to transfer from its concentration account to a segregated account (the "*Carve Out Account*") not subject to the control of the Agent an amount equal to the Carve Out Cap; *provided* that, cash or other amounts on deposit in any account of the Agent into which the Borrowers deposit cash for the benefit of the Agent's L/C Exposure (as defined in the DIP Credit Agreement), shall not be subject to the Carve Out. The dollar limitation on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the delivery of a Carve Out Notice or by any fees, expenses, indemnities or other amounts paid to the Agent or any DIP Lender or such party's respective attorneys and agents under the DIP Credit Agreement or otherwise. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out, and the DIP Lenders (1) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account and (2) shall have a security interest in any residual interest in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Carve Out. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described above. **Interim Order ¶ 6(b).** |
| **Conditions to Closing**<br>*Bankruptcy Rule 4001(c)(1)(B);* | Usual and customary for financings of this type, including, among other things, delivery of financing documentation, payment of fees and expenses, governmental and third party approvals, corporate documents, retention of a financial advisor, consent to rely |

| | |
|---|---|
| *Local Rule 4001-2(a)(2), 2(h)* | upon certain asset appraisals directed by the Prepetition Lenders, prepayment in full of all obligations under the Prepetition Credit Facilities, termination of the commitments thereunder and release of all liens, if any, granted thereunder, and entry of the Interim Order.  *See* **DIP Agmt. §§ 4.01, Interim Order Intro.** |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(8)* | **Affirmative Covenants**.  Usual and customary for financings of this type, including, without limitation, delivery of financial statements, notices of material events, provision of information regarding collateral, maintenance of properties and insurance, compliance with all applicable laws, payment of any postpetition obligations, provisions of further assurances in connection with performance under the DIP Agreement, information regarding the Debtors' cash management system, and payment of any required contributions to certain benefit and pension plans (to the extent non-payment would result in a material adverse effect).  *See* **DIP Agmt. §§ 5.01 to 5.19.**<br><br>**Negative Covenants**.  Usual and customary for financings of this type, including, without limitation, restrictions on liens, investments, indebtedness (including guarantees), fundamental changes, changes to the nature of the business, dispositions, dividends and distributions, affiliate transactions, sale and leaseback transactions, swap contracts, prepayment of indebtedness, and amendment of certain material documents.  *See* **DIP Agmt., at §§ 6.01 to 6.11.**<br><br>**Financial Covenants**. Usual and customary for financings of this type, including, without limitation, certain requirements related to minimum excess availability, minimum liquidity, minimum cumulative EBITDA, granting of superpriority claims to parties other than the Lenders, and rejections of lease interests that are part of the collateral package under the DIP Financing without proper notice to the Administrative Agent.  *See* **DIP Agmt., at §§ 6.12 to 6.17.** |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(10)* | **Events of Default**.  Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties (subject to certain exceptions contained in the DIP Agreement), dismissal or conversion of the bankruptcy cases, entry of an order vacating the automatic stay to foreclose of property in excess of $1.0 million, entry of an order reversing or staying the DIP Orders or more than 10 days, non-permitted prepetition debt payments, seeking authority to sell substantially all of any the Debtors' assets, failure to comply with certain ERISA regulations, the invalidation of liens securing the DIP collateral, a change of control, a breach of a material contract, and failure to pay rent under any lease for more than 5 days.  *See* **DIP Agmt., at § 7.01.**<br><br>**Remedies Upon an Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions with proper notice to the U.S. Trustee and Creditors' Committee, as provided in the DIP Agreement:<br><br>• declare the Commitment of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;<br><br>• declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which |

K&E 18124617.1

| | |
|---|---|
| | are hereby expressly waived by the Loan Parties;<br><br>• require that the Loan Parties cash collateralize the L/C Exposure; and<br><br>• whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, may (and at the direction of the Required Lenders, shall) proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties. *See* **DIP Agmt., at § 7.02.** |
| **Change of Control**<br>*Local Rule*<br>*4001-2(a)(11)* | "*Change in Control*" means, at any time, (a) the board of directors of the Debtors shall cease to consist of a majority of the Continuing Directors or (b) any person or group (within the meaning of Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934, as amended) other than a Permitted Holder shall acquire a majority of the voting power represented by the Debtors' outstanding capital stock entitled to vote in the election of directors of the Debtors. *See* **DIP Agmt., at § 1.01.** |
| **Automatic Stay**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(iv)* | **DIP Financing.** Seven days' prior notice to the Debtors, the automatic stay is vacated to permit the exercise of remedies by the Administrative Agent and the Lenders to the extent set forth in the DIP Orders. **Interim Order, ¶ 8(b).** |

## Key Provisions

8.     As a condition to obtaining the proposed financing, the Lenders have required and the Debtors have agreed to certain provisions that may be considered key provisions to be highlighted to the Court.  These provisions include the following:

- **Avoidance Actions.**  Subject to the entry of the Final Order, the Lenders shall be granted a perfected first priority lien by the proceeds of any avoidance claims or causes of action under chapter 5 of the Bankruptcy Code pursuant to section 364(c)(2) of the Bankruptcy Code.

- **Section 506(c) Waiver**.  Subject to the entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the Lenders' collateral under section 506(c) of the Bankruptcy Code or otherwise and any right to assert the "equities of the case" exception in section 552 of the Bankruptcy Code shall be waived.

- **Carve Outs.**  Carve Out means: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b)

12

of the Bankruptcy Code not to exceed $100,000 and (iii) at any time after the first business day after the occurrence and during the continuance of a C/C Event of Default and delivery of the Carve Out Notice to the extent allowed at any time, whether before or after delivery of a Carve Out Notice, whether by interim order, procedural order or otherwise, the payment of Professional Fees in an aggregate amount not exceeding the "Carve Out Cap, which amount may be used subject to the terms of this Order (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the day immediately following the business day after delivery of the Carve Out Notice). Immediately upon delivery of a Carve Out Notice, the Debtors shall be required to transfer from its concentration account to a Carve Out Account not subject to the control of the Agent an amount equal to the Carve Out Cap; provided that, cash or other amounts on deposit in any account of the Agent into which the Borrowers deposit cash for the benefit of the Agent's L/C Exposure (as defined in the DIP Agreement), shall not be subject to the Carve Out. The dollar limitation on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the delivery of a Carve Out Notice or by any fees, expenses, indemnities or other amounts paid to the Agent or any DIP Lender or such party's respective attorneys and agents under the DIP Credit Agreement or otherwise. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out, and the DIP Lenders (A) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account and (B) shall have a security interest in any residual interest in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Carve Out. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described above.

- **Relief from the Automatic Stay**. The Debtors have agreed to a modification of the automatic stay as follows: within seven days from the date that the Administrative Agent or Lenders file a notice of an event of default with the Bankruptcy Court with respect to the chapter 11 cases, the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of the Bankruptcy Court to allow the DIP Agent to take any and all actions, as if no case were pending under the Bankruptcy Code unless within such seven-day period of time the Bankruptcy Court determines that no event of default has occurred and is continuing.

- **Fees**. The Debtors have agreed, subject to Court approval, to pay certain fees to the Lenders in exchange for their providing the DIP Financing. Specifically, the Debtors will pay to the Lenders certain underwriting, incentive, and other arrangement fees and an administrative agency fee in favor of the Administrative Agent, in each case as set forth in a confidential fee letter. The Debtors have provided or will provide copies of the confidential side letter to the U.S. Trustee, to the Court, and to any official creditors' committee appointed in the Debtors' chapter 11 cases. The Debtors request that this side letter and it contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for any committee), in order to protect the sensitive commercial

13

information of the Administrative Agent and the Lenders contained therein.[8] Additionally, the Debtors have agreed, subject to Court approval, to pay 0.50% per annum on the average daily unused portion of the Revolving Facility and .125% per annum of the face amount of each letter of credit.

## Background

9.     On the date hereof, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested joint administration of their chapter 11 cases, and no official committees have been appointed.

10.     As set forth more fully in the Brace Declaration, the Debtors are one of the nation's leading food and drug retailers.  The Debtors operate 395 supermarkets, combination food and drug stores, liquor stores, and limited assortment food stores across eight Northeastern states and the District of Columbia.

11.     In the twelve months ended September 11, 2010, the Debtors reported revenues of $8.4 billion.  As of September 11, 2010, the Debtors reported total assets of $2.5 billion and liabilities of $3.2 billion.

---

[8]   Confidential commercial information is information which, if disclosed, would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994)).  Commercial information, however, need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code.  *Orion Pictures*, 21 F.3d at 28 (holding that a license agreement authorizing a licensee to "reproduce, manufacture, distribute, and sell videocassettes of three films" contained confidential commercial information and that protection of such information under section 107(b) was justified); *In re Barney's, Inc.*, 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential commercial "information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with suppliers").

K&E 18124617.1

12.     The Debtors currently employ approximately 41,000 employees.  Approximately 95 percent of the Debtors' employees are covered by collective bargaining agreements, and approximately 68 percent of the Debtors' employees are employed on a part time basis.

### Outstanding Prepetition Indebtedness

13.     The Debtors have approximately $1.0 billion in funded indebtedness and related obligations, comprised of:  (a) a prepetition senior secured term facility and revolving facility with the Prepetition Lenders; (b) the prepetition Secured Notes; (c) four series of unsecured notes; and (d) $10.0 million in unsecured promissory notes.  The Debtors have also 175,000 shares of convertible preferred stock issued and outstanding, with a $1,000 per share liquidation preference.  Goldstein Decl. ¶ 4.

**A.     Prepetition Credit Facilities**

14.     The Debtors and the Prepetition Lenders party thereto are parties to that certain Amended and Restated Credit Agreement, dated as of December 27, 2007 (as amended, supplemented, modified, or amended and restated from time to time, the "***Prepetition Credit Agreement***").  The Prepetition Credit Agreement provides the Debtors with the Prepetition Credit Facilities, consisting of approximately $520 million in total availability through a two-tranche revolving facility and two-tranche term loan facility.  As of the Commencement Date, approximately $135.5 million was outstanding under the Prepetition Credit Facilities.  The Prepetition Credit Facilities also provide for, among other things, a $400 million letter of credit subfacility under which approximately $196.2 million in letters of credit are issued and outstanding as of the Commencement Date.

15.     Borrowing under the revolver is determined by a borrowing base formula calculated by reference to advance rates on, among other things, inventory, receivables, scripts,

15

Coinstar collections, pharmacy scripts, certain real estate and leaseholds, less reserves taken by the Prepetition Lenders. Each of the above-captioned Debtors are either borrowers or guarantors under the Prepetition Credit Facilities. Obligations arising under the Prepetition Credit Facilities are secured by first priority liens on all of the Debtors' personal property, including inventory and receivables, and certain of the Debtors' leaseholds and owned real property.

## B.    Prepetition Secured Notes

16.    A&P, as issuer, and each of the above captioned Debtors, as guarantors, have issued the Secured Notes pursuant to that indenture dated as of August 4, 2009 by and between the Debtors and Wilmington Trust Company in its capacity as trustee and collateral agent. The Secured Notes bear interest at 11.375%, and approximately $260.0 million in Secured Notes remain outstanding as of the Commencement Date. The Secured Notes mature on August 4, 2015. The Secured Notes are secured by second priority liens on the Prepetition Collateral.

## C.    Intercreditor Agreement

17.    On August 4, 2009, the collateral agent under the Prepetition Credit Facilities, and the collateral agent under the Prepetition Secured Notes Security Agreement, entered into the Intercreditor Agreement, which governs the relative contractual rights of the Prepetition Lenders and the Second Lien Lenders. Among other things, the Intercreditor Agreement provides that claims arising under the Prepetition Secured Notes or the Second Lien Indenture are subordinated to "first lien debt" of up to approximately $815 million, including as such debt may be refinanced. The Intercreditor Agreement also imposes certain limitations on the ability of the Second Lien Lenders: (a) to contest a refinancing of the Prepetition Credit Facilities and/or a proposed postpetition DIP financing provided by or consented-to by lenders under the Prepetition Credit Facilities; and (b) request adequate protection during a bankruptcy proceeding.

16

Thus, as explained in more detail below, the Second Lien Lenders have effectively consented to the Debtors' access to any postpetition financing, including the DIP Financing, and the Debtors' use of cash collateral subject to their junior liens, as described herein.

**The Debtors' Marketing Efforts to Obtain Postpetition Financing**

18.     The Debtors approached the Prepetition Lenders, JPMorgan, and a third, well-known DIP lending source regarding a potential postpetition financing arrangement. Goldstein Decl. ¶ 6. Then, on or about December 4, 2010, A&P engaged Lazard to assist with, among other things, evaluation of any financing proposals. The Debtors determined not to engage in broader discussions or efforts to obtain postpetition financing due to the substantial risk of a wide-scale collapse of trade credit, which would have been catastrophic to the Debtors' business and operations.[9] By the second week of December, the Debtors had reduced the potential financing sources to the Prepetition Lenders and JPMorgan. Id. The Debtors continued to engage in intense discussions and negotiations with both parties, including diligence initiatives and the negotiation of definitive financing terms and conditions. Id. at ¶ 6.

19.     The proposal received by the Prepetition Lenders offered a $675 million postpetition financing facility containing a "roll-up" of the Prepetition Credit Facilities with less incremental liquidity, subject to syndication on a "best efforts" basis. The proposal received by JPMorgan contained a fully underwritten $800 committed facility, which would: (a) refinance the Prepetition Credit Facilities and provide over $187 million in additional liquidity after entry of the Interim Order, and over $263 million after entry of the Final Order, through a Term Facility; and (b) provide access to $200 million in letters of credit through the Revolving Facility

---

[9]     Indeed, since rumors of the Debtors' potential chapter 11 filing hit the press, certain vendors have stopped shipping and the Debtors have been contacted by countless vendors regarding trade terms, making the Debtors' need for the DIP Financing that much more acute.

K&E 18124617.1

upon entry of the Interim Order and access to the full $450 million Revolving Facility upon entry of the Final Order. In addition to being underwritten, the JPMorgan's proposal contained significantly more available liquidity at significantly lower overall pricing, subject to certain customary "flex" provisions in the event JPMorgan is unable to syndicate the DIP Financing.

20. On December 8, 2010, the Debtors presented both proposals to their board of directors and the board instructed the management team and its advisors to continue their diligence and negotiations with both the Prepetition Lenders and JPMorgan and authorized them to enter into the proposal that ultimately offered the Debtors financing that would facilitate restructuring on the best available economic terms. After exploring the two options and engaging in extensive negotiations with concessions coming from all sides, the Debtors determined, in their reasonable business judgment, that the proposal from JPMorgan represented the best and most favorable financing under the circumstances and in light of the Debtors' liquidity needs and reorganization goals. Goldstein Decl. ¶ 10.

<u>Basis for Relief</u>

**A.     The Debtors Should be Authorized to Obtain Postpetition Financing through the DIP Documents.**

> **i.     Entry into the DIP Financing is an Exercise of the Debtors' Sound and Reasonable Business Judgment.**

21. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing

18

does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

22.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court should consider the economic terms of the DIP Financing in light of current market conditions. *See* Transcript of Record at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. <u>Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization</u>. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that

> ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

    **ii.**      **The DIP Financing Represents the Best Available Financing.**

23. The proposed DIP Financing will provide the best and most favorable financing under the circumstances, and the Debtors' decision to enter into the DIP Financing was the result of a true "market test." Indeed, as a fully underwritten facility in the aggregate amount of $800 million from a new lender, the DIP Financing represents the first of its kind and size in recent history. The only alternative to the DIP Financing—the Prepetition Lenders' proposal— not only charged greater fees for less liquidity, but more importantly, imposed restrictive operational covenants upon the Debtors and case management controls. Unlike the DIP Financing, the Prepetition Lenders proposal was also not fully committed. Goldstein Decl. ¶ 13. Given the potential liquidity compression posed by trade creditors at the outset of a bankruptcy case, the Debtors and Lazard determined that an underwritten DIP Financing was necessary to ensure both confidence of their supplier base and liquidity to weather potential trade contraction on day one of these cases. Goldstein Decl. ¶ 13. The DIP Financing addresses that need by providing the Debtors with sufficient funding to pay off the Prepetition Credit Facilities and provide incremental liquidity of over $210 million after entry of the Interim Order.[10] Additionally, the DIP Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash.

---

[10] The Debtors originally requested that the DIP Agreement provide that the Revolving Facility be available upon entry of the Interim Order with the option to later draw down upon the Term Facility. However, as a condition to obtaining the DIP Financing, JPMorgan required the Term Facility be drawn upon entry of the Interim Order in order to make syndication of the term loan feasible.

K&E 18124617.1

24. For these reasons, the Debtors submit that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**ii.     The Refinancing of the Prepetition Credit Facilities Should Be Approved**

25. As a condition to providing the Debtors the funding they desperately need to operate their businesses and preserve going concern value for the benefit of all parties in interest, the Administrative Agent insisted that a commitment of such postpetition financing (on the timeline and on the scale needed to fund these chapter 11 cases) would be unavailable absent refinancing the oversecured Prepetition Credit Facilities at the outset of the cases. Goldstein Decl. ¶ 12.

26. Understanding the nature of this refinancing and the concerns of creditors that may be expressed in connection with the DIP Financing, the Debtors carefully considered the terms of the proposed refinancing and the scope and validity of the First Lien Lenders' secured claim (and any associated causes of action). To protect both the estates and their creditors, the DIP Orders contain a provision that will allow the Debtors to claw-back the proceeds of the DIP Financing paid to the Prepetition Lenders if it is determined that their liens under the Prepetition Credit Facilities were not perfected or otherwise valid. In other words, if a successful challenge to the validty of the Prepetition Lenders' prepetition liens is brought, the recipients of the DIP proceeds will be required to disgorge such proceeds as appropriate. Accordingly, unsecured creditors of the Debtors are protected through the challenge mechanism in the DIP Order, while at the same time receiving the substantial benefits of the DIP Financing. Id. at ¶ 11.

27. Moreover, approval of refinancing prepetition debt by an outside party at the first day hearing has been approved in this district and others. *See, e.g.*, *In re Lyondell Chem. Co.*,

21

Case 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009)*; In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 2, 2007); *In re Twinlab Corp.*, Case No. 03-15564 (Bankr. S.D.N.Y. Sept. 4, 2003); *In re Bear Island Paper* Co., *L.L.C.*, Case No. 10-31202 (Bankr. E.D. Va. Feb. 26, 2010; *In re Movie Gallery, Inc.*, Case No. 10-30696 (Bankr. E.D. Va. Feb. 3, 2010).

### iii. The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

28.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

29.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an

22

administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

30. The Debtors attempted to secure financing on terms other than a secured superpriority basis, but given the Debtors' operational difficulties, its over-leveraged balance sheet, and lack of substantially unencumbered assets precluded them from doing so.  The Court should therefore authorize the Debtors to provide the Administrative Agent, on behalf of itself and the other Lenders, a superpriority administrative expense status for any obligations arising under the DIP Agreement as provided for in section 364(c)(1) of the Bankruptcy Code.

**iv.** **The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

31. In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).   Here, the only parties who may have their interests in the Debtors' assets subject to a priming lien are the Second Lien Lenders because JPMorgan is paying off the Prepetition Lenders in full and does not prime existing liens. Moreover, because JPMorgan is refinancing the existing Prepetition Credit Facilities, the Second

23

Lien Lenders are only truly being primed to the extent the amount drawn under the DIP Financing exceeds the outstanding debt under the Prepetition Secured Facilities and the value of the Unencumbered Collateral.

32.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).  The DIP Documents satisfy each of these factors.

33.     <u>First</u>, as described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the JPMorgan offered the best option for obtaining the postpetition financing the Debtors require.  The Debtors conducted arm's-length negotiations with the Lenders regarding the terms of the DIP Financing, and those agreements reflect the most favorable terms on which the Lenders were willing to offer

24

financing. The Debtors are not able to obtain financing on equal or better terms from the Lenders, or any other source, without granting first priority priming liens.

34.     Second, the Debtors need the funds to be provided under the DIP Financing to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Financing and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

35.     Third, upon entry of the Interim Order, the DIP Financing will provide access to $187 million in incremental liquidity and access to $200 million in letters of credit through the Revolving Facility, which the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. Accordingly, the terms of the DIP Financing are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

36.     Fourth, as described in greater detail above and in the Goldstein Declaration, the Debtors and the Lenders negotiated the DIP Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment. The only alternative financing proposal presented to the Debtors was riddled with operational and financial covenants that would undoubtedly ham-string the Debtors' reorganization efforts. Simply put, the DIP Financing proposal was a logic choice.

K&E 18124617.1

### v. The Interests of the Second Lien Lenders Are Adequately Protected.

37.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

38.     As an initial matter, it is important to recognize that the liens held by Second Lien Lenders are subordinate to the liens provided in connection with the Prepetition Credit Facilities, and thus the Second Lien Lenders are only being primed to the extent the amount drawn under the DIP Financing exceeds the outstanding debt under the Prepetition Secured Facilities and the value of the Unencumbered Collateral.

39.     To account for any potential diminution in value, the Debtors will provide adequate protection to the Second Lien Lenders in the form of (a) replacement liens on the Prepetition Collateral, (b) junior liens on the Unencumbered Collateral, and (c) a section 507(b)

26

superpriority claim, subject to the Carve Out (the "***Adequate Protection Package***").[11]  This Adequate Protection Package is both fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  And significantly, the Second Lien Lenders have consented to the DIP Financing and the Adequate Protection Package to be provided to them to be provided in connection with the financing pursuant to the applicable provisions of the Intercreditor Agreement if the Prepetition Lenders consent to the DIP Financing.

40.     Moreover, it is apparent that the Prepetition Credit Facilities are oversecured and the additional debt incurred through a fully drawn DIP Financing would not impair the value the Second Lien Lenders' interest in the Prepetition Collateral.  Goldstein Decl.  ¶ 12. Indeed, as of the Commencement Date, there was availability of approximately $96 million under the prepetition revolver.  If the Debtors did not have sufficient assets on hand, they would be forced to draw upon the revolver.  Thus, this significant availability demonstrates that the Prepetition Collateral exceeds the value of the Senior Lien Lenders' interests and the Senior Lien Lenders will suffer no diminution in the value of their interests as a result of obtaining the DIP Financing.

41.     Accordingly, the Court should find that the Adequate Protection Package is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.      The Debtors Should be Authorized to Use the Cash Collateral.**

42.     Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—

---

[11]   The Senior Lien Lenders shall also receive additional adequate protection in the form of a subordinated lien to the liens provided to the DIP Financing Lenders in the event the Senior Secured Lenders are disgorged of the proceeds of the DIP Financing, yet continue to hold valid, enforceable liens on the Prepetition Collateral.

27

       (A)  each entity that has an interest in such cash collateral
consents; or

       (B)  the court, after notice and a hearing, authorizes such use, sale,
or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an

interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest."  11 U.S.C. § 363(e).

     43.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and

should be authorized to use the Cash Collateral.  First, as explained above, pursuant to the

Intercreditor Agreement, the Second Lien Lenders have effectively consented to the use of the

Cash Collateral according to the terms of the Intercreditor Agreement.  Second, the Second Lien

Lenders' interests in the Cash Collateral are adequately protected in satisfaction of section 363(e)

of the Bankruptcy Code.  As described above, the Debtors are providing replacement liens on the

Second Lien Lenders' collateral, including Cash Collateral, which adequately protects the

Second Lien Lenders' interests in the Prepetition Collateral from diminution caused by the DIP

Financing.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under

section 363(c)(2) of the Bankruptcy Code.

**C.**     **The Debtors Should be Authorized to Pay the Fees Required by the Lenders and
Honor Obligations Under the Commitment Letter.**

     44.     As described above, the Debtors have agreed, subject to Court approval, to pay

certain fees to the Lenders in exchange for their providing the DIP Financing.  Specifically, the

Debtors will pay:  (a) certain up front and other arrangement fees in favor of the Lenders; (b) an

administrative agency fee in favor of the Administrative Agent, in each case as set forth in a

confidential side letter; (c) a monthly fee in arrears for the unused portion of each Lender's

commitment under the DIP Financing; and (d) fees related to issuance of letters of credit. The fees the Debtors have agreed to pay to the Lenders and other obligations under the DIP Agreement represent the most favorable terms to the Debtors on which the Lenders would agree to make the DIP Financing available. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates, creditors, and other parties in interest. Moreover, as noted above, these fees are lower than those of other proposed financing sources.

45.     Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates. *See*, *e.g.*, *In re Lear Corp.*, No. 14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Prop., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. March 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *In re DJK Residential, Inc.*, No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

K&E 18124617.1

**D.     The Scope of the Carve-Out is Appropriate.**

46.     The proposed DIP Financing subjects the security interests and administrative expense claims of the Lenders to the Carve-Out. Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

**E.     The Lenders Should be Deemed Good Faith Lenders under Section 364(e).**

47.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

K&E 18124617.1

48.     As explained in detail herein and in the Brace Declaration and the Goldstein Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the Lenders.   The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**F.      Modification of the Automatic Stay is Warranted.**

49.     The DIP Documents and the proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Agreement), all rights and remedies provided for in the DIP Agreement, and to take various other actions without further order of or application to the Court.  The Interim Order provides, however, that the DIP Lenders must provide the Debtors with seven business days prior written notice before exercising any enforcement rights or remedies, which will allow the Debtors to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

50.     Stay modification provisions of this sort are ordinary features of DIP Financing and, in the Debtors' business judgment, are reasonable under the circumstances.  *See*, *e.g.*, *In re*

*The Reader's Digest Assoc.*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009), *In re Lear Corp.*, No. 14326 (Bankr. S.D.N.Y. Aug. 4, 2009); *In re Gen. Growth Props. Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. April 23, 2009); *In re Wellman, Inc.*, No. 08-10595 (Bankr. S.D.N.Y. April 7, 2008).

**G.      The Debtors Require Immediate Access to the Cash Collateral and DIP Financing.**

51.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

52.      The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $350 million under the DIP Financing is not granted promptly after the Commencement Date.  The Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Financing.  Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services

from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

53.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See*, *e.g., In re The Reader's Digest Assoc.*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving postpetition financing on an interim basis); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (same); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, No. 08-14679 (S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, No. 08-10595 (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**H.      Request for Final Hearing.**

54.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 35 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.[12]

55.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

---

[12]  The DIP Agreement and the Interim Order require that the Final Order is entered no later than 35 days after entry of the Interim Order.

## Request for Waiver of Stay

56.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of ten (10) days after entry of the order, unless the court orders otherwise."   As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## Motion Practice

57.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## No Prior Request

58.     No prior motion for the relief requested herein has been made to this or any other court.

## Notice

59.     The Debtors have caused notice of this Motion to be provided by electronic mail, facsimile, and/or by overnight mail to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 40 Largest Unsecured Claims; (c) counsel to the agent for the Debtors' proposed postpetition secured lender; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) the indenture trustee for each of the Debtors' secured and unsecured outstanding bond issuances; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief

34

requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

K&E 18124617.1

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the DIP Orders granting (a) the relief requested herein and (b) such other relief as is appropriate under the circumstances.

New York, New York
Dated: December 12, 2010

/s/ Paul M. Basta

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

K&E 18124617.1