# EXHIBIT B

**Commitment Letter**

**J.P. MORGAN SECURITIES LLC**
383 Madison Avenue
New York, New York 10179

**JPMORGAN CHASE BANK, N.A.**
270 Park Avenue
New York, New York 10017

December 10, 2010

The Great Atlantic & Pacific Tea Company, Inc.
Two Paragon Drive
Montvale, New Jersey 07645
Attention: Brenda Galgano, Chief Financial Officer

Commitment Letter

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank") and J.P. Morgan Securities LLC ("JPMorgan" and, together with JPMorgan Chase Bank, the "Commitment Parties", "us" or "we") that The Great Atlantic & Pacific Tea Company, Inc. ("you" or the "Company"), together with all of its direct and indirect domestic subsidiaries, are considering filing voluntary petitions under title 11 of the United States Code (the "Bankruptcy Code").

Capitalized terms used but not defined herein are used with the meanings assigned to them on Exhibit A attached hereto (the "Term Sheet" and, together with this letter, collectively, the "Commitment Letter"). As used herein, the term "Transactions" means, collectively, the entering into and funding of the DIP Facilities, the refinancing of the Prepetition Credit Facilities and all other related transactions, including the payment of fees and expenses in connection therewith. The date on which the initial funding under the DIP Facilities occurs is referred to as the "Closing Date," and the date on which you file a voluntary petition under chapter 11 of the Bankruptcy Code is referred to as the "Petition Date."

1. Commitments

In connection with the Transactions, JPMorgan Chase Bank is pleased to advise you of its commitment, and hereby commits to provide, 100% of the aggregate amount of the DIP Facilities upon the terms and conditions set forth in this Commitment Letter.

2. Titles and Roles

It is agreed that (i) JPMorgan will act as sole lead arranger and sole bookrunner for the DIP Facilities (acting in such capacities, the "Lead Arranger") and (ii) JPMorgan Chase Bank will act as sole administrative agent for the DIP Facilities.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheet and Fee Letter referred to below) will be paid in connection with the DIP Facilities unless you and we shall so reasonably agree (it being understood and

agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of the DIP Facilities than the Commitment Parties).

3. Syndication

Following the Petition Date, we intend to syndicate the DIP Facilities to a group of lenders identified by us in consultation with you (together with JPMorgan Chase Bank, the "Lenders"); provided that it is understood that the Lead Arranger will not syndicate to (a) any company engaged principally in the business of supermarkets or other retail food or grocery stores or (b) any financial institutions identified in writing to the Lead Arranger by you on or prior to the date hereof (collectively, the "Disqualified Institutions"); provided further that (i) JPMorgan Chase Bank shall retain exclusive control over all rights and obligations with respect to its commitments, including all rights with respect to consents, modifications and amendments of the definitive loan documents, until the Closing Date has occurred, and (ii) any assignment of any commitment prior to the Closing Date shall not reduce JPMorgan Chase Bank's obligation to make available the DIP Facilities pursuant to its commitments as set forth in this Commitment Letter on the Closing Date. The Commitment Parties intend to commence syndication efforts promptly following the Petition Date, and you agree, following the Petition Date, to use your commercially reasonable efforts to assist the Commitment Parties in completing a syndication satisfactory to the Commitment Parties until the earlier of (x) the date that is 60 days following the Closing Date and (y) the completion of a Successful Syndication (as defined in the Fee Letter). Such commercially reasonable efforts to assist shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your subsidiaries' existing banking relationships, (B) your using commercially reasonable efforts to cause direct contact between your senior management and advisors and the proposed Lenders at mutually agreed times, (C) your preparing and providing to the Commitment Parties all customary information with respect to you and your subsidiaries, including all financial information and Projections (as defined below), as the Commitment Parties may reasonably request in connection with the arrangement and syndication of the DIP Facilities and your assistance in the preparation of one or more customary confidential information memoranda (each, a "Confidential Information Memorandum") and other marketing materials to be used in connection with the syndication (all such information, memoranda and material, "Information Materials"), (D) the hosting, with the Commitment Parties, of one or more meetings of prospective Lenders at reasonable times and locations to be mutually agreed (which meetings shall be in New York, New York), (E) your using your commercially reasonable efforts to obtain ratings for the Term Loan Facility constituting part of the DIP Facilities from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Financial Services LLC ("S&P") as soon as practicable and in any event prior to January 15, 2011 and (F) your using your commercially reasonable efforts to obtain, promptly following the Petition Date, customary reliance letters in form and substance acceptable to the Administrative Agent, from independent appraisers previously engaged by Bank of America, N.A., as agent under the Prepetition Credit Facilities.

Subject to the foregoing, the Commitment Parties will manage, in consultation with you, all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount (subject to the maximum amount of the fees set forth in the Fee Letter) and distribution of fees among the Lenders. You hereby acknowledge and agree that the Commitment Parties will not be subject to any fiduciary or other implied duties other than as expressly set forth herein in connection with the transactions contemplated hereby.

At the request of the Commitment Parties, you agree to use reasonable efforts to assist in the preparation of a version of each Confidential Information Memorandum or other Information Material (a "Public Version") consisting exclusively of information with respect to you and your affiliates that to

your knowledge is either publicly available or does not contain material non-public information (within the meaning of United States federal securities laws) with respect to you and your subsidiaries, or any of your or their respective securities for purposes of United States federal and state securities laws (such information, "Non-MNPI"). Such Public Versions, together with any other information prepared by you or your subsidiaries or your representatives and conspicuously marked "Public" (collectively, the "Public Information"), which at a minimum means that the word "Public" will appear prominently on the first page of any such information, may be distributed by us to prospective Lenders who have advised us that they wish to receive only Non-MNPI ("Public Side Lenders"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing Non-MNPI. You acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise after being provided a reasonable amount of time to review such documentation provided by us, (a) drafts and final definitive documentation with respect to the DIP Facilities (excluding specified schedules thereto), (b) administrative materials prepared by the Commitment Parties for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda) and (c) notifications of changes in the terms of the DIP Facilities may be distributed to Public Side Lenders.

In connection with our distribution to prospective Lenders of any Confidential Information Memorandum, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof, representing that it only contains Non-MNPI.

4. Information

You hereby represent and warrant that (a) all information concerning or affecting you or any of your subsidiaries (including all Information Materials), other than the Projections, forward looking information and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial and/or business projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time prepared (it being recognized by the Commitment Parties that such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized and such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, and thereafter until the earlier of (i) the date which occurs 60 days after the Closing Date or (ii) the date upon which a Successful Syndication occurs, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations are correct in all material respects under those circumstances. You understand that in arranging and syndicating the DIP Facilities we may use and rely on the Information and Projections without independent verification thereof, it being understood that Projections by their nature are inherently uncertain and no assurances are being given that the results in the Projections will be achieved.

5.  Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the Fee Letter dated the date hereof and delivered herewith (the "Fee Letter") on the terms and subject to the conditions set forth therein, it being understood that such payments will also be subject to the entry of an order of the U.S. Bankruptcy Court authorizing the debtors to enter into this Commitment Letter and the Fee Letter and to pay the fees and expenses set forth or referred to herein.

6.  Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 6 and in the Term Sheet under the heading "Certain Conditions - Initial Conditions".

Each Commitment Party's commitments and agreements hereunder are further subject to (a) since September 11, 2010, there not having been any change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of the Company and its subsidiaries, taken as a whole, other than as a result of events leading up to and following the commencement of their proceedings under chapter 11 of the Bankruptcy Code or the continuation and prosecution thereof; provided, however, that nothing disclosed in (i) the Company's Annual Report on Form 10-K for the year ended February 27, 2010, (ii) Quarterly Report on Form 10-Q for each quarter ended since February 27, 2010, as filed prior to the date of this Commitment Letter and (iii) any filings on Form 8-K made through the date of this Commitment Letter shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), be deemed to constitute a material adverse effect, (b) such Commitment Party's not becoming aware after the date hereof of any information (other than publicly available information or information with respect to general economic or industry conditions) not previously known to such Commitment Party directly affecting the Company and the Transactions that is inconsistent in a material and adverse manner with any such information (taken as a whole) disclosed (through public filings or private disclosure) to such Commitment Party prior to the date hereof or could reasonably be expected to materially impair the syndication of the DIP Facilities (after taking into account any changes to the terms of the DIP Facilities agreed to by the Company), (c) until the earlier of (i) the date that is 60 days after the Closing Date or (ii) the date a Successful Syndication is achieved, that there is no competing offering, placement, arrangement or syndication of any debt securities or bank financing (other than the DIP Facilities by or on behalf of you or your subsidiaries and indebtedness not prohibited by the terms of the definitive documentation relating to the DIP Facilities) without the prior written consent of the Commitment Parties if such financing would have, in the reasonable judgment of the Commitment Parties, a detrimental effect upon the primary syndication of the DIP Facilities, and (d) your performance of (i) all your obligations hereunder to provide information and otherwise use your commercially reasonable efforts to assist in the efforts to syndicate the DIP Facilities, and (ii) all your obligations hereunder and under the Fee Letter to pay fees and expenses. Without limiting your obligations to assist with syndication efforts as set forth in this Commitment Letter, the Commitment Parties agree that neither completion of such syndication nor achievement of a Successful Syndication is a condition to their commitments under this Commitment Letter or to any funding under the DIP Facilities and each Commitment Party further agrees that (except for purposes of determining whether a "Successful Syndication" has been achieved under the market flex provisions of the Fee Letter) such Commitment Party shall not be released from its commitment hereunder in connection with such syndication to any lender until such lender shall have entered into the applicable DIP Facilities definitive documentation and funded the portion of the applicable DIP Facilities required to be funded by it on the Closing Date, and each of the Commitment Parties hereby agrees that upon the terms and subject to the

satisfaction or waiver of the conditions set forth in this Commitment Letter and the other conditions set forth in the Term Sheet, they will execute definitive documentation and close and fund the DIP Facilities prior to the completion of the syndication of the DIP Facilities.

7. Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Parties, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all actual losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the DIP Facilities, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses (x) to the extent they are found by a final nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of any indemnified person or its affiliates , directors, officers, employees, advisors, agents or other representatives (collectively, the "Related Parties"), (y) to the extent arising from any dispute solely among indemnified persons other than any claims against any Commitment Party in its capacity or in fulfilling its role as an Administrative Agent or Lead Arranger or any similar role under the DIP Facilities and other than any claims arising out of any act or omission on the part of you or your subsidiaries and (z) that arise from any material breach of this Commitment Letter by the Commitment Parties and (b) regardless of whether the Closing Date occurs, to reimburse within 30 days of written demand (together with reasonably detailed supporting documentation) each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to the Closing Date or following termination or expiration of the commitments hereunder (including reasonable and documented out-of-pocket due diligence expenses, syndication expenses, travel expenses, reasonable fees and reasonable documented out-of-pocket expenses of in-house professionals engaged in field examinations, collateral reviews, appraisals and environmental reviews, and reasonable fees, charges and disbursements of one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction and (ii) and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)) incurred in connection with the DIP Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facilities on a several, and not joint, basis with any other Commitment Party. No indemnified person shall be, liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such indemnified person (or any of its Related Parties). None of the indemnified persons or you, or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the DIP Facilities or the transactions contemplated hereby, provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

5

8.  Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates. In addition, each Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

9.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, (b) as may be required (or necessary in connection with) in any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter or the transactions contemplated hereby (in which case you agree to inform us promptly thereof) and further that you may disclose this Commitment Letter and the Fee Letter to the official committee of unsecured creditors appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "Creditors' Committee") and its advisors and to any other official committee appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "Committees"), so long as the disclosure of the Fee Letter to the Creditors Committee, any other official committee and their respective advisors is on a confidential "professionals only" basis) or as otherwise required by applicable law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof and it being understood and agreed that you shall take reasonable actions as shall be necessary to prevent the Fee Letter from becoming publicly available (it being acknowledged such actions may not be successful)), (c)

upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any syndication or other marketing material in connection with the DIP Facilities or in connection with any public filing requirement, and (d) the Term Sheet may be disclosed to potential Lenders and to any rating agency in connection with the DIP Facilities. Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letter with the Bankruptcy Court under seal and provide an unredacted copy of the Fee Letter to the Bankruptcy Court, the Office of the United States Trustee and the advisors to the Committees so long as the disclosure to such advisors to the Committees is on a confidential "professionals only" basis.

The Commitment Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to any Lenders or participants or prospective Lenders or participants that agrees in writing for the benefit of the Company, to keep such information confidential on terms reasonably acceptable to the Company (including pursuant to customary "click through" or similar electronic agreements); provided, no disclosure may be made to Disqualified Institutions, (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions; provided, no disclosure may be made to Disqualified Institutions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party's affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information. The obligations of the Commitment Parties under this paragraph shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the date the Credit Agreement is entered into, at which point any confidentiality undertaking in the Loan Documents shall supersede the provisions of this paragraph.

10. Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such

manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the DIP Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the bankruptcy court having jurisdiction over the chapter 11 cases of the Company and its subsidiaries or, if such court denies jurisdiction or the Company elects not to file cases under the Bankruptcy Code, then any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letter or the performance hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to (a) assistance to be provided in connection with the syndication thereof and (b) confidentiality of the Fee Letter and the contents thereof) shall automatically terminate and be superseded by the provisions of the Loan Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than the earlier of (a) 12:00 p.m., New York City time, on December 11, 2010 and (b) the time of the filing by the Loan Parties of their petition or petitions under Chapter 11 of the Bankruptcy Code. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the initial borrowing under the DIP Facilities does not occur on or before December 22, 2010, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to

an extension. In addition, this Commitment Letter and the commitments hereunder shall expire at (a) 5:00 p.m. (New York City time) on December 15, 2010, unless the Loan Parties shall have theretofore filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the Court and (b) if such petitions have been filed by such time, at 11:59 p.m. (New York City time) on the date that is 7 days after such filing, unless, prior to that time, the Court shall have entered the Interim Order, the Borrowers shall have paid to the Commitment Parties the fees that are specified in the Fee Letter to be due upon such entry and the Borrowers shall have entered into definitive documentation with respect to the DIP Facilities. In the further event that the Interim Order is entered, this Commitment Letter and the commitments hereunder shall expire 40 days after the entry of the Interim Order unless the Final Order shall have been entered prior to the expiration of such 40-day period.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
Name: _____
Title: _____

J.P. MORGAN SECURITIES LLC

By: _____
Name:
Title:

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:


J.P. MORGAN SECURITIES LLC

By: _____
Name: *Don Rambo*
Title: *Executive Director*

Accepted and agreed to as of the date first written above:

THE GREAT ATLANTIC & PACIFIC TEA
     COMPANY, INC.

By: _____

    Name: Frederic F. Brace

    Title: CRO & CAO

Exhibit A

$800,000,000 SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITIES

Term Sheet
December 10, 2010

This Term Sheet is delivered with a commitment letter of even date herewith (the "Commitment Letter") from JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC to the Company in connection with the superpriority debtor-in-possession Revolving Facility and Term Loan Facility described below (collectively, the "DIP Facilities"). Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Commitment Letter.

---

## I.     Parties

| | |
|---|---|
| Borrowers: | The Great Atlantic & Pacific Tea Company, Inc. (the "Company") and the other borrowers under the amended and restated credit agreement dated as of December 27, 2007, as amended (the "Prepetition Credit Agreement" and the facilities thereunder, the "Prepetition Credit Facilities") among the Company, the subsidiary borrowers party thereto, the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent (collectively with the Company, the "Borrowers"), as debtors in possession in one or more cases (the "Borrowers' Cases") under Chapter 11 of the Bankruptcy Code. |
| Lead Arranger and Bookrunner: | J.P. Morgan Securities LLC ( "JPMorgan" and in such capacity, the "Lead Arranger"). |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank" and in such capacity, the "Administrative Agent"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (including JPMorgan Chase Bank, but excluding the Disqualified Institutions) arranged by the Lead Arranger in consultation with the Company (collectively, the "Lenders"). |

## II.    Revolving Credit Facility

| | |
|---|---|
| Type and Amount of Facility: | Superpriority debtor-in-possession revolving credit facility (the "Revolving Facility") in the amount of $450,000,000 (the "Revolving Commitment" and the loans thereunder, the "Revolving Loans"). |
| Revolver Availability: | The Revolving Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the Termination Date (as defined below); provided that (x) prior to the entry of the Final Order (as defined below), only Letters of Credit (as defined below) may be issued under the Revolving |

Facility and (y) no Revolving Loans will be permitted to be requested by the Company prior to the entry of the Final Order. Revolving Loans bearing interest at the Alternate Base Rate (as defined in Annex I hereto) shall be available on a same day basis.

Revolver Availability under the Revolving Facility will be subject to the Revolver Borrowing Base and the Collateral Amount referred to below. "<u>Revolver Availability</u>" means, at any time, an amount equal to the lesser of (a) an amount equal to (i) the lesser of the Revolving Commitment and the Revolver Borrowing Base *minus* (ii) the sum of the aggregate outstanding amount of borrowings under the Revolving Facility plus the undrawn amount of outstanding Letters of Credit issued for the account of the Borrowers (collectively, the "<u>Aggregate Revolving Credit Extensions</u>") and (b) an amount equal to (i) the Collateral Amount *minus* (ii) the sum of the Aggregate Revolving Credit Extensions and the outstanding amount of borrowings under the Term Loan Facility (the "<u>Outstanding Term Loans</u>").

|                          |                          |
|--------------------------|--------------------------|
| Letters of Credit:       | A portion of the Revolving Facility not in excess of $250,000,000 shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by JPMorgan Chase Bank and any Lender that is also an issuing bank under the Prepetition Credit Facilities (collectively, in such capacity, the "<u>Issuing Lenders</u>"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) five business days prior to the Maturity Date (as defined below), <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional periods (which shall in no event extend beyond the date referred to in clause (b) above). |

Drawings under any Letter of Credit shall be reimbursed by the Borrowers (whether with their own funds or with the proceeds of Revolving Loans, subject to the satisfaction of the applicable conditions precedent to Revolving Loan borrowings) on the same business day (if notice is provided by a specified time) or the next business day. To the extent that the Borrowers do not so reimburse the Issuing Lenders, the Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to reimburse the Issuing Lenders on a <u>pro rata</u> basis.

|                          |                          |
|--------------------------|--------------------------|
| Revolver Borrowing Base: | The "<u>Revolver Borrowing Base</u>" will equal the sum of: |

(a) the lesser of (i) 75% of the Borrowers' eligible inventory (valued at the lower of cost (FIFO) or market) and (ii) the product of 90% *multiplied by* the net orderly liquidation value percentage identified in the most recent acceptable inventory appraisal *multiplied by* the Borrowers' eligible inventory (valued at the lower of cost (FIFO) or market), <u>plus</u>

(b) 90% of the Borrowers' eligible credit card accounts receivable, <u>plus</u>

(c)     85% of the Borrowers' eligible Coinstar accounts receivable, <u>plus</u>

(d)     85% of the Borrowers' eligible third party insurance provider accounts receivable, <u>plus</u>

(e)     85% *multiplied* by the net orderly liquidation value of the Borrowers' scripts as set forth in the most recent acceptable scripts appraisal, <u>plus</u>

(f)     50% *multiplied* by the fair market value of the Borrowers' eligible real estate identified in the most recent acceptable real estate appraisal, <u>less</u>

(g)     reserves established by the Administrative Agent in its Permitted Discretion, which reserves shall be substantially similar to the reserves permitted under the Prepetition Credit Agreement, as modified to reflect the proposed amendments thereto dated October 10, 2010 in connection with the proposed out-of-court restructuring (the "<u>Restructuring Credit Agreement Draft</u>"), plus a reserve for the Carve Out (as defined below) and subject to such changes as may be agreed by the Company and the Administrative Agent. "Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset based lender) business judgment.

Collateral Amount:     The "Collateral Amount" will equal the sum of:

(a)     the net orderly liquidation value percentage identified in the most recent inventory appraisal acceptable to the Administrative Agent *multiplied by* the Borrowers' eligible inventory (valued at the lower of cost (FIFO) or market), <u>plus</u>

(b)     the Borrowers' eligible credit card accounts receivable, <u>plus</u>

(c)     the Borrowers' eligible Coinstar accounts receivable, <u>plus</u>

(d)     the Borrowers' eligible third party insurance provider accounts receivable, <u>plus</u>

(e)     the net orderly liquidation value of the Borrowers' scripts as set forth in the most recent acceptable scripts appraisal, <u>plus</u>

(f)     the fair market value of the Borrowers' eligible real estate identified in the most recent acceptable real estate appraisal, <u>plus</u>

(g)     the fair market value of the Borrowers' eligible leaseholds identified in the most recent acceptable leasehold appraisal, <u>less</u>

(h)     reserves established by the Administrative Agent in its Permitted Discretion, which reserves shall be substantially similar

to the reserves permitted under the Restructuring Credit Agreement Draft, plus a reserve for the Carve Out and subject to such changes as may be agreed by the Company and the Administrative Agent.

Eligibility:

The eligibility criteria for eligible credit card accounts receivable, eligible Coinstar accounts receivable, eligible third party insurance provider accounts receivable, eligible inventory, eligible real estate and eligible leasehold will be substantially similar to the eligibility criteria set forth in the Restructuring Credit Agreement Draft, subject to such changes as may be agreed by the Company and the Administrative Agent. Mortgages on owned and leasehold properties shall not be required by the Closing Date but the Administrative Agent reserves the right to require such mortgages in its Permitted Discretion post-Closing.

In addition, the Administrative Agent would retain the right, from time to time, in its Permitted Discretion, to establish additional standards of eligibility and reserves against eligibility, to adjust reserves and to reduce advance rates used in computing the Revolver Borrowing Base substantially in accordance with standards set forth in the Restructuring Credit Agreement Draft, subject to such changes as may be agreed by the Company and the Administrative Agent.

Maturity and Termination Date:

The Revolving Loans shall be repaid in full and the Revolving Commitment shall terminate on the earliest to occur of (i) the date that is 18 months after the Closing Date (the "Maturity Date"), (ii) 40 days after the entry of the Interim Order (as defined below) if the Final Order has not been entered prior to the expiration of such 40-day period, (iii) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization that is confirmed pursuant to an order entered by the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases (as defined below) (the "Court") and (iv) the acceleration of the Loans and the termination of the Commitment in accordance with the Credit Agreement (as defined below) (such earliest date, the "Termination Date").

On the Termination Date, the Loans and other obligations shall be repaid, and the proceeds from and recoveries on the Collateral will be applied, first, to amounts owing in respect of the Revolving Facility (including, without limitation, fees, indemnities, expense reimbursements and cash collateralization of outstanding letters) and bank products and second, to the Term Loan Facility.

## III. Term Loan Facility

Type and Amount of Facility:

Superpriority debtor-in-possession term facility (the "Term Loan Facility") in the amount of $350,000,000 (the "Term Loan

Commitment" and, together with the Revolving Commitment, the "Commitment", and the loans thereunder, the "Term Loans" and, together with the Revolving Loans, the "Loans").

Term Loan Availability:

The Term Loans shall be made available to the Company in a single drawing on the Closing Date (as defined below). The sum of the Outstanding Term Loans and the Aggregate Revolving Credit Extensions shall at all times be less than or equal to the Collateral Amount.

Maturity and Termination Date:

The Term Loan Facility will mature and the Term Loans shall be repaid in full on the Termination Date.

## IV.   Purpose; Certain Payment Provisions

Purpose:

The proceeds of the DIP Facilities shall be used (i) to finance the working capital needs/for general corporate purposes of the Company and its subsidiaries following the commencement of the Cases, (ii) to pay the fees, costs and expenses incurred by the Company and its subsidiaries in connection with the Transactions and the Cases and (iii) to refinance (or collateralize, as applicable) in full the indebtedness outstanding as of the commencement of the Cases (the "Petition Date") under the Prepetition Credit Facilities.

Fees and Interest Rates:

As set forth on Annex I.

Mandatory Prepayments:

(a)     If at any time the Aggregate Revolving Credit Extensions exceed the lesser of the Revolving Commitment and the Revolver Borrowing Base, then the Borrowers will immediately first prepay outstanding Revolving Loans and second cash collateralize outstanding Letters of Credit, in an aggregate amount equal to such excess (it being agreed that upon request by the Company following the elimination of such excess (e.g., due to increase in the Revolving Borrowing Base, prepayment of the Loans or otherwise), the Administrative Agent shall return the applicable amount of cash collateral to the Company).

(b)     If at any time the sum of the Outstanding Term Loans and the Aggregate Revolving Credit Extensions exceed the Collateral Amount, then the Company will immediately first prepay outstanding Revolving Loans (without any permanent reduction of the Revolving Commitment), second cash collateralize outstanding Letters of Credit, and third prepay Outstanding Term Loans, in an aggregate amount equal to such excess.

(c)     In addition to the mandatory prepayments described above, the Credit Agreement will contain mandatory prepayment provisions that will require a prepayment of amounts outstanding under the DIP Facilities (without any reduction of the Revolving Commitment in the case of the Revolving Facility), subject to exceptions and thresholds to be mutually agreed: (i) upon a sale or transfer by the Company or

its subsidiaries of assets; (ii) upon the receipt of net cash proceeds from the issuance of any indebtedness (with exceptions for permitted indebtedness); and (iii) upon receipt of insurance proceeds or condemnation awards. The mandatory prepayments described in this clause (c) shall be applied <u>first</u> to prepay outstanding Revolving Loans (without any reduction of the Revolving Commitment in the case of the Revolving Facility), <u>second</u> to cash collateralize outstanding Letters of Credit and <u>third</u> to prepay Outstanding Term Loans (subject to, in the case of this clause <u>third</u>, a limited reinvestment right in an aggregate amount not to exceed an amount to be agreed on terms and subject to conditions to be agreed), in an aggregate amount equal to such excess.

| | |
|---|---|
| Voluntary Prepayments: | Permitted in whole or in part, with prior written notice to the Administrative Agent but without premium or penalty (other than the Prepayment Fee described in Annex I hereto), subject to limitations as to minimum amounts of prepayments and customary indemnification for breakage costs in the case of prepayment of Eurodollar Loans other than on the last day of an interest period; <u>provided</u> that no voluntary prepayments of the Term Loans may be made at any time unless (x) there are no Revolving Loans outstanding (excluding, for the avoidance of doubt, any outstanding Letters of Credit) at such time and (y) a pro forma liquidity test to be agreed is satisfied. |

## V.     <u>Collateral and Other Credit Support</u>

| | |
|---|---|
| Collateral and Priority: | The DIP Facilities (and all guarantees of the DIP Facilities by the Guarantors) shall at all times: |

(i)      pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases (but excluding a claim on avoidance actions and, prior to entry of the Final Order, the proceeds of avoidance actions),

(ii)      pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all of the assets of the Loan Parties, whether consisting of real, personal, tangible or intangible property (including all of the outstanding shares of capital stock of subsidiaries (limited, in the case of voting capital stock of foreign subsidiaries, to 65% of the voting capital stock of first tier foreign subsidiaries to the extent a pledge of a greater percentage could reasonably be expected to result in material adverse tax consequences to the Company or any of its subsidiaries as reasonably determined by the Company) that is not subject to valid, perfected and non-avoidable liens, excluding avoidance actions and, prior to entry of the Final Order, the proceeds of avoidance actions (it being understood that, notwithstanding such exclusion of avoidance actions, the proceeds of such actions (including, without limitation, assets as to which liens are avoided) shall, after entry of the Final Order, be subject to such liens under Section 364(c)(2) of the Bankruptcy Code

and available to repay the Loans and all other obligations under the DIP Facilities),

(iii)     pursuant to an intercreditor agreement dated as of August 4, 2009 (the "Intercreditor Agreement") (and, to the extent applicable, Section 364(d) of the Bankruptcy Code), be secured by a perfected first priority priming lien on all of the assets of the Loan Parties subject to a lien securing the notes issued by the Company under an indenture dated as of August 4, 2009 between Wilmington Trust Company, as trustee, and the Company (the "Prepetition Secured Notes"), and

(iv)     pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all of the assets of the Loan Parties that is subject to (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or (y) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, in each case other than the liens securing the Prepetition Secured Notes (together with the assets described in clauses (ii) and (iii) above, the "Collateral"),

subject to, in each case, (x) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code and (y) at any time after the occurrence and during the continuance of an Event of Default under the DIP Facilities and after the first business day following delivery of notice thereof by the Administrative Agent to the U.S. Trustee and each of the lead counsel for the Company and the official committee of unsecured creditors (once appointed, the "Committee") (the "Carve Out Notice"), to the extent allowed by the Court at any time, whether before or after delivery of a Carve Out Notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Loan Parties and the Committee, in an aggregate amount not exceeding $15,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed at any time by the Court that were incurred prior to or on the first business day following the delivery of the Carve Out Notice) (the "Carve Out"); provided that (A) so long as no Carve Out Notice shall have been delivered, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and (B) the right of any party to object to the reasonableness of any such fees or expenses to be paid by the estates of the Loan Parties shall not be impaired as a result of the existence of the Carve Out.

Upon the occurrence of an Event of Default, the Company shall be required to transfer from its concentration account to a segregated account not subject to the control of the Administrative Agent (the

"Carve Out Account") an amount equal to the Carve Out Cap. Proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out. It is understood and agreed that the Administrative Agent and the Lenders (x) shall not sweep or foreclose on cash of the Company necessary to fund the Carve Out Account and (y) shall have a security interest in any residual interest in the Carve Out Account.

Subject to the Carve Out, the Collateral will also secure bank products (including ACH transactions, credit card transactions and cash management services) and hedging obligations owing to the Administrative Agent or any Lender.

The liens on the Collateral securing the Prepetition Secured Notes shall be junior and subordinate to the Carve Out and the liens securing the DIP Facilities pursuant to the terms of the Intercreditor Agreement.

|  |  |
|---|---|
| Guaranties: | Each Borrower shall unconditionally guarantee all of the indebtedness, obligations and liabilities of each other Borrower arising under or in connection with the Loan Documents. In addition, each direct and indirect domestic subsidiary of the Company (collectively, the "Guarantors") that is a debtor-in-possession in a case, pending under Chapter 11 of the Bankruptcy Code (collectively, the "Guarantors' Cases" and, together with the Borrowers' Cases, the "Cases"), other than a Borrower, shall unconditionally guarantee all of the indebtedness, obligations and liabilities of the Borrowers arising under or in connection with the Loan Documents. |

## VI.    Certain Conditions

|  |  |
|---|---|
| Initial Conditions (other than for Revolving Loans) | The availability of the DIP Facilities (other than Revolving Loans) shall be conditioned upon satisfaction (or waiver) of the following conditions precedent (the date upon which the initial funding occurs upon the satisfaction (or waiver) of all such conditions, the "Closing Date") on or before December [ ], 2010: |

(a)     The Borrowers and the Guarantors (collectively, the "Loan Parties") shall have executed and delivered satisfactory definitive financing documentation with respect to the DIP Facilities, including a credit agreement (the "Credit Agreement"), security documents, guarantees and other customary legal documentation (collectively, together with the Credit Agreement, the "Loan Documents") mutually satisfactory to the Company and the Lenders.

(b)     The Lenders, the Administrative Agent and the Lead Arranger shall have received all fees required to be paid, and all expenses for which invoices have been presented, on or before the Closing Date.

(c)     All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Company and its subsidiaries

(including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

(d)     The Administrative Agent shall have received (i) the audited consolidated financial statements of the Company for the two most recent fiscal years ended prior to the Closing Date as to which such financial statements are available (the receipt of which is hereby acknowledged by the Administrative Agent), (ii) unaudited interim consolidated financial statements of the Company for each fiscal four-week period and quarterly period ended subsequent to the date of the latest financial statements delivered pursuant to clause (i) of this paragraph as to which such financial statements are available, (iii) the Company's most recent projected income statement, balance sheet and cash flows in form and substance reasonably acceptable to the Administrative Agent for the period beginning with the week that includes the Petition Date and ending on June 16, 2012 (after giving pro forma effect to the DIP Facilities) (the receipt and acceptability of which is hereby acknowledged by the Administrative Agent), and (iv) a reasonably detailed receipts and disbursements forecast in form and substance reasonably acceptable to the Administrative Agent for the 26 weeks commencing with the week that includes the Petition Date (the receipt and acceptability of which is hereby acknowledged by the Administrative Agent).

(e)     The Company shall have retained a financial advisor acceptable to the Administrative Agent (provided, that the Administrative Agent acknowledges that Lazard Ltd., is acceptable to them) and the Administrative Agent shall have been provided reasonable access to such financial advisor.

(f)     The Administrative Agent shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates in each Loan Party's jurisdiction of formation, incumbency certificates, flood insurance certificates and related endorsements (to the extent required by applicable law), customary opinions of counsel, organizational documents, title insurance policies (to the extent in the Company's possession) and financing statements, all in form and substance reasonably acceptable to the Administrative Agent and the Lead Arranger.

(g)     The Administrative Agent shall have received the most recently prepared asset appraisals available to the Company in form and substance reasonably acceptable to the Administrative Agent (the receipt and acceptability of which is hereby acknowledged), together with acceptable customary reliance letters.

(h)     The Administrative Agent shall have received a borrowing base certificate as of a date as recent as reasonably practicable, but in any event no earlier than December 4 (or if available, no more than 7 business days prior to the most recent Saturday prior to the

Closing Date) with customary supporting documentation and supplemental reporting to be agreed upon between the Administrative Agent and the Company.

(i)     The Administrative Agent shall have received any requested environmental review reports to the extent previously prepared and available to the Company.

(j)     Prepayment in full of all obligations under the Prepetition Credit Facilities, termination of the commitments thereunder and release of all liens, if any, granted thereunder (with such prepayment in full, termination and release being evidenced by a payoff letter reasonably acceptable to the Administrative Agent or, if such letter is not available, appropriate provisions in the Interim Order confirming such termination and release).

(k)     Compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

(l)     Minimum unrestricted cash and cash equivalents of the Loan Parties (after giving effect to the Transactions, excluding cash in stores and in-transit cash) of $165,000,000.

(m)     Not later than 7 days following the commencement of the Cases, entry of an order of the Court in substantially the form set forth as an exhibit to the Credit Agreement (the "Interim Order") on an application or motion by the Borrowers that is reasonably satisfactory in form and substance to the Administrative Agent, which Interim Order shall have been entered and on such prior notice to such parties as may be reasonably satisfactory to the Administrative Agent, which Interim Order shall (w) authorize the extensions of credit in respect of the Revolving Facility and Term Loan Facility, each in the amounts and on the terms set forth herein, (x) grant the superpriority claim status and other collateral and liens referred to above, (y) approve the payment by the Borrowers of all of the fees provided for herein and (z) not have been vacated, reversed, modified, amended or stayed.

(n)     All of the "first day orders" entered at the time of commencement of the Cases shall be reasonably satisfactory in form and substance to the Administrative Agent

**Initial Conditions to Revolving Loans:**

The availability of the Revolving Loans shall be conditioned upon satisfaction (or waiver) of the following conditions precedent (the date upon which all such conditions shall be satisfied or waived, the "Revolver Availability Date"):

(a)     The Closing Date shall have occurred.

(b)     The Final Order shall have been entered by the Court.

(c)     The Administrative Agent shall have received appraisals of assets included in the Revolver Borrowing Base or Collateral Amount as specified by the Administrative Agent from (x) independent appraisers satisfactory to the Administrative Agent engaged directly by the Administrative Agent or (y) the appraisers previously engaged by Bank of America, N.A., as agent under the Prepetition Credit Facilities, in connection with its determination of the borrowing base thereunder; provided that any such appraisal in connection with the Prepetition Credit Facilities shall have been conducted not more than six months prior to the Revolver Availability Date and, if such appraisal was conducted by an appraiser engaged by Bank of America, N.A. as administrative agent under the Prepetition Credit Facilities, a customary reliance letter in form and substance acceptable to the Administrative Agent shall have been provided; provided further that any such appraisals described in clause (x) and clause (y) above shall be in form and substance reasonably satisfactory to the Administrative Agent (it being acknowledged that the appraisals described in clause (y) are in form and substance satisfactory to the Administrative Agent).

(d)     The Administrative Agent or its designee shall have conducted a satisfactory field examination of the accounts receivable, inventory and related working capital matters and financial information of the Company and its subsidiaries and of the related data processing and other systems.

(e)     The Administrative Agent shall have received any reasonably requested Phase I environmental review reports from one or more firms reasonably satisfactory to the Administrative Agent. Any environmental hazards or liabilities identified in any such environmental review report shall indicate the Company's plans with respect thereto.

On-Going Conditions:   The making of each extension of credit shall be conditioned upon (a) the accuracy in all material respects of all representations and warranties in the Loan Documents (including, without limitation, the material adverse change and litigation representations); (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit, (c) after giving effect to the extensions of credit request, (i) the Aggregate Revolving Credit Extensions shall not exceed the lesser of the Revolving Commitment or the Revolver Borrowing Base then in effect and (ii) the sum of the Outstanding Term Loans and the Aggregate Revolving Credit Extension shall not exceed the lesser of (A) the Collateral Amount and (B) the aggregate amount authorized by the Interim Order, (d) not later than 40 days after the entry of the Interim Order, the Court shall have entered an order (the "Final Order") in substantially the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Administrative Agent in its sole discretion and (e) the Interim Order or the Final Order, as the case may be, shall be in

full force and effect, and shall not have been vacated, reversed, modified, amended or stayed, or modified or amended in a manner that the requisite Lenders reasonably determine to be adverse to their interests. As used herein and in the Loan Documents a "material adverse change" shall mean any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on (i) the business, assets, operations, or financial condition of the Company and its subsidiaries taken as a whole (other than as a result of the events leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof and provided that nothing disclosed in (1) the Company's Annual Report on Form 10-K for the year ended February 22, 2010, (2) Quarterly Report on Form 10-Q for each quarter ended since February 22, 2010, as filed prior to the date of the Commitment Letter and/or (3) any filings on Form 8-K made through the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), be deemed to constitute a material adverse effect), (ii) the ability of the Borrowers (taken as a whole) to perform any of their material obligations under the Loan Documents to which they are a party and the ability of the Loan Parties (taken as a whole) to perform any of their material obligations under the Loan Documents to which it is a party, (iii) the Collateral, or the Administrative Agent's liens (on behalf of itself and the Lenders) on the Collateral or the priority of such liens or (iv) the rights of the Administrative Agent, the Issuing Lenders and the Lenders under the Loan Documents.

## VII.  Certain Documentation Matters

The Loan Documents shall contain the following representations, warranties, covenants and events of default customary for debtor-in-possession financings of this type (which shall be, in each case, subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon):

Representations and Warranties:

Financial statements; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Loan Documents; no conflict with law or post-petition contractual obligations; no material unstayed litigation; no default; ownership of property; liens; intellectual property; no burdensome post-petition restrictions; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; accuracy of disclosure.

Affirmative Covenants:

Delivery of fiscal four-week, quarterly and annual financial statements, rolling 26-week cash receipts and disbursements forecast (together with a reconciliation of actual results to forecasted results), monthly compliance certificates and projections, weekly collateral

reporting (including accounts receivable agings and inventory reports) and weekly borrowing base certificates (to be delivered no later than 7 business days after the end of the week) until the delivery of a compliance certificate with respect to financial covenants for the period ending August 13, 2011, and thereafter, bi-weekly borrowing base certificates so long as no Event of Default, and other information reasonably requested by the Administrative Agent; reasonable access to the financial advisors of the Loan Parties; payment of material post-petition obligations; continuation of business (taken as a whole) and maintenance of existence (taken as a whole); compliance with laws; maintenance of material property and insurance consistent with customary industry practice; maintenance of books and records; right of the Administrative Agent to inspect property and books and records (including periodic field examinations and inventory, real estate, scripts and leasehold appraisals, in each case as set forth below); notices of defaults, material litigation and other material events; compliance with environmental laws; depository banks; casualty and condemnation; delivery of mortgages within 60 days following the Closing Date (which date may be extended by the Administrative Agent by up to an additional 60 days at its discretion) on certain real estate in form and substance satisfactory to the Administrative Agent and executed by the relevant Loan Party; certain other post-closing collateral matters to be agreed; delivery of insurance certificates, loss payable and additional insured endorsements within 3 days following the Closing Date (which date may be extended by the Administrative Agent by up to an additional 4 days at its discretion); and use of proceeds.

Financial Covenants:

The following financial covenants:

(i) Minimum unrestricted cash and cash equivalents (including cash in stores and in-transit cash, and excluding for the avoidance of doubt, the Segregated Account described below and the Carve Out Account) of $100,000,000 at all times.

(ii) Minimum sum of (x) Revolver Availability and (y) cash of the Loan Parties held in a segregated account that is under the exclusive control of the Administrative Agent (the "Segregated Account") of (A) at all times on or prior to August 13, 2011, $100,000,000, (B) at all times after August 13, 2011, but on or prior to November 5, 2011, $75,000,000, and (C) at all times on and after November 5, 2011, $50,000,000;

(iii) (x) Minimum cumulative EBITDA for each period from April 24, 2011 to each of the following dates in the amount set forth opposite such date:

| Date | Minimum EBITDA |
| --- | --- |
| August 13, 2011 | $0 |
| September 10, 2011 | $10,000,000 |
| October 8, 2011 | $20,000,000 |

| November 5, 2011 | $35,000,000 |
| December 3, 2011 | $50,000,000 |
| December 31, 2011 | $65,000,000 |
| January 28, 2012 | $90,000,000 |
| February 25, 2012 | $100,000,000 |
| March 24, 2012 | $110,000,000 |
| April 21, 2012 | $125,000,000 |

(y)      Minimum twelve month trailing EBITDA as of each of the following dates in the amount set forth opposite such date:

| Date | Minimum EBITDA |
| --- | --- |
| May 19, 2012 | $150,000,000 |
| June 16, 2012 | $175,000,000 |

**Negative Covenants:**

Limitations (subject to exceptions, as appropriate, to be negotiated) on: indebtedness (including guarantee obligations and preferred stock of subsidiaries, (with exceptions to include a subordinated junior secured debtor-in-possession facility, subject to (x) the maximum senior secured debt cap in the Intercreditor Agreement, (y) an intercreditor agreement acceptable to (1) Lenders holding a majority of the Revolving Commitments, (2) Lenders holding a majority of the outstanding Term Loans and (3) the Administrative Agent), and (z) terms and conditions otherwise reasonably satisfactory to the Administrative Agent, including, without limitation, payment subordination to the DIP Facilities, interest coverage and liquidity tests and ability to be repaid other than in cash upon exit from bankruptcy); liens; mergers, consolidations, liquidations and dissolutions; sales of assets; payment of restricted payments (including dividends and other payments in respect of capital stock of the Company); investments (including acquisitions), loans and advances; sale and leaseback transactions; swap agreements; optional payments and modifications of subordinated and other debt instruments; transactions with affiliates; changes in fiscal year; negative pledge clauses; amendment of material documents; payment of prepetition obligations; and other superpriority claims.

**Cash Dominion:**

As soon as practicable and in no event more than 60 days following the Closing Date (which date may be extended by the Administrative Agent by up to an additional 60 days), the Company and its subsidiaries will be subject to cash dominion from such date for the life of the DIP Facilities, and, from and after such date, funds deposited into any depository account (except as set forth below) will be swept on a daily basis into a blocked account with the Administrative Agent. As soon as practicable and in no event more than 60 days following the Closing Date (which date may be extended by the Administrative Agent by up to an additional 60 days), the Administrative Agent shall be the principal depository and disbursement bank of the Loan Parties. The appropriate and customary documentation, including blocked account and/or lockbox agreements reasonably acceptable to the Administrative

Agent, will be required for all depository accounts of the Loan Parties. Notwithstanding the foregoing, the following deposit accounts shall be excluded from the foregoing requirements: (i) payroll, trust, and tax accounts, (ii) local store accounts having available balances of less than an agreed-upon amount, individually and (iii) other accounts (other than lockbox accounts and other accounts into which customer or other third party payments in respect of collateral are made) having balances not in excess of an amount to be agreed in the aggregate.

|                  |                                                                 |
|------------------|-----------------------------------------------------------------|
| Events of Default: | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after three business days; representations and warranties are incorrect in any material respect; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to occurrence of a default (whether or not resulting in acceleration) under any other agreement governing post-petition indebtedness of the Company or any of its domestic subsidiaries, in excess of an amount to be agreed; certain ERISA events; any of the Loan Documents shall cease to be in full force and effect or any Loan Party thereto shall so assert; any interests created by the Interim Order or the Final Order shall cease to be enforceable and of the same priority purported to be created thereby; a change of control (the definition of which is to be agreed); dismissal of the Cases or conversion of the Cases to a case under chapter 7 of the Bankruptcy Code; appointment of a trustee (subject to a period for the Company to contest); entry of an order granting relief from the automatic stay as to assets with a value in excess of an amount to be agreed; modification to the Interim Order or Final Order in a manner which is adverse to the interests of the Lenders; post petition judgments in excess of an amount to be agreed; pre-petition payments (other than as permitted by the Interim Order, Final Order or any "first day" or "second day" order); non-compliance by the Loan Parties with the terms of the Interim Order or Final Order; entry of a Bankruptcy Court order granting any superpriority claim which is senior or pari passu with the Lenders' claims under the DIP Facilities; entry of a Bankruptcy Court order authorizing the sale of all or substantially all of the assets of the Company and its subsidiaries unless (i) such order contemplates repayment in full in cash of the DIP Facilities upon consummation of the sale or (ii) consummated as part of a plan of reorganization; and cessation of liens or superpriority claims granted with respect to the DIP Facilities to be valid, perfected and enforceable in all respects. |

|          |                                                                           |
|----------|---------------------------------------------------------------------------|
| Voting:  | Amendments, waivers and consents with respect to the Loan Documents shall require the approval of the Company and Lenders holding not less than a majority of the commitments and loans under the DIP Facilities, except that (a) the consent of each Lender affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of maturity of any loan or reduce the amount or extend the payment date for, any required mandatory payments, (ii) reductions in the rate of interest |

or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the loan documents) and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment; (b) the consent of each Lender shall be required to (i) add additional categories of assets to the definition of Collateral Amount, (ii) modify the pro rata sharing requirements of the Loan Documents, (iii) permit any Loan Party to assign its rights under the Credit Agreement, (iv) modify any of the voting percentages, (v) release any Guarantor, except as otherwise permitted in the Loan Documents, or (vi) release all or substantially all of the Collateral; (c) amendments of the financial covenants (and definitions used therein) and amendments to the definition of Collateral Amount (and the defined terms used in such definitions) or the definition of Revolver Availability shall require the consent of (i) Lenders holding a majority of the Revolving Commitments and (ii) Lenders holding a majority of the outstanding Term Loans; and (d) the consent of each Lender under the Revolving Facility shall be required to increase the advance rates set forth in the definition of Revolver Borrowing Base or to add additional categories of assets to the definition of Revolver Borrowing Base. Any other amendments to the definition of Revolver Borrowing Base, in each case in a manner adverse to the interests of the Lenders or in a manner that would make more credit available to the Borrowers will require the consent of Lenders holding more than 66-2/3% of the aggregate amount of the Revolving Commitment (in the case of additions of the Revolver Borrowing Base) or of the Term Loans (in the case of the additions to the Collateral Amount).

Assignments and Participations: The Lenders shall be permitted to assign all or a portion of their Loans and Commitments (other than to a Disqualified Institution) with the consent, not to be unreasonably withheld, of (a) the Administrative Agent , unless only a Term Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund and (b) the Issuing Lenders, unless only a Term Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund. In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $5,000,000, in the case of a Revolving Commitment, and $1,000,000, in the case of a Term Loan, unless otherwise agreed by the Company and the Administrative Agent. The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the Lenders from which they acquired their participations with respect to yield protection and increased cost provisions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of all Lenders, all affected Lenders (if applicable) or all Lenders under the applicable Facility would be required. Pledges of Loans in accordance with applicable law shall be permitted without restriction. Subject to entry into customary confidentiality

|                      | undertakings, each Lender may disclose information to prospective participants and assignees. |
| -------------------- | -------------------- |

Yield Protection:

The Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

In connection with any proposed amendment, waiver or other modification to the DIP Facilities (a "Proposed Change") requiring the consent of all Lenders or all affected Lenders, if the consent to such Proposed Change of all Lenders whose consent is required is not obtained, but the consent of Lenders with a majority of the Loans and commitments held by the applicable group of Lenders is obtained (any such Lender whose consent is required but is not obtained, a "Non-Consenting Lender"), then the Company may, at its sole expense, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to all restrictions otherwise applicable to assignments), all its interests, rights and obligations under the DIP Facilities to an assignee that shall assume such obligations; provided that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the DIP Facilities from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts).

Field Examinations:

Two field examinations per 12 month period may be conducted at the reasonable expense of the Borrowers; provided that (x) the number or frequency of field examinations shall be increased to a number and frequency to be agreed if the Revolver Availability is less than an amount to be agreed and (y) there shall be no limitation on the number or frequency of such field examinations if an Event of Default shall have occurred and is continuing.

Appraisals:

Two appraisals per 12 month period may be conducted on inventory, real estate, scripts and leaseholds; provided that with respect to inventory and scripts (x) the number or frequency of appraisals shall be increased to a number and frequency to be agreed if the Revolver Availability is less than an amount to be agreed and (y) there shall be no limitation on the number or frequency of such appraisals if an Event of Default shall have occurred and is continuing.

Expenses and

| Indemnification: | The Borrowers shall pay (a) all reasonable documented out-of-pocket expenses of the Administrative Agent and the Lead Arranger associated with the syndication of the DIP Facilities and the preparation, execution, delivery and administration of the Loan Documents and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of one primary counsel designated by the Administrative Agent (and appropriate local counsel in applicable local jurisdictions, but limited to one local counsel in each such jurisdiction) for the Lead Arranger and the Administrative Agent), (b) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Loan Documents; _provided_ that the reimbursement of the charges of such counsel shall be limited to one counsel for the group (which shall be designated by the Administrative Agent) (and (i) appropriate local counsel in applicable local jurisdictions, but limited to one local counsel for the group in each such jurisdiction (which shall be designated by the Administrative Agent) and (ii) solely in the case of a conflict of interest, additional counsel in each relevant jurisdiction for group members who are similarly situated and (c) all reasonable fees and documented out-of-pocket expenses associated with collateral monitoring, collateral reviews and appraisals, environmental reviews and reasonable fees and documented expenses of other advisors and professionals engaged by the Administrative Agent or the Lead Arranger in consultation with the Company. |
|---|---|

The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; _provided_ that the Company and its subsidiaries shall have no obligation to indemnify any indemnified person against any such loss, liability cost or expense (x) to the extent they are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such indemnified party or (y) to the extent arising from any dispute solely among indemnified persons other than (i) any claims against the Administrative Agent or Lead Arranger acting in such capacity or in fulfilling such role or any similar role under the DIP Facilities and (ii) any claims arising out of any act or omission on the part of the Company or its subsidiaries. No Lender shall be responsible or liable to the Company or any of its subsidiaries or any other person for consequential or punitive damages.

| Governing Law: | This Term Sheet and any related commitment letter and fee letter are, and the Loan Documents will be, governed by the Bankruptcy Code, as applicable, and the internal laws of the State of New York. |
|---|---|

Counsel to the Administrative
Agent and the Lead Arranger:   Davis Polk & Wardwell LLP.

Interest and Certain Fees

| | |
|---|---|
| Interest Rate Options: | The Borrowers may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans herein referred to as "ABR Loans") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans herein referred to as "Eurodollar Loans") plus the Applicable Margin. |

As used herein:

"Alternate Base Rate" or "ABR" means the greatest of (a) the prime rate of interest announced from time to time by JPMorgan Chase Bank or its parent (which is not necessarily the lowest rate charged to any customer), changing when and as said prime rate changes (the "Prime Rate"), (b) the federal funds effective rate from time to time plus 0.50% and (c) the Adjusted LIBO Rate for a one month interest period appearing on the Reuters Page LIBOR01 (or on any successor or substitute page) on such day plus 1.00%.

"Adjusted LIBO Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one or two weeks, one, two, three or six months (as selected by the Borrowers) appearing on Reuters Page LIBOR01 (or on any other service providing comparable rate quotations) at approximately 11:00 a.m., London time, two business days prior to the first day of the applicable interest period; provided that solely with respect to the Term Loans, the Adjusted LIBO Rate shall in no event be less than 1.75%.

"Applicable Margin" means, a margin with respect to:

Revolving Loans
2.00% in the case of ABR Loans
3.00% in the case of Eurodollar Loans

Term Loans
6.50% in the case of ABR Loans
7.50% in the case of Eurodollar Loans

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, interest shall be payable in arrears on the first day of each month, upon any prepayment due to acceleration and at final maturity. |

In the case of Eurodollar Loans, interest shall be payable in arrears on the last day of each interest period and, in the case of an interest period longer than three months, quarterly, upon any prepayment and at final maturity.

| | |
|---|---|
| Commitment Fee: | A commitment fee equal to 0.50% per annum on the average daily unused portion of the Revolving Commitment (then available), payable monthly in arrears to the Administrative Agent for the ratable benefit of the Lenders from the Closing Date until termination of the Revolving Commitment. |

| Letter of Credit Fees: | <u>Letter of Credit:</u> A letter of credit fee, equal to the Revolving Facility Applicable Margin for Eurodollar Loans, on the daily maximum amount to be drawn under all Letters of Credit, payable monthly in arrears to the Lenders (including the Issuing Lenders) ratably. |
|---|---|
| | <u>Fronting Fee:</u> A fronting fee of 0.125% per annum of the face amount of each Letter of Credit issued shall be payable to the Issuing Lender of such Letter of Credit, together with any documentary and processing charges in accordance with the Issuing Lender's standard schedule for such charges with respect to the issuance, amendment, cancellation, negotiation or transfer of each letter of credit and each drawing made thereunder. |
| Agent and Arranger Fees: | Such additional fees payable to the Administrative Agent and the Lead Arranger as are specified in the fee letter dated December [ ], 2010, among the Administrative Agent, the Lead Arranger and the Company. |
| Default Rate: | After any Specified Default (as defined in the Prepetition Credit Agreement) and delivery of notice by the Administrative Agent, the applicable interest rate for all Loans will be increased to, and overdue interest, fees and other amounts (other than overdue principal) shall bear interest at 2% per annum above the rate applicable to ABR Loans. Overdue principal shall bear interest at 2% above the rate otherwise applicable. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans) for actual days elapsed. |
| Prepayment Fee: | Upon an optional prepayment of obligations under the Term Loan Facility in connection with a Repricing Transaction (as defined below), a fee payable to the Administrative Agent for the ratable benefit of the Lenders in an amount equal to the aggregate amount of Term Loans repaid *multiplied* by 1.00%. "<u>Repricing Transaction</u>" means the prepayment or refinancing of all or any portion of the Term Loan Facility concurrently with the incurrence by the Company or any of its subsidiaries of any indebtedness having a lower cost of financing than, or any amendment to the Term Loan Facility that has the effect of reducing the interest rate margin then applicable to, the Term Loan Facility (including any mandatory assignment in connection therewith). |

(NY) 27011/200/TERMSHEET/term.sheet.doc