# EXHIBIT D

**Goldstein Declaration**

James H.M. Sprayregen P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF STEPHEN GOLDSTEIN IN SUPPORT OF DIP FINANCING**

Pursuant to 28 U.S.C. § 1746, I, Stephen Goldstein, hereby declare as follows:

1. I am a Managing Director in the Restructuring Group of Lazard Frères & Co. ("***Lazard***"), the U.S. operating subsidiary of a preeminent international financial advisory and asset management firm. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing more than $1 trillion in debtor assets.

2. Since joining Lazard in 2002, I have advised companies on numerous in-court and out-of-court restructurings, recapitalizations and reorganizations, and I have extensive experience in procuring, structuring and negotiating debtor-in-possession ("***DIP***") financing

facilities. Before Lazard, I was a Vice President at Thomas Weisel Partners where I headed the firm's east coast Private Placement effort. Prior to that I worked as an associate in the Investment Banking Group at NationBanc Montgomery Securities and as an attorney at Morgan, Lewis & Bockius, where I specialized in securities law and mergers and acquisitions. I received my Bachelor of Arts degree from Cornell University in 1992. I received my Juris Doctor degree from New York University School of Law in 1995.

3. I offer this declaration in support of the Debtors' motion to obtain approval of a fully-committed $800 million DIP financing facility offered by J.P. Morgan Chase Bank N.A. In particular, I submit this declaration to place before this Court evidence supporting my opinions, to a reasonable degree of expert certainty, that J.P. Morgan's DIP proposal (a) was the product of an arm's length negotiation, (b) is the best available DIP for the Debtors and (c) is in the best interests of the Debtors' estates and creditors.

## A. The Debtors' Current Capital Structure and Need for DIP Financing

4. Because the Debtors' current capital structured is explained in the first day declaration of Frederic F. Brace, I will not repeat it here in detail. To summarize, however, the Debtors have approximately $1 billion in funded indebtedness and related obligations, consisting of (a) a prepetition senior secured term facility and revolving facility, (b) prepetition secured notes, (c) four series of unsecured notes and (d) a $10 million unsecured promissory note.

5. As explained in the first day declaration, the combination of an increasingly competitive marketplace, unfavorable supply and logistics contracts, and legacy costs have exacerbated the Debtors' leveraged capital structure and constrained their liquidity. On December 4, 2010, after the Debtors were convinced that an out-of-court restructuring was not attainable, the Debtors engaged Lazard to assist them in obtaining the best DIP financing available prior to filing.

### B. The DIP Marketing Process

6. The Company began the DIP marketing process by reviewing its contacts, consulting with its advisors and thinking about the best potential financing sources. In the end, the company came up with three viable candidates – the prepetition lenders, J.P. Morgan Chase Bank N.A. ("***JPMorgan***") and a third, well-known DIP lending source. The company asked all three for DIP proposals, but the third lender declined, leaving only JPMorgan and the prepetition lenders as potential DIP lenders.

7. Over a period of roughly ten days, the Debtors and their advisors engaged in round-the-clock diligence and dual-track negotiations with both the prepetition lenders and JPMorgan to obtain the best DIP terms each was willing to offer. These negotiations were arm's length at all times and were characterized by hard bargaining by all interested parties. Through such efforts, the Debtors were able to improve upon the initial offers of both the prepetition lenders and JPMorgan until each group ultimately made its best and final DIP proposal.

8. In early December 2010, the prepetition lenders delivered to the Debtors draft terms sheets for DIP financing. Around the same time, JPMorgan delivered to the Debtors indicative term sheets, draft term sheets and commitment letters.

9. The final DIP proposals of the prepetition lenders and JPMorgan were analyzed in detail by the Debtors and their advisors, including Lazard. On December 9, 2010, Lazard made a formal presentation to the Debtors' Board of Directors that analyzed the details of the competing proposals, answered numerous questions posed by Board members and made various observations and recommendations concerning the strengths and weaknesses of each proposal.

### C. The Debtors Select JPMorgan's DIP Proposal

10. As a restructuring professional with substantial expertise with DIP financings, I am well aware that seeking approval of a DIP financing that provides for the immediate

refinancing of existing lenders requires careful scrutiny by this Court. But I believe the Debtors' request to approve the JPMorgan DIP loan should be granted for a variety of reasons.

11. ***First***, while JPMorgan's DIP loan refinances the prepetition lenders, it does so subject to disgorgement rights. In addition, the only alternative here – the prepetition lenders' DIP proposal – contained a roll-up feature. Thus, under either proposal advances by the prepetition lenders are administrative expenses that are required to be paid in full in any event.

12. ***Second***, it is clear that the prepetition lenders are oversecured at this time. The prepetition facility is a borrowing base loan and, as of the petition date, there was significant excess availability. This alone demonstrates that the prepetition loan is oversecured.

13. ***Third***, and finally, when all terms of the final DIP proposals of the prepetition lenders and JPMorgan were studied side-by-side, the Debtors concluded that the JPMorgan proposal was superior in almost all material respects and was by far in the best interests of their estates and creditors. This is so for at least three reasons. The JPMorgan DIP loan proposal is fully committed, while the prepetition lenders' proposal was best efforts only. The JPMorgan DIP financing proposal offers superior liquidity. And the JPMorgan DIP loan proposal contains far fewer restrictive covenants. All of this and more caused Lazard and the Debtors to easily conclude that the JPMorgan facility should be presented to this Court for approval.

14. The JPMorgan DIP loan proposal is on a firm commitment basis, while the prepetition lenders' proposal was on a best efforts only basis. The Company relies on approximately $250 million of trade credit from suppliers. A fully committed facility demonstrates to suppliers that the Company has the liquidity and ability to satisfy postpetiton liabilities and will incent them to provide trade credit. I understand that, by separate application, the Debtors are seeking to implement a critical vendor motion. The JPMorgan DIP loan proposal

is the funding to make that critical vendor program work and incent trade suppliers to provide the trade credit contemplated by that motion.

15. The JPMorgan DIP loan proposal is for $800 million versus only $675 million offered by the prepetition lenders and, as such, provides substantially more incremental liquidity. The JPMorgan DIP financing proposal also offers a materially lower interest rate than the prepetition lenders' proposal; however, JPMorgan does have the option to "flex" certain economic terms as part of any syndication efforts.

16. The covenant package offered by JPMorgan also is much more favorable than that offered by the prepetition lenders. The prepetition lenders' proposal contained significant case control mechanisms relative to the JPMorgan proposal, including with respect to asset dispositions and lease assumptions and rejections. On the other hand, while it is true that the upfront fees associated with the JPMorgan proposal are greater than those under the competing offer, that is to be expected given the fully underwritten nature of the JPMorgan proposal. These, and other comparisons between the competing proposals, can be seen in the following chart:

| KEY TERM | JPMORGAN CHASE | COMMENT |
|---|---|---|
| CREDIT FACILITIES | • $800 million DIP facility (Fully Underwritten)<br>  • Revolving Credit Facility: $450 million ($250 million L/C sublimit)<br>  • Term Loan: $350 million | • Large (and fully committed) facility, significantly larger than alternative |
| TOTAL LIQUIDITY[a] | • ~$263 million, increasing to $313 million over the life of the facility | • Significantly more liquidity for the Company than any alternative |
| TENOR | • 18 months | • Provides adequate runway for operational restructuring of Company |
| PRICING/FEES | Tranche | Drawn Spread | Libor Floor | Undrawn Fee |<br>Revolver | L + 300 | N/A | 50 bps |<br>Term Loan | L + 750 | 1.75% | N/A | • Interest payments significantly lower than alternative, subject to customary market flex<br>• Higher upfront fees, |

|  |  | L/C Fees 300 bps<br>• Other customary fees (agency fees, fronting fees, etc.) associated with a fully underwritten credit facility | reflecting the fact that facility is fully underwritten |
| --- | --- | --- | --- |
| **FINANCIAL AND OTHER COVENANTS** |  | • Minimum Revolver Availability plus Cash Collateral<br>• Minimum Cash Balance<br>• Minimum Cumulative EBITDA (tested beginning August 2011 according to an increasing scale) | • Significantly better and less restrictive covenant package than any alternative |

(a) Represents projected cash balance plus borrowing base availability (including covenant restrictions) at time of final order.

17. Taking all of this into consideration, including the firm commitment, the superior liquidity, and the less restrictive covenants, the Debtors, as authorized by the Board and in consultation with their advisors, signed JPMorgan's commitment letter on December 11, 2010.

### D. **JPMORGAN's DIP Proposal Should Be Approved**

18. Based on my experience in general and my specific involvement in the marketing and negotiation of the DIP financing in this matter, I believe that the process was full and fair, it was comprehensive and it produced the best available financing option given the circumstances. The negotiations with both lenders were always conducted at arm's length and were productive, as the Debtors were able to improve upon the initial offers of both groups.

19. I also believe that, all things considered, JPMorgan's DIP loan proposal is fairly priced, is superior to the prepetition lenders' offer and is a better fit for these Debtors at this time. In my view, among other things, the certainty and stability associated with a firm commitment, like JPMorgan's DIP, simply cannot be overstated.

20. I believe that the Debtors greatly need the significant additional liquidity offered by JPMorgan's DIP loan proposal. Among other things, JPMorgan's DIP will reduce the Debtors' exposure to trade contraction, reclamation claims and claims under the Perishable Agricultural Commodities Act of 1930, and will send a strong signal to employees, customers and other parties of the Company's viability. Accordingly, if approved, the JPMorgan DIP loan

will preserve and enhance the value of the Debtors' businesses and, as such, is in the best interests of the Debtors' estates and creditors.

21. Finally, I believe that JPMorgan's DIP loan provides adequate protection for the second lien lenders who hold the prepetition secured notes discussed in the first day declaration. To begin with, as I understand it those lenders have agreed, by virtue of an intercreditor agreement, not to object to up to $850 million of DIP financing. The access to the capital provided by JPMorgan's DIP loan will not only preserve the Debtors' liquidity but, as noted above, will preserve and enhance the value of the Debtors' businesses. And, just as importantly, I understand that the second lien lenders will be offered replacement liens and junior liens on previously unencumbered leaseholds. By their very nature, all of these events provide adequate protection for these second lien lenders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


December 12, 2010                    /s/ Stephen Goldstein_____
                                     Stephen Goldstein