**Hearing Date:  April 28, 2011 at 10:00 a.m.**
**Objections Due:  April 21, 2011 at 4:00 p.m.**

Richard M. Meth, Esq.
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
rmeth@foxrothschild.com
Telephone:  973.992.4800
Facsimile:  973.992.9125

-and-

Michael G. Menkowitz, Esq.
FOX ROTHSCHILD LLP
2000 Market Street – 20th Floor
Philadelphia, Pennsylvania 19103
mmenkowitz@foxrothschild.com
Telephone:  215.299.2000
Facsimile:  215.299.2150

*Counsel to Schmidts Retail, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,<br><br>                Debtors. | Chapter 11<br>(Jointly Administered)<br><br>Case No.:  10-24549 (RDD) |

**NOTICE OF HEARING ON SCHMIDTS RETAIL, LP'S**
**MOTION TO COMPEL DEBTORS TO ASSUME OR REJECT LEASE**

     **PLEASE TAKE NOTICE** that counsel for Schmidts Retail, LP shall present the

attached Motion to Compel Debtors to Assume or Reject Lease (the "Motion") to the Honorable

Robert D. Drain, Bankruptcy Judge of the United States Bankruptcy Court for the Southern

District of New York (the "Bankruptcy Court"), at 300 Quarropas Street, White Plains, New

York 10601, at a hearing to be held on April 28, 2011 at 10:00 a.m. (prevailing Eastern Time)

(the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in

the Motion must comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of

the United States Bankruptcy Court for the Southern District of New York, must be set forth in a

writing describing the basis therefor and must be filed with the Bankruptcy Court electronically

in accordance with General Order M-399 by registered users of the Bankruptcy Court's

electronic case filing system (the User's Manual for the Electronic Case Filing System can be

found at http://www.nysb.uscourts.gov, the official website of the Bankruptcy Court), and by all

other parties in interest, on a 3½ inch disk or cd, preferably in Portable Document Format (PDF),

WordPerfect or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers) and served in accordance with, and upon, the parties specified in the Order

Establishing Certain Notice, Case Management and Administrative Procedures dated December

14, 2010 (the "Case Management Procedures"), including, among other parties, Fox Rothschild

LLP, attorneys for Schmidts Retail LP, 75 Eisenhower Parkway, Suite 200, Roseland, NJ 07068,

Attn: Richard M. Meth, Esq., so as to be actually received **no later than April 21, 2011 at 4:00**

**p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed,

served and received will be considered at the Hearing.  Failure to file a timely objection may

result in entry of a final order granting the Motion as requested by Schmidts Retail LP without

further notice.  All objecting parties are required to attend the Hearing, and failure to attend in

person or by counsel may result in relief being granted or denied upon default.

2

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Rule 9014-2(f) of the

Local Bankruptcy Rules for the Southern District of New York and Section 1 of the Case

Management Procedures, the Hearing shall be an evidentiary hearing to the extent necessary or

appropriate with respect to the relief requested by the Motion and/or if objections to the relief

requested in the Motion are filed and not withdrawn or resolved.

Dated: March 21, 2011
      Roseland, NJ

/s/ Richard M. Meth
Richard M. Meth (RM7791)
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
Telephone:  973.992.4800
Facsimile:  973.992.9125
rmeth@foxrothschild.com

*Counsel to Schmidts Retail, LP*

RL1 883955v1 03/21/11

**Hearing Date:  April 28, 2011 at 10:00 a.m.**
**Objections Due:  April 21, 2011 at 4:00 p.m.**

Richard M. Meth, Esq.
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
rmeth@foxrothschild.com
Telephone:  973.992.4800
Facsimile:  973.992.9125

-and-

Michael G. Menkowitz, Esq.
FOX ROTHSCHILD LLP
2000 Market Street – 20th Floor
Philadelphia, Pennsylvania 19103
mmenkowitz@foxrothschild.com
Telephone:  215.299.2000
Facsimile:  215.299.2150

*Counsel to Schmidts Retail, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*, | (Jointly Administered) |
| Debtors. | Case No.:  10-24549 (RDD) |

**SCHMIDTS RETAIL, LP'S MOTION TO**
**COMPEL DEBTORS TO ASSUME OR REJECT LEASE**

Schmidts Retail, LP ("Schmidts"), by and through its undersigned counsel, hereby files

Schmidts Retail, LP's Motion to Compel Debtors to Assume or Reject Lease (the "Motion").  In

support of the Motion, Schmidts represents as follows:

## BACKGROUND

**A.**     **The Bankruptcy Cases**

1.     On December 12, 2010 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.     The Debtors continue to operate their businesses and manage their financial affairs pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.     On December 21, 2010, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases.

**B.**     **The Lease and Redevelopment Project**

4.     On September 8, 2008, Northern Liberties Development, LP ("Northern Liberties")[1] and Pathmark Stores, Inc. ("Pathmark")  entered into that certain lease agreement whereby Pathmark agreed to lease certain property located at 2nd Street and Girard Avenue, Philadelphia, Pennsylvania (the "Premises") for the construction, development and operation of a supermarket and certain related business operations (as amended, the "Lease"). [2]  (A copy of the Lease, its exhibits, and the First Amendment to Lease are collectively attached as Exhibit A.)

5.     On February 7, 2011, *i.e.*, after the Petition Date, Schmidts delivered possession of the Premises to the Debtors pursuant to the Lease's terms.[3]

---

[1]     Northern Liberties is the predecessor-in-interest to Schmidts.

[2]     Capitalized terms not defined herein shall have the same meaning ascribed to them as in the Lease.

[3]     The Debtors have not yet commenced rent payments under the Lease because they are within the 120 day grace period provided in section 3 thereof, whereby the Debtors are afforded 120 days after Delivery of Possession of the Premises before they are required to commence payments under the Lease.

2

6.      The supermarket development project contemplated by the Lease is a cornerstone of a major redevelopment and revitalization project located in the Northern Liberties section of Philadelphia (the "Redevelopment Project").  The Redevelopment Project, which occupies the former site of a Schmidt's Brewery, is a mixed use retail and residential community that provides a supermarket as an anchor tenant and is intended to renew a long-abandoned 15 acre site in the city.  The Commonwealth of Pennsylvania and the City of Philadelphia have provided funding to the Redevelopment Project because the area is significantly under-served with respect to residents' access to a supermarket.

7.      In large part, the success of the Redevelopment Project depends upon Schmidts' ability to obtain a large grocery store operation as the anchor tenant for its retail space.  Throughout the planning, development, and construction of the Redevelopment Project, Schmidts assured its retail and commercial tenants that a supermarket would anchor the retail segment of the project.    However, Schmidts' ability to rent other retail space in the Redevelopment Project has now virtually disappeared because prospective tenants and real estate brokers are concerned about whether Pathmark will occupy the Premises.    As a result, other retailers have been extremely reluctant to enter into any lease agreements without certainty as to the presence of an operating supermarket to anchor the Redevelopment Project.

8.      In addition, and perhaps even more importantly, Schmidts' leases with other retailers in the Redevelopment Project contain co-tenancy provisions which allow for abated or reduced rents, a delay in opening such retailers' business and/or a tenant option to terminate their leases early should certain benchmarks not be met with respect to the construction, completion and opening of a supermarket on the Premises.

PH1 2765678v5 03/21/11

9.      Continued delay with respect to the completion and opening of a supermarket in the Redevelopment Project has injured, and will continue to injure, Schmidts as a result of its inability to collect any, much less full, rents during the period while a supermarket is not open on the Premises.   Furthermore, this delay puts Schmidts in danger of breaching its financing obligations as to, and its leases with other tenants in, the Redevelopment Project.   The loss of such tenants would understandably cause severe and irreparable harm to both Schmidts and the Redevelopment Project.

10.     Significantly, Schmidts has received expressions of interest from other supermarket operators interested in building and operating a supermarket at the Premises.   What is not certain, however, is how long these expressions of interest will stay open.

11.     Fortunately, in the ordinary course of their communications with Schmidts, the Debtors have indicated their plans to reject the Lease.[4]   Thus, the relief sought by Schmidts pursuant to the Motion is believed to be entirely consistent with the Debtors' own plans regarding the Lease, and the Premises.

**B.      Schmidts' Filed Claims**

12.     On December 20, 2010, Schmidts filed proof of claim number 13 against Debtor Pathmark in the amount of $750,000.00 for failure to comply with section 7(f) of the Lease (defined below).   Section 7(f) required the Debtors to pay such sum to Schmidts within 10 business days from the delivery of the Premises (defined below) to Debtors.   Schmidts also filed proof of claim number 18, in the amount of $750,000.00, against Debtor, The Great Atlantic &

---

[4]      Information regarding Schmidts' communications with prospective tenants and real estate brokers, the general terms and conditions of Schmidts' co-tenancy provisions contained in its leases with other tenants of the Redevelopment Project, and communications between Schmidts and the Debtors regarding the Debtors' intent to reject the Lease are contained in the Affidavit of Adam Lisausky, attached as Exhibit B.

4

Pacific Tea Company, Inc. ("A&P"), based upon its guaranty of the required $750,000.00 payment.

13.     On December 20, 2010, Accelerated Construction Company ("ACC") (an affiliate of Schmidts) filed proof of claim number 12 (in the amount of $125,000.00) against Pathmark, and proof of claim number 11 against A&P in the same amount, for construction services performed. Pathmark and A&P are jointly and severally liable for ACC's claim.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

15.     Venue in this District is proper pursuant to 28 U.S.C. § 1409.

## RELIEF REQUESTED

16.     By the Motion, Schmidts requests that the Court issue an order, substantially in the form submitted herewith, compelling the Debtors to assume or reject the Lease and to pay all post-petition amounts due under the Lease within 10 days of such order's entry.

## BASIS FOR RELIEF

17.     Pursuant to Bankruptcy Code section 365(a), the Debtors may assume or reject an unexpired lease or executory contact. Further, Bankruptcy Code section 105(a) grants the Court equitable powers to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 105(a).

PH1 2765678v5 03/21/11

18.     Because the Debtors have already expressed their intent to reject the Lease, the "normal" reasons for delaying a decision to assume or reject do not exist in this case.  Schmidts therefore respectfully requests that the Court compel the Debtors to make their decision regarding assumption or rejection of the Lease within 10 days.  Notably, and by way of comparison, the longer that the Debtors wait to reject (or assume) the Lease, the greater the injury to Schmidts and the other Redevelopment Project tenants.

19.     More particularly, until the Debtors formally assume or reject the Lease and certainty is provided with respect to the presence of a supermarket anchor tenant, Schmidts cannot re-lease the Premises and will therefore suffer continuing, and potentially catastrophic, economic loss.

20.     Additionally, the Debtors' delay on their decision whether to accept or reject the Lease will likely cause Schmidts to breach its leases with other tenants.  In addition to the loss of rent revenue (and possibly tenants, themselves), such delay could give rise to causes of action against Schmidts for breach of other lease agreements, thereby further jeopardizing the health and success of the Redevelopment Project.[5]

21.     Schmidts therefore submits that compelling the Debtors to now assume or reject the Lease within 10 days of the entry of an appropriate order is in the best interest of all parties-in-interest, including the Debtors.  Among other things, it will reduce the potential for administrative/post-petition claims against the Debtors' estates,  reduce the chances  of any post-

---

[5]     Since delivery of the Premises to the Debtors occurred post-petition, any subsequent loss of rent revenue by Schmidts, or any termination of other leases caused by the breach of co-tenancy provisions contained in those leases, will give rise to a post-petition cause of action and claims against the Debtors.

6

petition causes of action against Schmidts and, most importantly, allow the Redevelopment Project to continue with both minimal disruption and a reduction of potential damage to other tenants of the Redevelopment Project and to Schmidts.  Finally, requiring a decision to assume or reject the Lease sooner, rather than later, will cause the Debtors no additional financial cost or detriment. Therefore, Schmidts requests that the Debtors be directed to immediately assume or reject the Lease.

## MOTION PRACTICE

22.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  As such, Schmidts submits that the Motion satisfies Local Bankruptcy Rule 9013(1)(a).

## NOTICE

23.    Schmidts has caused notice of this Motion to be provided by electronic mail, facsimile and/or by overnight mail to: (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel for the Debtors; (c) the Debtors; (d) counsel for the Official Unsecured Creditors Committee; and (e) counsel for the Debtors' secured lenders. Schmidts respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST

24.    No prior motion for the relief requested herein has been made to this or any other court.

PH1 2765678v5 03/21/11

WHEREFORE, Schmidts requests the entry of an Order, substantially in the form submitted, (i) compelling the Debtors to assume or reject the Lease within 10 days from the entry of such Order, (ii) directing the Debtors to promptly pay all post-petition sums currently due under the Lease, and (iii) granting such additional relief as the Court deems just and proper.

Dated: March 21, 2011
      Roseland, NJ

/s/ Richard M. Meth           
Richard M. Meth (RM7791)
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
Telephone:  973.992.4800
Facsimile:  973.992.9125
rmeth@foxrothschild.com

*Counsel to Schmidts Retail, LP*

8

# Exhibit "A"

KEY NO.
Approximately 51,000 sq.ft.
2nd Street & Girard Avenue
Philadelphia, Pennsylvania

## L E A S E

Between

### NORTHERN LIBERTIES DEVELOPMENT LP

Landlord,

and

### PATHMARK STORES, INC.,

Tenant.

Dated: ~~August~~ *8*, 2008
*SEPTEMBER*

Premises: 2nd Street & Girard Avenue, Philadelphia, Pennsylvania

TABLE OF CONTENTS

Page

1.    EXHIBITS ................................................ 1
2.    DEMISED PREMISES AND COMMON AREA ....................... 1
3.    TERM ................................................... 2
4.    RENEWAL PERIODS ........................................ 3
5.    FIXED ANNUAL RENT ...................................... 4
6.    USE AND OCCUPANCY ...................................... 6
7.    CONSTRUCTION ........................................... 7
8.    DELIVERY OF POSSESSION ................................ 13
9.    REMAINDER OF THE IMPROVEMENTS ......................... 16
10.   PYLON SIGNS AND ANNOUNCEMENTS ......................... 17
11.   COMMON AREA ........................................... 18
12.   REPAIRS ............................................... 20
13.   INSURANCE ............................................. 21
14.   REQUIREMENTS OF LAW AND FIRE INSURANCE ................ 24
15.   ALTERATIONS ........................................... 24
16.   ACCESS TO PREMISES .................................... 25
17.   UTILITIES ............................................. 25
18.   SUBORDINATION, RECOGNITION, NON-DISTURBANCE
      AND ATTORNMENT ........................................ 25
19.   FIXTURES .............................................. 26
20.   ASSIGNMENT AND SUBLETTING ............................. 28
21.   RESTRICTIVE COVENANT .................................. 29
22.   LANDLORD'S TITLE ...................................... 30
23.   QUIET ENJOYMENT ....................................... 33
24.   UNAVOIDABLE DELAYS .................................... 33
25.   END OF TERM ........................................... 33
26.   HOLDING OVER .......................................... 34
27.   LANDLORD'S DEFAULT .................................... 34
28.   ADDITIONAL CHARGES .................................... 35
29.   TENANT'S DEFAULT ...................................... 35
30.   DAMAGE OR DESTRUCTION ................................. 37
31.   EMINENT DOMAIN ........................................ 38
32.   LANDLORD'S PAYMENTS ................................... 40
33.   WAIVER OF DISTRAINT ................................... 41
34.   INVALIDITY OF CERTAIN PROVISIONS ...................... 41
35.   CHOICE OF LAW ......................................... 41
36.   ESTOPPEL CERTIFICATES ................................. 41
37.   NOTICES ............................................... 41
38.   NO WAIVER ............................................. 42
39.   ENTIRE AGREEMENT ...................................... 42
40.   BROKER ................................................ 41
41.   MECHANIC'S LIENS ...................................... 43
42.   CAPTIONS .............................................. 43
43.   RIGHT OF FIRST REFUSAL ................................ 43
44.   DEFINITION OF LANDLORD ................................ 44
45.   ADJOINING OR ADJACENT PROPERTY ........................ 45

i

Page

46.   OPTION TO EXECUTE ........................................ 45
47.   ENVIRONMENTAL LAWS ....................................... 45
48.   SUCCESSORS AND ASSIGNS ................................... 48
49.   WAIVER OF TRIAL BY JURY .................................. 48
50.   NO PRESUMPTION AGAINST DRAFTER ........................... 48
51.   SATELLITE DISH ........................................... 48

KEY NO.
Approx. 51,000 sq.ft.
2nd Street & Girard Avenue
Philadelphia, Pennsylvania

<u>LEASE</u>

**THIS LEASE**, made as of this 8TH day of ~~August~~ SEPTEMBER, 2008, between NORTHERN LIBERTIES DEVELOPMENT LP, a Pennsylvania limited partnership , or its assignee, having an office at 969 North 2nd Street, Philadelphia, Pennsylvania 19123 (hereinafter called "Landlord"), and PATHMARK STORES, INC., a Delaware corporation, having an office at 2 Paragon Drive, Montvale, New Jersey 07645 (hereinafter called "Tenant"):

**W I T N E S S E T H:**

Landlord and Tenant covenant and agree as follows:

1.    **EXHIBITS.**    The following Exhibits are annexed hereto and made a part hereof:

A.    Exhibit A, a site plan of the Shopping Center (as hereinafter defined);

B.    Exhibit A-1, Limited Common Area, including but not limited to Loading Area (as hereinafter defined) and Tenant Parking (as hereinafter defined;

C.    Exhibit B, a legal description of the Land (as hereinafter defined);

D.    Exhibit C, a list of documents pertaining to Landlord's construction of the Tenant's Building and some, but not all, of the remainder of the Improvements (as such terms are hereinafter defined);

E.    Exhibit D, a form of agreement setting forth the Rent Commencement Date (as hereinafter defined in Section Three (3)), the date of expiration of the initial term of this Lease and the commencement dates of the Renewal Periods (as hereinafter defined);

F.    Exhibit E, Permitted Encumbrances (as hereinafter defined);

G.    Exhibit F, form of Subordination, Recognition and Non-Disturbance Agreement;

H.    Exhibit G, Real Estate Taxes;

I.   Exhibit H, Common Area Costs;
J.   Exhibit I, Corporate Guaranty;
K.   Exhibit J, -Rent Per Square Foot;
L.   EXHIBIT K, Tenant Architect; and
M.   EXHIBIT L, Tenant Contractors.

2.   **DEMISED PREMISES AND COMMON AREA.** Landlord hereby leases to Tenant and Tenant hereby takes from Landlord the premises labeled "Demised Premises" and shown cross hatched on Exhibit A and the improvements now or hereafter erected on said premises (said premises and improvements being hereinafter collectively called the "Demised Premises"), together with the benefit of any and all easements, appurtenances, rights and privileges now or hereafter belonging thereto. The Demised Premises specifically excludes the exterior windows facing 2nd Street & Girard Avenue. Landlord shall have and shall maintain exclusive use of said windows. The Demised Premises are located within that certain parcel of land (hereinafter called the "Land") as depicted on Exhibit A. Any buildings and other improvements now or hereafter erected on the Land shall be hereinafter called the "Improvements." The Land and the Improvements shall be hereinafter collectively called the "Shopping Center." Landlord hereby grants to Tenant the right and easement to use, in common with other permitted tenants of the Shopping Center, those portions of the Shopping Center not included within the building sites referred to in Article 9A hereof, including, but not limited to, First Floor parking areas, roads, streets, drives, tunnels, passageways, First Floor landscaped areas, open and enclosed malls, exterior ramps, walks (hereinafter collectively called the "Common Area") for all customary and proper purposes. Tenant and its invitees shall have a dedicated and exclusive parking area together with the benefit of any and all easements, appurtenances, rights and privileges now or hereafter belonging thereto ("Tenant's Parking") located on the second level adjacent to the Demised Premises, as depicted on Exhibit "A". With Landlord's cooperation, Tenant shall be responsible for policing and controlling Tenant's Parking. In addition, Tenant shall have receiving and compactor area on the ground level as further depicted on Exhibit "A", together with the benefit of any and all easements, appurtenances, rights and privileges now or hereafter belonging thereto ("Loading Area"). Tenant's Parking and Loading Area are collectively referred to herein as Limited Common Area as depicted on Exhibit A-1.

3.   **TERM.**

A.   The term of this Lease shall commence on the date hereof and shall continue to and include the date which is twenty

2

(20) years after the day before the Rent Commencement Date (as hereinafter defined) if the Rent Commencement Date is the first day of a month, or twenty (20) years after the last day of the month in which the Rent Commencement Date occurs if the Rent Commencement Date is not the first day of a month. The Rent Commencement Date shall be the date which is the earlier of (a) the date on which Tenant opens the Demised Premises to the public for business, or (b) the date which is one hundred twenty (120) days after the Delivery of Possession (as hereinafter defined). The term Expiration Date shall mean the date on which the term of this Lease, as same may have been extended, shall expire. Tenant shall not be obligated to pay fixed annual rent or additional charges or to perform any of Tenant's obligations hereunder during the period between the date hereof and the day before the Rent Commencement Date (such period being hereinafter called the "Interim Term"), except that Tenant shall pay for utilities consumed by it and shall comply with insurance requirements under this Lease from and after the Delivery of Possession of the Demised Premises. Tenant may enter the Demised Premises during the Interim Term as hereinafter provided in this Lease, in order to inspect the Demised Premises, install trade fixtures and equipment and otherwise in connection with preparing for occupancy, but in all cases without material interference with performance by Landlord or its Contractor of Landlord's Work (as hereinafter defined).

B. Within ten (10) days after request of either party after the Rent Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other an agreement in the form provided in Exhibit D and in form for recording setting forth the Rent Commencement Date, the date of expiration of the initial term of this Lease and the dates of commencement of the Renewal Periods. The term Lease Year shall mean the following: the first Lease Year shall be the twelve (12) month period commencing on the Rent Commencement Date if the Rent Commencement Date is the first day of a month, or on the first day of the month immediately following the month in which the Rent Commencement Date occurs if the Rent Commencement Date is not the first day of a month; and each succeeding twelve (12) month period thereafter shall be a Lease Year.

4. **RENEWAL PERIODS.** Provided Tenant is not in monetary or material default, beyond any applicable notice, cure and grace period, at the time of exercise of each applicable renewal period, Tenant shall have the right and option to extend the term of this Lease from the date upon which it would otherwise expire for four (4) separate renewal periods for five (5) years each (each such period being hereinafter called a "Renewal Period") upon the same terms and conditions as are herein set forth. If Tenant elects to exercise any one or more of said options to renew, it shall do so by giving written notice of such election

3

to Landlord at any time during the term of this Lease (including
any Renewal Periods) on or before the date which is not less than
180 days, but not more than 270 days before the beginning of the
Renewal Period or Renewal Periods for which the term hereof is to
be renewed by the exercise of such option or options.   If Tenant
elects to exercise any one or more of said options to renew, the
term of this Lease shall be automatically extended for the
Renewal Period covered by the option or options so exercised
without   execution   of   an   extension   or   renewal   lease.
Notwithstanding anything to the contrary set forth herein, the
extended term of this Lease shall expire no later than twenty
(20) years after the expiration of the initial 20-year term.
Landlord and Tenant shall execute an agreement in the form
attached hereto as Exhibit D and in form for recording for the
purpose of setting forth the new expiration dates of the Renewal
Periods.   If Tenant shall not have given notice of such election
to Landlord by such date in respect of any Renewal Period,
Landlord   shall   (unless   notice   shall   have   been   given   as
hereinafter specifically permitted) give notice to Tenant that
Tenant has failed to give notice of such election to Landlord
(hereinafter called "Option Notice").   Tenant's time to give
notice of such election shall continue until the date which is
thirty (30) days after receipt of the Option Notice.   Landlord
shall not give the Option Notice prior to the date which is two
hundred   ten (210) days before the Expiration Date.   If Tenant
shall not have received the Option Notice prior to the date which
is one hundred eighty (180) days before the beginning of the next
succeeding Renewal Period, the term of this Lease shall be
extended beyond the Expiration Date to the date which is one
hundred and eighty (180) days after the date on which the Option
Notice is received by Tenant, but on and after the Expiration
Date, Tenant shall have the right to terminate this Lease by
giving thirty (30) days prior notice of termination to Landlord.
If Tenant so terminates this Lease, any fixed annual rent and
all other charges payable by Tenant hereunder (such other charges
being hereinafter called the "Charges") paid for the period after
the date that Tenant vacates the Demised Premises shall be
refunded to Tenant upon demand.   The expiration date of any
Renewal Period for which Tenant exercises its option to renew
after having received the Option Notice shall remain unchanged
from such expiration date as is set forth herein, and the
expiration dates of all remaining Renewal Periods, if any, shall
also remain unchanged.

        5.   **FIXED ANNUAL RENT.**   The fixed annual rent, commencing
on the Rent Commencement Date, shall be payable at the rates
hereinafter provided unless abated or diminished as hereinafter
provided without setoff deduction or demand, unless specifically
provided for herein Tenant shall pay the fixed annual rent to
Landlord at the address of Landlord as hereinabove set forth (or
such other address as Landlord may designate by notice to Tenant)

                                4

in equal monthly installments, in advance on the first day of each month during the term of this Lease (including any Renewal Periods). Rent for a part of a month shall be prorated on a daily basis and paid on the first day of the month immediately following the month in which the Rent Commencement Date occurs. The fixed annual rent shall be payable as follows:

A.    From    the    Rent    Commencement    Date    until    the expiration of the fifth (5th) Lease Year, fixed annual rent shall be $1,040,400.00 per Lease Year, payable in equal monthly installments of $86,700.00,

B.    During the sixth (6th) through tenth (10th) Lease Years, fixed annual rent shall be $1,121,490.00 per Lease Year, payable in equal monthly installments of $93,457.50,

C.    During the eleventh (11th) through fifteenth (15th) Lease Years, fixed annual rent shall be $1,209,210.00 per Lease Year, payable in equal monthly installments of $100,767.50,

D.    During the sixteenth (16th) through twentieth (20th) Lease Years, fixed annual rent shall be $1,304,070.00 per Lease Year, payable in equal monthly installments of $108,672.50.

E.    During the first (1st) Renewal Period, fixed annual rent shall be $1,381,080.00 per Lease Year, payable in equal monthly installments of $115,090.00,

F.    During the second (2nd) Renewal Period, fixed annual rent shall be $1,491,750.00 per Lease Year, payable in equal monthly installments of $124,312.50,

G.    During the third (3rd) Renewal Period, fixed annual rent shall be $1,611,090.00 per Lease Year, payable in equal monthly installments of $134,257.50,

H.    During the fourth (4th) Renewal Period, fixed annual rent shall be $1,740,120.00 per Lease Year, payable in equal monthly installments of $145,010.00.

Notwithstanding anything to the contrary contained herein, within thirty (30) days after substantial completion of Demised Premises and Tenant's Building, as determined using American Institute of Architects (AIA) standards, Demised Premises shall be field measured and certified by the Architect responsible for architectural drawings for the Tenant's Building or by a duly licensed AIA architect mutually agreeable by Landlord and Tenant("Certified Architect"). If the Certified Architect determines that the actual Floor Area of Tenant's Building is more than one (1%) percent greater or less than

51,000 square feet, then the fixed annual rent as set forth on Exhibit J shall be adjusted by multiplying the fixed annual rent per square foot times the actual  Floor Area of the Demised Premises and Tenant's Building as determined by Certified Architect and the parties agree that any other amounts in this Lease which are based on the actual Floor Area shall also be adjusted in the same manner.  The term "Floor Area", as used herein, shall mean the square foot area of the floor of Tenant's Building computed by measurements made from the outside of walls that constitute the interior foremost walls of the Demised Premises.  The term Floor Area shall not include any loading docks or enclosed loading docks or truck wells, and pad and retaining wall, sidewalks and stairs outside of Tenant's Building including but not limited to the elevators and elevator lobbies serving the Demised Premises.  The term Floor Area shall include any interior vestibule within Tenant's Building.  Notwithstanding the foregoing, it is agreed that the determination of Floor Area of Tenant's Building by Certified Architect  shall be presumptive but not conclusive evidence thereof; provided, however, that pending a final determination of the  Floor Area of Tenant's Building, Tenant shall pay the fixed annual rent in the amount set forth above and pay the balance of the fixed annual rent, if any, or be paid the excess, if any, within thirty (30) days after the  Floor Area of Tenant's Building shall have been finally determined.   Upon request of either party, Landlord and Tenant shall enter into a written agreement setting forth the  Floor Area of Tenant's Building and revised amounts of fixed annual rent and other revised amounts (if any) but the execution of such agreement shall not be a precondition to the effectiveness of the adjustments effected hereby.

If Tenant fails to pay fixed annual rent within five (5) days after due, a late charge shall be due and payable with respect to any such late payment in a sum equal to five (5%) percent of the amount of such payment.  If Landlord has not received such payment within ten (10) days after such payment is due, a late charge of ten percent (10%) of the amount due shall be due and payable together with such late payment.

6.   **USE AND OCCUPANCY.**

A.   The Demised Premises may be used and occupied for the operation of a supermarket with ancillary uses, including, without limitation of drugstore, automated teller machine, bank and/or for any other lawful purpose or purposes of similarly situated supermarkets; provided that such use does not violate any exclusivity of other Shopping Center lessee whose square footage in the Shopping Center exceed Ten Thousand (10,000) Square Feet.  Tenant agrees to operate a supermarket for a period of twelve (12) consecutive months after the Rent Commencement Date.   Thereafter, Tenant shall not be obligated to operate a

supermarket nor conduct any business in the Demised Premises but shall pay Landlord the fixed annual rent and additional charges set forth in this Lease.  Landlord warrants and represents that Landlord will use its best efforts to obtain zoning of the Land to permit the construction of the Improvements as contemplated herein and the use and occupancy of the Demised Premises for the operation of a supermarket and the use of the Land as a shopping center.   Landlord shall be responsible for obtaining such variances, special use permits, building permits and other governmental permits or approvals, if any, as may be required in order to permit the construction of Tenant's Building and may operate as a twenty-four hour a day operation of the Demised Premises as a supermarket provided such hours of operation do not violate any governmental ordinances, rules and laws.

B.   Except as provided in Section Forty Six (46), Tenant shall indemnify and hold harmless Landlord, its employees and agents from any and all claims, causes of action, damages, expenses and liability, including reasonable attorneys' fees, sustained or incurred by any persons  which are based upon or arise out of illness or injury, including death of any person or damage to any property and which arise from or in any manner grow out of Tenant, its agents, partners or employees operations in Tenant's Building and in on or upon Limited Common Area(as hereinafter defined).   Except as provided in Section Forty Six (46), Tenant shall immediately respond and assume the investigation, defense and expense of all non-environmental claims and causes of action arising out of or in connection with occurrences which arise from or in any manner grow out of Tenant, its agents, partners or employees operations in Tenant's Building and in on or upon Limited Common Area(as hereinafter defined) regardless of whether such non-environmental claims or causes of action name Landlord as a party or allege joint negligence of the Landlord.   Landlord may, at its sole cost and expense, join in such defense with counsel of its choice.

## 7.   CONSTRUCTION

Tenant will furnish Landlord with the preliminary fixture plans, criteria drawings and building specifications and other details more particularly set forth on Exhibit C (hereinafter collectively called the "Criteria Drawings") within Ninety(90) days of Landlord providing a building footprint of the Demised Premises showing column location and any other information necessary for Tenant to develop its plans.  Criteria Drawings shall be paid for by Tenant.  The Criteria Drawings will be executed by Landlord and Tenant and incorporated herein by reference and made a part hereof.  Landlord agrees at its sole cost and expense to prepare and furnish to Tenant within ninety (90) days after the date of receipt of the Criteria Drawings complete architectural drawings and specifications (hereinafter

7

called the "Plans and Specifications") incorporating therein the
items specified and shown in the Criteria Drawings for the
construction of the building to be built by Landlord for Tenant
on the Demised Premises (hereinafter called "Tenant's Building")
and (to the extent covered by the Criteria Drawings) any other
Improvements to be built by Landlord in the Shopping Center
(herein Collectively called "Landlord's Work").   The Plans and
Specifications shall be collaboratively prepared by Landlord's
duly licensed Architect ("Building Architect") and a Tenant
approved architect(s) set forth on Exhibit K which architect
("Tenant Architect") shall be subject to the reasonable written
approval of Landlord. Landlord shall be solely responsible for
the actual and reasonable costs associated with Building
Architects and Tenants' Architects and respective plans related
thereto. Tenant agrees to review the Plans and Specifications and
in each case to approve same or to state what changes, if any,
Tenant requires therein within fifteen (15) business days after
receipt thereof.   If Tenant requires any reasonable changes
outside the scope of its Fixture Plans, Landlord shall cause the
Plans and Specifications to be revised at Tenant's sole cost.
Notwithstanding anything to the contrary contained herein, Tenant
shall not be responsible for any costs associated with changes
made as a result of non-conforming specification made by the
Landlord or resulting from Landlord's errors, omissions and/or
changes.   In addition, Tenant may review said drawings and
specifications and request changes therein during the course of
preparation thereof by said architect and Landlord shall cause
said architect to revise said drawings and specifications
accordingly.    The revisions and resubmissions shall continue
until Tenant shall have approved the Plans and Specifications
(said approved Plans and Specifications being hereinafter called
the "Approved Plans and Specifications").Tenant's approval of the
Plans and Specifications shall not constitute an opinion or
agreement by Tenant that the Tenant's Building or other
Improvements, including, without limitation, the Common Area
paving and substrata thereof, are structurally sufficient or that
the Approved Plans and Specifications are in compliance with law
(it being agreed that such compliance is solely Landlord's
responsibility) nor shall such approval impose any present or
future liability on Tenant or waive any of Tenant's rights
hereunder, it being agreed that in all instances the Criteria
Drawings shall prevail.   Landlord shall provide Tenant with two
(2) sets of the Approved Plans and Specifications and Landlord
and Tenant shall execute counterparts thereof, acknowledging
acceptance of the Approved Plans and Specifications.      The
Approved Plans and Specifications shall be final and shall not be
changed by Landlord or Tenant without the prior written consent
of the other, which consent shall not be unreasonably withheld,
conditioned or delayed but Tenant shall have the right to make
changes therein provided Tenant pays for any costs associated
therewith.    Except for Tenant's or its affiliates customary

8

signage, logo, trademarks, and interior product display Tenant shall not change the exterior design of the Building or Shopping Center without approval by Landlord, such approval not to be unreasonably withheld, conditioned nor delayed. If the direct cost and expense of construction of the Tenant's Building and other improvements on the Demised Premises is increased or decreased by any change or changes made by Tenant to the Approved Plans and Specifications, then Tenant shall pay to Landlord the amount by which the cost and expense was thereby increased (if and to the extent that the Agreed Construction Cost (as hereinafter defined) exceeds the product of $130.00 times the square foot of floor area of Tenant's Building). The payment provided for in the immediately preceding sentence shall be made within ten (10) business days of Delivery of Possession or, if said increase in cost and expenses shall not have been determined by the Delivery of Possession, then within ten (10) days after such increase shall have been determined but in no event later than thirty (30) days after the Delivery of Possession. If the Agreed Construction Cost (as said term is hereinafter defined) is in excess of One Hundred Thirty Dollars ($130.00) per square foot of Floor area of Tenant's Building but less than One Hundred Forty Dollars ($140.00) per square foot, Tenant shall elect, by written notice to Landlord, to either (i) revise the Approved Plans and Specifications so as to reduce the cost of constructing Tenant's Building, or (ii) pay to Landlord on or before the Delivery of Possession the difference between the Agreed Construction Cost and the product of the square footage of Floor area of Tenant's Building and One Hundred Thirty Dollars ($130.00) (hereinafter called the "Excess Construction Cost") or (iii) Increase the rent per square foot based upon a 10% return on cost to the Landlord that exceeds $130 per square foot. Notwithstanding anything to the contrary contained herein, the calculation of Excess Construction Cost shall not include any of the following: (a) any elevators servicing the Premises; (b) any additional construction costs associated with the "green roof" (i.e. columns trusses roofing costs, additional costs from the placement and screening of Tenant's rooftop equipment, grass and soil installation, etc.); (c) any costs associated with the Landlord's obligation to provide Utility Deliverables, as defined herein, to the Tenant at an area designated by Tenant; (d) any costs incurred by Landlord's Selected Contractor, as defined herein, that exceeds $130 per square foot; (e) any cost associated with Landlord's exterior aesthetics and design elements; and/or (f) any costs associated with any pre-existing Environmental Costs or Losses as defined and identified in Section Forty Six (46) herein. If the Agreed Construction Cost is One Hundred Forty Dollars ($140.00) Dollars per square foot of Floor Area of Tenant's Building or greater (such costs greater than One Hundred Forty Dollars ($140.00) Dollars per square foot of Floor Area of Tenant's Building are hereinafter called the "Additional Construction Cost"), then Tenant shall within thirty

9

(30)days elect, by written notice to Landlord, to either (x) revise the Approved Plans and Specifications, at Tenant's sole cost and expense, so as to reduce the costs of constructing Tenant's Building so that it is equal to or less than One Hundred Forty Dollars ($140.00) Dollars per square foot of Floor Area, or less, or (y) pay to Landlord within thirty(30) days after Delivery of Possession Excess Construction Cost and the Additional Construction Cost, or (z) terminate this Lease, whereupon this Lease shall terminate effective as of the date of Tenant's written notice unless Landlord exercises its right as defined below and thereafter the parties shall have no further liability hereunder.    If Tenant exercises right under subparagraph (x) hereof and the Agreed Construction Cost is not reduced below One Hundred Thirty Dollars ($130.00) Dollars per square foot of Floor Area of Tenant's Building, then Tenant shall pay to Landlord within thirty (30) days after Delivery of Possession the Excess Construction Cost and the Additional Construction Cost, if any.    If Tenant elects to exercise its right under (z), hereinabove, to terminate this Lease, then Landlord shall have the right to nullify such termination by agreeing to pay the Additional Construction Cost, if any, upon written notice to Tenant given within ten (10) days after receipt of Tenant's written notice of termination.    Landlord and Tenant hereby agree that the cost of constructing the Tenant's Building shall be prepared by  contractors, three (3) of whom shall be designated by Tenant as listed on Exhibit L "Tenant Contractors" and the other shall be selected by Landlord ("Landlord's Selected Contractor") subject to Tenant's reasonable approval. The amount of the lowest bid shall be the Agreed Construction Cost, it being agreed that if the actual costs incurred by Landlord exceed the Agreed Construction Cost, whether due to cost overruns, default by the contractor or any other reason, other than costs directly resulting from delays caused due to Tenant's failure to comply with its obligations hereunder and only if Landlord shall have given to Tenant notice of such delay within ten (10) business days after Landlord first has knowledge thereof, Landlord shall pay any such excess; provided, however, that Tenant may negotiate with the Landlord's Selected Contractor and Landlord to lower the bid and, further provided, that the Agreed Construction Cost shall specifically exclude (and Landlord, at its sole cost and expense, shall pay for) any the costs associated with supplying Tenant a structural slab as per Tenant's Criteria Drawings, any costs associated with the Clock Tower as shown on Exhibit A the cost of supplying steel columns that extends above the structural slab sufficient for tie-in to complete the Demised Premises arising above, any demolition costs, costs incurred with respect to compliance with environmental laws or other subsurface conditions, the cost of bringing in utilities as per Tenant's specifications to  a designated area within  Tenant's Building, specified by Tenant, rough grading, fine grading, and any other off-site improvement costs and Soft Costs (as hereinafter

10

defined).   The term Soft Costs as used herein include, but are
not limited to real estate commissions, developers' overhead,
soil tests, surveys, engineering or architectural fees, legal
fees, and any interim interest associated with the Shopping
Center and any other costs commonly referred to as soft costs.
Notwithstanding anything to the contrary contained herein, both
Landlord and Tenant agree to use commercially reasonable best
efforts to deliver any of the deliverables to the other party as
expeditiously as possible.

          B.   Landlord covenants and agrees that upon Tenant's
approval of the Plans and Specifications, Landlord's obtaining of
all final, unappealable approvals, variances, building permit,
special use permits and other governmental approvals required
with respect to Landlord's Work (all of which Landlord agrees to
use its best efforts to obtain), Landlord shall, in accordance
with the Approved Plans and Specifications, promptly commence and
with due diligence proceed to construct the Tenant's Building and
other improvements on the Demised Premises and the remainder of
the Improvements, including, without limitation, utility lines,
drainage, lighting facilities, grading and paving, landscaping,
approaches, entrances, exits, ramps, sidewalks, roadways, curb
cuts, loading areas, platforms, service roads, parking garage and
all buildings required to be constructed hereunder, all as shown
on Exhibit A.    Unless Landlord receives written notice from
Tenant, Landlord shall keep Tenant reasonably apprised of the
status of its efforts to obtain all approvals, permits and other
governmental consents for Landlord's Work. The construction work
on the Tenant's Building, other Improvements on the Demised
Premises and the remainder of the Improvements shall be done by
the contractor whose bid was accepted, as set forth above, and
shall be done in a good and workmanlike manner and in compliance
with all applicable laws, orders and regulations of federal,
state, county and municipal authorities, with any direction by
any public officer pursuant to law and with all regulations of
any board of fire underwriters having jurisdiction.   Landlord,
within 24 months of the date hereof (if not obtained within 24
months Tenant shall have the right to either terminate or extend
Landlord's date to obtain zoning) shall at its sole cost and
expense,  obtain or cause to be obtained all building permits,
temporary and permanent certificates of occupancy and other
governmental approvals except for those approvals and permits
which are operational in nature or are specific to Tenant's
business(all of which shall be final, unappealable and
unconditional, except for any conditions that are (a) acceptable
to Tenant and (b) satisfied by Landlord prior to Delivery of
Possession) which may be required to permit the construction of
the Tenant's Building in accordance with the Approved Plans and
Specifications and the occupancy thereof as a supermarket, except
that if and to the extent that a certificate of occupancy cannot
be obtained until Tenant completes the installation of its trade

                              11

fixtures in the Demised Premises, Landlord shall not be obligated to obtain such Certificate of Occupancy until Tenant shall have completed such installation to the extent so required.

C.     During the course of construction of the Tenant's Building and other improvements on the Demised Premises, Tenant may, with Landlord's approval, enter upon the Demised Premises for the purposes of inspecting the work, taking measurements, making plans, installing trade fixtures, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay the fixed annual rent and/or Charges. Tenant agrees that Landlord shall have no liability to Tenant for damage to any property of Tenant stored on the Demised Premises except for damages caused by the negligence of Landlord or its employees, agents, invitees or contractors.     Tenant shall not unreasonably interfere with Landlord's construction work on the Demised Premises in the exercise of Tenant's rights under this Subdivision 7C. All work done by Tenant or its contractors, employees or agents shall be in harmony with local building trades and must not interfere with Landlord's work.

D.     If Tenant's Building shall not have been completed and Delivery of Possession shall not have occurred within twenty-four (24) months after the date of receipt of all unappealable approvals and permits, and after meeting with Landlord to confirm and discuss the Completion schedule, Tenant shall have the right, at its option, in any such event, to (1) extend from time to time a Completion Date, or (2) commence or complete the construction work on all of, or any portion of, the Improvements, after giving written notice to Landlord of its intention to do so after a Completion Date or any extension thereof, as the case may be, and deduct the cost and expense thereof from fixed annual rate and or Charges thereafter becoming due and payable to Landlord, except to the extent, if any, that Landlord reimburses to Tenant any sums that Tenant shall have paid in accordance with this provision.  Notwithstanding the foregoing, should Tenant exercise its right set forth in (2) above, Landlord and Tenant shall meet within five (5) days of notice, at which time Landlord will detail its completion schedule and if satisfactory to Tenant in Tenant's reasonable review, Tenant shall rescind its notice previously provided. Upon receiving such notice of Tenant's intentions, Landlord shall cease doing any work, which would in any way interfere with Tenant's construction work on the Improvements. Within ten (10) days of receipt of Tenant's notice of Tenant's election to commence or complete the construction of all or any portion of the Improvements, Landlord shall cooperate and collaborate with the Tenant and its representatives in the completion of the Improvements. Tenant's election to commence or complete the construction of all or any portion of the

12

Improvements shall not relieve Landlord of the obligation of completing the construction of the remainder of the Improvements. If Tenant's Building shall not have been completed and Deliver of Possession shall not have occurred within thirty-six (36) months after the date of receipt of all unappealable approvals and permits, Tenant shall have the right to terminate this Lease by giving Landlord written notice of same within ten (10) days. If no notice is given tenant has waived its right to terminate pursuant to this subsection D.

E.   Within six (6) months after the date hereof, Landlord shall deliver to Tenant an accurate survey of the Shopping Center dated as of a date not earlier than the date hereof.  Within ninety (90) days after completion of construction of the Tenant's Building and other improvements on the Demised Premises, Landlord shall deliver to Tenant an accurate "as built" survey of the Shopping Center certified to Tenant by a duly licensed surveyor together with three (3) sets of "as built" plans of the Tenant's Building, including, without limitation, architectural and mechanical plans and operating manuals and specifications.

F.   Within ten (10) business days of the Delivery of Possession, Tenant shall pay to Landlord the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) as payment towards the cost to construct the parking structure ("Tenant's Payment) with no right to set off.

8.   **DELIVERY OF POSSESSION.**

A.   Landlord shall be deemed to have delivered possession of the Demised Premises to Tenant (hereinafter called "Delivery of Possession") on the date on which the latest of all of the following shall have occurred:

(1)   Actual possession of the Demised Premises shall have been delivered to Tenant free of all tenancies, occupancies and leases (other than this Lease), and title shall be as warranted and represented in Article 22 hereof;

(2)   Substantial completion of Tenant's Building and the Demised Premises and construction and/or improvements to be made to the Common Area and Limited Common Area which would affect Tenant's business, including, but not limited to, Tenant's Parking area, the signage permitted under Article 10, paving and striping in the Common Area and Limited Common Area, the connection of utilities to and in the Tenant's Building and the installation of the storm and sanitary sewer drainage in the Common Area; all utilities shall be in adequate supply for Tenant's use (collectively, "Utility Deliverables"); the fire protection sprinkler system shall be charged and in operation at

13

designed pressure and the storm and sanitary sewer drainage shall be adequate for Tenant's use. Notwithstanding the foregoing, however, if, due to weather conditions, Landlord is unable to complete landscaping or striping of the parking spaces in the Shopping Center at the time that Delivery of Possession would otherwise have occurred, and if Landlord has theretofore obtained a temporary or permanent certificate of occupancy for Tenant's Building and completion of landscaping or such striping is not required in order to enable Tenant to open for business and would not interfere with Tenant's business or adversely affect Tenant's use or occupancy of the Demised Premises or the Common Area, Landlord shall have the right to delay completion of landscaping until weather conditions permit such work to be done, whereupon such landscaping shall be completed as expeditiously as possible without interference with Tenant's business, and Landlord shall have the right to delay completion of striping until the weather permits. Landlord shall have substantially completed construction on all areas of "Building Space" labeled as "Required Construction" on Exhibit A except to the extent that any further construction on or around the Building Space will not interfere with or adversely impact Tenant's operation of the Demised Premises.

(3) A temporary or final certificate of occupancy for (a) the Demised Premises (as constructed in accordance with the Approved Plans and Specifications), permitting the use of the Demised Premises as a supermarket, and all other approvals, permits and consents for the Demised Premises (other than any licenses or permits required by any regulatory authority with respect to the types of business operations conducted by Tenant in the Demised Premises, such as, for example, a liquor license, health license, etc.(collectively referred to herein as the "Tenant Approvals") and, (b) if related to the use or occupancy of or the business conducted at the Demised Premises, the Shopping Center, permitting the construction or renovation thereof in accordance with the Approved Plans and Specifications, shall have been issued and delivered to Tenant with all applicable appeal periods having expired without any appeal having been taken, and no such approvals, permits or consents shall be conditioned upon or subject to any requirement that Tenant, in good faith, determines would adversely affect or interfere with the operation of its business in the Demised Premises in such manner as Tenant may deem appropriate, unless such temporary or permanent certificate of occupancy or other permits, approvals or consents cannot be issued solely as a result of Tenant's failure to complete installation of its trade fixtures, in which latter event Delivery of Possession shall be deemed to have occurred notwithstanding that the certificate of occupancy and such permits, approvals and consents shall have not been obtained (but provided that all of the other conditions to Delivery of Possession shall have occurred) and Landlord shall

14

obtain the temporary or permanent certificate of occupancy and such other permits, approvals and consents within ten (10) business days after Landlord's receipt of Tenant's notice of substantial completion of such installation, failing which Tenant, in addition to any of its other rights and remedies, shall have no obligation to pay fixed annual rent or Charges (except utilities and insurance premiums, if any) until the later of (a) the date that the temporary or permanent certificate of occupancy and all such other permits and approvals have been obtained; or (b) the first to occur of (i) the date on which Tenant opens the Demised Premises for business to the public, or (ii) the date which is one hundred and twenty (120) days after the date of Delivery of Possession. If the temporary certificate of occupancy terminates or expires, if such termination or expiration resulted from Landlord's failure to perform any of its obligations under this Lease, and fixed annual rent and all Charges shall abate for the period commencing with the date of termination or expiration of such temporary certificate or other permits or approvals until the date of issuance of the final or permanent certificate and all such final permits and approvals;

(4) Construction or installation of the foundations, structural steel, finished exterior walls, roof and roofing of all of the buildings labeled "Required Construction" on Exhibit A shall have been completed;

(5) Landlord shall have complied with its obligations under Section 46C hereof that are required thereunder to be complied with prior to Delivery of Possession which shall include obtaining an Act 2 Approval Letter (as hereinafter defined) from the Pennsylvania Department of Environmental Protection ("PADEP") unless waived, in writing, pursuant to the terms of Section 46C and any required polychlorinated biphenyl ("PCB") remediation approval from the United States Environmental Protection Agency ("USEPA") ; and

(6) Landlord shall have delivered to Tenant a duly executed and acknowledged Subordination, Recognition and Non-Disturbance Agreement from each mortgagee under each mortgage covering the Shopping Center as of the date of Delivery of Possession in substantially the same form annexed hereto as Exhibit F (other than any such mortgage that is subordinate to this Lease).

(7) Landlord shall have completed the Tenants dedicated parking lot on the second level, as well as, the ground level parking lot and all means of ingress/egress to and from both lots.

B.   Tenant's opening of the Demised Premises to the

15

public for business prior to Delivery of Possession shall not relieve Landlord of any of its obligations under this Lease, including, without limitation, the obligations of completing construction of the Improvements and providing any certificates and approvals required hereunder but shall be conclusive that the Delivery of Possession has occurred.

C.    If at any time, either before or within sixty (60) days after Delivery of Possession, any deviation from the Approved Plans and Specifications appears and Landlord fails to correct such deviation within sixty (60) days after written notice thereof from Tenant (or if such correction shall reasonably take more than sixty (60) days to complete and Landlord fails to commence such correction work within sixty (60) days of such notice or fails to diligently prosecute same to completion), Tenant may perform the work to correct any such deviation.  Any reasonable third party cost or expense incurred by Tenant and reasonably documented to Landlord in correcting such deviation may be deducted by Tenant from any fixed annual rent and Charges becoming due and payable under this Lease, not to exceed twenty-five percent (25%) of any monthly rent payment.

9.    **REMAINDER OF THE IMPROVEMENTS.**

A.    Landlord has induced Tenant to execute and deliver this Lease by making the following warranties, representations and agreements:  (1) The Shopping Center, as shown on Exhibit A and Exhibit A-1, shall not be materially changed or modified; (2) All buildings in the Shopping Center shall at all times be located entirely within the building sites labeled "Permitted Building Area" on Exhibit A.  The perimeter lines of sites shall be deemed to represent maximum building limits and no buildings shall extend beyond said limits or be constructed in whole or in part on any other portion of the Shopping Center without Tenant's consent;

B.    Except for Tenant's customary signage, Landlord's written approval is required with respect to Tenant's exterior signs, such approval shall not be unreasonably, withheld, conditioned nor delayed.  Landlord shall have exclusive control of the exterior windows facing 2nd Street and Girard Avenue. Tenant shall maintain and remove all of its signs at or prior to the Expiration Date or as soon thereafter as is reasonably practical, except that, with respect to any pylon sign, Tenant shall only be required to remove its sign panel therefrom.

C.    All portions of water, gas, electricity, sewage and other utility lines within the Shopping Center and not within the exterior walls of any structure or enclosed area may be installed above ground.

16

10. **SIGNS AND ANNOUNCEMENTS.**

A. Except for Tenant's customary signage, Landlord's written approval is required with respect to Tenant's exterior signs, such approval not to be unreasonably withheld, conditioned nor delayed.   Tenant shall not have any lit or neon signs unless approved by Landlord as required herein.   Landlord shall, at Tenant's cost, at the request of Tenant, which request Tenant may make at any time after the date hereof, place a temporary sign approved by Landlord, which sign will be supplied by Tenant, on the property announcing Tenant's intent to locate a store in the Shopping Center; provided, however, that (i) in the event that Landlord is not the owner of the Shopping Center at this time, then Tenant shall wait until such time as Landlord actually acquires the fee; and (ii) Tenant shall, at its own cost and expense, obtain any and all required municipal approvals for said sign and Landlord shall cooperate with Tenant in obtaining same.

B. As part of Landlord's approvals, Landlord shall cause to be obtained to the extent possible exterior signage for Tenant. Such exterior signage will include signage on Girard Avenue, 2nd Street and on the front of the Demised Premises.   Landlord shall use commercially reasonable efforts to ensure such signage shall minimally equate to Tenant's pro rata square footage of the Shopping Center.

C.   Unless Tenant is legally obligated to disclose any of the information relating to the Lease, Tenant agrees to keep this Lease confidential and not make any public announcements or disclosures in any manner whatsoever with respect to the subject matter of this Lease Agreement without the written consent of Landlord, such consent shall not be unreasonably withheld, conditioned nor delayed.

11. **COMMON AREA.**

A.   Landlord shall, keep and maintain the Common Area in good condition and repair, including, but not limited to, re-striping (at least once every twenty four months); repairing and replacing paving and the substrata thereof; keeping the Common Area properly policed, drained, free of snow, ice, water, rubbish and obstructions, and in a neat, clean, orderly and sanitary condition; keeping the Common Area safe and suitably lighted;

17

maintaining signs, markers and other means and methods of pedestrian and vehicular traffic control; and maintaining any plantings and landscaped areas, if any. Costs associated with such maintenance shall be included and reimbursed as part of Common Area Maintenance.

B.    Limited Common Area - Landlord shall, at its expense subject to reimbursement as part of Common Area Maintenance, keep and maintain the Limited Common Area in good condition and repair, including, but not limited to, re-striping (at least once every twenty four months); repairing and replacing paving and the substrata thereof; keeping the Limited Common Area properly policed, drained, free of snow, ice, water, rubbish and obstructions, and in a neat, clean, orderly and sanitary condition; keeping the Limited Common Area safe and suitably lighted; maintaining signs, markers and other means and methods of pedestrian and vehicular traffic control; and maintaining any plantings and landscaped areas, if any.  The Parking Spaces to the second floor area shall be used only for the parking of private vehicles of Tenant's customers, invitees and employees of tenants and for no other purpose. With Landlord's cooperation, Tenant shall not allow overnight parking or parking in excess of two (2) hours, except for employees. Landlord shall cause the light stanchions located within the Limited Common Area to be directly connected to the Tenant's Building for operation by Tenant with a minimum foot candle as per Tenant's specifications identified in the Criteria Drawings. Tenant Light Stanchions shall be connected by Landlord to the electric meter for Tenant's Building and Tenant shall be responsible for payment of the electric utility costs for the operation of Tenant Light Stanchions. Common Area Cost (as defined in the Lease) shall not include any electric utility costs for operation of any lights in the Limited Common Area paid for by Tenant.

C.    Except as otherwise expressly provided herein, the parking spaces in the Common Area shall be used only for the parking of private vehicles of customers, invitees and employees of tenants of the Shopping Center and for no other purpose. The roads, streets and drives shall be used for pedestrian and vehicular traffic serving the Shopping Center and for no other purpose. Employees of the tenants of the Shopping Center shall not park their automobiles in the Common Area and Landlord shall require all other tenants of the Shopping Center to use their best efforts to prevent any violation of this provision. Tenant shall use its best efforts to prevent any violation by its employees.  Tenant shall use reasonable efforts to prevent its shopping carts from obstructing the Common Areas and on a daily

18

basis will cause the shopping carts to be removed from the Common Areas.

D.   Neither party shall exact any charge or permit others to exact any charge for use of the Limited Common Area from Tenant or its customers, invitees or employees or of any other tenant or from any other parties using the Shopping Center in accordance with the terms of this Lease.

E.   There shall be no advertisements or signs in the Common Area except the signs hereinbefore provided for, traffic control signs and Tenant's cart corrals as hereinafter provided for.   No merchandise shall be sold or displayed in the Common Area or Limited Common Area.   Notwithstanding the foregoing, any occupant of the Demised Premises may use the sidewalk adjacent to the front of the Demised Premises for display and selling of goods, with Landlord's consent, and without Landlord's consent for the storage of shopping carts and Tenant may erect a cart corral or similar device thereon, subject to compliance with all applicable laws, Tenant may place any sign or advertisement on any cart corral serving the Demised Premises, subject to Landlord's approval which shall not be unreasonably withheld, conditioned nor delayed.   Furthermore, Tenant may place cart corrals or similar devices within the parking areas of both levels in areas approved by Landlord.   Tenant shall not store anything in on or upon Common Area or Limited Common Area except as set forth herein.

F.   Landlord and Tenant shall each indemnify and hold harmless the other party, its employees and agents from any and all claims, causes of action, damages, expenses and liability, including reasonable attorneys' fees, sustained or incurred by any persons (other than   Landlord or Tenant, its employees and agents) which are based upon or arise out of illness or injury, including death of any person or damage to any property and which arise from or in any manner grow out of any act or omission of the other party, its agents, partners or employees in the Common Area.   Landlord or Tenant, as the case may be, shall immediately respond and assume the investigation, defense and expense of all claims and causes of action arising out of or in connection with occurrences within the Common Area.   Except as provided in Section Forty Six (46), if any claims or causes of action allege acts or omissions of both Tenant and Landlord, then each party shall indemnify the other party to the extent of its relative and respective liability.   The other party may, at its sole cost and expense, join in such defense with counsel of its choosing.

G.   Tenant shall pay to Landlord, on a monthly basis, as additional rent commencing  on the Rent Commencement Date, Tenant's "Pro-Rata Share" of the "Common Area Costs" as described and defined on the attached Exhibit "G".

19

H.    Tenant shall pay to Landlord, on a monthly basis, as additional rent commencing  on the Rent Commencement Date, Tenant's "Pro-Rata Share" of the "Real Estate Taxes" as described and defined on the attached Exhibit "H".

12.  **REPAIRS.**

A.    Tenant shall keep the Demised Premises in good order and condition and shall make all necessary interior non-structural repairs to Tenant's Building including repairs to the heating, ventilating and air conditioning system located therein, to the interior exposed plumbing and exposed portions of the electrical systems and to interior unexposed plumbing and electrical systems, all doors and windows,  freight elevators, loading docks, store front and upon receipt of the roof warranty to Tenant, Tenant shall be responsible for the roof over the Demised Premises and those required as a result of Tenant's negligence except that Tenant shall not be obligated to make any of the foregoing arising out of or in any way connected with (1) fire or other casualty, (2) settling, (3) defects in labor, workmanship, materials or equipment employed, supplied or installed in the construction of Tenant's Building,(4) the negligence or wrongful acts or omissions of Landlord, its agents, employees or contractors, or (5) repairs, maintenance or replacements to the roof necessitated by the Landlord's installation of any materials on the surface of the roof.  In addition, upon delivery and transfer of the roof warranty to Tenant, Tenant shall keep the roof in good order and condition and shall make all necessary repairs and replacements thereto.

B. Landlord shall make all replacements of the customer and freight elevators and all repairs which are not required to be made by tenant under subdivision A hereof, including, without limitation, all structural repairs and replacements and all repairs and replacements to the exterior (excluding tenant's signs), finished slab of tenant's building and to the water, sewer and electrical systems servicing the Demised Premises. Furthermore, Landlord shall be responsible for repairing the customer elevators servicing the Demised Premises and first level retailers.

C.    Except for repairs necessitated by the negligence or wrongful acts or omissions of Tenant, its agents, employees or contractors and except for normal wear and tear, notwithstanding anything to the contrary contained in this Lease, Landlord agrees that until the expiration of the first Lease Year, Landlord shall

20

make all repairs and replacements to the Demised Premises. In addition, Landlord shall deliver to Tenant certificates of all warranties required pursuant to the Criteria Drawings. Should Landlord fail to obtain any warranty required pursuant to the Criteria Drawings for more than fifteen (15) days after notice and demand, Landlord shall reimburse Tenant for any reasonable expense incurred by Tenant by reason of Landlord's failure to obtain any such warranty.

D.   Landlord shall indemnify Tenant and hold harmless Tenant, its employees and agents from any and all charges, claims, causes of action, damages, expenses and liability, including reasonable attorneys' fees, sustained or incurred by any persons (other than Tenant, its employees and agents) which are based upon or arise out of illness or injury, including death of any person or damage to any property and which arise from or in any manner grow out of any act or omission of Landlord, Landlord's agents, partners, members, employees, contractors or subcontractors in connection with the construction of Tenant's Building and any other improvements constructed on the Demised Premises and/or repairs and replacements required to be made by Landlord hereunder. Landlord shall immediately respond and take over the expense, defense and investigation of all claims arising out of or in connection with any defect in the construction of Tenant's Building or any other improvements constructed on the Demised Premises and/or claims attributable to acts or omissions of Landlord its agents, partners, members, employees, contractors or subcontractors concerning the exterior, structural portions, roof or floor of Tenant's Building or any other portions of Tenant's Building or the Demised Premises which Landlord is obligated to repair and/or replace. Tenant may, at its sole cost and expense, join in such defense with counsel of its own choice.

E.   Landlord shall maintain the exterior of all buildings and other structures in the Shopping Center in good order and condition, which shall include repainting when necessary; and

F.   Notwithstanding subsection A above, Landlord shall be responsible for any repair, maintenance and/or replacement costs associated with or necessitated by Landlord's placement and/or screening of any roof-top materials, equipment, grass and soil installation (collectively, the "Green Roof"). The Green Roof shall not interfere with any Tenant equipment servicing the Demised Premises nor Tenant's use thereof.

13.  INSURANCE.

A.   Landlord agrees to maintain insurance policies providing against loss by fire, lightning, and perils of extended coverage and malicious mischief covering the Demised Premises and

21

the other Improvements in the Shopping Center excluding Tenant's FF&E. In addition, until possession of Tenant's Building shall have been delivered to Tenant, Landlord shall insure Tenant's Building under a Builder's Risk Policy on an all risk basis. The policies covering the Building required under this Subdivision 13A shall contain the following endorsements:

(1) An endorsement providing for a thirty (30) day notice of cancellation of insurance to all who are or become additional insureds as required under this Lease;

(2) An endorsement naming Tenant [and any future occupant(s) of the Demised Premises designated by Tenant] as an additional insured; and

(3) An endorsement whereby insurer acknowledges that Landlord has waived any and all rights of recovery against Tenant and any other occupant(s) of the Demised Premises and their agents and employees for damage or destruction to any and all of the Improvements, including, without limitation, Tenant's Building, whether or not caused by acts or negligence of Tenant or said occupant(s) or any of their agents or employees.

All policies of insurance required under this Subdivision 13A shall be for the full replacement value of Tenant's Building and other Improvements required to be insured hereunder. Such policy or policies shall provide that the proceeds of any loss shall be payable to Landlord and to the holder (as its interest may appear) of any mortgage to which this Lease is subordinate so long as the Landlord and such holder and future holders of such mortgage are obligated to apply proceeds of insurance in the manner provided for in this Lease. Landlord hereby covenants that it shall not permit any occupant or occupants of premises in the Shopping Center and adjoining Demised Premises to use said adjoining premises for any purpose which would increase the fire insurance rate applicable to the Demised Premises and/or to Tenant's merchandise, fixtures and other property in the Demised Premises unless Landlord pays additional premium.

B.    Landlord hereby waives all rights of recovery against Tenant and any other occupant(s) of the Demised Premises and any of their agents and employees for damage or destruction to any and all of the Improvements, including, without limitation, Tenant's Building, arising out of fire or other casualty whether or not caused by acts or negligence of the aforementioned persons.    Tenant hereby waives all rights of recovery against Landlord, its agents and employees for damage or destruction to its fixtures and equipment arising out of fire or other casualty whether or not caused by the acts or negligence of Landlord, its agents or employees.

22

C.    Landlord    shall    maintain    commercial    general liability insurance having minimum limits of coverage of Five Million ($5,000,000.00) Dollars per occurrence combined single limit (primary and excess liability insurance coverage) for bodily injury, personal injury and property damage.    Said commercial general liability policy shall contain the following provisions:

(1)    Tenant    shall    be    named    as    an    additional insured endorsed in the insurance contract as follows:    "Tenant, [insert name of Tenant], is hereby named as an additional insured and covered under this insurance contract but only to the extent of losses or claims caused by or arising out of the negligent acts of the named insured (Landlord), named insured's employees, agents, and partners";

(2)    An    agreement    that    the    hold    harmless    and indemnification wording of this Lease is insured as a contractual obligation; and

(3)    A thirty (30) day notice of cancellation of insurance to all who are or who become additional insureds as required in this Lease.

D.    Tenant shall maintain at its own cost and expense automobile liability insurance having minimum limits of coverage of Five Million ($5,000,000.00) Dollars per occurrence combined single limit for bodily injury, personal injury and property damage.

E.    Tenant shall maintain at its own cost and expense commercial general liability insurance having minimum limits of coverage of Five Million ($5,000,000.00) Dollars per occurrence combined single limit for bodily injury, personal injury and property damage.    Said policy shall contain the following provisions:

(1)    Landlord and Landlord's designees shall be named as an additional insured endorsed in the insurance contract as follows: "Landlord, [insert name of Landlord], is hereby named as an additional insured and covered under this insurance contract but only to the extent of losses or claims caused by or arising out of the negligent acts of the named insured (Tenant), named insured's members, employees, agents and partners";

(2)    An agreement providing that the hold harmless and indemnification wording of this Lease is insured as a contractual obligation; and

23

(3)   A thirty (30) day notice of cancellation of insurance to all who are or who become additional insureds as required in this Lease.

F.   All policies of insurance required under this Article 13 shall be written and signed by solvent and responsible insurance companies reasonably acceptable to both Landlord and Tenant and authorized to do business in the jurisdiction wherein the Shopping Center is located.  Within fifteen (15) days after the Delivery of Possession, Landlord shall provide Tenant with certificates of Landlord's insurers evidencing the insurance coverage required of Landlord under this Article 13.   Within fifteen (15) days of Delivery of Possession, Tenant shall provide Landlord with certificates of Tenant's insurers evidencing the insurance coverage required of Tenant under this Article 13.   In addition, each party shall deliver to the other renewal policies or certificates thereof not later than thirty (30) days prior to the expiration of any policies which such party is required to carry hereunder.

G.   Notwithstanding anything to the contrary contained herein, as long as Tenant maintains a tangible net worth in excess of $150,000,000.00, Tenant shall have the right to self-insure, in whole or in part, for any of the insurance required to be carried under this Lease under a program of self-insurance.

H.   Environmental  Insurance.  To  the  extent  any environmental insurance coverage to the Shopping Center is required by a third party including Landlord's lender and/or mortgagee or obtained voluntarily by Landlord, then Landlord shall name Tenant and Guarantor as additional insured(s) under such environmental insurance policy. Any additional costs associated with the inclusion of Tenant and Guarantor as additional named insured(s) shall be paid by Tenant if Tenant elects such coverage.

14.  **REQUIREMENTS OF LAW AND FIRE INSURANCE.**  Tenant shall comply with and shall from time to time conform the Demised Premises to every applicable requirement of law, duly constituted authority, Board of Fire Underwriters having jurisdiction or of the carriers of all insurance on the Demised Premises (all of the foregoing being hereinafter called "Requirements") insofar as the necessity therefor shall arise solely out of its manner or method of use of the Demised Premises; provided, however, that the foregoing shall not require Tenant to make any structural, exterior, floor or roof changes, replacements, alterations, installations or repairs at any time unless required as a result of the use of the Demised Premises for any purpose other than a supermarket or due to alterations performed by Tenant subsequent to the initial alterations of the Demised Premises under Article 7 hereof.  Landlord shall comply with all Requirements except to

24

the extent that Tenant is obligated to comply therewith. Tenant shall have the right upon giving notice to Landlord to contest any obligations imposed upon Tenant pursuant to the provisions of this Article and to defer compliance during the pendency of such contest, if the failure of Tenant so to comply will not subject Landlord to criminal penalty. Landlord shall cooperate with Tenant in such contest and shall execute any documents reasonably required in furtherance of such purpose. This Article is not intended to impose on Tenant any obligation, which, pursuant to this Lease, is an obligation of Landlord.

15. **ALTERATIONS.** The Tenant may, without Landlord consent and at its own expense from time to time, during the term hereof, make such interior alterations, improvements and changes, excluding structural (hereinafter called "Alterations"), in the Demised Premises which it may deem necessary or desirable, provided such Alterations shall not change the footprint of the Demised Premises or impair the structural integrity of the Demised Premises. The Tenant may, with Landlord consent and at its own expense from time to time, during the term hereof, make such structural improvement in the Demised Premises which it may deem necessary or desirable, provided such structural improvements shall not impair the structural integrity of the Demised Premises. Tenant, in making any Alterations, shall use materials of equal or better quality than those used in the construction of the Demised Premises and comply with all applicable laws, orders and regulations of federal, state, county and municipal authorities, with any direction given by a public officer pursuant to law and will all regulations of any Board of Fire Underwriters having jurisdiction. Tenant shall obtain or cause to be obtained all building permits, licenses, temporary and permanent certificates of occupancy and other governmental approvals which may be required in connection with the making of Alterations. Landlord shall cooperate with Tenant in the obtaining thereof and shall execute any reasonable documents required in furtherance of such purpose. Tenant may, but shall not be obligated to, remove any Alteration. Tenant may not make any exterior alterations without Landlord's consent which shall not be unreasonably withheld, conditioned or delayed. Upon Landlord's request, Tenant will provide Landlord with copies of any plans that Tenant is required to file with any governmental authority with respect to any Alterations.

16. **ACCESS TO PREMISES.** Tenant shall permit Landlord to enter upon the Demised Premises at all reasonable times (a) to make repairs, changes, replacements, and restorations to Tenant's Building which are required to be made by Landlord, and (b) during the nine (9) month period preceding the Expiration Date, to exhibit the Demised Premises to prospective tenants, provided that Landlord shall not unreasonably interfere with the conduct of business therein, except in case of emergency.

25

17. UTILITIES.

A. Tenant shall pay for water, gas, electricity and fuel used by it in the Tenant's Building, provided same is separately metered or submetered, (Landlord hereby agreeing to install said meters at its sole cost and expense) to measure Tenant's actual consumption. Tenant shall pay all sewer charges assessed by the municipal authority having jurisdiction provided same are based upon the amount of water Tenant consumes in the Tenant's Building, but in no event shall Tenant pay assessments for public improvements relating to the construction, installation or improvement of a sewer system and/or sewage treatment plant whether or not such assessments are measured by the amount of water consumed by Tenant in the Tenant's Building. Landlord shall pay all charges arising out of, connected with or attributable to any fire sprinkler or other sprinkler system.

B. Landlord shall be responsible for providing utilities servicing Demised Premises, as more fully described and required in the Construction Specifications on Exhibit C, attached hereto and made a part hereof (collectively, the "Utility Deliverables", in location(s) specified by tenant.

C. Tenant shall have the right to apply for, claim and receive any rebate, reimbursement, credit, or payment from any utility company providing service to Demised Premises resulting from the installation of energy saving equipment in or on Demised Premises.

18. SUBORDINATION, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT. This Lease shall become subject and subordinate to the lien of any mortgage of the entire fee interest of the Shopping Center made to a bank, trust company, savings and loan association, title company, college, university, insurance company, federal or state pension or retirement fund or other entity engaged in the business of placing and selling to the capital markets pools of securitized mortgage loans covering properties leased to investment grade and other tenants and any renewals, modifications or extensions thereof, provided that a Subordination, Recognition and Non-Disturbance Agreement in recordable form and in substantially the same form annexed hereto as Exhibit F is executed, acknowledged and delivered by such mortgagee to Tenant. If the holder of any first mortgage of the entire fee interest of the Shopping Center requires that this Lease have priority over such mortgage, Tenant shall, upon request of such holder, execute, acknowledge and deliver to such holder an agreement acknowledging such priority.

26

## 19.  FIXTURES

A.    All fixtures and equipment whether owned by Tenant or leased by Tenant from a Lessor/Owner (hereinafter called the "Equipment Lessor") installed in the Tenant's Building, regardless of the manner or mode of attachment, shall be and remain the property of Tenant or any such Equipment Lessor and may be removed by Tenant or any such Equipment Lessor at any time prior to expiration of the Term, and any Holding Over period incurred by Tenant. In no event (including a default under this Lease) shall Landlord have any liens, rights or claims in Tenant's or Equipment Lessor's fixtures and equipment and Landlord agrees to execute and deliver to Tenant and Equipment Lessor, within ten (10) days after request therefor, any reasonable document required by Tenant or Equipment Lessor in order to evidence the foregoing. Tenant shall promptly repair all damage to the Tenant's Building caused by the removal of any such fixtures or equipment.

B.    In the event Tenant shall enter into any arrangement to finance all or any portion of its fixtures or equipment either before or after the installation thereof in the Tenant's Building and whether such financing shall be in the form of a mortgage, financing agreement, equipment lease, equipment sale-leaseback or otherwise and in the event the lessor secured party thereunder (hereinafter called the "Owner/Secured Party") shall require a copy of any notice sent by Landlord to Tenant under this Lease also to be sent to the Owner/Secured Party, then Landlord shall simultaneously send a copy of any such notice to such Owner/Secured Party at the address furnished to Landlord. The copy of any such notice shall be sent to such Owner/Secured Party in the same manner as notices are required to be sent and in the same manner as such notice is being sent to Tenant hereunder. Landlord further agrees that any such Owner/Secured Party shall have the right, but not the obligation, to remedy or cure any default of Tenant under this Lease within a period of time which shall in all events be thirty (30) days longer than the period of time granted to Tenant to remedy or cure any such default under this Lease. In no event shall Landlord have liability to Owner/Secured Party.

C.    (1) With notice to Landlord, Tenant shall have the right at any time and from time to time, with Landlord's consent, not unreasonably withheld, to mortgage the leasehold estate hereby created and/or Tenant's interest in or to the Demised Premises and fixtures and equipment therein to any Institutional Lender (hereinafter called the "Leasehold Mortgagee"). The execution and delivery of any leasehold mortgage (hereinafter called the "Leasehold Mortgage") shall not constitute an assignment or transfer of this Lease nor shall any

27

Leasehold Mortgagee be deemed an assignee or transferee of this
Lease or require such holder to assume the performance of any of
its terms, covenants or conditions, unless and until such
Leasehold Mortgagee shall take possession of the Demised
Premises.    Landlord shall be notified of the execution and
delivery of the Leasehold Mortgage and be furnished with a copy
thereof.    No purported cancellation, surrender, modification or
amendment made without the prior written consent of any Leasehold
Mortgagee shall be binding on such Leasehold Mortgagee, unless it
shall have been given at least seven (7) days' prior notice of
the parties' intention to effectuate such transaction.

                (2)  In the event that the Leasehold Mortgagee
shall have given written notice to Landlord that it is the holder
of said mortgage, and provided such notice includes the address
to which notices to such Leasehold Mortgagee are to be sent,
Landlord agrees that in the event it shall give written notice to
Tenant to cure a default of Tenant as provided for in Article
29A, Landlord shall give a copy of said notice to said Leasehold
Mortgagee.    Landlord agrees that said Leasehold Mortgagee may
cure or remedy such default within the time permitted to Tenant
pursuant to Article 29A, except that unless the remedying of such
default is required in order to prevent injury to persons or
property or to avoid a material interference with the conduct of
business at the Demised Premises, or is required in case of an
emergency, the Leasehold Mortgagee shall have an additional
period of thirty (30) days to remedy such default. In no event
shall Landlord have liability to Leasehold Mortgagee.

                (3)  If Landlord shall become entitled to serve a
notice of termination of this Lease, it shall simultaneously with
the serving of such notice of termination on Tenant, give to the
Leasehold Mortgagee (a copy of whose Leasehold Mortgage shall
have been theretofore furnished to Landlord) a copy of the
termination notice setting forth the default giving rise to such
right of termination and stating that it is entitled to serve a
notice of termination.    The Leasehold Mortgagee shall have the
same rights to remedy such default(s) as Tenant shall have under
the provisions of Subdivision 29A.

                (4)  Tenant irrevocably authorizes and directs
Landlord to accept, and Landlord agrees to accept, performance by
any Leasehold Mortgagee or its nominee or designee of any of the
terms, covenants or provisions on Tenant's part to be performed
hereunder with the same force and effect as though performed by
Tenant.

                (5)  For purposes of this Article, a "nominee" or
"designee" of any Leasehold Mortgage may include, without
limitation, a purchaser in foreclosure or in-lieu-of foreclosure

                                28

of Tenant's interest in this Lease.

(6) Lessor shall, upon the written request of any
Leasehold Mortgagee, enter into any reasonable agreement with
such Mortgagee confirming the foregoing provisions of this
Subdivision 19B.

## 20. ASSIGNMENT AND SUBLETTING.

A. Tenant may sublet all or any part of the Demised
Premises, or license the use of any portion thereof or assign
this Lease with the prior written consent of Landlord and only so
long as the primary use as a supermarket remains substantially
the same as similarly situated supermarkets, but Tenant shall
nevertheless continue to remain liable hereunder. Furthermore,
Tenant may license any portion of the Demised Premises to a third
party licensee provided such license does not violate any
existing exclusive granted by Landlord and provided such
licensee's use is a primary use and licensee is operating in an
area lesser than 1,500 useable square feet. Notwithstanding the
foregoing, Tenant shall have the right to license to a sushi or
Asian foods operator. If Tenant assigns this Lease, Landlord,
when giving notice to said assignee or any future assignee with
respect to any default, shall also serve a copy of such notice
upon The Great Atlantic & Pacific Tea Company, Inc. (The Great
Atlantic & Pacific Tea Company, Inc. or its successor being
herein called "Original Tenant"). The Original Tenant shall have
the same period after receipt of such notice to cure such default
as is given to Tenant under this Lease. If this Lease terminates
or this Lease and the term hereof cease and expire because of a
default of such assignee or because of the occurrence of any of
the contingencies set forth in Subdivision 29B after an
assignment of this Lease shall have been made, Landlord shall
promptly give the Original Tenant notice thereof. The Original
Tenant shall have the option, to be exercised by notifying
Landlord within thirty (30) days after receipt by the Original
Tenant of Landlord's notice, to cure any default and become
Tenant under a new lease for the remainder of the term of this
Lease (including any Renewal Periods) upon all of the same terms
and conditions as then remain under this Lease, as it may have
been amended by agreement between Landlord and Original Tenant.
If any default of such assignee is incapable of being cured by
the Original Tenant then, notwithstanding the failure to cure
same, the Original Tenant shall have the foregoing option to
enter into a new lease. Such new lease shall commence on the
date of termination of this Lease. Notwithstanding the
foregoing, Landlord shall have no liability to Original Tenant
pursuant to this Paragraph 20.

B. Landlord shall, within ten (10) days after
Tenant's request, deliver to Tenant a non-disturbance agreement

29

reasonably acceptable to Tenant, executed and acknowledged by
Landlord, for the benefit of any subtenant of all or any part of
the Demised Premises, provided that such subtenant (a) is
subleasing at least 3,500 square feet of space and (b) is
required to pay fixed annual rent under such sublease at a per
square foot rate no less than the per square foot rate of fixed
annual rent payable by Tenant under this Lease.

        C.    Landlord shall have the right to assign this
lease to any successor in interest without the consent of Tenant.

        21.  **RESTRICTIVE COVENANT.**

        A.    Provided Tenant is operating a supermarket in the
Demised Premises, Landlord shall not permit, except for the
Demised premises, any premises in the Shopping Center to be
occupied as its primary use for  a  supermarket or food store,
convenience store, produce store or department, seafood store or
department, meat store or department, bakery store or department,
delicatessen  store or department (excluded are shops such as
Subway, Quizino's etc.), the sale of health and beauty aids,
and/or the sale of prescription drugs, excluding a drug
store/pharmacy.  Landlord further agrees it shall not lease any
portion of the Shopping Center for any noxious or offensive use,
for manufacturing, or to be used for a theater, bowling alley,
funeral parlor, warehouse (except as may be incidental to a
permitted retail and/or retail services use), brokerage office
(off-track betting or check cashing facility, car wash,
automobile repair or service facility, automobile, boat, trailer,
truck sales or leasing, amusement park, carnival, banquet
facility, dance hall, disco, night club, any type of
entertainment, including but not limited to a video game room,
pool hall, arcade containing coin operated games, pinball
machines or similar devices, or other amusement center, Fitness
Center, animal raising or store, pawn shop, flea market, junk
yard, dumping, disposal or incineration or reduction of garbage
or refuse other than enclosed receptacles intended for such
purposes, training facility, barber or beauty school, any use
which constitutes a public or private nuisance.

        B.    If the covenants contained in Subdivision A of
this Article 21 are breached by Landlord and not cured or
resolved within thirty (30) days of written notice to Landlord,
Tenant may, in addition to all other remedies available to it,
withhold payment of twenty-five (25%) percent of fixed annual
rent accruing during the period from the date of any breach until
same be cured or otherwise resolved, and the monies so withheld
may be retained by Tenant as liquidated damages and not as a

                                30

penalty.

## 22. LANDLORD'S TITLE.

A.    Landlord warrants and represents to Tenant that
Landlord has the right and lawful authority to enter into this
Lease for the term hereof (including the Renewal Periods), that
Landlord shall be, as of the  date hereof, the owner of the fee
simple of the Shopping Center and that title to the Shopping
Center is and shall continue to be, until Rent Commencement, free
and clear of any liens and encumbrances except for those set
forth on Exhibit E, and except for any liens or encumbrances
first arising after the date of this Lease that could not (i)
diminish any of Tenant's rights or increase any of its
obligations under this Lease; (ii) interfere with, impair or
prevent the use or occupancy of the Demised Premises or the
Shopping Center; (iii) result in a foreclosure of any  fee or
leasehold interest in the Shopping Center (except under a mort-
gage with respect to which Tenant shall have been furnished with
a non-disturbance agreement, as set forth herein); or (iv)
otherwise jeopardize or otherwise adversely affect Tenant's
leasehold estate (hereinafter called "Permitted Encumbrances").
Landlord covenants and agrees to execute any documents reasonably
required by Tenant for the purpose of curing any title defects.

Landlord and Tenant shall execute a Memorandum of
Lease (hereinafter called "Memorandum").  Landlord shall record
the Memorandum and covenants and agrees to record the Memorandum
prior to the recordation of any other lease (or memorandum
thereof) affecting the Shopping Center. Tenant agrees to execute
any reasonable document that may be required by Landlord as it
relates to said Memorandum.  If the payment of transfer tax is
required at the time of lease recordation Tenants shall pay the
requisite tax and recording fees.  Landlord further covenants and
agrees that within fifteen (15) days after the date of recording
of the Memorandum, Landlord shall furnish Tenant with a title
report updated to show the Memorandum of record and the title to
be as warranted and represented herein. If, for any reason, the
Memorandum cannot be recorded in the form annexed hereto or if
any document is required to be submitted to effectuate such
recording, Landlord, upon Tenant's request, shall execute such
modified Memorandum or such other documents. The parties shall
execute a Termination of the Memorandum, which Termination shall
be held in Escrow until such time, if any, as this lease is
terminated as provided for herein at which time the Termination
of the Memorandum shall be release from Escrow Agent and
recorded.

23.  QUIET  ENJOYMENT.    Upon  payment  of  all  sums  due
hereunder,  Landlord  covenants  and  agrees  that  Tenant  shall

31

peaceably and quietly have, hold and enjoy the Demised Premises
and all rights, easements, appurtenances and privileges belonging
or in anywise appertaining thereto during the full term of this
Lease and any extension thereof.

24. **UNAVOIDABLE DELAYS.** If either party shall be prevented
or delayed from punctually performing any obligation or
satisfying any condition under this Lease by any strike, lockout,
labor dispute, inability to obtain labor or material, Act of God,
governmental restriction, regulation or control, enemy or hostile
governmental action, civil commotion, insurrection, sabotage,
fire or other casualty or by any other event similar to the
foregoing and beyond the control of such party, then the time to
perform such obligation or to satisfy such condition shall be
postponed by the period of time consumed by the delay. If either
party shall, as a result of any such event, be unable to exercise
any right or option within any time limit provided therefor in
this Lease, the time for exercise thereof shall be postponed for
the period of time consumed by such delay. In no event shall the
Completion Dates set forth in Article 7 or the time limits for
restoration after a Destruction or Taking as set forth in
Article 30A and Article 31B be extended by reason of the
foregoing events for a period in excess of one hundred twenty
(120) days, except that the Completion Date set forth in Article
7 with respect to the Rent Commencement Date shall be extended
one day for each day that Landlord is delayed in obtaining the
certificate of occupancy for Tenant's Building due solely to
Tenant's failure to complete installation of Tenant's trade
fixtures, provided that Landlord shall have notified Tenant
thereof no later than one (1) business day after Landlord becomes
aware of the delay.

25. **END OF TERM.** Upon expiration or other termination of
the term of this Lease, Tenant shall peaceably and quietly quit
and surrender the Demised Premises broom clean and with all
systems in good working order and condition, reasonable wear and
tear and damage by fire, the elements, or casualty or causes
beyond Tenant's control excepted, and with all of Tenant's
signage removed and any and all damage repaired by Tenant.

26. **HOLDING OVER** Except as otherwise set forth in this
Lease, should Tenant hold over in possession after the Expiration
Date, such holding over shall not be deemed to extend the term or
to renew this Lease; but the tenancy thereafter shall continue as
a tenancy from month to month upon the terms and conditions
herein contained and at 150% of the fixed annual rent, and
Charges (actual, not 150% thereof) in effect immediately
preceding the Expiration Date.

27. **LANDLORD'S DEFAULT.**

32

A.   If Landlord shall be in default hereunder, Tenant may (i) after thirty (30) days notice that Landlord is in default in the payment of any monies which Landlord is obligated to pay to Tenant pursuant to the terms of this Lease, deduct the amount thereof plus interest at the Lease Interest Rate (as defined herein) from fixed annual rent, but only to the extent of twenty-five (25%) percent of fixed annual rent ; or(ii) after thirty (30) days notice that Tenant intends to cure such default or such notice as is reasonable under the circumstances, if in Tenant's reasonable judgment an emergency shall exist, cure such default and Landlord shall pay to Tenant within ten (10) days of demand the reasonable cost thereof, failing which Tenant may deduct same from twenty-five 25% percent of any payments of fixed annual rent and/or Charges or (iii) after thirty (30) days notice that Landlord is in default under this Lease, terminate this Lease by giving ten (10) days notice of termination to Landlord. Any such deduction from fixed annual rent shall not constitute a default unless Tenant shall fail to pay the amount of such deduction to Landlord within thirty (30) days after final adjudication by a court of competent jurisdiction that such amount is owing to Landlord.   If it is determined by a court of competent jurisdiction, that Tenant was not entitled to offset any sums, Tenant shall promptly reimburse such sums to Landlord, together with interest at the Lease Interest Rate from the date any such offset was taken until the date of reimbursement by Tenant. Any cost or expense incurred by either party in correcting such deviation may be deducted by the non-defaulting party from any fixed annual rent and Charges becoming due and payable under this Lease together with the greater of (i) interest at the Prime Rate (as hereinafter defined) per annum plus two (2%) percent per annum or (ii) nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law (hereinafter called the "Lease Interest Rate").

B.   Tenant shall not terminate this Lease or, except in an emergency, commence to cure any default of such a nature that said default could not reasonably be cured within such period of thirty (30) days, if Landlord promptly commences and thereafter proceeds with due diligence and in good faith to cure such default.

C.   In the event that the holder of a mortgage covering the Demised Premises shall have given written notice to Tenant that it is the holder of said mortgage, and provided such notice includes the address to which notices to such mortgagee are to be sent, Tenant agrees that in the event it shall give written notice to Landlord to cure a default of Landlord as provided for in this Article 27, Tenant shall give a copy of said notice to said mortgagee.  Tenant agrees that said mortgagee may cure or remedy such default within the time permitted to Landlord pursuant to this Article 27.

33

28. **ADDITIONAL CHARGES.** If Tenant shall be in default hereunder, Landlord, after thirty (30) days notice that Landlord intends to cure such default, shall have the right, but not the obligation, to cure such default and Tenant shall pay to Landlord, upon demand, as additional charges the reasonable cost thereof plus interest at the Lease Interest Rate. Landlord shall not commence to cure any default of such a nature that it could not reasonably be cured within such period of thirty (30) days, if Tenant commences to cure same within said period, and thereafter proceeds with reasonable diligence and in good faith to cure such default.

29. **TENANT'S DEFAULT.**

A. If Tenant defaults in the performance of any obligation under this Lease, Landlord may give Tenant a notice specifying the nature of the default. If Tenant does not, within thirty (30) days after receipt of such notice, cure a default (other than a default in the payment of fixed annual rent and/or Charges, which shall be cured within ten (10)days of written notice) or, if such default is of such a nature that it could not reasonably be cured within such period of thirty (30) days, and Tenant does not commence and proceed with reasonable diligence and in good faith to cure such default then, after the expiration of such thirty (30) day period [or longer period if such default cannot reasonably be cured within said thirty (30) day period], Landlord shall have the right, in addition to the rights set forth in Article 28 hereof, to seek damages or an injunction. If Tenant does not, within thirty (30) days after receipt of notice from Landlord, cure a default in the payment of fixed annual rent and/or Charges, then after the expiration of such thirty (30) day period Landlord may, but only during the continuance of such default, re-enter the Demised Premises and dispossess Tenant and any other occupants thereof, remove their effects not previously removed by them, and hold the Demised Premises as if this Lease had not been made; and Tenant waives the service of any additional notice of intention to re-enter or to institute legal proceedings to that end.

B. If, pursuant to an order, judgment or decree entered by any court of competent jurisdiction (1) a receiver, trustee or liquidator of Tenant or of all or substantially all of the assets of Tenant shall be appointed, or (2) Tenant shall be adjudicated a bankrupt or insolvent, or (3) a petition seeking reorganization of Tenant or an arrangement with creditors or a petition to take advantage of any insolvency law shall be approved, and fixed annual rent and Charges shall not thereafter be paid in accordance with the terms hereof, Landlord may serve notice of termination of this Lease upon Tenant, stating the date of termination, which date of termination shall be at least ten

34

(10) days after the date on which notice is received by Tenant, and upon the date specified in such notice this Lease and the term hereof shall cease and expire [unless payment is made within such ten (10) day period] and Tenant shall then quit and surrender the Demised Premises, but Tenant shall remain liable as hereinafter provided.   If this Lease and the term hereof shall cease and expire in accordance with this Subdivision B, Landlord may dispossess or remove Tenant or any other occupant of the Demised Premises by summary proceedings or otherwise and remove their effects and hold the Demised Premises as if this Lease had not been made.

C.   After a dispossess or removal in accordance with Subdivision A or Subdivision B of this Article, (1) the fixed annual rent and Charges shall be paid up to the date of such dispossess or removal, (2) Landlord may relet the Demised Premises or any part or parts thereof either in the name of Landlord or otherwise, for a term or terms which may, at the option of Landlord, be less than or exceed the period which would otherwise have constituted the balance of the term of this Lease, and at a rental that may be greater or less than the rental payable under this Lease, with such free rent or rent concession, as may be commercially reasonable but in no event to exceed sixty (60) days, and, in connection therewith, may, at its sole cost and expense, without releasing Tenant from any of its obligations hereunder and without any obligation on Tenant's part to reimburse to Landlord any of such costs or expenses, make such renovations, repairs, alterations, additions and decorations as Landlord may deem appropriate,   and (3) Tenant shall pay to Landlord, as liquidated damages, any deficiency between the fixed annual rent and Charges due hereunder and the amount, if any, of the rents collected on account of the new lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease (not including any Renewal Periods the commencement of which shall not have occurred prior to such dispossess or removal).   In computing such liquidated damages there shall be added to said deficiency the expenses which Landlord incurs in connection with re-letting the Demised Premises including reasonable attorneys' and brokerage fees.   Such liquidated damages shall be paid by Tenant in monthly installments on the dates specified in this Lease for payment of fixed annual rent and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord shall not be liable for failure to re-let the Demised Premises or, in the event that the Demised Premises are re-let, for failure to collect the rent under such re-letting unless Landlord shall not have used its best efforts to re-let promptly the Demised Premises for the reasonable rental value thereof and to collect the rent under such re-letting.   Landlord shall use

35

commercially reasonable efforts to mitigate damages.

D.    Landlord hereby expressly waives any and all
rights granted by or under any present or future laws to re-enter
the Demised Premises, to dispossess Tenant or any other occupant
thereof or to remove their effects not previously removed by
them, except as expressly provided herein, or to terminate this
Lease for any reason or in any manner other than as set forth in
Subdivisions A or B of this Article, Subdivision B of Article 30
or Subdivision B of Article 31.

30.    **DAMAGE OR DESTRUCTION.**

A.    In the event of any damage or destruction by fire, the
elements or casualty (hereinafter called "Destruction") to a
substantial part of the Improvement, including, but not limited
to, the Common Area, Landlord shall commence promptly, and with
due diligence continue, to restore same to substantially the same
condition as existed immediately preceding the Destruction,
except as otherwise provided in this Article. If the Destruction
is partial less then sixty percent (60%) of the Demised Premises
as determined by an AIA Architect, Landlord shall complete the
restoration within one hundred and eighty days (180) days after
the Destruction. If the Destruction is total greater then sixty
percent (60%) as determined by an AIA Architect, Landlord shall
complete the restoration within three hundred and sixty (360)
days after the Destruction. Tenant shall have the right to
request Landlord to make changes to the Tenant's Building in the
course of such restoration. If the cost and expense of
restoration of the Building is increased by any change or changes
required by Tenant then Tenant shall pay to Landlord, as
additional charges within fifteen (15) business days after the
completion of such restoration the amount by which the cost and
expense of restoration of the Building was thereby increased and
the deadlines for completion of restoration set forth above shall
be extended by the period of time reasonably needed in order to
make any such changes requested by Tenant.

B.    If, as a result of any Destruction, fifty (50%)
percent or more of the total floor area of the Tenant's Building
is damaged, destroyed or, in Tenant's reasonable opinion,
rendered untenantable, when less than two (2) years remain under
the term of this Lease [and, if said term shall have been
extended, then this provision shall apply only to the last two
(2) years of the then existing Renewal Period], Landlord and
Tenant may elect to terminate this Lease by giving notice to the
other of such election on or before the date which is thirty (30)
days after the Destruction, stating the date of termination,
which shall be not more than thirty (30) days after the date on
which such notice of termination shall have been given, and (1)
upon the date specified in such notice this Lease and the term

36

hereof shall cease and expire , (2) any fixed annual rent and Charges paid for a period after the date of the Destruction shall be refunded to Tenant upon demand and (3) all net insurance proceeds payable with respect to the damage to Tenant's Building to the extent (if any) not previously applied, shall be paid to Landlord (or any mortgagee, pursuant to any applicable mortgagee endorsement. Landlord's notice of termination hereunder shall be null and void if Tenant, within thirty (30) days after receipt of such notice from Landlord, shall give notice of the exercise of an option to extend the term for the next succeeding Renewal Period.

C. If, as a result of any Destruction, Tenant loses the use of the whole or any part of the Tenant's Building or the whole or any part of the Common Area, fixed annual rent and Charges shall abate equitably to the extent Tenant is deprived of such use. If by reason of any Destruction Tenant, in its reasonable opinion, determines that to remain open for business is not practicable and Tenant closes the Demised Premises for business, fixed annual rent and Charges shall be abated in full until the condition which caused Tenant so to close shall have been remedied.

## 31. EMINENT DOMAIN.

A. In the event of a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or of eminent domain or by agreement between Landlord and those having the authority to exercise such right (hereinafter called "Taking") of the entire Tenant's Building, then (1) this Lease and the term hereof shall cease and expire as of the date of vesting of title or transfer of possession, whichever occurs earlier, as a result of the Taking, and (2) any fixed annual rent and Charges paid for a period after such date of termination shall be refunded to Tenant upon demand.

B. (1) In the event of a Taking of any part of the Demised Premises, or in the event of a Taking resulting in a reduction of ten (10%) percent or more of the parking spaces (unless Landlord provides adequate and sufficient additional contiguous parking areas in substitution therefor, acceptable to Tenant in Tenant's sole discretion), or in the event of a Taking of any part of the area labeled "Prohibited Taking Area" on Exhibit A, or in the event of a Taking resulting in a divided Shopping Center, or in the event of a denial of adequate access or diminishing of access to the Shopping Center, whether or not a Taking shall have occurred, Tenant may elect to terminate this

37

Lease by giving notice of termination to Landlord on or before
the date which is ninety (90) days after receipt by Tenant of
notice that the Taking or denial or diminishing of access shall
have occurred. Said notice of termination shall state the date
of termination, which date of termination shall be not more than
thirty (30) days after the date on which such notice of
termination is given to Landlord, and (a) upon the date specified
in such notice of termination this Lease and the term hereof
shall cease and expire, and (b) any fixed annual rent and Charges
paid for a period after such date of termination shall be
refunded to Tenant upon demand.

(2)   If Tenant does not elect to terminate this
Lease as aforesaid, then the award or payment for the Taking
shall be paid to and used by Landlord for restoration as
hereinafter set forth and Landlord shall promptly commence and
with due diligence continue to restore the portion of the Common
Area and the Demised Premises remaining after the Taking to
substantially the same condition and tenantability as existed
immediately preceding the Taking, except that Tenant shall have
the right to require Landlord to make changes to the Tenant's
Building in the course of such restoration.   Landlord shall
complete the restoration within one hundred eighty (180) days
after the Taking.   In the event of a Taking of any part of
Tenant's Building, then commencing upon the date of vesting of
title or transfer of possession, whichever occurs earlier, fixed
annual rent (except as same shall be abated as hereinafter
provided) shall be the product of the fixed annual rent
immediately preceding the Taking and a fraction, the numerator of
which shall be the total Floor area of the Tenant's Building
remaining after the Taking and the denominator of which shall be
the total Floor area of the Tenant's Building immediately
preceding the Taking. Fixed annual rent shall also be justly and
equitably reduced to reflect a Taking of or denial or diminishing
of adequate access to all or any part of the Common Area.   During
the period of any restoration, the fixed annual rent and Charges
shall be abated justly and equitably.   Nothing herein contained
shall be deemed or construed to prevent either Landlord or Tenant
from enforcing and prosecuting a claim for the value of its
respective interest in any condemnation proceedings.

32.  **LANDLORD'S PAYMENTS.**   All taxes, assessments and
charges on the Shopping Center payable by Landlord and
obligations secured by mortgage or other liens superior to this
Lease shall be paid by Landlord when due.   If Tenant, after
thirty (30) days' prior notice to Landlord (except in an
emergency, in which event no notice shall be required),   (a)
satisfies or (b) if Tenant's leasehold estate or its right to use
or occupy the Demised Premises or the Common Area is in imminent

38

danger of being jeopardized, performs or acquires, any lien, encumbrance or agreement of Landlord, any monies paid in connection therewith shall be paid by Landlord to Tenant within twenty (20) days after written demand. Tenant, in addition to all of its rights hereunder, shall be subrogated to all rights of the obligee against Landlord, the Demised Premises and/or the Shopping Center and no merger shall be construed which would defeat such subrogation. The provisions hereof shall apply only to those liens, encumbrances or agreements which are prior in lien to this Lease and which, if foreclosed or otherwise enforced, could result in the termination of this Lease or otherwise jeopardize Tenant's rights or interests in or under this Lease, the Shopping Center or the Demised Premises. Nothing herein shall be deemed to diminish any of Landlord's obligations with respect to any such lien, encumbrance or agreement pursuant to the terms thereof, regardless of whether Tenant satisfies, performs or acquires same.

33. **WAIVER OF DISTRAINT.** Landlord hereby expressly waives any and all rights granted by or under any present or future laws to levy or distraint for rent, in arrears, in advance or both, upon any goods, merchandise, equipment, fixtures, furniture and other personal property of Tenant or any nominee of Tenant in the Shopping Center, delivered or to be delivered thereto.

34. **INVALIDITY OF CERTAIN PROVISIONS.** If any provision of this Lease shall be invalid or unenforceable, the remainder of the provisions of this Lease shall not be affected thereby and each and every provision of this Lease shall be enforceable to the fullest extent permitted by law.

35. **CHOICE OF LAW.** This Lease, and the rights and obligations of the parties hereto, shall be interpreted and construed in accordance with the laws of the state in which the Shopping Center is located.

36. **ESTOPPEL CERTIFICATES.** Upon the request of either party, at any time and from time to time, Landlord and Tenant agree to execute and deliver to the other, within fifteen (15) days after such request, a written instrument, duly executed (a) certifying that this Lease has not been modified and is in full force and effect or, if there has been a modification of this Lease, that this Lease is in full force and effect as modified, stating such modifications, (b) specifying the dates to which the fixed annual rent and Charges have been paid, (c) stating whether or not, to the knowledge of the party executing such instrument, the other party hereto is in default and, if such party is in default, stating the nature of such default, (d) stating the Rent Commencement Date, and (e) stating which options to renew the term have been exercised, if any.

39

37. NOTICES.

A.   No successor to Landlord's interest in the
Shopping Center shall be entitled to receive fixed annual rent
and/or Charges until five (5) days after Tenant's receipt of
proper notice of such change together with a copy of the executed
document or documents evidencing such change from the grantor,
assignor or party entitled to receive fixed annual rent and/or
Charges immediately preceding such change. Until such receipt
Tenant shall continue to pay the fixed annual rent and/or Charges
to the party to which, and in the manner in which, the last
preceding installment of fixed annual rent was paid or pending
receipt of such proper notification and documentation, accrue and
withhold payment of fixed annual rent and/or Charges.

B.   Any notices, consents, approvals, submissions or
demands given under this Lease or pursuant to any law or
governmental regulation, including, without limitation, those by
Landlord to Tenant or by Tenant to Landlord shall be in writing.
Unless otherwise required by law, governmental regulation or this
Lease, any such notice, consent, approval, submission or demand
shall be deemed given if sent by registered or certified mail,
return receipt requested, postage prepaid (a) to Landlord, Attn:
General Counsel, at the address of Landlord with a required copy
to President as hereinabove set forth or such other address as
Landlord may designate by notice to Tenant or (b) to Tenant, then
in duplicate (under separate cover), one copy to the attention of
the Senior Vice President of Real Estate & Development of Tenant
and one copy to the attention of the Vice President of Legal
Services of Tenant at the address of Tenant as hereinabove set
forth and one copy to the Senior Director of Real Estate of
Tenant at the address of Tenant as hereinabove set forth, or to
such other addresses as Tenant may designate by notice to
Landlord. During the period of any postal strike or other
interference with the mails, personal delivery shall be
substituted for registered or certified mail. If Tenant shall be
in doubt as to Landlord's address, Tenant may send any
communication to Landlord at the address to which fixed annual
rent was last sent.

38. NO WAIVER. The failure of either party to seek redress
for violation of, or to insist upon the strict performance of,
any term, covenant or condition contained in this Lease shall not
prevent a similar subsequent act from constituting a default
under this Lease.

39. ENTIRE AGREEMENT. This Lease contains the entire
agreement between the parties and cannot be changed, modified or
amended unless such change, modification or amendment is in
writing and executed by the party against which the enforcement

40

of the change, modification or amendment is sought. Any
document, notice or consent including, without limitation, this
Lease, any amendment thereto or extensions thereof or any notice
given under Article 7 shall only be binding upon Tenant if
executed by a corporate officer duly authorized to do so or by
such other party authorized in writing by the Board of Directors
of Tenant to execute documents on behalf of Tenant. Any such
notice, Tenant may ratify document or extension not so executed.

        40. **BROKER.** Tenant represents that it has been represented
by Prime Sites, LLC as broker in connection with the negotiation,
execution and delivery of this Lease and no other broker or
brokers. Landlord is solely responsible for any commission that
may be due to Prime Sites, LLC as a result of this transaction.
Landlord shall defend, indemnify and hold harmless Tenant from
and against any demands, liabilities or expenses (including,
without limitation, reasonable attorneys' fees) relating to
claims for brokerage commissions or finder's fees arising from
Landlord's acts.

        41. **MECHANIC'S LIENS.** Tenant will not permit any
mechanic's or materialmen's or other liens to stand against the
Demised Premises for any labor or material furnished to Tenant in
connection with work of any character performed on said premises
by or at the direction of Tenant and Landlord will not permit any
such liens for work or material furnished the Landlord to stand
against said premises. Any such lien shall be discharged by
bonding or otherwise within sixty (60) days after notice of such
lien and demand by the other party that it be discharged.
However, Landlord and Tenant shall respectively have the right to
contest the validity or amount of any such lien, provided that
the payment of such amount is bonded during the pendency of such
contest, but upon the final determination of such contest the
party responsible for such lien shall immediately pay any
judgment rendered with all proper costs and charges (including
reasonable attorneys' fees) and shall have the lien released at
its own expense. In lieu of bonding either party may obtain
other security acceptable to the other party.

        42. **CAPTIONS.** The captions preceding the Articles of this
Lease are intended only as a matter of convenience and for
reference and in no way define, limit or describe the scope of
this Lease or the intent of any provision hereof.

        43. **DEFINITION OF LANDLORD.** The term "Landlord" as used
herein, means Landlord named herein and any subsequent owner of
Landlord's estate hereunder, but any owner of Landlord's estate
hereunder shall be relieved of all liability under this Lease
after the date that it ceases to be the owner of Landlord's

                                41

estate (except for any liability arising prior to such date) provided that the party succeeding to Landlord's estate shall have executed an agreement, satisfactory to Tenant, wherein it assumes 'and agrees to perform all of Landlord's obligations under this Lease from and after the date it acquires Landlord's estate. Notwithstanding the foregoing Landlord named herein shall not, in any event, be relieved of its obligations to complete construct- .ion of Tenant's Building and the Shopping Center in accordance with the terms hereof, which obligations shall remain a covenant of Landlord named herein.   From and after the time that Landlord acquires the Shopping Center, Tenant shall look solely to the estate and property of Landlord in the Land and Improvements comprising the Shopping Center (including, without limitation, the rents, distributions and income therefrom and the proceeds from any sale, financing or refinancing thereof and any insurance and condemnation proceeds or awards) for the collection of any judgment, or in connection with any other judicial process, requiring the payment of money by Landlord to Tenant in the event of any default or breach of Landlord with respect to any of the terms, representations, covenants and conditions to be observed and performed by Landlord or any other liability of Landlord, and no property or estates of Landlord or any property or estates of the partners, shareholders, principals, members or managers of Landlord (other than such partners' or shareholders', principals', members' or managers' interest in the Shopping Center) shall be personally subject to satisfaction of Tenant's remedies under this Lease.   The foregoing shall not apply to or limit (i) any injunctive, declaratory or any other forms of relief to which Tenant may be entitled (notwithstanding that such actions are in *personam* in nature); or (ii) any other remedy or action against Landlord which does not involve the personal liability of Landlord or its partners, shareholders, principals, members, or managers for monetary damages from the property other than as aforesaid.

44.   **ADJOINING OR ADJACENT PROPERTY.**   To extent applicable, Landlord shall use commercially reasonable efforts to promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Land or from any municipal or other governmental authority in connection with any hearing or other administrative proceeding relating to the use of the Land or any adjoining or adjacent property.   Tenant may, at its sole cost and expense, in its own name and/or in the name of Landlord, appear in any such proceeding.     Landlord shall fully cooperate with Tenant and shall, without limitation, make such appearances and furnish such information as may be required by Tenant.   Landlord agrees to execute any instruments requested by Tenant in connection with any such proceeding.

45.   **OPTION TO EXECUTE.**   In consideration of Ten ($10.00)

42

Dollars paid by Tenant to Landlord, the receipt and sufficiency
of which are hereby acknowledged, Landlord agrees that Tenant
shall have the option to execute this instrument at any time
within thirty (30) days after receipt of the same duly executed
by Landlord.

## 46. ENVIRONMENTAL LAWS.

A. Landlord has provided Tenant with certain
environmental reports for review, including (1) *Final Report
Demonstrating Attainment of Statewide Health Standards in Soils &
Remedial Investigation Report and Cleanup Plan for Site Specific
Standards in Soil and Groundwater*, dated January 31, 2008,
prepared by React Environmental Professional Services Group
("REPSG"); and (2) *Project Summary Report*, dated July 29, 2008,
prepared by REPSG (collectively, the "Environmental Reports").
Landlord represents and warrants that, to the best of Landlord's
knowledge and belief, except as set forth in the Environmental
Reports the receipt of which is acknowledged by Tenant, there are
no Hazardous Materials (as hereinafter defined) contained within,
upon or under the Demised Premises and/or Land and that the
Demised Premises and Land will be materially in compliance with
all applicable Environmental Laws (as hereinafter defined).
Landlord agrees not to maintain, use or install or allow to be
installed, used or maintained Hazardous Materials in, on or under
the Demised Premises except (1) as set forth in the Environmental
Reports, as approved or required by appropriate regulatory
agencies reviewing those Environmental Reports or follow-up
submissions to those Environmental Reports, and (2) as may be
customary for construction or operation of the Shopping Center
and in compliance with all any Environmental Laws, as defined
herein. "Environmental Laws" shall mean all federal, state or
local laws, ordinances, rules, regulations, or remediation
criteria, whether now or hereafter enacted, governing the use,
clean-up storage, treatment, transportation, manufacture,
refinement, handling, production or disposal of Hazardous
Materials including, without limitation: (1) the Comprehensive
Environmental Response, Compensation and Liability Act of 1980,
(42 U.S.C. Sections 9601, et seq.) as amended by the Superfund
Amendments and Reauthorization Act; (2) the Hazardous and Solid
Waste amendments of 1984 Pub L 98-616 (42 U.S.C. Section 699);
(3) the Hazardous Materials Transportation Act, (49 U.S.C.
Section 1801, et seq.); (4) the Resource Conservation and
Recovery Act of 1976, (42 U.S.C. Sections 6901, et seq.); (5) the
Toxic Substances Control Act; (6) the Pennsylvania Hazardous
Sites Cleanup Act (Pa. Stat. Ann. tit. 35 § 6020.101, et seq.);
(7) the Pennsylvania Solid Waste Management Act (Pa. Stat. Ann.
tit. 35 § 6018.101 et seq.); and (8) the Pennsylvania Clean
Streams Law (Pa. Stat. Ann. tit. 35 § 691.1, et seq.) and any
amendments thereto and any regulations adopted and publications
promulgated pursuant thereto, or any other federal, state or

43

local environmental laws, ordinances, rules, or regulations whether now or hereafter enacted. "Hazardous Materials" shall mean (1) any hazardous wastes, hazardous substances, regulated substances, pollutants or contaminants as defined in any Environmental Law including, without limitation, any asbestos, PCB, toxic noxious or radioactive substances, methane, volatile hydrocarbons, petroleum, petroleum by-products, industrial solvents or (2) any other material or substance which could cause or constitute a health, safety or other environmental hazard to any person or property.

      B.    Tenant shall, at its own expense, during the term of this Lease comply with all Environmental Laws and respond to Hazardous Materials released or exacerbated on the Demised Premises after the Delivery of Possession to the extent that same is required and attributable to and as a result of the acts or omissions of Tenant or its agents, contractors or employees and/or Tenant's business operations conducted at the Demised Premises.    Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all Losses (as hereinafter defined) which Landlord may incur by reason of Tenant's breach of the provisions of this Subdivision 46B.    Tenant shall be responsible to clean-up, to comply with any Environmental Law regarding, and shall indemnify, defend and hold Landlord harmless from any losses, costs, damages, liabilities or expenses, including without limitation reasonable attorney's fees (collectively for purposes of this Section 46, "Losses") incurred by Landlord with respect to, any Hazardous Materials to the extent used, stored, disposed of, transported to or from or manufactured within the Demised Premises and/or Shopping Center by Tenant or their its agents, contractors, or employees.

      C.    Landlord shall at Landlord's sole cost and expense comply with all Environmental Laws including without limitation in connection with conditions identified in the Environmental Reports and all Losses attributable thereto, during the term of this Lease except to the extent Tenant is required to do so under this Section 46.    Including for conditions attributable to and identified in the Environmental Reports, or otherwise first occurring prior to Delivery of Possession, Landlord shall diligently respond to any environmental contamination on or affecting the Demised Premises, Common Area or Limited Common Area, except to the extent Tenant is required to do so under Subdivision 46B above, in conformance with the requirements of all Environmental Laws and applicable remediation criteria.    Such diligent response shall include obtaining prior to Delivery of Possession PADEP written approval of that response under the Pennsylvania Land Recycling and Remediation Standards Act, 35 P.S. Section 6026.101 et seq. (the "Act 2 Approval Letter") provided that Tenant may, at its own discretion, waive, in writing, receipt of an Act 2 Approval Letter prior to Delivery of

44

Possession if Tenant receives satisfactory assurance regarding
Tenant's potential risks in occupying the Demised Premises
pending formal issuance of the Act 2 Approval Letter, and any
required approval from USEPA for PCB remediation, and after
Delivery of Possession shall be conducted upon reasonable notice
to Tenant and in a manner which avoids material interference with
Tenant's operations.   Landlord shall comply with and be solely
responsible for all remediation measures detailed by the PADEP or
other governmental agency with jurisdiction over environmental
remediation of the Demised Premises.  Landlord shall indemnify,
defend, and hold Tenant harmless from and against any and all
Losses which Tenant may incur by reason of Landlord's breach of
the provisions of this Subdivision 46. At no cost to Tenant, its
successors or assigns, Tenant and its successors and assigns
shall cooperate with any institutional or engineering control
which Landlord utilizes as part of any remediation conducted at
the Demised Premises, which shall not materially interfere with
Tenant's use of the Demised Premises under this Lease and Tenant
shall indemnify, defend, and hold Landlord harmless from and
against any and all Losses which Landlord may incur by reason of
the breach of the same by Tenant, its successors or assigns.

        D.    After Delivery of Possession, each party agrees to
provide the other with copies of any notices pertaining to any
governmental proceedings or actions under any Environmental Law
(including requests or demands for entry onto the Demised
Premises and/or Land for purposes of inspection regarding the
handling, disposal or clean-up of Hazardous Materials or claims,
penalties, fines or assessments for Losses) within ten (10)
business days after receipt thereof.   Upon Lease execution,
Landlord and Tenant agree to cooperate with each other and
provide such documents, affidavits and information as may be
reasonably necessary for each of the parties to comply with all
Environmental Laws or to prepare for timely Delivery of
Possession.

        E. Notwithstanding anything contained in this Lease to
the contrary, Tenant shall have no obligation to clean up, to
comply with any Environmental Laws regarding, or to indemnify,
defend or hold Landlord harmless with respect to any Losses
incurred by Landlord with respect to, any Hazardous Materials
which were not used, stored, disposed of, exacerbated,
transported to or from or manufactured within the Demised
Premises by Tenant or its agents, contractors, or employees, and
Landlord waives any right of contribution against Tenant with
respect to any Losses incurred by Landlord with respect to any
such Hazardous Materials described in this subparagraph
(E)including without limitation as identified in the
Environmental Reports except to the extent exacerbated by Tenant
or its agents, contractors or employees.

                                45

F. Landlord shall defend, indemnify and hold Tenant harmless from and against any and all Losses which may be incurred by or assessed against Tenant, if not caused by the Tenant's or its employees', contractors', agents' or invitees' acts or omissions and/or Tenant's business operations conducted at the Demised Premises, to the extent same arise out of or result from (1) the presence of Hazardous Materials as set forth in the Environmental Reports or otherwise in, on, from or affecting the Demised Premises, Land and/or Shopping Center (including, but not limited to, air, surface water, and groundwater), now or in the future, and/or (2) Landlord's breach of the provisions of this Article.

G. The provisions of this Article 46 shall survive the termination, cancellation, modification, expiration or rescission of this Lease, and shall constitute the parties' exclusive remedies with respect to each other in connection with the obligations and Losses arising under Environmental Laws in connection with matters addressed in this Lease.

47. **SUCCESSORS AND ASSIGNS.** The covenants and agreements contained in this Lease shall bind and inure to the benefit of Landlord and its heirs, executors, successors and assigns and Tenant and its successors and assigns.

48. **WAIVER OF TRIAL BY JURY.** Except for third party actions and/or claims, Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Demised Premises, and/or claim of injury or damage.

49. **NO PRESUMPTION AGAINST DRAFTER.** Landlord and Tenant agree and acknowledge that:

A. This Lease has been freely negotiated by Landlord and Tenant; and

B. In any event of any ambiguity, controversy, dispute or disagreement over the interpretation, validity or enforceability of this Lease or any of its covenants, terms or conditions, no inference, presumption or conclusion whatsoever shall be drawn against Landlord by virtue of Tenant's having drafted this Lease.

50. **SATELLITE DISH.** Tenant shall have the right to place on the roof of the Tenant's Building at Tenant's sole cost and expense provided however that such devices are reasonably screened and not visible from the street level, a satellite dish

46

or other similar type devices or equipment as Tenant may deem appropriate (hereinafter collectively called the "Dish") for transmission of data between Tenant's various operations and its headquarters and/or for such other purposes as Tenant may deem appropriate. Provided Landlord or other tenants indemnify Tenant and such contemplated installation does not interfere with Tenant use and occupancy of the Premises, Tenant shall permit other tenants of the Shopping Center to place satellite dishes on roof of Tenant's Building. Provided Landlord or other tenants indemnify Tenant and such contemplated installation does not interfere with Tenant use and occupancy of the Premises, Tenant Landlord's contractor shall perform the installation of the Dish or a contractor approved by Tenant for such installation.

IN **WITNESS WHEREOF**, this Lease has been duly executed under seal as of the day and year first above written.

NORTHERN LIBERTIES DEVELOPMENT LP
By: Northern Liberties GenPar, Inc.
its general partner

BY:
Name: Barr Blatstein
Title: President
[Seal]

PATHMARK STORES, INC.

BY:
Name: Christopher McGarry
Title:Vice President
[SEAL]

47

EXHIBIT A

SITE PLAN

48

## EXHIBIT A-1

## LIMITED COMMON AREA

49

EXHIBIT B

LEGAL DESCRIPTION

EXHIBIT C

LIST OF DOCUMENTS PERTAINING TO
CONSTRUCTION OF THE TENANT'S BUILDING
2ND & GIRARD PHILADELPHIA, PA

**ARCHITECTUAL  DRAWINGS**
**Sheet #    Description**

| A0-0 | Cover Sheet |
| A1-1 | Architectural Floor Plan |
| A1-2 | Slab Depression Floor Plan |
| A1-4 | Floor Tile Plan |
| A1-5 | Reflected Ceiling Floor Plan |
| A1-6 | Enlarged Partial Plans |
| A1-7 | Enlarged Partial Plans |
| A2-1 | Exterior Elevations |
| A3-1 | Interior Elevations |
| A3-2 | Enlarged Toilet Plan |
| A4-1 | Interior Sections |
| A4-2 | Interior Sections |
| A5-1 | Finish Schedule and Partition Types |
| A5-2 | Door Schedule and Details |

**REFRIGERATION  DRAWINGS**
**Sheet #    Description**

| RS-1 | Refrigeration Stub Up Plan |
| RC-1 | Refrigeration Control Plan |

**HVAC  DRAWINGS**
**Sheet #    Description**

| H-1 | HVAC Floor Plan |
| H-2 | HVAC Details |
| H-3 | HVAC Schedules |
| H-4 | HVAC Roof Plan |

**ELECTRICAL  DRAWINGS**
**Sheet #    Description**

51

```
E-1        Lighting Plan
E-2        Power Plan
E-3        Partial Power Plans
E-4        Refrigeration Power Plans
E-5        HVAC. Power Plan
E-5A       Roof Electrical Plan
E-6        Sound and Fire Alarm System Plan
E-6A       CCTV System Plan
E-7        Legend, Notes and Schedules
E-8        Electric Riser Diagrams
E-9        Panel Schedules
E-10       Panel Schedules
E-11       Computer Details
E-12.      Electrical Details
E-13       Refrigeration Control Termination Plan
E-14       Refrigeration Control Riser
E-15       Refrigeration Control Detail
E-16       Refrigeration Input/Output Schedules
E-17       Heat Trace Plan
```

## PLUMBING  DRAWINGS
### Sheet #   Description

```
P-1        Plumbing Waste Piping Plan
P-2        Plumbing Domestic Water Piping Plan
P-3        Plumbing Details
P-4        Plumbing Notes and Schedules
P-5        Plumbing Pressure Wash Plan
P-6        Plumbing Riser Diagrams
P-7        Plumbing Dimension Plan
```

## SPRINKLER  DRAWINGS
### Sheet #   Description

```
SP-1       Sprinkler Schedules, Notes and Details
SP-2       Sprinkler Plan
```

**Specification Book 8-1-07**

## EXHIBIT D

### CONFIRMATION OF LEASE TERM AGREEMENT

**THIS AGREEMENT,** made as of the          day of
         , 20   , between NORTHERN LIBERTIES DEVELOPMENT LP.,
a _____ corporation having an office at 969 North 2nd
Street, Philadelphia, Pennsylvania 19123 and PATHMARK STORES,
INC., a Delaware corporation having an office at 2 Paragon Drive,
Montvale, New Jersey, 07645 (hereinafter called Tenant).

### W I T N E S S E T H:

**WHEREAS,** by a certain lease (hereinafter called the
"Lease"), dated the      day of          , Landlord leased to
Tenant a portion of the real property described in Exhibit A
annexed hereto and made a part hereof, a memorandum or short form
of which Lease was recorded in the                              ;
and

**WHEREAS,** Tenant is now in possession of the premises under
the Lease; and

**WHEREAS,** under Article 3 of the Lease, Landlord and Tenant
agreed to execute, acknowledge and deliver to each other an
agreement setting forth the Rent Commencement Date (as defined in
the Lease), the date of expiration of the initial term of the
Lease and the commencement dates of the Renewal Periods (as
defined in the Lease);

**NOW THEREFORE,** Landlord and Tenant agree as follows:

1.   The Rent Commencement Date is                    .

2.   The date of the expiration of the initial term of the
Lease shall be          .

3.   The commencement date of the first Renewal Period shall
be the      day of              .

4.   The commencement date of the second Renewal Period
shall be the      day of              .

5.   The commencement date of the third Renewal Period shall
be the      day of          .

6.   The commencement date of the fourth Renewal Period
shall be the      day of          .

53

7.   The commencement date of the fifth Renewal Period shall be the     day of     .

8.   The commencement date of the sixth Renewal Period shall be the     day of     .

9.   The commencement date of the seventh Renewal Period shall be the     day of     .

10.   This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective heirs, personal representatives, successors and assigns.

11.   This Agreement cannot be changed, modified, waived or canceled except by an agreement in writing executed by both parties.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Agreement to be executed the day and year first above written.

WITNESS or ATTEST:                    NORTHERN LIBERTIES DEVELOPMENT LP

                                      _____

                                      _____ (SEAL)

                                      _____

WITNESS:                              PATHMARK STORES, INC.

_____               By:_____
                                                         , Vice President

_____               ATTEST:_____

**EXHIBIT E**

**PERMITTED ENCUMBRANCES**

1.   Subject to such state of facts shown on the survey dated _____ prepared by _____ and expressly set forth below on this list of Permitted Encumbrances, subject to such changes to the premises shown on such survey as are to be made by Landlord in accordance with the terms of this Lease;

2.   Real estate taxes and water and sewer charges and assessments not yet due and payable as of the date hereof.

3.   Sub-surface conditions not disclosed by an instrument recorded in the County Clerk's/Register's Office provided that any rights arising with respect to the foregoing will not interfere with the maintenance of Tenant's Building, the use, occupancy or operation of business at the Demised Premises or the use of the Common Areas of the Shopping Center.

## EXHIBIT F

### SUBORDINATION, RECOGNITION AND NON-DISTURBANCE AGREEMENT

**THIS AGREEMENT,** made as of the            day of
          , 200_, between                (hereinafter
called Mortgagee) and          , a          corporation
having an office at
(hereinafter called Tenant).

### W I T N E S S E T H:

**WHEREAS,** Mortgagee is about to make a loan to
          (hereinafter called "Landlord") secured by a
mortgage or deed of trust (hereinafter called the "Mortgage")
covering a parcel of land owned by Landlord and described on
Exhibit A annexed hereto and made a part hereof, together with
the improvements now or hereafter erected thereon (said parcel of
land and improvements thereon being hereinafter called the
"Mortgaged Property"); and

**WHEREAS,** by a certain lease heretofore entered into between
          (hereinafter called "Landlord")
and Tenant dated as of          and amended as
follows:

[hereinafter (collectively) called the "Lease"], Landlord leased
to Tenant that certain parcel of land described on Exhibit A
annexed hereto and made a part hereof, together with the building
now or hereafter erected on all or a portion of said premises
(said premises and improvements on or to be erected thereon being
hereinafter called the "Demised Premises"); and

**WHEREAS,** a Short Form, Memorandum of Notice of the Lease has
been recorded in the
                                                              ;
and
**WHEREAS,** a copy of the Lease has been delivered to
Mortgagee, the receipt of which is hereby acknowledged; and

**WHEREAS,** Mortgagee is unwilling to make said loan to
Landlord unless the Lease is subordinate to the lien of the
Mortgage; and

**WHEREAS,** Article 18 of the Lease provides that the Lease
shall become subject and subordinate to the lien of a first
mortgage of the entire fee interest of the Demised Premises made
to certain institutional lenders if and when a non-disturbance
agreement is entered into with respect to such mortgage; and

**WHEREAS,** the parties hereto desire to effect the subor-dination of the Lease to the lien of the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.   Mortgagee hereby consents to and approves the Lease.

2.   Tenant covenants and agrees with Mortgagee that the Lease is hereby made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, (as same may be modified and extended) without regard to the order of priority of recording the Mortgage and the Short Form, Memorandum or Notice of the Lease, subject, however, to the provisions of this Agreement.

3.   Tenant certifies that the Lease is presently in full force and effect.

4.   Mortgagee agrees that so long as the Lease shall be in full force and effect and Tenant shall not be in default thereof after notice and expiration of applicable grace period:

(a)   Tenant shall not be named or joined as a party defendant or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)   The possession by Tenant of the Demised Premises and the Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage or any other documents held by the Mortgagee, or by an judicial sale or execution or other sale of the Mortgaged Property, or by any deed given in lieu of foreclosure, or by the exercise of any other rights given to the Mortgagee by any other documents or as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby;

(c)   All condemnation awards and insurance proceeds paid or payable with respect to the Mortgaged Property and received by the Mortgagee shall be applied and paid in the manner set forth in the Lease.

5.   Mortgagee hereby acknowledges and agrees that all fixtures and equipment whether owned by Tenant or any subtenant

or leased by Tenant from a Lessor/Owner (hereinafter called the "Equipment Lessor") installed in or on the Mortgaged Property, regardless of the manner or mode of attachment, shall be and remain the property of Tenant or any such Equipment Lessor and may be removed by Tenant or any such Equipment Lessor at any time.   In no event (including a default under the Lease or Mortgage) shall Mortgagee have any liens, rights or claims in Tenant's or Equipment Lessor's fixtures and equipment, whether or not all or any part thereof shall be deemed fixtures; and Mortgagee expressly waives all rights of levy, distraint, or execution with respect to said fixtures and equipment.   Mortgagee agrees to execute and deliver to Tenant and Equipment Lessor, within ten (10) days after request therefor, any document required by Tenant or Equipment Lessor in order to evidence the foregoing.

　　　　6.   If the Mortgagee shall become the owner of the Mortgaged Property by reason of foreclosure of the Mortgage or otherwise, or if the Mortgaged Property shall be sold as a result of any action or proceeding to foreclose the Mortgage or by a deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant, as tenant thereunder, and the then owner of the Mortgaged Property, as landlord thereunder, upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

　　　　　　(a)   Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as landlord under the Lease; and

　　　　　　(b)   Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which terms, covenants and provisions such new owner hereby agrees to assume and perform.

　　　　7.   Any notices or communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address as Mortgagee may designate by notice, or (b) if to Tenant, then in triplicate (under separate cover), one copy to the attention of the Vice President of Real Estate of Tenant and one copy to the attention of the Real Estate Law Director of Tenant, at the address of Tenant as hereinabove set forth and one copy to the Regional Director of Real Estate of Tenant at
or at such other address as Tenant may designate by notice.

During the period of any postal strike or other interference with the mail, personal delivery shall be substituted for registered or certified mail.

8.   This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective heirs, personal representatives, successors and assigns.

9.   This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver of cancellation is sought.

10.  This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby. This Agreement shall be binding upon and shall enure to the benefit of the parties hereto and their respective successors and assigns.

11.  This Agreement consists of four (4) pages numbered 1-4.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement as of the day and year first above written.

WITNESS or ATTEST:                                    (Mortgagee)

_____         By_____

WITNESS or ATTEST:                                    (Tenant)

_____         By_____

## EXHIBIT G

### WITH RESPECT TO REAL ESTATE TAXES

As used in this Exhibit, the following terms shall be defined as follows:

"<u>Real Estate Taxes</u>" shall mean  general (i.e., county, town, village and school) real estate taxes levied against the entire Shopping Center fully improved in accordance with the terms of this Lease, actually paid by Landlord as distinguished from special assessments or taxes in the nature of improvement or betterment taxes plus use and occupancy taxes.  Real Estate Taxes exclude, without limitation, any income, franchise, gross receipts, corporation, capital levy, excess profits, revenue, rent, inheritance, devolution, gift, estate, payroll or stamp tax by whatsoever authority imposed or howsoever designated or any tax upon the sale, transfer and/or assignment of Landlord's title or estate which at any time may be assessed against or become a lien upon all or any part of the Shopping Center or this leasehold.

"<u>Sales   Tax</u>"   notwithstanding  anything  to  the  contrary contained herein, Tenant shall pay any sales tax required by any governing authority having jurisdiction.

"<u>Tax  Year</u>"  shall  mean  the  real  estate  fiscal  tax  year designated by the local taxing authorities.

"<u>Tenant's Proportionate Share of Building Real Estate Taxes</u>" shall be the product of the amount of Real Estate Taxes assessed against the buildings in the Shopping Center for any Tax Year and a fraction, the numerator of which shall be the total Floor area of  Tenant's  Building  and  mezzanine  area,  if  any,  and  the denominator  of  which  shall  be  the  total  floor  area  of  all buildings in the Shopping Center.

"<u>Tenant's  Proportionate  Share  of  Land  Real  Estate  Taxes</u>" shall be the product of the amount of Real Estate Taxes assessed against the Land for any Tax Year and a fraction, the numerator of which shall be the total Floor area of Tenant's Building and the denominator of which shall be the total floor area of all buildings shown on Exhibit A (whether or not constructed).

"<u>Tenant's  Proportionate  Share  of  Real  Estate  Taxes</u>"  shall

{P:\wdox\CLIENTS\007936\00000\00140736.DOC;12}

F:\wdox\CLIENTS\007936\00000\00140736.DOC

mean the sum of Tenant's Proportionate Share of Building Real Estate Taxes and Tenant's Proportionate Share of Land Real Estate Taxes.

For each Tax Year commencing with the Tax Year in which the Rent Commencement Date occurs, Tenant shall pay to Landlord, in the manner hereinafter provided, Tenant's Proportionate Share of Real Estate Taxes. Tenant's Proportionate Share of said Real Estate Taxes shall be due and payable by Tenant thirty (30) days after receipt by Tenant of a tax bill or tax bills indicating thereon the real estate taxes assessed against the Shopping Center for the applicable Tax Year (which tax bill or bills Landlord may not send to Tenant sooner than forty-five (45) days before such real estate taxes are due and payable) and a statement setting forth, in detail, the calculation of Tenant's Proportionate Share of Real Estate Taxes, together with a receipted tax bill or other proof of payment of all of the Real Estate Taxes for the immediately preceding Tax Year, failing which Tenant shall have no obligation to pay Tenant's Proportionate Share of Real Estate Taxes until such time as Landlord provides such proof. If, by law, any real estate taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise the option to pay the same in installments.

Landlord may, but shall not be obligated to, bill Tenant for its Proportionate Share of Real Estate Taxes, in an amount reasonably computed to reflect Tenant's Proportionate Share of Real Estate Taxes payable hereunder by Tenant by notice to Tenant in writing. In such event, Tenant shall pay its share of Real Estate Taxes in monthly installments on or before the first day of each calendar month, in advance, and Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of real estate taxes for each Lease Year accompanied by a copy of the total bill for the entire Shopping Center. If the total amount paid monthly by Tenant under this Section for any Lease Year during the Term shall be less than the actual amount due from Tenant for such Year, as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due within thirty (30) days after demand therefor by Landlord; and if the total amount paid by Tenant for any such Lease Year shall exceed such actual amount due from Tenant for such Lease Year, such excess shall be credited against any succeeding installments of real estate taxes and other Charges due from Tenant to Landlord hereunder, and any portion of such excess remaining upon termination of this Lease will be refunded promptly to Tenant.

{P:\wdox\CLIENTS\007936\00000\00140736.DOC;12}
F:\wdox\CLIENTS\007936\00000\00140736.DOC

2



Any Real Estate Taxes for a real estate fiscal tax period, a part of which is included within the term of this Lease (including any Renewal Periods) and a part of which is included in a period of time before the expiration of the Interim Term or after the Expiration Date (or sooner expiration or termination date) shall be equitably adjusted between Landlord and Tenant as of the expiration of the Interim Term or the Expiration Date (or sooner expiration or termination date), as the case may be.

Landlord shall notify Tenant of any increase in real estate assessment, tax rate and/or Real Estate Taxes. Tenant may at its option, and at its cost and expense, request Landlord to protest, appeal or institute such other proceedings as it may consider appropriate to effect a reduction or abatement in such real estate assessment, tax rate, or Real Estate Taxes. Landlord shall have the right to determine a final settlement with taxing authority.

In the event a refund is obtained for any Tax Year in which Tenant paid Tenant's Proportionate Share of Real Estate Taxes, Landlord shall within 30 days of receipt thereof, pay Tenant its proportionate share of such refund. If Tenant obtains such refund, it may also deduct all expenses incurred in doing so from such refund.

Landlord shall use best efforts to file in a timely manner, for any and all rebates, exemptions and abatements of Real Estate Taxes or any other tax rebates, exemptions and abatements available to Landlord for the Demised Premises and/or Shopping Center,, including, without limitation, Landlord's submission of duly completed Application For The Exemption of Real Estate Taxes Due to Improvements ("Application"). A copy of the Application is attached hereto. To the extent that Exemption of Real Estate Taxes Due to Improvements ("Exemption")is still available within the City of Philadelphia, Landlord covenants and agrees to file the Application in a timely manner, but nonetheless within the applicable time period to receive such abatements. Landlord shall provide Tenant with all documents filed in connection with the abatement(s). Should Landlord fail to timely file for any such tax abatements and such Exemption is still available, then in such event Tenant shall not be obligated to contribute towards or to reimburse Landlord for the amount of any abatement which would otherwise have been received.

{P:\wdox\CLIENTS\007936\00000\00140736.DOC;12}
P:\wdox\CLIENTS\007936\00000\00140736.DOC

3

## APPLICATION FOR THE EXEMPTION OF REAL ESTATE TAXES DUE TO IMPROVEMENTS

**Read the attached Instructions. Please file a separate application for each BRT Account.

CITY OF PHILADELPHIA
BOARD OF REVISION OF TAXES
34 South 11th Street-8th Fl
Philadelphia, PA 19107
Telephone (215) 686-9270

**FOR OFFICIAL USE ONLY**

Application No. _____

BRT Account No. _____

1. Application must comply with City Councilmanic Ord. 1202 to be eligible for an exemption of real estate taxes. Please refer to the instructions for additional information. Check one block only per application This application is submitted pursuant to the following Ordinance / Act:

☐ Ord. 9, as amended    ☐ Ord. 1456-A, as amended    ☐ Ord. 1130, as amended
☐ Ord. 9674    ☐ State Act 205 / 175, as amended    ☐ State Act:_____    ☐ Ord.:_____

| 2. Property Location (BRT designation only) | | 3. Owner's Telephone Number |
|---|---|---|
| 4. Owner of Record | 5. Owner's Mailing Address / Zip Code | |
| 6. Owner's Social Security No. | 7. Owner's Business Privilege Tax No. | 8. Owner's Federal I.D. No. | 9. Year Business Began |

10. Tenant's Name / or General Partner's Name / or Corporation's Name, if filer:

| 11. Tenant's/ a General Partner's / or Corporation's Mailing Address | 12. Tenant's/ or General Partner's/ or Corporation's Telephone Number |
|---|---|
| 13. Applicant's Filer's Name (if different from above) | 14. Applicant's Mailing Address | 15. Applicant's Telephone Number |
| 16. Building Permit Number-Attach copy | 17. Permit Issuance Date | 18. Date Construction Began | 19. Construction Costs |

20. How will the improved property be used?

☐ Owner-Occupied Residential    ☐ Tenant-Occupied Residential    ☐ Commercial*
*property use is subject to Philadelphia Business Tax

21. Description of the improvements:

IMPORTANT: You Must complete the reverse side of page 4 of this Application

### CERTIFICATION

I / We declare that the statements made in this Application for the Exemption of Real Estate Due to Improvements are true and correct to the best my/our knowledge and belief. I/We understand that false statements made herein are subject to the penalties of the Act December 6,1972. P.L. 1482, No 334, as amended, 18 PA. C.S.A. 4904, relating to falsification to authorities.

22. _____    _____    _____
Owner of Record    Tenant/or General Partner/or Corporate Office    Date of Signing

BY THE BOARD OF REVISION OF TAXES:

Application No. _____ is:    ☐ Approved    ☐ Disapproved

_____
Chairman of the board

_____
Secretary of the board

Date of Decision _____

## EXHIBIT H
## WITH RESPECT TO COMMON AREA COSTS

Tenant shall pay for each Lease Year, Tenant's Pro Rata Share (as hereinafter defined) of the aggregate cost for each Lease Year of the following Charges with respect only to the Common Area and Limited Common Area(hereinafter called the "Common Area Costs"):     (1) Removal of snow and ice; (2) Maintenance, repair and replacement on a monthly basis of lighting equipment (excluding replacement costs for Light Stanchions); (3) Cleaning; (4) Repainting of lines and wheel stops designating vehicular parking and traffic flow; (5) repair, maintenance and resurfacing (resurfacing to be amortized over the useful life of the improvement and not completed within the last two (2) years of the term of the Lease) of the surface area of the Common Area (but not any replacements thereto); (6) Repainting of sign and light poles; (7) Charges for electricity for illumination; (8) premiums for fire, extended coverage insurance and liability insurance; (9) sprinkler standby charges; (10) costs to maintain and replace landscaping (11) security, if required and (12) sewer and water charges for the Demised Premises only if not separately metered. In addition, with the exception of the insurance premiums, Tenant shall pay to Landlord a five percent (5%) administrative fee of the sum of the aforementioned permitted Common Area Costs.    "Tenant's Pro Rata Share" of such actual expenses paid for by Landlord is hereby agreed to be the amount arrived at by multiplying the Common Area Costs for the applicable Lease Year by a fraction, the numerator of which shall be the total Floor area of Tenant's Building and the denominator of which shall be the total floor area of all buildings in the Shopping Center.

Landlord, within one hundred fifty (150) days after the expiration of each Lease Year, shall provide Tenant with copies of receipted bills and a statement showing the computation, in detail, of Tenant's Pro Rata Share of Common Area Costs.

Common Area Costs for any period less than a Lease Year shall be equitably prorated and paid within thirty (30) days after the expiration of such period provided that Tenant shall have received the bills, statement and demand for payment referred to above within sixty (60) days after the end of such period.  Landlord may, but shall not be obligated to, bill Tenant for its Pro Rata Share of the Common
Area Costs in an amount reasonably computed to reflect Tenant's Pro Rata Share of Common Area Costs, payable hereunder by

{P:\wdox\CLIENTS\007936\00000\00140736.DOC;12}

F:\wdox\CLIENTS\007936\00000\00140736.DOC

Landlord, by notice to Tenant in writing.  In such event, Tenant shall pay its Pro Rata Share of Common Area Costs in monthly installments on or before the first day of each calendar month, in advance, and Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Pro Rata Share of Common Area Costs for each year plus copies of receipted bills. If the total amount paid monthly by Tenant under this Section for any Lease Year during the Term shall be less than the actual amount due from Tenant for such year, as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due within thirty (30) days after demand therefor by Landlord; and if the total amount paid by Tenant for any such Lease Year shall exceed such actual amount due from Tenant for such Lease Year, such excess shall be credited against the next installment of Common Area Costs due from Tenant to Landlord hereunder, and any portion of such excess remaining upon termination of this Lease will be refunded promptly to Tenant.

Landlord covenants and agrees to use its best efforts to maintain Common Area Costs at a minimum; provided, however, that nothing herein is intended to relieve Landlord of all of its obligations hereunder.  In furtherance of the foregoing, Landlord shall perform all work that will ultimately have the effect of keeping Common Area Costs over the term of this Lease at a minimum.

Tenant may, upon reasonable notice and no more then once per calendar year during the term of this Lease, audit Landlord's books and records pertaining to Common Area Costs. Landlord shall cooperate with Tenant and shall make all such books and records available to Tenant.  If any audit discloses that Tenant paid in excess of its Pro Rata Share of Common Area Costs, Landlord shall pay such excess to Tenant within fifteen (15) days after Tenant demands payment thereof together with interest at the Lease Interest Rate.  If any error is in excess of three (3%) percent, Landlord shall pay Tenant the reasonable and actual cost of such audit within ten (10) days after demand therefor.

**EXHIBIT I**

**GUARANTY**

    In order to induce _____
("Landlord") to enter into a lease dated _         ("Lease") with
_____ ("Tenant") for certain
supermarket premises to be located

_____
("Premises"), the undersigned ("Guarantor") guarantees to
Landlord the due and punctual payment and performance by the
Tenant of all of its obligations pursuant to the Lease
("Obligations").  Guarantor shall, upon demand, pay, perform or
observe any term, covenant or condition of the Lease in the same
place and stead as Tenant.  Capitalized terms defined in the
Lease and not defined herein shall have the same meanings when
used herein.

    Guarantor agrees further that this Guaranty and Guarantor's
liability hereunder shall not be impaired or affected by any
modification, supplement, extension or amendment of the Lease to
which the parties thereto may hereafter agree, nor by any
modification, release or other alteration of any of the
Obligations hereby guaranteed, nor by any other agreements or
arrangements whatever with the Tenant or anyone else.  The
liability of Guarantor hereunder is direct and unconditional and
may be enforced without requiring Landlord first to resort to any
other right, remedy or security.  Guarantor shall not have any
right of subrogation, reimbursement or indemnity whatsoever
unless and until all of the Obligations have been paid or
performed in full.  This Guaranty is a continuing Guaranty which
shall remain in full force and effect during the term unless
Landlord and Tenant mutually agree in writing to terminate it,
whereupon it will have no further force or effect.  Neither the

C:\Documents and Settings\bodischA\Local Settings\Temporary Internet Files\OLKEB\PM - ML - 2nd  Girard Phil PA 082208 (clean).doc

3

discharge of Tenant from the Obligations in bankruptcy or in any
similar proceeding or any other event shall discharge or satisfy
the liability of Guarantor hereunder except the full performance
of all of the Obligations.

Guarantor also agrees to indemnify Landlord and hold
Landlord harmless against all obligations, demands and
liabilities, by whomever asserted, and against all losses in any
way suffered, incurred or paid by Landlord as a result of or in
any way arising out of, or following, or consequential to a
breach by Tenant of any of its Obligations and to pay all costs
and expenses, including reasonable attorneys' fees, of any
proceeding by Landlord to enforce this Guaranty.

Guarantor expressly waives the following:  notice of
acceptance hereof; the right to a jury trial in any action
hereunder; presentment and protest of any instrument, and notice
thereof; and all other notices to which such Guarantor might
otherwise be entitled; except for copies of default notices and
notices as Landlord shall be obligated to send Guarantor pursuant
to the provisions of the Lease.

This Guaranty, all acts and transactions hereunder, and the
rights and obligations of the parties hereto shall be binding
upon successors and assigns of Guarantor, may not be changed or
modified orally, and shall inure to the benefit of Landlord's
successors and assigns.

WITNESS:                         **THE GREAT ATLANTIC & PACIFIC
                                 TEA COMPANY, INC.** [GUARANTOR]


_____  _____  BY _____


C:\Documents and Settings\bodiechk\Local Settings\Temporary Internet Files\OLK2B\PM - ML - 2nd Girard Phil PA 082208 (clean).doc

4

**STATE OF NEW JERSEY**          )
                                 ) ss:
**COUNTY OF BERGEN**             )

ON THIS _____ day of August 2008, before me, the subscriber, personally came _____, to me known, who being by me duly sworn, did depose and say that he is Vice-President of **THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**, the corporation described in and which executed the within instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was ·so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
Notary Public

C:\Documents and Settings\bodiachk\Local Settings\Temporary Internet Files\OLKEB\PM - ML - 2nd  Girard Phil PA 082208 (clean).doc

5

Exhibit J
Rent Schedule

**LOCATION:**      **Former Schmidt's Brewery Site**
                   **2nd Street & Girard Avenue**
                   **Philadelphia, PA**

**DEVELOPER:**     Northern Liberties Development LP

**STORE SIZE:**    51,000 +/- square feet or as determined per
                   Section Five (5) of the Lease

**RENT:**

| Years | | Per Square foot |
|-------|--|-----------------|
| 1-5   |            | $20.40 |
| 6-10  |            | $21.99 |
| 11-15 |            | $23.71 |
| 16-20 |            | $25.57 |
| 21-25 | (option1)  | $27.07 |
| 26-30 | (option 2) | $29.25 |
| 31-35 | (option 3) | $31.59 |
| 36-40 | (option 4) | $34.12 |
| 41-45 | (option 5) | $36.85 |
| 46-50 | (option 6) | $39.79 |

C:\Documents and Settings\bodischk\Local Settings\Temporary Internet Files\OLKEB\PM - NL - 2nd Girard Phil PA 082208 (clean).doc

6

C:\Documents and Settings\bodischX\Local Settings\Temporary Internet Files\OLKEB\PM - NL - 2nd  Girard Phil PA 082208 (clean).doc

7

## EXHIBIT  K

## TENANT  ARCHITECT

1.    Studio 5
      Contact:   Joe Smith

2.    Rosenbaum Design Group
      Contact:   Jay Tuller

3.    Jim Debarbieri
      Contact:   Jim Debarbieri

C:\Documents and Settings\bodiachk\Local Settings\Temporary Internet Files\OLK8B\PM - NL - 2nd  Girard Phil PA 082208 (clean).doc

8

## EXHIBIT L

### TENANT CONTRACTORS

1. Northwood Construction
Attn:   Joseph Bachinsky

2. F&F Construction
Attn: Roy Byers

3. Nurminen Construction Company
Attn: Arno Nurminen

C:\Documents and Settings\bodischk\Local Settings\Temporary Internet Files\OLK2B\TM - NL - 2nd  Girard Phil PA 082208 (clean).doc

9

### FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** (this "First Amendment") is made as of the 22nd day of December, 2009, by and between Schmidts Retail, LP, successor in interest to Northern Liberties Development LP, ("Landlord") and Pathmark Stores, Inc. ("Tenant").

### RECITALS

**WHEREAS**, pursuant to the Lease (the "Lease") dated September 8, 2008 between Landlord and Tenant for the premises (the "Premises") located at 2nd Street and Girard Avenue, Philadelphia, Pennsylvania, Tenant has leased, and Landlord has leased to Tenant the Premises; and

**WHEREAS,** Landlord and Tenant desire to amend the Lease as set forth in this First Amendment.

### TERMS

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant, intending to be legally bound, agree as follows:

1.    **Incorporation of Recitals.** The foregoing Recitals are hereby incorporated in and made a part of this First Amendment by this reference.

2.    **Certain Definitions.** Except as otherwise defined in this First Amendment, each capitalized term herein shall have the meaning ascribed to such term in the Lease.

3.    Notwithstanding anything to the contrary in the Lease, Landlord, at its sole cost and expense and without any contribution by Tenant, shall construct the Demised Premises in accordance with the Approved Plans and Specifications attached hereto as **Exhibit A** and made a part hereof.  As such, any references in the Lease to "Agreed Construction Costs" are deleted and the provisions in Section 7A of the Lease beginning with the first full sentence on page 9 ("If the direct...") and continuing through the end of Section 7A on page 11 ("... as expeditiously as possible"), are deleted in their entirety as replaced as follows:

"If the direct cost and expense of construction of Tenant's Building and other improvements on the Demised Premises is increased or decreased by any change or changes to the Approved Plans and Specifications made by Tenant in writing ("Change Orders"), then Tenant shall pay to Landlord the amount by which the cost and expense was thereby increased.  The payment for Change Orders shall be made within ten (10) business days following Delivery of Possession or, if said increase in cost and expenses shall not have been determined by the Delivery of Possession, then within ten (10) days after such increase shall have been determined.  Notwithstanding anything to the contrary contained herein, Landlord shall not approve any Tenant-requested Change Order if the change will delay Landlord's Delivery of Possession.  Any changes required by a governmental authority shall not be deemed to be a change requested by Tenant; rather, such changes shall be at Landlord's sole cost and expense."

4.    Section 7D of the Lease is amended by deleting the words "twenty-four months after the date of all unappealable approvals and permits" in the first sentence and replacing same with "January 1, 2012."

5.    Section 6A of the Lease is hereby modified such that the following shall appear after its last sentence:

"During the Term, Tenant or any party occupying the Demised Premises including any permitted Subtenant, assignee, or licensee shall not on the Demised Premises be or become engaged in or use or permit the use of the Demised Premises for the conduct of any of the following, each, for purposes hereof, a **"Tenant Excluded Business"**:

(1)    The leasing of Residential Rental Property.  For this purpose, "Residential Rental Property" means any building or structure if eighty percent (80%) or more of the gross rental income from such building or structure for the taxable year is rental income from "dwelling units."  For such purpose, a "dwelling unit" means a house or apartment used to provide living accommodations in a building or structure, but does not include a unit in a hotel, motel, or other establishment more than one half (1/2) of the units in which are used on a transient basis.  If any portion of the building or structure is occupied by the taxpayer, the gross rental income for such building or structure includes the rental value of the portion so occupied; and

(2)    Any trade or business, either as a principal or an ancillary business, that is an excluded business under Section 1.45D-1(d)(5)(iii) of the Treasury Regulations, including, without limitation, any one or more of the following: (i) developing or holding intangibles for sale or license; (ii) the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, or any store the principal activity of which is the sale of alcoholic beverages for consumption off the Premises; or (iii) farming, as that term is defined in Section 2032A(e)(5)(A) or (B) of the Internal Revenue Code of 1986."

6.    The Lease is also modified to include <u>Section 51</u> – New Markets Tax Credits, as set forth below:

"**51.    NEW MARKETS TAX CREDITS.**    Tenant acknowledges that Landlord is financing the improvements to the Property with the proceeds of loans that will qualify as a "qualified low-income community investment" for purposes of generating certain tax credits (the "New Markets Tax Credit" or "NMTCs") under Section 45D of the Internal Revenue Code of 1986, as amended (the "Code").  Tenant hereby represents, warrants, covenants and agrees that it will provide Landlord with such information and documentation as may be necessary for Landlord to meet any NMTC requirements, including the providing of information to Landlord as may be requested of Landlord pursuant to any loan documents."

7.    **Full force and Effect.**  This First Amendment shall modify and is made part of the Lease.  All terms and provisions of the Lease or any prior amendment thereto are

2

superseded to the extent inconsistent with the provisions of this First Amendment. Except as amended by this First Amendment, the Lease shall remain unmodified and in full force and effect.

8.      **Successors and Assigns.** This First Amendment, which shall be binding upon the parties hereto and their respective successors and assigns, shall be governed and construed according to the laws of the Commonwealth of Pennsylvania.

9.      **Counterparts.** This First Amendment may be executed and delivered by facsimile and in one or more counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[SIGNATURES APPEAR ON FOLLOWING PAGE.]

3

*IN WITNESS WHEREOF*, each party hereto has caused this First Amendment to be duly executed to be effective as of the day and year first above written.

LANDLORD:

**SCHMIDTS RETAIL, LP**
BY:  Schmidts Retail GenPar, Inc., its general partner

By: _____

    Bart Blatstein, President

TENANT:

**PATHMARK STORES, INC.**

By: _____

Name: Christopher W. McGarry
Title: Senior Vice President

4

## EXHIBIT A

### APPROVED PLANS AND SPECIFICATIONS

(Attached)

5

# Exhibit "B"

Richard M. Meth, Esq.
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
rmeth@foxrothschild.com
Telephone:  973.992.4800
Facsimile:  973.992.9125

-and-

Michael G. Menkowitz, Esq.
FOX ROTHSCHILD LLP
2000 Market Street – 20th Floor
Philadelphia, Pennsylvania 19103
mmenkowitz@foxrothschild.com
Telephone:  215.299.2000
Facsimile:  215.299.2150

*Counsel to Schmidts Retail, LP*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,<br><br>             Debtors. | Chapter 11<br>(Jointly Administered)<br><br>Case No.:  10-24549 (RDD) |

### AFFIDAVIT OF ADAM LISAUSKY IN SUPPORT OF SCHMIDTS RETAIL, LP'S VERIFIED MOTION TO COMPEL DEBTORS TO ASSUME OR REJECT LEASE

COMMONWEALTH OF PENNSYLVANIA    :
                                        :     SS
COUNTY OF PHILADELPHIA             :

ADAM LISAUSKY, being duly sworn according to law, deposes and says:

1.      I am the Vice President of Schmidts Retail GenPar, Inc., general partner of

Schmidts Retail, LP ("Schmidts").  Schmidts is the successor-in-interest to Northern Liberties

Development, LP, the original lessor to that certain lease agreement wherein Northern Liberties

Development, LP agreed to lease to Pathmark Stores, Inc. certain property located at 2nd Street and Girard Avenue, Philadelphia, Pennsylvania (the "Premises") for the construction, development and operation of a supermarket and certain related business operations (as amended, the "Lease").

2.    This Affidavit is being submitted in support of Schmidts Retail, LP's Motion to Compel Debtors to Assume or Reject Lease (the "Motion").

3.    Since commencing the Redevelopment Project,[1] Schmidts has conducted numerous meetings with prospective tenants and with real estate brokers representing prospective tenants. Despite Schmidts' willingness to offer co-tenancy provisions similar to those outlined below, numerous prospective tenants have refused to lease space, and real estate brokers will not bring in potential tenants unless and until there is an operating supermarket to anchor the Redevelopment Project's retail space.

4.    This unwillingness of prospective tenants to enter into lease agreements without an operating supermarket has hindered the project's development, and has caused economic harm by preventing Schmidts from realizing rent revenues.

5.    Generally, Schmidt's leases with other retailers in the Redevelopment Project contain co-tenancy provisions which allow for abated or reduced rents, a delay in opening such retailers' business and/or a tenant option to terminate their leases early should certain benchmarks not be met with respect to the construction, completion and opening of a supermarket on the Premises.

---

[1]    Capitalized terms not defined herein shall have the same meaning ascribed to them as in the Motion.

2

6.     A continued delay with respect to the completion and opening of a supermarket in the Redevelopment Project means that Schmidts will not be allowed to collect full (if any) rents during the period while a supermarket is not open on the Premises. In addition, a continued delay in the opening of a supermarket places Schmidts in danger of breaching and its financing obligations and its leases with other tenants in the Redevelopment Project. The loss of such tenants would cause severe and irreparable harm to Schmidts and the Redevelopment Project.

7.     Since the commencement of the A&P bankruptcy cases, certain high-level employees of the Debtors responsible for the management and maintenance of the Debtors' relationships with their landlords have, on more than one occasion, expressed the Debtors' intent and desire to reject the Lease to me. Further, the Debtors and their financial advisors have engaged in discussions with me and other executives at Schmidts regarding the Debtors' sale of the furniture, fixtures, and equipment already installed in the Premises to Schmidts; these discussions have also involved the timing of the Debtors' anticipated rejection of the Lease.

Adam Lisausky

Sworn to and Subscribed
Before me this 21 day
of March , 2011.

Notary Public
My Commission Expires: 10-24-2014

NOTARIAL SEAL
JANE UBELE-WHITNEY
Notary Public
PHILADELPHIA CITY, PHILADELPHIA COUNTY
My Commission Expires Oct 24, 2014

3

Richard M. Meth, Esq.
FOX ROTHSCHILD LLP
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey  07068-1600
rmeth@foxrothschild.com
Telephone:  973.992.4800
Facsimile:  973.992.9125

-and-

Michael G. Menkowitz, Esq.
FOX ROTHSCHILD LLP
2000 Market Street – 20th Floor
Philadelphia, Pennsylvania 19103
mmenkowitz@foxrothschild.com
Telephone:  215.299.2000
Facsimile:  215.299.2150

*Counsel to Schmidts Retail, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC<br>TEA COMPANY, INC., *et al.*,<br><br>Debtors. | Chapter 11<br>(Jointly Administered)<br><br>Case No.:  10-24549 (RDD) |

**ORDER GRANTING SCHMIDTS RETAIL, LP'S MOTION**
**TO COMPEL DEBTORS TO ASSUME OR REJECT LEASE**

THIS MATTER having been opened to the Court by Schmidts Retail, LP

("Schmidts"), upon motion for the entry of an Order compelling the Debtors to Assume

or Reject Lease (the "Motion"); and adequate notice of the Motion having been provided;

and the Court having considered any objections filed with respect to the Motion, as well

as oral argument of counsel, if any; and a hearing having been conducted on the Motion;

and for good cause shown; it is hereby

ORDERED that the Debtors be, and hereby are, directed to assume or reject the Lease (as such term is defined in the Motion) within ten (10) days of the date hereof; and it is

FURTHER ORDERED that the Debtors shall pay all post-petition sums currently due under the Lease to Schmidts within fifteen (15) days of the days of their receipt of a certified statement as to all such sums.

DATED:
        WHITE PLAINS, NY

_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

2