James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) | Case No. 10-24549 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF FILING OF FORM ASSET PURCHASE AGREEMENT**
**FOR THE SALE OF THE SOUTHERN STORE ASSETS**

      **PLEASE TAKE NOTICE** that in accordance with the *Bidding Procedures for Southern Store Assets* approved by this Court on May 2. 2011 [Docket No. 1478], the Debtors hereby file the form asset purchase agreement for the sale of the Southern Store Assets attached hereto as **Exhibit A**.

New York, New York  /s/ Ray C. Schrock
Dated: May 6, 2011  James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to the Debtors and Debtors in Possession

K&E 18973210.1

# EXHIBIT A

## Form Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.,

SUPER FRESH FOOD MARKETS, INC.,

AND

[BUYER]

[• ], 2011

# Table of Contents

Page

Article I Definitions ..................................................................................................................1
    Section 1.1    Definitions ...........................................................................................1
    Section 1.2    Interpretations ....................................................................................11
Article II Purchase and Sale ....................................................................................................12
    Section 2.1    Purchase and Sale of Assets ..............................................................12
    Section 2.2    Assumed Liabilities ...........................................................................12
    Section 2.3    Consideration; Deposit; Escrow Amount ..........................................12
    Section 2.4    Closing ...............................................................................................13
    Section 2.5    Closing Payments and Deliveries ......................................................13
    Section 2.6    Inventory ............................................................................................14
    Section 2.7    Allocation ...........................................................................................15
    Section 2.8    Proration ............................................................................................15
    Section 2.9    Removal of Excluded Assets .............................................................15
Article III Sellers' Representations and Warranties .................................................................16
    Section 3.1    Organization of Sellers; Good Standing .............................................16
    Section 3.2    Authorization of Transaction .............................................................16
    Section 3.3    Noncontravention; Government Filings ..............................................16
    Section 3.4    Title to Assets ....................................................................................17
    Section 3.5    Real Property .....................................................................................17
    Section 3.6    Transferred Contracts ........................................................................17
    Section 3.7    Litigation; Decrees ............................................................................17
    Section 3.8    Labor Relations .................................................................................17
    Section 3.9    Brokers' Fees ......................................................................................18
    Section 3.10    Disclaimer of Other Representations and Warranties ......................18
Article IV Buyer's Representations and Warranties .................................................................18
    Section 4.1    Organization of Buyer; Good Standing ...............................................18
    Section 4.2    Authorization of Transaction .............................................................18
    Section 4.3    Noncontravention ..............................................................................18
    Section 4.4    Litigation; Decrees ............................................................................19
    Section 4.5    Brokers' Fees ......................................................................................19
    Section 4.6    Sufficient Funds; Adequate Assurances .............................................19
    Section 4.7    Buyer Information ..............................................................................19
    Section 4.8    Buyer's Acknowledgment ...................................................................19
Article V Pre-Closing Covenants ...........................................................................................20
    Section 5.1    Efforts; Cooperation ..........................................................................20
    Section 5.2    Regulatory Approvals ........................................................................20
    Section 5.3    Bankruptcy Actions ...........................................................................22
    Section 5.4    Bidding Procedures ............................................................................22
    Section 5.5    Notices and Consents ........................................................................23
    Section 5.6    Prescription Lists ...............................................................................23
    Section 5.7    Notice of Developments .....................................................................23
    Section 5.8    Notice of Supplemental Disclosure ...................................................24
    Section 5.9    Access; No Contact; Confidentiality ..................................................24
    Section 5.10    Bulk Transfer Laws ..........................................................................24

| Section 5.11 | Replacement Bonding Requirements | 24 |
|---|---|---|

Article VI Other Covenants ....................................................................................... 25
| Section 6.1 | Further Assurances | 25 |
| Section 6.2 | Access; Enforcement; Record Retention | 25 |
| Section 6.3 | Covered Employees | 25 |
| Section 6.4 | Certain Tax Matters | 28 |
| Section 6.5 | Insurance Matters | 29 |
| Section 6.6 | Acknowledgements | 29 |
| Section 6.7 | Press Releases and Public Announcements | 30 |
| Section 6.8 | Seller Marks. | 30 |

Article VII Conditions to Obligation to Close............................................................ 30
| Section 7.1 | Conditions to Buyer's Obligations | 30 |
| Section 7.2 | Conditions to Sellers' Obligations. | 31 |
| Section 7.3 | No Frustration of Closing Conditions | 31 |

Article VIII Termination ............................................................................................ 32
| Section 8.1 | Termination of Agreement | 32 |
| Section 8.2 | Effect of Termination | 33 |
| Section 8.3 | Termination Fee; Deposit Return | 33 |
| Section 8.4 | Lease Indemnity | 33 |

Article IX Miscellaneous ........................................................................................... 34
| Section 9.1 | Survival | 34 |
| Section 9.2 | Expenses | 34 |
| Section 9.3 | Entire Agreement | 34 |
| Section 9.4 | Incorporation of Exhibits and Disclosure Schedule | 34 |
| Section 9.5 | Amendments and Waivers | 34 |
| Section 9.6 | Succession and Assignment | 34 |
| Section 9.7 | Notices | 34 |
| Section 9.8 | Governing Law | 36 |
| Section 9.9 | Submission to Jurisdiction; Service of Process | 36 |
| Section 9.10 | Waiver of Jury Trial | 36 |
| Section 9.11 | Specific Performance | 36 |
| Section 9.12 | Severability | 37 |
| Section 9.13 | No Third Party Beneficiaries | 37 |
| Section 9.14 | Mutual Drafting | 37 |
| Section 9.15 | Disclosure Schedule | 37 |
| Section 9.16 | Headings; Table of Contents | 37 |
| Section 9.17 | Counterparts; Facsimile and Electronic Signatures | 37 |

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Certain Sale Order Terms
Exhibit D – Form of Bill of Sale
Exhibit E – Form of Assignment and Assumption Agreement

Disclosure Schedule
Schedule 1.1(a)        Transferred Contracts

Schedule 1.1(b)    Assumed Labor Agreements
Schedule 1.1(c)    Buyer's Wire Instructions
Schedule 1.1(d)    Seller Marks
Schedule 1.1(e)    Excluded Furnishings and Equipment
Schedule 1.1(f)    Specifically Identified Excluded Assets
Schedule 1.1(g)    Furnishings and Equipment
Schedule 1.1(h)    General Inventory
Schedule 1.1(i)    Sellers' Wire Instructions
Schedule 2.6(a)    Inventory Instructions & Pricing

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of [•], 2011 by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation and a wholly-owned Subsidiary of A&P (the "<u>Company</u>" and, together with A&P, "<u>Sellers</u>"), and [Buyer], a [_____ _____] ("<u>Buyer</u>").[1]  Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>".

### WITNESSETH

WHEREAS, on December 12, 2010, A&P and its debtor affiliates (including the Company) each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which case is administered under Case No. 10-24549 (the "<u>Bankruptcy Case</u>");

WHEREAS, Sellers operate the [25] supermarkets at the locations set forth in <u>Section 3.5</u> of the <u>Disclosure Schedule</u> (as defined below) under the name "SuperFresh" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers wish to sell, and Buyer wishes to buy, the Acquired Assets (as defined below), on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

### ARTICLE I
### DEFINITIONS

Section 1.1  <u>Definitions</u>.  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers and used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the Closing Date:

    (a)    the General Inventory (other than Excluded Inventory);

    (b)    the Pharmaceutical Inventory (other than Excluded Inventory);

---

[1] NTD:  If Buyer is a shell company or otherwise does not have sufficient assets to stand behind the obligations hereunder (as determined by A&P), A&P will require a guarantee from an appropriate parent entity of all of Buyer's obligations hereunder.

(c)     the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

(d)     the Prescription Lists (to the extent that the transfer thereof to Buyer is permitted under applicable Law);

(e)     the Leases;

(f)     the Assumed Labor Agreements;

(g)     all rights under those Contracts set forth on Schedule 1.1(a), other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Leases and the Assumed Labor Agreements, the "Transferred Contracts");

(h)     all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses"); and

(i)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.7.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(b).

"Assumed Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Schedule 1.1(b).[2]

"Assumed Liabilities" means:

 (a) all Liabilities under the Transferred Contracts (including all Cure Costs);

 (b) all amounts allocated to Buyer under Section 2.8 and all Transfer Taxes and other Taxes allocated to Buyer pursuant to Section 6.4;

 (c) for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Acquired Asset from and after the Closing Date; and

 (e) all Liabilities to be assumed by Buyer in accordance with the provisions of Section 6.3.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Base Purchase Price" has the meaning set forth in Section 2.3.

"Bidding Procedures" has the meaning set forth in Section 5.4.

"Bidding Procedures Order" means the *Order Approving Bidding Procedures in Connection with the Proposed Sale of Certain SuperFresh Banner Store Assets*, entered on May 2, 2011 [Docket No. 1478], a copy of which is attached hereto as Exhibit A.

"Bill of Sale" has the meaning set forth in Section 2.5(b).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Proration Amount" has the meaning set forth in Section 2.8.

"Buyer's Account" means the bank account (including complete wire transfer instructions therefor) set forth on Schedule 1.1(c).

---

[2] NTD: Schedule to list Contract #2326 with UFCW Local 27, Contract #2403 with UFCW Local 27, Contract #2405 with UFCW Local 400, and Contract #2407 with UFCW Local 1776.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Closing" has the meaning set forth in Section 2.3(a).

"Closing Date" has the meaning set forth in Section 2.3(a).

"Closing Statement" has the meaning set forth in Section 2.5(a).

"COBRA" has the meaning set forth in Section 6.3(g).

"Company" has the meaning set forth in the preamble.

"Confidentiality Agreement" means the letter agreement, dated as of [• ], 2011, by and between A&P and [• ], regarding the terms and conditions on which A&P would make available to [• ] certain information relating to the Stores and the Acquired Assets and Assumed Liabilities.

"Consent" means any consent, approval, authorization, qualification, waiver, or notification of a Person.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be  bound thereby.

"Covered Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores.

"Cure Costs" means any and all amounts required to be paid in connection with the assumption and assignment of any Transferred Contract pursuant to section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court, to cure all defaults, and to pay all Damages that have resulted from such defaults, under such Transferred Contract.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Deposit" has the meaning set forth in Section 2.3.

"Disclosure Schedule" has the meaning set forth in Article III.

"Disclosure Supplement" has the meaning set forth in Section 5.8.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) covered by ERISA and any other material employee benefit plan, program or arrangement of any kind established, maintained, sponsored or contributed to (or with respect to which an obligation to contribute has been undertaken) by A&P on behalf of any Covered Employee.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means any entity that would be deemed a "single employer" with A&P under Section 414(b), (c), (m) or (o) of the IRC or Section 4001 of ERISA.

"<u>Escrow Agent</u>" means Chicago Title Insurance Co., a Nebraska corporation.

"<u>Escrow Agreement</u>" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as <u>Exhibit B</u>.

"<u>Escrow Amount</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Escrow Deadline</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Estimated Purchase Price</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Excess Amount</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934.

"<u>Excluded Assets</u>" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)     any asset of Sellers that is (i) not located in the Stores and used or held for use exclusively in the operation of the Stores or (ii) inseparable from any other business of Seller or any of its Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to Taxes paid or payable by Sellers; (C) any Tax refund, credit, attribute, or other Tax asset of or with respect to Sellers; and (D) any assets not customarily based or located at the Stores;

(b)     capital stock of any of A&P's Subsidiaries;

(c)     all Cash Equivalents and accounts receivable;

(d)     except as provided in <u>Section 6.3</u>, all rights and assets under or related to any Employee Benefit Plan;

(e)     all Permits;

(f)     all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(g)     all of Sellers' rights under this Agreement or any Related Agreement;

(h)     all of Sellers' rights under any Contracts primarily related to any Excluded Asset;

(i)     any and all automobiles, trucks, tractors, and trailers;

(j)     any other rebate or refund arising from the operation of the Stores prior to the Closing;

(k)     all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "SuperFresh" and all other marks set forth on Schedule 1.1(d), any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(l)     all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices;

(m)     the Furnishings and Equipment described on Schedule 1.1(e) (the "Excluded Furnishings and Equipment");

(n)     all Contracts other than the Transferred Contracts;

(o)     assets relating to, arising under or in connection with any Employee Benefit Plans;

(p)     all Excluded Inventory;

(q)     all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores;

(r)     all other assets bearing any Seller Mark; and

(s)     those items set forth on Schedule 1.1(f).

"Excluded Furnishings and Equipment" has the meaning set forth in the definition of Excluded Assets.

"Excluded Inventory" has the meaning set forth in Section 2.6(a).

"Excluded Liabilities" means the following Liabilities of Sellers:

(a)     any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)     any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.4);

(c)     except as provided in Section 6.3(i), all Liabilities relating to employees of Seller in connection with withheld payroll Taxes, payroll, workman's compensation benefits, and employee withholding, in each case, accrued prior to the Closing;

(d)     all Liabilities of Seller under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby; and

(e)     except as provided in Section 6.3, all Liabilities of Sellers or any ERISA Affiliate with respect to any Employee Benefit Plan.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models, shelving, and refrigeration equipment owned by Sellers and located at the Stores, including those items listed on Schedule 1.1(g).

"GAAP" means United States generally accepted accounting principles consistently applied.

"General Inventory" means all food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products (including general merchandise items described in Schedule 1.1(h) but excluding greeting cards) offered for sale to customers at the Stores.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets,

know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"<u>Inventory</u>" means all General Inventory and Pharmaceutical Inventory.

"<u>Inventory Date</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Inventory Purchase Price</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Inventory Taker</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Knowledge</u>" of Sellers (and other words of similar import) means the actual knowledge [_____].  "<u>Knowledge</u>" of Buyer (and other words of similar import) means the actual knowledge of [_____].

"<u>Law</u>" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either Seller holds any leasehold or subleasehold estates and other rights to use or occupy any Store.

"<u>Liability</u>" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"<u>Lien</u>" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; <u>provided</u>, <u>however</u>, that "Lien" shall not be deemed to include any license of Intellectual Property.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether before any Governmental Authority.

"<u>Material Adverse Effect</u>" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to:  (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not

declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party; (h) changes as a result of the announcement or pendancy of this Agreement; (i) any effects or changes arising from or related to the breach of the Agreement by Buyer; (j) the failure of Seller to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; or (k) any items set forth in the <u>Disclosure Schedule</u>.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 8.1(b)(ii)</u>.

"<u>Party</u>" has the meaning set forth in the preamble.

"<u>Permit</u>" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"<u>Permitted Lien</u>" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the ordinary course of business; (c) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions, leases and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property taken as a whole as it is currently used; (f) matters that would be disclosed on an accurate survey of the real property; and (g) other Liens, none of which, individually or in the aggregate, materially impairs the use of the affected Acquired Assets as they are currently being used.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"<u>Pharmaceutical Inventory</u>" means prescription pharmaceuticals and prescription products.

"<u>Prepaid Expenses</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Prepaid Expenses Amount</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Prescription Lists</u>" means, on any date, Sellers' lists of those customers for whom either Seller has filled a prescription from one of Sellers' pharmacies located within one of the Stores within the 12-month period immediately preceding such date.

"<u>Prorated Charges</u>" has the meaning set forth in <u>Section 2.8</u>.

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Order" means an order of the Bankruptcy Court (a) approving (i) the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer on the terms set forth herein; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption by, and assignment to, Buyer of the Transferred Contracts on the terms set forth herein; and (b) otherwise containing the material terms set forth on Exhibit C, except where the failure of the Sale Order to contain such terms set forth on Exhibit C would not have a material adverse effect on Buyer's right to own and operate the Acquired Assets following the Closing.

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Seller Proration Amount" has the meaning set forth in Section 2.8.

"Sellers" has the meaning set forth in the preamble.

"Sellers' Account" means the bank account (including complete wire transfer instructions therefor) set forth on Schedule 1.1(i).

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock,

franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" has the meaning set forth in Section 8.3(a).

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2     Interpretations. Unless otherwise indicated herein to the contrary:

(a) When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b) The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c) The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d) The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e) The use of "or" herein is not intended to be exclusive.

(f) The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g) All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)     Any reference herein to law or to a legal requirement (or, with respect to any statute, ordinance, code, rule or regulation, any provision thereof) shall be deemed to include reference to all laws and or to such legal requirement and any legal requirement promulgated thereunder (or provision thereof, as applicable), including any successor thereto, respectively, in each case, as may be amended.

(i)     References herein to a Person are also to its permitted successors and assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(j)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(k)     Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(l)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Seller or provided, or that is able to be provided if requested, to Buyer or its Representatives in response to requests for materials or information.

# ARTICLE II
# PURCHASE AND SALE

Section 2.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer at the Closing all of the Acquired Assets.

Section 2.2     <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid, at or prior to the Closing, all Cure Costs.  For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid at or prior to the Closing, any Cure Costs.

Section 2.3     <u>Consideration; Deposit; Escrow Amount</u>.

(a)     The consideration for the Acquired Assets shall be (a) an aggregate Dollar amount equal to the sum of (i) $[_____] (the "<u>Base Purchase Price</u>"), plus (ii) the amount of the Inventory Purchase Price, plus (iii) the amount of the Prepaid Expenses (the "<u>Prepaid Expenses Amount</u>"), plus (iv) the Seller Proration Amount, if any, and minus (v) the Buyer Proration Amount, if any (such sum, the "<u>Purchase Price</u>") and (b) Buyer's assumption of the Assumed Liabilities.

(b)     On the date hereof, Buyer has deposited with A&P $[_____][3] in cash (the "Deposit") by wire transfer of immediately available funds.  Except as set forth in Section 8.3(b), the Deposit shall not be refundable.

(c)     Within two Business Days following the entry of the Sale Order by the Bankruptcy Court (the "Escrow Deadline"), Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an aggregate amount in cash equal to (i) the Base Purchase Price, plus (ii) Sellers' good faith estimate of the Inventory Purchase Price, plus (iii) Sellers' good faith estimate of the Prepaid Expenses Amount, plus or minus, as applicable, (iv) Sellers' good faith estimate of the Seller Proration Amount or the Buyer Proration Amount (collectively, the "Estimated Purchase Price"), minus (v) the amount of the Deposit (the "Escrow Amount").  The Escrow Amount shall be held and disbursed at the Closing pursuant to the terms of the Escrow Agreement and Section 2.5(a).

Section 2.4     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a date (the "Closing Date") that is the later of (a) the fifth Business Day after the Escrow Deadline and (b) the first Business Day following the first date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions with respect to actions the Parties will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5     Closing Payments and Deliveries.

(a)     Sellers shall prepare and deliver, within one Business Day prior to the Closing Date, a statement setting forth the amount of (i) the Inventory Purchase Price (as determined in accordance with Section 2.6), (ii) the Prepaid Expenses Amount (as determined in good faith by Sellers), (iii) as applicable, the Seller Proration Amount or the Buyer Proration Amount (as determined in accordance with Section 2.8), and (iv) the resulting Purchase Price (as calculated pursuant to Section 2.3(a)) (the "Closing Statement").  If the Purchase Price (as set forth on the Closing Statement) is less than the Estimated Purchase Price (as determined in accordance with Section 2.3(c)), Buyer and Sellers shall instruct the Escrow Agent to release from the account holding the Escrow Amount and deliver at the Closing to (i) Buyer, by wire transfer of immediately available funds to Buyer's Account, the amount by which the Estimated Purchase Price exceeds the Purchase Price (the "Excess Amount") and (ii) Sellers, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount minus the Excess Amount.  If the Purchase Price (as set forth on the Closing Statement) is greater than the Estimated Purchase Price (as determined in accordance with Section 2.3(c)),

---

[3] NTD: To be an amount equal to 10% of the anticipated Purchase Price.

(i) Buyer and Sellers shall instruct the Escrow Agent to deliver to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount and (ii) Buyer shall pay to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, the amount by which the Purchase Price exceeds the Estimated Purchase Price.

(b)     At the Closing, Sellers will deliver to Buyer (i) a duly executed Bill of Sale substantially in the form of <u>Exhibit D</u> (the "<u>Bill of Sale</u>"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of <u>Exhibit E</u> (the "<u>Assignment and Assumption Agreement</u>"); and (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> is satisfied.

(c)     At the Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; and (iii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> are satisfied.

Section 2.6     <u>Inventory</u>.

(a)     A physical count of the Inventory, and calculation of the value thereof, at each of the Stores shall be made by a nationally-recognized, independent inventory service (the "<u>Inventory Taker</u>") selected and engaged by Sellers, in their sole discretion, two days prior to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such inventory being the "<u>Inventory Date</u>").  The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in <u>Schedule 2.6(a)</u> and otherwise in accordance with the terms and conditions of this <u>Section 2.6</u>.  Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne one-half by Buyer and one-half by Sellers.  The physical inventory (and the Inventory Purchase Price to be paid by Buyer for the Inventory) shall not include Inventory that is (i) A&P branded (including any "SuperFresh" branded) private label inventory; (ii) damaged, spoiled, perishable, outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than 14 days after the Inventory Date being deemed outdated for this purpose), obsolete, or otherwise unsaleable at normal retail price in the ordinary course of business at the Stores; or (iii) not transferable to Buyer under applicable Law (collectively, the "<u>Excluded Inventory</u>").  The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date, excluding the Excluded Inventory (but including any portion or all of the Excluded Inventory described in clause (ii) or (iii) above that Buyer deems Inventory), at the percentages of the segment retail price set forth in <u>Schedule 2.6(a)</u> (such value, the "<u>Inventory Purchase Price</u>").

(b)     Buyer shall make application to the applicable authorities to transfer any alcohol included in the Inventory to Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyer, at Buyer's sole cost and expense.  Sellers, at no out-of-pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above.  In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.7     Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than 60 days after the Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation"). The Purchase Price Allocation shall be conclusive and binding on the parties, and Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation.  None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by law.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8     Proration.  On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges) under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with (a) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Prorated Charges under such Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (ii) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (b) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers).  The net amount of all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers.  Except as set forth in this Section 2.8 and in Section 6.4, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

Section 2.9     Removal of Excluded Assets.  As promptly as practicable following the Closing Date (and in any event within 10 Business Days), Buyer shall remove at its expense all of the Excluded Assets that are located at the Stores and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule") or (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court.

Section 3.1     Organization of Sellers; Good Standing.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2     Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3     Noncontravention; Government Filings.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of either Seller, (b) subject to the entry of the Sale Order, violate any law or Decree to which either Seller is subject in respect of the Acquired Assets, or (c) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which either Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.  Other than (x) any filings required under the Exchange Act, (y) the applicable requirements of the HSR Act, and (z) as required or pursuant to the Bankruptcy Code, neither Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect or prevent or materially impair or delay either Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Title to Assets.  At the Closing, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, and, pursuant to the Sale Order, Sellers will convey at the Closing good and valid title to, or their rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    Real Property.    Section 3.5 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to either Seller by a third party, and a list of all Leases.  Sellers have made available to Buyer a true and complete copy of each Lease.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not have a Material Adverse Effect.

Section 3.6    Transferred Contracts.  With respect to each Transferred Contract (other than the Leases):  (a) assuming due authorization and delivery by the other party thereto, such Contract constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity; and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Contract, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Transferred Contracts) or (ii) to the extent such breach or default would not have a Material Adverse Effect.

Section 3.7    Litigation; Decrees.  Except as set forth in Section 3.7 of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, neither Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.8    Labor Relations.  Except as set forth in Section 3.8 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees.

Section 3.9     Brokers' Fees.  Other than the fees and expenses payable to Hilco Real Estate, Inc. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.10     Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III or expressly contained in any Related Agreement, neither Seller nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, any Acquired Assets, any Assumed Liabilities or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NEITHER SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).

ARTICLE IV
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this Article IV are true and correct as of the date of this Agreement.

Section 4.1     Organization of Buyer; Good Standing.  Buyer is a _____ duly organized, validly existing, and in good standing under the laws of the State of _____ and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2     Authorization of Transaction.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Seller) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3     Noncontravention.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and

assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4   <u>Litigation; Decrees</u>.   There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5   <u>Brokers' Fees</u>.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or any of its Affiliates could become liable or obligated to pay.

Section 4.6   <u>Sufficient Funds; Adequate Assurances</u>.  Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 4.7   <u>Buyer Information</u>.  As of the date hereof, Buyer has disclosed to Sellers any and all potential issues under any Antitrust Law that may be credibly raised about the transactions contemplated hereby.  As of the date hereof, Buyer has provided to Seller true, correct, and complete information relating to the businesses and sales of Buyer and its Subsidiaries and joint ventures upon which Seller can reasonably determine whether any objections to the transactions contemplated hereby may be credibly asserted under any Antitrust Law.

Section 4.8   <u>Buyer's Acknowledgment</u>.  Neither Buyer nor any of its Representatives is aware of any facts or circumstance that (with or without notice or lapse of time or both) would cause any representations or warranties of Seller to be untrue or incorrect in any respect.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.5(a)), each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5. Without limiting the generality of the foregoing, (i) each Seller shall use its reasonable best efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its reasonable best efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

(b)    Without limiting the generality of Section 5.1(a), Buyer shall not take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.2    Regulatory Approvals.

(a)    Buyer shall use its best efforts to (i) file a Notification and Report Form to the extent required under the HSR Act with respect to the transactions contemplated hereby within three Business Days after the date hereof, (ii) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (iii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

(b)    In connection with the efforts referenced in Section 5.1 and this Section 5.2 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law or any state law, Buyer shall use its best efforts to (i) cooperate with Sellers in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep Sellers informed in all material respects of any material communication received by Buyer from, or given by Buyer to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit Sellers to review any material communication given to it by, and consult with Buyer in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or

participate in such meeting, conference, or proceeding. The foregoing obligations in this Section 5.2(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to allow for the exchange of such privileged materials without waiving any such privilege.

(c) Without limiting the generality of Section 5.2(b), if any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is threatened or instituted by any Governmental Authority or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law, Buyer shall use its best efforts to resolve such objections or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement as soon as practicable and in any event on or prior to the Outside Date. Without limiting the generality of the foregoing, Buyer shall promptly take and diligently pursue any or all of the following actions to the extent necessary to eliminate any concerns on the part of, or to satisfy any conditions imposed by, any Governmental Authority with jurisdiction over the enforcement of any applicable law, including any Antitrust Law, regarding the legality of Buyer's acquisition of any portion of the Acquired Assets or the Assumed Liabilities:

(i) entering into negotiations, providing information, making proposals, entering into and performing agreements or submitting to orders, or, pursuant to any such agreement or order or otherwise, selling or otherwise disposing of, or holding separate (through the establishment of a trust or otherwise), particular assets or categories of assets (including, after the Closing, any of the Acquired Assets), or operations (including, after the Closing, the Stores or any portion thereof), of Buyer or any of its Affiliates;

(ii) using its best efforts to prevent the entry in a judicial or administrative proceeding brought under any law, including any Antitrust Law, by any Governmental Authority or any other Person of any permanent, temporary, or preliminary injunction or other order that would make consummation of the acquisition of the Acquired Assets or the Assumed Liabilities in accordance with the terms of this Agreement unlawful or that would prevent or delay such consummation;

(iii) taking promptly and diligently pursuing, in the event that an injunction or order has been issued as referred to in this Section 5.2, any and all steps, including the appeal thereof, the posting of a bond, or the steps contemplated by this Section 5.2, necessary to vacate, modify, or suspend such injunction or order so as to permit such consummation as promptly as possible; and

(iv) taking promptly and diligently pursuing all other actions and doing all other things necessary and proper to avoid or eliminate each and every impediment under any law, including any Antitrust Law, that may be asserted by any Governmental Authority or any other Person to the consummation of any transaction contemplated

hereby, including the acquisition of some or any portion of the Acquired Assets or the Assumed Liabilities by Buyer in accordance with the terms of this Agreement.

(d)     Without limiting the generality of Section 5.2(c), if necessary to obtain any regulatory actions or non-actions, orders, waivers, consents, clearances, extensions and approvals necessary to consummate the transactions contemplated by this Agreement, or if any suit or other action is threatened or instituted by any Person challenging the transactions contemplated by this Agreement as violative of any applicable law, Buyer shall, and shall cause its respective Subsidiaries to, hold separate or dispose of any portion of their assets or businesses or otherwise conduct their businesses or any portion of their businesses in a specified manner as soon as practicable and in any event on or prior to the Outside Date.

(e)     Buyer shall reimburse Sellers for the reasonable costs and expenses of Seller and their respective Representatives, including reasonable fees and disbursements of legal counsel and other advisors, incurred from and after the date hereof in connection with preparing for, responding to, defending against, or participating in the defense of any objection asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted or threatened by any Governmental Authority or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law, which shall be payable promptly following request therefor; provided, however, that nothing in this Section 5.2(e) shall entitle Buyer to dictate or control, directly or indirectly, Sellers' choice of counsel or such counsel's conduct in connection with the transactions contemplated hereby.

(f)     Actions or agreements required of Buyer pursuant to this Section 5.2 shall under no circumstances be considered a Material Adverse Effect.  For the avoidance of doubt, Buyer must take any and all steps necessary to consummate the transactions contemplated hereby, including divesting or agreeing to divest assets (including those of Buyer and those to be acquired by Buyer in the transactions contemplated hereby) to third parties in a manner acceptable to the Federal Trade Commission and United States Department of Justice, Antitrust Division, and any other applicable Governmental Authority.

Section 5.3     Bankruptcy Actions.     Buyer shall promptly take all actions as are reasonably requested by Sellers to assist in (a) obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing documents or information for filing with the Bankruptcy Court, (b) making Buyer's representatives available to testify before the Bankruptcy Court, and (c) furnishing information or documents to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code with respect to any Transferred Contracts that are "executory" within the meaning of section 365 of the Bankruptcy Code.

Section 5.4     Bidding Procedures.     The bidding procedures to be employed with respect to this Agreement (the "Bidding Procedures") shall be those reflected in the Bidding Procedures Order. Buyer acknowledges that the Bidding Procedures may be supplemented or modified by other customary procedures not inconsistent with the matters otherwise set forth herein and the terms of this Agreement.  In addition, Buyer agrees and acknowledges that Sellers are and may continue soliciting inquiries, proposals, or offers for the Acquired Assets pursuant to the terms of the Bidding Procedures Order.

Section 5.5    Notices and Consents.  Prior to the Closing and as necessary following the Closing:

(a)    Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.5(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; provided, however, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters, (ii) neither A&P nor any Subsidiary of A&P shall be required to pay any consideration therefor, and (iii) Buyer shall pay any reasonable costs, or bear any reasonable effects as a result of amendments or modifications to any Transferred Contract, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Acquired Asset shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion and Buyer will indemnify Sellers for any Damages as a result thereof, including any Damages from any inability of either Seller (including any Subsidiary of either Seller) to perform under a Contract that otherwise would be a Transferred Contract as a result of the other transactions contemplated hereby.

(b)    Without limiting Section 5.2, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities in connection with the matters referred to in Section 5.5(b) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.6    Prescription Lists.  Promptly after the execution of this Agreement, Buyer shall make application to the applicable authorities to transfer the Prescription Lists from Sellers to Buyer.  Such application shall be made on a timely basis and shall be diligently pursued by Buyer, at its sole cost and expense.  Sellers, at Buyer's expense, shall cooperate with Buyer and provide any documents and/or information necessary to assist in effectuating such transfer and execute such consents or other papers as may reasonably be required subject to applicable patient privacy rights.  At the Closing, Sellers shall, subject to applicable patient privacy rights, assign, transfer, and convey to Buyer all of its right, title, and interest in and to the Prescription Lists (and shall update the above electronic format records that shall be current as of the Closing), and Buyer hereby agrees to purchase and accept from Seller all of the Prescription Lists.

Section 5.7    Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority or any securities market or securities regulator in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.7 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.8    Notice of Supplemental Disclosure.  Without limiting the obligations of Sellers contemplated by Section 5.7, from and after the date hereof but prior to the fifth Business Day prior to the Closing Date, Sellers may inform Buyer pursuant to this Section 5.8 that any representation or warranty of either Seller was, may have been or may have been deemed to have been inaccurate when made and provide a proposed supplement to the Disclosure Schedule delivered as of the date hereof to correct such actual or potential inaccuracy as if set forth on the Disclosure Statement as of the date hereof (a "Disclosure Supplement").  If the inaccuracies contemplated by such Disclosure Supplement are sufficiently material to prevent, after a reasonable period in which to cure such inaccuracy, the satisfaction of the condition set forth in Section 7.1(a), Buyer may terminate this Agreement prior to the Closing and in no event later than five Business Days after receipt by Buyer of such Disclosure Supplement.  If Buyer shall not have exercised such right of termination by such date, the Disclosure Schedule shall be deemed to have been amended (effective as of the date of this Agreement) to add such Disclosure Supplement.  Notwithstanding the foregoing, if any such inaccuracy arises solely as a result of the inclusion of a specific asset or group of assets as an Acquired Asset, Sellers may elect, in their sole discretion, to add such asset or group of assets to Schedule 1.1(f) and thereby cause such asset or group of assets to become Excluded Assets and not to assign such asset or group of assets, in which case, the Purchase Price shall be reduced by an amount equal to the portion of the original Purchase Price allocated to such asset or group of assets.  In the event that any such asset or group of assets is a Lease, the amount of any such Purchase Price reduction shall be the product of (a) the Base Purchase Price multiplied by (b) an amount equal to (i) the 2010 calendar year gross rent for such Lease or group of Leases divided by (ii) the aggregate amount of the 2010 calendar gross rents for all Leases.

Section 5.9    Access; No Contact; Confidentiality.  Upon the reasonable request of Buyer, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of either Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto.  Prior to the Closing, Buyer shall not, and shall cause its Representatives not to, contact any employees, customers, suppliers, landlords, or licensors of either Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller.

Section 5.10    Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.11    Replacement Bonding Requirements.  On or prior to the Closing Date, Buyer shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Bonding Requirements.  To the extent Buyer is unable to make such arrangements with respect to any Bonding Requirements prior to the

Closing, with Sellers' consent in lieu thereof, Buyer shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1 <u>Further Assurances</u>. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2 <u>Access; Enforcement; Record Retention</u>. From and after the Closing, upon request by either Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of either Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if it (i) may result in a waiver or breach of any attorney/client privilege, (ii) could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this <u>Section 6.2</u> in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six years following the Closing.

Section 6.3 <u>Covered Employees</u>.

(a) <u>Offer of Employment</u>. Prior to the Closing Date, Buyer shall make an offer of employment, effective as of the Closing Date, to each of the Covered Employees (initially at the same location and on the same terms and conditions of employment as in effect immediately prior to the Closing, or with respect to union-represented Covered Employees, as required by the applicable Assumed Labor Agreement); <u>provided</u>, <u>however</u>, that any offer of employment shall be contingent upon the Closing actually occurring. Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law and the governing Assumed Labor Agreement, at any time following the Closing Date.

(b) <u>Compensation and Benefits.</u>

(i)     Commencing on the Closing Date and continuing through the first anniversary of the Closing Date, Buyer shall provide or cause to be provided to the Covered Employees who are not union represented compensation and employee benefits that are in the aggregate (including base salary and incentive bonus opportunities) substantially comparable to the compensation and employee benefits provided by A&P or any of its Affiliates to such Covered Employees immediately prior to the Closing.  With respect to union-represented Covered Employees, Buyer agrees to apply to all such Covered Employees the terms and conditions set forth in the Assumed Labor Agreements, as they may be modified from time to time.

(ii)     Buyer shall provide each non-union Covered Employee with the severance benefits that are set forth on <u>Section 6.3(b)(ii)</u> of the <u>Disclosure Schedule</u> applicable to each such Covered Employee in accordance with the applicable underlying plans or agreements as in effect immediately prior to the Closing Date, and Buyer shall provide to each Covered Employee who is union represented severance, retention, and other benefits, as applicable, as set forth in the applicable Assumed Labor Agreements.

(iii)     As of the Closing Date, Buyer will assume and honor the Assumed Labor Agreements and shall indemnify and hold Seller and its Affiliates harmless with respect to any Liability related to any such agreement

(c)     <u>Service Credit</u>.  Each Covered Employee shall be given credit for all service with A&P, its Affiliates, and their respective predecessors under any employee benefit plans or arrangements of Buyer and its Affiliates, including any such plans providing vacation, sick pay, severance, and retirement benefits maintained by Buyer in which such Covered Employees participate for purposes of eligibility, vesting, and entitlement to benefits, including for severance benefits and vacation entitlement (but not for accrual of pension benefits). Notwithstanding the foregoing, nothing in this Section shall be construed to require crediting of service that would result in a duplication of benefits.

(d)     <u>Waiver of Pre-Existing Conditions; Crediting of Deductibles</u>.  No later than the Closing Date, Buyer shall establish or cause to be established, at its own expense, benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and other group welfare benefits for Covered Employees. Buyer shall cause (i) the waiver of all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Covered Employees under any such welfare benefit plans to the extent that such conditions, exclusions or waiting periods would not apply under the Employee Benefit Plans, and (ii) for the plan year in which the Closing Date occurs (or, if later, in the calendar year in which Covered Employees and their dependents commence participation in the applicable welfare plans), the crediting of each Covered Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder.

(e)     401(k) Plan Rollovers.  Buyer agrees to cause the Buyer's 401(k) plan to accept a "direct rollover" to Buyer's 401(k) plan of each Covered Employee's account balances (including promissory notes evidencing all outstanding loans) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Covered Employee.

(f)     Accrued Vacation.  Buyer shall provide each Covered Employee with credit for the same number of vacation and sickness benefit days such Covered Employee has accrued but not used in the calendar year in which the Closing Date occurs, provided that, to the extent required by applicable law, such amount shall be paid by Buyer to the applicable Covered Employee in cash.  In the event that a Covered Employee is unable to use such carried over vacation and sickness days within the calendar year in which the Closing Date occurs, Buyer shall allow such Covered Employee to carry over such vacation and sickness days to be used in the subsequent calendar year unless such Covered Employee requests payout at the end of the current calendar year or such payout is required by applicable law, in either of which events Buyer will timely make such payments to such Covered Employee.

(g)     Welfare Benefit Claims; COBRA.  On the Closing Date, A&P and its Affiliates shall cease to provide welfare coverage to each Covered Employee and his or her covered dependents, and Buyer shall commence providing such coverage to such individuals. A&P shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of its Affiliates) in effect prior to the Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under A&P's Employee Benefit Plans that are welfare benefit plans prior to the Closing Date by the Covered Employees and their dependents.  Buyer shall be responsible in accordance with the applicable welfare plans of Buyer and its Affiliates for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, on or after the Closing Date (or the date of commencement of employment with Buyer, if later) by Covered Employees and their dependents.  For purposes of this Section, a claim shall be deemed to have been incurred as follows:  (i) for health, dental and prescription drug benefits, upon provision of such services, (ii) for life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits, and (iii) for hospital-provided health, dental, prescription drug or the benefits that become payable with respect to any hospital confinement, pro-rata based upon the number of days of such confinement occurring before and after the Closing Date.  A&P and its Affiliates shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under A&P's Employee Benefit Plans that are group health plans with respect to qualifying events occurring on or prior to the Closing Date; provided, however, that to the extent that a dependent of a Covered Employee is receiving continuation coverage under COBRA as of the Closing Date, Buyer shall be obligated to continue to provide COBRA continuation coverage to such dependent on and following the Closing Date for the period required under applicable law. Buyer and its Affiliates shall provide coverage required by COBRA to Covered Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring after the Closing Date.

(h)     WARN Act.  Provided that on or before the Closing Date A&P provides Buyer with a list, by date and location, of employee layoffs implemented by Sellers with respect

to employees of the Stores in the 90-day period receding the Closing Date, Buyer shall indemnify and hold harmless each Seller and its Affiliates and their respective Representatives with respect to any Liability arising under the WARN Act with respect to employees of the Stores arising in whole or part from the actions or omissions of Buyer from and after the Closing Date.

(i)     Tax Reporting.  Buyer shall adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Covered Employees reflecting all wages paid and taxes withheld with respect to such Covered Employees for the calendar year in which the Closing Date occurs. Seller as the predecessor employer shall have no employment tax reporting responsibilities for the Covered Employees following the Closing Date.  Buyer shall also adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(j)     No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.3, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.

(k)     Cooperation.  After the Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Seller to provide such current information regarding the Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Covered Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates.  Buyer shall, and shall cause its Affiliates to, permit Covered Employees to provide such assistance to A&P as may be required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that, in A&P's opinion, (i) an Covered Employee has knowledge of relevant facts or issues, or (ii) a Covered Employee's assistance is reasonably necessary in respect of any such claim.

Section 6.4     Certain Tax Matters.

(a)     Transfer Taxes.  Buyer shall pay any stamp, documentary, registration, sales, use, transfer, added-value or other non-income Tax (a "Transfer Tax") imposed under applicable law in connection with the transactions contemplated hereby.  Accordingly, if either Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller.  Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than 10 Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned.  Each Seller and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

(b)     Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those

referred to in <u>Section 2.8</u>), personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "<u>Proration Period</u>") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes. If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period. When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than 10 days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.

Section 6.5     <u>Insurance Matters</u>.  Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by either Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets and no further coverage shall be available to Buyer, the Stores, or the Acquired Assets under any such policies.

Section 6.6     <u>Acknowledgements</u>.

(a)     Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person (including any Buyer Indemnified Party) shall have any claim against either Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto.  Accordingly, without limiting the generality of <u>Section 3.10</u> or <u>Section 9.1</u>, Buyer acknowledges that neither Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)     Buyer acknowledges that, except for the representations and warranties expressly set forth in <u>Article III</u> (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of <u>Section 3.10</u>, neither Seller nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and neither Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  Buyer

acknowledges that, should the Closing occur, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters). Further, without limiting any representation, warranty, or covenant of either Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives as a condition to the Closing any further due diligence reviews, inspections, or examinations with respect to either Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.7    Press Releases and Public Announcements. No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.8    Seller Marks. The Seller Marks may appear on some of the Acquired Assets, including on signage. Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks. Buyer shall within three Business Days after the Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

ARTICLE VII
CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations. Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(d)     all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)     no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof; and

(f)     each payment, if any, contemplated by Section 2.5(a) to be made to Buyer, and each delivery contemplated by Section 2.5(b) to be delivered to Buyer shall have been delivered.

Section 7.2     Conditions to Sellers' Obligations.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)     the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)     all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)     no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof; and

(f)     each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.3     No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or best efforts or commercially reasonable efforts, with respect to those matters contemplated by Section 5.2 or Section 5.5, respectively, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

# ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.  The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement;

(ii)    the Closing shall not have occurred prior to the 90th calendar day following the date hereof (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 8.1(b)(ii) shall not be available to Buyer (A) if its failure to fulfill any obligation under this Agreement (including its obligations set forth in Section 5.1 and Section 5.2) has been the cause of, or resulted in, the failure of the Closing to have occurred on or before the Outside Date or (B) in the event that the condition set forth in Section 7.1(d) has not been satisfied but all of the other conditions set forth in Section 7.1 have been or are capable of being satisfied;

(c)    by Buyer by giving written notice to each Seller if:

(i)    there has been a breach by either Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) 10 days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(ii)    to the extent Buyer has a right of termination pursuant to Section 5.8 after application of the last sentence thereof; or

(d)    by either Seller by giving written notice to Buyer and the other Seller if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by such Buyer prior to the earlier to occur of (A) 10 days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date.

Section 8.2    Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.10, Section 6.6, Section 8.3, Section 8.4, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 8.3 and Section 8.4) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement.

Section 8.3    Termination Fee; Deposit Return.

(a)    If this Agreement is terminated pursuant to (i) Section 8.1(b) due to the failure of Buyer to have fulfilled any of its obligations under this Agreement or any breach by Buyer of this Agreement (including a breach of a representation, warranty, covenant, or agreement), or if at the time of termination pursuant to Section 8.1(b) Buyer is not then in compliance with all of its obligations under this Agreement, or (ii) Section 8.1(d), then (x) Sellers shall be entitled to keep the Deposit, and (y) Buyer shall pay, or cause to be paid, to Sellers, by wire transfer of immediately available funds to Sellers' Account within two Business Days of the date of such termination, an aggregate cash fee equal to $[_____][4] (the "Termination Fee").  If Buyer fails to pay any portion of the Termination Fee as required pursuant to this Section 8.3(a) when due, (i) such fee shall accrue interest for the period commencing on the date such fee became past due, at a rate equal to the prime lending rate prevailing during such period as published in *The Wall Street Journal*, calculated on a daily basis from the date such amount was required to be paid until the date of actual payment and (ii) Buyer shall also reimburse Sellers for all of their costs and expenses (including attorney's fees) incurred in connection with their efforts to collect the Termination Fee.  Buyer's obligation to pay the Termination Fee pursuant to this Section 8.3(a) shall survive termination of this Agreement.  Buyer acknowledges that the Termination Fee and other provisions of this Section 8.3(a) are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Sellers would not enter into this Agreement.   Sellers' rights to receive the Termination Fee shall be in addition to, and not in lieu of, any other rights of Sellers at law or in equity arising under this Agreement or otherwise in connection with such termination.

(b)    If this Agreement is terminated in a manner that does not require payment of the Termination Fee in accordance with Section 8.3(a), then Sellers shall remit the Deposit to Buyer by wire transfer of immediately available funds to Buyer's Account within five Business Days of the date of such termination.

Section 8.4    Lease Indemnity. If this Agreement is terminated pursuant to Section 8.1(b) or Section 8.1(d), Buyer shall indemnify Sellers for all Liabilities and Damages arising out of any Lease assumed by Sellers pursuant to section 365(k) of the Bankruptcy Code.

---

[4] NTD: To be an amount equal to 10% of the anticipated Purchase Price.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Survival.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(b) or Section 2.5(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    Expenses.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.  This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

Section 9.7    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand,

claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; or (d) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to either Seller: The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:  Christopher W. McGarry
Craig Feldman
David Kelly

With a copies (which shall not constitute notice to Seller) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
Facsimile: (212) 446-4900

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:  James J. Mazza, Jr.
Howard Norber
Facsimile: (312) 862-2200

If to Buyer: [Buyer]
[Street Address]
[City, State, Zip Code]
Attention:  [Contact]
Facsimile: [Facsimile Number]

With a copy (which shall not constitute notice to Buyer) to:

[Firm]
[Street Address]
[City, State, Zip Code]
Attention: [Contact]
Facsimile: [Facsimile Number]

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.11    Specific Performance.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any

other remedy that a Party may have under law or equity, a Party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12  Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13  No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, A&P, the Company, and their respective successors and permitted assigns.

Section 9.14  Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.15  Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates.  The listing of any matter shall expressly not be deemed to constitute an admission by Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Seller's representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.16  Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.17  Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart

may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

[BUYER]

By:_____
Name:
Title: