James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-24549 (RDD) |
| Debtors. | Jointly Administered |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING SALE OF LOT 1 AND LOT 2 SUPERFRESH
STORES TO MRS. GREENS MANAGEMENT CORPORATION
AND VILLAGE SUPER MARKET INC. FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED
LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that the undersigned[1] will present the attached *Debtors'*

*Motion for Entry of an Order (I) Approving the Sale of Lot 1 and Lot 2 SuperFresh Stores to*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land

*Mrs. Greens Management Corporation and Village Super Market Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "**Motion**") to the Honorable Judge Robert D. Drain, Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), at 300 Quarropas Street, White Plains, New York 10601, at a hearing to be held on **June 14, 2011 at 10:00 a.m. (prevailing Eastern Time)** (the "***Hearing***").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion must comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, must be set forth in a writing describing the basis therefore and must be filed with the Bankruptcy Court electronically in accordance with General Order M-399 by registered users of the Bankruptcy Court's electronic case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website of the Bankruptcy Court) and, by all other parties in interest, on a 3 ½ inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-182 or by first-class mail upon each of the following: (a) counsel for the Debtors, Kirkland & Ellis LLP, 600 Lexington Avenue, New York, New York 10022, Attn.: Paul M. Basta, Attn.: Ray C. Schrock, Attn.: James J. Mazza, Jr.; (b) counsel to the administrative agent for the Debtors' postpetition secured

---

Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

2

lenders, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York, 10017, Attn.: Donald S. Bernstein, Attn.: Marshall S. Huebner; (c) the Office of the United States Trustee for the Southern District of New York at 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Susan Golden, Attn.: Richard Morrissey; (d) counsel to the official committee of unsecured creditors, Milbank, Tweed, Hadley & McCloy LLP, Attn.: Dennis F. Dunne, Attn.: Abhilash M. Raval, Attn.: Matthew S. Barr; (e) counsel to Mrs. Greens (as defined in the Motion); (f) counsel to Village (as defined in the Motion); (g) all parties the Debtors know that hold liens or assert liens against the Pharmacy Assets (as defined in the Motion); and (h) any other parties as specified in the *Order Establishing Certain Notice, Case Management and Administrative Procedures* [Docket No. 75] (the "***Case Management Procedures***") so as to be actually received **no later than June 7, 2011 at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors without further notice. The parties are required to attend the Hearing and failure to attend in person or by counsel may result in relief being granted or denied upon default.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Rule 9014-2(f) of the Local Bankruptcy Rules for the Southern District of New York and Section 1 of the Case Management Procedures, the Bankruptcy Court's Hearing shall be an evidentiary hearing to the extent necessary or appropriate with respect to the relief requested by the Motion and/or if objections to the relief requested in the Motion are filed and not withdrawn or resolved.

3

New York, New York
Dated:  May 30, 2011

/s/ Ray C. Schrock
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

James J. Mazza Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to the Debtors and Debtors in Possession

K&E 19019004

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone      (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) ) | Case No. 10-24549 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING SALE OF LOT 1 AND LOT 2 SUPERFRESH**
**STORES TO MRS. GREENS MANAGEMENT CORPORATION**
**AND VILLAGE SUPER MARKET INC. FREE AND CLEAR OF**
**LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,**
**(II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED**
**LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

The Great Atlantic & Pacific Tea Company, Inc. ("***A&P***") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "***Debtors***")[2] file this motion (this "***Motion***")

---

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC

for entry of an order (the "**Sale Order**"), substantially in the form attached hereto as __Exhibit A__, pursuant to sections 105(a), 363, 365, 503, and 507 of 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), and this Court's General Order M-331, Adoption of Guidelines for the Conduct of Asset Sales, dated September 5, 2006 (the "**Sale Guidelines**"), (i) approving the sale (the "**Sale**") of the Lot 1 Stores (as defined herein) and Lot 2 Stores (as defined herein, and together with the Lot 1 Stores, the "**Acquired Assets**") to Mrs. Greens Management Corp. ("**Mrs. Greens**") and Village Super Market Inc. ("**Village**", together with Mrs. Greens, the "**Buyers**") who have jointly agreed to purchase the Acquired Assets pursuant to two separate asset purchase agreements (the "**Lot 1 APA**" and the "**Lot 2 APA**," and together the APAs) entered into between the SuperFresh Food Markets, Inc. and A&P (together, the "**Selling Debtors**") and the Buyers, substantially in the form attached hereto as __Exhibit B__ and __Exhibit C__,[3] respectively, free and clear of liens, claims, encumbrances, and other interests; (ii) the assumption and assignment of certain unexpired leases of nonresidential real property (the "**Leases**"), and (iii) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

---

(9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc. (1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

3     The Debtors are still discussing certain non-material terms of the APAs with Village and Mrs. Greens and will file the final executed APAs with the Court as soon as possible, along with a comparison showing any changes to the APAs filed with this Motion.  The Debtors have shared the APAs in their various drafts to key constituents throughout the negotiations with Mrs. Greens and Village.

## **Preliminary Statement[4]**

1.      After completing a robust marketing process, both prepetition and postpetition, and in consultation with their key constituents, the Debtors now seek this Court's approval of four motions to sell the assets of certain of their SuperFresh banner stores located in the Maryland/D.C. area (the "***Southern Stores***") to the highest and best bidder as declared upon the conclusion of a two-day auction for the Southern Store Assets.  Approval of the sale motions will generate more than $40 million in cash proceeds for the estates, free the Debtors from significant costs of operating underperforming stores that are not part of their going-forward business plan, and potentially offer continued employment for A&P employees at eleven store locations to be acquired by grocery store operators.[5]  The below chart provides a summary of the results of the marketing and auction process for the Southern Store Assets:

| Successful Bidder(s) | Stores Covered | Assets Purchased | Consideration |
|---|---|---|---|
| Mrs. Greens Management Corp. and Village Super Market, Inc., as a combined bid | To be acquired by Mrs. Greens:<br><br>Baltimore, Maryland (101)<br>Baltimore, Maryland (812)<br>Chestertown, Maryland (852)<br>Cambridge, Maryland (870)<br>Arnold, Maryland (891)<br>Parkville, Maryland (897)<br>Brunswick, Maryland (961)<br>Washington, D.C. (979)<br><br>To be acquired by Village:<br><br>Lutherville, Maryland (876)<br>White Oak, Maryland (985) | Leasehold interests, certain inventory, and prescription drug inventory and customer records (at the Lutherville, White Oak, and Cambridge locations) | $37,000,000 (plus consideration for inventory) |
| SUPERVALU, Inc. | Ellicott City, Maryland (855) | The leasehold interest, certain inventory, and prescription drug inventory and customer records | $400,000 (plus consideration for inventory) |

---

4    Capitalized terms used but not defined herein shall have the meanings set forth in the Bidding Procedures Order or the APAs, as applicable.

5    *See Notice of Auction Results for the Southern Store Assets* [Docket No. 1652].

| Successful Bidder(s) | Stores Covered | Assets Purchased | Consideration |
|---|---|---|---|
| Englar Center Limited Partnership | Westminster, Maryland (912) | The leasehold interest | $425,000 |
| Safeway | Towson, Maryland (829)<br>Mount Airy, Maryland (825)<br>Nottingham, Maryland (839) | Prescription drug inventory and customer records | $750,000 |
| Walgreens | Woodlawn, Maryland (521)<br>Salisbury, Maryland (872)<br>Glen Burnie, Maryland (881) | Prescription drug inventory and customer records | $1,200,000 |
| CVS | Odenton, Maryland (877) | Prescription drug inventory and customer records | $250,000 |
| No Bids Received[6] | Elkridge, Maryland (860)<br>Arbutus, Maryland (520)<br>Towson, Maryland (829)<br>Dover, Delaware (590)<br>Odenton, Maryland (877)<br>Milford, Delaware (561)<br>Frederick, Maryland (950)<br>Rosedale, Maryland (817) | N/A | N/A |

2.     Through this particular Motion, the Debtors seek approval of the sale of four of the Southern Stores (the "***Lot 1 Stores***") and six of the Southern Stores (the "***Lot 2 Stores***") pursuant to the Lot 1 and Lot 2 APA, respectively, to the Buyers free and clear of claims liens and encumbrances as set forth in the APAs and authorizing the assumption and assignment of certain leases as described in the APAs.

3.     The Lot 1 Stores are:

- store number 812 – Baltimore, Maryland (to be acquired by Mrs. Greens) ;

- store number 891 – Arnold, Maryland (to be acquired by Mrs. Greens);

- store number 897 – Parkville, Maryland (to be acquired by Mrs. Greens); and

- store number 985 – White Oak, Maryland (to be acquired by Village).

---

[6]     The Debtors have filed a separate motion on shortened notice for authority to conduct store closing sales at the Southern Stores not bid on in accordance with the store rationalization procedures approved by the Court on March 10, 2011. *See Debtors' Motion for Entry of an Order Authorizing the Debtors to Apply the Court-Approved Store Rationalization Procedures to Conduct Store Closing Sales at Certain SuperFresh Banner Stores* [Docket No. 1698].

4

The Lot 2 Stores are:

- store number 101 – Baltimore, Maryland (to be acquired by Mrs. Greens);

- store number 852 – Chestertown, Maryland (to be acquired by Mrs. Greens);

- store number 870 – Cambridge, Maryland (to be acquired by Mrs. Greens);

- store number 876 – Lutherville, Maryland (to be acquired by Village);

- store number 961 – Brunswick, Maryland (to be acquired by Mrs. Greens); and

- store number 979 – Washington, D.C. (to be acquired by Mrs. Greens).

## Jurisdiction

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, Local Bankruptcy Rules 6004-1 and 6006-1, and this Court's Sale Guidelines.

## Relief Requested

7.      By this Motion the Debtors seek entry of the Sale Order approving (a) the Lot 1 APA and the Lot 2 APA by and between the Selling Debtors and the Buyers for the Sale of the Lot 1 Stores and the Lot 2 Stores free and clear of all liens, claims, encumbrances, and other interests; (b) the assumption and assignment of the Leases; and (c) granting related relief.

## Background

8.      On December 12, 2010 (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  The chapter 11 cases are being jointly administered. On December 21, 2010, the U.S. Trustee appointed the Creditors' Committee.

## Bid and Auction Process

9.     In conjunction with the development of their business plan, the Debtors decided to exit the Southern Stores based on a rigorous analysis of the stores' profitability, prospects for rehabilitation, and position as non-core operations.  To exit the Southern Stores in an expeditious manner and generate maximum value for the estates from the Southern Store Assets, the Debtors established certain bidding procedures, which this Court approved on May 2, 2011.[7]   In accordance with the Bidding Procedures Order, the Debtors and their real estate advisor, Hilco, commenced an extensive marketing process for the Southern Store Assets, contacting a wide array of potentially interested parties, distributing a confidential information memorandum to 53 interested parties, and ultimately obtaining offers from 13 parties for various packages of the Southern Store Assets by the May 13, 2011 Bid Deadline.[8]   The APAs are the product of extensive negotiations between the Debtors and the Buyers, and were reached after additional consultation with the Creditors' Committee, the DIP Lenders' Agent, and the Union as set forth in the Bidding Procedures Order.

10.     On the May 13 Bid Deadline, the Debtors received various bid structures, including a number of bids from grocery store operators for certain of the Southern Store Assets. Having received such bids, the Debtors and their advisors devised a strategy to maximize value of the Southern Stores by packaging the stores that received the most interest from bidders into separate "lots," and auctioning off each lot separately.  After consultation with the Creditors'

---

[7]     *See Order Approving Bidding Procedures in Connection with the Proposed Sale of Certain SuperFresh Banner Store Assets* [Docket No. 1478] (the "**Bidding Procedures Order**").  The marketing process for the Southern Store Assets is further described in the *Debtors' Motion for Entry of an Order Approving Bidding Procedures in Connection with the Proposed Sale of Certain SuperFresh Banner Store Assets* [Docket No. 1334].  Also, attached hereto as **Exhibit D**, are the transcripts of the May 17 and May 18, 2011 auction proceedings.

[8]     Following an evaluation of the bids in consultation with the Creditors' Committee, the DIP Lenders' Agent, and the Union, the Debtors determined that each of the bids constituted a Qualified Bid.

Committee and the Union,[9] the Debtors approached certain bidders to negotiate lead bids to establish a floor for the most sought-after Southern Stores. These sought-after stores comprised the Lot 1 Stores and Lot 2 Stores.

## I. The Lot 1 Stores Auction

11. After extensive negotiations, the Debtors qualified Giant of Maryland, LLC ("*Giant*"), a subsidiary of Ahold N.A., Inc., as the lead bidder for the Lot 1 Stores pursuant to an asset purchase agreement (the "*Giant APA*") under which Giant would purchase the Lot 1 Stores (subject to the terms of the Giant APA) for $18.5 million, which also included assumption of obligations under the collective bargaining agreements that governed each Lot 1 Store. The Debtors then commenced the auction by subjecting Giant's $18.5 million lead bid to higher bids, with a minimum overbid of $150,000.

12. Following the announcement of Giant's lead bit, Mrs. Greens and Village offered a combined bid for the Lot 1 Stores subject to negotiation and documentation of an asset purchase agreement at $19.7 million based on an overbid of $800,000, well exceeding the minimum overbid increment of $150,000 announced at the auction. The Debtors then adjourned the auction to the next day (May 18) to negotiate an asset purchase agreement under which the Mrs. Greens and Village would become the new lead bid for the Lot 1 Stores. The next day after reaching a satisfactory asset purchase agreement under which Mrs. Greens and Village, together, submitted an irrevocable offer consistent with the Bidding Procedures Order, the Debtors continued the auction with Mrs. Greens and Village in the position as the lead bid for the Lot 1 Stores at $19.7 million. After several rounds of bidding, in which both Giant and Mrs. Greens and Village participated, the Debtors in consultation with the Creditors' Committee and the

---

[9] Representatives of the DIP Lenders' Agent chose not to be present at the auction, but were informed of the negotiations by the Debtors.

Union designated Mrs. Greens and Village as the Successful Bidder with the highest and best bid of $24.5 million for the Lot 1 Stores.[10] The Debtors also declared Giant as the Backup Bidder pursuant to the Giant APA with a bid of $24 million, without objection from Giant which had previously stated on the record that their bid was irrevocable pursuant to the Bidding Procedures Order.[11] May 18, 2011 Auction Tr. at 43:14-43-17; 60:21–60:25.

## II. The Lot 2 Stores

13. After declaring the Mrs. Greens and Village as the Successful Bidder for the Lot 1 Stores, the Debtors proceeded to negotiate, in consultation with the Creditors' Committee and the Union,[12] a new asset purchase agreement with a lead bidder for the Lot 2 Stores. After extensive negotiations with certain bidders, the Mrs. Greens and Village, together again, approached the Debtors, as the Debtors were about to continue the auction, with an offer to acquire the Lot 2 Stores for a total purchase price of $12.5 million based generally on the same terms and conditions as the Lot 1 APA. After consultation with the Creditors' Committee and the Union, the Debtors determined to designate this bid as the lead bid for the Lot 2 Stores and continue the Auction. Upon reconvening the Auction, the Debtors solicited bids on the Lot 2 Stores. After first receiving no bids for the entire package of Lot 2 Stores, the Debtors solicited bids on an individual store-by-store basis. SUPERVALU, Inc. ("**_SUPERVALU_**") submitted an

---

[10] At the auction, Giant objected to Mrs. Greens and Village's initial combined overbid, on the basis that they had not submitted a combined Qualified Bid at the Bid Deadline to participate in the auction. *See* May 18, 2011 Auction Tr. at 49:2–49-25. The Debtors took note of Giant's objection on the record, but proceeded with the auction based on the fact that both Mrs. Greens and Village had each themselves submitted their own Qualified Bid to participate in the auction. Moreover, both entities were signatories to the Lot 1 APA and the Bidding Procedures Order allowed for the submission of additional bids and for the Debtors to qualify such bids during the auction. *Id.* at 59:20–60:11.

[11] The Giant APA and proposed sale order, which is an exhibit to the Giant APA, will be filed with the Court under seal pursuant to separate motion. The Debtors have made each of these documents available to the Creditors' Committee. The Debtors are not seeking approval of the Giant APA or entry of the proposed sale order, but in the event the Buyers fail to consummate the Sale of the Lot 1 Stores, the Debtors will seek to unseal the Giant APA and request entry of the Giant sale order on three days' notice to the Court.

[12] As noted earlier, representatives of the DIP Lenders' Agent were not present at the Auction.

irrevocable offer on store number 876 (Lutherville, Maryland) and store number 870 (Cambridge, Maryland) for $1.6 million and $3 million, respectively, based on an earlier asset purchase agreement submitted by SUPERVALU (the "**SUPERVALU APA**"). The Fresh Market, Inc. ("**Fresh Market**") submitted a bid on store number 979 (Washington, D.C.) for $2 million based on an earlier asset purchase agreement submitted by Fresh Market (the "**Fresh Market APA**"). Given that these individual bids in the aggregate did not surpass the $12.5 million combined lead bid from Mrs. Greens and Village, the Debtors declared the Mrs. Greens and Village the Successful Bidder for the Lot 2 Stores. Pursuant to the Bidding Procedures Order, the Debtors also declared SUPERVALU the Backup Bidder for Lutherville and Cambridge. May 18, 2011 Auction Tr. at 78:18–78:25.[13] The Debtors also declared Fresh Market as the Backup Bidder for Washington, D.C. *Id.* at 78:15–78:17. Fresh Market objected to being declared the Backup Bidder, but given that Fresh Market had submitted an irrevocable Qualified Bid for $2 million on the record, the Debtors proceeded to declare Fresh Market as the Backup Bidder pursuant to the Bidding Procedures Order.[14]

### The Lot 1 APA and Lot 2 APAs

14. After the auction, the Debtors with Mrs. Greens and Village negotiated the final terms of the APAs. In general, and as qualified by the APAs, the Buyers will purchase the leasehold interests, furnishing and equipment, pharmaceutical scripts, inventory, and certain

---

[13] SUPERVALU affirmed this on the record. *Id.* at 79:1.

[14] The SUPERVALU APA and Fresh Market APA and their proposed sale orders, which are exhibits to the SUPERVALU APA and Fresh Market APA, will be filed with the Court under seal pursuant to separate motion. The Debtors have made each of these documents available to the Creditors' Committee. The Debtors are not seeking approval of the Giant APA or Fresh Market APA or entry of their respective proposed sale orders, but in the event the Buyers fail to consummate the Sale of the Lot 2 Stores, the Debtors will seek to unseal the SUPERVALU APA and Fresh Market APA and request entry of the respective sale order on three days' notice to the Court.

9

prepaid expenses for the Lot 1 and Lot 2 Stores for a total of $37 million.[15]  Thus, the Debtors

also seek authority in this Motion to assume and assign the relevant store leases to the Buyers

consistent with section 365 of the Bankruptcy Code.  Additionally, the Buyers have separately

agreed with the Union to recognize the Union as the exclusive representative for the collective

bargaining units it currently represents in the Lot 1 Stores and Lot 2 Stores for the purposes of

collective bargaining.  Pursuant to this agreement, the Union will waive any claims under each of

the current collective bargaining agreement(s) (each a "*CBA*") with the Debtors, including any

sucessorship claims, if the Buyers and the Union agree on a new CBA.  In the event a CBA is

agreed to prior to the objection deadline to this Motion, as such objection deadline may be

extended by the Debtors, the Buyers will receive a $200,000 purchase price reduction at

closing.[16]

## I.     The Lot 1 APA

15.     The principal terms of the Lot 1 APA are summarized in the following chart:[17]

| APA Provision | Summary Description |
|---|---|
| APA Parties | Sellers:  A&P and Super Fresh Food Markets, Inc.<br><br>Buyers:  Mrs. Greens Management Corp. and Village Super Market, Inc. |
| Purchase Price | $24.5 million.  Lot 1 APA § 2.3 (not including Inventory Purchase Price and Union |

[15]  Specifically, the purchase price for the Lot 1 Stores and the Lot 2 Stores are $24.5 million and $12.5 million respectively (before non-pharmaceutical inventory purchases).  To the extent certain inventory is excluded pursuant to the APAs, the Debtors will liquidate the inventory in the ordinary course and consistent with the store rationalization procedures already approved by this Court [Docket No. 1004].

[16]  If the Buyers do not reach a CBA with the Union and the Union does not waive its alleged claims, the Debtors would seek to have this Motion construed as an application for relief under section 1113 of the Bankruptcy Code, to the extent this provision applies to the Sale of these assets around which the Debtors are not reorganizing.  Given the July 10, 2011 deadline to assume unexpired leases of nonresidential real property, section 1113 relief would be needed, if applicable (although the Debtors do not believe that it is here) before that date to ensure that the Debtors can assume the relevant leases and assign them to the Buyers as contemplated in the transactions.

[17]  To the extent of any inconsistency between the summary set forth herein and the Lot 1 APA, the terms and conditions of the Lot 1 APA shall govern.

| APA Provision | Summary Description |
|---|---|
| | Agreement Discount Amount). |
| Deposit | 10% equal to $2.45 million. Lot 1 APA §2.3. |
| Bid Protections | None |
| Acquired Assets | The Acquired Assets include: (i) the General Inventory (other than Excluded Inventory); (ii) the Pharmaceutical Inventory (other than Excluded Inventory); (iii) the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment); (iv) the Prescription Lists (to the extent that the transfer thereof to Buyers are permitted under applicable Law); (v) the Leases; (vi) all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases; (vii) certain permits related to the store operations; (viii) all point of sale register equipment owned by Sellers and located at the Group 1 Stores; and (ix) to the extent transferable, all warranties related to any of the foregoing. Lot 1 APA § 2.1. |
| Assumed Liabilities | The Assumed Liabilities include: (i) all Liabilities under the Leases (excluding any Cure Costs); (ii) all amounts allocated to Buyers under Section 2.8 and all Property Taxes allocated to Buyers pursuant to Section 6.4; and (iii) for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Acquired Asset from and after the Closing Date. Lot 1 APA §2.2. |
| Employment Provisions | Except as set forth in section 3.7 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Employees. Lot 1 APA § 3.7.

Prior to the Closing Date, the Buyers shall have the right but not the obligation to contact or interview any Employees and may, in the Buyers' sole discretion, offer employment to such Employees, such offer of employment to be effective on the day immediately following the Closing Date and conditional on Closing. Prior to Closing, Sellers shall terminate or transfer to other stores or facilities of Sellers all Employees of the Stores. Sellers shall indemnify, defend and hold harmless Buyers, their Affiliates and their respective Representatives from all Liabilities arising under the WARN Act with respect to Employees of the Stores arising in whole or in part from the actions or omissions of either Seller at any time. Lot 1 APA § 6.3.

Notwithstanding the terms and conditions of the Lot 1 APA, Buyers with the Union agreed to a "Memorandum of Understanding" with respect to recognizing the Union as the exclusive bargaining representative for the employees in the Lot 1 Stores. |
| Closing Conditions | Buyers and Seller: (i) representations and warranties shall be true and correct on the date of execution and as of the Closing; (ii) Sellers shall have performed and complied with its covenants and agreements through Closing; (iii) the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; (iv) all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated; (v) no material Decree shall be in effect that (a) prohibits consummation of any of the transactions contemplated by this Agreement, or (b) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof. Lot 1 APA §§ 7.1, 7.2. |

K&E 19019004

| APA Provision | Summary Description |
|---|---|
| | **Buyers:** each payment, if any, contemplated by Section 2.5(a) to be made to Buyers, and each delivery contemplated by Section 2.5(b) to be delivered to Buyers shall have been delivered, and all Cure Costs that are, individually, greater than $75,000, shall have been paid by Sellers. Lot 1 APA § 7.1.<br><br>**Seller:** each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(b) to be delivered to Sellers shall have been delivered. Lot 1 APA § 7.2. |
| Representations, Warranties and Covenants | Representations, warranties and covenants made or agreed to by the parties include, without limitation, representations, warranties and covenants relating to organization/good standing, authority to enter into the Sale, noncontravention, transfer of title free and clear of all Liens other than Permitted Liens, transfer of Leases, no litigation pending, labor relations, brokers' fees, and sufficient funds. Lot 1 APA Arts. III and IV. |
| Pre-Closing Covenants | If any such inaccuracy, or any other matter that causes any of the conditions to Closing in Section 7.1 to not be capable of being satisfied, arises solely as a result of the inclusion of one or more assets related solely to either (i) the Group 1 Stores or (ii) the Group 2 Store, then Sellers may elect, in their sole discretion, to add the Leases and all other assets related to either the Group 1 Stores or the Group 2 Store, as applicable to Schedule 1.1(c) and thereby cause such assets to become Excluded Assets and not to assign such assets to Buyers, in which case, the Purchase Price shall be reduced by an amount equal to (i) the Group 1 Stores Exclusion Amount, in the event that the Group 1 Stores are so excluded or (ii) the Group 2 Store Exclusion amount, in the event that the Group 2 Store is so excluded. Lot 1 APA § 5.8. |
| Excluded Assets | Excluded Assets includes:<br><br>(i) any asset of Sellers that is (a) not located in the Stores and used or held for use primarily in the operation of the Stores or (b) inseparable from any other business of Seller or any of its Affiliates (other than the operation of the Stores);<br>(ii) capital stock of any of A&P's Subsidiaries;<br>(iii) all Cash Equivalents and accounts receivable;<br>(iv) all rights and assets under or related to any Employee Benefit Plan;<br>(v) certain Permits;<br>(vi) all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;<br>(vii) all of Sellers' rights under this Agreement or any Related Agreement;<br>(viii) all of Sellers' rights under any Contracts;<br>(ix) any and all automobiles, trucks, tractors, and trailers;<br>(x) any other rebate or refund arising from the operation of the Stores prior to the Closing;<br>(xi) all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "SuperFresh" and all other marks set forth on Schedule 1.1(d);<br>(xii) all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices;<br>(xiii) the Furnishings and Equipment described on Schedule 1.1(e) (the |

K&E 19019004

| APA Provision | Summary Description |
|---|---|
| | "Excluded Furnishings and Equipment"); |
| | (xiv)     all Contracts; |
| | (xv)     assets relating to, arising under or in connection with any Employee Benefit Plans; |
| | (xvi)     all Excluded Inventory; |
| | (xvii)     all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores |
| | (xviii)     all other assets bearing any Seller Mark; and |
| | (xiv)     those items set forth on Schedule 1.1(f). |
| | Lot 1 APA § 1.1. |
| Excluded Liabilities | Excluded Liabilities means all Liabilities of Sellers that are not expressly included in the Assumed Liabilities including: (i) any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability primarily relating to or primarily arising out of the Excluded Assets; (ii) any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.4); (iii) all Liabilities relating to employees of Seller, whether arising prior to or after Closing, including, without limitation, Liabilities in connection with withheld payroll Taxes, payroll, workman's compensation benefits, and employee withholding and Liabilities arising under the WARN Act; (iv) all Liabilities of Seller under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby; (v) all Liabilities of Sellers or any ERISA Affiliate with respect to any Employee Benefit Plan, pension plan or under any benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and/or other group welfare benefits; (vi) all Liabilities under any Labor Agreements; and (vii) all Cure Costs. Lot 1 APA § 1.1. |
| Termination Provisions | Parties may terminate on the following conditions: (i) mutual written consent; (ii) written notice by Seller if (a) any court or competent Governmental Authority prohibits consummation of the Sale, (b) Closing occurs 90 calendar days after execution of the Lot 1 APA; (iii) written notice by Buyers if Seller breaches any warranty or covenant or condition to Closing; (iv) written notice by either Seller if Buyers breach a representation, warranty, covenant, or agreement in the Lot 1 APA that prevents closing of the Sale; (v) by Buyers if any Seller files a plan with the Court contemplating the sale of any portion of the Acquired Assets that is inconsistent with the terms of this Agreement. Lot 1 APA § 8.1.<br><br>If this Agreement is terminated pursuant to (i) Section 8.1(b) due to the failure of Buyers to have fulfilled any of their obligations under this Agreement or any breach by Buyers of this Agreement (including a breach of a representation, warranty, covenant, or agreement), or (ii) Section 8.1(d), in each case, so long as Sellers are then in compliance with their obligations under this Agreement, then Sellers shall be entitled to keep the Deposit as the sole and exclusive remedy as liquidated damages, and Sellers shall not be entitled to any other damages, losses or payment from the Buyers, and the Buyers shall have no further obligation or liability under this Agreement. Lot 1 APA § 8.3(a) |

K&E 19019004

## II.    The Lot 2 APA

16.    The principal terms of the Lot 2 APA are summarized in the following chart:[18]

| APA Provision | Summary Description |
|---|---|
| APA Parties | Sellers:  A&P and Super Fresh Food Markets, Inc.<br><br>Buyers:  Mrs. Greens Management Corp. and Village Super Market, Inc. |
| Purchase Price | $12.5 million.  Lot 2 APA § 2.3 (not including Inventory Purchase Price and Union Agreement Discount Amount). |
| Deposit | 10% equal to $1.25 million. Lot 2 APA §2.3. |
| Bid Protections | None |
| Acquired Assets | The Acquired Assets include:  (i) the General Inventory (other than Excluded Inventory); (ii) the Pharmaceutical Inventory (other than Excluded Inventory); (iii) the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment); (iv) the Prescription Lists (to the extent that the transfer thereof to Buyers are permitted under applicable Law); (v) the Leases; (vi) all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases; (vii) certain permits related to the store operations; (viii) all point of sale register equipment owned by Sellers and located at the Group 1 Stores; and (ix) to the extent transferable, all warranties related to any of the foregoing; provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.  Lot 2 APA § 2.1. |
| Assumed Liabilities | The Assumed Liabilities include:  (i) all Liabilities under the Leases (excluding any Cure Costs); (ii) all amounts allocated to Buyers under Section 2.8 and all Property Taxes allocated to Buyers pursuant to Section 6.4; and (iii) for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Acquired Asset from and after the Closing Date.  Lot 2 APA §2.2. |
| Employment Provisions | Except as set forth in section 3.7 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Employees.  Lot 2 APA § 3.7.<br><br>Prior to the Closing Date, the Buyers shall have the right but not the obligation to contact or interview any Employees and may, in the Buyers' sole discretion, offer employment to such Employees, such offer of employment to be effective on the day immediately following the Closing Date and conditional on Closing.  Prior to Closing, Sellers shall terminate or transfer to other stores or facilities of Sellers all Employees of the Stores.  Sellers shall indemnify, defend and hold harmless Buyers, their Affiliates and their respective Representatives from all Liabilities arising under the WARN Act with respect to Employees of the Stores arising in whole or in part from the actions or omissions of either Seller at any time.  Lot 2 APA § 6.3. |

---

[18]   To the extent of any inconsistency between the summary set forth herein and the Lot 2 APA, the terms and conditions of the Lot 2 APA shall govern.

| APA Provision | Summary Description |
|---|---|
| | Notwithstanding the terms and conditions of the Lot 2 APA, Buyers with the Union agreed to a "Memorandum of Understanding" with respect to recognizing the Union as the exclusive bargaining representative for the employees in the Lot 2 Stores. |
| Closing Conditions | **Buyers and Seller:** (i) representations and warranties shall be true and correct on the date of execution and as of the Closing; (ii) Sellers shall have performed and complied with its covenants and agreements through Closing; (iii) the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; (iv) all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated; (v) no material Decree shall be in effect that (a) prohibits consummation of any of the transactions contemplated by this Agreement, or (b) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof. Lot 2 APA §§ 7.1, 7.2<br><br>**Buyers:** each payment, if any, contemplated by Section 2.5(a) to be made to Buyers, and each delivery contemplated by Section 2.5(b) to be delivered to Buyers shall have been delivered, and all Cure Costs that are, individually, greater than $75,000, shall have been paid by Sellers. Lot 2 APA § 7.1.<br><br>**Seller:** each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(b) to be delivered to Sellers shall have been delivered. Lot 2 APA § 7.2. |
| Representations, Warranties and Covenants | Representations, warranties and covenants made or agreed to by the parties include, without limitation, representations, warranties and covenants relating to organization/good standing, authority to enter into the Sale, noncontravention, transfer of title free and clear of all Liens other than Permitted Liens, transfer of Leases, no litigation pending, labor relations, brokers' fees, and sufficient funds. Lot 2 APA Arts. III and IV. |
| Pre-Closing Covenants | If any such inaccuracy, or any other matter that causes any of the conditions to Closing in Section 7.1 to not be capable of being satisfied, arises solely as a result of the inclusion of one or more assets related solely to either (i) the Group 1 Stores or (ii) the Group 2 Store, then Sellers may elect, in their sole discretion, to add the Leases and all other assets related to either the Group 1 Stores or the Group 2 Store, as applicable to Schedule 1.1(c) and thereby cause such assets to become Excluded Assets and not to assign such assets to Buyers, in which case, the Purchase Price shall be reduced by an amount equal to (i) the Group 1 Stores Exclusion Amount, in the event that the Group 1 Stores are so excluded or (ii) the Group 2 Store Exclusion amount, in the event that the Group 2 Store is so excluded. Lot 2 APA § 5.8. |
| Excluded Assets | Excluded Assets includes:<br><br>(i)     any asset of Sellers that is (a) not located in the Stores and used or held for use primarily in the operation of the Stores or (b) inseparable from any other business of Seller or any of its Affiliates (other than the operation of the Stores);<br>(ii)    capital stock of any of A&P's Subsidiaries;<br>(iii)   all Cash Equivalents and accounts receivable;<br>(iv)   all rights and assets under or related to any Employee Benefit Plan;<br>(v)    certain Permits;<br>(vi)   all insurance policies and binders and all claims, refunds and credits from |

15

| APA Provision | Summary Description |
|---|---|
| | insurance policies or binders due or to become due with respect to such policies or binders; |
| | (vii)    all of Sellers' rights under this Agreement or any Related Agreement; |
| | (viii)    all of Sellers' rights under any Contracts; |
| | (ix)    any and all automobiles, trucks, tractors, and trailers; |
| | (x)    any other rebate or refund arising from the operation of the Stores prior to the Closing; |
| | (xi)    all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "SuperFresh" and all other marks set forth on Schedule 1.1(d); |
| | (xii)    all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices; |
| | (xiii)    the Furnishings and Equipment described on Schedule 1.1(e) (the "Excluded Furnishings and Equipment"); |
| | (xiv)    all Contracts; |
| | (xv)    assets relating to, arising under or in connection with any Employee Benefit Plans; |
| | (xvi)    all Excluded Inventory; |
| | (xvii)    all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores |
| | (xvii)    all other assets bearing any Seller Mark; and |
| | (xiv)    those items set forth on Schedule 1.1(f). |
| | Lot 2 APA § 1.1. |
| Excluded Liabilities | Excluded Liabilities means all Liabilities of Sellers that are not expressly included in the Assumed Liabilities including:  (i) any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability primarily relating to or primarily arising out of the Excluded Assets; (ii) any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.4); (iii) all Liabilities relating to employees of Seller, whether arising prior to or after Closing, including, without limitation, Liabilities in connection with withheld payroll Taxes, payroll, workman's compensation benefits, and employee withholding and Liabilities arising under the WARN Act; (iv)  all Liabilities of Seller under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby; (v) all Liabilities of Sellers or any ERISA Affiliate with respect to any Employee Benefit Plan, pension plan or under any benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and/or other group welfare benefits; (vi) all Liabilities under any Labor Agreements; and (vii) all Cure Costs. Lot 2 APA § 1.1. |
| Termination Provisions | Parties may terminate on the following conditions:  (i) mutual written consent; (ii) written notice by Seller if (a) any court or competent Governmental Authority prohibits consummation of the Sale, (b) Closing occurs 90 calendar days after execution of the Lot 2 APA; (iii) written notice by Buyers if Seller breaches any warranty or covenant or condition to Closing; (iv) written notice by either Seller if Buyers breach a representation, warranty, covenant, or agreement in the Lot 2 APA that prevents closing of the Sale; (v) by Buyers if any Seller files a plan with the Court contemplating the sale of any portion of the Acquired Assets that is |

16

| APA Provision | Summary Description |
|---|---|
| | inconsistent with the terms this Agreement. Lot 2 APA §8.1. |
| | If this Agreement is terminated pursuant to (i) Section 8.1(b) due to the failure of Buyers to have fulfilled any of its obligations under this Agreement or any breach by Buyers of this Agreement, then Sellers shall be entitled to keep the Deposit, Buyers shall pay Seller a Termination Fee equal to 10% of the purchase price, and their rights to the Deposit and Termination Fee shall be in addition to, and not in lieu of, any other rights of Sellers at law or in equity arising under this Agreement or otherwise in connection with such termination. Lot 2 APA §8.3(a). |

### **The Backup Bids**

17.     As stated above the Debtors designated Backup Bidders for the entirety of the Lot 1 Stores and three of the six Lot 2 Stores, pursuant to the Court-approved Bidding Procedures. The Debtors declared the Backup Bidders on the record at the auction without objection by the Backup Bidders except for Fresh Market.[19]   Under the Bidding Procedures Order, all bids, including Backup Bids, are irrevocable "until the earlier to occur of (a) 25 days after entry of a Sale Order approving the sale of the [Acquired] Assets and (b) closing of the sale of [Acquired] Assets in accordance with the Successful Bid.  *See Bidding Procedures* ¶ 5.  If the Buyers fail to consummate the Sale, breach the APAs or otherwise fail to perform, the Backup Bidder(s) shall become the Successful Bidder(s) pursuant to the Bidding Procedures Order for the Lot 1 Stores and the individual stores identified in the Lot 2 Stores with Backup Bids.  *Id.* ¶ 10.  Under a scenario where a Backup Bid becomes the Successful Bid, the Debtors will submit a sale order for approval upon three days' notice to parties in interest and will unseal the asset purchase agreement for each Backup Bid and file such document on the docket.

---

[19]   Given that Fresh Market submitted an irrevocable offer to acquire the D.C. store on the record at the auction, the Debtors believe that Fresh Market's Bid was properly designated as a Backup Bid and its objection is not well-founded.

K&E 19019004

## Assumption and Assignment of Unexpired Leases

18.     In connection with the Sale and the ongoing operations of the Acquired Assets, the Debtors have agreed to assume and assign (a) the leases for the two Baltimore Stores; Parkville; Arnold; Chestertown; Cambridge; Brunswick; and Washington D.C. to Mrs. Greens (together, the "***Mrs. Greens Leases***") and (b) the leases for White Oak and Lutherville to Village (together, the "***Village Leases***").  The Leases are an integral component of the APAs and key to selling the Acquired Assets.  A schedule of the Leases to be assigned to the Buyers upon approval of the Sale by and their respective cure amounts is attached hereto as **Exhibit E**.[20]

19.     The Debtors believe that it is necessary to establish a process by which (a) the Debtors and the lessors (the "***Lessors***") to the Leases can establish the cure amounts (the "***Cure Amounts***"), if any, necessary to be paid in accordance with section 365 of the Bankruptcy Code for the assumption of the Leases, and (b) the Lessors can assert any objection they may have to such assumption and assignment of the Leases and/or the Cure Amounts associated therewith. Attached as **Exhibit F** hereto is a form notice (the "***Lease Notice***") which will (a) identify the Leases and Cure Amounts and (b) describe procedures for objecting to the assumption and assignment of the Leases and/or objecting to the proposed Cure Amount(s), as set forth below. The Debtors will serve this Sale Motion and a notice substantially in form of **Exhibit F** on the Lessors.

---

[20]    The Debtors already received one objection to the assumption and assignment of the Washington, D.C. store by the landlord [Docket No. 1702].

20.    To facilitate a resolution of any disputes relating to the Cure Amounts or to the assignment of the Leases in general, the Debtors will utilize the following procedures (the "*Assumption and Assignment Procedures*"):

| | |
|---|---|
| **Notice of Lease Objection Deadline** | On the date hereof, the Debtors shall serve the Lease Notice by overnight mail on each Lessor to each Lease, notifying such Lessor of the Debtors' intent to assume and assign the applicable Lease and of the Cure Amount determined by the Debtors to be necessary for such assumption and assignment. |
| **Lease Objections** | If a Lessor wishes to object to the Debtors' assumption and assignment of the Lease, or assert a Cure Amount based on defaults, conditions, or pecuniary losses under the Lease different than the proposed Cure Amount set forth in the Lease Notice, the Lessor shall be required to file and serve a written objection (a "***Lease Objection***") setting forth with specificity (i) the Cure Amount that the Lessor asserts must be cured or satisfied for the Lease, and/or (ii) if the objection to the potential assumption and assignment of the Lease is based on adequate assurance issues, what information with respect to the Buyers the Lessor requires to satisfy its adequate assurance concerns, and/or (iii) any and all other grounds for an objection to the potential assumption and assignment of the Lease. |
| **Lease Objection Deadline** | To be considered timely, a Lease Objection must be filed with the Court no later than 4:00 p.m. (prevailing Eastern time) on June 7, 2011 (the "***Lease Objection Deadline***"). |
| **Failure to Timely File Lease Objection** | Unless a Lease Objection is timely filed by the Objection Deadline, the Court shall enter an order authorizing or effecting the assumption and assignment of the applicable Lease at the Sale Hearing, or otherwise without regard to any objection such party may have or any provisions to the contrary in the applicable Lease. |
| **Waiver of Lease Objection** | If a Lessor or any other party in interest fails to file a Lease Objection as provided above, such party shall be deemed to have waived and released any and all cure obligations and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyers, or any other assignee of the Lease that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under the Lease for the period prior to the consummation of the respective APA.  The Sale Order shall provide that the Buyers' promise to perform under the Lease is deemed adequate assurance of future performance under the Lease. |

19

| Unresolved Lease Objections | As provided for the in the APAs, the Selling Debtors shall pay the proposed Cure Amount to the Lessor upon the Closing of the Sale. |
| | If a Lessor objects to the proposed Cure Amount, then any disputed Cure Amount must be paid by the earlier of (i) when the Debtors and the Lessor can agree to an amount or (ii) the date of the entry of an order by the Court determining an amount. The proposed assumption and assignment of the Lease shall be effective notwithstanding a dispute relating solely to the Cure Amount. |

21.     The Debtors believe that these procedures are fair and reasonable, and will provide sufficient notice to the Lessors of the parties' intent with respect to the Leases. Moreover, the Debtors believe that these procedures will provide necessary certainty to the Debtors and the Lessors regarding their obligations and rights in connection with the Cure Amounts.

<u>**Basis for Relief**</u>

**I.      The Court Should Approve the APAs Pursuant to Section 363 of the Bankruptcy Code.**

22.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1). While section 363 does not establish a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan, courts in the Second Circuit and elsewhere have required that the decision to sell assets outside the ordinary course of business be based upon a debtor's sound business judgment. *See In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[B]ankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action."); *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

23.     Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See*, *e.g.*, *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

24.     Moreover, if a valid business justification exists for the sale of property of the estate, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).  Parties objecting to the debtor's decision to sell property of the estate must make a showing of "bad faith, self-interest or gross negligence."  *Integrated Res.*, 147 B.R. at 656; *see also Johns-Manville Corp.*, 60 B.R. 612 at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

21

generally not entertain objections to the debtor's conduct.").  Accordingly, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

## II.    The Debtors Have Sound Business Reasons for Entering into the APAs and the Purchase Price Is Fair and Reasonable.

25.    The Debtors believe that the Sale represents the best means for them to maximize the value of their estates for the benefit of their stakeholders.  As discussed above, the Acquired Assets are non-core assets that are not part of the Debtors' going-forward business plan.  The mid-Atlantic market is an area that the Debtors have chosen to exit and while a few of the SuperFresh stores generate value, they are outside the geographic scope of the Debtors' core operations and do not comport with the Debtors' overall restructuring initiatives.  Thus, the Debtors and their advisors have concluded that the Sale represents the best option to maximize value for the Debtors' stakeholders by infusing the Debtors' estates with $37 million in cash for the sale of the Lot 1 Stores and Lot 2 Stores alone (not including excluded inventory, which will be liquidated separately and will generate additional value for the estates).

26.    The Debtors believe that the value of the consideration offered by the Buyers for the Acquired Assets is fair and reasonable given the robust marketing and active auction process.  Further, the Debtors submit that their determination to enter into the APAs and proceed to a sale of the Acquired Assets constitutes a valid and sound exercise of their business judgment.  Accordingly, the Debtor request that this Court approve the APAs and, at the conclusion of the Sale Hearing, authorize them to sell the Acquired Assets to the Buyers as a proper exercise of their business judgment.

K&E 19019004

**III.    Buyers Are Each Good Faith Purchasers and Are Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.**

27.    The Bankruptcy Court should grant the Buyers the protections afforded to a good

faith purchaser under section 363(m) of the Bankruptcy Code.   Section 363(m) provides, in

relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).   Section 363(m) thus protects a purchaser of assets sold pursuant to

section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased

assets if the order allowing the sale is reversed on appeal.   Although the Bankruptcy Code does

not define "good faith purchaser," the Second Circuit has indicated that, to demonstrate a lack of

good faith, a party must show fraud or collusion between a proposed buyer and the debtor in

possession or other bidders.   *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs.* (*In re

Colony Hill Assocs.*), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would

destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the

[buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders"); *see also In re Angelika Films*, 57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); *In

re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

28.    Here, the APAs are a product of good faith, arm's-length negotiations between the

Debtors and the Buyers.   There is no evidence of fraud or collusion in those negotiations as

stated on the record by each of the Qualified Bidders.   May 17, 2011 Auction Tr. at 12:25–15:16.

Both Mrs. Greens and Village are signatories to the APAs, and their participation as a combined

bidder inured to the benefit of the Debtors' estates by creating an active and competitive bidding

23

process for the Lot 1 Stores and Lot 2 Stores.  In addition, neither Buyer is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  As described above, the consideration to be received by the Debtors pursuant to the APAs is substantial, fair, and reasonable.  Thus, the Buyers are entitled to the full protections of section 363(m) of the Bankruptcy Code as the transaction contemplated by the APAs was not in any way tainted by fraud or bad faith.  Accordingly, the Debtors request that the Court make a finding that the APAs with the Buyers were negotiated at arm's-length and that each Buyer is entitled to the full protections of section 363(m) of the Bankruptcy Code.

**IV.** **The Sale of the Acquired Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code.**

29.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sales price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr. S.D.N.Y 1992) (same).

30.     With respect to any party asserting a lien, claim, or encumbrance against the Acquired Assets, the Debtors believe that they satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  First, all liens on the Acquired Assets will attach to the proceeds of the Sale, with the same validity, force, and effect.  Second, the Debtors are also in

24

discussions with the DIP Lenders' Agent, who hold a lien on substantially all the Debtors' assets, regarding various Sothern Store Assets and the Debtors expect the DIP Lenders' Agent will consent to the Sale given the channeling of liens to the proceeds, with the same validity, force, and effect, as provided in the proposed Sale Order  Further, the DIP Lenders and all other identified lien holders will have received notice of this Motion, and will be given sufficient opportunity to object to the relief requested.  Any such entity that does not object to the sale should be deemed to have consented.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted)); *Hargrave v. Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *see also In re Enron Corp.*, No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).  Moreover, the Debtors believe that any claim or interest against the assets here, which are not being used in furtherance of the Debtors' reorganization except for the generation of proceeds, would be either in bona fide dispute or could be compelled to accept a money satisfaction of such interest.  *See* 11 U.S.C. § 363(f)(4)(5).

31.     In this instance, the Debtors' efforts to market the Southern Stores along with the competitive and successful auction, ensured that the purchase price paid for the Lot 1 Stores and Lot 2 Stores was the best available.  Therefore, the Sale should be approved free and clear of any and all liens, claims, and encumbrances regardless of their face amount.

## V.     The Acquired Assets Should Be Sold to Buyers Free of Any Successor Liability

32.     Additionally, the APAs require that the proposed Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability.  *See* APAs § 7.1.  The Debtors' are transferring the Acquired Assets to the Buyers and do not intend to operate any of the Lot 1 Stores or Lot 2 Stores in any capacity and upon closing, the Debtors will completely exit these store locations.  Thus the Sale does not contemplate any continuation of the business, de facto merger, or any other transaction that could give rise to successor liability.  In light of the extensive marketing and open nature of this Sale transaction, and the form and manner of notice provided, including that it contains an express disclosure regarding successor liability findings in the Sale Order, the Debtors believe affected parties will have sufficient notice of the Sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the Sale's benefits.[21]

## VI.    The Assumption and Assignment of the Leases Is Appropriate Under Section 365 of the Bankruptcy Code

33.     Pursuant to section 2.2 of the APAs, the Debtors have agreed to assume and assign to the Buyers the Leases listed on **Exhibit E**, with the Debtors covering any cure costs. The Leases are those leases that the Buyers identified as necessary to the continuing operation of the Acquired Assets after the Sale.  Under section 365(a) of the Bankruptcy Code, a debtor,

---

[21]   The Sale Guidelines require the disclosure of certain "extraordinary provisions," including the disclosure of any limitations on a purchaser's successor liability.

"subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default…;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

34. Courts apply a "business judgment" standard to a debtor's determination regarding the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code. *See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume, the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

35. Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract or unexpired lease. *See In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469

27

(Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

36.     In the present case, the Debtors' assumption and assignment of the Leases meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the APAs will provide significant benefits to the Debtors, their estates, and stakeholders. Further, the assignment of the Leases to the Buyers represents an essential part of the Sale transaction. Because the Debtors cannot obtain the benefits of the APAs without assuming and assigning the Leases, the decision to seek approval for the assumption and assignment of the Leases constitutes a sound exercise of the Debtors' business judgment.

**(i)     Adequate Assurance of Future Performance**

37.     A debtor may assign an executory contract or an unexpired lease if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993). Thus, adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective

assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

38.     Here, pursuant to section 2.2 of the APAs, the Selling Debtors have agreed to pay the Cure Amounts in connection with the Leases.  The Debtors estimate that the total Cure Amounts associated with all of the Leases will total less than $643,000.  In addition, the Buyers, as assignees, have sufficient assets to continue performance thereunder, and will demonstrate to the satisfaction of the Court at the Sale Hearing that adequate assurance of future performance is present by the promise to perform the obligations of the Leases from and after the Closing Date. The Sale Hearing will, therefore, provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Buyers to provide adequate assurance of future performance under the Leases.  Accordingly, the Debtors submit that the assumption and assignment of the Leases as set forth herein should be approved.

39.     Village has the financial wherewithal and sufficient cash on hand to continue performance under the Village Leases, as evidenced by Village's publicly filed financial statements.  For the fiscal year ending July 31, 2010, Village had approximately $69 million in cash and cash equivalents with total assets equaling approximately $357 million.  Mrs. Greens also has the financial wherewithal to continue performance under the Mrs. Greens Leases and will provide to the landlords to the Mrs. Greens Leases information regarding their ability to provide adequate assurance.  Accordingly, the Debtors submit that the assumption and assignment of the Leases as set forth herein should be approved.

**(ii)     Assignment Notwithstanding Anti-Assignment Provisions**

40.     To assist in the assumption, and assignment of the Leases and the Sale of the Acquired Assets, the Debtors also request that the Sale Order provide that certain anti-assignment provisions in the Leases shall not restrict, limit, or prohibit the assumption or

29

assignment of the Leases and that such provisions are deemed and found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

41.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

42.     Section 365(f)(l) of the Bankruptcy Code thus invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See*, *e.g.*, *Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See*, *e.g.*, *In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

43.     Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption or assignment of the Leases and be deemed and found

to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## Motion Practice

44. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules.

## Waiver of Rule 6004 Stay

45. The Debtors request a waiver of any stay of the effectiveness of the Sale Order approving the relief requested in this Motion. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Sale was extensively marketed and notice of the Sale was provided to all parties in interest. Entry of the Sale Order is a condition precedent to the closing of the Sale and immediate entry of the Sale Order will allow the Debtors to close the Sale as expeditiously as possible and bring in much-needed funds into the Debtors' estates. Therefore, the Debtors submit there are adequate grounds to waive the 14 day stay so that the Sale Order is effective immediately.

## Notice

46. Notice of this Motion to be provided by electronic mail, facsimile, and/or by overnight mail to: (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) counsel to the agent for the Debtors' postpetition secured lenders; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) the indenture trustees for each of the Debtors' secured and unsecured outstanding bond issuances; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) all parties the Debtors know that hold liens or assert liens against the

31

Debtors; (i) the State Attorney General's offices (upon the Chief or Director of the Consumer Protection Division or Bureau and Chief or Director of the Bankruptcy Division or Bureau); (j) all the of the Debtors' taxing authorities; (k) counsel to the Union; (l) the lessors to the Lot 1 Stores and Lot 2 Stores; (m) counsel to Mrs. Greens; (n) counsel to Village; and (o) any other parties as specified in the *Order Establishing Certain Notice, Case Management and Administrative Procedures* [Docket No. 75].  The Debtors respectfully submit that further notice of this Motion is neither required nor necessary.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

47.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other or further relief as is just.

New York, New York
Dated: May 30, 2011

/s/ Ray C. Schrock
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession

33

**<u>Exhibit A</u>**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA | ) Case No. 10-24549 (RDD) |
| COMPANY, INC., *et al.* | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER (I) APPROVING SALE OF LOT 1 AND LOT 2 SUPERFRESH STORES TO MRS. GREENS MANAGEMENT CORPORATION AND VILLAGE SUPER MARKET INC. FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "***Sale Motion***")[1] of The Great Atlantic & Pacific Tea Company,

Inc. ("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"***Debtors***")[2] for entry of an order, pursuant to 11 U.S.C. §§ 105(a), 363, 365, 503 and 507, and

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Sale Motion or the APAs, as applicable.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc. (1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods (Continued…)

Fed. R. Bankr. P. 2002, 6004, 6006, and 9007 (a) authorizing and approving the entry into, performance under and terms and conditions of the Lot 1 APA and Lot 2 APA, substantially in the form attached hereto as **Exhibit A** and **Exhibit B**, respectively (collectively, the "*APAs*"), whereby the Debtors have agreed to sell, and Mrs. Green's Management Corp. and Village Super Market, Inc. (collectively, the "*Buyer*"), has agreed to buy the Lot 1 Stores and the Lot 2 Stores (specifically as set forth and defined in the APAs, and together, the "*Acquired Assets*"), free and clear of all liens, claims, encumbrances, and other interests, and the Debtors have agreed to transfer and Buyer has agreed to assume certain of the Debtors' liabilities (specifically as set forth and defined in the APAs, the "*Assumed Liabilities*") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APAs, the "*Transactions*"); (b) authorizing and approving the sale of the Acquired Assets free and clear of any and all liens, claims, and encumbrances; (c) authorizing the assumption and assignment to Buyer of certain unexpired leases of the Debtors (collectively, the "*Leases*") in accordance with the Sale Motion and the APAs; and (d) granting other relief; and the Court having entered an order approving the bidding procedures and granting certain related relief on May 2, 2011 [Docket No. 1478] (the "*Bidding Procedures Order*"); and an auction conducted in accordance with the Bidding Procedures Order (the "*Auction*") having been held on May 17 and 18, 2011 pursuant to the Bidding Procedures Order; and Buyer having submitted the highest and best offer at the Auction; and the Court having conducted a hearing on the Sale Motion on June 14, 2011 (the "*Sale Hearing*") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered the Sale

---

of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

2

Motion, the APAs, the Bidding Procedures Order, the record of the hearing before the Court on April 28, 2011 at which the Bidding Procedures Order was approved; and having heard statements of counsel and the evidence presented in support of the relief requested in the Sale Motion at the Sale Hearing; and it appearing that due notice of the Sale Motion, the APAs, the Bidding Procedures Order and the Auction has been provided; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:**

<u>**Jurisdiction, Venue and Final Order**</u>

A.     This Court has jurisdiction to hear the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding FED. R. BANKR. P. 6004(h) and 6006(d), and to any extent necessary under FED. R. BANKR. P. 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by FED. R. BANKR. P. 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

K&E 19070747

## Notice of the APAs, Sale Hearing, Auction and the Cure Amounts

C.     As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Motion, the Auction, the Sale Hearing, and the APAs has been provided in accordance with §§ 102(1), 363 and 365 of the Bankruptcy Code and FED. R. BANKR. P. 2002, 6004, 6006 and 9014, and Local Bankruptcy Rule 9013-1(b).  The Debtors have complied with all obligations to provide notice of the Sale Motion, the Auction, the Sale Hearing, and the APAs as required by the Bidding Procedures Order.  The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Auction, the Sale Hearing, or the APAs is required or necessary.

D.     A reasonable opportunity to object or to be heard regarding the Sale Motion, the relief requested therein, and this Order, was afforded to all interested persons and entities.

E.     In accordance with the Sale Motion, the Debtors have served a notice of their intent to assume and assign the Leases and of the Cure Amounts upon each non-Debtor counterparty to a Lease.  The service and provision of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Leases or establishing a Cure Amount for the respective Leases.  Non-Debtor counterparties to the Leases to be assigned have had an adequate opportunity to object to assumption and assignment of the applicable Leases and the Cure Amount set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to Buyer for purposes of § 365(c)(1) of the Bankruptcy Code).  No objections, responses or requests for adequate assurance were made, and if made, have been overruled.

4

**<u>Highest and Best Offer</u>**

F.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted an Auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The Auction was duly noticed and conducted in a noncollusive, fair and good faith manner and the Auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities.

G.      The Acquired Assets were adequately marketed by the Debtors, and the consideration provided by Buyer under the APAs constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities.

H.      Approval of the Sale Motion and the APAs and the consummation of the Transactions contemplated thereby is in the best interests of the Debtors, their respective creditors, estates and other parties in interest.  The Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the APAs.

I.      Entry of an order approving the APAs and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Transactions, as set forth in the APAs.

K&E 19070747

**Good Faith of Buyer**

J.       The APAs and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and Buyer without collusion, in good faith and at arms' length.

K.       Neither Buyer, nor any of its respective affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns (each such entity individually and taken together, which hereafter shall be included in the definition of ***"Buyer"***) is an "insider" of any of the Debtors, as that term is defined in § 101(31) of the Bankruptcy Code.  Buyer is entering into the Transactions in good faith and is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the APAs to be avoided or impose any costs or damages under § 363(n) of the Bankruptcy Code.

**No Fraudulent Transfer or De Facto Merger**

L.       The consideration provided by Buyer pursuant to the APAs for its purchase of all Acquired Assets and the assumption of all Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and under the laws of the United States, any state, territory, possession or the District of Columbia.  The APAs were not entered into fraudulently, or for the purpose of hindering, delaying or defrauding creditors of the Sellers.

M.       The Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between Buyer and the Debtors.  Buyer is not holding itself out to the public as a

6

continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors.

### Sale Is Free and Clear Under Section 365(f) of the Bankruptcy Code

N.     The sale of all Acquired Assets to Buyer under the terms of the APAs meets the applicable provisions of § 363(f) of the Bankruptcy Code such that the sale of the Acquired Assets will be free and clear of any and all claims, liens, and encumbrances (with such liens attaching to the proceeds of such sale with the same, validity, force and effect), and, except as expressly provided in the APAs with respect to the Assumed Liabilities, the (i) transfer of the Acquired Assets to Buyer and (ii) assumption and/or assignment to Buyer of the Leases and Assumed Liabilities, will be free and clear of all interests, liens, and claims and will not subject the Buyer to any liability for any claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability).  All holders of claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to § 363(f)(2) of the Bankruptcy Code, and all holders of claims are adequately protected — thus satisfying § 363(e) of the Bankruptcy Code — by having their claims or liens, if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert a claim or lien or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such claim holder had prior to the Transactions, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

O.     The Buyer asserts that it would not have entered into the APAs and would not consummate the Transactions, thus adversely affecting the Sellers, their estates and their creditors, if the sale by the Debtors of the Acquired Assets to the Buyer, and the assumption and

K&E 19070747

assignment or transfer by the Debtors of the Leases and the other Acquired Assets to the Buyer, were not free and clear of all liens, claims, and interests of any kind or nature whatsoever.

P.      The transfer of the Acquired Assets to Buyer under the APAs will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Acquired Assets free and clear of all claims.  The Debtors may sell their interests in the Acquired Assets free and clear of all claims because, in each case, one or more of the standards set forth in § 363(f) has been satisfied.

<u>**Assumption and Assignment of the Leases**</u>

Q.      The assumption and assignment of the Leases pursuant to the terms of this Order are integral to the APAs, are in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

R.      The Debtors have met all requirements of § 365(b) of the Bankruptcy Code for each of the Leases.  The Debtors and/or Buyer, as applicable under the APAs, have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Leases, within the meaning of § 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Leases, within the meaning of § 365(b)(1)(B) of the Bankruptcy Code.  Each of the Leases is free and clear of all claims against Sellers and the Buyer.

S.      Buyer has provided adequate assurance of its future performance under the relevant Leases within the meaning of §§ 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Pursuant to § 365(f) of the Bankruptcy Code, the Leases to be assumed and assigned under the

APAs shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in the leases or other restrictions prohibiting their assignment or transfer and pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Leases after such assumption by the Debtors and assignment to Buyer.

## Other Findings

T.  Each Seller (i) has full corporate power and authority to execute the APAs and all other documents contemplated thereby, (ii) has all of the corporate power and authority necessary to consummate the Transactions, and (iii) requires no consents or approvals, other than those expressly provided for in the APAs and addressed herein, to consummate the Transactions.

**THEREFORE, ITS IS HEREBY ORDERED THAT:**

## General Provisions

1.  The Sale Motion is granted to the extent provided herein.

2.  All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Order, and all reservations of rights included therein, are, except as provided in other orders of the Court, hereby overruled on the merits with prejudice.

3.  Where appropriate herein, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

## Approval of the APAs

4.     The APAs, all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects.  The failure specifically to include any particular provision of the APAs in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APAs be authorized and approved in its entirety.

5.     The Debtors are authorized to the extent not already done to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Transactions, including the sale to Buyer of all Acquired Assets, in accordance with the terms and conditions set forth in the APAs and this Order, and (b) to assume and assign any and all Lease(s).

## Sale and Transfer Free and Clear of Claims

6.     At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Acquired Assets shall be immediately vested in Buyer pursuant to §§ 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all liens, claims, and interests.  Such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets.

7.     The transfer of the Acquired Assets by the Debtors to Buyer shall relieve the Debtors from any liability occurring, arising from or relating to such Acquired Assets after such transfer, except as expressly provided in the APAs or this Order.

## No Successor or Transferee Liability

8.     The Buyer shall not be deemed, as a result of any action taken in connection with the APAs, the consummation of the Transactions contemplated by the APAs, or the transfer, operation or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations as an assignee

under the Leases arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue, bulk-transfer, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Consistent with the foregoing, as a result of the closing of the Transactions, the Buyer shall not have successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Debtors or any obligations of the Debtors, including, but not limited to, in the case of liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing or any taxes in connection with, or in any way relating to the cancellation of debt of the Sellers or their affiliates. Without limiting the generality of the foregoing, the Buyer shall not have any liability or obligations under any of Sellers' contracts, unless provided for under the APAs.

## Good Faith of Buyer

9.     The Transactions contemplated by the APAs are undertaken by Buyer without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Leases), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

10.     Neither the Debtors nor Buyer have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under § 363(n) of the Bankruptcy Code.  The consideration provided by Buyer for the Acquired Assets under the APAs is fair and reasonable and the sale may not be avoided under § 363(n) of the Bankruptcy Code.

## Assumption and Assignment of Leases

11.     The Debtors are authorized and directed at the Closing to assume and assign each of the Leases to Buyer in accordance with the APAs free and clear of all claims pursuant to §§ 105(a) and 365 of the Bankruptcy Code and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Leases to Buyer.  The Sellers shall be obligated to pay or cause to be paid any and all Cure Amounts under the Leases in accordance with the terms of the APAs.  The payment of the applicable Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Leases by the Debtors and the assignment of the Leases to Buyer, constitute adequate assurance of future performance thereof within the meaning of 11

K&E 19070747

U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B). The Debtors shall consult with the Creditors' Committee in connection with calculating and paying any applicable Cure Amounts.

12.    Any provisions in any Lease that prohibit or condition the assignment of such Lease or allow the counterparty to such Lease to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Lease, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under §§ 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of the Leases have been satisfied. Upon the Closing, in accordance with §§ 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Leases, and such Leases shall remain in full force and effect for the benefit of Buyer. Each non-Debtor counterparty to the Leases shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

13.    Upon the Closing and the payment of the relevant Cure Amounts, Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Leases and the Debtors shall be released, pursuant to § 365(k) of the Bankruptcy Code, from any liability under the Leases. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Leases.

Notwithstanding any provision of the Leases, including a covenant of continuous operation or a "go dark" provision, Buyer shall not be required to operate its business from the Stores for a period of 90 days after the Closing, in order to renovate and remodel such Stores, and may do so without incurring any fee, penalty, or increased rent under the Leases.

14.     The assignments of each of the Leases are made in good faith under §§363(b) and (m) of the Bankruptcy Code.

## Injunction

15.     Except as expressly permitted by the APAs or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, clients, trade creditors, litigation claimants and other persons, holding claims or interests of any kind or nature whatsoever against or in the Debtors or the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses before the Closing or the transfer of the Debtors' interests in the Acquired Assets to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any liens, claims or interests against the Buyer, its property, or the Acquired Assets.  Following the Closing, no holder of a lien, claim, or interest against the Debtors or the Acquired Assets shall interfere with Buyer's title to, or use and enjoyment of, the Acquired Assets based on or related to such lien, claim or interest, and all such liens, claims, or interests, if any, shall be, and hereby are

transferred and attached to the proceeds from the Transactions in the order of their priority, with the same validity, force and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Sellers may possess with respect thereto.

## Seller Release

16.     The Buyer and its affiliates, successors and assigns, and each of their respective officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents and representatives shall not have or incur any liability to, or be subject to any action by, the Sellers, their respective affiliates, or any of their predecessors, affiliates, successors and assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the APAs and the entry into and consummation of the Transactions contemplated thereby, except as expressly provided in the APAs.

## Other Provisions

17.     The APAs may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; provided, further that in connection with any modification, amendment or supplement authorized pursuant to this paragraph the parties shall have consulted with the Creditors' Committee.

18.     This Order and the APAs shall be binding in all respects upon all the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code.

19.     This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

20.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APAs, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale.

21.     For a period of 90 days after the Closing, the Buyer shall be permitted to renovate, remodel, reconstruct, and perform alterations with respect to the Acquired Assets, including the leased property, to meet the Buyer's standards, and to replace and modify existing signage with Buyer's signage (subject to applicable zoning laws), without the need for landlord approval and without violating any provision of the Leases.

22.     Until satisfied, all such obligations shall continue to have the protections provided in this Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with Buyer, its successors, or assigns.

23.    Nothing contained in any subsequent order of this Court or any court of competent jurisdiction in these or other chapter 11 cases (including without limitation, an order authorizing the sale of assets pursuant to sections 363, 365 or any other provision of the Bankruptcy Code or any order entered after any conversion of a chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter 11 plan confirmed in any Debtors' bankruptcy cases or any order confirming any such plan shall nullify, alter, conflict with, or in any manner derogate from the provisions of this Order, and the provisions of this Order shall survive and remain in full force and effect.

24.    Notwithstanding the possible applicability of Rules 6004(h), 6006(d), 7062 and 9014 of the Federal Rules of Bankruptcy Procedure or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors and Buyer are authorized to close the sale immediately upon entry of this Order.

25.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.    To the extent there are any inconsistencies between the terms of this Order and the APAs, the terms of this Order shall control.

27.    The Transactions contemplated hereunder shall not be subject to any bulk sales, bulk transfer, or similar laws.

28.    To the extent that there is any inconsistency between this Order and the terms of the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 365* [Docket No. 479] (the

17

"***DIP Order***") or related documents (including, without limitation, sections 5.06 and 6.05 of the debtor-in-possession credit agreement), with respect to the application of proceeds of the sale, the DIP Order and related documents shall control.

White Plains, New York
Date: _____, 2011

_____
United States Bankruptcy Judge

K&E 19070747

**Exhibit B**

**Lot 1 APA**

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.,

SUPER FRESH FOOD MARKETS, INC.,

MRS. GREENS MANAGEMENT CORP.,

AND

VILLAGE SUPER MARKET, INC.

May 18, 2011

Table of Contents

Article I Definitions ........................................................................................................1
    Section 1.1        Definitions. ...........................................................................1
    Section 1.2        Interpretations. ....................................................................13
Article II Purchase and Sale ........................................................................................14
    Section 2.1        Purchase and Sale of Assets. ...............................................14
    Section 2.2        Assumed Liabilities. ............................................................15
    Section 2.3        Consideration; Deposit; Escrow Amount ...........................15
    Section 2.4        Closing. ...............................................................................15
    Section 2.5        Closing Payments and Deliveries .......................................16
    Section 2.6        Inventory .............................................................................17
    Section 2.7        Allocation. ...........................................................................17
    Section 2.8        Proration. ............................................................................18
    Section 2.9        Removal of Excluded Assets. ..............................................18
    Section 2.10      Damaged or Destroyed Store Closing. .................................19
Article III Sellers' Representations and Warranties .....................................................19
    Section 3.1        Organization of Sellers; Good Standing. .............................19
    Section 3.2        Authorization of Transaction. .............................................19
    Section 3.3        Noncontravention; Government Filings. ...............................19
    Section 3.4        Title to Assets. ....................................................................20
    Section 3.5        Real Property. .....................................................................20
    Section 3.6        Litigation; Decrees. .............................................................20
    Section 3.7        Labor Relations. ..................................................................20
    Section 3.8        Brokers' Fees. .....................................................................20
    Section 3.9        Environmental Matters ........................................................21
    Section 3.10      Condemnation .....................................................................21
    Section 3.11      Disclaimer of Other Representations and Warranties. ........21
Article IV Buyers' Representations and Warranties .....................................................22
    Section 4.1        Organization of Buyer; Good Standing. ..............................22
    Section 4.2        Authorization of Transaction. .............................................22
    Section 4.3        Noncontravention. ...............................................................22
    Section 4.4        Litigation; Decrees. .............................................................22
    Section 4.5        Brokers' Fees. .....................................................................23
                    Sufficient Funds; Adequate Assurances .............................23
Article V Pre-Closing Covenants .................................................................................23
    Section 5.1        Efforts; Cooperation. ..........................................................23
    Section 5.2        Regulatory Approvals ..........................................................23
    Section 5.3        Bankruptcy Actions. ............................................................24
                    Bidding Procedures .............................................................24
    Section 5.5        Notices and Consents ..........................................................24
                    Prescription Lists ................................................................25
    Section 5.7        Notice of Developments. .....................................................25
    Section 5.8        Notice of Supplemental Disclosure. ....................................25
    Section 5.9        Access; No Contact; Confidentiality. ..................................26
    Section 5.10      Bulk Transfer Laws. ............................................................26

Section 5.11 Replacement Bonding Requirements......................................................27
Section 5.12 Operations Prior to Closing ...............................................................27
Section 5.13 Union Negotiations ...........................................................................27
Article VI Other Covenants .........................................................................................27
Section 6.1 Further Assurances............................................................................27
Section 6.2 Access; Enforcement; Record Retention. ..........................................28
Section 6.3 Employees.........................................................................................28
Section 6.4 Certain Tax Matters ..........................................................................29
Section 6.5 Insurance Matters.  Each ...................................................................30
Section 6.6 Acknowledgements...........................................................................30
Section 6.7 Press Releases and Public Announcements. ......................................30
Section 6.8 Seller Marks. ....................................................................................30
Section 6.9 Point of Sale Equipment ..................................................................31
Article VII Conditions to Obligation to Close ..............................................................31
Section 7.1 Conditions to Buyer's Obligations....................................................31
Section 7.2 Conditions to Sellers' Obligations....................................................31
Section 7.3 No Frustration of Closing Conditions................................................32
Article VIII Termination................................................................................................32
Section 8.1 Termination of Agreement................................................................32
Section 8.2 Effect of Termination........................................................................33
Section 8.3 Deposit Return .................................................................................34
Article IX Miscellaneous ..............................................................................................34
Section 9.1 Survival. ............................................................................................34
 Obligations of Buyer Joint and Several ............................34
 Expenses .........................................................................34
Section 9.4 Entire Agreement. .............................................................................34
Section 9.5 Incorporation of Exhibits and Disclosure Schedule...........................35
Section 9.6 Amendments and Waivers. ...............................................................35
Section 9.7 Succession and Assignment...............................................................35
Section 9.8 Notices. .............................................................................................35
Section 9.9 Governing Law. .................................................................................37
Section 9.10 Submission to Jurisdiction; Service of Process. ................................37
Section 9.11 Waiver of Jury Trial..........................................................................37
Section 9.12 Specific Performance. .......................................................................38
Section 9.13 Severability. ......................................................................................38
Section 9.14 No Third Party Beneficiaries. ............................................................38
Section 9.15 Disclosure Schedule..........................................................................38
Section 9.16 Headings; Table of Contents..............................................................38
Section 9.17 Counterparts; Facsimile and Electronic Signatures. ..........................38

Exhibits:

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement
Exhibit E – Non-Foreign Affidavit


Disclosure Schedules:

| | |
|---|---|
| Schedule 1.1(a) | Buyer's Wire Instructions |
| Schedule 1.1(b) | Excluded Furnishings and Equipment |
| Schedule 1.1(c) | Specifically Identified Excluded Assets |
| Schedule 1.1(d) | Sellers' Wire Instructions |
| Schedule 2.6(a) | Inventory Instructions & Pricing |
| Schedule 3.5 | Store Locations and Leases |
| Schedule 3.6 | Litigation |
| Schedule 3.7 | Collective Bargaining Agreements |
| Schedule 5.5(b) | Notices and Consents |

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of May 18, 2011 by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation and a wholly-owned Subsidiary of A&P (the "<u>Company</u>" and, together with A&P, "<u>Sellers</u>"), Mrs. Greens Management Corp, a New York Corporation ("<u>Mrs. Greens</u>"), and Village Super Market, Inc., a New Jersey corporation ("<u>Village</u>" and together with Mrs. Greens, "<u>Buyers</u>").  Sellers and Buyers are referred to collectively herein as the "<u>Parties</u>".

WITNESSETH

WHEREAS, on December 12, 2010, A&P and its debtor affiliates (including the Company) each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which case is administered under Case No. 10-24549 (the "<u>Bankruptcy Case</u>");

WHEREAS, Sellers operate the 4 supermarkets at the locations set forth on of <u>Section 3.5</u> of the Disclosure Schedule under the name "SuperFresh" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers wish to sell, and Buyers wish to buy, the Acquired Assets (as defined below), on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

ARTICLE I
DEFINITIONS

Section 1.1     <u>Definitions.</u>  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means, collectively, the Group 1 Stores Acquired Assets and the Group 2 Store Acquired Assets.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Antitrust Law</u>" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Assumed Liabilities</u>" means, collectively, the Group 1 Stores Assumed Liabilities and the Group 2 Store Liabilities.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Base Purchase Price</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Bidding Procedures</u>" has the meaning set forth in <u>Section 5.4</u>.

"<u>Bidding Procedures Order</u>" means the *Order Approving Bidding Procedures in Connection with the Proposed Sale of Certain SuperFresh Banner Store Assets*, entered on May 2, 2011 Docket No. 1478, a copy of which is attached hereto as <u>Exhibit A</u>.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Bonding Requirements</u>" means standby letters of credit, guarantees, escrows, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Leases.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by law to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyers' Account</u>" means the bank accounts (including complete wire transfer instructions therefor) set forth on <u>Schedule 1.1(a)</u>.

"<u>Cash Equivalents</u>" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"Company" has the meaning set forth in the preamble.

"Confidentiality Agreement" means, collectively, (i) the letter agreement, dated as of April 18, 2011, by and between A&P and Mrs. Greens, regarding the terms and conditions on which A&P would make available to Mrs. Greens certain information relating to the Stores and the Acquired Assets and Assumed Liabilities and (ii) the letter agreement, dated as of April 18, 2011, by and between A&P and Village, regarding the terms and conditions on which A&P would make available to Village certain information relating to the Stores and the Acquired Assets and Assumed Liabilities.

"Consent" means any consent, approval, authorization, qualification, waiver, or notification of a Person.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be  bound thereby; provided, however, that the term "Contract" shall exclude any Lease.

"Cure Costs" means any and all amounts required to be paid in connection with the assumption and assignment of any Lease pursuant to section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court, to cure all defaults, and to pay all Damages that have resulted from such defaults, under such Lease, in each case, solely to the extent required pursuant to section 365 of the Bankruptcy Code, to effectuate such assumption and assignment.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Deposit" has the meaning set forth in Section 2.3.

"Disclosure Schedule" has the meaning set forth in Article III.

"Disclosure Supplement" has the meaning set forth in Section 5.8.

"Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) covered by ERISA and any other material employee benefit plan, program or arrangement of any kind established, maintained, sponsored or contributed to (or with respect to which an obligation to contribute has been undertaken) by A&P on behalf of any Employee.

"Environmental Laws" has the meaning set forth in Section 3.9.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that would be deemed a "single employer" with A&P under Section 414(b), (c), (m) or (o) of the IRC or Section 4001 of ERISA.

"Escrow Agent" means Chicago Title Insurance Co., a Nebraska corporation.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyers, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(c).

"Escrow Deadline" has the meaning set forth in Section 2.3(c).

"Excess Amount" has the meaning set forth in Section 2.5(a).

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)     any asset of Sellers that is (i) not located in the Stores and used or held for use primarily in the operation of the Stores or (ii) inseparable from any other business of Seller or any of its Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to Taxes paid or payable by Sellers; and (C) any Tax refund, credit, attribute, or other Tax asset of or with respect to Sellers;

(b)     capital stock of any of A&P's Subsidiaries;

(c)     all Cash Equivalents and accounts receivable;

(d)     all rights and assets under or related to any Employee Benefit Plan;

(e)     all Permits (other than Group 1 Permits and Group 2 Permits);

(f)     all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(g)     all of Sellers' rights under this Agreement or any Related Agreement;

(h)     all of Sellers' rights under any Contracts;

(i)	any and all automobiles, trucks, tractors, and trailers;

(j)	any other rebate or refund arising from the operation of the Stores prior to the Closing;

(k)	all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "SuperFresh", any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(l)	all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices;

(m)	the Furnishings and Equipment described on Schedule 1.1(b) (the "Excluded Furnishings and Equipment");

(n)	all Contracts;

(o)	assets relating to, arising under or in connection with any Employee Benefit Plans;

(p)	all Excluded Inventory;

(q)	all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores;

(r)	all other assets bearing any Seller Mark; and

(s)	those items set forth on Schedule 1.1(c).

"Excluded Inventory" has the meaning set forth in Section 2.6(a).

"Excluded Liabilities" means all Liabilities of Sellers that are not expressly included in the Assumed Liabilities including:

(a)	any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability primarily relating to or primarily arising out of the Excluded Assets;

(b)	any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.4);

(c)     all Liabilities relating to employees of Seller, whether arising prior to or after Closing, including, without limitation, Liabilities in connection with withheld payroll Taxes, payroll, workman's compensation benefits, and employee withholding and Liabilities arising under the WARN Act;

(d)     all Liabilities of Seller under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(e)     all Liabilities of Sellers or any ERISA Affiliate with respect to any Employee Benefit Plan, pension plan or under any benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and/or other group welfare benefits;

(f)     all Liabilities under any Labor Agreements;

(g)     any Contract with any supplier or vendor to the Sellers; and

(h)     all Cure Costs.

"Final Allocation" has the meaning set forth in Section 2.7.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models, shelving, refrigeration equipment, [scales, slicers, carts, shopping carts, checkout counters, appliances, utensils and other equipment] owned by Sellers and located at the Stores.

"GAAP" means United States generally accepted accounting principles consistently applied.

"General Inventory" means all food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products offered for sale to customers at the Stores.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Group 1 Permits" means the Permits related solely to the Group 1 Stores that are transferable to Buyers under applicable Law without any material cost or expense or any material action or obligation by any Seller (with it being understood that expense or cost related to the transfer of any Group 1 Permit shall be borne by Buyer).

"Group 1 Stores" means the Stores located at 1238 Bay Dale Drive, Arnold, Maryland; 1020 West 41st Street, Baltimore, Maryland; and 7709 Harford Road, Parkville, Maryland.

"Group 1 Stores Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers and used or held for use primarily in the operation of the Group 1 Stores and (to the extent applicable) located at the Group 1 Stores (unless otherwise specified below) on the Closing Date:

(a)     the General Inventory (other than Excluded Inventory);

(b)     the Pharmaceutical Inventory (other than Excluded Inventory);

(c)     the Furnishings and Equipment owned by Sellers;

(d)     the Prescription Lists (to the extent that the transfer thereof to Buyer or its designee is permitted under applicable Law);

(e)     the Group 1 Stores Leases;

(f)     the Group 1 Stores Prepaid Expenses;

(g)     all point of sale register equipment owned by Sellers and located at the Group 1 Stores;

(h)     all Group 1 Permits; and

(i)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Group 1 Stores Acquired Assets shall not include any Excluded Assets.

"Group 1 Stores Assumed Liabilities" means:

(a)     all Liabilities under the Group 1 Stores Leases (other than Excluded Liabilities);

(b)     all amounts allocated to Mrs. Greens under Section 2.8 and all Property Taxes allocated to Mrs. Greens pursuant to Section 6.4; and

(c)     for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Group 1 Stores Acquired Asset from and after the Closing Date.

"Group 1 Stores Buyer Proration Amount" has the meaning set forth in Section 2.8.

"Group 1 Stores Exclusion Amount" means $20,604,500.00.

"Group 1 Stores Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either Seller holds any leasehold or subleasehold estates and other rights to use or occupy any Group 1 Store including the leases described on Schedule 3.5 designated as Group 1 Store Leases.

"Group 1 Stores Prepaid Expenses" means, collectively, all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Group 1 Stores Leases.

"Group 1 Stores Seller Proration Amount" has the meaning set forth in Section 2.8.

"Group 2 Permits" means the Permits related solely to the Group 2 Stores that are transferable to Buyers under applicable Law without any material cost or expense or any material action or obligation by any Seller (with it being understood that expense or cost related to the transfer of any Group 2 Permit shall be borne by Buyer).

"Group 2 SNDA" has the meaning set forth in Section 5.11(b).

"Group 2 Store" means the Store located at 12028 Cherry Hill Road, White Oak, Maryland.

"Group 2 Store Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers and used or held for use primarily in the operation of the Group 2 Store and (to the extent applicable) located at the Group 2 Store (unless otherwise specified below) on the Closing Date:

(a)     the General Inventory (other than Excluded Inventory);

(b)     the Pharmaceutical Inventory (other than Excluded Inventory);

(c)     the Furnishings and Equipment owned by Sellers;

(d)     the Prescription Lists (to the extent that the transfer thereof to Buyer or its designee is permitted under applicable Law);

(e)     the Group 2 Store Lease;

(f)     the Group 2 Store Prepaid Expenses;

(h)     all Group 2 Permits; and

(h)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Group 2 Store Acquired Assets shall not include any Excluded Assets.

"Group 2 Store Assumed Liabilities" means:

(a)     all Liabilities under the Group 2 Store Leases (other than Excluded Liabilities);

(b)     all amounts allocated to Village under Section 2.8 and all Property Taxes allocated to Village pursuant to Section 6.4; and

(c)     for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Group 2 Store Acquired Asset from and after the Closing Date.

"Group 2 Store Buyer Proration Amount" has the meaning set forth in <u>Section 2.8</u>.

"Group 2 Store Exclusion Amount" means $3,895,500.00.

"Group 2 Store Lease" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either Seller holds any leasehold or subleasehold estates and other rights to use or occupy the Group 2 Store including the leases described on <u>Schedule 3.5</u> and designated as Group 2 Store Leases

"Group 2 Store Prepaid Expenses" means, collectively, all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Group 2 Store Lease.

"Group 2 Store Seller Proration Amount" has the meaning set forth in <u>Section 2.8</u>.

"Hazardous Substance" means all pollutants, contaminants, chemicals, wastes, and any other infectious, carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials (whether solids, liquids or gases) subject to regulation, control or remediation under applicable Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Initial Allocation" has the meaning set forth in <u>Section 2.7</u>.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Inventory" means all General Inventory and Pharmaceutical Inventory.

"Inventory Date" has the meaning set forth in <u>Section 2.6(a)</u>.

"Inventory Purchase Price" has the meaning set forth in <u>Section 2.6(a)</u>.

"Inventory Taker" has the meaning set forth in <u>Section 2.6(a)</u>.

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of any current employee of a Seller having a title of Senior Vice President, President, Chief Executive Officer or Chief Financial Officer. "Knowledge" of Buyer (and other words of similar import) means, in the case of Village, the actual knowledge of Frank Sauro, John Sumas,

William Sumas and, in the case of Mrs. Greens, the actual knowledge of Gabriel de Alba and Matt Williams.

"Labor Agreements" means the collective bargaining agreements and related contracts covering any of the Employees.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means, collectively, the Group 1 Stores Leases and the Group 2 Store Lease.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the written consent of the other Party; (h) changes as a result of the announcement or pendancy of this Agreement; (i) any effects or changes arising from or related to the breach of the Agreement by Buyer; (j) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; or (k) any items set forth in the Disclosure Schedule.

"Mrs. Greens" has the meaning set forth in the preamble.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Party" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent; (b) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (c) easements, covenants, conditions, restrictions, leases and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property taken as a whole as it is currently used; (d) matters that would be disclosed on an accurate survey of the real property; and (e) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the ordinary course of business.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Pharmaceutical Inventory" means prescription pharmaceuticals and prescription products.

"Prepaid Expenses" means the Group 1 Stores Prepaid Expenses and the Group 2 Store Prepaid Expenses, collectively.

"Prepaid Expenses Amount" has the meaning set forth in Section 2.3(a).

"Prescription Lists" means, on any date, Sellers' lists of those customers for whom either Seller has filled a prescription from one of Sellers' pharmacies located within one of the Stores within the 12-month period immediately preceding such date.

"Property Taxes" has the meaning set forth in Section 6.4(b).

"Prorated Charges" has the meaning set forth in Section 2.8.

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents,

representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Order" means an order of the Bankruptcy Court (a) approving (i) the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer on the terms set forth herein; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption by, and assignment to, Buyer of the Leases on the terms set forth herein; (b) that is in form and substance reasonably acceptable to Buyer and Sellers; and (c) that, without limiting the generality of the foregoing, includes (i) a finding that the Buyer purchased the Acquired Assets in "good faith," as such term is used in section 363(m) of the Bankruptcy Code and is entitled to the benefits and protections set forth therein, (ii) a prohibition against any holder of a claim against the Sellers or the Acquired Assets, including, without limitation, any union or landlord, from asserting, prosecuting or otherwise pursuing such claim against the Buyer, including without limitation any claim for Cure Costs, in all cases except as expressly provided in this Agreement with respect to Assumed Liabilities, (iii) a finding that, upon Sellers' payment of Cure Costs, all Leases remain in full force and effect, with all parties to the Leases foreclosed from asserting against the Buyer any default, breach, acceleration, assignment fees, increases, or any other fees resulting from Sellers' assumption and assignment of the Leases to Buyer; (iv) a finding that the sale does not and will not subject the Buyer to any liability by reason of such sale pursuant to any bulk-transfer laws, successor liability, or similar theories, and (v) a finding that this Agreement and the Sale Order will be binding on any trustee appointed in the Sellers' bankruptcy cases.

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Sellers" has the meaning set forth in the preamble.

"Sellers' Account" means the bank account (including complete wire transfer instructions therefor) set forth on Schedule 1.1(d).

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on

minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Union Agreement Discount Amount" shall mean (i) in the event that Buyer enters into collective bargaining agreements with respect to the employees at each of the Stores, which agreements are acceptable to the applicable Union local for such Store (i.e., local 27, local 400 and local 1776), prior to the date that is the deadline for the filing of objections to the motion to approve the Sale Order (or such later date as may otherwise be agreed to by the Parties), $200,000 and (ii) in all other cases, $0.

"Village" has the meaning set forth in the preamble.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

"White Oak SNDA" has the meaning set forth in Section 5.11.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)     All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)     Any reference herein to law or to a legal requirement (or, with respect to any statute, ordinance, code, rule or regulation, any provision thereof) shall be deemed to include reference to all laws and or to such legal requirement and any legal requirement promulgated thereunder (or provision thereof, as applicable), including any successor thereto, respectively, in each case, as may be amended.

(i)     References herein to a Person are also to its permitted successors and assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(j)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(k)     Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(l)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Seller or provided, or that is able to be provided if requested, to Buyer or its Representatives in response to requests for materials or information.

(m)     References in this Agreement to "the applicable Buyer" and other phrases of similar import shall mean, to the extent that the subject of such phrase relates to the Group 1 Stores, Mrs. Green's, and, to the extent the subject of such phrase relates to the Group 2 Store, Village.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1     <u>Purchase and Sale of Assets.</u>  On the terms and subject to the conditions set forth in this Agreement:

(a)     Mrs. Greens will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Mrs. Greens free and clear of all Liens (other than Permitted Liens) at the Closing all of the Group 1 Stores Acquired Assets; and

(b)     Village will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Village free and clear of all Liens (other than Permitted Liens) all of the Group 2 Store Acquired Assets.

Section 2.2    Assumed Liabilities.   On the terms and subject to the conditions set forth in this Agreement:

(a)    Mrs. Greens will assume and become responsible only for the Group 1 Stores Assumed Liabilities at the Closing and no others.  Mrs. Greens agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Group 1 Stores Assumed Liabilities in a timely manner in accordance with the terms thereof; and

(b)    Village will assume and become responsible only for the Group 2 Store Assumed Liabilities at the Closing and no others.  Village agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Group 2 Store Assumed Liabilities in a timely manner in accordance with the terms thereof.

For the avoidance of doubt, Sellers shall be liable for and shall pay at or prior to Closing all Cure Costs, and Buyers shall not have any liability therefor.

Section 2.3    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets shall be (a) an aggregate Dollar amount equal to the sum of (i) $24,500,000.00 (the "Base Purchase Price"), plus (ii) the amount of the Inventory Purchase Price, plus (iii) the amount of the Prepaid Expenses (the "Prepaid Expenses Amount"), plus (iv) the Group 1 Stores Seller Proration Amount, if any, plus (v) the Group 2 Store Seller Proration Amount, if any, minus (vi) the Group 1 Stores Buyer Proration Amount, if any, minus (vii) the Group 2 Store Proration Amount, if any, and minus (viii) the Union Agreement Discount Amount, if any (such sum, the "Purchase Price") and (b) Buyers' assumption of the Assumed Liabilities as described in Section 2.2 above.

(b)    On the date hereof, Buyers (with the deposits of both Mrs. Greens and Village) has deposited with A&P an amount equal to 10% of the Base Purchase Price in cash (the "Deposit") by wire transfer of immediately available funds.

(c)    Within two Business Days following the entry of the Sale Order by the Bankruptcy Court (the "Escrow Deadline"), Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an aggregate amount in cash equal to (i) the Base Purchase Price, plus (ii) Sellers' good faith estimate of the Inventory Purchase Price, plus (iii) Sellers' good faith estimate of the Prepaid Expenses Amount, plus or minus, as applicable, (iv) Sellers' good faith estimate of the Group 1 Stores Seller Proration Amount, the Group 2 Store Sellers Proration Amount, the Group 1 Stores Buyer Proration Amount or the Group 2 Store Buyer Proration Amount, as applicable (collectively, the "Estimated Purchase Price"), minus (v) the amount of the Deposit (the "Escrow Amount").  The Escrow Amount shall be held and disbursed at the Closing pursuant to the terms of the Escrow Agreement and Section 2.5(a).

Section 2.4    Closing.   The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyers) commencing at 10:00 a.m. local time on a date (the "Closing Date") that is the later of (a) the fifth Business Day after the Escrow Deadline and (b) the first Business Day following the first date upon which all of the conditions to the obligations of Sellers and Buyers

to consummate the transactions contemplated hereby set forth in <u>Article VII</u> (other than conditions with respect to actions the Parties will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyers prior thereto.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5     <u>Closing Payments and Deliveries</u>.

(a)     Sellers shall prepare and deliver, within one day prior to the Closing Date, a statement setting forth the amount of (i) the Inventory Purchase Price (as determined in accordance with <u>Section 2.6</u>), (ii) the Prepaid Expenses Amount (as determined in good faith by Sellers), (iii) as applicable, the Group 1 Stores Seller Proration Amount, the Group 2 Store Seller Proration Amount, the Group 1 Stores Buyer Proration Amount or the Group 2 Store Buyer Proration Amount (as determined in accordance with <u>Section 2.8</u>), and (iv) the resulting Purchase Price (as calculated pursuant to <u>Section 2.3(a)</u>) (the "<u>Closing Statement</u>").  If the Purchase Price (as set forth on the Closing Statement) is less than the Estimated Purchase Price (as determined in accordance with <u>Section 2.3(c)</u>), Buyers and Sellers shall instruct the Escrow Agent to release from the account holding the Escrow Amount and deliver at the Closing to (i) Buyers, by wire transfer of immediately available funds to each Buyer's Account, as directed by the Buyers (with it being understood that Seller shall be entitled to rely on any such direction from either Buyer and shall not incur any obligation or liability as a result of any such compliance), the amount by which the Estimated Purchase Price exceeds the Purchase Price (the "<u>Excess Amount</u>") and (ii) Sellers, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount minus the Excess Amount.  If the Purchase Price (as set forth on the Closing Statement) is greater than the Estimated Purchase Price (as determined in accordance with <u>Section 2.3(c)</u>), (i) Buyers and Sellers shall instruct the Escrow Agent to deliver to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount and (ii) Buyers shall pay to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, the amount by which the Purchase Price exceeds the Estimated Purchase Price.

(b)     At the Closing, Sellers will deliver to each of Mrs. Greens and Village (i) a duly executed Bill of Sale substantially in the form of <u>Exhibit C</u> (collectively, the "<u>Bill of Sale</u>"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of <u>Exhibit D</u> (collectively, the "<u>Assignment and Assumption Agreement</u>"); (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u>, <u>Section 7.1(b)</u> and <u>Section 7.1(e)</u> (with respect to Cure Costs) is satisfied; and (iv) a duly executed statement in accordance with Treasury Regulation Section 1.1445-2(b), in the form attached hereto as <u>Exhibit E</u> (the "<u>Non-Foreign Affidavit</u>").

(c)     At the Closing, each of Mrs. Greens and Village will deliver to Sellers (i) their respective Bill of Sale duly executed by Mrs. Greens or Village, as applicable; (ii) their respective Assignment and Assumption Agreement duly executed by Mrs. Greens or Village, as applicable; and (iii) a duly executed certificate from an officer of Mrs. Greens and Village to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> are satisfied.

Section 2.6     Inventory.

(a)     A physical count of the Inventory, and calculation of the value thereof, at each of the Stores shall be made by a nationally-recognized, independent inventory service (the "Inventory Taker"), which Inventory Taker shall be acceptable to both Buyers and Sellers in their reasonable discretion, one day prior (or on such other date that the Parties mutually agree) to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such inventory being the "Inventory Date").  The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.6(a) and otherwise in accordance with the terms and conditions of this Section 2.6.  Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne one-half by Buyers and one-half by Sellers.  The physical inventory (and the Inventory Purchase Price Amount) shall not include Inventory that is (i) A&P branded (including any "SuperFresh" branded) private label inventory; (ii) damaged, spoiled, perishable, outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than 14 days after the Inventory Date being deemed outdated for this purpose), obsolete, or otherwise unsaleable at normal retail price in the ordinary course of business at the Stores; or (iii) not transferable to Buyer under applicable Law (collectively, the "Excluded Inventory"), provided, however, that any portion of the Excluded Inventory described in clause (ii) and (iii) that, in the case of Excluded Inventory located at the Group 1 Stores, Mrs. Greens affirmatively elects in writing to deem Inventory, or, in the case of Excluded Inventory located at the Group 2 Store, Village affirmatively elects in writing to deem Inventory, shall be treated as Inventory for purposes of this Agreement.  The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date, excluding the Excluded Inventory, at the percentages of the segment retail price set forth in Schedule 2.6(a) (the "Inventory Purchase Price").

(b)     Promptly following the execution of this Agreement, Buyers shall make application to the applicable authorities to transfer any alcohol included in the Inventory to the applicable Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyers, at Buyers' sole cost and expense.  Sellers shall reasonably cooperate with Buyers and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above.  In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.7     Allocation.  Buyers and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder.  No later than 60 days after the Closing Date, Buyers shall deliver to Sellers an initial allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date (the "Initial Allocation").  If Sellers raise any reasonable objection to the Initial

Allocation within seven (7) days of the receipt thereof, Buyers and Sellers will negotiate in good faith to resolve such objection(s). Absent any such timely objection from Sellers or upon final resolution thereof, the Initial Allocation shall be deemed conclusive and binding on the parties (the "Final Allocation"). In the event that the Purchase Price is adjusted pursuant to this Agreement, Buyers and Sellers shall cooperate and mutually agree on adjustments to the Final Allocation. Buyers and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare and file IRS Form 8594 and all Tax Returns on a basis consistent with the Final Allocation. None of the Parties will take any position inconsistent with the Final Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by law. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8    Proration.  On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and the applicable Buyer as of the Closing Date with (a) the applicable Buyer (i.e., Mrs. Greens with respect to any such payment related to the Group 1 Stores and Village with respect to any such payments related to the Group 2 Store) bearing the expense of such Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Prorated Charges under such Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (ii) the number of days in such lease month following the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (b) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to the applicable Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers). The net amount of all Prorated Charges attributable to the Group 1 Stores shall be referred to as the "Group 1 Stores Buyer Proration Amount" if owed to Mrs. Greens or the "Group 1 Stores Seller Proration Amount" if owed to Sellers. The net amount of all Prorated Charges attributable to the Group 2 Store shall be referred to as the "Group 2 Store Buyer Proration Amount" if owed to Village or the "Group 2 Store Seller Proration Amount" if owed to Sellers. The Parties acknowledge and agree that the Group 1 Stores Seller Proration Amount, if any, shall be deemed a Group 1 Stores Assumed Liability, and the Group 2 Store Seller Proration Amount, if any, shall be deemed a Group 2 Store Assumed Liability. Except as set forth in this Section 2.8 and in Section 6.4, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyers.

Section 2.9    Removal of Excluded Assets.  As promptly as practicable following the Closing Date (and in any event within 10 Business Days), Buyers shall allow Sellers to remove, at Sellers' sole cost and expense, all of the Excluded Assets that are located at the Stores and, if requested by Sellers, Buyers shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' sole cost and expense (an estimated amount of which shall be paid in advance by Sellers based upon the applicable Buyer's good faith estimate to the extent that Buyers might reasonably be liable to any third party for such expenses); provided, however, that Sellers shall not unreasonably interfere with Buyer's operations at the applicable Stores, and Sellers shall indemnify Buyers for any out of pocket costs constituting Damages caused by such removal of any such Excluded Assets by Sellers of Sellers' agents. Any Person other than

Sellers' employees used by Seller to remove the Excluded Assets shall provide evidence of commercial liability and workers compensation insurance prior to being permitted to begin removing the Excluded Assets from the Stores. If Sellers have not instructed the applicable Buyer prior to the expiration of such 10 Business Day period as to the location to which any Excluded Assets should be transported, the applicable Buyer, in its sole discretion, may dispose of such Excluded Assets at Sellers' sole cost and expense or take title to such Excluded Assets without paying any consideration or incurring any liability therefor.

Section 2.10   Damaged or Destroyed Store Closing.  If, during the period between the date of this Agreement and the Closing, a Store is damaged or destroyed by fire or other casualty covered by Sellers' insurance, then the applicable Buyer shall close and shall be entitled to receive any insurance proceeds actually received by Sellers in respect of such loss or damage to the extent related to any Acquired Asset, net of any deductible, costs of recovery and other costs incurred or required to be paid by Sellers with respect thereto.

ARTICLE III
SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyers that the statements contained in this Article III are true and correct as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1    Organization of Sellers; Good Standing.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 3.2    Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    Noncontravention; Government Filings.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of either Seller, (b) subject to the entry of the Sale Order, violate any Law or Decree to which either Seller is subject in respect of the Acquired Assets, or (c) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any

material Contract or any Lease to which either Seller is a party or to which any of the Acquired Assets is subject.  Other than (x) any filings required under the Exchange Act, (y) the applicable requirements of the HSR Act, and (z) as required or pursuant to the Bankruptcy Code, neither Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

Section 3.4     <u>Title to Assets.</u>  At the Closing, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, and valid leasehold interests in the Leases, and, pursuant to the Sale Order, Sellers will convey at the Closing good and valid title to, or their rights to use, all of the tangible Acquired Assets and a valid leasehold interest in the Leases, free and clear of all Liens other than Permitted Liens.

Section 3.5     <u>Real Property.</u>  <u>Section 3.5</u> of the <u>Disclosure Schedule</u> accurately sets forth the location of each Store, each of which is leased to either Seller by a third party and a list of all Leases, including all amendments, supplements, subordination, non-disturbance and attornment agreements and other similar Contracts related to the Leases. Sellers have made available to Buyers a true and complete copy of each Lease, including all amendments, supplements and related Contracts (including subordination, non-disturbance and attornment agreements).  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases).

Section 3.6     <u>Litigation; Decrees.</u>  Except as set forth in <u>Section 3.6</u> of the <u>Disclosure Schedule</u> and other than the Bankruptcy Case, there is no Litigation pending that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, neither Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7     <u>Labor Relations.</u>  Except as set forth in <u>Section 3.7</u> of the <u>Disclosure Schedule</u>, neither Seller is a party to or bound by any collective bargaining agreement covering the Employees.

Section 3.8     <u>Brokers' Fees.</u>  Other than the fees and expenses payable to Hilco Real Estate, Inc. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any

broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.9    Environmental Matters.    To the Sellers' Knowledge, except as would not, individually or in the aggregate, give rise to a Material Adverse Effect:

(a)    Sellers' current operations of the Stores comply with all, and are not subject to any pending or threatened Decree, claim, demand, suit or action related to or arising out of any, federal, state or local laws, rules or regulatory requirements concerning the protection, preservation, conservation, or regulation of the environment ("Environmental Laws"), and no Seller has received any written notice alleging that the activities of Sellers' business at the Stores are in violation or alleged violation of, or alleging liability or potential liability under, any Environmental Laws;

(b)    there has been no Release of any Hazardous Substances at, on or under any of the Stores that required or requires reporting, or which could trigger the need for investigation or remediation costs, under applicable Environmental Laws, and none of such properties has been used by any Person as a landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid waste as defined under any Environmental Law; and

(c)    there are no circumstances or conditions that currently exist relating to the Stores, or the activities of Sellers' business at the Stores, that would reasonably be expected to result in non-compliance with or liability under any Environmental Law.

Section 3.10    Condemnation.    [To Sellers' Knowledge, no condemnation proceedings are pending as to any Store.]

Section 3.11    Disclaimer of Other Representations and Warranties.    Except for the representations and warranties contained in this Article III or expressly contained in any Related Agreement, neither Seller nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, any Acquired Assets, any Assumed Liabilities or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NEITHER SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.    BUYERS ACKNOWLEDGE THAT, SHOULD THE CLOSING OCCUR, BUYERS WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).

# ARTICLE IV
## BUYERS' REPRESENTATIONS AND WARRANTIES

Each Buyer hereby represents and warrants to each Seller that the statements contained in this <u>Article IV</u> with respect to such Buyer are true and correct as of the date of this Agreement.

Section 4.1    <u>Organization of Buyer; Good Standing.</u>  Mrs. Green is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.  Village is a corporation duly organized, validly existing, and in good standing under the laws of the State of New Jersey and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    <u>Authorization of Transaction.</u>    Each Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which such Buyer is a party have been duly authorized by such Buyer.  This Agreement (assuming due authorization and delivery by Seller) constitutes the valid and legally binding obligation of such Buyer, enforceable against such Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    <u>Noncontravention.</u>  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of either Buyer, (b) violate any law or Decree to which either Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which either Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on either Buyer.  Other than the applicable requirements of the HSR Act, neither Buyer is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay such Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    <u>Litigation; Decrees.</u>  There is no Litigation pending or, to either Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither any Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or

materially impair or delay such Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.    Neither Buyer has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or any of its Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.    Each Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of such Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, such Buyer in connection with the transactions contemplated hereby.    Each Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Leases and the related Assumed Liabilities.

ARTICLE V
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.    Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.5(a)), each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5. Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) each Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

Section 5.2    Regulatory Approvals.

(a)    If required by applicable Law, the Parties shall use their commercially reasonable efforts to (i) file a Notification and Report Form to the extent required under the HSR Act with respect to the transactions contemplated hereby promptly after the date hereof, (ii) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (iii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

(b)    In connection with the efforts referenced in Section 5.1 and this Section 5.2 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law or any state law, each Party shall use its commercially reasonable efforts to (i) cooperate with the other Parties in connection with any filing or

submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other Parties informed in all material respects of any material communication received by it from, or given by it to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit the other Parties to review any material communication given to it by, and consult with it in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding. The foregoing obligations in this Section 5.2(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to allow for the exchange of such privileged materials without waiving any such privilege.

Section 5.3    Bankruptcy Actions.    Buyers shall promptly take all actions as are reasonably requested by Sellers to assist in (a) obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing documents or information for filing with the Bankruptcy Court, (b) making Buyers' representatives available to testify before the Bankruptcy Court, and (c) furnishing information or documents to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code with respect to any Leases that are "executory" within the meaning of section 365 of the Bankruptcy Code.

Section 5.4    Bidding Procedures.    The bidding procedures to be employed with respect to this Agreement (the "Bidding Procedures") shall be those reflected in the Bidding Procedures Order. Buyers acknowledge that the Bidding Procedures may be supplemented or modified by other customary procedures not inconsistent with the matters otherwise set forth herein and the terms of this Agreement. For avoidance of doubt, after such time that Buyers are the Successful Bidder (as defined in the Bidding Procedures) and that the transaction contemplated by this Agreement is the Successful Bid (as defined in the Bidding Procedures), and so long as this Agreement is in effect, Sellers shall not be entitled to solicit inquiries, proposals, or offers for the Acquired Assets or otherwise take any action to consummate any such alternative transaction; provided, however, that Sellers shall be entitled to take any actions in furtherance of maintaining its back-up bids on all or part of the Acquired Assets, provided further, that so long as this Agreement has not been terminated with respect to each Buyer in accordance with Article XII, Sellers may not consummate any such back-up bid or take any action in violation of its obligations pursuant to this Agreement, including Section 5.1 and this Section 5.4.

Section 5.5    Notices and Consents.    Prior to the Closing and as necessary following the Closing:

(a)    Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.5(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; provided, however, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters (except in the case of any landlord

under any Lease which communications shall be governed by Section 5.9), and (ii) neither A&P nor any Subsidiary of A&P shall be required to pay any consideration therefor,

(b)     Without limiting Section 5.2, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities in connection with the matters referred to in Section 5.5(b) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.6     Prescription Lists.  Promptly after the execution of this Agreement, Mrs. Greens shall make application to the applicable authorities to transfer the Prescription Lists related to the Group 1 Stores from Sellers to Mrs. Greens or its designee; and Village shall make application to the applicable authorities to transfer the Prescription Lists related to the Group 2 Store from Sellers to Village or its designee.  Such application shall be made on a timely basis and shall be diligently pursued by Buyers, at their sole cost and expense.  Sellers, at Sellers' expense, shall cooperate with Buyers and provide any documents and/or information necessary to assist in effectuating such transfer and execute such consents or other papers as may reasonably be required subject to applicable patient privacy rights.  At the Closing, Sellers shall, subject to applicable patient privacy rights, assign, transfer, and convey to the applicable Buyer (or its designee) all of its right, title, and interest in and to the Prescription Lists (and shall update the above electronic format records that shall be current as of the Closing), and Buyers hereby agrees to purchase and accept from Seller all of the Prescription Lists.

Section 5.7     Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority or any securities market or securities regulator in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.7 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.8     Notice of Supplemental Disclosure.  Without limiting the obligations of Sellers contemplated by Section 5.7, from and after the date hereof but prior to the fifth Business Day prior to the Closing Date, Sellers may inform Buyer pursuant to this Section 5.8 that any representation or warranty of either Seller was, may have been or may have been deemed to have been inaccurate when made and provide a proposed supplement to the Disclosure Schedule delivered as of the date hereof to correct such actual or potential inaccuracy as if set forth on the Disclosure Statement as of the date hereof (a "Disclosure Supplement").  If the inaccuracies contemplated by such Disclosure Supplement are sufficiently material to prevent the satisfaction of the condition set forth in Section 7.1(a), either Buyer may terminate this Agreement prior to Closing and in no event later than ten days after receipt by such Buyer of such Disclosure Supplement.  If Buyer shall not have exercised such right of termination by such date, the Disclosure Schedule shall be deemed to have been amended (effective as of the date of this

Agreement) to add such Disclosure Supplement. Notwithstanding the foregoing, if any such inaccuracy, or any other matter that causes any of the conditions to Closing in <u>Section 7.1</u> to not be capable of being satisfied, arises solely as a result of the inclusion of one or more assets related solely to either (i) the Group 1 Stores or (ii) the Group 2 Store, then Sellers may elect, in their sole discretion, to deem the Group 1 Stores Acquired Assets or the Group 2 Store Acquired Assets, as applicable, to be Excluded Assets and deem the Group 1 Stores Assumed Liabilities or Group 2 Store Assumed Liabilities, as applicable to be Excluded Liabilities, and not to assign such assets or liabilities to the applicable Buyer, in which case, this Agreement shall be deemed terminated with respect to the applicable Buyer and the Purchase Price shall be reduced by an amount equal to (i) the Group 1 Stores Exclusion Amount, in the event that the Group 1 Stores Acquired Assets are so excluded or (ii) the Group 2 Store Exclusion amount, in the event that the Group 2 Store Acquired Assets is so excluded.

Section 5.9 <u>Access; No Contact; Confidentiality.</u> Upon the reasonable request of each Buyer, Sellers will permit such Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, and books and records included, in the case of Mrs. Greens, in the Group 1 Stores Acquired Assets, and, in the case of Village, in the Group 2 Store Acquired Assets, during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of either Seller; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto; <u>provided</u>, <u>further</u>, that such access shall be primarily coordinated through Ernie Koenig or his designees, so long as such Person is reasonably available and responsive to Buyers' requests pursuant to this <u>Section 5.9</u>. Prior to the Closing, Buyers shall not, and shall cause its Representatives not to, contact any employees, customers, suppliers, landlords, or licensors of either Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller; <u>provided</u>, <u>however</u>, that Mrs. Greens may communicate directly with any landlord under any Group 1 Stores Lease and Village may communicate directly with any landlord under the Group 2 Store Lease, in each case, within the presence of either Seller or any Representative thereof, to arrange for Buyers' access to the premises or otherwise, and either Buyer may contact Employees for the purposes of offering them employment. The Parties further acknowledge and agree that nothing contained herein shall preclude any Buyer or its Representatives from contacting any Person with whom such Buyer currently does business as a customer or supplier.

Section 5.10 <u>Bulk Transfer Laws.</u> Buyers acknowledge that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement and hereby waives all claims related to the non-compliance therewith.

Section 5.11    Replacement Bonding Requirements.

(a)    On or prior to the Closing Date, Village shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to the Bonding Requirements that are provided for in that certain Lease Modification, Subordination, Non-Disturbance and Attornment Agreement, dated February 13, 2001, by and between A&P, Salomon Brothers Realty Corp. and White Oak Grocery, LLC with respect to the Lease at 12028 Cherry Hill Road, White Oak, Maryland ("the "White Oak SNDA"), in form and substance reasonably satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Village and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Village and Sellers with respect to all Bonding Requirements under the Group 2 Lease.    To the extent Village is unable to make such arrangements with respect to such Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Village shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.    As of the date hereof, Sellers' Bonding Requirement for White Oak, Maryland is approximately $794,921.

(b)    In the event that prior to Closing Village delivers a form of subordination, non-disturbance and attornment agreement (the "Group 2 SNDA") with respect to the Group 2 Lease in a form acceptable to Village, Sellers, the landlord of the Group 2 Store and such landlord's lender(s), Sellers agree to execute the Group 2 SNDA in the form provided by Village and to assume and assign the Group 2 SNDA to Village (as part of the lease) at Closing.

Section 5.12    Operations Prior to Closing.  Sellers covenant and agree to operate and keep open for business the Stores through the Inventory Date and to continue to fill prescription pharmaceuticals and prescription product scripts through such date.

Section 5.13    Union Negotiations.  Buyer agrees to use good faith efforts to negotiate with the applicable Union local for each Store (i.e., local 27, local 400 and local 1176) for collective bargaining agreements with the applicable Union with respect to any employees already in a collective bargaining unit at each Store, prior to the date that is the deadline for the filing of objections to the motion to approve the Sale Order.

ARTICLE VI
OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to

the applicable Buyer all of the Acquired Assets or to confirm the applicable Buyer's assumption of the Assumed Liabilities.

Section 6.2 <u>Access; Enforcement; Record Retention.</u> From and after the Closing, upon request by either Seller, in the case of the Group 1 Stores, Mrs. Greens, and in the case of the Group 2 Store, Village, will permit, at Sellers' sole cost and expense, Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the applicable Buyer, to all premises, properties, personnel, books and records of or related to the applicable Acquired Assets or the applicable Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of either Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require either Buyer to take any such action if it (i) may result in a waiver or breach of any attorney/client privilege, (ii) could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to its operations.

Section 6.3 <u>Employees</u>.

(a) Prior to the Closing Date, Buyers shall have the right but not the obligation to contact or interview any Employees and may, in each Buyer's sole discretion, offer employment to such Employees, such offer of employment to be effective on the day immediately following the Closing Date and conditional on Closing.

(b) Each Buyer acknowledges that the acceptance by any Employee of an offer of employment made pursuant to <u>Section 6.3(b)</u> shall not constitute a condition to Buyers' obligations under this Agreement.

(c) Prior to Closing, Sellers shall terminate or transfer to other stores or facilities of Sellers all Employees of the Stores. Sellers shall indemnify, defend and hold harmless Buyers, their Affiliates and their respective Representatives from all Liabilities arising under the WARN Act or otherwise with respect to Employees of the Stores arising in whole or in part from the actions or omissions of either Seller at any time.

(d) <u>Tax Reporting</u>. Each Buyer shall adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53. Under this procedure, each Buyer shall provide Forms W-2 to Employees reflecting all wages paid and taxes withheld with respect to such Employees for the calendar year in which the Closing Date occurs. Seller as the predecessor employer shall have no employment tax reporting responsibilities for the Employees hired by Buyers following the Closing Date, but shall provide Buyers with all information concerning wages paid and taxes withheld with respect to any employees of Sellers hired by Buyers during the year in which the Closing occurs. Each Buyer shall also adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(e)     No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.3, whether express or implied, is intended to create any third party beneficiary rights in any Employee.

(f)     Cooperation.  After the Closing Date, each Buyer shall, and shall cause its Affiliates to, reasonably cooperate with Sellers to provide such current information regarding the Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates.  Each Buyer shall, and shall cause its Affiliates to (at Sellers' sole cost and expense), permit Employees to provide such reasonable assistance to A&P as may be reasonably required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that (i) an Employee has knowledge of relevant facts or issues, or (ii) an Employee's assistance is reasonably necessary in respect of any such claim; provided that any such assistance shall not unreasonably interfere with such Buyer's operations of the Stores or its business.

Section 6.4     Certain Tax Matters.

(a)     Transfer Taxes.  Sellers shall pay any stamp, documentary, registration, sales, use, transfer, added-value or other non-income Tax (a "Transfer Tax") imposed under applicable law in connection with the transactions contemplated hereby. Buyers shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than 10 Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyers' approval, which shall not be unreasonably withheld, delayed, or conditioned.  Each Seller and each Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

(b)     Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those referred to in Section 2.8), personal property Taxes and similar Taxes) (any such taxes, "Ad-Velorem Taxes") for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than 10 days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers  The Parties acknowledge and agree that as between Mrs. Greens and Village and with respect to the definition of Group 1 Stores Assumed

Liabilities and Group 2 Store Assumed Liabilities, any Ad-Velorem Taxes attributable to the Group 1 Stores and owed by Buyers pursuant to this <u>Section 6.4(b)</u> shall be the responsibility of Mrs. Greens and deemed a Group 1 Stores Assumed Liability and any Ad-Velorem Taxes attributable to the Group 2 Store and owed by Buyers pursuant to this <u>Section 6.4(b)</u> shall be the responsibility of Village and deemed a Group 2 Store Assumed Liability.

Section 6.5 <u>Insurance Matters</u>. Each Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by either Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyers, the Stores, or the Acquired Assets and no further coverage shall be available to Buyers, the Stores, or the Acquired Assets under any such policies.

Section 6.6 <u>Acknowledgements</u>. Each Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics. Each Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) such Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished with respect thereto; and (iii) except as may be otherwise provided herein, neither Buyer nor any other Person (including any Buyer Indemnified Party) shall have any claim against either Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of <u>Section 3.11</u> or <u>Section 9.1</u>, Buyer acknowledges that except for the representations and warranties set forth in <u>Article III</u> (which representations and warranties shall terminate and be of no further force or effect as of the Closing), neither Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information so furnished with respect thereto.

Section 6.7 <u>Press Releases and Public Announcements.</u> No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.8 <u>Seller Marks.</u> The Seller Marks may appear on some of the Acquired Assets, including on signage. Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks. Buyer shall within twenty Business Days after the Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

Section 6.9    Point of Sale Equipment.  Seller agrees to allow Buyers the use of any point of sale equipment which does not constitute a Group 1 Stores Acquired Asset located and used by Sellers at the Group 1 Stores for a period of thirty (30) days following the Closing; provided that Buyers shall reimburse Sellers for Sellers' out-of-pocket rental/lease fees and all other out-of-pocket costs and expenses of Sellers paid or due to third parties constituting Damages arising out of Buyers' use of such point of sale equipment during such thirty day period.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date); except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof;  and

(e)    each payment, if any, contemplated by Section 2.5(a) to be made to Buyer, and each delivery contemplated by Section 2.5 to be delivered to Buyer shall have been delivered, and all Cure Costs that are, individually, greater than $75,000, shall have been paid by Sellers (and for the avoidance of doubt, Sellers shall pay all other Cure Costs that are agreed upon and accepted by the applicable counterparty or are determined by the Bankruptcy Court to be owing, in each case, as soon as is reasonably practicable after the Closing).

Section 7.2    Conditions to Sellers' Obligations.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as

of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)     the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)     no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof; and

(e)     each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.3     No Frustration of Closing Conditions.     Neither Buyers nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its commercially reasonable efforts to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1     Termination of Agreement.     The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)     by the mutual written consent of the Parties;

(b)     by any Party by giving written notice to the other Parties if:

(i)     any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to any Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement;

(ii)     the Closing shall not have occurred prior to the 90th calendar day following the date hereof (the "Outside Date");

(c)     by (i) Mrs. Greens with respect to its obligations under this Agreement including the purchase of the Group 1 Stores Acquired Assets and the assumption of the Group 1 Stores Assumed Liabilities, in which case the Group 1 Stores Acquired Assets shall be deemed an Excluded Asset and the Group 1 Stores Assumed Liabilities shall be deemed an Excluded Liability and the Purchase Price shall be reduced by an amount equal to the Group 1 Stores Exclusion amount, and (ii) Village with respect to its obligations under this Agreement including the purchase of the Group 2 Store Acquired Assets and the assumption of the Group 2 Store Assumed Liabilities, in which case the Group 2 Store Acquired Assets shall be deemed an Excluded Asset and the Group 2 Store Assumed Liabilities shall be deemed an Excluded Liability and the Purchase Price shall be reduced by an amount equal to the Group 2 Store Exclusion amount, if:

(i)     after giving effect to the last sentence of Section 5.8, there has been a breach by either Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyers at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by such Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) 10 days after receipt of such Buyer's notice of intent to terminate or (B) the Outside Date;

(ii)     to the extent such Buyer has a right of termination pursuant to Section 5.8 (after giving effect to the last sentence thereof);

provided, however, that either such Buyer's right to terminate pursuant to the immediately preceding clauses (i) or (ii) shall only apply to the extent that the underlying breach giving rise to such right of termination is related to such Buyer's Acquired Assets (i.e., a breach with respect to the Group 1 Stores will not trigger a termination right for Village, and a breach with respect to the Group 2 Store will not trigger a termination right for Mrs. Green's);

(d)     by either Seller by giving written notice to Buyers and the other Seller if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by such Buyer prior to the earlier to occur of (A) 10 days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;  or

(e)     by either Buyer if any Seller files a plan with the Bankruptcy Court contemplating the sale or retention of any portion of the Acquired Assets that is inconsistent with the terms of this Agreement.

Section 8.2     Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.11, Section 6.6, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability except as set forth in Section 8.3 to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach

occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement.

Section 8.3    Deposit Return

(a)    If this Agreement is terminated pursuant to (i) Section 8.1(b) due to the failure of Buyers to have fulfilled any of their obligations under this Agreement, or (ii) Section 8.1(d), in each case, so long as Sellers are then in compliance with their obligations under this Agreement, then Sellers shall be entitled to keep the Deposit as the sole and exclusive remedy as liquidated damages, and Sellers shall not be entitled to any other Damages or payment from Buyers, and Buyers shall have no further obligation or liability under this Agreement or any Related Agreement of any kind to either Seller or any Affiliate of either Seller or any of their respective representatives on account of this Agreement or any Related Agreement.

(b)    If this Agreement is terminated in a manner that does not require Buyers to forfeit the Deposit in accordance with Section 8.3(a), then Sellers shall remit the Deposit to Buyers by wire transfer of immediately available funds as directed by Buyers to Buyers' Account within five Business Days of the date of such termination.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Survival.    Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of the Parties set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    Obligations of Buyer Joint and Several.    Each obligation of Buyer under this Agreement shall be the joint and several obligation of Mrs. Greens and Village, provided, however, the Parties acknowledge and agree that from and after the Closing, Mrs. Greens shall be solely responsible for the Group 1 Stores Assumed Liabilities and any post-Closing covenant or obligation of Mrs. Greens pursuant to this Agreement and Village shall be solely responsible for the Group 2 Store Assumed Liabilities and any post-Closing covenant or obligation of Village pursuant to this Agreement.

Section 9.3    Expenses.    Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyers shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.4    Entire Agreement.    This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Section 9.5     Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.6     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.6 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.7     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties, provided, however, that either Buyer may assign its rights and obligations under this Agreement, in whole or in part (including with respect to the Prescription Lists, Pharmaceutical Inventory or any other Acquired Assets) at any time prior to, at or after Closing, to any Person, provided that such transfer or assignment shall not relieve such Buyer of its obligations hereunder to Sellers.

Section 9.8     Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; or (d) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to either Seller:          The Great Atlantic and Pacific Tea Company, Inc.
                              2 Paragon Drive
                              Montvale, New Jersey 07645
                              Attention:  Christopher W. McGarry
                                          Craig Feldman
                                          David Kelly

With a copies (which shall not constitute notice to Seller) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: James H.M. Sprayregen, P.C.
              Paul M. Basta
              Ray C. Schrock
Facsimile: (212) 446-4900

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention: James J. Mazza, Jr.
              Howard Norber
Facsimile: (312) 862-2200

If to Buyers:        Mrs. Greens Management Corp.
c/o The Catalyst Capital Group Inc.
Royal Trust Tower
77 King Street West, Suite 4320
P.O. Box 212
Toronto, ON M5K 1J3
Attention: Gabriel de Alba
Facsimile: (416) 945-3060

-and-

Village Super Market, Inc.
733 Mountain Avenue
Springfield, New Jersey 07081
Attention: General Counsel
With copies to (which shall not constitute notice to Buyer) to:

McMillan LLP
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M4J 2T3
Attention: Andrew J.F. Kent
Facsimile: (416) 865-7048

-and-

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, IL 60606
Attention:  James Ktsanes
Facsimile: (312) 993-9767

-and-

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
Attention: Paul R. DeFilippo, Esq.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.8.

Section 9.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.10    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.8; provided, however, that nothing in this Section 9.10 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.11    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF,

UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.12  Specific Performance.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that a Party may have under law or equity, a Party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.13  Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.14  No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyers, A&P, the Company, and their respective successors and permitted assigns.

Section 9.15  Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any specific representation or warranty to which the relevance of such disclosure on its face is reasonably apparent in light of the form and substance of the disclosure made.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.16  Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.17  Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart

may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.


By:_____
Name:
Title:


SUPER FRESH FOOD MARKETS, INC.


By:_____
Name:
Title:


MRS. GREENS MANAGEMENT CORP.


By:_____
Name:
Title:


VILLAGE SUPER MARKET, INC.


By:_____
Name:
Title:

**Exhibit A – Bidding Procedures Order**

**[To be appended]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) ) | Case No. 10-24549 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF CERTAIN SUPERFRESH BANNER STORE ASSETS

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc. ("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***") for the entry of an order (this "***Order***") authorizing the Bidding Procedures for the sale of the Southern Store Assets, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors having provided adequate and appropriate notice of the Motion under the circumstances; and upon the record of the April 28, 2011 hearing on the Motion, at which there was no opposition to the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

1.       The Motion is granted to the extent provided herein.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1024549110502000000000014

2.     The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved.

3.     If no objections to the Stalking Horse Notice are received, the Stalking Horse and Stalking Horse Bid, including payment of the Breakup Fee, shall be deemed approved by the Court, without the need for further Court order.

4.     Nothing in this Order releases, nullifies, or enjoins the enforcement of any liability to any governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing in this paragraph should be construed to (i) create for any governmental unit or any other party any substantive right that does not already exist under applicable law; or (ii) deem any purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties for days of violation prior to the entry of this Order.

5.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

6.     Notwithstanding Bankruptcy Rule 6004 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

2

7.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  White Plains, New York
        May 2, 2011

/s/Robert D. Drain
United States Bankruptcy Judge

K&E 18907437

## Exhibit 1

## Bidding Procedures

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE GREAT ATLANTIC & PACIFIC TEA | ) | Case No. 10-24549 (RDD) |
| COMPANY, INC., *et al.* | ) |  |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## BIDDING PROCEDURES FOR SOUTHERN STORE ASSETS

Set forth below are the bidding procedures (the "***Bidding Procedures***") that shall govern the sale of the assets of 25 SuperFresh grocery stores (the "***Southern Stores***") owned and operated by the debtors and debtors in possession (collectively, the "***Debtors***")[1] in the above captioned chapter 11 cases.

## I. Assets to Be Sold

The assets (the "***Assets***") to be offered for sale consist of all or substantially all the Southern Stores, including, without limitation, all inventory, certain equipment, interests in contracts or leases, accounts receivable, and payment intangibles associated with any of the Assets as described in the Asset Categories below, but excluding all Excluded Assets (as may be defined in the APA (defined below)).

Bidders must offer to purchase some or all of the Assets in one or more of the following

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

asset categories (the "***Asset Categories***"):

| Category | Asset Description |
|---|---|
| 1. | All of the Assets and assumption of certain liabilities, including the assumption of collective bargaining agreements related to the Southern Stores. |
| 2. | All of the Assets located in one or more of the Southern Stores, together with the assumption of the store lease for each such Southern Store, including the assumption of certain liabilities, including the relevant collective bargaining agreement. |
| 3. | All of the Assets located in one or more Southern Stores, but excluding the assumption of any store lease. |
| 4. | All or any part of the Assets consisting of inventory, including, without limitation, pharmaceutical inventory and prescription lists. |
| 5. | All or any part of the Assets consisting of inventory, but excluding pharmaceutical inventory and prescription lists. |
| 6. | All or any part of the Assets consisting of pharmaceutical inventory and prescription lists. |
| 7. | All or any part of the equipment at any Southern Stores. |
| 8. | Unexpired leases or executory contracts relating to any of the Southern Stores. |

## II.  Consideration of Bids

Without limiting the foregoing, the Assets will be offered for sale in separate Asset Categories, in one or more combinations and as a whole.  The Debtors may consider bids (each, a "***Bid***") for all of the Assets in a single bid from a single bidder or multiple bids from multiple bidders for Assets in any combination of the Asset Categories listed above.  The Debtors shall determine, in consultation with the administrative agent for the Debtors' postpetition secured lenders (the "***DIP Lenders' Agent***"), the official committee of unsecured creditors (the "***Creditors' Committee***") and the United Food and Commercial Workers Union Local and its local union affiliates — Local 27, Local 400, and Local 1776 (collectively, the "***Union***"), the Successful Bidder (as defined below) based on, among other things, but not limited to, the number of Assets purchased, the assumption of certain liabilities, the purchase price for the Assets, and the value to the estates.

The Assets that are offered for sale shall be sold pursuant to section 363 of the

Bankruptcy Code free and clear of all liens and other interests in such Assets with certain exceptions which exceptions are to be assumed under the APA or satisfied at closing from the cash proceeds received in connection with the purchase of such Assets; <u>provided</u> that the DIP Lenders' Agent's liens shall attach to the proceeds of the Assets with the same validity, force, and effect.

The Debtors will provide all bidders with a form asset purchase agreement (the "***APA***"), which the Debtors shall file with the United States Bankruptcy Court for the Southern District of New York (the "***Court***") pursuant to a supplemental notice and will make the APA available at a data site maintained by Hilco Real Estate, LLC ("***Hilco***"), specifically for the sale of the Assets.[2]

## III.    Marketing Process and Due Diligence

The Debtors have and will continue to provide confidential information regarding the Assets to potential purchasers (the "***Initial Information***").  Before receiving Initial Information, each potential purchaser must execute a confidentiality agreement, in a form satisfactory to the Debtors.  The Debtors will make the Initial Information and other information available electronically through a data room.  The Debtors may, but are not obligated to, furnish any due diligence information after the Bid Deadline (as defined below) for Qualified Bids (as defined below) or to any entity that the Debtors determine.

## IV.    Bid Deadline

All Bids must be served upon and actually received by the Debtors, counsel to the Debtors, Hilco, the DIP Lenders' Agent, and the Creditors' Committee, on or before 4:00 p.m., prevailing Eastern Time, on May 13, 2011 (the "***Bid Deadline***").  Bids must be sent to:  (a) the Debtors, The Great Atlantic & Pacific Tea Company, Inc., Attn:  Christopher W. McGarry, Craig Feldman and David Kelly, 2 Paragon Road, Montvale, New Jersey 07645; (b) counsel to the Debtors, Kirkland & Ellis LLP, Attn:  Ray Schrock, 601 Lexington Avenue, New York, New York 10022, and Attn:  James J. Mazza, Jr., 300 North LaSalle, Chicago, Illinois 60654; (c) Hilco Real Estate, LLC, Attn:  Zvi Rhine, 5 Revere Drive, Suite 320, Northbrook, Illinois 60062; (d) counsel to the DIP Lenders' Agent, Davis Polk & Wardwell LLP, Attn:  Donald S. Bernstein and Marshall S. Huebner, 450 Lexington Avenue, New York, New York 10017; (e) counsel to the Creditors' Committee, Milbank, Tweed, Hadley & McCloy LLP, attn:  Dennis F. Dunne, Abhilash M. Raval and Matthew S. Barr, One Chase Manhattan Plaza, New York, New York 10005; and (f) counsel to the Union, Cohen, Weiss, and Simon LLP, attn: Bruce Simon, Richard Seltzer, and Thomas Ciantra, 330 West 42nd Street, New York, New York 10036 (collectively, the "***Notice Parties***").  The Debtors may extend (after consultation with the DIP Lenders' Agent, and the Creditors' Committee) the Bid Deadline for the delivery of Bids once or successively, without further notice and for one or more bidders.

---

[2]    To the extent there are any conflicts between these Bidding Procedures and the APA, the terms of the APA shall govern.

## V.     Qualified Bid Requirements

The Debtors will determine, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union and subject to the Bidding Procedures and the requirements below, whether a Bid is a Qualified Bid and, ultimately a Successful Bid (as these terms are defined below).

Any entity that desires to submit a Bid to purchase the Assets may do so in writing as follows:

(i)     a Bid must include an executed APA, blacklined to show changes from the APA that the Debtors have submitted pursuant to a supplemental filing, clearly setting forth any conditions for closing and stating that the Bid is irrevocable as set forth below;

(ii)    the Bid must identify with particularity each and every unexpired lease or executory contract (each, an "***Assumed Contract***") sought to be assumed and assigned, the assumption and assignment of which is a condition precedent to closing, and include an executed assumption and assignment agreement;

(iii)   a Bid must clearly set forth the purchase price to be paid;

(iv)    a Bid shall not be contingent upon any due diligence investigation, any material adverse change, the receipt of financing, or approval by any board of directors, shareholders, or other entity;

(v)     a Bid must include evidence, including financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtors upon consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union) sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner, or other sponsor (each, a "***Sponsor***"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

(vi)    a Bid must contain such financial and/or other information that will allow the Debtors, following consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the APA, including such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;

(vii)   a Bid must not include a credit bid by the holder of a lien on equipment and related property of any Debtor such that the offer would make the sale of the

remainder of property reasonably impractical at what would otherwise be the highest or best terms, as the case may be, available to the Debtors' estates;

(viii)   a Bid must disclose the identity of the bidder's organization, including confirmation that the competing Bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any);

(ix)   a Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the APA;

(x)   a Bid must state that the bidder is willing to consummate and fund the proposed transaction by no later than five (5) business days after the Sale Hearing (as defined below), however such requirement may be waived by the Debtors;

(xi)   a Bid must include a cashier's check or be accompanied by a wire transfer (or, if by a landlord for its own lease, value) payable or delivered to the Debtors, their counsel or other agreed upon escrow agent, in an amount equal to 10 percent (10%) of the total purchase price in the APA (the "***Deposit***"); and

(xii)   a Bid must disclose any agreements or understandings between the bidder and any third party with respect to the subject Assets or with respect to any possible transaction involving the Debtors.

Notwithstanding anything to the contrary, the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union shall have the right to consider Bids that do not conform to one or more of the requirements set forth in these procedures and to deem such Bids Qualified Bids (as defined below).

Notwithstanding anything to the contrary in these procedures, the Bid of the Successful Bidder (as defined below) must remain irrevocable in accordance with the terms of the APA executed by the Successful Bidder.  All other Bids must be irrevocable until the earlier to occur of (a) 25 days after entry of a Sale Order (as defined below) approving the sale of the Assets and (b) closing of the sale of Assets in accordance with the Successful Bid (as defined below).

Notwithstanding anything to the contrary in these procedures, the Debtors also reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to reject any and all Bids, including Qualified Bids, for any Asset in any particular Asset Category.

## VI.   Evaluation of Qualified Bids

The DIP Lenders' Agent, the Creditors' Committee, and the Union shall be given a reasonable opportunity to review any information and documentation, financial or otherwise, required of potential bidders by the Debtors prior to the Debtors' selection of Qualified Bidders (as defined below).  The Debtors may request additional information from a potential bidder to better evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in

connection therewith, and such bidder shall be obligated to provide such information as a pre-condition to participating further in the Auction (as defined below).

The sufficiency of any submitted Bid will be at the discretion of the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union. The Debtors shall promptly as practicable notify potential bidders who have (a) returned a signed confidentiality agreement, (b) timely submitted the information and documentation listed above in Section 7(i) - (xii), and (c) who have financial qualifications satisfactory to the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, that they have been selected as a qualified bidder (each a "***Qualified Bidder***") and that their Bid is a "Qualified Bid."

The submission of the information and documentation listed above in Section 7(i) - (xii) will be deemed to be the bidder's consent for the Debtors and their advisors to share any information submitted by the bidder to the DIP Lenders' Agent, the Creditors' Committee, the Union, any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such bidder. Any bidders submitting Bids will bear their own expenses in connection with the sale, regardless of whether the sale is approved, in accordance with the terms of the APA, subject to the Debtors' right to designate a Stalking Horse (defined below).

## VII. Stalking Horse Bids

The Debtors reserve the right in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to enter into one or more APAs with any entity for all or any portion of the Assets, and designate that entity or entities as a stalking horse (the "***Stalking Horse***") subject to the terms herein. The Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union may offer a breakup fee to the Stalking Horse. The Debtors are under no obligation to choose a Stalking Horse or offer a breakup fee for any of the Assets.

In the event the Debtors select a Stalking Horse, the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, may offer bid protections, including a breakup fee of up to 2.5% of the cash portion of the purchase price of the Stalking Horse Bid. If the Debtors identify a Stalking Horse, the Debtors will file a supplemental notice (the "***Stalking Horse Notice***") with the Court identifying the Stalking Horse and the terms of the Stalking Horse Bid, including the terms and conditions for payment of any breakup fee. Any entity wishing to object to the Stalking Horse shall have five (5) days from the filing of the Stalking Horse Notice to file an objection (the "***Objection***") with the Court and serve it on the Notice Parties. In the event an Objection is filed and such Objection cannot be resolved consensually, the Debtors will seek to schedule a hearing with the Court for approval of the Stalking Horse and Stalking Horse Bid, including payment of any breakup fee. If no Objections to the Stalking Horse Notice are received, the Stalking Horse and Stalking Horse Bid, including payment of any breakup fee, shall be deemed approved by the Court, without the need for further Court order.

In the event the Debtors choose a Stalking Horse, the Stalking Horse Bid will be a

Qualified Bid.

## VIII.  The Auction

The auction (the "***Auction***") will be conducted for the Assets on May 17, 2011 at 10:00 a.m. prevailing Eastern Time (the "***Auction Date***") at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York 10022.  The Assets shall be sold free and clear of all liens, claims, and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code; <u>provided</u> that the DIP Lenders' Agent's liens shall attach to the proceeds of the Assets with the same validity, force and effect.

The Debtors may conduct the Auction in any manner and upon any terms and conditions the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, believe will achieve the maximum value for the Assets.  If an auction is held, the Debtors will, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, submit rules and procedures for the auction.  The Debtors shall, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, promulgate rules regarding any auction as they deem appropriate, including, but not limited to, rules governing minimum starting bids, minimum overbids, and subsequent bids.

Only Qualified Bidders may bid at the Auction.  If multiple Qualified Bids are received, each Qualified Bidder (or its duly authorized representative) shall have the right to continue to improve its Qualified Bid at the Auction.

At the conclusion of the Auction, and subject to Court approval following the Auction, the successful Bid or Bids shall be selected and announced by the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union (the "***Successful Bid*** or ***Bids***"), and the backup Bid or Bids shall be selected and announced by the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union (the "***Backup Bid*** or ***Bids***").

Within 24 hours of completion of the Auction, the entity or entities that made the Successful Bid or Bids (the "***Successful Bidder***") and the entity or entities that made the Backup Bid or Bids shall complete and sign all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which such Successful Bid or Bids and Backup Bid or Bids were made.

If a Stalking Horse is selected and no Qualified Bids are received for the Assets (or no Stalking Horse is selected and only one Qualified Bid is received for the Assets), the Debtors may determine, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, that the Stalking Horse Bid or the Qualified Bid, as applicable, is the Successful Bid and seek Court approval of the relevant APA without offering the subject Assets for sale at the Auction.  If the Debtors determine that there is no Successful Bid for a particular Asset, the Debtors may decide, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to not sell that Asset at the Auction.

The Auction may be adjourned or cancelled as the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, deem appropriate.  Reasonable

notice of such adjournment and the time and place for the resumption of the Auction or cancellation shall be given to all participants and to the DIP Lenders' Agent, the Creditors' Committee, and the Union.

## IX.   Selection of Successful Bid or Bids

The Debtors reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to base the selection of the Successful Bid and Backup Bid (as defined below) on the following factors, among others: the Asset Categories included in the Bid; liabilities assumed in the Bid; purchase price; and the APA markup submitted with the Bid.

The Debtors may, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, (a) reject any Bid (including a Stalking Horse Bid) that, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors and/or (b) refuse to consider any Bid that fails to comply with the Bidding Procedures or any other procedures established by the Debtors.

## X.   Backup Bids

If the Successful Bidder fails to consummate the sale, breaches the APA or otherwise fails to perform, upon consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, the Debtors may consummate the proposed sale with the next highest or best bidder at the Auction — the Backup Bidder, which hereafter shall be included in the definition of "Successful Bidder," without the need for further Court approval.

## XI.   Damages for Failure to Close

If the Successful Bidder fails to consummate the sale in accordance with the terms of its Successful Bid and applicable APA: (a) the Debtors will retain the Deposit of such bidder, to the extent provided by the APA, and (b) the Debtors will maintain the right to pursue all available remedies against such bidder.

Notwithstanding anything to the contrary in these procedures, the Deposit of the Successful Bidder will be retained by the Debtors in accordance with the terms of the APA executed by the Successful Bidder. Deposits of all other bidders will be retained by the Debtors until the earlier to occur of (i) twenty-five days after entry of a Sale Order approving the sale of the Assets or (ii) closing of the sale of Assets in accordance with the Successful Bid.

## XII.   Sale Motion and Hearing

Upon the selection of a Successful Bidder, the Debtors will file a motion to approve the sale (the "*Sale Motion*"). A hearing will be conducted on the Sale Motion by the Court on June 14, 2011 at 10:00 a.m. prevailing Eastern Time (the "*Sale Hearing*"). At the Sale Hearing, the Debtors will request that the Court enter an order (the "*Sale Order*"): (a) approving (i) the Successful Bid(s), (ii) the applicable APA(s), and (iii) the proposed assumption and assignment of any Assumed Contract, and (b) authorizing the Debtors to consummate the proposed

transaction. At the Sale Hearing, the Court shall also determine: (a) any cure required under 11 U.S.C. §365(b) if the affected landlord timely filed an objection to the Debtors' proposed cure of any unexpired lease to be assumed and assigned, and (b) if applicable, whether the Debtors have demonstrated adequate assurance of future performance under 11 U.S.C. § 365.

## XIII.    "As Is, Where Is"

The proposed transfer of any of the Debtors' Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the applicable APA of each Successful Bidder as accepted by the Debtors and approved by the Court. Except as otherwise provided in an APA, all of the Debtors' right, title and interest in and to the respective Asset will be transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests in accordance with section 363 of the Bankruptcy Code. Any other claim, lien or encumbrance, as set forth in the APA, will attach to the net proceeds of the sale of the particular Asset.

Each bidder for any of the Debtors' Assets will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct such due diligence regarding the Asset prior to making its offer as provided in the APA, (b) has relied solely upon its own independent review, investigation and/or inspection of any document including, without limitation, executory contracts and unexpired leases in making its Bid, and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Asset, or the completeness of any information provided in connection with the Asset sale or the Auction, except as expressly stated in the particular APA.

## XIV.    Reservation of Rights

Notwithstanding the Debtors' determination of a Stalking Horse and/or receipt of any Qualified Bids for any particular Asset, the Debtors may continue to negotiate and solicit Bids. The Debtors reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to enter into agreements for the sale of any of their Assets, either individually or as part of a package prior to an Auction, without further notice to any party, which agreements, if any, will be subject to higher or otherwise better Bids at the Auction (including evaluation on a package or individual basis). The Debtors retain the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to withdraw one or more Assets from the sale, including in connection with a package offer, up to the date of the Auction or Sale Hearing. Formal approval of a Bid will not occur unless and until the Court enters an order approving and authorizing the Debtors to consummate the transaction.

The Debtors reserve the right to implement additional procedural rules after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, provided such additional rules are not inconsistent with these Bidding Procedures.

*  *  *

**Exhibit B – Escrow Agreement**

**[To be appended]**

# CHICAGO TITLE AND TRUST COMPANY

## 171 NORTH CLARK, CHICAGO, ILLINOIS 60601

Refer to: _____ Escrow Officer
Phone no.: _____
Fax no.: _____

## JOINT INSTRUCTION ESCROW TRUST INSTRUCTIONS

ESCROW TRUST NO.: _____          DATE: _____

FILE NO. _____

To:  Chicago Title and Trust Company, Escrow Trustee:

### Customer Identification:

Sellers:      The Great Atlantic and Pacific Tea Company, Inc.; Super Fresh Food Markets, Inc.
Buyers:      Mrs. Greens Management Corp.; Village Super Market, Inc.
Proposed Disbursement Date: _____

### Deposit:

The sum of $_____(_____ Dollars) by Buyers  representing the Escrow Amount (as defined in that certain Asset Purchase Agreement, dated as of May 18, 2011, by and among Sellers and Buyers).

### Delivery of Deposit:

The above-referenced escrow trust deposit (the "deposit") is deposited with the escrow trustee to be delivered by it only upon the receipt of joint instructions from the undersigned or their respective legal representatives or assigns.  In no case shall the deposit be surrendered except upon the receipt of instructions signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

### Billing Instructions:

Escrow trust fee will be billed as follows:  One-half to Seller; and one-half to Buyers.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title Insurance Co. (the "Company") will impose an administrative maintenance fee (quarterly, semi-annually, or annually) equivalent to the fee set forth on the Company's then current rate schedule.  This fee may be deducted from the outstanding escrow balance or billed to Buyers.

PLEASE NOTE: The escrow trust fee for these joint instruction escrow trust instructions (these "Instructions") is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. The Company, at its sole discretion, may reduce or waive the escrow trust fee for these Instructions.

### Investment:

The deposit may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to these Instructions, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest the deposit, the Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these Instructions.

**Direction Not to Invest/Right to Commingle:**

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Nothing herein, however, shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

**Compliance With Court Order:**

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the deposit.

**Execution:**

These Instructions are governed by and are to be construed under the laws of the state of Illinois. These Instructions and any amendments or supplemental instructions hereto may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

**For Sellers:**

| | | **For Buyers:** | |
|---|---|---|---|
| Name: | The Great Atlantic and Pacific Tea Company, Inc. | Name: | Mrs. Greens Management Corp. |
| By: | | By: | |
| Address: | 2 Paragon Drive | Address: | |
| | Montvale, New Jersey 07645 | | |
| Fax: | | Fax: | |
| Signature: | | Signature: | |
| Name: | Super Fresh Food Markets, Inc. | Name: | Village Super Market, Inc. |
| By: | | By: | |
| Address: | 2 Paragon Drive | Address: | |
| | Montvale, New Jersey 07645 | | |
| Fax: | | Fax: | |
| Signature: | | Signature: | |

Accepted:    CHICAGO TITLE INSURANCE CO. AS ESCROW TRUSTEE

By:                                                    Date:

**Exhibit C – Form of Bill of Sale**

**[To be appended]**

<u>BILL OF SALE</u>

THIS BILL OF SALE (this "<u>Bill of Sale</u>") is entered into and effective as of [_____ __], 2011, by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation (together with A&P, "<u>Sellers</u>"), Mrs. Greens Management Corp, a New York Corporation ("<u>Mrs. Greens</u>"), and Village Super Market, Inc., a New Jersey corporation ("<u>Village</u>" and together with Mrs. Greens, "<u>Buyers</u>").

WHEREAS, Sellers and Buyers are parties to that certain Asset Purchase Agreement, dated May 18, 2011 (the "<u>Purchase Agreement</u>") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Sections 2.5(b)(i) and 2.5(c)(i) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the parties hereto hereby agree as follows:

1.      <u>Sale and Acceptance of Acquired Assets</u>.    For true and lawful consideration paid to them by Buyers, the sufficiency of which is hereby acknowledged, effective as of the Closing, Sellers hereby sell, assign, transfer, convey, and deliver to Buyers the Acquired Assets.  As of the Closing, Buyers hereby accept the foregoing sale and assignment.

2.      <u>Conflict</u>.  The sale, assignment, transfer, conveyance, and delivery of the Acquired Assets made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the parties contained in the Purchase Agreement or the survival thereof.

3.      <u>Notices</u>.  Any notice, request, or other document to be given hereunder to any party hereto shall be given in the manner specified in Section 9.8 of the Purchase Agreement.  Any party hereto may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other parties hereto.

4.      <u>Severability</u>.  Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5.      <u>Enforceability</u>.  If any provision of this Bill of Sale or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable

in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not effect any other provision hereof.

6. <u>Amendments</u>. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyers and Sellers.

7. <u>Counterparts; Facsimile and Electronic Signatures</u>. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

8. <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

9. <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale as of date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

MRS. GREENS MANAGEMENT CORP.

By:_____
Name:
Title:

VILLAGE SUPER MARKET, INC.

By:____
Name:
Title:

**Exhibit D – Form of Assignment and Assumption Agreement**

**[To be appended]**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into and effective as of [_____ __], 2011, by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("A&P"), Super Fresh Food Markets, Inc., a Delaware corporation (together with A&P, "Sellers"), Mrs. Greens Management Corp, a New York Corporation ("Mrs. Greens"), and Village Super Market, Inc., a New Jersey corporation ("Village" and together with Mrs. Greens, "Buyers").

WHEREAS, Sellers and Buyers are parties to that certain Asset Purchase Agreement, dated May 18, 2011 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Agreement is contemplated by Sections 2.5(b)(ii) and 2.5(c)(ii) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the parties hereto hereby agree as follows:

1.      Assumption of Assumed Liabilities.  Effective as of the Closing, Sellers hereby assign, and Buyers hereby assume and agrees to pay, discharge, or perform when due, on or after the Closing Date, the Assumed Liabilities to the extent provided in the Purchase Agreement.

2.      Conflict.  The assignment and assumption of the Assumed Liabilities made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the parties contained in the Purchase Agreement or the survival thereof.

3.      Notices.  Any notice, request, or other document to be given hereunder to any party hereto shall be given in the manner specified in Section 9.8 of the Purchase Agreement.  Any party hereto may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other parties hereto.

4.      Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

5.      Enforceability.  If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable

in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not effect any other provision hereof.

6.      Amendments.  This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyers and Sellers.

7.      Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

8.      Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

9.      Third Party Beneficiaries and Obligations.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Agreement.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

MRS. GREENS MANAGEMENT CORP.

By:_____
Name:
Title:

VILLAGE SUPER MARKET, INC.

By:_____
Name:
Title:

**Exhibit E**

**CERTIFICATE OF NON-FOREIGN STATUS**

This certificate is being delivered pursuant to <u>Section 2.5(b)</u> of that certain Asset Purchase Agreement, dated as of _____ 2011, by and among Mrs. Greens Management Corp, a New York corporation ("Mrs. Greens"), Village Super Market, Inc., a New Jersey corporation ("Village" and together with Mrs. Greens, "Buyers"), The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("A&P"), and Super Fresh Food Markets, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P ("Transferor").

Section 1445 of the Internal Revenue Code of 1986, as amended, (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform Buyers that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

(a)    Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate, (as those terms are defined in the Code and the Treasury Regulations promulgated thereunder);

(b)    Transferor is not a disregarded entity as defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

(c)    Transferor's employer identification number is **[_____]**; and

(d)    Transferor's office address is:

**[Two Paragon Drive
Montvale, New Jersey 07645]**

Transferor understands that this Certificate may be disclosed to the Internal Revenue Service by Buyers and that any false statement herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have the authority to sign this certificate on behalf of Transferor.


Date: __/__/2011                                        _____

                                                                   By:
                                                                   Title:

**Disclosure Schedule**
**Schedule 1.1(a) – Buyer's Wire Instructions**


**<u>Mrs. Greens</u>:**

**[TO COME]**

**<u>Village</u>:**

ABA#             021200012
WELLS FARGO BANK/WACHOVIA
ACCPONT #     2100015573297
VILLAGE SUPERMARKETS, INC.

**Disclosure Schedule**
**Schedule 1.1(b) – Excluded Furnishings and Equipment**

All software.

**Disclosure Schedule**
**Schedule 1.1 (c) – Specifically Identified Excluded Assets**

None.

**Disclosure Schedule**
**Schedule 1.1(d) – Sellers' Wire Instructions**

Citibank, N.A.
734 Third Avenue
New York, N.Y.  10017

**ABA #021-000-089**
Chicago Title Insurance Company
711 3rd Avenue-5th Floor
New York, N.Y.  10017

National Special Deposit Account
**ACCOUNT # 9936777790**

Telephone-Advise upon receipt
Kathleen Fio Rito
(212) 880-1336

**Reference**

**121100092 – [Mrs. Greens/Village]**

**Disclosure Schedule**
**Schedule 2.6 (a) – Inventory Instructions & Pricing**


The Inventory Taker shall value all national brands, shelf inventory and case lot inventory carried in the Stores, excluding certain items hereinafter, referred to at the following percentages of the retail price (subject to the requirements of applicable law):

| | |
|---|---|
| Grocery | 71% |
| Alcohol | 78% |
| Tobacco/Cigarettes | 45% |
| Frozen Food | 63% |
| Frozen Meat | 50% |
| Frozen Seafood | 47% |
| Health and Beauty Aids | 67% |
| General Merchandizing | 55% |

Such retail price of all items counted to be as shown by the price on each item on the shelf or, if there is no price, on each as shown in the most recent price book or other price guide of Sellers.

The Inventory Taker shall value the contents of the Pharmaceutical Inventory by visually estimating the number of containers (rounding the estimate to the nearest one-tenth $(1/10^{th})$ of the container) and multiplying the number by Sellers' actual cost for that container.

**Disclosure Schedule**
*Section 3.5 – Store Locations and Leases[1]*


**Group 1 Stores**

Store # 897 - 7709 Harford Rd., Parkville, MD
Store # 891 - 1238 Bay Dale Dr., Arnold, MD
Store # 812 - 1020 W 41 St., Baltimore, MD

**Group 2 Store**

Store # 985 – 12028 Cherry Hill Rd., White Oak, MD

**Group 1 Stores Leases**

Store # 897 – Lease between CEM Securities Corporation, as landlord and The Great Atlantic & Pacific Tea Company, Inc., as tenant dated November 10, 1961 (as amended, supplemented or restated from time to time)

Store # 891 - Lease between College Parkway Limited Partnership, as landlord and The Great Atlantic & Pacific Tea Company, Inc., as tenant dated October 12, 1976 (as amended, supplemented or restated from time to time)

Store # 812 - Lease between L.V.M Limited Partnership, as landlord and The Great Atlantic & Pacific Tea Company, Inc., as tenant dated July 16, 1991 (as amended, supplemented or restated from time to time)

**Group 2 Store Lease**

Store # 985 - Lease between White Oak-Grocery, LLC, as landlord, and The Great Atlantic & Pacific Tea Company, Inc., as tenant, dated February 13, 2001 (as amended, supplemented or restated from time to time)

> Lease Modification, Subordination, Non-Disturbance, and Attornment Agreement, dated February 13, 2001, by and among Salomon Brothers Realty Corp., The Great Atlantic & Pacific Tea Company, Inc., and White Oak-Grocery, LLC

---

[1]   Note to Sellers: Please revise schedule consistent with the revised Section 3.5.

**Disclosure Schedule**
***Section 3.6 – Litigation***

None.

**Disclosure Schedule**
*Section 3.7 – Collective Bargaining Agreements*

- Agreement between the Great Atlantic & Pacific Tea Company, Inc., Baltimore Division, Super Fresh Sav-A-Center or Sun and The United Food and Commercial Workers Union Local 1776, Area 3, AFL-CIO-CLC, South Central Pennsylvania Division dated August 20, 2000.
- Collective Bargaining Agreement between Great Atlantic and Pacific Tea Company, Inc. Super Fresh (Baltimore Division) and United Food & Commercial Workers Union Local 27, dated August 3, 2008.
- Agreement made by and between Local 400 Chartered by the United Food & Commercial Workers International Union and The Great Atlantic & Pacific Tea Company, Inc., Super Fresh, dated August 3, 2008.
- Agreement between Super Fresh Food Markets, Inc. and United Food and Commercial Workers Union Local 27, dated October 31, 2004.
- Side Letter between United Food & Commercial Workers International Union and The Great Atlantic & Pacific Tea Company, dated August 3, 2008.

**Disclosure Schedule**
***Section 5.5(b) – Notices and Consents***

None.

**Exhibit C**

**Lot 2 APA**

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.,

SUPER FRESH FOOD MARKETS, INC.,

MRS. GREENS MANAGEMENT CORP.,

AND

VILLAGE SUPER MARKET, INC.

May 18, 2011

Table of Contents

Page

Article I Definitions ............................................................................................................1
    Section 1.1        Definitions. ....................................................................................1
    Section 1.2        Interpretations. ............................................................................13
Article II Purchase and Sale..............................................................................................14
    Section 2.1        Purchase and Sale of Assets........................................................14
    Section 2.2        Assumed Liabilities. ....................................................................14
    Section 2.3        Consideration; Deposit; Escrow Amount ....................................15
    Section 2.4        Closing. ........................................................................................15
    Section 2.5        Closing Payments and Deliveries ................................................16
    Section 2.6        Inventory .......................................................................................16
    Section 2.7        Allocation.....................................................................................17
    Section 2.8        Proration.......................................................................................18
    Section 2.9        Removal of Excluded Assets. ......................................................18
    Section 2.10      Damaged or Destroyed Store Closing..........................................19
Article III Sellers' Representations and Warranties ..........................................................19
    Section 3.1        Organization of Sellers; Good Standing. .....................................19
    Section 3.2        Authorization of Transaction. ......................................................19
    Section 3.3        Noncontravention; Government Filings. ......................................19
    Section 3.4        Title to Assets. .............................................................................20
    Section 3.5        Real Property. ...............................................................................20
    Section 3.6        Litigation; Decrees.......................................................................20
    Section 3.7        Labor Relations............................................................................20
    Section 3.8        Brokers' Fees. ..............................................................................20
    Section 3.9        Environmental Matters.................................................................20
    Section 3.10      Condemnation ..............................................................................21
    Section 3.11      Disclaimer of Other Representations and Warranties.................21
Article IV Buyers' Representations and Warranties...........................................................21
    Section 4.1        Organization of Buyer; Good Standing. ......................................21
    Section 4.2        Authorization of Transaction. ......................................................22
    Section 4.3        Noncontravention.........................................................................22
    Section 4.4        Litigation; Decrees.......................................................................22
    Section 4.5        Brokers' Fees. ..............................................................................22
                       Sufficient Funds; Adequate Assurances .....................................23
Article V Pre-Closing Covenants.......................................................................................23
    Section 5.1        Efforts; Cooperation.....................................................................23
    Section 5.2        Regulatory Approvals ...................................................................23
    Section 5.3        Bankruptcy Actions. ....................................................................24
                       Bidding Procedures......................................................................24
    Section 5.5        Notices and Consents ...................................................................24
                       Prescription Lists .........................................................................25
    Section 5.7        Notice of Developments. ..............................................................25
    Section 5.8        Notice of Supplemental Disclosure. ............................................25
    Section 5.9        Access; No Contact; Confidentiality. ..........................................26
    Section 5.10      Bulk Transfer Laws.......................................................................26

| Section 5.11 | Operations Prior to Closing | 26 |
| | | |

Article VI Other Covenants ....................................................................................26

| Section 6.1 | Further Assurances.......................................................................26 |
| Section 6.2 | Access; Enforcement; Record Retention. ....................................27 |
| Section 6.3 | Employees....................................................................................27 |
| Section 6.4 | Certain Tax Matters .....................................................................28 |
| Section 6.5 | Insurance Matters.  Each .............................................................29 |
| Section 6.6 | Acknowledgements ......................................................................29 |
| Section 6.7 | Press Releases and Public Announcements. .................................29 |
| Section 6.8 | Seller Marks. ...............................................................................29 |
| Section 6.9 | Point of Sale Equipment .............................................................30 |

Article VII Conditions to Obligation to Close ........................................................30

| Section 7.1 | Conditions to Buyer's Obligations...............................................30 |
| Section 7.2 | Conditions to Sellers' Obligations...............................................30 |
| Section 7.3 | No Frustration of Closing Conditions...........................................31 |

Article VIII Termination..........................................................................................31

| Section 8.1 | Termination of Agreement...........................................................31 |
| Section 8.2 | Effect of Termination...................................................................32 |
| Section 8.3 | Deposit Return and Termination Fee...........................................33 |

Article IX Miscellaneous ........................................................................................33

| Section 9.1 | Survival.......................................................................................33 |
| | Obligations of Buyer Joint and Several ......................................34 |
| | Expenses......................................................................................34 |
| Section 9.4 | Entire Agreement. .......................................................................34 |
| Section 9.5 | Incorporation of Exhibits and Disclosure Schedule.....................34 |
| Section 9.6 | Amendments and Waivers. ..........................................................34 |
| Section 9.7 | Succession and Assignment.........................................................34 |
| Section 9.8 | Notices. .......................................................................................35 |
| Section 9.9 | Governing Law. ...........................................................................36 |
| Section 9.10 | Submission to Jurisdiction; Service of Process. ..........................36 |
| Section 9.11 | Waiver of Jury Trial.....................................................................37 |
| Section 9.12 | Specific Performance. ..................................................................37 |
| Section 9.13 | Severability. ................................................................................37 |
| Section 9.14 | No Third Party Beneficiaries. ......................................................37 |
| Section 9.15 | Disclosure Schedule.....................................................................37 |
| Section 9.16 | Headings; Table of Contents........................................................38 |
| Section 9.17 | Counterparts; Facsimile and Electronic Signatures. ....................38 |

<u>Exhibits</u>:

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement
Exhibit E – Non-Foreign Affidavit


Disclosure Schedules:

| | |
|---|---|
| Schedule 1.1(a) | Buyer's Wire Instructions |
| Schedule 1.1(b) | Excluded Furnishings and Equipment |
| Schedule 1.1(c) | Specifically Identified Excluded Assets |
| Schedule 1.1(d) | Sellers' Wire Instructions |
| Schedule 2.6(a) | Inventory Instructions & Pricing |
| Schedule 3.5 | Store Locations and Leases |
| Schedule 3.6 | Litigation |
| Schedule 3.7 | Collective Bargaining Agreements |
| Schedule 5.5(b) | Notices and Consents |

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of May 18, 2011 by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation and a wholly-owned Subsidiary of A&P (the "<u>Company</u>" and, together with A&P, "<u>Sellers</u>"), Mrs. Greens Management Corp, a New York Corporation ("<u>Mrs. Greens</u>"), and Village Super Market, Inc., a New Jersey corporation ("<u>Village</u>" and together with Mrs. Greens, "<u>Buyers</u>").  Sellers and Buyers are referred to collectively herein as the "<u>Parties</u>".

WITNESSETH

WHEREAS, on December 12, 2010, A&P and its debtor affiliates (including the Company) each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which case is administered under Case No. 10-24549 (the "<u>Bankruptcy Case</u>");

WHEREAS, Sellers operate the 4 supermarkets at the locations set forth on of <u>Section 3.5</u> of the Disclosure Schedule under the name "SuperFresh" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers wish to sell, and Buyers wish to buy, the Acquired Assets (as defined below), on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

ARTICLE I
DEFINITIONS

Section 1.1    <u>Definitions.</u>  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means, collectively, the Group 1 Stores Acquired Assets and the Group 2 Store Acquired Assets.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(b).

"Assumed Liabilities" means, collectively, the Group 1 Stores Assumed Liabilities and the Group 2 Store Liabilities.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Base Purchase Price" has the meaning set forth in Section 2.3.

"Bidding Procedures" has the meaning set forth in Section 5.4.

"Bidding Procedures Order" means the *Order Approving Bidding Procedures in Connection with the Proposed Sale of Certain SuperFresh Banner Store Assets*, entered on May 2, 2011 Docket No. 1478, a copy of which is attached hereto as Exhibit A.

"Bill of Sale" has the meaning set forth in Section 2.5(b).

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyers' Account" means the bank accounts (including complete wire transfer instructions therefor) set forth on Schedule 1.1(a).

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Closing" has the meaning set forth in Section 2.3(a).

"Closing Date" has the meaning set forth in Section 2.3(a).

"Closing Statement" has the meaning set forth in Section 2.5(a).

"Company" has the meaning set forth in the preamble.

"Confidentiality Agreement" means, collectively, (i) the letter agreement, dated as of April 18, 2011, by and between A&P and Mrs. Greens, regarding the terms and conditions on

which A&P would make available to Mrs. Greens certain information relating to the Stores and the Acquired Assets and Assumed Liabilities and (ii) the letter agreement, dated as of April 18, 2011, by and between A&P and Village, regarding the terms and conditions on which A&P would make available to Village certain information relating to the Stores and the Acquired Assets and Assumed Liabilities.

"Consent" means any consent, approval, authorization, qualification, waiver, or notification of a Person.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby; provided, however, that the term "Contract" shall exclude any Lease.

"Cure Costs" means any and all amounts required to be paid in connection with the assumption and assignment of any Lease pursuant to section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court, to cure all defaults, and to pay all Damages that have resulted from such defaults, under such Lease, in each case, solely to the extent required pursuant to section 365 of the Bankruptcy Code, to effectuate such assumption and assignment.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Deposit" has the meaning set forth in Section 2.3.

"Disclosure Schedule" has the meaning set forth in Article III.

"Disclosure Supplement" has the meaning set forth in Section 5.8.

"Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) covered by ERISA and any other material employee benefit plan, program or arrangement of any kind established, maintained, sponsored or contributed to (or with respect to which an obligation to contribute has been undertaken) by A&P on behalf of any Employee.

"Environmental Laws" has the meaning set forth in Section 3.9.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that would be deemed a "single employer" with A&P under Section 414(b), (c), (m) or (o) of the IRC or Section 4001 of ERISA.

"Escrow Agent" means Chicago Title Insurance Co., a Nebraska corporation.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyers, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(c).

"Escrow Deadline" has the meaning set forth in Section 2.3(c).

"Excess Amount" has the meaning set forth in Section 2.5(a).

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a) any asset of Sellers that is (i) not located in the Stores and used or held for use primarily in the operation of the Stores or (ii) inseparable from any other business of Seller or any of its Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to Taxes paid or payable by Sellers; and (C) any Tax refund, credit, attribute, or other Tax asset of or with respect to Sellers;

(b) capital stock of any of A&P's Subsidiaries;

(c) all Cash Equivalents and accounts receivable;

(d) all rights and assets under or related to any Employee Benefit Plan;

(e) all Permits (other than Group 1 Permits and Group 2 Permits);

(f) all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(g) all of Sellers' rights under this Agreement or any Related Agreement;

(h) all of Sellers' rights under any Contracts;

(i) any and all automobiles, trucks, tractors, and trailers;

(j)     any other rebate or refund arising from the operation of the Stores prior to the Closing;

(k)     all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "SuperFresh", any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(l)     all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices;

(m)     the Furnishings and Equipment described on Schedule 1.1(b) (the "Excluded Furnishings and Equipment");

(n)     all Contracts;

(o)     assets relating to, arising under or in connection with any Employee Benefit Plans;

(p)     all Excluded Inventory;

(q)     all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores;

(r)     all other assets bearing any Seller Mark; and

(s)     those items set forth on Schedule 1.1(c).

"Excluded Inventory" has the meaning set forth in Section 2.6(a).

"Excluded Liabilities" means all Liabilities of Sellers that are not expressly included in the Assumed Liabilities including:

(a)     any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability primarily relating to or primarily arising out of the Excluded Assets;

(b)     any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.4);

(c)     all Liabilities relating to employees of Seller, whether arising prior to or after Closing, including, without limitation, Liabilities in connection with withheld

payroll Taxes, payroll, workman's compensation benefits, and employee withholding and Liabilities arising under the WARN Act;

(d)     all Liabilities of Seller under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(e)     all Liabilities of Sellers or any ERISA Affiliate with respect to any Employee Benefit Plan, pension plan or under any benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and/or other group welfare benefits;

(f)     all Liabilities under any Labor Agreements;

(g)     any Contract with any supplier or vendor to the Sellers; and

(h)     all Cure Costs.

"Final Allocation" has the meaning set forth in Section 2.7.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models, shelving, refrigeration equipment, [scales, slicers, carts, shopping carts, checkout counters, appliances, utensils and other equipment] owned by Sellers and located at the Stores.

"GAAP" means United States generally accepted accounting principles consistently applied.

"General Inventory" means all food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products offered for sale to customers at the Stores.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Group 1 Permits" means the Permits related solely to the Group 1 Stores that are transferable to Buyers under applicable Law without any material cost or expense or any material action or obligation by any Seller (with it being understood that expense or cost related to the transfer of any Group 1 Permit shall be borne by Buyer).

"Group 1 Stores" means the Stores located at 222 N. Charles Street, Baltimore, Maryland; 40 Souder Road, Brunswick, Maryland; 780 Cambridge Plaza, Cambridge, Maryland; 17 Washington Square, Chestertown, Maryland; 4330 48th Street NW, Washington, D.C.

"Group 1 Stores Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers and used or held for use primarily in the operation of the Group 1 Stores and (to the extent applicable) located at the Group 1 Stores (unless otherwise specified below) on the Closing Date:

(a)     the General Inventory (other than Excluded Inventory);

(b)     the Pharmaceutical Inventory (other than Excluded Inventory);

(c)     the Furnishings and Equipment owned by Sellers;

(d)     the Prescription Lists (to the extent that the transfer thereof to Buyer or its designee is permitted under applicable Law);

(e)     the Group 1 Stores Leases;

(f)     the Group 1 Stores Prepaid Expenses;

(g)     all point of sale register equipment owned by Sellers and located at the Group 1 Stores;

(h)     all Group 1 Permits; and

(i)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Group 1 Stores Acquired Assets shall not include any Excluded Assets.

"Group 1 Stores Assumed Liabilities" means:

(a)     all Liabilities under the Group 1 Stores Leases (other than Excluded Liabilities);

(b)     all amounts allocated to Mrs. Greens under Section 2.8 and all Property Taxes allocated to Mrs. Greens pursuant to Section 6.4; and

(c)     for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Group 1 Stores Acquired Asset from and after the Closing Date.

"Group 1 Stores Buyer Proration Amount" has the meaning set forth in Section 2.8.

"Group 1 Stores Exclusion Amount" means $9,800,000.00.

"Group 1 Stores Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either Seller holds any leasehold or subleasehold estates and other rights to use or occupy any Group 1 Store including the leases described on Schedule 3.5 designated as Group 1 Store Leases.

"Group 1 Stores Prepaid Expenses" means, collectively, all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Group 1 Stores Leases.

"Group 1 Stores Seller Proration Amount" has the meaning set forth in Section 2.8.

"Group 2 Permits" means the Permits related solely to the Group 2 Stores that are transferable to Buyers under applicable Law without any material cost or expense or any material action or obligation by any Seller (with it being understood that expense or cost related to the transfer of any Group 1 Permit shall be borne by Buyer).

"Group 2 Store" means the Store located at 37 West Aylesbury Rd, Lutherville-Timonium, Maryland.

"Group 2 Store Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers and used or held for use primarily in the operation of the Group 2 Store and (to the extent applicable) located at the Group 2 Store (unless otherwise specified below) on the Closing Date:

(a) the General Inventory (other than Excluded Inventory);

(b) the Pharmaceutical Inventory (other than Excluded Inventory);

(c) the Furnishings and Equipment owned by Sellers;

(d) the Prescription Lists (to the extent that the transfer thereof to Buyer or its designee is permitted under applicable Law);

(e) the Group 2 Store Lease;

(f) the Group 2 Store Prepaid Expenses;

(h) all Group 2 Permits; and

(h) to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Group 2 Store Acquired Assets shall not include any Excluded Assets.

"Group 2 Store Assumed Liabilities" means:

(a) all Liabilities under the Group 2 Store Leases (other than Excluded Liabilities);

(b) all amounts allocated to Village under Section 2.8 and all Property Taxes allocated to Village pursuant to Section 6.4; and

(c) for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of any Group 2 Store Acquired Asset from and after the Closing Date.

"Group 2 Store Buyer Proration Amount" has the meaning set forth in Section 2.8.

"Group 2 Store Exclusion Amount" means $2,700,000.00.

"Group 2 Store Lease" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either Seller holds any leasehold or subleasehold estates and other rights to use or occupy the Group 2 Store including the leases described on Schedule 3.5 and designated as Group 2 Store Leases

"Group 2 Store Prepaid Expenses" means, collectively, all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Group 2 Store Lease.

"Group 2 Store Seller Proration Amount" has the meaning set forth in Section 2.8.

"Hazardous Substance" means all pollutants, contaminants, chemicals, wastes, and any other infectious, carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials (whether solids, liquids or gases) subject to regulation, control or remediation under applicable Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Initial Allocation" has the meaning set forth in Section 2.7.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Inventory" means all General Inventory and Pharmaceutical Inventory.

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.6(a).

"Inventory Taker" has the meaning set forth in Section 2.6(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of any current employee of a Seller having a title of Senior Vice President, President, Chief Executive Officer or Chief Financial Officer. "Knowledge" of Buyer (and other words of similar import) means, in the case of Village, the actual knowledge of Frank Sauro, John Sumas, William Sumas and, in the case of Mrs. Greens, the actual knowledge of Gabriel de Alba and Matt Williams.

"Labor Agreements" means the collective bargaining agreements and related contracts covering any of the Employees.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means, collectively, the Group 1 Stores Leases and the Group 2 Store Lease.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the written consent of the other Party; (h) changes as a result of the announcement or pendancy of this Agreement; (i) any effects or changes arising from or related to the breach of the Agreement by Buyer; (j) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; or (k) any items set forth in the Disclosure Schedule.

"Mrs. Greens" has the meaning set forth in the preamble.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Party" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent; (b) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (c) easements, covenants, conditions, restrictions, leases and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property taken as a whole as it is currently used; (d) matters that would be disclosed on an accurate survey of the real property; and (e) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the ordinary course of business.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Pharmaceutical Inventory" means prescription pharmaceuticals and prescription products.

"Prepaid Expenses" means the Group 1 Stores Prepaid Expenses and the Group 2 Store Prepaid Expenses, collectively.

"Prepaid Expenses Amount" has the meaning set forth in Section 2.3(a).

"Prescription Lists" means, on any date, Sellers' lists of those customers for whom either Seller has filled a prescription from one of Sellers' pharmacies located within one of the Stores within the 12-month period immediately preceding such date.

"Property Taxes" has the meaning set forth in Section 6.4(b).

"Prorated Charges" has the meaning set forth in Section 2.8.

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Order" means an order of the Bankruptcy Court (a) approving (i) the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer on the terms set forth herein; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption by, and assignment to, Buyer of the Leases on the terms set forth herein; (b) that is in form and substance reasonably acceptable to Buyer and Sellers; and (c) that, without limiting the generality of the foregoing, includes (i) a finding that the Buyer purchased the Acquired Assets in "good faith," as such term is used in section 363(m) of the Bankruptcy Code and is entitled to the benefits and protections set forth therein, (ii) a prohibition against any holder of a claim against the Sellers or the Acquired Assets, including, without limitation, any union or landlord, from asserting, prosecuting or otherwise pursuing such claim against the Buyer, including without limitation any claim for Cure Costs, in all cases except as expressly provided in this Agreement with respect to Assumed Liabilities, (iii) a finding that, upon Sellers' payment of Cure Costs, all Leases remain in full force and effect, with all parties to the Leases foreclosed from asserting against the Buyer any default, breach, acceleration, assignment fees, increases, or any other fees resulting from Sellers' assumption and assignment of the Leases to Buyer; (iv) a finding that the sale does not and will not subject the Buyer to any liability by reason of such sale pursuant to any bulk-transfer laws, successor liability, or similar theories, and (v) a finding that this Agreement and the Sale Order will be binding on any trustee appointed in the Sellers' bankruptcy cases.

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Sellers" has the meaning set forth in the preamble.

"Sellers' Account" means the bank account (including complete wire transfer instructions therefor) set forth on Schedule 1.1(d).

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" has the meaning set forth in Section 8.3(a).

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Village" has the meaning set forth in the preamble.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    Any reference herein to law or to a legal requirement (or, with respect to any statute, ordinance, code, rule or regulation, any provision thereof) shall be deemed to include reference to all laws and or to such legal requirement and any legal requirement promulgated thereunder (or provision thereof, as applicable), including any successor thereto, respectively, in each case, as may be amended.

(i) References herein to a Person are also to its permitted successors and assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(j) Any reference herein to "Dollars" or "$" shall mean United States dollars.

(k) Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(l) References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Seller or provided, or that is able to be provided if requested, to Buyer or its Representatives in response to requests for materials or information.

(m) References in this Agreement to "the applicable Buyer" and other phrases of similar import shall mean, to the extent that the subject of such phrase relates to the Group 1 Stores, Mrs. Green's, and, to the extent the subject of such phrase relates to the Group 2 Store, Village.

ARTICLE II
PURCHASE AND SALE

Section 2.1 <u>Purchase and Sale of Assets.</u> On the terms and subject to the conditions set forth in this Agreement:

(a) Mrs. Greens will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Mrs. Greens free and clear of all Liens (other than Permitted Liens) with respect to the Group 1 Stores Acquired Assets; and

(b) Village will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Village free and clear of all Liens (other than Permitted Liens) with respect to the Group 2 Store Acquired Assets.

Section 2.2 <u>Assumed Liabilities.</u> On the terms and subject to the conditions set forth in this Agreement:

(a) Mrs. Greens will assume and become responsible only for the Group 1 Stores Assumed Liabilities at the Closing and no others. Mrs. Greens agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Group 1 Stores Assumed Liabilities in a timely manner in accordance with the terms thereof; and

(b) Village will assume and become responsible only for the Group 2 Store Assumed Liabilities at the Closing and no others. Village agrees to pay, perform, honor, and

discharge, or cause to be paid, performed, honored and discharged, all Group 2 Store Assumed Liabilities in a timely manner in accordance with the terms thereof.

For the avoidance of doubt, Sellers shall be liable for and shall pay at or prior to Closing all Cure Costs, and Buyers shall not have any liability therefor.

      Section 2.3    <u>Consideration; Deposit; Escrow Amount</u>.

      (a)    The consideration for the Acquired Assets shall be (a) an aggregate Dollar amount equal to the sum of (i) $12,500,000.00 (the "<u>Base Purchase Price</u>"), plus (ii) the amount of the Inventory Purchase Price, plus (iii) the amount of the Prepaid Expenses (the "<u>Prepaid Expenses Amount</u>"), plus (iv) the Group 1 Stores Seller Proration Amount, if any, plus (v) the Group 2 Store Seller Proration Amount, if any, minus (vi) the Group 1 Stores Buyer Proration Amount, if any, and minus (vii) the Group 2 Store Proration Amount, if any (such sum, the "<u>Purchase Price</u>") and (b) Buyers' assumption of the Assumed Liabilities as described in <u>Section 2.2</u> above.

      (b)    On the date hereof, Buyers (with the deposits of both Mrs. Greens and Village) has deposited with A&P an amount equal to 10% of the Base Purchase Price in cash (the "<u>Deposit</u>") by wire transfer of immediately available funds.

      (c)    Within two Business Days following the entry of the Sale Order by the Bankruptcy Court (the "<u>Escrow Deadline</u>"), Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an aggregate amount in cash equal to (i) the Base Purchase Price, plus (ii) Sellers' good faith estimate of the Inventory Purchase Price, plus (iii) Sellers' good faith estimate of the Prepaid Expenses Amount, plus or minus, as applicable, (iv) Sellers' good faith estimate of the Group 1 Stores Seller Proration Amount, the Group 2 Store Sellers Proration Amount, the Group 1 Stores Buyer Proration Amount or the Group 2 Store Buyer Proration Amount, as applicable (collectively, the "<u>Estimated Purchase Price</u>"), minus (v) the amount of the Deposit (the "<u>Escrow Amount</u>"). The Escrow Amount shall be held and disbursed at the Closing pursuant to the terms of the Escrow Agreement and <u>Section 2.5(a)</u>.

      Section 2.4    <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyers) commencing at 10:00 a.m. local time on a date (the "<u>Closing Date</u>") that is the later of (a) the fifth Business Day after the Escrow Deadline and (b) the first Business Day following the first date upon which all of the conditions to the obligations of Sellers and Buyers to consummate the transactions contemplated hereby set forth in <u>Article VII</u> (other than conditions with respect to actions the Parties will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyers prior thereto. For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5    Closing Payments and Deliveries.

(a)    Sellers shall prepare and deliver, within one day prior to the Closing Date, a statement setting forth the amount of (i) the Inventory Purchase Price (as determined in accordance with Section 2.6), (ii) the Prepaid Expenses Amount (as determined in good faith by Sellers), (iii) as applicable, the Group 1 Stores Seller Proration Amount, the Group 2 Store Seller Proration Amount, the Group 1 Stores Buyer Proration Amount or the Group 2 Store Buyer Proration Amount (as determined in accordance with Section 2.8), and (iv) the resulting Purchase Price (as calculated pursuant to Section 2.3(a)) (the "Closing Statement").  If the Purchase Price (as set forth on the Closing Statement) is less than the Estimated Purchase Price (as determined in accordance with Section 2.3(c)), Buyers and Sellers shall instruct the Escrow Agent to release from the account holding the Escrow Amount and deliver at the Closing to (i) Buyers, by wire transfer of immediately available funds to each Buyer's Account, as directed by the Buyers (with it being understood that Seller shall be entitled to rely on any such direction from either Buyer and shall not incur any obligation or liability as a result of any such compliance), the amount by which the Estimated Purchase Price exceeds the Purchase Price (the "Excess Amount") and (ii) Sellers, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount minus the Excess Amount.  If the Purchase Price (as set forth on the Closing Statement) is greater than the Estimated Purchase Price (as determined in accordance with Section 2.3(c)), (i) Buyers and Sellers shall instruct the Escrow Agent to deliver to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, an amount equal to the Escrow Amount and (ii) Buyers shall pay to Sellers at the Closing, by wire transfer of immediately available funds to Sellers' Account, the amount by which the Purchase Price exceeds the Estimated Purchase Price.

(b)    At the Closing, Sellers will deliver to each of Mrs. Greens and Village (i) a duly executed Bill of Sale substantially in the form of Exhibit C (collectively, the "Bill of Sale"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit D (collectively, the "Assignment and Assumption Agreement"); (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(e) (with respect to Cure Costs) is satisfied; and (iv) a duly executed statement in accordance with Treasury Regulation Section 1.1445-2(b), in the form attached hereto as Exhibit E (the "Non-Foreign Affidavit").

(c)    At the Closing, each of Mrs. Greens and Village will deliver to Sellers (i) their respective Bill of Sale duly executed by Mrs. Greens or Village, as applicable; (ii) their respective Assignment and Assumption Agreement duly executed by Mrs. Greens or Village, as applicable; and (iii) a duly executed certificate from an officer of Mrs. Greens and Village to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied.

Section 2.6    Inventory.

(a)    A physical count of the Inventory, and calculation of the value thereof, at each of the Stores shall be made by a nationally-recognized, independent inventory service (the "Inventory Taker"), which Inventory Taker shall be acceptable to both Buyers and Sellers in their reasonable discretion, one day prior (or on such other date that the Parties mutually agree) to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date

of such inventory being the "Inventory Date").  The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.6(a) and otherwise in accordance with the terms and conditions of this Section 2.6.  Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne one-half by Buyers and one-half by Sellers.  The physical inventory (and the Inventory Purchase Price Amount) shall not include Inventory that is (i) A&P branded (including any "SuperFresh" branded) private label inventory; (ii) damaged, spoiled, perishable, outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than 14 days after the Inventory Date being deemed outdated for this purpose), obsolete, or otherwise unsaleable at normal retail price in the ordinary course of business at the Stores; or (iii) not transferable to Buyer under applicable Law (collectively, the "Excluded Inventory"), provided, however, that any portion of the Excluded Inventory described in clause (ii) and (iii) that, in the case of Excluded Inventory located at the Group 1 Stores, Mrs. Greens affirmatively elects in writing to deem Inventory, or, in the case of Excluded Inventory located at the Group 2 Store, Village affirmatively elects in writing to deem Inventory, shall be treated as Inventory for purposes of this Agreement.  The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date, excluding the Excluded Inventory, at the percentages of the segment retail price set forth in Schedule 2.6(a) (the "Inventory Purchase Price").

(b)     Promptly following the execution of this Agreement, Buyers shall make application to the applicable authorities to transfer any alcohol included in the Inventory to the applicable Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyers, at Buyers' sole cost and expense.  Sellers shall reasonably cooperate with Buyers and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above.  In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.7     Allocation.  Buyers and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder.  No later than 60 days after the Closing Date, Buyers shall deliver to Sellers an initial allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date (the "Initial Allocation").  If Sellers raise any reasonable objection to the Initial Allocation within seven (7) days of the receipt thereof, Buyers and Sellers will negotiate in good faith to resolve such objection(s).  Absent any such timely objection from Sellers or upon final resolution thereof, the Initial Allocation shall be deemed conclusive and binding on the parties (the "Final Allocation").  In the event that the Purchase Price is adjusted pursuant to this Agreement, Buyers and Sellers shall cooperate and mutually agree on adjustments to the Final Allocation.  Buyers and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare and file IRS Form 8594 and all Tax Returns on a basis consistent with the

Final Allocation. None of the Parties will take any position inconsistent with the Final Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by law. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8    Proration.  On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and the applicable Buyer as of the Closing Date with (a) the applicable Buyer (i.e., Mrs. Greens with respect to any such payment related to the Group 1 Stores and Village with respect to any such payments related to the Group 2 Store) bearing the expense of such Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Prorated Charges under such Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (ii) the number of days in such lease month following the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (b) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to the applicable Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers).  The net amount of all Prorated Charges attributable to the Group 1 Stores shall be referred to as the "Group 1 Stores Buyer Proration Amount" if owed to Mrs. Greens or the "Group 1 Stores Seller Proration Amount" if owed to Sellers.  The net amount of all Prorated Charges attributable to the Group 2 Store shall be referred to as the "Group 2 Store Buyer Proration Amount" if owed to Village or the "Group 2 Store Seller Proration Amount" if owed to Sellers.  The Parties acknowledge and agree that the Group 1 Stores Seller Proration Amount, if any, shall be deemed a Group 1 Stores Assumed Liability, and the Group 2 Store Seller Proration Amount, if any, shall be deemed a Group 2 Store Assumed Liability.  Except as set forth in this Section 2.8 and in Section 6.4, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyers.

Section 2.9    Removal of Excluded Assets.  As promptly as practicable following the Closing Date (and in any event within 10 Business Days), Buyers shall allow Sellers to remove, at Sellers' sole cost and expense, all of the Excluded Assets that are located at the Stores and, if requested by Sellers, Buyers shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' sole cost and expense (an estimated amount of which shall be paid in advance by Sellers based upon the applicable Buyer's good faith estimate to the extent that Buyers might reasonably be liable to any third party for such expenses); provided, however, that Sellers shall not unreasonably interfere with Buyer's operations at the applicable Stores, and Sellers shall indemnify Buyers for any out of pocket costs constituting Damages caused by such removal of any such Excluded Assets by Sellers of Sellers' agents.  Any Person other than Sellers' employees used by Seller to remove the Excluded Assets shall provide evidence of commercial liability and workers compensation insurance prior to being permitted to begin removing the Excluded Assets from the Stores.  If Sellers have not instructed the applicable Buyer prior to the expiration of such 10 Business Day period as to the location to which any Excluded Assets should be transported, the applicable Buyer, in its sole discretion, may dispose of such Excluded Assets at Sellers' sole cost and expense or take title to such Excluded Assets without paying any consideration or incurring any liability therefor.

Section 2.10    Damaged or Destroyed Store Closing.  If, during the period between the date of this Agreement and the Closing, a Store is damaged or destroyed by fire or other casualty covered by Sellers' insurance, then the applicable Buyer shall close and shall be entitled to receive any insurance proceeds actually received by Sellers in respect of such loss or damage to the extent related to any Acquired Asset, net of any deductible, costs of recovery and other costs incurred or required to be paid by Sellers with respect thereto.

ARTICLE III
SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyers that the statements contained in this Article III are true and correct as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1    Organization of Sellers; Good Standing.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 3.2    Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    Noncontravention; Government Filings.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of either Seller, (b) subject to the entry of the Sale Order, violate any Law or Decree to which either Seller is subject in respect of the Acquired Assets, or (c) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract or any Lease to which either Seller is a party or to which any of the Acquired Assets is subject.  Other than (x) any filings required under the Exchange Act, (y) the applicable requirements of the HSR Act, and (z) as required or pursuant to the Bankruptcy Code, neither Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

Section 3.4    Title to Assets.  At the Closing, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, and valid leasehold interests in the Leases, and, pursuant to the Sale Order, Sellers will convey at the Closing good and valid title to, or their rights to use, all of the tangible Acquired Assets and a valid leasehold interest in the Leases, free and clear of all Liens other than Permitted Liens.

Section 3.5    Real Property.  Section 3.5 of the Disclosure Schedule accurately sets forth the location of each Store, each of which is leased to either Seller by a third party and a list of all Leases, including all amendments, supplements, subordination, non-disturbance and attornment agreements and other similar Contracts related to the Leases. Sellers have made available to Buyers a true and complete copy of each Lease, including all amendments, supplements and related Contracts (including subordination, non-disturbance and attornment agreements).  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases).

Section 3.6    Litigation; Decrees.  Except as set forth in Section 3.6 of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, neither Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7    Labor Relations.  Except as set forth in Section 3.7 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Employees.

Section 3.8    Brokers' Fees.  Other than the fees and expenses payable to Hilco Real Estate, Inc. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.9    Environmental Matters.  To the Sellers' Knowledge, except as would not, individually or in the aggregate, give rise to a Material Adverse Effect:

(a)    Sellers' current operations of the Stores comply with all, and are not subject to any pending or threatened Decree, claim, demand, suit or action related to or arising

out of any, federal, state or local laws, rules or regulatory requirements concerning the protection, preservation, conservation, or regulation of the environment ("Environmental Laws"), and no Seller has received any written notice alleging that the activities of Sellers' business at the Stores are in violation or alleged violation of, or alleging liability or potential liability under, any Environmental Laws;

(b) there has been no Release of any Hazardous Substances at, on or under any of the Stores that required or requires reporting, or which could trigger the need for investigation or remediation costs, under applicable Environmental Laws, and none of such properties has been used by any Person as a landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid waste as defined under any Environmental Law; and

(c) there are no circumstances or conditions that currently exist relating to the Stores, or the activities of Sellers' business at the Stores, that would reasonably be expected to result in non-compliance with or liability under any Environmental Law.

Section 3.10    Condemnation. [To Sellers' Knowledge, no condemnation proceedings are pending as to any Store.]

Section 3.11    Disclaimer of Other Representations and Warranties.    Except for the representations and warranties contained in this Article III or expressly contained in any Related Agreement, neither Seller nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, any Acquired Assets, any Assumed Liabilities or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NEITHER SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.    BUYERS ACKNOWLEDGE THAT, SHOULD THE CLOSING OCCUR, BUYERS WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).

ARTICLE IV
BUYERS' REPRESENTATIONS AND WARRANTIES

Each Buyer hereby represents and warrants to each Seller that the statements contained in this Article IV with respect to such Buyer are true and correct as of the date of this Agreement.

Section 4.1    Organization of Buyer; Good Standing.    Mrs. Green is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York and has all requisite corporate or similar power and authority to own, lease, and operate its assets and

to carry on its business as now being conducted. Village is a corporation duly organized, validly existing, and in good standing under the laws of the State of New Jersey and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction.    Each Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which such Buyer is a party have been duly authorized by such Buyer. This Agreement (assuming due authorization and delivery by Seller) constitutes the valid and legally binding obligation of such Buyer, enforceable against such Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of either Buyer, (b) violate any law or Decree to which either Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which either Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on either Buyer.  Other than the applicable requirements of the HSR Act, neither Buyer is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay such Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Litigation; Decrees.    There is no Litigation pending or, to either Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither any Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay such Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.    Neither Buyer has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or any of its Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Each Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of such Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, such Buyer in connection with the transactions contemplated hereby.  Each Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Leases and the related Assumed Liabilities.

ARTICLE V
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.5(a)), each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5. Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) each Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

Section 5.2    Regulatory Approvals.

(a)    If required by applicable Law, the Parties shall use their commercially reasonable efforts to (i) file a Notification and Report Form to the extent required under the HSR Act with respect to the transactions contemplated hereby promptly after the date hereof, (ii) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (iii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

(b)    In connection with the efforts referenced in Section 5.1 and this Section 5.2 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law or any state law, each Party shall use its commercially reasonable efforts to (i) cooperate with the other Parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other Parties informed in all material respects of any material communication received by it from, or given by it to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit the other Parties to review any material communication given to it by, and consult with it in advance of any meeting or conference with, any Governmental Authority, including in connection with

any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding. The foregoing obligations in this Section 5.2(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to allow for the exchange of such privileged materials without waiving any such privilege.

Section 5.3 **Bankruptcy Actions.** Buyers shall promptly take all actions as are reasonably requested by Sellers to assist in (a) obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing documents or information for filing with the Bankruptcy Court, (b) making Buyers' representatives available to testify before the Bankruptcy Court, and (c) furnishing information or documents to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code with respect to any Leases that are "executory" within the meaning of section 365 of the Bankruptcy Code.

Section 5.4 **Bidding Procedures.** The bidding procedures to be employed with respect to this Agreement (the "Bidding Procedures") shall be those reflected in the Bidding Procedures Order. Buyers acknowledge that the Bidding Procedures may be supplemented or modified by other customary procedures not inconsistent with the matters otherwise set forth herein and the terms of this Agreement. For avoidance of doubt, after such time that Buyers are the Successful Bidder (as defined in the Bidding Procedures) and that the transaction contemplated by this Agreement is the Successful Bid (as defined in the Bidding Procedures), and so long as this Agreement is in effect, Sellers shall not be entitled to solicit inquiries, proposals, or offers for the Acquired Assets or otherwise take any action to consummate any such alternative transaction; provided, however, that Sellers shall be entitled to take any actions in furtherance of maintaining its back-up bids on all or part of the Acquired Assets, provided further, that so long as this Agreement has not been terminated with respect to each Buyer in accordance with Article XII, Sellers may not consummate any such back-up bid or take any action in violation of its obligations pursuant to this Agreement, including Section 5.1 and this Section 5.4.

Section 5.5 **Notices and Consents.** Prior to the Closing and as necessary following the Closing:

(a) Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.5(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; provided, however, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters (except in the case of any landlord under any Lease which communications shall be governed by Section 5.9), and (ii) neither A&P nor any Subsidiary of A&P shall be required to pay any consideration therefor,

(b) Without limiting Section 5.2, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities in connection with the matters referred to

in Section 5.5(b) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.6    Prescription Lists.    Promptly after the execution of this Agreement, Mrs. Greens shall make application to the applicable authorities to transfer the Prescription Lists related to the Group 1 Stores from Sellers to Mrs. Greens or its designee; and Village shall make application to the applicable authorities to transfer the Prescription Lists related to the Group 2 Store from Sellers to Village or its designee.    Such application shall be made on a timely basis and shall be diligently pursued by Buyers, at their sole cost and expense.    Sellers, at Sellers' expense, shall cooperate with Buyers and provide any documents and/or information necessary to assist in effectuating such transfer and execute such consents or other papers as may reasonably be required subject to applicable patient privacy rights.    At the Closing, Sellers shall, subject to applicable patient privacy rights, assign, transfer, and convey to the applicable Buyer (or its designee) all of its right, title, and interest in and to the Prescription Lists (and shall update the above electronic format records that shall be current as of the Closing), and Buyers hereby agrees to purchase and accept from Seller all of the Prescription Lists.

Section 5.7    Notice of Developments.    Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority or any securities market or securities regulator in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.7 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.8    Notice of Supplemental Disclosure.    Without limiting the obligations of Sellers contemplated by Section 5.7, from and after the date hereof but prior to the fifth Business Day prior to the Closing Date, Sellers may inform Buyer pursuant to this Section 5.8 that any representation or warranty of either Seller was, may have been or may have been deemed to have been inaccurate when made and provide a proposed supplement to the Disclosure Schedule delivered as of the date hereof to correct such actual or potential inaccuracy as if set forth on the Disclosure Statement as of the date hereof (a "Disclosure Supplement").    If the inaccuracies contemplated by such Disclosure Supplement are sufficiently material to prevent the satisfaction of the condition set forth in Section 7.1(a), either Buyer may terminate this Agreement prior to Closing and in no event later than ten days after receipt by such Buyer of such Disclosure Supplement.    If Buyer shall not have exercised such right of termination by such date, the Disclosure Schedule shall be deemed to have been amended (effective as of the date of this Agreement) to add such Disclosure Supplement.    Notwithstanding the foregoing, if any such inaccuracy, or any other matter that causes any of the conditions to Closing in Section 7.1 to not be capable of being satisfied, arises solely as a result of the inclusion of one or more assets related solely to either (i) the Group 1 Stores or (ii) the Group 2 Store, then Sellers may elect, in their sole discretion, to deem the Group 1 Stores Acquired Assets or the Group 2 Store Acquired Assets, as applicable, to be Excluded Assets and deem the Group 1 Stores Assumed Liabilities or

Group 2 Store Assumed Liabilities, as applicable to be Excluded Liabilities, and not to assign such assets or liabilities to the applicable Buyer, in which case, this Agreement shall be deemed terminated with respect to the applicable Buyer and the Purchase Price shall be reduced by an amount equal to (i) the Group 1 Stores Exclusion Amount, in the event that the Group 1 Stores Acquired Assets are so excluded or (ii) the Group 2 Store Exclusion amount, in the event that the Group 2 Store Acquired Assets is so excluded.

Section 5.9    Access; No Contact; Confidentiality.  Upon the reasonable request of each Buyer, Sellers will permit such Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, and books and records included, in the case of Mrs. Greens, in the Group 1 Stores Acquired Assets, and, in the case of Village, in the Group 2 Store Acquired Assets, during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of either Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto; provided, further, that such access shall be primarily coordinated through Ernie Koenig or his designees, so long as such Person is reasonably available and responsive to Buyers' requests pursuant to this Section 5.9.  Prior to the Closing, Buyers shall not, and shall cause its Representatives not to, contact any employees, customers, suppliers, landlords, or licensors of either Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller; provided, however, that Mrs. Greens may communicate directly with any landlord under any Group 1 Stores Lease and Village may communicate directly with any landlord under the Group 2 Store Lease, in each case, within the presence of either Seller or any Representative thereof, to arrange for Buyers' access to the premises or otherwise, and either Buyer may contact Employees for the purposes of offering them employment.  The Parties further acknowledge and agree that nothing contained herein shall preclude any Buyer or its Representatives from contacting any Person with whom such Buyer currently does business as a customer or supplier.

Section 5.10    Bulk Transfer Laws.  Buyers acknowledge that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement and hereby waives all claims related to the non-compliance therewith.

Section 5.11    Operations Prior to Closing.  Sellers covenant and agree to operate and keep open for business the Stores through the Inventory Date and to continue to fill prescription pharmaceuticals and prescription product scripts through such date.

ARTICLE VI
OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may

reasonably request which actions shall be reasonably necessary to transfer, convey or assign to the applicable Buyer all of the Acquired Assets or to confirm the applicable Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by either Seller, in the case of the Group 1 Stores, Mrs. Greens, and in the case of the Group 2 Store, Village, will permit, at Sellers' sole cost and expense, Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the applicable Buyer, to all premises, properties, personnel, books and records of or related to the applicable Acquired Assets or the applicable Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of either Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require either Buyer to take any such action if it (i) may result in a waiver or breach of any attorney/client privilege, (ii) could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to its operations.

Section 6.3    Employees.

(a)    Prior to the Closing Date, Buyers shall have the right but not the obligation to contact or interview any Employees and may, in each Buyer's sole discretion, offer employment to such Employees, such offer of employment to be effective on the day immediately following the Closing Date and conditional on Closing.

(b)    Each Buyer acknowledges that the acceptance by any Employee of an offer of employment made pursuant to Section 6.3(b) shall not constitute a condition to Buyers' obligations under this Agreement.

(c)    Prior to Closing, Sellers shall terminate or transfer to other stores or facilities of Sellers all Employees of the Stores.  Sellers shall indemnify, defend and hold harmless Buyers, their Affiliates and their respective Representatives from all Liabilities arising under the WARN Act or otherwise with respect to Employees of the Stores arising in whole or in part from the actions or omissions of either Seller at any time.

(d)    Tax Reporting.  Each Buyer shall adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, each Buyer shall provide Forms W-2 to Employees reflecting all wages paid and taxes withheld with respect to such Employees for the calendar year in which the Closing Date occurs.  Seller as the predecessor employer shall have no employment tax reporting responsibilities for the Employees hired by Buyers following the Closing Date, but shall provide Buyers with all information concerning wages paid and taxes withheld with respect to any employees of Sellers hired by Buyers during the year in which the Closing occurs.  Each Buyer shall also adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(e)    No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.3, whether express or implied, is intended to create any third party beneficiary rights in any Employee.

(f)    Cooperation.  After the Closing Date, each Buyer shall, and shall cause its Affiliates to, reasonably cooperate with Sellers to provide such current information regarding the Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates.  Each Buyer shall, and shall cause its Affiliates to (at Sellers' sole cost and expense), permit Employees to provide such reasonable assistance to A&P as may be reasonably required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that (i) an Employee has knowledge of relevant facts or issues, or (ii) an Employee's assistance is reasonably necessary in respect of any such claim; provided that any such assistance shall not unreasonably interfere with such Buyer's operations of the Stores or its business.

Section 6.4    Certain Tax Matters.

(a)    Transfer Taxes.  Sellers shall pay any stamp, documentary, registration, sales, use, transfer, added-value or other non-income Tax (a "Transfer Tax") imposed under applicable law in connection with the transactions contemplated hereby. Buyers shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than 10 Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyers' approval, which shall not be unreasonably withheld, delayed, or conditioned.  Each Seller and each Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

(b)    Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those referred to in Section 2.8), personal property Taxes and similar Taxes) (any such taxes, "Ad-Velorem Taxes") for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than 10 days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers  The Parties acknowledge and agree that as between Mrs. Greens and Village and with respect to the definition of Group 1 Stores Assumed

Liabilities and Group 2 Store Assumed Liabilities, any Ad-Velorem Taxes attributable to the Group 1 Stores and owed by Buyers pursuant to this <u>Section 6.4(b)</u> shall be the responsibility of Mrs. Greens and deemed a Group 1 Stores Assumed Liability and any Ad-Velorem Taxes attributable to the Group 2 Store and owed by Buyers pursuant to this <u>Section 6.4(b)</u> shall be the responsibility of Village and deemed a Group 2 Store Assumed Liability.

Section 6.5 <u>Insurance Matters</u>. Each Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by either Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyers, the Stores, or the Acquired Assets and no further coverage shall be available to Buyers, the Stores, or the Acquired Assets under any such policies.

Section 6.6 <u>Acknowledgements</u>. Each Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics. Each Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) such Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished with respect thereto; and (iii) except as may be otherwise provided herein, neither Buyer nor any other Person (including any Buyer Indemnified Party) shall have any claim against either Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of <u>Section 3.11</u> or <u>Section 9.1</u>, Buyer acknowledges that except for the representations and warranties set forth in <u>Article III</u> (which representations and warranties shall terminate and be of no further force or effect as of the Closing), neither Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information so furnished with respect thereto.

Section 6.7 <u>Press Releases and Public Announcements.</u> No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.8 <u>Seller Marks</u>. The Seller Marks may appear on some of the Acquired Assets, including on signage. Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks. Buyer shall within twenty Business Days after the Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

Section 6.9    Point of Sale Equipment.    Seller agrees to allow Buyers the use of any point of sale equipment which does not constitute a Group 1 Stores Acquired Asset located and used by Sellers at the Group 1 Stores for a period of thirty (30) days following the Closing; provided that Buyers shall reimburse Sellers for Sellers' out-of-pocket rental/lease fees and all other out-of-pocket costs and expenses of Sellers paid or due to third parties constituting Damages arising out of Buyers' use of such point of sale equipment during such thirty day period.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date); except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof;  and

(e)    each payment, if any, contemplated by Section 2.5(a) to be made to Buyer, and each delivery contemplated by Section 2.5 to be delivered to Buyer shall have been delivered, and all Cure Costs that are, individually, greater than $75,000, shall have been paid by Sellers (and for the avoidance of doubt, Sellers shall pay all other Cure Costs that are agreed upon and accepted by the applicable counterparty or are determined by the Bankruptcy Court to be owing, in each case, as soon as is reasonably practicable after the Closing).

Section 7.2    Conditions to Sellers' Obligations.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as

of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that (i) prohibits consummation of any of the transactions contemplated by this Agreement, or (ii) would be reasonably expected to result in any of the transactions contemplated by this Agreement being rescinded following consummation thereof; and

(e)    each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.3    No Frustration of Closing Conditions.    Neither Buyers nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its commercially reasonable efforts to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to any Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement;

(ii)    the Closing shall not have occurred prior to the 90th calendar day following the date hereof (the "Outside Date");

(c)     by (i) Mrs. Greens with respect to its obligations under this Agreement including the purchase of the Group 1 Stores Acquired Assets and the assumption of the Group 1 Stores Assumed Liabilities, in which case the Group 1 Stores Acquired Assets shall be deemed an Excluded Asset and the Group 1 Stores Assumed Liabilities shall be deemed an Excluded Liability and the Purchase Price shall be reduced by an amount equal to the Group 1 Stores Exclusion amount, and (ii) Village with respect to its obligations under this Agreement including the purchase of the Group 2 Store Acquired Assets and the assumption of the Group 2 Store Assumed Liabilities, in which case the Group 2 Store Acquired Assets shall be deemed an Excluded Asset and the Group 2 Store Assumed Liabilities shall be deemed an Excluded Liability and the Purchase Price shall be reduced by an amount equal to the Group 2 Store Exclusion amount, if:

(i)     after giving effect to the last sentence of Section 5.8, there has been a breach by either Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyers at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by such Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) 10 days after receipt of such Buyer's notice of intent to terminate or (B) the Outside Date;

(ii)    to the extent such Buyer has a right of termination pursuant to Section 5.8 (after giving effect to the last sentence thereof);

provided, however, that either such Buyer's right to terminate pursuant to the immediately preceding clauses (i) or (ii) shall only apply to the extent that the underlying breach giving rise to such right of termination is related to such Buyer's Acquired Assets (i.e., a breach with respect to the Group 1 Stores will not trigger a termination right for Village, and a breach with respect to the Group 2 Store will not trigger a termination right for Mrs. Green's);

(d)     by either Seller by giving written notice to Buyers and the other Seller if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by such Buyer prior to the earlier to occur of (A) 10 days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;  or

(e)     by either Buyer if any Seller files a plan with the Bankruptcy Court contemplating the sale or retention of any portion of the Acquired Assets that is inconsistent with the terms of this Agreement.

Section 8.2     Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.11, Section 6.6, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability except as set forth in Section 8.3 to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach

occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement.

Section 8.3    Deposit Return and Termination Fee

(a)    If this Agreement is terminated pursuant to (i) Section 8.1(b) due to the failure of Buyers to have fulfilled any of their obligations under this Agreement, or (ii) Section 8.1(d), in each case, so long as Sellers are then in compliance with their obligations under this Agreement, then (x) Sellers shall be entitled to keep the Deposit, and (y) Buyers shall pay, or cause to be paid, to Sellers, by wire transfer of immediately available funds to Sellers' Account within two Business Days of the date of such termination, an aggregate cash fee equal to $1,250,000 (the "Termination Fee").  If Buyers fail to pay any portion of the Termination Fee as required pursuant to this Section 8.3(a) when due, (i) such fee shall accrue interest for the period commencing on the date such fee became past due, at a rate equal to the prime lending rate prevailing during such period as published in *The Wall Street Journal*, calculated on a daily basis from the date such amount was required to be paid until the date of actual payment and (ii) if Sellers are successful in collecting the Termination Fee, Buyers shall also reimburse Sellers for all of their costs and expenses (including attorney's fees) incurred in connection with their efforts to collect the Termination Fee.  Buyers' obligation to pay the Termination Fee pursuant to this Section 8.3(a) shall survive termination of this Agreement.  Buyers acknowledges that the Termination Fee and other provisions of this Section 8.3(a) are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Sellers would not enter into this Agreement.  Sellers' rights to retain the Deposit and to receive the Termination Fee pursuant to this Section 8.3(a) shall be in addition to, and not in lieu of, any other rights of Sellers at law or in equity arising under this Agreement or otherwise in connection with such termination (with it being understood that the amount of Damages incurred by Sellers in connection with any such termination shall be calculated net of any such amounts actually received or retained by Sellers pursuant to this Section 8.3(a)) as liquidated damages, and Sellers shall not be entitled to any other Damages or payment from Buyers, and Buyers shall have no further obligation or liability under this Agreement or any Related Agreement of any kind to either Seller or any Affiliate of either Seller or any of their respective representatives on account of this Agreement or any Related Agreement.

(b)    If this Agreement is terminated in a manner that does not require Buyers to forfeit the Deposit in accordance with Section 8.3(a), then Sellers shall remit the Deposit to Buyers by wire transfer of immediately available funds as directed by Buyers to Buyers' Account within five Business Days of the date of such termination.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Survival.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of the Parties set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2     Obligations of Buyer Joint and Several.   Each obligation of Buyer under this Agreement shall be the joint and several obligation of Mrs. Greens and Village, provided, however, the Parties acknowledge and agree that from and after the Closing, Mrs. Greens shall be solely responsible for the Group 1 Stores Assumed Liabilities and any post-Closing covenant or obligation of Mrs. Greens pursuant to this Agreement and Village shall be solely responsible for the Group 2 Store Assumed Liabilities and any post-Closing covenant or obligation of Village pursuant to this Agreement.

Section 9.3     Expenses.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyers shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.4     Entire Agreement.  This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Section 9.5     Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.6     Amendments and Waivers.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.6 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.7     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties, provided, however, that either Buyer may assign its rights and obligations under this Agreement, in whole or in part (including with respect to the Prescription Lists, Pharmaceutical Inventory or any other Acquired Assets) at any time prior to, at or after Closing, to any Person, provided that such transfer or assignment shall not relieve such Buyer of its obligations hereunder to Sellers.

Section 9.8    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; or (d) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to either Seller: | The Great Atlantic and Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, New Jersey 07645<br>Attention:  Christopher W. McGarry<br>Craig Feldman<br>David Kelly |
| | With a copies (which shall not constitute notice to Seller) to: |
| | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  James H.M. Sprayregen, P.C.<br>Paul M. Basta<br>Ray C. Schrock<br>Facsimile: (212) 446-4900 |
| | and |
| | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  James J. Mazza, Jr.<br>Howard Norber<br>Facsimile: (312) 862-2200 |
| If to Buyers: | Mrs. Greens Management Corp.<br>c/o The Catalyst Capital Group Inc.<br>Royal Trust Tower<br>77 King Street West, Suite 4320<br>P.O. Box 212<br>Toronto, ON M5K 1J3<br>Attention:  Gabriel de Alba<br>Facsimile: (416) 945-3060 |
| | -and- |

Village Super Market, Inc.
733 Mountain Avenue
Springfield, New Jersey 07081
Attention: General Counsel
With copies to (which shall not constitute notice to
Buyer) to:

McMillan LLP
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M4J 2T3
Attention:  Andrew J.F. Kent
Facsimile: (416) 865-7048

-and-

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, IL 60606
Attention:  James Ktsanes
Facsimile: (312) 993-9767

-and-

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
Attention: Paul R. DeFilippo, Esq.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.8.

Section 9.9     Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.10     Submission to Jurisdiction; Service of Process.   Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.   Each of the Parties irrevocably and

unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.8</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.10</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.11  <u>Waiver of Jury Trial.</u>   EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.12  <u>Specific Performance.</u>  Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that a Party may have under law or equity, a Party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.13  <u>Severability.</u>  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.14  <u>No Third Party Beneficiaries.</u>  This Agreement shall not confer any rights or remedies upon any Person other than Buyers, A&P, the Company, and their respective successors and permitted assigns.

Section 9.15  <u>Disclosure Schedule.</u>  All capitalized terms not defined in the <u>Disclosure Schedule</u> shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the <u>Disclosure Schedule</u>.  The disclosure of any matter in any section of the <u>Disclosure Schedule</u> shall be deemed to be a disclosure with respect to any specific representation or warranty to which the relevance of such disclosure on its face is reasonably apparent in light of the form and substance of the disclosure made.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the <u>Disclosure Schedule</u> relating to any possible breach or violation of any Contract

or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the <u>Disclosure Schedule</u> be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the <u>Disclosure Schedule</u> are incorporated by reference into the <u>Disclosure Schedule</u> in which they are directly or indirectly referenced. The information contained in the <u>Disclosure Schedule</u> is in all respects provided subject to the Confidentiality Agreement.

Section 9.16 <u>Headings; Table of Contents.</u> The section headings and the table of contents contained in this Agreement and the <u>Disclosure Schedule</u> are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.17 <u>Counterparts; Facsimile and Electronic Signatures.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

MRS. GREENS MANAGEMENT CORP.

By:_____
Name:
Title:

VILLAGE SUPER MARKET, INC.

By:_____
Name:
Title:

**Exhibit A – Bidding Procedures Order**

**[To be appended]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA | ) Case No. 10-24549 (RDD) |
| COMPANY, INC., *et al.* | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF CERTAIN SUPERFRESH BANNER STORE ASSETS

Upon the motion (the "***Motion***")[1] of The Great Atlantic & Pacific Tea Company, Inc.

("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"***Debtors***") for the entry of an order (this "***Order***") authorizing the Bidding Procedures for the

sale of the Southern Store Assets, all as more fully set forth in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Debtors having provided adequate and appropriate notice of the

Motion under the circumstances; and upon the record of the April 28, 2011 hearing on the

Motion, at which there was no opposition to the relief granted herein; and it appearing that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

1.    The Motion is granted to the extent provided herein.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1024549110502000000000014

2.     The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved.

3.     If no objections to the Stalking Horse Notice are received, the Stalking Horse and Stalking Horse Bid, including payment of the Breakup Fee, shall be deemed approved by the Court, without the need for further Court order.

4.     Nothing in this Order releases, nullifies, or enjoins the enforcement of any liability to any governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing in this paragraph should be construed to (i) create for any governmental unit or any other party any substantive right that does not already exist under applicable law; or (ii) deem any purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties for days of violation prior to the entry of this Order.

5.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

6.     Notwithstanding Bankruptcy Rule 6004 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

K&E 18907437

7.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  White Plains, New York       /s/Robert D. Drain
        May 2, 2011                   United States Bankruptcy Judge

K&E 18907437

<u>**Exhibit 1**</u>

**Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-24549 (RDD) |
| Debtors. | Jointly Administered |

## BIDDING PROCEDURES FOR SOUTHERN STORE ASSETS

Set forth below are the bidding procedures (the "***Bidding Procedures***") that shall govern the sale of the assets of 25 SuperFresh grocery stores (the "***Southern Stores***") owned and operated by the debtors and debtors in possession (collectively, the "***Debtors***")[1] in the above captioned chapter 11 cases.

## I. Assets to Be Sold

The assets (the "***Assets***") to be offered for sale consist of all or substantially all the Southern Stores, including, without limitation, all inventory, certain equipment, interests in contracts or leases, accounts receivable, and payment intangibles associated with any of the Assets as described in the Asset Categories below, but excluding all Excluded Assets (as may be defined in the APA (defined below)).

Bidders must offer to purchase some or all of the Assets in one or more of the following

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc. (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

asset categories (the "***Asset Categories***"):

| Category | Asset Description |
|---|---|
| 1. | All of the Assets and assumption of certain liabilities, including the assumption of collective bargaining agreements related to the Southern Stores. |
| 2. | All of the Assets located in one or more of the Southern Stores, together with the assumption of the store lease for each such Southern Store, including the assumption of certain liabilities, including the relevant collective bargaining agreement. |
| 3. | All of the Assets located in one or more Southern Stores, but excluding the assumption of any store lease. |
| 4. | All or any part of the Assets consisting of inventory, including, without limitation, pharmaceutical inventory and prescription lists. |
| 5. | All or any part of the Assets consisting of inventory, but excluding pharmaceutical inventory and prescription lists. |
| 6. | All or any part of the Assets consisting of pharmaceutical inventory and prescription lists. |
| 7. | All or any part of the equipment at any Southern Stores. |
| 8. | Unexpired leases or executory contracts relating to any of the Southern Stores. |

## II.    Consideration of Bids

Without limiting the foregoing, the Assets will be offered for sale in separate Asset Categories, in one or more combinations and as a whole. The Debtors may consider bids (each, a "***Bid***") for all of the Assets in a single bid from a single bidder or multiple bids from multiple bidders for Assets in any combination of the Asset Categories listed above. The Debtors shall determine, in consultation with the administrative agent for the Debtors' postpetition secured lenders (the "***DIP Lenders' Agent***"), the official committee of unsecured creditors (the "***Creditors' Committee***") and the United Food and Commercial Workers Union Local and its local union affiliates — Local 27, Local 400, and Local 1776 (collectively, the "***Union***"), the Successful Bidder (as defined below) based on, among other things, but not limited to, the number of Assets purchased, the assumption of certain liabilities, the purchase price for the Assets, and the value to the estates.

The Assets that are offered for sale shall be sold pursuant to section 363 of the

Bankruptcy Code free and clear of all liens and other interests in such Assets with certain exceptions which exceptions are to be assumed under the APA or satisfied at closing from the cash proceeds received in connection with the purchase of such Assets; provided that the DIP Lenders' Agent's liens shall attach to the proceeds of the Assets with the same validity, force, and effect.

The Debtors will provide all bidders with a form asset purchase agreement (the "*APA*"), which the Debtors shall file with the United States Bankruptcy Court for the Southern District of New York (the "*Court*") pursuant to a supplemental notice and will make the APA available at a data site maintained by Hilco Real Estate, LLC ("*Hilco*"), specifically for the sale of the Assets.[2]

## III. Marketing Process and Due Diligence

The Debtors have and will continue to provide confidential information regarding the Assets to potential purchasers (the "*Initial Information*"). Before receiving Initial Information, each potential purchaser must execute a confidentiality agreement, in a form satisfactory to the Debtors. The Debtors will make the Initial Information and other information available electronically through a data room. The Debtors may, but are not obligated to, furnish any due diligence information after the Bid Deadline (as defined below) for Qualified Bids (as defined below) or to any entity that the Debtors determine.

## IV. Bid Deadline

All Bids must be served upon and actually received by the Debtors, counsel to the Debtors, Hilco, the DIP Lenders' Agent, and the Creditors' Committee, on or before 4:00 p.m., prevailing Eastern Time, on May 13, 2011 (the "*Bid Deadline*"). Bids must be sent to: (a) the Debtors, The Great Atlantic & Pacific Tea Company, Inc., Attn: Christopher W. McGarry, Craig Feldman and David Kelly, 2 Paragon Road, Montvale, New Jersey 07645; (b) counsel to the Debtors, Kirkland & Ellis LLP, Attn: Ray Schrock, 601 Lexington Avenue, New York, New York 10022, and Attn: James J. Mazza, Jr., 300 North LaSalle, Chicago, Illinois 60654; (c) Hilco Real Estate, LLC, Attn: Zvi Rhine, 5 Revere Drive, Suite 320, Northbrook, Illinois 60062; (d) counsel to the DIP Lenders' Agent, Davis Polk & Wardwell LLP, Attn: Donald S. Bernstein and Marshall S. Huebner, 450 Lexington Avenue, New York, New York 10017; (e) counsel to the Creditors' Committee, Milbank, Tweed, Hadley & McCloy LLP, attn: Dennis F. Dunne, Abhilash M. Raval and Matthew S. Barr, One Chase Manhattan Plaza, New York, New York 10005; and (f) counsel to the Union, Cohen, Weiss, and Simon LLP, attn: Bruce Simon, Richard Seltzer, and Thomas Ciantra, 330 West 42nd Street, New York, New York 10036 (collectively, the "*Notice Parties*"). The Debtors may extend (after consultation with the DIP Lenders' Agent, and the Creditors' Committee) the Bid Deadline for the delivery of Bids once or successively, without further notice and for one or more bidders.

---

[2] To the extent there are any conflicts between these Bidding Procedures and the APA, the terms of the APA shall govern.

## V.     Qualified Bid Requirements

The Debtors will determine, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union and subject to the Bidding Procedures and the requirements below, whether a Bid is a Qualified Bid and, ultimately a Successful Bid (as these terms are defined below).

Any entity that desires to submit a Bid to purchase the Assets may do so in writing as follows:

(i)      a Bid must include an executed APA, blacklined to show changes from the APA that the Debtors have submitted pursuant to a supplemental filing, clearly setting forth any conditions for closing and stating that the Bid is irrevocable as set forth below;

(ii)     the Bid must identify with particularity each and every unexpired lease or executory contract (each, an "***Assumed Contract***") sought to be assumed and assigned, the assumption and assignment of which is a condition precedent to closing, and include an executed assumption and assignment agreement;

(iii)    a Bid must clearly set forth the purchase price to be paid;

(iv)    a Bid shall not be contingent upon any due diligence investigation, any material adverse change, the receipt of financing, or approval by any board of directors, shareholders, or other entity;

(v)     a Bid must include evidence, including financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtors upon consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union) sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner, or other sponsor (each, a "***Sponsor***"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

(vi)    a Bid must contain such financial and/or other information that will allow the Debtors, following consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the APA, including such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;

(vii)   a Bid must not include a credit bid by the holder of a lien on equipment and related property of any Debtor such that the offer would make the sale of the

remainder of property reasonably impractical at what would otherwise be the highest or best terms, as the case may be, available to the Debtors' estates;

(viii)    a Bid must disclose the identity of the bidder's organization, including confirmation that the competing Bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any);

(ix)    a Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the APA;

(x)    a Bid must state that the bidder is willing to consummate and fund the proposed transaction by no later than five (5) business days after the Sale Hearing (as defined below), however such requirement may be waived by the Debtors;

(xi)    a Bid must include a cashier's check or be accompanied by a wire transfer (or, if by a landlord for its own lease, value) payable or delivered to the Debtors, their counsel or other agreed upon escrow agent, in an amount equal to 10 percent (10%) of the total purchase price in the APA (the "***Deposit***"); and

(xii)    a Bid must disclose any agreements or understandings between the bidder and any third party with respect to the subject Assets or with respect to any possible transaction involving the Debtors.

Notwithstanding anything to the contrary, the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union shall have the right to consider Bids that do not conform to one or more of the requirements set forth in these procedures and to deem such Bids Qualified Bids (as defined below).

Notwithstanding anything to the contrary in these procedures, the Bid of the Successful Bidder (as defined below) must remain irrevocable in accordance with the terms of the APA executed by the Successful Bidder. All other Bids must be irrevocable until the earlier to occur of (a) 25 days after entry of a Sale Order (as defined below) approving the sale of the Assets and (b) closing of the sale of Assets in accordance with the Successful Bid (as defined below).

Notwithstanding anything to the contrary in these procedures, the Debtors also reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to reject any and all Bids, including Qualified Bids, for any Asset in any particular Asset Category.

## VI.    Evaluation of Qualified Bids

The DIP Lenders' Agent, the Creditors' Committee, and the Union shall be given a reasonable opportunity to review any information and documentation, financial or otherwise, required of potential bidders by the Debtors prior to the Debtors' selection of Qualified Bidders (as defined below). The Debtors may request additional information from a potential bidder to better evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in

connection therewith, and such bidder shall be obligated to provide such information as a pre-condition to participating further in the Auction (as defined below).

The sufficiency of any submitted Bid will be at the discretion of the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union. The Debtors shall promptly as practicable notify potential bidders who have (a) returned a signed confidentiality agreement, (b) timely submitted the information and documentation listed above in Section 7(i) - (xii), and (c) who have financial qualifications satisfactory to the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, that they have been selected as a qualified bidder (each a "***Qualified Bidder***") and that their Bid is a "Qualified Bid."

The submission of the information and documentation listed above in Section 7(i) - (xii) will be deemed to be the bidder's consent for the Debtors and their advisors to share any information submitted by the bidder to the DIP Lenders' Agent, the Creditors' Committee, the Union, any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such bidder. Any bidders submitting Bids will bear their own expenses in connection with the sale, regardless of whether the sale is approved, in accordance with the terms of the APA, subject to the Debtors' right to designate a Stalking Horse (defined below).

## VII.    Stalking Horse Bids

The Debtors reserve the right in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to enter into one or more APAs with any entity for all or any portion of the Assets, and designate that entity or entities as a stalking horse (the "***Stalking Horse***") subject to the terms herein. The Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union may offer a breakup fee to the Stalking Horse. The Debtors are under no obligation to choose a Stalking Horse or offer a breakup fee for any of the Assets.

In the event the Debtors select a Stalking Horse, the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, may offer bid protections, including a breakup fee of up to 2.5% of the cash portion of the purchase price of the Stalking Horse Bid. If the Debtors identify a Stalking Horse, the Debtors will file a supplemental notice (the "***Stalking Horse Notice***") with the Court identifying the Stalking Horse and the terms of the Stalking Horse Bid, including the terms and conditions for payment of any breakup fee. Any entity wishing to object to the Stalking Horse shall have five (5) days from the filing of the Stalking Horse Notice to file an objection (the "***Objection***") with the Court and serve it on the Notice Parties. In the event an Objection is filed and such Objection cannot be resolved consensually, the Debtors will seek to schedule a hearing with the Court for approval of the Stalking Horse and Stalking Horse Bid, including payment of any breakup fee. If no Objections to the Stalking Horse Notice are received, the Stalking Horse and Stalking Horse Bid, including payment of any breakup fee, shall be deemed approved by the Court, without the need for further Court order.

In the event the Debtors choose a Stalking Horse, the Stalking Horse Bid will be a

Qualified Bid.

## VIII.  The Auction

The auction (the "***Auction***") will be conducted for the Assets on May 17, 2011 at 10:00 a.m. prevailing Eastern Time (the "***Auction Date***") at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York 10022.  The Assets shall be sold free and clear of all liens, claims, and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code; <u>provided</u> that the DIP Lenders' Agent's liens shall attach to the proceeds of the Assets with the same validity, force and effect.

The Debtors may conduct the Auction in any manner and upon any terms and conditions the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, believe will achieve the maximum value for the Assets.  If an auction is held, the Debtors will, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, submit rules and procedures for the auction.  The Debtors shall, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, promulgate rules regarding any auction as they deem appropriate, including, but not limited to, rules governing minimum starting bids, minimum overbids, and subsequent bids.

Only Qualified Bidders may bid at the Auction.  If multiple Qualified Bids are received, each Qualified Bidder (or its duly authorized representative) shall have the right to continue to improve its Qualified Bid at the Auction.

At the conclusion of the Auction, and subject to Court approval following the Auction, the successful Bid or Bids shall be selected and announced by the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union (the "***Successful Bid*** or ***Bids***"), and the backup Bid or Bids shall be selected and announced by the Debtors, in consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union (the "***Backup Bid*** or ***Bids***").

Within 24 hours of completion of the Auction, the entity or entities that made the Successful Bid or Bids (the "***Successful Bidder***") and the entity or entities that made the Backup Bid or Bids shall complete and sign all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which such Successful Bid or Bids and Backup Bid or Bids were made.

If a Stalking Horse is selected and no Qualified Bids are received for the Assets (or no Stalking Horse is selected and only one Qualified Bid is received for the Assets), the Debtors may determine, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, that the Stalking Horse Bid or the Qualified Bid, as applicable, is the Successful Bid and seek Court approval of the relevant APA without offering the subject Assets for sale at the Auction.  If the Debtors determine that there is no Successful Bid for a particular Asset, the Debtors may decide, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to not sell that Asset at the Auction.

The Auction may be adjourned or cancelled as the Debtors, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, deem appropriate.  Reasonable

notice of such adjournment and the time and place for the resumption of the Auction or cancellation shall be given to all participants and to the DIP Lenders' Agent, the Creditors' Committee, and the Union.

## IX. Selection of Successful Bid or Bids

The Debtors reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to base the selection of the Successful Bid and Backup Bid (as defined below) on the following factors, among others: the Asset Categories included in the Bid; liabilities assumed in the Bid; purchase price; and the APA markup submitted with the Bid.

The Debtors may, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, (a) reject any Bid (including a Stalking Horse Bid) that, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors and/or (b) refuse to consider any Bid that fails to comply with the Bidding Procedures or any other procedures established by the Debtors.

## X. Backup Bids

If the Successful Bidder fails to consummate the sale, breaches the APA or otherwise fails to perform, upon consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, the Debtors may consummate the proposed sale with the next highest or best bidder at the Auction — the Backup Bidder, which hereafter shall be included in the definition of "Successful Bidder," without the need for further Court approval.

## XI. Damages for Failure to Close

If the Successful Bidder fails to consummate the sale in accordance with the terms of its Successful Bid and applicable APA: (a) the Debtors will retain the Deposit of such bidder, to the extent provided by the APA, and (b) the Debtors will maintain the right to pursue all available remedies against such bidder.

Notwithstanding anything to the contrary in these procedures, the Deposit of the Successful Bidder will be retained by the Debtors in accordance with the terms of the APA executed by the Successful Bidder. Deposits of all other bidders will be retained by the Debtors until the earlier to occur of (i) twenty-five days after entry of a Sale Order approving the sale of the Assets or (ii) closing of the sale of Assets in accordance with the Successful Bid.

## XII. Sale Motion and Hearing

Upon the selection of a Successful Bidder, the Debtors will file a motion to approve the sale (the "***Sale Motion***"). A hearing will be conducted on the Sale Motion by the Court on June 14, 2011 at 10:00 a.m. prevailing Eastern Time (the "***Sale Hearing***"). At the Sale Hearing, the Debtors will request that the Court enter an order (the "***Sale Order***"): (a) approving (i) the Successful Bid(s), (ii) the applicable APA(s), and (iii) the proposed assumption and assignment of any Assumed Contract, and (b) authorizing the Debtors to consummate the proposed

transaction.  At the Sale Hearing, the Court shall also determine:  (a) any cure required under 11 U.S.C. §365(b) if the affected landlord timely filed an objection to the Debtors' proposed cure of any unexpired lease to be assumed and assigned, and (b) if applicable, whether the Debtors have demonstrated adequate assurance of future performance under 11 U.S.C. § 365.

## XIII.  "As Is, Where Is"

The proposed transfer of any of the Debtors' Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the applicable APA of each Successful Bidder as accepted by the Debtors and approved by the Court.  Except as otherwise provided in an APA, all of the Debtors' right, title and interest in and to the respective Asset will be transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests in accordance with section 363 of the Bankruptcy Code.  Any other claim, lien or encumbrance, as set forth in the APA, will attach to the net proceeds of the sale of the particular Asset.

Each bidder for any of the Debtors' Assets will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct such due diligence regarding the Asset prior to making its offer as provided in the APA, (b) has relied solely upon its own independent review, investigation and/or inspection of any document including, without limitation, executory contracts and unexpired leases in making its Bid, and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Asset, or the completeness of any information provided in connection with the Asset sale or the Auction, except as expressly stated in the particular APA.

## XIV.  Reservation of Rights

Notwithstanding the Debtors' determination of a Stalking Horse and/or receipt of any Qualified Bids for any particular Asset, the Debtors may continue to negotiate and solicit Bids. The Debtors reserve the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to enter into agreements for the sale of any of their Assets, either individually or as part of a package prior to an Auction, without further notice to any party, which agreements, if any, will be subject to higher or otherwise better Bids at the Auction (including evaluation on a package or individual basis).  The Debtors retain the right, after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, to withdraw one or more Assets from the sale, including in connection with a package offer, up to the date of the Auction or Sale Hearing.  Formal approval of a Bid will not occur unless and until the Court enters an order approving and authorizing the Debtors to consummate the transaction.

The Debtors reserve the right to implement additional procedural rules after consultation with the DIP Lenders' Agent, the Creditors' Committee, and the Union, provided such additional rules are not inconsistent with these Bidding Procedures.

*  *  *

**Exhibit B – Escrow Agreement**

**[To be appended]**

# CHICAGO TITLE AND TRUST COMPANY

## 171 NORTH CLARK, CHICAGO, ILLINOIS 60601

Refer to: _____ Escrow Officer
Phone no.: _____
Fax no.: _____

## JOINT INSTRUCTION ESCROW TRUST INSTRUCTIONS

ESCROW TRUST NO.: _____          DATE: _____
FILE NO. _____

To:  Chicago Title and Trust Company, Escrow Trustee:

## Customer Identification:

Sellers:          The Great Atlantic and Pacific Tea Company, Inc.; Super Fresh Food Markets, Inc.
Buyers:          Mrs. Greens Management Corp.; Village Super Market, Inc.
Proposed Disbursement Date: _____

## Deposit:

The sum of $_____(_____ Dollars) by Buyers  representing the Escrow Amount (as defined in that certain Asset Purchase Agreement, dated as of May 18, 2011, by and among Sellers and Buyers).

## Delivery of Deposit:

The above-referenced escrow trust deposit (the "deposit") is deposited with the escrow trustee to be delivered by it only upon the receipt of joint instructions from the undersigned or their respective legal representatives or assigns.  In no case shall the deposit be surrendered except upon the receipt of instructions signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

## Billing Instructions:

Escrow trust fee will be billed as follows:  One-half to Seller; and one-half to Buyers.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title Insurance Co. (the "Company") will impose an administrative maintenance fee (quarterly, semi-annually, or annually) equivalent to the fee set forth on the Company's then current rate schedule.  This fee may be deducted from the outstanding escrow balance or billed to Buyers.

PLEASE NOTE: The escrow trust fee for these joint instruction escrow trust instructions (these "Instructions") is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. The Company, at its sole discretion, may reduce or waive the escrow trust fee for these Instructions.

## Investment:

The deposit may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to these Instructions, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest the deposit, the Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these Instructions.

**Direction Not to Invest/Right to Commingle:**

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Nothing herein, however, shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

**Compliance With Court Order:**

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the deposit.

**Execution:**

These Instructions are governed by and are to be construed under the laws of the state of Illinois. These Instructions and any amendments or supplemental instructions hereto may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

**For Sellers:**

| | |
|---|---|
| Name: | The Great Atlantic and Pacific Tea Company, Inc. |
| By: | |
| Address: | 2 Paragon Drive |
| | Montvale, New Jersey 07645 |
| Fax: | |
| Signature: | |

**For Buyers:**

| | |
|---|---|
| Name: | Mrs. Greens Management Corp. |
| By: | |
| Address: | |
| | |
| Fax: | |
| Signature: | |

**For Sellers:**

| | |
|---|---|
| Name: | Super Fresh Food Markets, Inc. |
| By: | |
| Address: | 2 Paragon Drive |
| | Montvale, New Jersey 07645 |
| Fax: | |
| Signature: | |

**For Buyers:**

| | |
|---|---|
| Name: | Village Super Market, Inc. |
| By: | |
| Address: | |
| | |
| Fax: | |
| Signature: | |

Accepted:   CHICAGO TITLE INSURANCE CO. AS ESCROW TRUSTEE

By: _____     Date: _____

**Exhibit C – Form of Bill of Sale**

**[To be appended]**

<u>BILL OF SALE</u>

THIS BILL OF SALE (this "<u>Bill of Sale</u>") is entered into and effective as of [_____ __], 2011, by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation (together with A&P, "<u>Sellers</u>"), Mrs. Greens Management Corp, a New York Corporation ("<u>Mrs. Greens</u>"), and Village Super Market, Inc., a New Jersey corporation ("<u>Village</u>" and together with Mrs. Greens, "<u>Buyers</u>").

WHEREAS, Sellers and Buyers are parties to that certain Asset Purchase Agreement, dated May 18, 2011 (the "<u>Purchase Agreement</u>") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Sections 2.5(b)(i) and 2.5(c)(i) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the parties hereto hereby agree as follows:

1. <u>Sale and Acceptance of Acquired Assets</u>. For true and lawful consideration paid to them by Buyers, the sufficiency of which is hereby acknowledged, effective as of the Closing, Sellers hereby sell, assign, transfer, convey, and deliver to Buyers the Acquired Assets. As of the Closing, Buyers hereby accept the foregoing sale and assignment.

2. <u>Conflict</u>. The sale, assignment, transfer, conveyance, and delivery of the Acquired Assets made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail. Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the parties contained in the Purchase Agreement or the survival thereof.

3. <u>Notices</u>. Any notice, request, or other document to be given hereunder to any party hereto shall be given in the manner specified in Section 9.8 of the Purchase Agreement. Any party hereto may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other parties hereto.

4. <u>Severability</u>. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5. <u>Enforceability</u>. If any provision of this Bill of Sale or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable

in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not effect any other provision hereof.

6. <u>Amendments</u>.  This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyers and Sellers.

7. <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

8. <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

9. <u>Third Party Beneficiaries and Obligations</u>.  This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale as of date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

MRS. GREENS MANAGEMENT CORP.

By:_____
Name:
Title:

VILLAGE SUPER MARKET, INC.

By:____
Name:
Title:

**Exhibit D – Form of Assignment and Assumption Agreement**

**[To be appended]**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into and effective as of [_____ __], 2011, by and among The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("A&P"), Super Fresh Food Markets, Inc., a Delaware corporation (together with A&P, "Sellers"), Mrs. Greens Management Corp, a New York Corporation ("Mrs. Greens"), and Village Super Market, Inc., a New Jersey corporation ("Village" and together with Mrs. Greens, "Buyers").

WHEREAS, Sellers and Buyers are parties to that certain Asset Purchase Agreement, dated May 18, 2011 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Agreement is contemplated by Sections 2.5(b)(ii) and 2.5(c)(ii) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the parties hereto hereby agree as follows:

1.      Assumption of Assumed Liabilities.  Effective as of the Closing, Sellers hereby assign, and Buyers hereby assume and agrees to pay, discharge, or perform when due, on or after the Closing Date, the Assumed Liabilities to the extent provided in the Purchase Agreement.

2.      Conflict.  The assignment and assumption of the Assumed Liabilities made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the parties contained in the Purchase Agreement or the survival thereof.

3.      Notices.  Any notice, request, or other document to be given hereunder to any party hereto shall be given in the manner specified in Section 9.8 of the Purchase Agreement.  Any party hereto may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other parties hereto.

4.      Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

5.      Enforceability.  If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable

in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not effect any other provision hereof.

6. <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyers and Sellers.

7. <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

8. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

9. <u>Third Party Beneficiaries and Obligations</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Agreement.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of date first above written.

THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.

By:_____
Name:
Title:

SUPER FRESH FOOD MARKETS, INC.

By:_____
Name:
Title:

MRS. GREENS MANAGEMENT CORP.

By:_____
Name:
Title:

VILLAGE SUPER MARKET, INC.

By:_____
Name:
Title:

**Exhibit E**

**CERTIFICATE OF NON-FOREIGN STATUS**

This certificate is being delivered pursuant to <u>Section 2.5(b)</u> of that certain Asset Purchase Agreement, dated as of _____ 2011, by and among Mrs. Greens Management Corp, a New York corporation ("Mrs. Greens"), Village Super Market, Inc., a New Jersey corporation ("Village" and together with Mrs. Greens, "Buyers"), The Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation ("A&P"), and Super Fresh Food Markets, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P ("Transferor").

Section 1445 of the Internal Revenue Code of 1986, as amended, (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform Buyers that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

(a) Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate, (as those terms are defined in the Code and the Treasury Regulations promulgated thereunder);

(b) Transferor is not a disregarded entity as defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

(c) Transferor's employer identification number is [_____]; and

(d) Transferor's office address is:

> **[Two Paragon Drive**
> **Montvale, New Jersey 07645]**

Transferor understands that this Certificate may be disclosed to the Internal Revenue Service by Buyers and that any false statement herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have the authority to sign this certificate on behalf of Transferor.

Date: __/__/2011

_____

By:
Title:

**Disclosure Schedule**
**Schedule 1.1(a) – Buyer's Wire Instructions**


**<u>Mrs. Green's/Village[1]:</u>**

[ABA#        021200012
WELLS FARGO BANK/WACHOVIA
ACCPONT #    2100015573297
VILLAGE SUPERMARKETS, INC].

---

[1] Single, joint account for Buyers

**Disclosure Schedule**
**Schedule 1.1(b) – Excluded Furnishings and Equipment**

All software.

**Disclosure Schedule**
**Schedule 1.1 (c) – Specifically Identified Excluded Assets**

None.

**Disclosure Schedule**
**Schedule 1.1(d) – Sellers' Wire Instructions**

Citibank, N.A.
734 Third Avenue
New York, N.Y.  10017

**ABA #021-000-089**
Chicago Title Insurance Company
711 3rd Avenue-5th Floor
New York, N.Y.  10017

National Special Deposit Account
**ACCOUNT # 9936777790**

Telephone-Advise upon receipt
Kathleen Fio Rito
(212) 880-1336

**Reference**

**121100092 – [Mrs. Greens/Village]**

**Disclosure Schedule**
**Schedule 2.6 (a) – Inventory Instructions & Pricing**

The Inventory Taker shall value all national brands, shelf inventory and case lot inventory carried in the Stores, excluding certain items hereinafter, referred to at the following percentages of the retail price (subject to the requirements of applicable law):

|  |  |
|---|---|
| Grocery | 71% |
| Alcohol | 78% |
| Tobacco/Cigarettes | 45% |
| Frozen Food | 63% |
| Frozen Meat | 50% |
| Frozen Seafood | 47% |
| Health and Beauty Aids | 67% |
| General Merchandizing | 55% |

Such retail price of all items counted to be as shown by the price on each item on the shelf or, if there is no price, on each as shown in the most recent price book or other price guide of Sellers.

The Inventory Taker shall value the contents of the Pharmaceutical Inventory by visually estimating the number of containers (rounding the estimate to the nearest one-tenth $(1/10^{th})$ of the container) and multiplying the number by Sellers' actual cost for that container.

**Disclosure Schedule**
***Section 3.5 – Store Locations and Leases***

## Group 1 Stores

Store # 979 - 4330 48th St NW, Washington, DC
Store # 852 - 17 Washington Square, Chestertown, MD
Store # 961 - 40 Souder Rd, Brunswick, MD
Store # 870 - 780 Cambridge Plaza, Cambridge, MD
Store # 101 - 222 N. Charles St., Baltimore, MD

## Group 2 Store

Store # 876 - 37 W Aylesbury Rd, Lutherville-Timonium, MD

## Group 1 Stores Leases

Store # 979 - Lease Agreement between Kogud and Burka Enterprises, Inc., Lessor, and The Great Atlantic & Pacific Tea Company, Inc., Lessee Dated July 26, 1963 (as amended, supplemented or restated from time to time)

Store # 852 - Lease between GMSD Realty Associates, Landlord and The Great Atlantic & Pacific Tea Company, Inc., Tenant Dated June 15, 1990 (as amended, supplemented or restated from time to time)

Store # 961 - Lease between Brunswick Associates, Landlord, and The Great Atlantic & Pacific Tea Company, Inc., Tenant Dated March 8, 1985 (as amended, supplemented or restated from time to time)

Store # 870 - Agreement between Cambridge, Inc. and Cambridge Plaza and Safeway Stores, Incorporated Dated October 17, 1980 (as amended, supplemented or restated from time to time)

Store # 101 - Lease between Charles Plaza, LLC, Landlord and Super Fresh Food Markets, Inc., Tenant Dated July 14, 2005 (as amended, supplemented or restated from time to time)

## Group 2 Store Lease

Store # 876 - Sublease Agreement between The Great Atlantic & Pacific Tea Company, Inc., Sublandlord and Provident Bank, Subtenant, dated November 5, 2002 (as amended, supplemented or restated from time to time)

> Lease between Manekin Aylesbury LLLP, Landlord and The Great Atlantic & Pacific Tea Company, Tenant Dated December 29, 1997 (as amended, supplemented or restated from time to time).

**Disclosure Schedule**
***Section 3.6 – Litigation***

None.

**Disclosure Schedule**
*Section 3.7 – Collective Bargaining Agreements*

- Agreement between the Great Atlantic & Pacific Tea Company, Inc., Baltimore Division, Super Fresh Sav-A-Center or Sun and The United Food and Commercial Workers Union Local 1776, Area 3, AFL-CIO-CLC, South Central Pennsylvania Division dated August 20, 2000.
- Collective Bargaining Agreement between Great Atlantic and Pacific Tea Company, Inc. Super Fresh (Baltimore Division) and United Food & Commercial Workers Union Local 27, dated August 3, 2008.
- Agreement made by and between Local 400 Chartered by the United Food & Commercial Workers International Union and The Great Atlantic & Pacific Tea Company, Inc., Super Fresh, dated August 3, 2008.
- Agreement between Super Fresh Food Markets, Inc. and United Food and Commercial Workers Union Local 27, dated October 31, 2004.
- Side Letter between United Food & Commercial Workers International Union and The Great Atlantic & Pacific Tea Company, dated August 3, 2008.

**Disclosure Schedule**
***Section 5.5(b) – Notices and Consents***

None.

## Exhibit D

## May 17 and May 18 2011 Auction Transcript

# In The Matter Of:

## *In Re THE GREAT ATLANTIC & PACIFIC TEA COMPANY*

_____

## *AUCTION - Vol. 1*
### *May 17, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


-------------------------------------------x

In Re THE GREAT ATLANTIC & PACIFIC TEA COMPANY

-------------------------------------------x


                          May 17, 2011

                          8:37 p.m.


                          Kirkland & Ellis LLP

                          601 Lexington Avenue

                          New York, New York 10022




JAMES J. MAZZA, JR., ESQ.,

RAY C. SCHROCK, ESQ.,

GREGORY APTER,

                    Moderators

```
 1

 2   A T T E N D E E S:

 3   A-MCB WHITE OAK LLC:

 4   ADAM HARRIS

 5   BRIAN TONG

 6   ROBERT MASTERS

 7   CHRISTOPHER CONLON

 8   DAVID BRAMBLE

 9
      COMMITTEE COUNSEL FROM MILBANK TWEED HADLEY & McCLOY
10   and FINANCIAL ADVISORS from FTI:

11   JOE PEGNIA

12   MIKE COMERFORD

13   ALEX KAYE

14   STEVE SZANZER

15   JON OSTRZEGA

16   VICTORIA ZHU

17   RACHEL FINK

18   STEVE SIMMS

19   NICK VENDITTO

20
      CONVERTIBLE NOTEHOLDERS - STROOCK & STROOCK & LAVAN:
21
      JAYME T. GOLDSTEIN
22
      JOSHUA SIEGEL
23

24   CVS PHARMACY, INC.:
      SYED HUSAIN
25
      MARK MINUTI
```

```
 1
 2   A T T E N D E E S (Continued):
 3   DJM ASSET MANAGEMENT:
 4   NEIL HERMAN
 5   ANDY GRAISER
 6   MICHAEL JERBICH
 7   FRED BURSTEIN
 8   MATTHEW MORRIS
 9
     ENGLAR CENTER LIMITED PARTNERSHIP:
10
     MORRIS L. GARTEN
11
     JERRY MOSES
12
     MARK BOMSE
13
     STUART KOMROWER
14
     LEETE GARTEN
15
16   FPA AYLESBUR LLLP:
17   BRADLEY SWALLOW
18
     THE FRESH MARKET:
19
     JAMES DEWEY
20
     SCOTT DUGGAN
21
22   GIANT of MARYLAND LLC:
23   JOHN CUNNINGHAM
24   JIM SYLVIA
25
```

1

2    A T T E N D E E S (Continued):

3    HANA ORIENT SUPERMARKET, INC. d/b/a LOTTE PLAZA
     INTERNATIONAL SUPERMARKETS:

4
     SANG MIN LEE

5

6    MRS. GREENS MANAGEMENT CORPORATION:

7    GABRIEL de ALBA

8    ZACHARY MICHAUD

9    PAUL HARNER

10   JAMES KTSANES

11
     SAFEWAY:

12
     WENDY WALKER

13
     GREG HERR

14
     TIM BAKER

15

16   SUPERVALU, INC:

17   JOSH BOYD

18   JAMA KRIZ

19   WAYNE KIRK

20   BILL EVANOFF

21   JOSH HERSHKOVITZ

22   AVI HERSHKOVITZ

23
     UNION REPRESENTATIVES:

24
     RICHARD SELTZER

25

1

2    A T T E N D E E S (Continued):

3    UNION REPRESENTATIVES:

4    MICHAEL GLANZER

5    GEORGE MURPHY, SR.

6    GEORGE MURPHY, JR.

7    CAREY BUTSAVAGE

8    JOHN DURKALSKI

9
     VILLAGE SUPER MARKET, INC.:
10
     FRANK SAURO
11
     PAUL DiFILIPPO
12
     BILL SUMAS
13
     JON SUMAS
14

15   WALGREEN CO.:

16   MICHAEL CAIRO

17   WILLIAM J. BARRETT

18

19

20

21

22

23

24

25

| 20:37:41 | 1 | MR. MAZZA: We are opening up the |
| 20:37:42 | 2 | phone lines. We are about to get started |
| 20:37:44 | 3 | here in Great Atlantic and Pacific Tea |
| 20:37:48 | 4 | Company bankruptcy case. We will go on |
| 20:37:50 | 5 | the record at this point. Good evening. |
| 20:37:52 | 6 | Appreciate everybody for what's already |
| 20:37:55 | 7 | been a long day waiting around and some of |
| 20:37:57 | 8 | us are crazy enough to think we want to |
| 20:38:00 | 9 | make a long night out of this and get the |
| 20:38:01 | 10 | bidding going. It's been, again, we |
| 20:38:04 | 11 | appreciate everybody sticking around and |
| 20:38:06 | 12 | being here with us. |
| 20:38:07 | 13 | So we are opening up the auction and |
| 20:38:10 | 14 | proceedings are now on the record with |
| 20:38:12 | 15 | respect to the stores that are up for sale |
| 20:38:14 | 16 | for the Great Atlantic and Pacific Tea |
| 20:38:21 | 17 | Company. |
| 20:38:27 | 18 | My name is Jim Mazza, I'm a partner |
| 20:38:31 | 19 | with Kirkland and Ellis LLP, counsel to |
| 20:38:33 | 20 | the Great Atlantic and Pacific Tea Company |
| 20:38:34 | 21 | and its affiliated debtors and debtors in |
| 20:38:37 | 22 | possession in their Chapter 11 cases |
| 20:38:39 | 23 | pending in the United States Bankruptcy |
| 20:38:41 | 24 | Court for the Southern District of New |
| 20:38:43 | 25 | York, being jointly administered under |

20:38:45   1       case number 10-24549. I'll refer to the

20:38:49   2       debtors as A&P or the debtors throughout

20:38:53   3       this process

20:38:53   4          Here this evening I have Greg Apter

20:38:56   5       from Hilco and my partner Ray Schrock on

20:38:59   6       my right who will be assisting with the

20:39:01   7       moderation of the proceedings today or

20:39:03   8       this evening.

20:39:04   9          Also in attendance are representatives

20:39:06 10       of our Official Committee of Unsecured

20:39:09 11       Creditors and the United Food and

20:39:12 12       Commercial Workers Union and its local

20:39:14 13       affiliates that are affiliated with the

20:39:16 14       stores that are up for auction today.

20:39:19 15          Just a preview. We're going to be

20:39:23 16       beginning the auction with a lot of four

20:39:26 17       stores' assets and I will identify those

20:39:28 18       stores in a little bit. We secured a lead

20:39:30 19       bid on these assets which I'll describe in

20:39:34 20       a moment from Giant of Maryland LLC and we

20:39:37 21       will read into the record some of the

20:39:38 22       conditions and issues in connection with

20:39:40 23       that bid.

20:39:42 24          After bidding on the Lot 1 Assets

20:39:46 25       takes place, we will take another recess

20:39:47  1    to develop the structure of the auction

20:39:49  2    with respect to remaining assets which may

20:39:52  3    be on a lot-by-lot basis, depending on the

20:39:55  4    discussions that we're having with some of

20:39:57  5    the bidders right now in connection with

20:39:59  6    the stores after we get through the first

20:40:01  7    lot of four.

20:40:03  8         If you haven't signed in yet, there's

20:40:05  9    a sign-in sheet over in the back of the

20:40:08  10   room that you can sign in.

20:40:11  11        Just a quick overview of the process

20:40:14  12   which I don't think people want to hear

20:40:16  13   too much about at this hour.

20:40:17  14        It's been a robust process, involves

20:40:19  15   25 stores located in Maryland and DC area

20:40:23  16   that began approximately four months ago

20:40:25  17   and that has continued since the company

20:40:27  18   filed for Chapter 11.

20:40:28  19        The auction is being conducted

20:40:31  20   pursuant to bidding procedures we had

20:40:33  21   approved by the bankruptcy court on May

20:40:35  22   2nd, 2011 which were posted on the case

20:40:40  23   docket as docket number 1478.

20:40:42  24        Again, we have a court reporter here

20:40:44  25   today to record the proceedings. All

20:40:46  1        bidding will be on the record and to

20:40:48  2        facilitate things for the court reporter,

20:40:50  3        I ask that each speaker identify

20:40:52  4        themselves and the bidder they represent

20:40:54  5        each time they speak, even if that bidder

20:40:57  6        has already spoken and that only one

20:40:59  7        person speak at a time.

20:41:00  8             Again, the moderators are myself, Ray

20:41:03  9        Schrock to my right and Greg Apter to the

20:41:05  10       left.

20:41:05  11            As the moderators, we will run this

20:41:07  12       auction, recognize bidders and address

20:41:09  13       their comments as appropriate.  We will

20:41:11  14       also act as liaisons to the qualified

20:41:14  15       bidders to provide bidders with updated

20:41:17  16       information as the auction progresses.

20:41:18  17            We the debtors reserve the right to

20:41:22  18       adjourn the auction and recommence it at

20:41:24  19       any time as we've done through

20:41:26  20       adjournments throughout the day today and

20:41:28  21       hopefully we won't have to adjourn it too

20:41:30  22       much more.  There may be an adjournment to

20:41:33  23       tomorrow depending on how things pan out

20:41:34  24       with our first line of bids.

20:41:36  25            I'd like to now go over the qualified

| 20:41:39 | 1 | bids so everybody has an understanding |
| 20:41:43 | 2 | with respect to being qualified bidders |
| 20:41:45 | 3 | here today. |
| 20:41:45 | 4 | Yesterday the company in consultation |
| 20:41:48 | 5 | with its advisors and the Creditors' |
| 20:41:51 | 6 | Committee, the union and the agent for the |
| 20:41:53 | 7 | DIP lenders, determined that each of the |
| 20:41:55 | 8 | bids that we did receive on Friday met the |
| 20:41:59 | 9 | requirements or were waivable with respect |
| 20:42:02 | 10 | to any technical issues so that they would |
| 20:42:04 | 11 | be qualified bids to participate in the |
| 20:42:08 | 12 | auction here today. |
| 20:42:09 | 13 | So there should be 13 qualified |
| 20:42:11 | 14 | bidders present here today which I'll |
| 20:42:13 | 15 | identify in a moment and people can speak |
| 20:42:16 | 16 | up with respect to the parties they, the |
| 20:42:20 | 17 | qualified bidder that they represent. |
| 20:42:21 | 18 | Each of the qualified bidders, |
| 20:42:24 | 19 | pursuant to the bidding procedures, is |
| 20:42:26 | 20 | eligible to bid on any assets up for |
| 20:42:28 | 21 | auction, provided that such qualified |
| 20:42:31 | 22 | bidders post a deposit that will be equal |
| 20:42:33 | 23 | to 10 percent of the value of the assets |
| 20:42:36 | 24 | that they may not have previously bid on |
| 20:42:38 | 25 | within 24 hours of the submission of their |

| | | |
|---|---|---|
| 20:42:41 | 1 | new bid. |
| 20:42:41 | 2 | We also reserve the right as the |
| 20:42:44 | 3 | debtors to request additional assurance of |
| 20:42:48 | 4 | financial performance and capabilities to |
| 20:42:50 | 5 | close the sale throughout the auction |
| 20:42:51 | 6 | process. |
| 20:42:52 | 7 | Each bidder should again have one |
| 20:42:54 | 8 | designated spokesperson.  Only qualified |
| 20:42:57 | 9 | bidders represented by one spokesperson |
| 20:42:58 | 10 | will be allowed to participate in bidding. |
| 20:43:00 | 11 | And let me give you a few statements, |
| 20:43:03 | 12 | just the general requirements that each of |
| 20:43:07 | 13 | the qualified bidders as they are |
| 20:43:08 | 14 | identified aver to. |
| 20:43:10 | 15 | A&P believes that each of the bidders |
| 20:43:12 | 16 | has at all times acted in good faith, |
| 20:43:15 | 17 | dealt at arm's-length with A&P. |
| 20:43:17 | 18 | Again, I'll ask each representative to |
| 20:43:21 | 19 | aver that on the record. |
| 20:43:24 | 20 | And in particular, I'd ask each |
| 20:43:28 | 21 | spokesperson as they identify themselves, |
| 20:43:31 | 22 | that the qualified bidder they represent |
| 20:43:33 | 23 | has not taken any action that would |
| 20:43:35 | 24 | prevent the bankruptcy court from finding |
| 20:43:37 | 25 | that such qualified bidder acted in good |

20:43:40  1          faith and at arm's-length at all times in

20:43:42  2          connection with the bidding process.

20:43:43  3              I'd also ask each party to confirm it

20:43:46  4          has not had any communications with any

20:43:48  5          other bidder with the goal of either

20:43:50  6          controlling the price for A&P's assets or

20:43:53  7          discouraging such other bidders'

20:43:55  8          participation in this auction, and its

20:43:58  9          qualified bid is a good faith bona fide

20:44:00  10         offer and intends to consummate proposed

20:44:03  11         transaction of its bid if selected as a

20:44:05  12         successful or winning bidder in this

20:44:07  13         auction.

20:44:09  14             As I announce the qualified bidders,

20:44:12  15         will each spokesperson for a qualified

20:44:14  16         bidder please identify themselves and

20:44:16  17         spell their names for the record and

20:44:17  18         confirm the good faith and fair dealing

20:44:19  19         representations I just read.

20:44:21  20             I'm going to go down these in

20:44:22  21         alphabetical order and for those folks

20:44:25  22         that are in the room just listen for your

20:44:26  23         bidder's name.

20:44:27  24             First I have A-MCB White Oak LLC.

20:44:35  25             MR. TONG:  Brian Tong from Schulte

20:44:39 1    Roth & Zabel.

20:44:41 2        MR. MAZZA:  CVS Pharmacy, Inc.

20:44:43 3        MR. MINUTI:  Mark Minuti for CVS

20:44:48 4    Pharmacy Inc and we affirm the statements

20:44:49 5    you indicated.

20:44:51 6        MR. MAZZA:  Thanks.  Brian, could you

20:44:53 7    affirm the statements I made with respect

20:44:54 8    to the good faith representations and

20:44:56 9    dealing with the debtors at arm's-length.

20:44:59 10       MR. TONG:  Brian Tong from Schulte

20:45:01 11   Roth & Zabel and we affirm the fair

20:45:04 12   dealing.

20:45:05 13       MR. MAZZA:  Thanks. Next I have DJM

20:45:07 14   Asset Management.

20:45:09 15       MR. JERBICH:  Michael Jerbich, DJM,

20:45:12 16   and I can affirm as well.

20:45:14 17       MR. MAZZA:  Englar Center Limited

20:45:16 18   Partnership.

20:45:16 19       MR. KOMROWER:   Stuart Komrower, I

20:45:23 20   affirm those representations.

20:45:24 21       MR. MAZZA:  Thank you very much.

20:45:26 22       FPA Aylesbur LLLP.

20:45:30 23       MR. SWALLOW:  Bradley Swallow from

20:45:31 24   Gordon Feinblatt law firm and we affirm

20:45:35 25   the good faith and fair dealing

20:45:36  1         representations.

20:45:37  2              MR. MAZZA:  Thanks, Bradley.

20:45:38  3              Giant of Maryland LLC.

20:45:42  4              MR. CUNNINGHAM:  John Cunningham of

20:45:43  5         White and Case, and I affirm the

20:45:46  6         representation on behalf of Giant.

20:45:49  7              MR. MAZZA:  Thanks, John.

20:45:50  8              Hana Oriental Supermarket doing

20:45:53  9         business as Lotte Plaza International

20:45:55 10         Supermarkets.

20:45:58 11              AUDIENCE MEMBER:  They left.

20:45:59 12              MR. MAZZA:  They left. All right, well

20:46:01 13         somebody couldn't stick out the time.

20:46:02 14              Mrs. Green's Management Corporation.

20:46:06 15              MR. De ALBA:  Gabriel de Alba, and we

20:46:10 16         affirm the representations.

20:46:12 17              MR. MAZZA:  Thank you.

20:46:13 18              Safeway Inc.

20:46:17 19              MS. WALKER:  Wendy Walker, Morgan

20:46:18 20         Lewis for Safeway Inc and we confirm the

20:46:20 21         good faith and fair dealing

20:46:22 22         representations.

20:46:23 23              MR. MAZZA:  Thank you.

20:46:23 24              SUPERVALU Inc.

20:46:25 25              MR. EVANOFF:  Bill Evanoff, Sidley

20:46:28  1      Austin, here on behalf of SUPERVALU and we

20:46:30  2      confirm the good faith and fair dealing

20:46:32  3      representations.

20:46:33  4          MR. MAZZA:  Thank you.

20:46:33  5          The Fresh Market Inc.

20:46:35  6          MR. DUGGAN:  Scott Duggan of the Fresh

20:46:38  7      Market, and we confirm the representation.

20:46:41  8          MR. MAZZA:  Thank you.

20:46:43  9          Village Super Market Inc.

20:46:46 10          MR. DEFILIPPO:  Paul DeFilippo, for

20:46:49 11      Village and we affirm the representation.

20:46:52 12          MR. MAZZA:  Thank you.

20:46:53 13          Walgreen Co.

20:46:55 14          MR. BARRETT:  William Barrett, Barack

20:47:00 15      Ferrazzano, and we affirm the

20:47:01 16      representations for Walgreen.

20:47:02 17          MR. MAZZA:  Thank you very much.  So

20:47:03 18      that's our list of qualified bidders.  We

20:47:05 19      have 12 of the 13 that we qualified as

20:47:08 20      bidders here in the auction room today.

20:47:10 21          So with that, let me go over just a

20:47:12 22      brief overview of what our auction

20:47:14 23      procedures are going to be and how we are

20:47:16 24      going to move forward.

20:47:17 25          The auction is going to be conducted

| | | |
|---|---|---|
| 20:47:19 | 1 | in accordance with the bidding procedures |
| 20:47:21 | 2 | approved by the court and auction |
| 20:47:23 | 3 | procedures that we've developed based on |
| 20:47:25 | 4 | the various qualified bids we've received |
| 20:47:27 | 5 | and have developed those procedures in |
| 20:47:28 | 6 | consultation with the committee and other |
| 20:47:30 | 7 | constituents in the case. |
| 20:47:32 | 8 | Based on the qualified bids submitted, |
| 20:47:34 | 9 | we've structured the auction to begin as I |
| 20:47:36 | 10 | mentioned at the outset with a lot of |
| 20:47:38 | 11 | assets.  We will then take a recess before |
| 20:47:41 | 12 | opening up the bids. |
| 20:47:42 | 13 | I understand this will mean that some |
| 20:47:44 | 14 | of you might have to wait, but hopefully |
| 20:47:46 | 15 | we can move things along now that we will |
| 20:47:48 | 16 | be opening up with lead bid on the first |
| 20:47:51 | 17 | lot of assets. |
| 20:47:52 | 18 | Let me describe for folks what that |
| 20:47:55 | 19 | lot is.  We will call it the Lot 1 Assets. |
| 20:47:59 | 20 | It's four stores and I will identify the |
| 20:48:01 | 21 | location of those stores and the store |
| 20:48:03 | 22 | numbers. |
| 20:48:03 | 23 | First is Baltimore, Maryland, that's |
| 20:48:06 | 24 | store number 812. |
| 20:48:10 | 25 | Second, Arnold, Maryland, that's store |

20:48:12   1          number 891.

20:48:13   2              Third, Parkville, Maryland, that's

20:48:16   3          store number 897.

20:48:17   4              Fourth, White Oak, Maryland, that's

20:48:20   5          store number 985.

20:48:22   6              We have a lead bid for those stores

20:48:26   7          and let me give some description of that.

20:48:28   8          In consultation with our constituents,

20:48:30   9          debtors have identified a lead bid

20:48:32  10          submitted by Giant of Maryland LLC in the

20:48:34  11          amount of $18.5 million as a lead bid for

20:48:38  12          these Lot 1 Assets, the four stores I just

20:48:41  13          mentioned.

20:48:42  14              Giant has agreed to assume A&P's

20:48:45  15          collective bargaining agreements governing

20:48:47  16          these store locations, will not purchase

20:48:51  17          certain excluded assets set forth in the

20:48:53  18          schedule that we will make available to

20:48:54  19          bidders.

20:48:55  20              This lead bid is based upon an asset

20:48:57  21          purchase agreement that was distributed

20:49:00  22          from Kirkland and Ellis to the

20:49:03  23          representatives of Giant at White and

20:49:06  24          Case, their legal counsel, earlier this

20:49:08  25          afternoon, around noon.

20:49:10  1          Those changes in that agreement in

20:49:14  2     addition to a term sheet that had been

20:49:15  3     agreed upon by the parties during the

20:49:18  4     course of the day would constitute the bid

20:49:21  5     that is the lead bid from Giant LLC on

20:49:24  6     these four stores.

20:49:26  7          I'd ask that counsel to Giant confirm

20:49:29  8     on the record that that bid is a binding

20:49:32  9     bid on Giant and it is an irrevocable

20:49:37 10     offer pursuant to the bidding procedures

20:49:39 11     that have been approved by the bankruptcy

20:49:40 12     court.

20:49:40 13          MR. CUNNINGHAM:  John Cunningham of

20:49:42 14     White and Case, on behalf of Giant of

20:49:45 15     Maryland LLC, I can confirm that is our

20:49:48 16     bid as modified and that it is binding and

20:49:53 17     irrevocable in accordance with the bidding

20:49:54 18     procedures.

20:50:00 19          MR. MAZZA:  Thank you, John.

20:50:01 20          Let me just describe for folks, this

20:50:02 21     is the first lot we're going to start with

20:50:04 22     and we will start the bidding on this lot

20:50:06 23     with any bids for all four stores on this

20:50:08 24     package.

20:50:09 25          MS. WALKER:  Wendy Walker with Morgan

20:50:15  1    Lewis with a question.  Is there a

20:50:16  2    breakdown of the purchase price amongst

20:50:18  3    the four stores that are part of the

20:50:19  4    package?

20:50:20  5        MR. MAZZA:  No, there's not.

20:50:20  6        MS. WALKER:  Thank you.

20:50:27  7        MR. MAZZA:  So on this package we're

20:50:28  8    going to start bidding with increments of

20:50:31  9    $150,000 above the $18.5 million purchase

20:50:35 10    price that is the headline of Giant's bid.

20:50:44 11        The debtors will retain discretion to

20:50:46 12    adjust the increments for bidding in

20:50:50 13    connection with this lot and as we move

20:50:52 14    forward with other stores in the auction.

20:50:53 15        If Giant is not surpassed as the

20:50:57 16    current highest and best bid on this

20:50:59 17    package basis for all stores, again we're

20:51:01 18    going to start with package bids for four

20:51:04 19    stores, then we will proceed with bidding

20:51:06 20    on alternative packages for these

20:51:09 21    particular four stores, specifically

20:51:11 22    packages of any combination of three, then

20:51:14 23    two stores and then ultimately individual

20:51:16 24    stores in this four store lot.

20:51:19 25        Giant will still be the lead bid until

20:51:21  1       a package and/or individual bids are

20:51:25  2       deemed to exceed Giant's lead bid of $18.5

20:51:28  3       million.

20:51:29  4           As bids come in on less than the full

20:51:31  5       package of four stores, if we get to that

20:51:33  6       scenario, such bids will be held in

20:51:36  7       reserve as irrevocable and must be

20:51:38  8       affirmed as such by bidders until there is

20:51:41  9       a determination that another bid or set of

20:51:43 10       bids is deemed higher and better.

20:51:45 11           It is also subject to the debtors'

20:51:48 12       rights under the bidding procedures to

20:51:49 13       deem bids as backup bids in the event that

20:51:52 14       the lead bidder, in this case Giant,

20:51:56 15       doesn't close on its asset purchase

20:51:58 16       agreement.

20:51:58 17           If there is a determination after the

20:52:01 18       bidding that Giant's bid has been topped,

20:52:03 19       then Giant will be allowed to re-bid on a

20:52:06 20       package or individual property basis, if

20:52:11 21       that scenario occurs.

20:52:12 22           So those are going to be the specific

20:52:14 23       guidelines that apply with respect to this

20:52:16 24       first lot of stores.

20:52:17 25           Let me give folks some general

20:52:19  1        parameters that are going to apply

20:52:21  2        throughout the auction process subject to

20:52:23  3        the debtors' discretion in consultation

20:52:25  4        with their constituents.

20:52:27  5            We're going to, as I mentioned, retain

20:52:29  6        the discretion and adjust increments and

20:52:32  7        timing between each bid.

20:52:33  8            We are going to try to hopefully speed

20:52:35  9        things up with respect to bidding as we

20:52:38 10        move things along and not have too much

20:52:40 11        time between bids.  Five minutes is what

20:52:43 12        we're going to try to do.

20:52:44 13            While each bidder must announce the

20:52:46 14        material terms of the bids, proposed asset

20:52:49 15        purchase agreements will not be

20:52:50 16        distributed to other qualified bidders,

20:52:53 17        given the differences between the

20:52:55 18        agreements that we've seen since qualified

20:52:57 19        bids have been provided.

20:52:58 20            If you do have any questions about a

20:53:00 21        particular bid, you may ask the debtors on

20:53:03 22        or off the record and we will do our best

20:53:05 23        to answer.

20:53:05 24            Again, pursuant to the bidding

20:53:08 25        procedures, each bidder is going to be

20:53:10  1      required to keep each overbid open and

20:53:13  2      irrevocable until the earlier of 25 days

20:53:16  3      after the entry of the sale order

20:53:18  4      approving the sale of the assets and

20:53:21  5      closing of the sale of assets in

20:53:23  6      accordance with the successful bid, that

20:53:25  7      is the bid that wins.

20:53:26  8          Each new overbid will supersede the

20:53:30  9      previous overbid of a bidder for purposes

20:53:32  10     of irrevocability to the extent the bid

20:53:36  11     pertains to the same asset or assets as

20:53:38  12     the prior bid or a greater pool of assets

20:53:41  13     than the prior bid.

20:53:41  14         So in other words, a lower bid for a

20:53:44  15     smaller pool of assets will not supersede

20:53:46  16     a higher bid for a larger group of assets

20:53:49  17     if a qualified bidder has put two bids on

20:53:51  18     the table at some point during these

20:53:53  19     proceedings.

20:53:53  20         In connection with the Lot 1 Assets,

20:53:57  21     after each qualified bidder has announced

20:53:59  22     their final bid for the Lot 1 Assets, we

20:54:01  23     will take a recess to determine the

20:54:02  24     current lead bid on the applicable package

20:54:06  25     or individual stores as the scenarios go

20:54:08  1     along.

20:54:09  2         And then at the conclusion of the

20:54:10  3     recess, we will announce the highest and

20:54:13  4     best qualified bid or bids for the Lot 1

20:54:16  5     Assets as determined by the debtors in

20:54:18  6     consultation with the committee and the

20:54:20  7     union, which will be referred to as a

20:54:23  8     successful bid at that time.

20:54:24  9         Debtors in consultation with the

20:54:26 10     committee and the union will also identify

20:54:29 11     a backup bidder or bidders for the Lot 1

20:54:33 12     Assets.  There may be more than one

20:54:34 13     back-up bidder to the extent there are

20:54:36 14     individual bids on the assets.

20:54:37 15         Again the debtors may divide the Lot 1

20:54:43 16     assets in whatever manner they deem will

20:54:46 17     bring the highest and greatest value to

20:54:48 18     their stakes.

20:54:49 19         Debtors may also evaluate each bid

20:54:52 20     based on certain non-quantifiable factors,

20:54:54 21     including execution risk and whether a

20:54:56 22     bidder has agreed to assume the relevant

20:55:00 23     collective bargaining agreements governing

20:55:02 24     each particular store location or

20:55:04 25     locations, and timing of the closing of

20:55:06  1   the sale among others.

20:55:07  2    As noted, we reserve the right to

20:55:12  3   adjourn the auction at times to facilitate

20:55:16  4   discussions between ourselves, our

20:55:18  5   constituents and qualified bidders; allow

20:55:20  6   qualified bidders to consider how they

20:55:23  7   wish to proceed; and provide qualified

20:55:25  8   bidders the opportunity to provide the

20:55:26  9   debtors with additional evidence as we may

20:55:30 10   in our reasonable judgment require to

20:55:33 11   close an APA.

20:55:34 12    We do not intend to consider any bid

20:55:38 13   submitted after the conclusion of the

20:55:40 14   auction and any and all such bids and

20:55:43 15   overbids shall be deemed untimely and

20:55:45 16   shall under no circumstances constitute a

20:55:47 17   qualified bid.

20:55:49 18    If a successful bidder fails to

20:55:52 19   consummate the sale, the debtors may

20:55:53 20   select the backup bidder as the successful

20:55:56 21   bidder.  In such case, as governed by the

20:56:00 22   relevant APA, the defaulting successful

20:56:04 23   bidder's deposit, if applicable, shall be

20:56:08 24   forfeited to the debtors and the debtors

20:56:09 25   specifically reserve the right to seek all

20:56:11  1     available damages from the defaulting

20:56:13  2     successful bidder.

20:56:13  3         Please remember that acceptance by the

20:56:17  4     debtors of the successful bid is

20:56:20  5     conditioned upon approval by the

20:56:22  6     bankruptcy court of the successful bid and

20:56:24  7     the entry of the sale order.

20:56:26  8         Sale order is currently scheduled for

20:56:28  9     June 14th, 2011 at 10 a.m. eastern time,

20:56:32 10     and the debtors intend to file a motion,

20:56:34 11     or motions, for approval of the various

20:56:38 12     sales contemplated here today by the end

20:56:39 13     of this month.

20:56:40 14         Any questions in the room regarding

20:56:43 15     these procedures?

20:56:48 16         Okay.  Hearing none, I think we're in

20:56:53 17     a position to take a break.  I would just

20:56:56 18     like to go through and get a qualification

20:56:58 19     from each of the qualified bidders that

20:57:00 20     they understand the terms of the auction

20:57:03 21     in connection with these Lot 1 Assets and

20:57:05 22     then as we move forward with the

20:57:07 23     additional stores.

20:57:08 24         So I'll go around, again in

20:57:11 25     alphabetical order:

| | | |
|---|---|---|
| 20:57:12 | 1 | A-MCB White Oak. |
| 20:57:14 | 2 | MR. TONG:  Brian Tong, Schulte Roth & |
| 20:57:16 | 3 | Zabel, I understand the bidding |
| 20:57:17 | 4 | qualifications. |
| 20:57:18 | 5 | MR. MAZZA:  CVS Pharmacy. |
| 20:57:23 | 6 | MR. MINUTI:  Mark Minuti, understood. |
| 20:57:23 | 7 | MR. MAZZA:  DJM Asset Management. |
| 20:57:26 | 8 | MR. JERBICH:  Michael Jerbich, |
| 20:57:28 | 9 | understood. |
| 20:57:28 | 10 | MR. MAZZA:  Englar Center Limited |
| 20:57:30 | 11 | Partnership. |
| 20:57:30 | 12 | MR. KOMROWER:  Stuart Komrower, |
| 20:57:31 | 13 | understood. |
| 20:57:32 | 14 | MR. MAZZA:  FPA Aylesbur LLLP. |
| 20:57:34 | 15 | MR. SWALLOW:  Bradley Swallow of |
| 20:57:37 | 16 | Gordon Feinblatt, understood. |
| 20:57:37 | 17 | MR. MAZZA:  Giant of Maryland LLC. |
| 20:57:40 | 18 | MR. CUNNINGHAM:  John Cunningham of |
| 20:57:42 | 19 | White and Case, understood. |
| 20:57:43 | 20 | MR. MAZZA:  Hana is not here. |
| 20:57:46 | 21 | Mrs. Green's Management Corporation. |
| 20:57:46 | 22 | MR. DE ALBA:  Gabriel de Alba, |
| 20:57:52 | 23 | understood. |
| 20:57:52 | 24 | MR. MAZZA:  Safeway, Inc. |
| 20:57:53 | 25 | MS. WALKER:  Wendy Walker, Morgan |

20:57:54  1        Lewis, understood.

20:57:55  2            MR. MAZZA:  SUPERVALU Inc.

20:57:56  3            MR. EVANOFF:  Bill Evanoff, Sidley

20:57:58  4        Austin, understood.

20:58:00  5            MR. MAZZA:  Fresh Market, Inc.

20:58:02  6            MR. DUGGAN:  Scott Duggan of the Fresh

20:58:04  7        Market, understood.

20:58:05  8            MR. MAZZA:  Village Super Market, Inc.

20:58:07  9            MR. DeFILIPPO:  Paul DeFilippo,

20:58:08 10        understood.

20:58:09 11            MR. MAZZA:  Walgreen Company.

20:58:11 12            MR. BARRETT:  William Barrett,

20:58:13 13        Walgreen, understood.

20:58:13 14            MR. MAZZA:  Thank you.  One other

20:58:15 15        point with respect to the Giant bid which

20:58:19 16        has been announced as the lead bid and

20:58:21 17        confirmed on the record by their counsel.

20:58:22 18        The unions have also confirmed that a

20:58:24 19        provision in the asset purchase agreement

20:58:26 20        regarding temporary collective bargaining

20:58:31 21        agreement is satisfactory to them.

20:58:33 22            I would ask a representative of the

20:58:34 23        UFCW or the locals to make that averment.

20:58:40 24            MR. SELTZER:  Richard Seltzer from

20:58:41 25        Cohen, Weiss & Simon for the UFCW and the

20:58:43  1        three locals, I so confirm.

20:58:46  2             MR. MAZZA:  Thank you, Richard.

20:58:47  3             Before we start the bidding, we would

20:58:49  4        like to take a short recess.  We will

20:58:50  5        begin in about five, ten minutes so folks

20:58:54  6        can go back and figure out what sort of

20:58:56  7        bid they want to make on the Lot 1 Assets

20:58:58  8        and then we will commence.  So people can

20:59:02  9        just hang around this area, we will get on

20:59:04  10       with it.  Let's go off the record.

21:34:50  11            (A recess was had.)

21:50:50  12            MR. MAZZA:  We are ready to go back on

21:50:52  13       the record in Great Atlantic and Pacific

21:50:53  14       Tea Company case number 10-24549.

21:50:58  15            We are here on the Lot 1 Assets that

21:51:00  16       are up for bid.  Again, Baltimore Maryland

21:51:03  17       store number 812, Arnold, Maryland store

21:51:06  18       number 891, Parkville, Maryland store

21:51:08  19       number 897, White Oak, Maryland store

21:51:11  20       number 985.

21:51:12  21            We have declared Giant the lead bid,

21:51:15  22       and they have confirmed on the record

21:51:17  23       their bid being irrevocable and in the

21:51:20  24       amount of $18.5 million.  And for

21:51:27  25       clarification, that $18.5 million does not

21:51:29  1     include inventory associated with those

21:51:31  2     stores; that would be additive to the

21:51:35  3     $18.5 million number.

21:51:37  4         So we're going to open up it up at

21:51:39  5     this point to see if there are any bids on

21:51:42  6     the lot one stores, collectively on all

21:51:45  7     four stores.

21:51:46  8         I'll put it open to the floor.

21:51:51  9         MR. DeFILIPPO:  Does that bid include

21:51:56 10     FF&E?

21:51:58 11         MR. MAZZA:  The bid does include FF&E,

21:52:02 12     furniture, fixtures and equipment.

21:52:04 13         MR. DeFILIPPO:  Right.

21:52:04 14         MR. MAZZA:  So any more questions with

21:52:06 15     respect to the Giant bid?

21:52:12 16         Anybody on the floor who will be

21:52:14 17     willing to bid on the four stores

21:52:16 18     identified in lot 1?

21:52:18 19         MR. DeFILIPPO:  Yes.  On behalf of a

21:52:20 20     joint venture between Village Super Market

21:52:22 21     and Mrs. Greens, with respect to lot 1, we

21:52:26 22     bid $18,650,000, including the furniture,

21:52:30 23     fixtures and equipment in those stores.

21:52:34 24         MR. MAZZA:  Okay.  So from Mr.

21:52:37 25     DeFilippo we have a bid of $18.65 million

21:52:44 1        for the four stores that are in lot 1

21:52:46 2        which is a joint venture between Village

21:52:48 3        Super Markets, Inc, qualified bidder, and

21:52:50 4        Mrs. Green's --

21:52:53 5            MR. DeFILIPPO:  Management.

21:52:57 6            MR. MAZZA:  Management.  With respect

21:52:57 7        to that bid, what is the legal

21:53:01 8        documentation that would, the relevant

21:53:04 9        asset purchase agreement that would go

21:53:06 10       along with that?  Because we would need to

21:53:08 11       review that, the debtors.

21:53:10 12           MR. DeFILIPPO:  The one we submitted.

21:53:14 13           MR. MAZZA:  Okay.  Before we, I think,

21:53:17 14       can make a determination, we will need to

21:53:20 15       deliberate that bid as to whether or not,

21:53:22 16       based on that documentation, it would

21:53:24 17       qualify as a bid that surpasses the lead

21:53:27 18       bid right now on lot 1 from Giant.

21:53:31 19           And so with that, we will have to take

21:53:33 20       a break and we will get back as soon as

21:53:35 21       possible.

21:53:41 22           Is there a question?

21:53:44 23           MR. CUNNINGHAM:  John Cunningham of

21:53:46 24       White and Case for Giant of Maryland.

21:53:49 25           Before you go off the record, can

21:53:50  1    counsel confirm whether or not they are

21:53:51  2    taking the collective bargaining

21:53:53  3    agreements with respect to those stores?

21:53:56  4        MR. MAZZA:  Counsel, can you confirm?

21:53:59  5        MR. DeFILIPPO:  We are not assuming

21:54:01  6    the collective bargaining agreements.

21:54:02  7        MR. MAZZA:  There's no assumption of

21:54:04  8    the collective bargaining agreements?

21:54:05  9        MR. DeFILIPPO:  No.

21:54:06 10        MR. MAZZA:  Okay.  Is there any

21:54:07 11    arrangement with the union?

21:54:08 12        MR. DeFILIPPO:  Yes.

21:54:09 13        MR. MAZZA:  We will have to review

21:54:10 14    that and we will have to go back on the

21:54:12 15    record as soon as we can deliberate.

21:54:15 16        So with that, we will adjourn for now.

21:54:19 17    Going off the record.

21:54:20 18        (A recess was had.)

22:46:18 19        MR. MAZZA:  We are going back on the

22:46:19 20    record in Great Atlantic and Pacific Tea

22:46:20 21    Company case number 10-24549.

22:46:26 22        We are currently auctioning off four

22:46:29 23    stores in lot 1 of today's auction,

22:46:30 24    Baltimore, Maryland store 812, Arnold

22:46:34 25    Maryland store 891, Parkville, Maryland,

22:46:37  1      897 and White Oak Maryland store number

22:46:40  2      985, with Giant of Maryland LLC right now

22:46:43  3      as the lead bid at $18.5 million with a

22:46:52  4      bid being put in by a joint venture

22:46:56  5      between Village and Mrs. Greens at

22:46:59  6      $18,650,000.

22:46:59  7          The debtors are currently deliberating

22:47:02  8      in connection with the bid put in by the

22:47:03  9      joint venture and working through the

22:47:08 10      legal document, so there has not been a

22:47:10 11      determination made yet by the debtors or

22:47:12 12      any consultation with the union or the

22:47:14 13      creditor's committee as to whether or not

22:47:16 14      that bid as yet topped the bid of Giant.

22:47:20 15          So we expect to be working for the

22:47:22 16      next, I'm not going to give any

22:47:24 17      predictions on how long it is going to

22:47:27 18      take.  It will certainly not take as long

22:47:28 19      as today's activities in getting this

22:47:30 20      auction started, but we do foresee it will

22:47:33 21      take some time and therefore, the assets

22:47:38 22      after lot 1 we would not expect to begin

22:47:40 23      auctioning until some time tomorrow.

22:47:42 24          So we're going to set a start time of

22:47:45 25      noon tomorrow for those parties that will

22:47:47 1      be interested in any assets outside of the

22:47:50 2      store's identified as the Lot 1 Assets.

22:47:53 3          So for those parties who are still

22:47:56 4      here that have qualified as bidders who

22:47:58 5      would like to participate in that part of

22:48:02 6      the auction, it's still going to be a

22:48:06 7      determination as to whether or not those

22:48:07 8      additional stores will be set up as

22:48:09 9      separate lots or dealt with on an

22:48:11 10     individual basis and we will deal with

22:48:13 11     that once we get to that point of the

22:48:14 12     auction.  But parties interested in those

22:48:17 13     stores can come back tomorrow at noon.

22:48:19 14         We would take parties' names, they can

22:48:22 15     give the names to Erin Broderick who is in

22:48:26 16     the corner over there and she can send out

22:48:29 17     an email to folks if we anticipate a

22:48:32 18     further delay tomorrow for the assets

22:48:34 19     after lot 1.  But again, we will start at

22:48:38 20     noon as an anticipated time for the assets

22:48:43 21     after lot 1.

22:48:56 22         And to the extent parties are from out

22:49:01 23     of town and they need to travel back, so

22:49:03 24     that they can potentially participate by

22:49:06 25     telephone, let us know and we can make

| | | |
|---|---|---|
| 22:49:09 | 1 | arrangements for that with respect to the |
| 22:49:10 | 2 | additional stores that will be bid out in |
| 22:49:14 | 3 | the lots again after the Lot 1 Assets. |
| 22:49:16 | 4 | So that is the situation right now on |
| 22:49:20 | 5 | the record under further deliberations |
| 22:49:23 | 6 | with respect to the Lot 1 Assets and the |
| 22:49:25 | 7 | joint venture bid that is now on the table |
| 22:49:27 | 8 | from Village Super Markets and |
| 22:49:30 | 9 | Mrs. Greens. |
| 22:49:30 | 10 | So with that, we will adjourn the |
| 22:49:32 | 11 | proceedings as just stated.  Okay, we will |
| 22:49:38 | 12 | go off the record. |
| 22:49:40 | 13 | (A recess was had.) |
| 23:50:14 | 14 | (Time noted: 11:50 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1             C E R T I F I C A T E

2    STATE OF NEW YORK    )

3                         : ss.

4    COUNTY OF NEW YORK   )

5

6          I, MARK RICHMAN, a Certified Shorthand

7    Reporter, Certified Realtime Reporter and Notary

8    Public within and for the State of New York, do

9    hereby certify:

10         That the within proceeding is a true

11   record.

12         I further certify that I am not related to

13   any of the parties to this action by blood or

14   marriage, and that I am in no way interested in

15   the outcome of this matter.

16         IN WITNESS WHEREOF, I have hereunto set my

17   hand this ____ day of _____, 2011.

18

19

20

21         _____

22         MARK RICHMAN, C.S.R., C.R.R.

23

24

25

# In The Matter Of:

## *In Re THE GREAT ATLANTIC & PACIFIC TEA COMPANY*

_____

## *AUCTION - Vol. 2*
### *May 18, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x

In Re THE GREAT ATLANTIC & PACIFIC TEA COMPANY

---------------------------------------------x


                        May 18, 2011

                        2:04 p.m.


                        Kirkland & Ellis LLP

                        601 Lexington Avenue

                        New York, New York 10022


                        Vol. 2

JAMES J. MAZZA, JR., ESQ.,

RAY C. SCHROCK, ESQ.

GREGORY APTER,

                Moderators.

1

2   A T T E N D E E S :

3   A-MCB WHITE OAK LLC:

4   ADAM HARRIS

5   BRIAN TONG

6   ROBERT MASTERS

7   CHRISTOPHER CONLON

8   DAVID BRAMBLE

9
    A&P:
10
    SCOTT BRANDT
11

12  HILCO REAL ESTATE, LLC:

13  ZVI RHINE

14
    COMMITTEE COUNSEL FROM MILBANK TWEED HADLEY & McCLOY
15  and FINANCIAL ADVISORS from FTI:

16  JOE PEGNIA

17  MIKE COMERFORD

18  ALEX KAYE

19  STEVE SZANZER

20  JON OSTRZEGA

21  VICTORIA ZHU

22  RACHEL FINK

23  STEVE SIMMS

24  NICK VENDITTO

25

1

2    A T T E N D E E S (Continued):

3    CONVERTIBLE NOTEHOLDERS - STROOCK & STROOCK & LAVAN:

4    JAYME T. GOLDSTEIN

5    JOSHUA SIEGEL

6
     CVS PHARMACY, INC.:
7
     SYED HUSAIN
8
     MARK MINUTI (via telephone)
9

10   DJM ASSET MANAGEMENT:

11   NEIL HERMAN

12   ANDY GRAISER

13   MICHAEL JERBICH

14   FRED BURSTEIN

15   MATTHEW MORRIS

16
     ENGLAR CENTER LIMITED PARTNERSHIP:
17
     MORRIS L. GARTEN
18
     JERRY MOSES
19
     MARK BOMSE
20
     STUART KOMROWER
21
     LEETE GARTEN
22

23   FPA AYLESBUR LLLP:

24   BRADLEY SWALLOW (via telephone)

25   MIKE ALBO (via telephone)

1

2    A T T E N D E E S (Continued):

3    THE FRESH MARKET:

4    JAMES DEWEY

5    SCOTT DUGGAN

6    BRIAN HARVEY

7
     GIANT of MARYLAND LLC:
8
     JOHN K. CUNNINGHAM
9
     DANIEL M. LATHAM
10
     JIM SYLVIA
11
     FRANK EATON
12
     JIM FERRARO
13

14   HANA ORIENT SUPERMARKET, INC. d/b/a LOTTE PLAZA
     INTERNATIONAL SUPERMARKETS:
15
     SANG MIN LEE
16

17   MRS. GREENS MANAGEMENT CORPORATION:

18   GABRIEL de ALBA

19   ZACHARY MICHAUD

20   PAUL HARNER

21   JAMES KTSANES

22

23

24

25

1

2    A T T E N D E E S (Continued):

3    SAFEWAY INC.:

4    WENDY WALKER (via telephone)

5    GREG HERR

6    TIM BAKER

7

     SUPERVALU, INC:
8
     JOSH BOYD
9
     JAMA KRIZ
10
     WAYNE KIRK
11
     BILL EVANOFF
12
     JOSH HERSHKOVITZ
13
     AVI HERSHKOVITZ
14

15    UNION REPRESENTATIVES:

16    RICHARD SELTZER

17    MICHAEL GLANZER

18    GEORGE MURPHY, SR.

19    GEORGE MURPHY, JR.

20    CAREY BUTSAVAGE

21    JOHN DURKALSKI

22

23

24

25

1

2    A T T E N D E E S (Continued):

3    VILLAGE SUPER MARKET, INC.:

4    FRANK SAURO

5    PAUL DeFILIPPO

6    BILL SUMAS

7    JOHN SUMAS

8
     WALGREEN CO.:
9
     MICHAEL CAIRO
10
     WILLIAM J. BARRETT
11

12   KIRKLAND & ELLIS LLP

13   CLEMENT YEE, ESQ.

14   ERIN BRODERICK, ESQ.

15
     LAZARD FRERES:
16
     TYLER COWAN
17

18

19

20

21

22

23

24

25

1                           Auction

2            MR. MAZZA:  Good afternoon.  Welcome back

3    after a brief hiatus.  Jim Mazza of Kirkland & Ellis

4    LLP, counsel to the Great Atlantic & Pacific Tea

5    Company and its affiliated debtors in their Chapter

6    11 cases pending in the United States Bankruptcy

7    Court for the Southern District of New York, jointly

8    administered under Case Number 10-24549.

9            As everyone is aware, we adjourned last

10   night, this is the second day of the auction, and we

11   commenced it yesterday evening at 8:30 p.m. Eastern

12   time.

13           We again appreciate your patience through

14   this process.

15           We're going to conduct the auction again

16   today in accordance with the Bidding Procedures that

17   were approved by the Bankruptcy Court on May 2, 2011,

18   and the Auction Procedures that we described last

19   night on the record.

20           As you all know, we began the auction

21   yesterday on the assets of the Lot 1 Stores,

22   Baltimore, Maryland, Arnold, Maryland, Parkville,

23   Maryland, White Oak, Maryland, stores 812, 891, 897

24   and 985 respectively.

25           Last night the debtors, in consultation

1                          Auction

2    with various constituents, identified the bid

3    submitted by Giant of Maryland LLC in the amount of

4    $18.5 million as the lead bid for Lot 1 Assets.  The

5    purchase price includes pharmaceutical assets, FF&E,

6    and excludes inventory which Giant will be purchasing

7    for additional consideration under the terms of the

8    Asset Purchase Agreement.

9                Giant also agreed to assume A&P's

10   collective bargaining agreement governing the stores'

11   locations, but will not purchase certain excluded

12   assets set forth in the Schedule to the Asset

13   Purchase Agreement.

14               Giant confirmed on the record yesterday

15   that its bid is a binding irrevocable bid subject to

16   the Bidding Procedures approved by the Bankruptcy

17   Court.

18               Last night, after announcement of Giant's

19   lead bid, we opened up bidding for other parties on

20   the Lot 1 Stores.

21               Mrs. Greens Management Corporation and

22   Village Super Markets Inc. submitted a joint venture

23   bid on the Lot 1 Assets in the amount of

24   $18.65 million, which includes pharmaceutical assets

25   and FF&E, and some inventory of certain of the

1                        Auction

2    stores.  Other inventory will be left with the estate

3    to liquidate for the benefit of the estate.

4           The joint venture also provided the

5    debtors with a Memorandum of Understanding with the

6    Union with respect to negotiating a new collective

7    bargaining agreement.  The joint venture's bid was

8    based upon an Asset Purchase Agreement submitted by

9    the joint venture to the debtors' counsel this

10   morning.

11          (Pause.)

12          MR. MAZZA:  I mentioned the Memorandum of

13   Understanding between the Union and the joint venture

14   that submitted the bid, it was based on an Asset

15   Purchase Agreement that was submitted to the debtors'

16   counsel this morning, subject to certain changes that

17   were negotiated in a term sheet prepared by the

18   debtors and negotiated with the joint venture

19   parties.

20          After negotiations and in consultation

21   with our Committee and in discussions with the Union,

22   the term sheet was agreed upon between the parties

23   this morning, and the joint venture agreed to

24   increase its bid that it reflected in last night's

25   auction at 18.65 million to a number of 18.85

1                          Auction

2     million, an increase of $200,000 to, in the debtors'

3     judgment, qualify it as the lead bid over the current

4     bid by Giant, given certain contingencies associated

5     with the joint venture's bid that the debtors

6     evaluated with the Committee in consultation with

7     them this morning.

8                    I'd note that the contingency, if it is

9     fulfilled or resolved, if you will, by the joint

10    venture by a certain date, then there will be a

11    $2,000 deduct -- excuse me -- $200,000 deduct --

12    yeah, that sounded low -- a $200,000 deduct on the

13    purchase price at closing.  And the parties have

14    agreed to that pursuant to the term sheet.

15                    After consultation with the Committee and

16    the Union, the debtors now have the understanding of

17    the Asset Purchase Agreement that has been put on the

18    table by the joint venture, subject to the provisions

19    of the term sheet, constitutes an irrevocable bid

20    binding on the joint venture that would constitute

21    the lead bid subject to confirmation from their

22    representative.

23                    So I'd ask the joint venture spokesperson

24    to confirm that on the record, that it has an

25    irrevocable bid that's reflected in what I just

1                        Auction

2    described as to how it was memorialized, and that all

3    certifications and representations provided with this

4    bid remain true and correct.

5                MR. DeFILIPPO:  That's agreed.  Paul

6    DeFilippo.

7                MR. MAZZA:  Thank you, Mr. DeFilippo.

8                Yes, could I also get a representative

9    from Mrs. Greens on that.

10                MR. HARNER:  Yes.  Paul Harner of Latham &

11    Watkins.  Also agreed.

12                MR. MAZZA:  Thank you, Paul.

13                A full review of the bid documents in

14    discussions with the joint venture and their

15    advisors, the debtors have determined that the bid

16    received provides sufficient assurance that the joint

17    venture has the financial wherewithal to consummate

18    its proposed overbid, therefore the debtors have

19    determined in their business judgment that the joint

20    venture will be permitted to participate in this

21    auction as a qualified bidder, and that its bid

22    constitutes a higher and better bid than the

23    previously submitted lead bid by Giant of Maryland

24    LLC for the Lot 1 Stores.

25                Before proceeding, in connection with the

1                          Auction

2    joint venture, I'd ask them that this joint venture

3    has been formed in connection solely with bidding on

4    these particular assets in Lot 1?

5             MR. DeFILIPPO:  It might be expanded to

6    include other assets.

7             MR. MAZZA:  With that, we would ask that

8    if there are additional bids on individual assets,

9    that if the Mrs. Greens or Village has individual

10   bids, that they would submit them to us in their

11   individual capacity prior to presenting them as a

12   joint venture.

13            MR. DeFILIPPO:  Do you mean if we're

14   bidding on the same asset?

15            MR. MAZZA:  No.  Different assets.

16            MR. DeFILIPPO:  No.  If we're bidding on

17   different assets, but we're competing for the same

18   asset in different lots?  That's my question.  You

19   want -- my question is --

20            MR. MAZZA:  You will let us know if you

21   have interest as an individual bidder in different

22   assets, is my question.

23            MR. SCHROCK:  This is Ray Schrock of

24   Kirkland.

25            Said a different way, the debtors are fine

1                          Auction

2    with you forming the joint venture for purposes of

3    placing bids on this group of assets.

4                  With regard to a separate group of assets

5    beyond this, if you're going to continue a joint

6    venture bid and use these terms, we'll have to

7    evaluate it at that time and assure ourselves that

8    you're not going to be placing bids on an individual

9    basis for those assets which would result in a higher

10   and better value for the estate.  That's it.

11                  MR. DeFILIPPO:  Okay.

12                  MR. SCHROCK:  Okay.  Thank you.

13                  MR. MAZZA:  It's confirmed?

14                  MR. SCHROCK:  For clarification, it's not

15   related to these assets.

16                  MR. DeFILIPPO:  That's right.

17                  MR. MAZZA:  Okay.  So that's confirmed on

18   the record.  Thanks.

19                  So with that, in accordance with the

20   Bidding Procedures and the Auction Procedures that

21   were put on the record yesterday, the debtors now

22   designate the joint venture as the current lead bid

23   for the Lot 1 Assets, and Giant Maryland LLC as the

24   backup bidder for the Lot 1 Assets pursuant to the

25   Bidding Procedures Order.

1                    Auction

2              I've got a question from Mr. Cunningham.

3              MR. CUNNINGHAM:  Jim, John Cunningham of

4    White & Case, on behalf of Giant of Maryland.

5              I wanted to note an objection and then a

6    request for clarification.

7              The objection, first of all, is for the

8    record that yesterday you went through and identified

9    13 qualified bidders, and Mrs. Greens and Village

10   were individually listed as qualified bidders.  There

11   was no mention of a joint venture as a qualified

12   bidder.

13             You've mentioned that today, but yesterday

14   when you went through listing the 13, a joint venture

15   was not one of the qualified bidders.  That was the

16   objection.

17             But the clarification that we would like

18   to get is on page 5 of the Bidding Procedures, one of

19   the requirements for a qualified bid, specifically

20   requirement number 8 says, "The bid must disclose the

21   identity of the bidder's organization, including

22   confirmation that the competing bid is made as

23   principal for the bidder's account and, if not, the

24   basis upon which the bidder is acting, and the

25   identities of all other participants, if any."

1                              Auction

2              And we wanted to get clarification on the

3    record whether there is any other strategic or

4    financial investor who is participating in this joint

5    venture bid.

6              MR. DeFILIPPO:  The only members are the

7    joint venturer Village and Mrs. Greens.

8              Does that answer the question?

9              MR. MAZZA:  Mr. DeFilippo has answered

10   your question.

11             MR. CUNNINGHAM:  Okay.  Thank you.

12             MR. SCHROCK:  And for the record, the

13   debtors have qualified the joint venture as the

14   qualified bidder for purposes of this lot of assets.

15             MR. MAZZA:  Okay.  After a few procedural

16   reminders, we're going to open the bidding up again

17   on these Lot 1 Assets.

18             On this package we're going to start

19   bidding again on $150,000 increments as we did

20   yesterday, with the debtors retaining the right to

21   adjust those increments as the bidding may proceed.

22             Let me add an element with respect to this

23   particular bid based on the contingency and the

24   $200,000 issue that I raised earlier in describing

25   the current lead bid.

1                              Auction

2             To top the lead bid of $18.85 million of

3    the joint venture, the bidder would have to submit a

4    bid of 18.8 million given the $200,000 discount being

5    attributed to the joint venture bid.

6             We're effectively treating it as an

7    $18.65 million bid based on the evaluation of that

8    contingency, and hence the purchase price moves up to

9    the $18.85 million subject to potential price

10   reduction, if the contingency is met based on the

11   agreement between the debtors and the joint venture.

12            Consistent with yesterday, the joint

13   venture will be the lead bid until a package and/or

14   individual bids are deemed to exceed the joint

15   venture's bid.

16            We want to remind all bidders that

17   pursuant to the Court approved Bidding Procedures,

18   each bidder is required to keep each overbid open as

19   irrevocable until the earlier of 25 days after entry

20   of the Sale Order approving the sale of the assets,

21   in closing of the sale, and in accordance with a

22   successful bid that is the winning bidder.

23            Again, the debtors may evaluate each bid

24   based on certain nonquantifiable factors, including

25   execution risk, whether a bidder has agreed to

1                          Auction

2    assume A&P's collective bargaining agreement

3    governing a particular store location/locations,

4    timing of sale and other contingencies.

5              If the successful bidder fails to

6    consummate the sale, the debtors may elect the backup

7    bidder as the successful bidder subject to provisions

8    in the parties' Asset Purchase Agreements regarding

9    damages for failure to close.

10             So with that, we'll now put it out to the

11   group here today as to whether any parties will be

12   providing a bid on Lot 1 Assets as a package.

13             And again, based on the $150,000 increment

14   that we're going to continue to employ, a bid of

15   18.8 million would be required to top the current bid

16   of the joint venture.

17             Are there any bids?

18             MR. CUNNINGHAM:  We need a break.

19             MR. MAZZA:  Okay.

20             MR. CUNNINGHAM:  So we can come back --

21             MR. MAZZA:  Is there anybody else who is

22   interested in bidding on the Lot 1 Assets?

23             How long do you need, John?

24             MR. CUNNINGHAM:  Ten minutes.

25             MR. MAZZA:  Okay.  We'll adjourn for 10

1                        Auction

2    minutes.  Thanks.  We're going off the record.  Thank

3    you.

4                    (A recess was taken.)

5                    MR. MAZZA:  Going back on the record.

6                    Jim Mazza, for Great Atlantic & Pacific

7    Tea Company, Case Number 10-24549.

8                    After the recess, Giant Maryland LLC

9    has -- we had just taken a recess, after declaring

10   the joint venture of Village Super Markets and

11   Mrs. Greens as the lead bid in the auction for the

12   Lot 1 Stores.  And a recess was asked for by Giant

13   Maryland LLC.

14                   And now we open the floor to them as to

15   whether they'll make an overbid.

16                   MR. CUNNINGHAM:  This is John Cunningham

17   for Giant of Maryland LLC.  And we are increasing our

18   bid for the Lot 1 Assets stores to $19,700,000.

19                   MR. MAZZA:  Okay.  Mr. Cunningham has now

20   put on the record a bid from Giant Maryland LLC for

21   $19,700,000, which would be based on the APA on which

22   Giant submitted its initial lead bid?

23                   MR. CUNNINGHAM:  Yes, I can confirm that.

24                   MR. MAZZA:  Okay.  Thank you.

25                   So based on that under the Bidding

1                          Auction

2      Procedures, that would be a binding offer from Giant

3      of Maryland subject to the irrevocability provisions

4      in the Bidding Procedures?

5                  MR. CUNNINGHAM:  Thank you.

6                  MR. MAZZA:  Thank you, Mr. Cunningham.

7                  We have an overbid on the Lot 1 Assets

8      from Giant Maryland LLC.  I'll recognize that as an

9      overbid at $19,700,000.

10                  Are there any bidders who would wish to

11     overbid on the $19.7 million bid from Giant of

12     Maryland?

13                  MR. DeFILIPPO:  Twenty million.

14                  MR. MAZZA:  Mr. DeFilippo has just --

15                  MR. DeFILIPPO:  Is that enough?

16                  MR. MAZZA:  I'm calculating it.

17                  MR. DeFILIPPO:  Well, it's 20 plus the 2,

18     right, 200?

19                  MR. MAZZA:  It would need to be --

20                  MR. APTER:  It needs to be higher.

21                  MR. DeFILIPPO:  It's 20 plus the 2, you

22     know, that's in our bid.  Apples to apples it's

23     200- --

24                  MR. APTER:  The 20.2?

25                  MR. DeFILIPPO:  It's 300 over theirs.

1                          Auction

2               MR. APTER:  So what we're saying is it's

3     20.2, which is inclusive of the $200,000 --

4               MR. HARNER:  Subject to the $200,000

5     credit, that's right.

6               MR. APTER:  Okay.

7               MR. MAZZA:  Thanks.

8               So the joint venture has submitted an

9     overbid at 20 million .2.  Is that based on the APA,

10    that interim sheet that was submitted as the earlier

11    bid --

12              MR. DeFILIPPO:  Yes.

13              MR. MAZZA:  -- from the joint venture?

14              Thank you, Mr. DeFilippo.

15              Based on that representation, we have an

16    overbid that has now topped the previous Giant

17    overbid.

18              We'll declare the joint venture of Village

19    Super Markets and Mrs. Greens as the lead bid now at

20    $20.2 million.

21              I'll put it back out for any overbids on

22    the current lead bid by the joint venture.

23              MR. CUNNINGHAM:  Yes.  This is John

24    Cunningham for Giant of Maryland LLC.  We'll increase

25    our bid to $20,500,000.

1                           Auction

2               MR. MAZZA:  Mr. Cunningham has now made a

3     bid for $20,500,000 based on the APA that was

4     submitted as its previous overbid; is that correct?

5               MR. CUNNINGHAM:  Yes, that's correct.

6               MR. MAZZA:  Based on that representation,

7     $20,500,000 would constitute an overbid over the

8     Village Super Market/Mrs. Greens joint venture bid.

9               And we'll recognize Giant LLC as the lead

10    bidder in the auction.

11              With that, I'll put it out for additional

12    overbids to the current lead bid of Giant.

13              MR. DeFILIPPO:  All right.  21 plus the 2.

14              MR. MAZZA:  So, Mr. DeFilippo, would that

15    be 21,200,000?

16              MR. DeFILIPPO:  Yes, subject to getting it

17    back.

18              (Laughter.)

19              MR. MAZZA:  It's on you to get it back.

20    Okay.

21              MR. DeFILIPPO:  Okay.

22              MR. SCHROCK:  But you're saying the same

23    conditions, correct?

24              MR. DeFILIPPO:  Yes.

25              MR. MAZZA:  The same.  Mr. DeFilippo has

1                          Auction

2    now submitted a bid by the joint venture for

3    21,200,000 which has now topped the bid of Giant and

4    is now the lead bid for the Lot 1 stores.

5              At that number, 21,200,000, does Giant

6    have an overbid?

7              MR. CUNNINGHAM:  Yes.  We'll increase our

8    bid to 21,500,000.

9              MR. MAZZA:  Based on the APA that has been

10   submitted?

11             MR. CUNNINGHAM:  That's correct.

12             MR. MAZZA:  Thank you.

13             So based on that submission by

14   Mr. Cunningham, we're now at 21,500,000 as the lead

15   bid by Giant Maryland LLC.

16             MR. DeFILIPPO:  We'll go to 22, same terms

17   as our last bid.

18             MR. SUMAS:  Plus the 200 --

19             MR. MAZZA:  Is it plus 200 or --

20             MR. DeFILIPPO:  No.  It's 22 flat.

21             MR. MAZZA:  22 flat?  That gets you there.

22             22 million from the joint ventures being

23   submitted by Mr. DeFilippo, which would make the

24   joint ventures the lead bid on the Lot 1 Assets.

25             MR. CUNNINGHAM:  Okay.  Giant of Maryland

1                           Auction

2    LLC will increase its bid to 22,500,000.

3              MR. MAZZA:  Mr. Cunningham has now put on

4    the record a $22.5 million bid based on the APA

5    between the debtors and Giant.

6              MR. CUNNINGHAM:  That's correct.

7              MR. MAZZA:  That is an overbid that

8    currently makes you the lead bid over the joint

9    venture's bid.

10             I'll put it back to the joint venture.

11             MR. DeFILIPPO:  23 flat.

12             MR. MAZZA:  23 flat from the joint venture

13   based on the APA --

14             MR. DeFILIPPO:  Yes.

15             MR. MAZZA:  -- that has been submitted

16   puts the joint venture as the lead bidder for the Lot

17   1 Assets.

18             MR. CUNNINGHAM:  Giant of Maryland LLC

19   will increase its bid to $24 million.

20             MR. MAZZA:  $24 million submitted by Giant

21   Maryland based on the APA --

22             MR. CUNNINGHAM:  That's correct.

23             MR. MAZZA:  -- between the debtors and

24   Giant that's been submitted.  That puts Giant in as a

25   lead bid at 24 million.

1                         Auction

2                 Any overbid from the joint venture?

3                 MR. DeFILIPPO:  24.5 flat.

4                 MR. MAZZA:  24.5 flat based on the APA

5       submitted by the joint venture puts them ahead as the

6       lead bidder.

7                 MR. CUNNINGHAM:  Jim, we'd like to take

8       another 10-minute break.

9                 MR. MAZZA:  A ten-minute break has been

10      requested.

11                MR. DeFILIPPO:  We object.  I'm kidding.

12                (Laughter.)

13                MR. MAZZA:  We'll go off the record for

14      seven minutes.

15                (A recess was taken.)

16                MR. MAZZA:  Okay.  We're going to go back

17      on the record in Great Atlantic & Pacific Tea Company

18      auction of the Lot 1 Stores.

19                Mr. Schrock, you have a statement?

20                MR. SCHROCK:  Yes.  This is Ray Schrock

21      for K&E, on behalf of the debtors.

22                Very quickly, regarding the objection that

23      was noted by Giant as to the JV placing qualified

24      bids at the auction.  I want to note for the record

25      that each of the qualified bidders is signing the

1                          Auction

2    Asset Purchase Agreement.

3              And of course, as is standard in most

4    auctions including this auction, the debtors, on page

5    9 of the Bidding Procedures, do reserve the right to

6    continue to submit their bids throughout the auction,

7    that these two bidders will result in a higher and

8    better value for the estates.

9              I just wanted to give you an explanation.

10   Hopefully that will alleviate your concerns on that

11   particular issue.  That's it.

12             MR. MAZZA:  Okay.  With that, we currently

13   have the JV bid as the lead bid in the Lot 1 Assets

14   at 24.5 million.

15             We took a recess at the request of

16   Mr. Cunningham, Giant's counsel.  And we would ask

17   them if they would like to make an overbid over the

18   current lead bid by the JV.

19             MR. CUNNINGHAM:  This is John Cunningham

20   for Giant.  We are not increasing our bid.

21             MR. MAZZA:  Okay.  With that, the

22   representation from Mr. Cunningham, the lead bid

23   would be the JV bid by Village Super Markets and

24   Mrs. Greens at 24.5 million.  Hearing -- I'm sorry --

25   are there any other bids at this point?  I didn't

1                          Auction

2    think so.

3                  (Laughter.)

4               MR. MAZZA:  So with that, the lead bid is

5    the 24.5 million by the JV, Village Super Markets and

6    Mrs. Greens.

7                  Hearing no other bids, we will declare

8    that bid at $24.5 million based on the APA that was

9    submitted to the debtors and the terms in the term

10   sheet agreed upon by the parties would be declared

11   the highest, best bid and acceptable bidder for the

12   Lot 1 Assets.  Based on the -- are there any bidders

13   for any individual stores in the Lot 1 Assets?

14               MR. COMERFORD:  Jim, if I could state

15   something on the record?

16               MR. MAZZA:  You got i.

17               MR. COMERFORD:  This is Mike Comerford on

18   behalf of the Creditors' Committee for A&P.

19                  We have certain consultation rights in the

20   Bidding Procedures and the Auction Procedures.

21                  We've received the APA that is the subject

22   of the winning bid to the Lot 1 Assets that we're

23   still in the process of reviewing.  We may have

24   comments to it and provide them to you, but we just

25   wanted to put that on the record so you're aware that

1                          Auction

2    we still are in the process of taking a look at it in

3    connection with our rights under the Procedures.

4              MR. MAZZA:  Comments from Mr. Comerford

5    representing the Creditors' Committee are noted in

6    connection with consultation rights in the Bidding

7    Procedures.

8              MR. SELTZER:  And Richard Seltzer for the

9    Union.  We also would like to look at the APA.

10             MR. MAZZA:  Mr. Seltzer's comments on

11   behalf of the Union are also reflected.

12             Putting it back out, in connection with

13   the Lot 1 Stores, are there any parties on the phone

14   or in the auction room who would place a bid for an

15   individual store in connection with the Lot 1 Stores?

16   I'll identify them again for the parties.

17             Baltimore, Maryland; Arnold, Maryland;

18   Parkville, Maryland; and White Oak, Maryland.

19             Okay.  Hearing no bids, the debtors would

20   declare the bid of the joint venture between Village

21   Super Markets Inc. and Mrs. Greens as the highest and

22   best bid, the winning bidder for the Lot 1 Assets.

23   And pursuant to the Bidding Procedures, in order to

24   comply with those Procedures, the JV would have to

25   increase its deposit that is currently held with the

1                          Auction
2    debtors to equal 10 percent of the amount of the
3    $24.5 million bid within 24 hours of this --
4              MR. DeFILIPPO:  I think we have
5    2.6 million already.  We have 600 up.
6              MR. MAZZA:  You've already submitted --
7    okay, I was going to ask how much you had on deposit
8    so far.
9              So with a $2.6 million deposit held by the
10   debtors right now --
11             MR. DeFILIPPO:  3.1 you have, I think.
12   2.5 for him, and 3.1 from us.
13             MR. APTER:  Pending other bids.
14             MR. MAZZA:  With the mechanic of those two
15   funds being counted for the bid of the lead bidder in
16   the winning bidder here, the JV, the deposit
17   requirement would be met.
18             The debtors would also declare that the
19   bid of Giant of Maryland LLC is a backup bid that
20   will remain in effect pursuant to the Bidding
21   Procedures Order, which requires that the backup bid
22   remain in effect irrevocable and binding upon the
23   backup bidder.  Let me just pull the language here.
24             "Till the earlier of 25 days after the
25   entry of the Sale Order approving the sale of the

1                          Auction

2    assets or the closing of the sale of the assets in

3    accordance with a successful bid," the successful bid

4    being the bid of the joint venture.

5                   So with that, we will close the auction in

6    the Lot 1 Stores and move on to the next lot of

7    assets.

8                   I believe it would be appropriate to take

9    a short recess before we move on to the next --

10                  MR. DeFILIPPO:  What's in the next lot?

11                  MR. MAZZA:  -- lot of stores.

12                  Right now we're in discussions with

13   parties in connection with potentially identifying a

14   second lot of stores or going --

15                  MR. APTER:  Why don't we take --

16                  MR. MAZZA:  Yes, we'll take 15 minutes to

17   determine what the next lot will be and we'll

18   reconvene.  Thanks very much.

19                  MR. DeFILIPPO:  Thank you.

20                  MR. MAZZA:  Going off the record.

21                  (A recess was taken.)

22

23

24

25

1    MR. MAZZA:  Good evening.  Jim Mazza

2  again from Kirkland Ellis.  I am going to

3  reconvene the auction for A&P under case

4  number 10-24549.  Let's take a quick roll

5  call of who is on the phone, so people

6  just chime in, please.

7    MR. LEE:  Alvin Lee for Hana.

8    MR. SWALLOW:  Brad Swallow for FPA

9  Aylesbur.

10    MR. BOMSE:  Michael Bomse with FPA

11  Aylesbur.

12    MR. JERBICH:  Michael Jerbich with

13  DJM.

14    MR. MINUTI:  Mark Minuti for CVS

15  Pharmacy Inc.

16    MR. THALASSINOS:  Angelo Thalassinos,

17  Brown Rudnick.

18    MR. MAZZA:  Anybody else?

19    MR. HARNER:  Paul Harner, Latham &

20  Watkins.

21    MR. MAZZA:  Anybody else?

22    MR. HUSSEIN:  Syed Hussain, CVS.

23    MR. MAZZA:  Again, thanks for

24  everyone's patience.  Hopefully this will

25  start to move along more quickly now.  We

Page 66

1    are moving into Lot 2 Assets which are

2    going to be the assets -- can you give us

3    a quick second so we can talk to the

4    creditors, please.

5        (A recess was had.)

6        MR. MAZZA:  We're going to go off the

7    record, adjourn for maybe the next ten

8    minutes.

9        Can the people on the phone hear us?

10   We will put you on mute.  We will send

11   around an email update when we are going

12   to go live again.  We will be right back.

13       (A recess was had.)

14       MR. MAZZA:  Let's go on the record.

15   Jim Mazza for Great Atlantic and Pacific

16   Tea Company, the debtors in these Chapter

17   11 cases.

18       We just adjourned the auction based on

19   some circumstances that developed from the

20   Village Super Market and Mrs. Greens who

21   had formed a joint venture earlier in the

22   process today in acquiring the Lot 1

23   Assets.

24       We had received an offer from the

25   joint venture for six additional stores to

1    be packaged together for a price of $12.5

2    million.  Those stores are the Washington,

3    D.C. store, the Lutherville Timonium

4    store, the Chestertown store, the Charles

5    Street store, the Cambridge store and

6    Brunswick store.

7         Based on the debtors' evaluation of

8    that offer from the joint venture and

9    their discussions and consultation was

10   both the committee and the union advisors,

11   we have made a determination in connection

12   with that bid.

13        The bid is based on the previous APA

14   submitted by the joint venture in

15   connection with the Lot 1 Assets, which

16   was the asset purchase agreement delivered

17   by Latham & Watkins to Kirkland and Ellis,

18   debtors' counsel, at 3:15 a.m. on May 18,

19   2011, which also included a list of agreed

20   upon modifications that comprise part of

21   that bid in respect to the Lot 1 Assets.

22        Based on that asset purchase agreement

23   and the modifications to it and the

24   addition of the six stores that were now

25   included in the package bid for $12.5

1   million by the joint venture, there will

2   be an additional amendment to the asset

3   purchase agreement that I'll read into the

4   record.

5       There will be return to language in

6   Section 8.3 of the debtors' draft dated

7   May 13, 2011, in order to provide that,

8   upon a termination of the agreement under

9   the circumstances that would allow seller

10  to retain the deposit as defined under the

11  agreement, buyer shall also pay to seller

12  a termination fee equal to ten percent of

13  the purchase price in addition to and not

14  in lieu of any other rights of sellers at

15  law or in equity arising under the

16  agreement or otherwise in connection with

17  such termination.  With an additional

18  change to provide that buyer shall only be

19  required to reimburse sellers for costs

20  and expenses incurred in connection with

21  their efforts to collect the termination

22  fee if the sellers are successful in

23  collecting the termination fee.

24      With those changes to the asset

25  purchase agreement that I just reflected

1    on the record, I would now request that

2    counsel and the representatives to the

3    joint venture confirm that they are making

4    an irrevocable offer that's binding upon

5    them to the debtors for the six stores in

6    increasing their, increasing their

7    acquisition of the stores in this auction.

8        So if I could call upon those

9    representatives to make those averments in

10   connection with those bids.

11       MR. DeFILIPPO:  Paul DeFilippo, for

12   Village, that's correct.

13       MR. CASANAS:  Jim Casanas, for

14   Mrs. Greens, so confirmed.

15       MR. MAZZA:  Thanks to both of you.  So

16   with that $12.5 million bid for those

17   assets now on the record and confirmed by

18   their authorized representatives of the

19   joint venture, we will put those up for

20   auction to the group here today as a lot,

21   similar to how we did it or exactly how we

22   did it in connection with the Lot 1

23   Assets.

24       So I'll put it out.  Is there a

25   question?

1      MS. WALKER:  Question.  Could you read

2  the store numbers or read the names, the

3  locations again slowly.

4      MR. MAZZA:  Sure thing.

5      MR. DeFILIPPO:  I got them.

6      MR. MAZZA:  Mr. DeFilippo, if you can

7  do that.

8      MR. DeFILIPPO:  979, 876, 852, 101,

9  961 and 870.

10      MR. MAZZA:  Thanks.

11      MR. EVANOFF:  Could you possibly give

12  their locations for each one of those?

13      MR. DeFILIPPO:  In the same order:

14  DC, Timonium, Chestertown, Charles,

15  Brunswick, and Cambridge.

16      MR. MAZZA:  We will open it up for

17  bidding on that lot of stores.

18      Are there any bidders on the phone or

19  here in the conference room, that would

20  provide a package bid on all six of those

21  stores?

22      Then we will open it up in connection

23  with different combinations of the stores

24  or individual bids.

25      MR. EVANOFF:  This is Bill Evanoff on

Page 71

1    behalf of SUPERVALU.  I would like to

2    request a five-minute break, five minute

3    recess.

4        MR. MAZZA:  Mr. Evanoff requests a

5    five-minute break.  That's fine with the

6    debtors.  We will be back in five minutes,

7    a real five minutes for all those who

8    care.  Thanks.  Off the record.

9        (A recess was had.)

10       MR. MAZZA:  We're going back on the

11   record for the auction in the Great

12   Atlantic and Pacific Tea Company Chapter

13   11 case.  We did just take a brief recess

14   at the request of Mr. Evanoff in

15   connection with the lot 2 stores that we

16   are now putting up for auction based on

17   the lead bid that has been confirmed on

18   the record from the joint venture between

19   Village Super Markets and Mrs. Greens.

20       So as discussed previously, we will

21   put out the package for bid and then go

22   through individual stores or combinations

23   of stores to determine if there will be a

24   topping bid.

25       We will use bidding increments for a

1    topping bid of $150,000 for this round.

2        So with that in place and subject to

3    the bidding procedures that have been

4    entered by the Court as well as the

5    auction rules that we've read into the

6    record during these proceedings, we will

7    put it out for bid to those on the phone

8    and those here in the conference room.

9    Are there any bids for all six stores?

10       Okay, I hear no bids for all six

11   stores.

12       Are there any bids for any combination

13   of the stores, whether it be for five

14   stores, four stores, three stores or two

15   stores?

16       I hear no bids for any combination of

17   the stores.

18       Are there any bids for any individual

19   sites?  Is there a bid for the DC site?

20       MR. HARVEY:  Brian Harvey on behalf of

21   Fresh Market.  Yes, there is.  There is a

22   bid of $2 million pursuant to the terms of

23   the APA agreed upon between myself on

24   behalf of the Fresh Market and

25   representatives of the debtors.

1    MR. MAZZA:  The Fresh Market,

2  represented by Mr. Harvey, has now bid $2

3  million for the DC site.

4    Are there any other bids on the DC

5  site?  Okay.  We will hold that bid before

6  qualifying it with respect to whether or

7  not it's a qualified bid.

8    Let's just go through the other sites.

9  The Timonium site.

10    MR. DE ALBA:  Gabriel de Alba for

11  Mrs. Greens.  Even though we are bidding

12  as a group bid, can I also have an

13  individual bid for the DC site?

14    MR. MAZZA:  The way this will work is

15  that your lead bid continues to remain in

16  effect.  So that if your lead bid is not

17  topped by the aggregate of the individual

18  stores, you'll not need to re-bid.  So

19  there's no need to re-bid on an individual

20  basis at this time.

21    MR. DE ALBA:  If there is an aggregate

22  that outbids the six bid, the six store

23  bid, can we still re-bid individually?

24    MR. MAZZA:  Afterward you'd have that

25  opportunity, Mr. De Alba, but at this

1    point there's no need to re-bid.

2       MR. EVANOFF:  Yes, I would like to put

3    a bid on the record for the Timonium

4    store.  It is part of a previously

5    submitted bid that was put as a joint

6    package and with respect to the Timonium

7    store we would be asserting a bid of $1.6

8    million.

9       MR. MAZZA:  Mr. Evanoff has submitted

10   a bid on Timonium for $1.6 million.

11      Any other bids on Timonium site?

12      MR. SWALLOW:  This is Brad Swallow.

13   Can I have just two minutes to confer with

14   my client?

15      MR. MAZZA:  Brad, are you interested

16   in bidding on the Timonium site?

17      MR. BRADLEY:  It is possible but I

18   wanted to just confirm.  Literally two

19   minutes.

20      MR. MAZZA:  Okay.  Let's move down the

21   list of other sites while we wait to hear

22   from Mr. Swallow.

23      Anything else on Timonium?

24      Okay.

25      Let's go down to Chestertown.  Any

1   bids on Chestertown from those here in the

2   conference room or on the phone?

3      Hearing none, we will go Charles

4   Street.  Any bids from those here in the

5   conference room or those on the phone?

6   Anything for Charles Street?

7      Hearing nothing from anyone on the

8   phone or here, we will move down to

9   Cambridge.  Any bids on the Cambridge

10   site?

11      MR. EVANOFF:  This is the bid on

12   Cambridge?

13      MR. MAZZA:  Yes.

14      MR. EVANOFF:  I would like to put a

15   bid on the record on behalf of SUPERVALU

16   for $3 million.

17      MR. MAZZA:  Mr. Evanoff has submitted

18   a bid of $3 million on the Cambridge site

19   on behalf of SUPERVALU.

20      Anybody else like to bid on the

21   Cambridge site?  Anyone on the phone,

22   anyone here in the conference room would

23   like to bid on the Cambridge site?

24      We will move down to Brunswick.  Any

25   bids here in the conference room or on the

1    phone in connection with the Brunswick

2    site?

3        I do not hear any bids on the phone or

4    from anyone here in the conference room on

5    the Brunswick site.

6        I believe there's a gentleman on the

7    phone who was considering approximately

8    two minutes ago on the Timonium site.

9        MR. BRADLEY:  Brad Swallow.  I've

10   conferred with my client and we will not

11   be making a bid.

12       MR. MAZZA:  Okay.

13       So there will not be a bid beyond the

14   $1.6 million bid submitted by SUPERVALU by

15   Mr. Evanoff.

16       Without qualifying these bids, just

17   based on an aggregate dollar value, these

18   bids add up to $6.6 million on these three

19   sites on which bids were submitted during

20   this auction.  None of these bids beat or

21   surpass the $12.5 million bid on the

22   package submitted by the joint venture of

23   Village Super Markets and Mrs. Greens.

24       So with that, the debtors would

25   declare Mrs. Greens and Village Super

1    Market joint venture bid the winning bid

2    under the bidding procedures for these six

3    sites pursuant to the terms described here

4    on the record and the conditions that are

5    provided in the revised asset purchase

6    agreement, including an increase in the

7    deposit amount now that these additional

8    stores have been added to the acquisitions

9    of the joint venture.

10       Based on the individual bids received

11   on the sites and the legal documentation

12   that has been negotiated between the

13   parties, SUPERVALU and The Fresh Market,

14   the debtors will be prepared to designate

15   as well each of those bids a backup bid in

16   connection with those particular sites.

17       So each backup bid for the record

18   would be The Fresh Market would have a

19   backup bid pursuant to the bidding

20   procedures that would be for $2 million

21   based on the offer that has been received

22   from The Fresh Market in connection with

23   its --

24       MR. HARVEY:  Brian Harvey on behalf of

25   the Fresh Market.  I object to that based

1   on our agreement that we had reached

2   earlier on the terms of our bid remaining

3   outstanding.  If the bid was, this

4   particular property was excluded from that

5   package, and that if that ever came apart

6   from that package, the $2 million bid

7   could be decreased to our minimum bid

8   which was submitted on Friday.

9       MR. MAZZA:  Okay, well from the

10  debtors' perspective you just bid on the

11  property again at $2 million.  So we

12  believe you submitted a backup bid for

13  that property.

14      MR. HARVEY:  We object.

15      MR. MAZZA:  Your objection is noted on

16  the record.  We are still declaring you a

17  back-up bidder.

18      With respect to the Timonium and the

19  Cambridge property, we declare that there

20  is a back-up bidder, SUPERVALU, for $1.6

21  million on Timonium and $3 million on

22  Cambridge, respectively, based on the

23  terms of the asset purchase agreement that

24  the parties had negotiated regarding these

25  properties.

1        MR. EVANOFF:  That's correct.

2        MR. MAZZA:  Mr. Evanoff has affirmed

3    that on the record.

4        Okay.  So that will take care of this

5    lot of stores.

6        We've narrowed down, we've been

7    through ten stores at this point.  We've

8    got a number of individual stores to go

9    through.  I would suggest that we take a

10   very brief real time recess in order to

11   come up with which stores we're going to

12   go through.

13       We will go through those stores very

14   quickly and see if there are any bids from

15   anyone on the phone and then anybody in

16   the conference room and then we will go

17   through the scripts for the stores to the

18   extent they remain open.

19       So we will need just about five

20   minutes.  We have a question from Mr.

21   Comerford.

22       MR. CUMERFORD:  Mike Cumerford on

23   behalf of the Creditors' Committee.  We

24   just reserve our rights to confer with the

25   debtors in connection with finalizing the

1    various APA's that are the subject of

2    these leases that were just auctioned.

3         MR. MAZZA:  Very well.  Noted.  Take a

4    brief recess and we will be back soon.

5    Thanks.

6         (A recess was had.)

7         MR. MAZZA:  We're going to go back on

8    the record here in the Great Atlantic and

9    Pacific Tea Company bankruptcy case.

10   We've been here auctioning off the

11   southern stores.  We're now on the third

12   addition of auctioning.  We've dealt with

13   lot 1 and lot 2.

14        Now we've got individual stores that

15   we're going to put on the block.  Let's

16   make sure everybody here is in the room.

17   If people on the phone can identify

18   themselves.  For the record, is anybody on

19   the phone?

20        MR. MINUTI:  Mark Minuti for CVS.

21        MR. THALASSINOS:  Angelo Thalassinos

22   of Brown Rudnick for the secured

23   noteholders.

24        MR. MAZZA:  Anyone else?

25        MR. HUSSAIN:  Syed Hussain of CVS.

1       MR. SIMMS:  Steve Simms of FTI.

2       MR. MAZZA:  Okay.  We are going to go

3   through each of the stores first for bids

4   that would be on the leases and inventory

5   including pharmaceutical.  We will run

6   through them.

7       First up is store number 855, Ellicott

8   City.  Any bids on that one?

9       MR. EVANOFF:  Yes, Bill Evanoff, for

10  the record, on behalf of SUPERVALU and the

11  bid is $400,000 in accordance with the

12  asset purchase agreement that was

13  submitted as a bid for multiple stores.

14  The bid will be for $400,000 solely for

15  that store on the consistent terms with

16  the APA.

17      MR. MAZZA:  Very well.  Mr. Evanoff

18  has now placed a bid on the Ellicott City

19  store, store number 855, of $400,000 based

20  on a previously negotiated APA between the

21  debtors and his client SUPERVALU.

22      That bid, in consultation with the

23  committee and in connection with amending

24  the APA since it would only cover that one

25  particular store Ellicott City and the

1    inventory and pharmaceutical scripts and

2    inventory for that store would be

3    consistent with the deal previously.

4        MR. EVANOFF:  Correct, that is my

5    understanding.

6        MR. MAZZA:  You confirm that offer

7    remains irrevocable, is binding on your

8    client pursuant to the bidding procedures

9    order?

10       MR. EVANOFF:  Yes, consistent with the

11   terms of the APA.

12       MR. MAZZA:  Very well.  That would be

13   a qualified bid from the debtors'

14   perspective.

15       Are there any other bids on the

16   Ellicott City store?

17       MR. DE ALBA:  One question.  Does it

18   include the scripts?

19       MR. MAZZA:  Yes, it does.  Any other

20   questions?  I'll open it up for bidding on

21   Ellicott City.  Any other bids on Ellicott

22   City.

23       The $400,000 lead bid by SUPERVALU,

24   going once, going twice, not hearing

25   anybody else, Mr. Evanoff, SUPERVALU will

1    be declared the winning bidder on the

2    Ellicott City store, $400,000 on the terms

3    reflected on the record.

4         Next up --

5         MR. CUMERFORD:  Mike Cumerford on

6    behalf of the committee.  We make the same

7    reservation of rights with respect to the

8    APA, just the opportunity to confer on

9    that.  Thank you.

10        MR. SELTZER:  Richard Seltzer, we make

11   the same reservation of rights.

12        MR. MAZZA:  Thanks.  We will move on

13   to the next store.  Store number 860 which

14   is the Elk Ridge store.  Any bids on the

15   Elk Ridge store, excluding simply

16   pharmaceutical bids?

17        I hear no bids on the Elk Ridge store,

18   so we will move on to the next one.

19        MR. SELTZER:  Which number is that?

20        MR. MAZZA:  That's number 860.

21        MS. WALKER:  Question.  Which store

22   was Ellicott City?

23        MR. MAZZA:  855.

24        No bids from anyone on the phone or in

25   the conference room on the Elk Ridge

1    store.

2        Next up is store number 520, the

3    Arbutus store.  Any bids on the Arbutus

4    store?  Nothing on Arbutus.  We will move

5    on.

6        Store number 829, the Towson store.

7    Anybody interested in the Towson store?

8        Hearing no bids, we will move on from

9    the Towson store to store number 590,

10   Dover store.

11       Hearing nothing on the Dover store, we

12   will move to the next store.

13       Store number 877 which is the Odentown

14   store.  Anybody interested in the Odentown

15   store?

16       Hearing nothing, we will move on to

17   562, the Milford store.  Anyone interested

18   in the Milford store?

19       Okay, hearing no bids, we will move on

20   to the Woodlawn store, store 521.  Any

21   interest in the Woodlawn store?

22       Next up, store number 912, the

23   Westminster store.

24       MR. KOMROWER:  Stuart Komrower in

25   behalf of Englar Center LP, we bid

1   $400,000 pursuant to the terms of the APA

2   that we submitted with our bid.

3       MR. MAZZA:  We have a bid on the

4   Westminster store of $400,000 by, is it

5   the landlord?

6       MR. KOMROWER:  Landlord, Englar Center

7   LP.

8       MR. MAZZA:  Englar Center LP, $400,000

9   in connection with the bid that was

10  received for that store at the bid

11  deadline.  Give us a moment on that store.

12  Just a question on the bid that was

13  received, which form of document was that?

14  Is that a lease termination or was it a

15  markup of the APA?

16      MR. KOMROWER:  Markup of the APA.

17      MR. MAZZA:  We will take a five-minute

18  break and be right back.

19      (A recess was had.)

20      MR. MAZZA:  We're going to go back on

21  the record in the auction here.  We just

22  got a bid on the Westminster property from

23  the landlord there.  We are going to hold

24  that one in a abeyance for now and move on

25  to the remaining properties in the

1    southern store package and see if there

2    are any bids on the real estate.

3        So the next up after holding over

4    Westminster is 825 and that's Mt. Airy.

5    Any bids, anyone interested in Mt. Airy?

6        Hearing none, we will move on to store

7    number 881, Glen Burne, store 881, Glen

8    Burne.

9        Hearing nothing on Glen Burne, we will

10   move on to store 839, Nottingham.  Store

11   839, Nottingham, any bids on or interest

12   in the store in Nottingham?

13       Hearing none, we will move on to store

14   872.

15       MR. EVANOFF:  The last store number?

16       MR. MAZZA:  Store number 839 for

17   Nottingham.

18       Next up, store 872, that's Salisbury.

19   Any interest in Salisbury?

20       No?  Hearing none, we will move on to

21   store number 950, that's Frederick, store

22   950, Frederick.  Any interest?

23       Hearing none, we will move on to store

24   817, Rosedale.  Any interest in Rosedale?

25       Hearing none, that would conclude the

1   various stores that comprise the southern

2   stores as defined in the bidding

3   procedures.

4       There's one store that remains in

5   negotiations pursuant to bid provided by

6   the landlord, that's store number 912,

7   Westminster.  We will go back on the

8   record in connection with that store

9   hopefully shortly.  We will take a short

10  break and get on to what many have been

11  anticipating, the auction on the scripts

12  for the stores that still have scripts

13  available for them.  We will hopefully not

14  take too much time and we will be back

15  with you soon.  Let's go off the record.

16  Thanks.

17      (A recess was had.)

18      MR. MAZZA:  We're back on the record.

19  Jim Mazza from Kirkland and Ellis for the

20  debtors now in the exciting final leg of

21  the auction with pharmaceutical scripts

22  being put up.  We've got a couple of

23  packages we're going to make available

24  with some lead bidders, and the first

25  package is going to be with Safeway on

1    three stores that I'm going to name, store

2    839, that's Nottingham; store 825, that's

3    Mt. Airy; and store 829, that's Towson.

4        And Safeway bids as a package for the

5    pharmaceutical scripts at that store for

6    $750,000.  They've submitted an agreement

7    that from the debtors' perspective has the

8    necessary provisions included together

9    with certain modifications agreed upon by

10   the parties.

11       And if the representative from Safeway

12   can confirm on the record that those terms

13   make its bid for these three stores an

14   irrevocable offer consistent with the

15   bidding procedures order, we will proceed

16   and recognize that bid as a qualified bid.

17       MS. WALKER:  Wendy Walker from Morgan

18   Lewis.  So confirmed.

19       MR. MAZZA:  Okay, Ms. Walker has

20   confirmed those qualifications in

21   connection with the bid and we will deem

22   it a qualified bid and begin the bidding

23   on that three-store lot for the

24   pharmaceutical scripts at $750,000.

25       First, are there any bids with respect

1    to those stores as a package?

2        MR. MINUTI:  Just a question for

3    clarification.  When you're done

4    announcing the packages and accepting bids

5    on the packages, are we going to do the

6    stores individually?

7        MR. MAZZA:  We will do them

8    individually right now.  It is going to be

9    based on the aggregation of the three

10   stores that equal the $750,000 purchase

11   price to determine if there's an aggregate

12   bid individually or on two or three of the

13   stores that would beat the $750,000 bid.

14       Just for further clarification, the

15   bidding increment would have to be

16   $150,000.

17       So with that, are there any individual

18   bids on any of these stores?

19       MR. MINUTI:  And if I could indulge

20   then, I would like to take just a

21   five-minute break to talk to my client

22   very quickly just so he understands the

23   procedures.  Real five minutes.

24       MR. MAZZA:  Mr. Minuti has requested a

25   real five-minute break.  I believe that

1   would be okay.  I think we have another

2   package that we can put out to folks.

3       MR. BLOCK:  Ross Block with Hilco.

4   Are you okay with proceeding with the

5   other package without talking with your

6   client?

7       MR. MINUTI:  Why don't you tell me

8   what the other package is.

9       MR. MAZZA:  That way you can talk to

10  your client in one fell swoop.

11      Package number 2 is being presented by

12  Walgreens, that involves three stores,

13  first of which is 521, Woodlawn; second of

14  which is 872, Salisbury; third of which is

15  881, Glenn Burne; total of $1.2 million

16  for the pharmaceutical scripts that relate

17  to those stores is a bid put together by

18  Walgreen's.

19      We've negotiated an asset purchase

20  agreement in connection with those stores

21  and this package bid submitted by

22  Walgreen's.

23      I would ask representative for

24  Walgreen's here in the auction room today

25  to aver on the record that is a binding

1    bid from Walgreen's perspective and

2    irrevocable pursuant to the bidding

3    procedures order entered by the bankruptcy

4    court.

5        MR. BARRETT:  William Barrett for

6    Walgreen, and in behalf of Walgreen I

7    affirm what counsel just stated.

8        Jim, I do have a question.  When the

9    bidding commences for these bids is

10   150,000 the bidding increment as it was

11   for the other bids in the entire package

12   of assets?

13       MR. MAZZA:  Correct.  That's correct.

14   For these two packages, yes.  If there are

15   any stores that are left over.

16       So with respect to that, based on the

17   averments on the record, the debtors in

18   consultation with the committee would deem

19   the bid by Walgreen to the second package,

20   Woodlawn, Salisbury and Glenn Burne, as a

21   qualified bid under the bidding procedures

22   and would recognize it as a leading bid

23   for this package of stores.

24       With that I'll put the package out for

25   any bids.

1    MR. MINUTI:  Again, can I have my five

2  minutes now?

3    MR. MAZZA:  Yes, you may have your

4  five minutes now.  There's one other store

5  that's out there that we might as well put

6  out for folks that would round out the

7  full pharmaceutical lot which is Odentown,

8  and that's an individual store.  We will

9  put it out for bid for folks to see if

10  there's any interest in the scripts.  We

11  can wait until Mr. Minuti comes back on

12  that one, but that will round things out.

13    MR. MINUTI:  Okay.  I'll be back in

14  five minutes.

15    MR. MAZZA:  We will go off the record

16  now.

17    (A recess was had.)

18    MR. MAZZA:  Back on the record for the

19  script auction.  Let's start off with the

20  Safeway package, 839, Nottingham; 825, Mt.

21  Airy; 829, Townsend, at $725,000.

22    Jim Mazza again for the debtors on the

23  record.

24    Is there anybody interested in bidding

25  on this package?  Mr. Minuti, any interest

1   from CVS?

2       MR. MINUTI:  We have none.

3       MR. MAZZA:  How about Walgreen's,

4   anything?

5       With respect to any of the stores on

6   an individual basis, Mr. Minuti,

7   Walgreen's?

8       MR. BARRETT:  None.

9       MR. MINUTI:  None.

10      MR. MAZZA:  None heard.  We will

11  declare the Safeway bid on the package 1,

12  839, Nottingham; 825, Mt. Airy; and 839,

13  Townsend at $750,000 based on the asset

14  purchase agreement submitted to the

15  debtors as the successful bid that wins

16  that lot of stores, pharmaceutical script

17  assets.

18      We will move on to package 2 which is

19  the Walgreen's bid on three stores, 529,

20  Woodlawn; 872, Salisbury; and 818, Glenn

21  Burne, a bid for $1.2 million on the

22  pharmaceutical scripts for those stores.

23  We will open up the bidding, see if

24  there's any interest in that package for

25  those stores.

1       None from Safeway.

2       Mr. Minuti?

3       MR. MINUTI:  None.

4       MR. MAZZA:  On an individual basis?

5       MR. MINUTI:  None.

6       MR. MAZZA:  Safeway?

7       MS. WALKER:  None.

8       MR. MAZZA:  No interest.  We will

9  declare the Walgreen's package 2 as the

10  winning successful bidder for those stores

11  at $1.2 million based on the asset

12  purchase agreement submitted to the

13  debtors in connection with those

14  pharmaceutical assets.

15       So that wraps up all of the

16  pharmaceutical scripts with the exception

17  of Odentown and we will open that up on

18  the floor for bidding.  Any bids on

19  Odentown?

20       MS. WALKER:  Can I ask a question off

21  the record?

22       MR. MAZZA:  You want to go off the

23  record?

24       MS. WALKER:  We can go outside and you

25  can stay on the record.

1     (Discussion was held off the record.)

2     MS. WALKER:  Wendy Walker, Morgan

3  Lewis.  Safeway put in a bid on store

4  number 877 of $100,000.

5     MR. MAZZA:  Store number 877, Odentown

6  at $100,000 bid from Safeway based on the

7  documents submitted to Kirkland and Ellis,

8  as modified, pursuant to discussions

9  between counsel for Safeway's bid.  That

10  would be held out as an irrevocable offer

11  pursuant to the bidding procedures.  Can

12  that be confirmed?

13     MS. WALKER:  Confirmed.

14     MR. MAZZA:  Thank you.  Is there any

15  other interest in Odentown?

16     MR. BARRETT:  No.

17     MR. MINUTI:  What was the bid?

18     MR. MAZZA:  $100,000.

19     MR. MINUTI:  CVS will place a bid and

20  all of CVS's bid to the extent our further

21  bid will be pursuant to its asset purchase

22  agreement that was submitted subject to

23  the modification that I've discussed

24  earlier, CVS will bid $150,000.

25     MR. MAZZA:  CVS has now bid $150,000.

1    The packages are over with respect to the

2    initial bidding being $100,000.  We will

3    exercise our discretion to have a smaller

4    incremental overbid and $50,000 would be

5    acceptable from the debtors perspective.

6    The committee I see nodding heads in

7    agreement with that.  So $50,000 based on

8    the asset purchase agreement is a topping

9    bid that would now make CVS the lead

10   bidder on the Odentown store.

11       MS. WALKER:  Safeway will go to

12   $200,000.

13       MR. MAZZA:  Safeway is now $200,000

14   making it the lead bid.  CVS.

15       MR. MINUTI:  250.

16       MR. MAZZA:  CVS is now the lead bid at

17   250.

18       MS. WALKER:  We're out.  Safeway is

19   out.

20       MR. MAZZA:  Safeway is out at 250.  We

21   will declare CVS the winning bidder for

22   pharmaceutical scripts at Odentown based

23   on its asset purchase agreement submitted

24   to Kirkland and Ellis.

25       The bid that was submitted at $200,000

1    by Safeway would set Safeway up as a

2    back-up bidder for the Odentown store.

3        That wraps up the pharmaceutical

4    scripts.  Appreciate everyone's patience

5    on that one.  What we have left is one

6    additional lease, Westminster.  So if we

7    go off the record, we will take a

8    two-minute adjournment and we will address

9    that last lease.

10       (A recess was had.)

11       MR. MAZZA:  Going back on the record,

12   Jim Mazza from Kirkland and Ellis for the

13   debtors.  We are back on the record.  We

14   have one lease left, that is Westminster,

15   and Englar Center LP has been in

16   discussion with the debtors.  We

17   understand there is now a bid on the table

18   for $425,000 pursuant to the agreement

19   submitted to the debtors.  Is that true?

20       MR. KOMROWER:  Stuart Komrower on

21   behalf of Englar Center, that's correct.

22       MR. MAZZA:  Is that an irrevocable

23   offer pursuant to the bidding procedures

24   and pursuant to the APA?

25       MR. KOMROWER:  And pursuant to the

1    APA, yes.

2        MR. MAZZA:  From debtors perspective

3    and in consultation with the committee we

4    consider that to be a qualified bid for

5    that Westminster property.  Just one

6    question, is it a lease termination or

7    asset purchase agreement?

8        MR. KOMROWER:  Asset purchase

9    agreement.

10       MR. MAZZA:  Asset purchase agreement.

11   Thanks for the clarification.

12       With that, we will put it out.  Is

13   anybody interested in bidding on the

14   Westminster property that Englar Center is

15   now the lead bid on at $425,000?

16       Hearing none, we will declare Englar

17   Center at $425,000 the winning bidder for

18   that property.

19       So that concludes all of the assets

20   having gone through all the southern store

21   assets as defined in the bidding

22   procedures.  There will be no more

23   opportunities to bid on the assets in this

24   auction setting.  We may have discussions

25   with parties to the extent some of the

1   assets were not sold and we will be in

2   contact with folks in that regard.

3        Just a few procedural remarks before

4   closing the auction officially.  Backup

5   bidders as provided in the bidding

6   procedures order that were announced here

7   on the record will remain in place until

8   the earlier of 25 days after the entry of

9   the sale order approving the sale of the

10  assets and closing of the sale of the

11  assets in accordance with the successful

12  bid as defined under the bidding

13  procedures.

14       For the record, the next steps will be

15  to memorialize any changes necessary to be

16  made and to finalize the applicable

17  documents in accordance with bids

18  submitted today on the various assets.

19       We've declared on the record earlier

20  today the successful bidders and backup

21  bidders in connection with lot 1 being the

22  joint venture of Mrs. Greens and Village

23  Super Markets being the winning bidder

24  with the back-up bidder being Giant of

25  Maryland LLC in connection with those Lot

1   1 Assets. Those four stores identified in

2   that lot being Baltimore, White Oak,

3   Arnold and Parkville.

4       Lot 2 assets then went to auction.

5   Those were, the successful bidder there

6   was again the joint venture of Mrs. Greens

7   Management Corp and Village Super Markets

8   Inc.  Those stores were Lutherville,

9   Washington, D.C., Cambridge, Brunswick,

10  Chestertown and Charles Street.  Those

11  came in at $12.5 million as the winning

12  bidder.

13      There were backup bidders on certain

14  individual properties that were declared

15  on the record in connection with those

16  particular stores from SUPERVALU and The

17  Fresh Market.

18      Lastly, we had SUPERVALU be the

19  successful bidder with the Ellicott City

20  property at $400,000 pursuant to the terms

21  of its APA, and we just concluded with

22  respect to the auctioning of the

23  pharmaceutical scripts to the winning

24  bidders there being Walgreen's on a

25  package of stores and Safeway on another

1   package and CVS on the Odentown store,

2   with Safeway being the back-up bidder on

3   the Odentown store.

4       And then finally, we just concluded in

5   connection with the Westminster property

6   that Englar Center is the winning bidder

7   on that property.

8       So with that, the proceedings are now

9   concluded and we will close the auction.

10  Thank you. We're off the record now.

11      (Time noted 1:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             C E R T I F I C A T E.

2    STATE OF NEW YORK    )

3                         : ss.

4    COUNTY OF NEW YORK   )

5

6         I, MARK RICHMAN, a Certified Shorthand

7    Reporter, Certified Realtime Reporter and Notary

8    Public within and for the State of New York, and

9    COLETTE CANTONI, SHORTHAND REPORTER and Notary

10   Public within and for the State of New York, do

11   hereby certify:

12        That the within proceeding is a true

13   record.

14        We further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, and that I am in no way interested in

17   the outcome of this matter.

18        IN WITNESS WHEREOF, we  have hereunto set

19   our hands this ____ day of _____, 2011.

20

21

22

23        _____

24        MARK RICHMAN, C.S.R., C.R.R.

25         COLETTE CANTONI

**<u>Exhibit E</u>**

**Leases and Cure Amounts**

# Lot 1 Stores and Lot 2 Stores Cure Schedule

| Store Number | Lessor/Sublessee | Store Address | Store City | Store State | Debtors' Proposed Cure Amount | Lease Expiration |
|---|---|---|---|---|---|---|
| 101 | Charles Plaza LLC | Charles Plaza | Baltimore | Maryland | $215.00 | 12/31/26 |
| 812 | LVM Limited Partnership | 41st & Hickory | Baltimore | Maryland | $149,025.04 | 1/31/19 |
| 852 | SGM Realty LLC | Rt. 213 Washington Sq. | Chestertown | Maryland | $89,716.61 | 10/31/16 |
| 870 | Cambridge Plaza LLC | 780 Cambridge | Cambridge | Maryland | $16,763.08 | 10/31/15 |
| 876 | Fairgrounds Plaza Associates LLLP | 37 W. Ayelesbury | Lutherville | Maryland | $0.00 | 1/31/19 |
| 876 | Manufacturers and Traders Trust Company | 37 W. Ayelesbury | Lutherville | Maryland | $0.00 | 10/31/12 |
| 891 | Broadneck Development Corp. | 1238 Bay Dale Dr. | Arnold | Maryland | $5,371.18 | 7/31/13 |
| 897 | Parkville Shopping Center LLC | 7709 Harford Rd. | Parkville | Maryland | $2,148.05 | 2/29/16 |
| 961 | Wood Realty Group Inc. | 40 Souder Rd. | Brunswick | Maryland | $3,133.26 | 1/31/11 |
| 979 | APEX Real Estate Co. | 4330 48th St. | Washington | D.C. | $375,681.80 | 7/31/14 |
| 985 | White Oak-Grocery LLC | 12028 Cherry Hill | White Oak | Maryland | $0.00 | 2/28/21 |

**Exhibit F**

**Lease Notice**

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | ) Case No. 10-24549 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF (I) ASSUMPTION AND ASSIGNMENT OF THE UNEXPIRED LEASE OF [STORE NUMBER], (II) PROPOSED LEASE CURE AMOUNTS, (III) OBJECTION DEADLINES, AND (IV) RELATED INFORMATION**

      **PLEASE TAKE NOTICE** that, on December 12, 2010 (the "***Commencement Date***"), The Great Atlantic & Pacific Tea Company, Inc. ("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), filed chapter 11 petitions commencing chapter 11 cases under the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").

      **PLEASE TAKE FURTHER NOTICE** that, on May 30, 2011, the Debtors filed with the Bankruptcy Court the *Debtors' Motion for Entry of an Order (I) Approving Sale of Lot 1 and Lot 2 SuperFresh Stores to Mrs. Greens Management Corporation and Village Super Market*

*Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. ##] (the "**Sale Motion**"), which seeks entry of an order approving, among other things, the assumption and assignment of certain of the Debtors' unexpired leases of nonresidential real property (each, a "**Lease**") relating to stores which the Debtors are seeking to sell pursuant to the Sale Motion.[1]  A copy of the Sale Motion may be obtained by accessing the following website:  www.kccllc.net/aptea.

PLEASE TAKE FURTHER NOTICE that the Debtors, in accordance with the Sale Motion the Debtors hereby provide notice of their intent to assume and assign the lease referenced below (the "**Lease**"):

| Landlord Name and Address | |
| --- | --- |
| Real Property Address | |
| Lease Expiration Date | |

PLEASE TAKE FURTHER NOTICE that the Debtors seek the assumption and assignment of the Lease to Buyer (the "**Assignee**") effective as of the Closing (the "**Assumption Date**").

PLEASE TAKE FURTHER NOTICE that enclosed with this notice is adequate assurance information demonstrating the assignee's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code, including, without limitation, the assignee's financial wherewithal and willingness to perform under the Lease.  This adequate assurance information is provided to you on a confidential basis.  To the extent you wish to disclose non-public adequate assurance information in an objection filed with the Bankruptcy Court, you must file such objection under seal.

PLEASE TAKE FURTHER NOTICE that the cure amount for the Lease, according to the Debtors' books and records, is $[          ] (the "**Cure Amount**").

PLEASE TAKE FURTHER NOTICE that, should you object to the Debtors' assumption and assignment of the Lease, you must file and serve a written objection so that such objection is filed with the Bankruptcy Court and **actually received** by **June 7, 2011**, by the following parties:  (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North La Salle, Chicago, IL 60654, Attn.: James Mazza, Attn.: Erin Broderick; (b)  the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn.:  Susan Golden, Attn.:  Richard Morrissey; (c) counsel to the agent for the Debtors' postpetition secured lenders, Davis Polk & Wardwell LLP, 450 Lexington Avenue New York, New York, 10017, Attn.:  Donald S. Bernstein, Attn.:  Marshall S. Huebner; (d) counsel for Wilmington Trust Company as indenture trustee for the Debtors' prepetition

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

2

unsecured notes, Covington & Burling LLP, 620 Eighth Ave, New York, New York, 10018, Attn.: Michael B. Hopkins, Attn.: Ronald A. Hewitt; (e) counsel for Wells Fargo Bank, as successor trustee and collateral agent for the Debtors' prepetition secured notes, Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn.: Edward S. Weisfelner; (f) counsel for the Creditors' Committee, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn.: Dennis F. Dunne, Attn.: Abhilash M. Raval, Attn.: Matthew S. Barr; and (g) those persons who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002 (collectively, the "***Objection Notice Parties***").

**PLEASE TAKE FURTHER NOTICE** that any such objection must set forth the Lease to which the objection relates, all specific defaults under such Lease, and, with respect to objections to the proposed Cure Amount, must identify a specific monetary amount that differs from the Debtors' proposed Cure Amount, and set forth all documentation supporting such amount.

**PLEASE TAKE FURTHER NOTICE** that if an objection is filed, such objection will be heard by the Bankruptcy Court at a hearing to be scheduled. The Debtors shall send a separate notice of hearing with respect to any Lease.

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION AS STATED ABOVE: (A) THE CURE AMOUNTS SET FORTH IN THE LEASE SCHEDULE SHALL BE CONTROLLING NOTWITHSTANDING ANYTHING TO THE CONTRARY IN ANY LEASE OR OTHER DOCUMENT; (B) THE NONDEBTOR PARTY TO THE PURCHASED LEASE SHALL BE FOREVER BARRED FROM ASSERTING ANY OTHER CLAIM ARISING PRIOR TO THE ASSIGNMENT AGAINST THE DEBTORS OR THE IDENTIFIED ASSIGNEE TO SUCH LEASE; (C) THE NONDEBTOR PARTIES TO THE PURCHASED LEASE SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASED LEASES TO THE IDENTIFIED ASSIGNEE; (D) THE IDENTIFIED ASSIGNEE'S PROMISE TO PERFORM UNDER ANY LEASE AND THE INFORMATION SUPPLIED TO THE DEBTORS TO SUPPORT SUCH PROMISE CONSTITUTE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE UNDER ANY PURCHASED LEASE; (E) PURSUANT TO SECTION 365(K) OF THE BANKRUPTCY CODE, AFTER THE ASSIGNMENT BY THE DEBTORS OF THE PURCHASED LEASE, THE DEBTORS SHALL HAVE NO LIABILITY FOR ANY BREACH OF SUCH LEASE THAT OCCURS AFTER SUCH ASSIGNMENT; AND (F) YOU WILL RECEIVE THE CURE AMOUNT, IF ANY, IDENTIFIED IN THE LEASES SCHEDULE (ASSUMING YOUR LEASE IS, IN FACT, ASSUMED AND ASSIGNED) FROM THE IDENTIFIED ASSIGNEE. UPON ASSUMPTION AND ASSIGNMENT OF ANY LEASE, THE DEBTORS AND THEIR ESTATES WILL BE RELIEVED FROM ANY LIABILITY WITH RESPECT TO SUCH LEASE, INCLUDING WITH RESPECT TO ANY BREACH OF ANY SUCH LEASE.

K&E 19031178

New York, New York
Dated:  May___, 2011

/s/
_____
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession

4