Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net
rraicht@halperinlaw.net

*Co-Counsel for United Food & Commercial
Workers Union Locals 1776 and 400*

Laurence Goodman, Esq.
**WILLIG, WILLIAMS & DAVIDSON**
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
Phone: (215) 656-3608; Fax: (215) 561-5135
lgoodman@wwdlaw.com

*Co-Counsel for United Food & Commercial
Workers Union Local 1776*

Carey R. Butsavage, Esq.
**BUTSAVAGE & ASSOCIATES, P.C.**
1920 L Street, N.W., Suite 301
Washington, DC 20036
Phone: (202)-861-9700; Fax: (202)-861-9711
cbutsavage@butsavage.com

*Co-Counsel for United Food & Commercial
Workers Union Local 400*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| THE GREAT ATLANTIC & PACIFIC TEA ) | 10-24549-rdd |
| COMPANY, INC., *et al.*, ) | |
| ) | Jointly Administered |
| Debtor(s). ) | |

# OBJECTION OF UFCW 1776 AND 400 TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING SALE OF LOT 1 AND LOT 2 SUPERFRESH STORES TO MRS. GREEN'S MANAGEMENT CORPORATION AND VILLAGE SUPER MARKET, INC. FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

United Food and Commercial Workers Local Unions 1776 and 400 (hereinafter "Locals 1776 and 400" or the "Locals") object as follows to the Debtors' Motion for Entry of an Order: (I) Approving Sale of Lot I and Lot 2 Superfresh Stores to Mrs. Green's Management Corporation ("Mrs. Green's") and Village Supermarket, Inc. ("Village") Free and Clear of Liens, Claims, Encumbrances, and other Interests, (II) the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith, and (III) Granting Related Relief: (the "Motion") [Docket No. 1719]:

## INTRODUCTION

The relief requested is contrary to the binding and directly applicable successorship requirements of the respective collective bargaining agreements between the Debtors and the Locals. Locals 1776 and 400 have already filed grievances contesting the proposed sales pursuant to the mandatory grievance and arbitration provisions in their respective agreements with the Debtors. If the Debtors contend that the CBAs authorize the proposed sales, the Locals are prepared to submit the grievances to arbitration on an expedited basis.[1]

The Debtors cannot wish away the successorship provisions by pretending that they do not mean what they say, or by positing a theory that section 1113 does not apply to sales transactions. In addition, it is flatly incorrect for the Debtors to suggest that a conclusory

---

[1] Locals 1776 and 400 have already agreed to have these grievances brought to arbitration as expeditiously as the parties can choose an arbitrator and schedule a hearing. *See infra*, ¶10

footnote in a sales motion can meet the detailed procedural and substantive requirements of a request for relief under Section 1113. See Motion, p. 10 n.16.

The Locals have been attempting to engage in a negotiation process with Mrs. Green's and Village since the auction was completed. Mrs. Green's and Village each agreed at the auction, in relation to any stores for which they were the successful bidder, to recognize the relevant Local as collective bargaining representative and negotiate over a new labor contract. Mrs. Green's has agreed to a first meeting with one or more of the Locals for Tuesday, June 7, 2011, the date objections are due on this Motion.

The Motion should either be denied or adjourned. The Locals remain willing to meet with Village and Mrs. Green's to reach mutually acceptable collective bargaining agreements in a timely fashion. Such a resolution would be in the best interests of the Estate and all parties-in-interest.

## BACKGROUND

1. Local 400 is a party to collective bargaining agreements covering employees at the White Oak store (store 985) in Lot 1 that the Debtors, by the Motion, seek to sell to Village and the Washington, D.C. store (store 979) in Lot 2 that the Debtors seek to sell to Mrs. Green's.

2. Local 1776 is a party to collective bargaining agreement covering employees at the Brunswick store (store 961) in Lot 2 that the Debtors, by the Motion, seek to sell to Mrs. Green's.

3. As the Debtors' reply papers on the sales procedures order revealed, each of the relevant CBAs contain successorship clauses relating to any sale of these stores. These

provisions permit the Debtors to only sell these stores if the buyer agrees to assume the relevant CBAs.

4. The relevant Local 400 agreement provides as follows;

> This Agreement shall be binding on all signatories hereto, and their successors and assigns, whether such status is created by sale, lease, assignment, or any other type transfer transaction. In consideration of the Union's execution of this agreement, *the Employer promises that its operations covered by this Agreement or any part thereof shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the Agreement of the successor to assume the Employer's obligation under this Agreement and to offer employment subject to the terms of this Agreement, to all of the employer's then current employees, recognizing their accrued seniority for all purposes*. Provided, that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the Union will look exclusively to the successor or assignee for compliance with the terms of this Agreement. The foregoing shall be applicable in cases only where the Employer sells or transfers more than 10% of the facilities covered by this agreement, and shall not apply in cases of store closing.

(emphasis added). The proposed sale involved more than 10% of the facilities covered by the agreement. Any disputes relating to the CBA are subject to the mandatory grievances and arbitration provisions of the CBA. Copies of relevant provisions of the Local 400 CBA(s) are annexed hereto as **Exhibit A**.

5. The relevant Local 1776 agreement states as follows:

(a) This Agreement shall be binding upon the successors and assigns of the Employer herein whether such status is created by sale, lease, assignment, or any other type transfer transaction, provide that the transaction involves at least thirty-five percent (35%) of the Employer's facilities covered by this Agreement.

(b) *The documents evidencing the transfer transaction must contain provisions which require the retention in employment by the successor or assignee of no less than fifty percent (50%) of the bargaining unit employees who*

> *would otherwise be displaced by the transaction.* Employees retained by the successor or assignee shall be subject to an initial sixty-day (60) probationary period, during or at the end of which the employee may be terminated without recourse to the grievance and arbitration procedure as contained in Article 10 of this Agreement. Employees retained after successful completion of their probationary period shall be credited with their seniority accrued as employees of the Employer herein and with full service credit for all purposes.
>
> (c) The foregoing paragraphs shall not apply in cases of store closings (more than thirty [30] days).

(emphasis added). The proposed sale involved more than 35% of the facilities covered by the agreement. Any disputes relating to the CBA are subject to the mandatory grievances and arbitration provisions of the CBA. A copy of relevant provisions of the Local 1776 CBA is annexed hereto as **Exhibit B**.

6. After the Debtors filed the Bidding Procedures Motion [Docket No. 1334], the Locals filed a Limited Objection and Response [Docket No. 1386]. That Objection reserved the Locals' respective rights under the CBAs:

> As the Motion briefly notes, Motion, p. 6 n.7, the Southern Store CBAs include successorship clauses relating to any sale of these stores. These provisions obligate the Debtors to only sell these stores if the buyer agrees to assume the relevant CBAs. These types of successorship clauses have consistently been found valid and enforceable by both arbitrators and the courts.
>
> ***
>
> Therefore, Locals 1776, and 400 reserve all their rights in any appropriate forum under the Southern Store CBAs.

7. At the hearing the Court determined that it was unnecessary to include a formal reservation of rights in the bidding procedures order, but in a colloquy with counsel confirmed that the Local unions' rights were reserved:

MR. SELTZER: Richard Seltzer of Cohen, Weiss and Simon, in this particular proceeding for Locals 27, 1776 and 400 of the UFCW. Your Honor all that's before the Court today is the debtor's request to approve bidding procedures.

THE COURT: Right

MR. SELTZER: The union has filed a limited response simply to reserve rights and to request that that reservation be in the order. There's no request to sell assets today. The sale is hypothetical. The debtors could conceivably even change their mind about whether they want to pursue the sale. There's no request or identification of request for approval of the buyer, the ABA, which assets, what conditions, what assumptions.

The union's rights and the legal issues that may be involved with that are not teed up teed up today for litigation. There's not a case of controversy about it. This isn't a court that authorized to issue advisory opinions. I'm not sure if that's what the company wanted. There are interesting issues here. We hope we don't get to them because we all reach a consensual resolution.

And I was pleased to hear the debtors saying that they were not seeking to terminate any rights through the bidding procedures motions. And in light of that, I'm not sure what the problem is with a fairly standard reservation of rights in the order.

THE COURT: Well, I think they just wanted their position know so that the record's clear on each side's position in case some prospective buyer isn't clear.

You know, I -- my inclination is that the record is clear that everyone's rights are preserved. You know that – and I would rather not have specific reservation in the order. You know, Kelly Drye's clients may want to stand up and say well, the landlords' rights should be preserved and Davis Polk's clients are going to stand up and say well our 363(f) rights should be preserved. I think the record's clear that this is not -- that this motion doesn't determine many of the sales issue. It just deals with the process.

MR. SELTZER: I appreciate that clarification. Thank you, Your Honor.

THE COURT: Okay. And I couldn't give you anything more today anyway, under Orion, so.

So I'm not going to put that language in the order. But I think the union's certainly loud and clear about its view about its rights and the debtor's loud and clear about its view about its rights, and hopefully, neither of you will have to fight about it.

MR. MAZZA: Hopefully, Your Honor. I guess from the debtor's perspective, it's just – it's not necessarily clear as to this – how this process works, if the union will try to object and say if a party doesn't take the CBA, whether that party would be qualified or not.

THE COURT: Well, we'll have to deal with that.

MR. MAZZA: But we think that's an issue that's in front of us with the determination of a qualified bidder in the bidding procedures, so—

THE COURT: I don't think it is. They don't have an absolute veto.

MR. MAZZA: No, they don't. That's absolutely right.

THE COURT: Right

MR. MAZZA: It's from the debtors' perspective with consultation rights. And we're take the position that parties would be qualified if they don't take the CBA –

THE COURT: Okay.

MR. MAZZA: -- in their entirety.

THE COURT: But, on the other hand, maybe, to avoid those issues, someone else might be more attractive. You don't know yet.

MR. MAZZA: The process needs to play out.

THE COURT: Right.

MR. MAZZA: That's for sure, Your Honor, but –

THE COURT: Right. I'm not going to give you an opinion on it today. It's really not appropriate to do it today.

MR. MAZZA: Very well, Your Honor.

THE COURT: Okay.

See April 30, 2011 Hearing Transcript, pp. 100–104, a copy of which is annexed hereto as **Exhibit C**.

8. Representatives of the Locals participated in the auction process. Giant of Maryland, consistent with its offer, confirmed that it would assume each of the relevant CBAs in Lot 1, and the Locals notified the Debtors that Giant's confirmation satisfied the requirements of the successorship provisions of the CBAs for the stores in Lot 1. During the course of the auction representatives of Village and Mrs. Green's each agreed to and executed a Memorandum of Agreement ("MOA") with the Locals recognizing the relevant local as the exclusive collective bargaining representative of employees of any store acquired through and following the auction, and the Locals agreed to waive, respectively, any claim for breach of the respective CBA if an acceptable CBA was negotiated. The Locals informed the Debtors that these agreements did not meet the successorship requirements of the CBAs but constituted progress in that direction. The Debtors determined to provide a $200,000 adjustment to the purchase price of Lot 1 if the Buyers enter into collective bargaining agreements by the date of the deadline for filing objections to the Motion or such later date as may be agreed to by the parties. Motion, Exhibit B, Lot 1 APA, definition of "Union Agreement Discount Amount," p. 13.

9. The Motion and associated asset purchase agreements ("APA") make note of the MOAs but otherwise provide that pursuant to the APAs the buyers are not obligated to assume or reach agreement with the Locals. *See, e.g.,* Motion, ¶¶15 (Descriptions of Acquired Assets, Assumed Liabilities, Employment Provisions, Excluded Assets, Excluded Liabilities), p. 16 (Same Descriptions).

10. In the absence of agreements with Village and Mrs. Green's, some of the Locals have already filed grievances with the Company over the violation of the relevant successorship clauses, and have offered to proceed to expedited arbitration over the issue. Copies of the grievances are annexed hereto as **Exhibit D**.

11. The Locals have requested that the Debtors adjourn the hearing on the Motion, but as of this date the Debtors have determined not to do so.

## OBJECTION

## THE DEBTORS MUST COMPLY WITH SECTION 1113 OF THE CODE TO REJECT THE CBAS AND MAY NOT EFFECTUATE THE SALES IN THE ABSENCE OF COMPLIANCE WITH THE APPLICABLE SUCCESSORSHIP CLAUSES IN THE NONREJECTED CBAS

A. A Collective Bargaining Agreement May Be Rejected Only Pursuant to the Exclusive Provisions of Section 1113

12. A court may approve a debtor's motion to reject its collective bargaining agreement with a union representing its employees only if the debtor meets the stringent and exclusive requirements set forth in Section 1113 of the Bankruptcy Code. *See* 11 U.S.C. § 1113. Section 1113(a) provides that a debtor may reject a collective bargaining agreement "only in accordance with the provisions of this section, 11 U.S.C. § 1113(a), and section 1113 (f) provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f).

13. As the Second Circuit has emphasized, "[w]e construe subsection 1113(f) quite literally. We hold that it was meant to prohibit the application of *any* other provision of the Bankruptcy Code when such application would permit a debtor to achieve a unilateral termination or modification of a collective bargaining agreement without meeting the

requirements of § 1113." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990-91 (2d Cir. 1990) (emphasis added). The Third Circuit agrees that the statute forbids the application of other Code provisions to permit debtor to escape the requirements of section 1113, "The intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate. Moreover, the provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to escape the terms of a collective bargaining agreement without complying with the requirements of section 1113." *See In re Continental Airlines*, 125 F.3d 120, 137 (3d Cir. 1997) (citation omitted).

14. As the district court concluded in the *Frontier Airlines* case, following this Court's own interpretation, "Section 1113 expressly prohibits a debtor from terminating or modifying a collective bargaining agreement absent compliance with these requirements [citing statute]." *Teamster Airline Div. v. Frontier Airlines, Inc.*, 2009 WL 2168851 *5 ( S.D.N.Y. 2009), *rev'g on other grounds, In re Frontier Airlines Holdings, Inc*., 2008 WL 5110927 * 13 (S.D.N.Y. 2008) ("One begins, of course, with the words of the statute itself, which provides that a debtor in possession may assume or reject, in this case reject, a collective bargaining agreement only if it does the following  . . .").

15. Based, on the foregoing, without providing for satisfaction of the relevant successorship clauses, the proposed asset sales, if approved, would permit and require the Company to violate section 1113(f).

B. <u>The Stringent Requirements of Section 1113</u>

16. Congress added section 1113 to the Code in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513 (1984). There, the Court held that a collective bargaining agreement is an executory contract like any other, and could be

unilaterally repudiated on a mere showing that it "burden[ed] the estate" and that the balance of equities favored rejection. *Id.* at 526. *Bildisco* heightened fears that debtors would increasingly use "bankruptcy law as an offensive weapon in labor relations." *In re Roth Am.,* 975 F.2d 949, 956 (3rd Cir. 1992). This led to the enactment of section 1113. *Truck Drivers Local 807, IBT v. Carey*, 816 F.2d 82, 87 (2d Cir. 1987).

17. In order to reject its collective bargaining agreement, a debtor must satisfy each of the requirements of section 1113(c) by demonstrating that:

- its proposal provides for "those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization" of the debtor;

- it has provided the union "with such relevant information as is necessary to evaluate the proposal;"

- its proposal "assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably;"

- it has met with the union "to confer in good faith in attempting to reach mutually satisfactory modifications;"

- the union has "refused to accept its proposal without good cause;" and

- "the balance of the equities clearly favors rejection of such agreement."

*See* 11 U.S.C. §1113(b) and (c); *Carey*, 816 F.2d at 93.

18. Thus, rejection would be possible here only if the Debtors had made a proposal to each of the Locals and provided the information necessary to evaluate the proposals, met and negotiated in good faith, and the Court ultimately found that all of the statute's

requirements had been met, including, *inter alia,* that the proposal was necessary to reorganize and that the Locals had rejected the proposal without good cause.[2]

C. The Debtors' Failure to Comply with Section 1113

19. It is undisputed that the Debtors have failed to comply with the exclusive and stringent requirements of section 1113. As a threshold matter, the Debtors have made no proposals to modify the CBAs. Having made no such proposals, the initial step of the section 1113 process, the Debtors have obviously not complied with any of the other statutory requirements. The footnote placed in their sale motion, which mentions section 1113 in passing is, on its face, insufficient to demonstrate compliance with section 1113, or even constitute an appropriate motion under section 1113.

20. In their reply papers in support of the Motion for Approval of Bidding Procedures, the Debtors suggested that section 363 somehow overrides section 1113, and that case law "generally supports the proposition that a debtor may sell assets free and clear of CBA obligations without first using section 1113." April 27, 2011 Debtors' Reply in Support of Bidding Procedures Motion, p. 5 ¶6 [Docket No. 1448]. This is a grossly erroneous statement of the law. First, as noted *supra*, section 1113(f) plainly states that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." In addition, the Second Circuit has held that section 1113 applies with full force to asset sales. In *In re Maxwell Newspapers*, 981 F.2d 85. 89 (2d Cir. 1992), the Court concluded that "[a] debtor may sell the assets of the business unencumbered by a collective bargaining agreement *if* that agreement has been rejected pursuant to § 1113.") (emphasis added).

---

[2] The Locals submit that it is doubtful that the Debtors would be able to make a showing of necessity and the other requirements of the statute; however, those questions are not before the Court because the Debtors have not even initiated the process.

21. Similarly, in *American Flint Glass Workers Union v. Anchor Resolution Corp.*,[3] the Third Circuit held that a debtor could not alter its obligations under a CBA by assumption and assignment to a purchaser because that would be "an attempt to effect an alteration of the CBA" and therefore the debtor "was required to comply with the procedures set out in Code § 1113." To do otherwise, the court held, would permit the debtor and a purchaser "to misuse the Code in an effort to avoid the collective bargaining process that Congress deemed essential to the balance between labor and reorganizing debtors that it struck in Section 1113." *Id.*[4]

D. Section 1113's Requirements Apply to Successorship Clauses

22. Consistent with the decisions of the Second Circuit in *Maxwell Newspapers* and the Third Circuit in *Anchor Resolution*, bankruptcy courts have also upheld the application of contractual successorship clauses to asset sales. *See In re Stein Henry Co., Inc.*, No. 91-15491S, 1992 WL 122902, at *2 (Bankr. E.D. Pa. June 1, 1992) (refusing to confirm plan which would result in asset sale without satisfaction of CBA's successorship clause because "[o]nly through the medium of 11 U.S.C. § 1113(f) can a collective bargaining agreement be terminated or modified in any way" and "[r]ights provided in the agreement as to successor-entities must be preserved unless there is, unlike here, compliance with the procedures of 11 U.S.C. §1113."); *In re Agripac, Inc.*, No. 699-60001-frall, Slip Op. at 9-12 (Bankr. D. Ore. April 2, 1999) (concluding that "[f]ailure to include in Sale Agreement a successor clause as required by the CBA is a breach of the Collective Bargaining Agreement which may result in a substantial

---

[3] 197 F.3d 76, 81-82 (3d Cir. 1999).

[4] Attempts to utilize other provisions of the Code to override Section 1113's exclusive provisions have similarly been rejected. *See. e.g., Chicago Dist. Council of Carpenters Pension Fund v. Cotter*, 914 F.Supp. 237, 242 (N.D. Ill.1996) (CBA cannot be rejected as part of plan of reorganization pursuant to provision providing automatic rejection of unassumed executory contracts pursuant to section 365).

claim against the estate" and holding that the sale could not proceed absent compliance with section 1113).[5]

23. Notwithstanding the unambiguous holdings of the Second Circuit and other courts that section 1113 applies to asset sales and attempts to abrogate successorship clauses, the Debtors rely on the Eighth Circuit BAP case *In re Family Snacks, Inc.*,[6] and the bankruptcy court decision in *In re The Lady H Coal Co.*[7] to support their contention that section 1113 does not apply to the proposed sale of assets in this case. The Debtors' reliance on these cases is misplaced.

24. In *Family Snacks*, the purchaser of assets ultimately signed a new CBA with the union and assumed post-petition employee claims. 257 B.R. at 888. The Union had objected to the sale *on the basis of the failure to pay certain prepetition medical claims. Id.*[8] Thereafter, the union sought administrative treatment for those prepetition claims, asserting that the agreement had been impliedly assumed or assumed as a matter of law, while the debtor, now a non-operating entity, moved to reject that agreement. The only remaining questions on appeal were whether a rejection application could be made after the sale of the debtor's assets and whether the bankruptcy court's denial of a section 1113 rejection motion resulted in the assumption of a CBA. *Id.* at 887, 890. In that situation, the question at issue was *not* whether the sale of the assets was an alteration of the CBA, and so the issue of a potential conflict between Section 363 and Section 1113 was not before the panel. Indeed, the panel noted that "[a] debtor may not, however, fail to take steps to reject the CBA under § 1113 and, at the same

---

[5] A true and correct copy of *Agripac* is annexed hereto as **Exhibit E**.

[6] 257 B.R. 884, 890-98 (8th Cir. BAP 2001).

[7] 193 B.R. 233 (Bankr. S.D.W.Va. 1996), *aff'd* 199 B.R. 595 (S.D.W.Va.), *aff'd on other grounds, sub nom. In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996).

[8] Indeed, it is not clear that any successorship clause was at issue.

time, fail to comply with the terms of the CBA. A debtor remains bound by the terms of the CBA until it takes affirmative steps to reject that agreement." *Id.* at 896 n.8. In short, to the extent that *Family Snacks* bears on the question before this Court, it supports the position of the Locals, not the Debtors.

25. The *Lady H* decision is neither binding nor persuasive. The court initially held that, consistent with the successorship clause and Section 1113, a sale could proceed only if the union and the buyer reached an agreement or if the court granted Section 1113 relief. 193 B.R. at 237-38. The court then refused to grant relief pursuant to Section 1113 because it found relief was not fair and equitable in light of certain executive compensation. *Id*. at 242. Thereafter, without explaining how it could ignore the mandate of Section 1113(f), the court reversed itself and held that the sale could go forward based on "relative equities to all parties-in-interest" and "the best combination of rights and remedies that can be tailored considering the issues presented and the limited choices that are available as a result of the Debtors' precarious financial position which has turned even worse during consideration of the Debtors' Motion." *Id*. at 236, 243.

26. The *Lady H* court, which issued its decision prior to the Third Circuit's decision in *Anchor Resolution* discussed above, simply ignored the fundamental requirements of section 1113. While the *Lady H* court's order was without legal justification, that court, unlike this Court, was faced with a shutdown of the debtor's entire operation, the debtor's inability to make payroll, and the imminent loss of electric power. *Id.* at 236, 245-45. Further, the *Lady H Coal* court granted the union an administrative expense claim, not for the rejection of the contract under section 1113, *compare In re Nw. Airlines Corp.*, 483 F.3d 160 (2d Cir. 2007), but

for breach of contract, 193 B.R. at 243, which in this case would lead to a huge administrative claim and further militates against any approval of the Motion.[9]

E.  Any Dispute Over Interpretation of the Successorship Clause Must be Resolved Through Arbitration

27.  To the extent the Debtors differ on the interpretation of the successorship clauses, that difference must be resolved through the exclusive and binding arbitration provisions of the CBAs, which remain in full force in bankruptcy. *Ionosphere Clubs, Inc.*, 922 F.2d at 993; *see also Continental Airlines,* 125 F.3d at 137-38*; In re Fulton Bellows & Components, Inc.,* 307 B.R. 896 (Bankr. E.D. Tenn. 2004); *In re Bunting Bearings,* 302 B.R. 210 (Bankr. N.D. Ohio 2003); *In re US Airways Group, Inc*., 296 B.R. 734, 746-48 (Bankr. E.D. Va. 2003); *In re Bob's Supermarket's, Inc*., 118 B.R. 783 (Bankr. D. Mont. 1990).

28.  As noted *supra*, the relevant Locals are willing to proceed directly to an expedited arbitration over any dispute as to the meaning of the meaning or application of the successorship clauses. The Locals also remain willing to meet with Village and Mrs. Green's to reach mutually acceptable collective bargaining agreements.

[*concluded on following page*]

---

[9] As noted, there is an alternative bid for Lot I that is in compliance with the successorship clauses.
{00147353.6 / 0888-001}  16

## **CONCLUSION**

29. For the foregoing reasons, the Court should adjourn or deny the Motion.

Dated: New York, New York
June 7, 2011

Respectfully submitted,

**HALPERIN BATTAGLIA RAICHT, LLP**

By: *Alan D. Halperin*
Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
555 Madison Avenue, 9th Floor
New York, NY 10022
(212) 765-9100
ahalperin@halperinlaw.net;
rraicht@halperinlaw.net;

*Co-Counsel for United Food & Commercial Workers Union Locals 1776 and 400*

Laurence Goodman, Esq.
**WILLIG, WILLIAMS & DAVIDSON**
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
(215) 656-3608
(215) 561-5135 (facsimile)
lgoodman@wwdlaw.com

*Co-Counsel for United Food & Commercial Workers Union Local 1776*

Carey R. Butsavage, Esq.
**BUTSAVAGE & ASSOCIATES, P.C.**
1920 L Street, N.W., Suite 301
Washington, DC 20036
(202)-861-9700
(202)-861-9711 (facsimile)
cbutsavage@butsavage.com

*Co-Counsel for United Food & Commercial Workers Union Local 400*

EXHIBITS TO OBJECTION

Exhibit A - Excerpts from Local 1776 Collective Bargaining Agreement

Exhibit B - Excerpts from Local 400 Collective Bargaining Agreement

Exhibit C – April 30, 2011 Hearing Transcript, pp. 100–104

Exhibit D - Copies of Grievances

Exhibit E - *In re Agripac, Inc*., No. 699-60001-frall, Slip Op. at 9-12 (Bankr. D. Ore. April 2, 1999)