SCHULTE ROTH & ZABEL LLP
Adam C. Harris
Brian C. Tong
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 595-5955

Hearing Date:  June 14, 2011 at 10:00 a.m. ET
Objection Deadline:  June 7, 2011 at 4:00 p.m. ET

Attorneys for A-MCB White Oak LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                  :
**In re**                   :      **Chapter 11**
                  :
**THE GREAT ATLANTIC & PACIFIC**   :      **Case No. 10-24549 (RDD)**
    **TEA COMPANY, INC., et al.**     :
                  :
       **Debtors.**         :      **Jointly Administered**
                  :
------------------------------------------------------------------x

**OBJECTION OF A-MCB WHITE OAK LLC TO DEBTORS'**
**PROPOSED ASSUMPTION AND ASSIGNMENT OF THE**
**UNEXPIRED NON-RESIDENTIAL LEASE FOR A&P STORE #985**

A-MCB White Oak LLC ("White Oak"), by its undersigned counsel, hereby files

this objection (the "Objection") to the *Debtors' Motion For Entry of an Order (I) Approving Sale*

*of Lot 1 and Lot 2 Superfresh Stores to Mrs. Greens Management Corporation and Village Super*

*Market Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) The*

*Assumption and Assignment of Certain Unexpired Leases in Connection Therewith, and (III)*

*Granting Related Relief* (the "Motion"), dated May 30, 2011 [Doc. No. 1719], based on the

Debtors' proposed cure amount, failure to cure performance defaults, and failure to execute the

replacement subordination, non-disturbance and attornment agreement for the unexpired non-

residential lease for A&P Store #985.  In support of the Objection, White Oak respectfully states

as follows:

1.     White Oak currently leases non-residential real property to the Debtors at a shopping center located at 12028 Cherry Hill, White Oak, Maryland 21218 (A&P Store #985) under that certain Lease Agreement between White Oak, as successor landlord by assignment, and The Great Atlantic & Pacific Tea Company, Inc., as Tenant, initially dated February 13, 2001 (as amended, modified or supplemented from time to time, the "Lease").

2.     The Debtors have listed a $0 cure amount in Exhibit E to the Motion in connection with their proposed assumption and assignment of the Lease.

3.     White Oak hereby objects to the Debtors' proposed cure amount for the Lease. According to White Oak's books and records, the amount outstanding under the Lease, as of June 3, 2011, was $48,103.46 for June 2011 rent.  A copy of White Oak's aged delinquency report for the Lease is attached hereto as Exhibit A.   In addition, White Oak has accrued attorney's fees through May 31, 2011 (with such attorney's fees continuing to accrue) in the amount of $18,588.00 in connection with Debtors' defaults under the Lease.  Accordingly, the actual cure amount under the Lease, as of June 3, 2011, is no less than $66,691.46 (the "Actual Cure Amount").

4.     White Oak further objects to the Debtors' proposed assumption and assignment of the Lease based on Debtors' failure to cure existing performance defaults under the Lease. Debtors have failed to make numerous repairs and to properly maintain the property in accordance with their obligations under Article 9 and Section 10.3 of the Lease (the "Performance Defaults").  The Performance Defaults are set forth below:

       a.  Debtors have failed to provide the required number of handicap accessible parking spaces on the property.  The ADA requires eight such parking spaces, while Debtors currently only have four.

       b.  Debtors have failed to re-stripe, crack seal, and seal coat the asphalt pavements in the parking lot.

c. Debtors have failed to repair the metal grate landing at the entrance to the mezzanine equipment room.

d. Debtors have failed to install electrical panel covers and provide proper lock out / tag out of all electrical breakers where required.

e. Debtors have failed to provide permanent markings for a clear path to the fire sprinkler zone valves located on the loading dock.

f. Debtors have failed to provide proper signage for the fire department hose connection in the rear of the building.

g. Debtors have failed to scrape and paint the metal railings on and provide new base connections on the rear service stairs and ramp.

h. Debtors have failed to replace the expansion / sealant base joint along the perimeter of the exterior walls and columns of the building.

5. White Oak further objects to the Debtors' proposed assumption and assignment of the Lease based on the Debtors' failure to execute the final form of the subordination, non-disturbance and attornment agreement that was negotiated and agreed upon among the Debtors, White Oak and White Oak's lender (the "Replacement SNDA"). The Replacement SNDA contained several critically important modifications to the Lease (the "Lease Modifications"), including, without limitation, Debtors' deposit of letters of credit to White Oak's lender as a security deposit and for tenant improvement purposes, the creation of certain escrow accounts that Debtors were required to fund for tax purposes, and the creation of reserve accounts that Debtors were required to fund for replacements and repairs to the property. A copy of the Replacement SNDA is attached hereto as Exhibit B.

6. Debtors agreed to include the Lease Modifications to the Replacement SNDA pursuant to that certain letter agreement, dated February 13, 2001, executed by Debtors and sent to White Oak-Grocery LLC (as predecessor in interest to White Oak) and White Oak-Grocery's lender (the "Letter Agreement"). Under the Letter Agreement, Debtors agreed to make the Lease Modifications, in substantially the same form as the provisions included in Section 6 of the Lease Modification, Subordination, Non-Disturbance, and Attornment Agreement, dated February 13,

3

2001, among the Debtors, White Oak-Grocery LLC (predecessor in interest to White Oak) and White Oak-Grocery's lender (the "2001 SNDA"), if requested by White Oak's lender in connection with certain financing. White Oak's lender in fact negotiated and requested the Lease Modifications as part of the Replacement SNDA in connection with the financing it provided to White Oak, and Debtors have substantially complied with such Lease Modifications by assigning the requisite letters of credit to White Oak's lender and by funding the escrow and reserve accounts pursuant to their obligations under the Replacement SNDA. Debtors, however, have failed to deliver an executed Replacement SNDA to White Oak. Copies of the Letter Agreement and the 2001 SNDA are attached hereto as Exhibit C, and Exhibit D respectively.

7.     To the extent that rent, attorneys' fees, or other charges continue to accrue, and/or White Oak suffers other pecuniary losses with respect to the Lease, and/or Debtors' further default under the Lease, White Oak hereby reserves the right to (i) amend the Actual Cure Amount to reflect such additional amounts or to account for reconciliations and adjustments which may not have yet been billed or have not yet become due under the terms of the Lease, and (ii) assert other performance defaults under the Lease. Nothing contained herein shall constitute a waiver of any rights or remedies of White Oak under the Bankruptcy Code or applicable law, including, without limitation, the right to supplement this Objection or raise any other additional arguments at a later date.

## CONCLUSION

WHEREFORE, for the foregoing reasons, White Oak respectfully request that the Court enter an order (i) requiring that the Debtors and/or the proposed assignee to the Lease pay the Actual Cure Amount, plus any additional amounts or pecuniary losses that hereafter accrue (including attorneys' fees), in connection with the Debtor's proposed assumption and assignment

of the Lease, (ii) requiring that the Debtors and/or the proposed assignee to the Lease cure each of the Performance Defaults, (iii) requiring that the Debtors deliver the executed Replacement SNDA to White Oak, and (iv) granting such other and further relief as this Court deems just and proper.

Dated: June 7, 2011
      New York, New York

SCHULTE ROTH & ZABEL LLP

By:   */s/ Adam C. Harris*
     Adam C. Harris
     (A Member of the Firm)
     Brian C. Tong
919 Third Avenue
New York, New York 10022
Tel:    (212) 756-2000
Fax:   (212) 593-5955

Attorneys for A-MCB White Oak LLC

## <u>EXHIBIT A</u>

## White Oak's Aged Delinquency Report

| Invoice Date | Category | | Source | Amount | Current | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|---|---|---|

**0161-003858**    **Super Fresh Food Market**      Master Occupant Id: 00003361-1      Day Due:      Delq Day:

       00001    Current      Last Payment:    5/19/2011    946.24

| Invoice Date | Category | | Source | Amount | Current | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|---|---|---|
| 4/6/2011 | FMR | COMMERCIAL RENT | CR | -11,909.15 | 0.00 | -11,909.15 | 0.00 | 0.00 | 0.00 |
| 4/27/2011 | FMR | COMMERCIAL RENT | CR | -11,909.15 | 0.00 | -11,909.15 | 0.00 | 0.00 | 0.00 |
| 5/19/2011 | FMR | COMMERCIAL RENT | CR | -946.24 | -946.24 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6/1/2011 | FMR | COMMERCIAL RENT | CH | 72,868.00 | 72,868.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Super Fresh Food Market Total:** | | | 48,103.46 | 71,921.76 | -23,818.30 | 0.00 | 0.00 | 0.00 |
| | **BLDG 0161 Total:** | | | 48,103.46 | 71,921.76 | -23,818.30 | 0.00 | 0.00 | 0.00 |
| | **Grand Total:** | | | 1,106,357.27 | 661,132.48 | 72,008.07 | 8,904.22 | 114,919.34 | 249,393.16 |

## EXHIBIT B

## Replacement SNDA

# LEASE MODIFICATION, SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS LEASE MODIFICATION, SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") made the ___ day of April, 2011, among BANK OF AMERICA, N.A., a national banking association, as administrative agent for itself and certain other lenders (collectively, "Lender"), THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation ("Lessee" or "Guarantor") and **A-MCB WHITE OAK LLC**, a Maryland limited liability company ("Lessor").

## R E C I T A L S :

A.    White Oak-Grocery, LLC (predecessor in interest to Lessor) and Lessee entered into a certain lease dated February 13, 2001 (the "Lease") relating to the premises described in Exhibit A attached hereto and by this reference made a part hereof (hereinafter referred to as the "Premises").

B.    Lender has given a revolving line of credit (the "Loan") to Acadia Strategic Opportunity Fund III LLC, ("Fund III") secured by, among other things, an indemnity deed of trust or security deed (as the same may be amended, restated, extended, or otherwise modified from time to time, the "Mortgage") from Lessor to Lender covering certain property described therein (the "Property") including the Premises.

C.    Lessee has agreed that the Lease shall be subject and subordinate to the Mortgage held by Lender, provided Lessee is assured of continued occupancy of the Premises and non-disturbance under the terms of the Lease (as modified by this Agreement).

D.    As a condition to granting non-disturbance to Lessee, Lender requires that Lessee, Guarantor and Lessor consent and agree to modify and amend the Lease, to the extent and for the time periods as hereinafter provided.

E.    Capitalized terms used, but not otherwise defined herein, shall have the meanings assigned to such terms in the Lease. All references in this Agreement to the Lease shall mean the Lease, as modified and amended by this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and notwithstanding anything in the Lease to the contrary, it is hereby agreed as follows:

1.    <u>Subordination and Consent</u>.  Lender, Lessee and Lessor do hereby covenant and agree that the Lease with all rights, options, liens and charges created thereby (including, without limitation, any option or rights contained in the Lease, or otherwise existing, to acquire any or all of the Premises, or any superior leasehold interest therein), is and shall continue to be subject and

subordinate in all respects to the Mortgage and to any renewals, modifications, consolidations, replacements and extensions thereof and to all advancements made thereunder.

2. <u>Nondisturbance</u>. Lender does hereby agree with Lessee that, if Lender or its nominee becomes the fee simple owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, so long as Lessee complies with and performs its obligations under the Lease, (a) the Lease shall continue in full force and effect as a direct Lease between the succeeding owner of the Property and Lessee, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the Lease Term (including any Renewal Terms), and Lender will not disturb the possession of Lessee, and (b) the Premises shall be subject to the Lease and Lender shall recognize Lessee as the lessee of the Premises for the remainder of the Lease Term (including any Renewal Terms) in accordance with the provisions thereof; provided, however, that Lender shall not be:

      (i) subject to any claims, offsets or defenses which Lessee might have against any prior Lessor (including Lessor); or

      (ii) liable for any act or omission of any prior Lessor (including Lessor), provided that the foregoing shall not limit Lender's liability for its own acts or omissions after Lender becomes the owner of the Property even if such acts or omissions are the same as those of a prior Lessor; or

      (iii) bound by any rent or additional rent which Lessee might have paid for more than the current month or any security deposit or other prepaid charge paid to any prior Lessor (including Lessor); or

      (iv) bound by any amendment or modification of the Lease made without its written consent, to be granted or denied in accordance with Section 3 of this Agreement;

Nothing contained herein shall prevent Lender from naming Lessee in any foreclosure or other action or proceeding initiated by Lender pursuant to the Mortgage to the extent necessary under applicable Law in order for Lender to avail itself of and complete the foreclosure or other remedy, subject to the provisions of this Section 2. If Lender shall ever become the owner of the rights and interests of Lessor in and to the Property and the Lease by reason of judicial foreclosure, nonjudicial trustee's sale or other proceedings brought by Lender to enforce its rights under the Mortgage, or through any other means or manner in connection with the Loan, Lender shall be deemed to be Lessor's successor and assignee under the Lease (notwithstanding anything in the Lease prohibiting or restricting assignment by the Lessor or establishing conditions under which an assignment by the Lessor would be permitted) and shall be entitled to all rights, benefits and privileges of the Lessor under the Lease. Lessee acknowledges and agrees that to the extent it has any right or option of any nature whatsoever, whether pursuant to the Lease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, the same is hereby acknowledged to be subject and subordinate to the Mortgage and the Assignment of Leases, unless the Loan is paid off in connection with the exercise of such option as provided in the Lease.

3. <u>Attornment</u>. Lessee does hereby agree with Lender that, if Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, then Lessee shall attorn to and recognize Lender as the Lessor under the Lease for the remainder of the term thereof, and Lessee shall perform and observe its obligations thereunder, subject only to the terms and conditions of the Lease (as modified by this Agreement). Lessee further covenants and agrees to execute and deliver upon request of Lender an appropriate agreement of attornment to Lender and any subsequent titleholder of the Premises. Lessor and Lessee agree that the Lease shall not be amended, modified or terminated by mutual agreement in any manner or respect without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, and any purported amendment, modification or termination made without such consent shall be ineffective and void as to Lender.

4. <u>Lease Defaults and Lease Submissions</u>. (a) If Lessor shall fail to perform or observe any of the terms, conditions or agreements in the Lease, Lessee shall give written notice thereof to Lender and Lender shall have the right (but not the obligation) to cure such default.

(b) Lessee shall deliver to Lender simultaneous with any delivery to Lessor, any notices or submissions delivered by Lessee under the Lease. To the extent a response from Lessor to such notice or submission is required or permitted and a response period is specified in the Lease, Lender shall be permitted to respond and shall have the same period of time as Lessor within which to respond and, with respect to Lender, such period shall not commence unless and until such notices or submissions have been delivered to Lender. Any response from Lender received by Lessee shall be deemed to be a response from Lessor and shall be accepted as Lessor's response by Lessee, whether or not Lessor shall similarly respond in substance or manner inconsistent with Lender's response.

5. <u>Obligations and Liability of Lender/Indemnity by Lessor</u>. (a  Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, hazardous wastes or environmental laws, Lessor's title, Lessor's authority, habitability, fitness for purpose or possession. Furthermore, if Lender shall acquire Lessor's interest in the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Property, and Lessee shall look exclusively to such equity interest of Lender, if any, in the Property for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Lease (or under any new lease with Lessee), and in which case Lender is hereby released and relieved of any other obligations or liability hereunder, under the Lease or under any such new lease. Lender shall not, either by virtue of the Mortgage or this Agreement, be or become a mortgagee in possession or be or become subject to any liability or obligation under the Lease or otherwise until Lender shall have acquired the Lessor's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Lender under the Lease shall extend only to those liability or obligations accruing subsequent to the date that Lender has acquired Lessor's interest in the Property. Without limiting the generality of the foregoing, neither the Mortgage nor this Agreement shall, prior to Lender's acquisition of Lessor's interest in the Property, by foreclosure or otherwise, operate to place responsibility for the control, care, management or repair of the Property upon Lender or impose upon Lender responsibility for the carrying out of any of the terms or

conditions of the Lease, and Lender shall not be responsible or liable for any waste committed on either the Premises or the Property by any party whatsoever, for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of either the Premises or the Property. Notwithstanding anything to the contrary contained in this Agreement, for as long as the Loan remains outstanding, Lessor and Lessee agree that Lender shall have the right (but not the obligation) to enforce, in the name of Lessor or otherwise, the rights and benefits of Lessor under the Lease and under any guaranty thereof.

(b)     Lessor further agrees to indemnify Lender and Lender's directors, officers, employees and agents from, and hold each of them harmless against, (x) any and all losses arising out of or by reason of any investigation or litigation or other proceedings (including any threatened investigation or litigation or other proceedings) relating in any way to the performance or non-performance of Lenders obligations under this Agreement, including, without limitation, the fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceedings and (y) any and all claims, actions, suits, proceedings, costs, expenses, losses, damages and liabilities of any kind, including in tort, penalties and interest, arising out or by reason of any matter relating, directly or indirectly, to the Mortgage or the ownership, condition, development, construction, sale, rental or financing of the Property or any part thereof (but excluding any such losses, liabilities, claims, damages or expenses incurred solely by reason of the gross negligence or willful misconduct of the party to be indemnified).

6.     <u>Modifications to Lease</u>. Until the Maturity Date of the Loan (October 10, 2011) or the repayment in full of the Loan (other than as described in the last sentence of subsection 26.27(1) of the Lease), whichever is earlier, Lessor, Lessee, Guarantor and Lender acknowledge and agree that the following provisions shall apply and the Lease shall be modified and amended as follows. During such period, if any provision of this Agreement conflicts with any provision of the Lease, the terms and provisions of this Agreement shall control.

(a)     <u>Lessee's Right to Go Dark</u>. The following language shall be added to the end of the last sentence of Article 8 of the Lease: "provided, however, if at any time after the commencement of the seventh (7th) Lease Year the Improvements go Dark, (x) A&P shall be required to deliver to Lessor and Lender a guaranty of payment of an amount equal to Lender's commercially reasonable estimate of leasing commissions and tenant improvement costs applicable to are-letting of the Property for the remaining balance of the term of the BofA Loan, which guaranty shall be in form and substance reasonably satisfactory to Lender and, (y) Lessee shall be required to post Escrows and Reserves in the amounts and as required by Sections 26.27, 26.28 and 26.29 of this Lease if Lessee is not then maintaining Escrows and Reserves or, if Lessee is then maintaining Escrows and Reserves, such Escrows and Reserves in the amounts and as required by Sections 26.27, 26.28 and 26.29 of this Lease shall be maintained by Lessee notwithstanding any other provision herein permitting the Escrows and Reserves to be discontinued."

(b)     <u>Alteration Limitations</u>. In connection with the performance of Alterations by Lessee pursuant to Article 10 of the Lease, Lessee shall be required to provide Lessor with, at Lessee's option, either a payment and performance bond or a letter of credit

4

covering the cost of the Alteration, in each case in form and substance reasonably satisfactory to Lender, if:

(1) the rating on A&P's long-term unsecured debt during the performance of such Alteration is at any time equal to or less than the A&P the rating on A&P's long-term unsecured debt during the performance of such Alteration is at any time equal to or less than the A&P Trigger Credit Rating and the cost of such Alteration exceeds the lesser of (x) two (2) months Base Rent under the Lease and (y) $250,000.00; or

(2) the cost of the Alteration is in excess of 20% of the Property Value, unless A&P's long-term unsecured debt at all times during the performance of such Alteration is rated by Standard & Poor's at BBB+ or better and by Moody's at Baal or better and A&P is not on credit watch with either rating agency.

(c) Leasehold Mortgages Prohibited. Article 21 of the Lease shall be deleted in its entirety and replaced with the following: "Lessee shall not, without the prior written consent of Lender (which consent may be withheld in Lender's sole and absolute discretion), mortgage, encumber, or pledge the Lease or any part thereof, or permit the Lease or any part thereof to be mortgaged, encumbered, or pledged." Clause (h) of the definition of "Permitted Liens" shall be deleted.

(d) Restoration Limitations. If and for so long as the rating on A&P's long-term unsecured debt is equal to or less than the A&P Trigger Credit Rating, (1) the definition of "Threshold Amount" shall be changed to mean the lesser of: (i) $250,000.00 (as such amount is increased pursuant to the CPI adjustment set forth in such definition) or (ii) 25% of the Property Value and (2) the $1,000,000.00 amount set forth in Section 14.4(b)(vii) of the Lease shall be reduced to $250,000.00 (as such amount is increased pursuant to the CPI adjustment set forth in such Section).

(e) Assignment Limitations. Section 13.1 of the Lease shall be modified to provide that Lessee may not, without the prior written consent of Lender, which consent may be withheld or conditioned in Lender's sole and absolute discretion, assign its interest in the Lease to any Person who does not have at least an Investment Grade Rating.

(f) Use Limitations. The first sentence of Article 8 of the Lease is deleted and replaced with the following: "The Property may be used only for and as a supermarket and/or any other retail use, any office purpose, a restaurant (with or without a bar), a multi-family residential dwelling, or a warehouse or other storage facility (other than a self-storage facility); provided that such uses shall not include the prohibited uses identified on Schedule F annexed hereto. The Property may also be used for any other use in addition to or in lieu of the uses identified in the preceding sentence to the extent that the Rating Agencies covering the securitized Loan made by Lender confirm such other use will not result in a credit rating downgrade of the securities issued in connection with the Loan, or if the Loan is less than 5% of the applicable pool, confirm that, were the

amount of such Loan 5% or more of the applicable pool, such other use would not result in a credit rating downgrade of the securities issued in connection with the Loan."

(g)     Escrows and Reserves.  The following new Sections 26.27, 26.28 and 26.29 shall be added to the Lease:

Section 26.27 Escrows and Reserves.

(1)     Lessee agrees to deposit with and deliver to Lender Escrows and Reserves on the date hereof and thereafter to maintain such Escrows and Reserves, in each case in the manner required under Section 26.28 and Section 26.29 of this Lease. Provided that no Event of Default has occurred and is continuing under this Lease and Lessee's interest in the Lease has not been assigned to a Person who does not have at least an Investment Grade Rating, upon satisfaction of the Release Condition (as hereinafter defined) all unutilized Escrows and Reserves shall be returned to Lessee and no further deposits or escrows shall be required if and for so long as A&P maintains a Minimum Rating. If at anytime after Escrows and Reserves are no longer required of Lessee hereunder, A&P's credit rating falls below the Minimum Rating, Lessee shall be required, at Lender's request, to deposit and maintain Escrows and Reserves with Lender as required under Sections 26.28 and 26.29 of this Lease. Upon repayment in full of the BofA Loan (other than through judicial or non-judicial foreclosure of the Mortgage or deed in lieu), all unutilized Escrows and Reserves shall be returned to Lessee. If the BofA Loan is repaid in full through judicial or non-judicial foreclosure of the Mortgage or deed in lieu), all unutilized Escrows and Reserves shall be returned to lessee.  If the BofA Loan is repaid in full through judicial or non-judicial foreclosure of the Mortgage or deed in lieu Lessee shall be required to maintain Escrows and Reserves until the Maturity Date of the BofA Loan for the benefit of any successor Lessor to the extent required to do so under Section 26.28 and 26.29 of this Lease.

(2)     All Escrows and Reserves (other than those delivered in the form of letters of credit) shall be deposited in interest bearing accounts at an institution or institutions selected by Lender and all interest on such Escrows and Reserves shall become part of the Escrows and Reserves and shall be held or disbursed in the same manner as other funds in such Escrows and Reserves.

(3)     Lessor and Lender agree that Lender shall (i) apply the Tax Escrow Fund (as defined in Section 26.28 below) to the payment of Taxes and as required by this Lease and (ii) make disbursements from the Replacement Reserve Fund (as defined in Section 26.29 below) to Lessee in accordance with the terms and provisions of Section 26.29 below.

Section 26.28.   Tax Escrow Fund. Beginning on the date hereof, and on the first day of each calendar month thereafter, Lessee shall pay to Lender (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable at least thirty (30) days prior to delinquency of the Taxes during the next ensuing twelve (12) months (said

amount hereinafter called the "<u>Tax Escrow Fund</u>"). Lender may, in its sole discretion, retain a third party tax consultant to obtain tax certificates or other evidence or estimates of tax due or to become due or to verify the payment of taxes and Lessee will promptly reimburse Lender for the reasonable cost of retaining any such third parties or obtaining such certificates. Any such reimbursements for the aforesaid shall constitute Additional Rent payable by Lessee under this Lease. At the request of Lessee or Lessor (accompanied by copies of the tax bill and specifying the payee thereof) and provided no Event of Default has occurred and is continuing, Lender shall promptly, but in no event later than ten (10) Business Days after receipt of such request, apply funds in the Tax Escrow Fund to the payment of Taxes as and when due and payable, in the form of one or more checks payable to the specified payee sent to Lessee, who shall make payment thereof and provide evidence of payment of Taxes to Lender. Payments to the Tax Escrow Fund payable hereunder shall constitute Additional Rent under this Lease. Lessee hereby pledges to Lender any and all monies now or hereafter deposited in the Tax Escrow Fund as additional security for the payment and performance of Lessee's obligations under this Lease; <u>provided</u>, <u>however</u>, such funds shall be held by Lender and shall only by applied to pay Taxes as provided in this Section. Lender will apply the Tax Escrow Fund to payments of Taxes required to be made by Lessor pursuant to the terms of this Lease. In making any payment relating to the Tax Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lessee is contesting Taxes in compliance with the terms and provisions of this Lease regarding contest of Taxes then, upon request of Lessee, Lender shall retain the amount of any contested Tax payment in the Tax Escrow Fund pending resolution of such contest or the failure by Lessee to satisfy any of the conditions in this Lease regarding the contest of Taxes. If the amount of the Tax Escrow Fund shall exceed the amounts due for Taxes, Lender shall, in its discretion, credit such excess against future payments to be made to the Escrow Fund. If at any time Lender determines that the Tax Escrow Fund is not or will not be sufficient to pay the items set forth above, Lender shall notify Lessee of such determination and Lessee shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Tax Escrow Fund to the payment of Taxes

(4)     As of the date hereof, the balance of the Tax Escrow Fund, which Lessor and Lessee hereby agree to transfer to Lender per instructions to be provided by Lender, is $_____.

Section 26.29 <u>Other Reserve Funds</u>.

(1)     <u>Replacement Reserve Fund</u>. Lessee shall pay to Lender on the first day of each calendar month, an amount equal to one-twelfth (l/12th) of the Replacement Reserve Annual Amount (hereinafter defined) for replacements and repairs to the Property (the "Replacement Reserve Fund"). As used herein, "Replacement Reserve Annual Amount" shall mean an amount equal to $0.15 multiplied by the square footage of the Improvements (i.e. $9,694.00). Lessee hereby pledges (and grants a lien and security interest) to Lender any and all monies now or hereafter deposited in the Replacement Reserve Fund as additional security for the payment and

performance of Lessee's obligations under this Lease, _provided_, _however_, as long as no Event of Default shall have occurred and is continuing, such funds shall be held by Lender and shall only be applied to the payment of replacements and repairs as provided in this Section 26.29. Notwithstanding the foregoing, Lender may reassess its estimate of the amount necessary for the Replacement Reserve Fund from time to time and in its reasonable discretion, and may adjust the monthly amounts required to be deposited into the Replacement Reserve Fund after giving thirty (30) days notice to Lessee. Provided that no Event of Default shall exist and remain uncured, Lender shall make disbursements from the Replacement Reserve Fund as requested, in writing, by Lessee, and approved by Lender (such approval not to be unreasonably withheld or conditioned), on a quarterly basis in increments of no less than $2,500 upon delivery by Lessee of copies of paid invoices (or with respect to requests in excess of $10,000, unpaid invoices) for the amounts requested and a certification from lessee stating: (A) the nature and type of the related replacement or repair, (B) that the related replacement or repair has been completed in a good and workmanlike manner and (C) that the related replacement or repair has been paid for in full (or, with respect to requests in excess of $10,000, will be paid for in full from the requested disbursement). Lender may require an inspection of the Property at Lessee's reasonable expense prior to making a disbursement in order to verify completion of replacements and repairs for which reimbursement is sought in any circumstance where the total cost of the repair or replacement project exceeds $100,000. The Replacement Reserve Fund is solely for the payment of the costs and expenses described in this Section in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Replacement Reserve Fund to the payment of replacements and capital repairs as provided in this Section 26.29.

(2)    As of the date hereof, the balance of the Replacement Reserve Fund, which Lessor and Lessee hereby agree to transfer to Lender per instructions to be provided by Lender, is $_____.

(3)    Tenant Improvement/Leasing Commission Letter of Credit.  Lessee has, on the date hereof, deposited with Lender an irrevocable letter of credit (together with any renewal, extension or replacement thereof, the "TI Letter of Credit") in an amount equal to the Leasing Reserve Annual Amount (hereinafter defined) for the anticipated cost of tenant improvement expenditures and leasing commissions in connection with leases projected to be entered into by Lessee at the Property and as security for the faithful performance and observance by Lessee of the terms, conditions and provisions of this Lease. As used herein, "Leasing Reserve Annual Amount" shall mean an amount equal to $397,461.00. The TI Letter of Credit is solely for the protection of Lender and entails no responsibility or obligation on Lender's part beyond the payment of the costs and expenses described in this section in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon the occurrence of an Event of Default, Lender may apply any sums drawn from the TI Letter of Credit to the payment of leasing commissions and tenant improvement costs as provided in this Section incurred by Lender or, subject to the terms of the Mortgage, incurred by Lessor, or to the payment of any sum as to which Lessee is in default or for any sum which Lessor or Lender may have expended or may be required to expend by reason of Lessee's default, including any damages or deficiency accrued before or after summary proceedings or other re-entry by Lessor. Notwithstanding anything to the contrary contained herein, following the occurrence of an Event of Default and

the repayment in full of the BofA Loan, any proceeds from the TI Letter of Credit remaining shall be delivered to Lessor upon written request of Lessor and may be applied by Lessor to pay any sums due and owing from Lessee to lessor under this Lease; provided that, Lessor shall not be entitled to receive any proceeds of the TI Letter of Credit from Lender unless and until the Lease has been terminated. Lessor shall promptly deliver a copy of any request sent to Lender for proceeds of the TI Letter of Credit to Lessee. If Lender draws upon the TI Letter of Credit and applies or retains any portion or all of the sum received upon such draw, Lessee shall forthwith take such action as is necessary to restore the face amount of the TI Letter of Credit so that at all time the amount of the TI Letter of Credit shall be equal to the Leasing Reserve Annual Amount.

(4) <u>Rent Letter of Credit</u>. Lessee has, on the date hereof, delivered to Lender a letter of credit (together with any renewal, extension or replacement thereof, the "Rent Letter of Credit") issued in favor of Lender in an amount equal to $397,461.00 (the "Rent Security Amount"), as security for the faithful performance and observance by Lessee of the terms, conditions and provisions of this Lease, including without limitation the payment of Base Rent, Additional Rent and all other sums of any nature whatsoever due and payable under this Lease and the surrender of possession of the Property to Lessor as herein provided. If Lessee defaults in respect of any of the terms of this Lease including, but not limited to, the payment of Base Rent and Additional Rent after the expiration of any applicable notice and cure periods, Lender may, at its election, draw upon the Rent Letter of Credit to the extent required for the payment of any sum as to which Lessee is in default or for any sum which Lessor or Lender may have expended or may be required to expend by reason of Lessee's default, including any damages or deficiency accrued before or after summary proceedings or other re-entry by Lessor. In addition, Lender may draw upon the Rent Letter of Credit to the extent required to compensate Lender or Lessor for the actual costs incurred by Lessor or Lender in re-leasing the Property. Notwithstanding anything to the contrary contained herein, following the occurrence of an Event of Default and the repayment in full of the BofA Loan, any proceeds from the Rent Letter of Credit remaining shall be delivered to Lessor upon written request of Lessor and may be applied by Lessor to pay any sums due and owing from Lessee to Lessor under this Lease, provided that, Lessor shall not be entitled to receive any proceeds of the Rent Letter of Credit from Lender unless and until the Lease has been terminated. Lessor shall promptly deliver a copy of any request sent to Lender for proceeds of the Rent Letter of Credit to Lessee. If Lender draws upon the Rent Letter of Credit and applies or retains any portion or all of the sum received upon such draw, Lessee shall forthwith take such action as is necessary to restore the face amount of the Rent Letter of Credit so that at all times the amount of the Rent Letter of Credit shall be equal to the Rent Security Amount.

(5) <u>The Letters of Credit</u>. Each Letter of Credit shall be an irrevocable, unconditional letter of credit with an initial term of not less than one year. Without further act or instrument required by Lender, each Letter of Credit shall be automatically renewed for successive one year periods throughout the remainder of the term of the BofA Loan unless, not less than 30 days prior to the then current expiration date of the Letter of Credit the issuing bank notifies Lender of its intention not to renew the Letter of Credit. Each Letter of Credit (or any renewal, extension or replacement thereof) shall continue in full force and effect and shall be maintained in its full face amount for two full calendar months beyond the expiration of the term of the BofA Loan. Each

Letter of Credit shall (i) be negotiable and freely transferable in connection with a transfer by Lender of all or any portion of its interest in the BofA Loan or the Property, subject to the provisions of clause (f) below; (ii) be issued by a New York City banking institution reasonably acceptable to Lender which is a member of the New York Clearing House Association; (iii) provide for payment of all or any portion of the face amount of the Letter of Credit to Lender upon the receipt by the issuing bank of a statement signed by a representative of Lender that Lender is entitled to such amount pursuant to the terms of this Lease and (iv) be otherwise in form and substance reasonably satisfactory to Lender. Lender's receipt of notice from the issuing bank of its intention not to renew any Letter of Credit or Lessee's failure to deliver a renewal or replacement Letter of Credit shall entitle Lender, at its option, to draw the full face amount of such Letter of Credit and retain such sum as security hereunder in lieu of the Letter of Credit. In addition, if any Letter of Credit does not permit multiple draws, Lender may, at its option, draw the full face amount of each Letter of Credit for application of proceeds as provided herein and, to the extent any proceeds remain, Lender may then hold the balance of such proceeds as case security. Lessee's failure to maintain any Letter of Credit or to substitute a cash deposit as a replacement therefore shall constitute a Default under this Lease.

(6)     <u>Holders of the Letters of Credit</u>. Custody of the Letters of Credit shall be retained by Lender or by one or more Permitted Holders until such time as the Letters of Credit, if any, are required to be returned to Lessee or A&P in accordance with the terms of Section 26.27 of this Lease.

(h)     <u>Definitions</u>. The following definitions shall be added to Section 1.2 of the Lease:

"<u>A&P Trigger Credit Rating</u>" shall mean a credit rating on A&P's unsecured long-term debt of either (x) B+ from Standard & Poor's or BB- on credit watch with negative implications from Standard & Poor's or (y) B1 from Moody's or Ba3 on credit watch with negative implications from Moody's.

"<u>BofA Loan</u>" shall mean that certain revolving line of credit given by Bank of America, N.A. to Acadia Strategic Opportunity Fund III LLC ("Fund III") which is secured by, among other things, the Mortgage covering the Property.

"<u>Dark</u>" shall mean if neither Lessee (nor an assignee) nor a sublessee or sublessees under Subleases (whether or not Qualified Subleases) are in occupancy of substantially all of the Supermarket Space and open for business (i) during the seventh (7th) and eighth (8th) Lease Years, for a period of at least six (6) consecutive months, or (ii) during the ninth (9th) Lease Year, immediately upon the cessation of business at the Property. "Dark" shall not include cessation of occupancy as a result of permitted alterations, casualty or condemnation or cessation of occupancy if the sole cause is an Unavoidable Delay.

"<u>Escrows</u>" shall mean the Tax Escrow Fund as defined in Section 26.28.

"Investment Grade Rating" means a credit rating of BBB- or better and not on credit watch with negative implications with Standard & Poor's and Baa3 or better and not on credit watch with negative implications with Moody's.

"Lease Year" shall mean each successive twelve month period commencing on February 1 and ending on January 31, provided that the first Lease Year shall commence on the date of this Lease and shall end on January 31, 2002.

"Letters of Credit" shall mean, collectively, the TI Letter of Credit and the Rent Letter of Credit, and "Letter of Credit" shall mean any one of the foregoing Letters of Credit.

"Minimum Rating" shall mean a credit rating on A&P's unsecured long term debt of BBB-or better with Standard & Poor's and Baa3 or better with Moody's.

"Mortgage" shall mean the mortgage or deed of trust covering the Property given by Lessor to secure the BofA Loan.

"Permitted Holders" shall mean any Institutional Lender or group of Institutional Lenders, any reputable servicer or custodian acting on behalf of an Institutional Lender or Lenders.

"Release Condition" shall mean that A&P shall have obtained credit ratings on A&P's unsecured long-term debt of BBB+ or better from Standard & Poor's, Baal or better from Moody's and an equivalent credit rating from all other nationally recognized rating agencies providing a rating on A&P's unsecured long term debt.

"Reserves" shall mean the Replacement Reserve Fund as such term is defined in Section 26.29 and the Letters of Credit.

"Taxes" shall mean all Impositions.

In addition, the definition of "Default Rate" shall be modified by adding the following language after the word "mean": the greater of (1) 5% above the annual rate announced by Citibank, N.A. in New York City, New York, as its base rate as in effect at the time of such default and (2)".

(i) Late Charges. If, as a result of the occurrence of an Event of Default under the Lease, any sum payable under the Loan is not paid on or before the third (3rd) day after the date on which it is due, Lessee shall pay to Lessor upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lessor (or Lender) in handling and processing such delinquent payment and to compensate Lessor and Lender for the loss of the use of such delinquent payment and such amount shall constitute Additional Rent under the Lease.

(j)     Intentionally Deleted.

(k)     <u>Cooperation</u>.  Lessee and Guarantor acknowledge that Lender and/or its successors and assigns may (i) sell the Mortgage to one or more investors, (ii) participate the BofA Loan secured by the Mortgage to one or more investors, (iii) deposit the Mortgage with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the BofA Loan or interest therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as a "Secondary Market Transaction").   Lessee and Guarantor shall cooperate with Lender in effecting the first Secondary Market Transaction  and shall cooperate to implement all requirements imposed by any Rating Agency involved in such Secondary Market Transaction, including but not limited to, (a) providing Lender an estoppel certificate in accordance with the provisions of Section 26.9 of the Lease and such reasonable information, legal opinions and documents relating to Lessee, Guarantor, if any, the Property and any tenants of the Property as Lender or the Rating Agencies may reasonably request in connection with such Secondary Market Transaction, (b) participating in bank, investors and Rating Agencies' meetings if requested by Lender, and (c) reviewing the offering documents relating to such Secondary Market Transaction to ensure that all information concerning Lessee and the Property is correct, and certifying to the accuracy thereof.

(l)     <u>Handicapped Access</u>. (i) Lessee agrees that the Property shall at all times comply in all material respects with applicable requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws"). Lessee's obligation hereunder shall be deemed to be an obligation of Lessee under Section 10.3(a) of the Lease which is subject to Lessee's rights set forth in Sections 10.3(a) and 10.4(b) of the Lease.

(ii)     Lessee agrees to give prompt notice to lender of any material action or complaint or threat of material litigation received by Lessee related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(m)     <u>Insurance</u>.  Schedule G of the Lease is hereby supplemented by adding the following new clause (h):  "(h) True and correct copies of all policies required by Section (a) above shall be made available for inspection by Lender at the offices of Lessee set forth on the first page of this Lease on at least 48 hours prior notice, provided that Lessee shall have the right to redact from such copies any proprietary information that does not relate in any way to the Property or to insurance coverage relating to the Property."

(n)     <u>Permits</u>.  Promptly following the request of Lender, Lessee shall provide to Lender copies of any Governmental Licenses relating to the operation of the Property or affecting Lessor or owner of the Property.

(7)     Severability. If any portion or portions of this Agreement shall be held invalid or inoperative, then all of the remaining portions shall remain in full force and effect, and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion or portions held to be invalid or inoperative.

(8)     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State where the Property is located.

(9)     Notices.  So long as the Mortgage remains outstanding and unsatisfied, Lessee will mail or deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to the Lessor by Lessee under and pursuant to the terms and provisions of the Lease. All notices or other communications required or permitted to be given pursuant to the provisions hereof shall be in writing and shall be considered as properly given if (i) mailed to the addressee by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the addressee, or (iii) by delivery to a third party commercial delivery service for same day or next day delivery to the office of the addressee with proof of delivery. Notice so given shall be effective, as applicable, upon (i) the third (3rd) day following the day such notice is deposited with the U.S. Postal Service, (ii) delivery to the addressee, or (iii) upon delivery to such third party delivery service. Notice given in any other manner shall be effective only if and when received by the addressee. For purposes of notice, the addresses of the parties shall be:

<blockquote>
Lender:     Bank of America, N.A.<br/>
            One Bryant Park, 35th Floor<br/>
            New York, New York 10036<br/>
            Attn: Mr. Peter Panagoulius

            With a copy to:

            Bank of America, N.A.<br/>
            Hearst Tower<br/>
            214 N. Tryon Street<br/>
            Mail Code:   NC1-027-21-04<br/>
            Charlotte, North Carolina 28255<br/>
            Attn:  Mr. Robert R. Wood

            and

            Schiff Hardin LLP<br/>
            900 Third Avenue, 23rd Floor<br/>
            New York, New York 10019<br/>
            Attn: Paul Mackey, Esq.

Lessor:     A-MCB White Oak LLC<br/>
            c/o Acadia Realty Trust<br/>
            1311 Mamaroneck Avenue, Suite 260
</blockquote>

White Plains, New York 10605
Attn: Robert Masters, Esq.

Lessee:        The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, NJ 07645
Attn: General Counsel

Notwithstanding the foregoing, any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other parties in the manner set forth herein.

(10)    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, successors-in-title and assigns. When used herein, the term "Lessor" refers to Lessor and to any successor to the interest of Lessor under the Lease and "Lender" refers to Lender and to any assignee of the note secured by the Mortgage and Lender's servicer of the Loan, if any.

(11)    <u>Lessee's Personal Property</u>. In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Lessee's Equipment and Personalty or other personal property at any time placed on or about the Premises.

(12)    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

(13)    <u>Headings</u>. The headings, captions and arrangements used in this Agreement are for convenience and shall not affect the interpretation of this Agreement.

(14)    <u>Guarantor</u>. Guarantor, as the guarantor of Lessee's obligations under the Lease, has executed this Agreement for the purpose of acknowledging and consenting to this Agreement. Guarantor agrees to be bound by the terms of this Agreement and confirms that the guaranty executed by Guarantor includes a guaranty of all of Lessee's obligations hereunder.

(15)    <u>No Construction Obligations</u>. Lessee hereby acknowledges and agrees that, as set forth in Section 3.5 of the Lease, Lessor has no obligation to make, pay for, or reimburse Lessee for any alterations, demolition, or other improvements or work at the Property.

(16)    <u>Sublessee SNDA's</u>. Lender hereby agrees to execute and deliver a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit B</u> with respect Qualified Sublease promptly following written request Lessee.

**(Signature page follows)**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the date first above written.

**LENDER:**

BANK OF AMERICA, N.A.
a national banking association,
as administrative agent

By: _____
         Name:
         Title:

**LESSEE AND GUARANTOR:**

THE GREAT ATLANTIC & PACIFIC
TEA COMPANY, INC., a Maryland
corporation

By: _____
         Name:  Christopher W. McGarry
         Title:   Senior Vice President

**LESSOR:**

A-MCB WHITE OAK LLC,
A Maryland limited liability company

By: _____
         Name:
         Title:

STATE OF _____

COUNTY OF _____

On this the _____ day of _____, 2011, before me, a Notary Public, personally appeared _____ _____, who acknowledged himself/herself/themselves to be the _____ of BANK OF AMERICA, N.A., a national banking association, and that he/she/they, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the national banking association by himself/herself/themselves as _____ _____.

In witness whereof I hereunto set my hand and official seal.

_____

NOTARY PUBLIC

Print Name: _____

My Commission Expires:

_____

STATE OF _____

COUNTY OF _____

On this the _____ day of _____, 2011, before me, a Notary Public, personally appeared _____ _____, who acknowledged himself/herself/themselves to be the _____ of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation, and that he/she/they, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself/herself/themselves as _____ _____.

In witness whereof I hereunto set my hand and official seal.

_____

NOTARY PUBLIC

Print Name: _____

My Commission Expires:

_____

STATE OF _____

COUNTY OF _____

On this the _____ day of _____, 2011, before me, a Notary Public, personally appeared _____ _____, who acknowledged himself/herself/themselves to be the _____ of A-MCB WHITE OAK, LLC, a Maryland limited liability company, and that he/she/they, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the company by himself/herself/themselves as _____ _____.

In witness whereof I hereunto set my hand and official seal.

_____

NOTARY PUBLIC

Print Name: _____

My Commission Expires:

_____

# EXHIBIT A

BEGINNING at a capped rebar found at the southerly right-of-way line of Broadbirch Drive (80 foot wide right-of-way), said point being located at the northeasterly terminus of a line connecting said Broadbirch Drive with the easterly right-of-way line of Plum Orchard Drive (80 foot wide right-of-way), and from said point of beginning running, thence;

1.      Along the southerly right-of-way line of Broadbirch Drive, along the arc of a curve to the left, having radius of 1,040.00 feet, turning a central angle of 20 degrees 48 minutes 13 seconds, and arc length of 377.62 feet, the chord bearing north 82 degrees 11 minutes 17 seconds, east and a chord distance of 375.54 feet to a drill hole set at a point of tangency, thence;

2.      Continuing along the southerly right-of-way line of Broadbirch Drive, north 71 degrees 47 minutes 10 seconds east, a distance of 166.09 feet to a point, thence;

3.       Leaving said Broadbirch Drive, and running along the common dividing line between Parcel VVV and Parcels YYY & CCCC, along the arc of a curve to the right, having a radius of 8,273.28 feet, turning a central angle of 02 degrees 00 minutes 59 seconds, and arc length of 291.15 feet, a chord bearing south 16 degrees 55 minutes 44 seconds east and a chord distance of 291.13 feet to a P.K. nail set for a point of tangency, thence;

4.      Continuing along the dividing line between Parcels VVV & CCCC, south 15 degrees 55 minutes 14 seconds east, a distance of 56.40 feet to a P.K. nail found, thence;

Running the following courses and distances along the dividing line between Parcels VVV & WWW, lands now or formerly Kohl's Department Stores, Inc.:

5.      South 64 degrees 58 minutes 23 seconds West, a distance of 426.28 feet to a P.K. nail found, thence;

6.      North 71 degrees 21 minutes 03 seconds West, a distance of 278.00 feet to a point, thence;

7.      North 18 degrees 08 minutes 49 seconds West, a distance of 123.03 feet to a' point, thence;

8.      North 70 degrees 34 minutes 55 seconds West, a distance of 27.82 feet to a P.K. nail found on the aforementioned right-of-way line of Plum Orchard Drive, thence;

9.      Along an easterly right-of-way line of Plum Orchard Drive, along the arc of a curve to the left, having a radius of 3,999.70 feet, turning a central angle of 02 degrees 34 minutes 57 seconds, an arc length of 180.24 feet to a drill hole set, thence;

10.     Along a line connecting the easterly right-of-way line of Plum Orchard Drive, with the southerly right-of-way line of Broadbirch Drive, north 54 degrees 21 minutes 59 seconds east, a distance of 38.90 feet to the point and place of beginning.

[QUALIFIED SUBLEASE]


SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") made this _ day of _____ 2011, among BANK OF AMERICA, N.A., a national banking association ("Lender"), _____ ("Subtenant"), and _____ _____, a _____ ("Sublandlord")

RECITALS:

A.      Sublandlord and Subtenant have entered into a Certain sublease dated _____ _____ which sublease has been amended as follows: _____ (collectively, the "Sublease"), relating to the premises described in Exhibit A attached hereto and by this reference made a part hereof (the "Premises").

B.      _____ ("Owner") has acquired from Sublandlord the property (the "Property") described in Exhibit A attached hereto, which Property includes the Premises, and Owner has subsequently leased-back the Property to Sublandlord pursuant to that certain Agreement of Lease (the "Overlease") dated _____, between Owner and Sublandlord.

C.      Lender has given a revolving line of credit to Acadia Strategic Opportunity Fund III LLC (the "Loan") secured by various mortgages, as well as a mortgage, deed of trust, or security deed (as the same may be amended, restated, extended, or otherwise modified from time to time, the "Mortgage") and an assignment of leases and rents (as the same may be amended, restated, extended, or otherwise modified from time to time, the "Assignment of Leases") from Owner to Lender covering the Property including the Premises.

D.      Subtenant has agreed that the Sublease shall be subject and subordinate to the Overlease, the Mortgage and the Assignment of Leases held by Lender, provided Subtenant is assured of continued occupancy of the Premises under the terms of the Sublease, except as modified herein.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and notwithstanding anything in the Sublease to the contrary, it is hereby agreed as follows:

1.      <u>Subordination and Consent</u>.  Lender, Subtenant and Sublandlord do hereby covenant and agree that the Sublease with all rights, options, liens and charges created thereby (including, without limitation, any option or rights contained in the Sublease, or otherwise

existing, to acquire any or all of the Premises, or any superior leasehold interest therein), is and shall continue to be subject and subordinate in all respects to the Overlease, the Mortgage and the Assignment of Leases and to any renewals, modifications, consolidations, replacements and extensions thereof and to all advancements made thereunder, subject to the provisions of this Agreement and to the Lessor Subordination, Non-Disturbance, and Attornment Agreement dated as of the date hereof.  Subtenant acknowledges that Owner will execute and deliver to Lender an assignment of the Overlease as security for the Loan, and Subtenant hereby expressly consents to such assignment.  Subtenant agrees that if there is a default by Sublandlord in the performance and observance of any of the terms of the Overlease and the Overlease is terminated, Lender may, at its option, demand all rents due under the Sublease be paid by Subtenant directly to Lender at the address specified below, or as otherwise specified by Lender.  Subtenant agrees that upon Lender's written request for payment of rent directly to Lender, Subtenant will timely remit any and all payments due under the Sublease directly to, and payable to the order of, Lender.  Such payments to Lender will constitute performance of Subtenant's payment obligations under the Sublease.

      2.   <u>Nondisturbance</u>.  Lender does hereby agree with Subtenant that, if Lender or any third party becomes the fee simple owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise and if the Overlease is terminated, so long as Subtenant is not in default under the Sublease beyond the applicable cure or grace period, (a) the Sublease shall continue in full force and effect as a direct Sublease between the succeeding owner of the Property and Subtenant, upon and subject to all of the terms, covenants and conditions of the Sublease, for the balance of the term of the Sublease (as same may be extended), and Lender will not disturb the possession of Subtenant, and (b) the Premises shall be subject to the Sublease and Lender shall recognize Subtenant as the subtenant of the Premises for the remainder of the term of the Sublease (as same may be extended) in accordance with the provisions thereof; provided, however, that:

      (i) Lender or such third party shall not be subject to any claims, offsets or defenses which Subtenant might have against any prior sublandlord (including Sublandlord); or

      (ii) Lender or such third party shall not be liable for any act or omission of any prior sublandlord (including Sublandlord), provided that the foregoing shall not limit Lender's liability for its own acts or omissions after Lender becomes the owner of the Property even if such acts or omissions are the same as those of the prior sublandlord (including Sublandlord); or

      (iii) Lender or such third party shall not be bound by any rent or additional rent which Subtenant might have paid for more than the current month or any security deposit or other prepaid charge paid to any prior sublandlord (including Sublandlord) except to the extent required by the Sublease and, unless such security deposit has physically been received by Lender; or

      (iv) If, without the prior written consent of Lender, there is any amendment, cancellation, termination or modification of the Sublease which would cause the Sublease

to cease to be a Qualified Sublease (as defined in the Overlease, which definition is set forth on Exhibit B attached hereto) or would cause the Qualified Sublease to meet the criteria set forth in Section 13.4(a) of the Overlease (as set forth on Exhibit "C" attached hereto), then, in either of such events, this Agreement shall automatically terminate with respect to the Sublease and the nondisturbance provisions of this Section 2, but not with respect to the subordination of the Sublease and the provisions contained in Section 1 of this Agreement.

Nothing contained herein shall prevent Lender from naming Subtenant in any foreclosure or other action or proceeding initiated by Lender pursuant to the Mortgage to the extent necessary under applicable law in order for Lender to avail itself of and complete the foreclosure or other remedy, subject to the provisions of this Article 2. Subtenant acknowledges and agrees that it has no right or option of any nature whatsoever, whether pursuant to the Sublease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, and to the extent that Subtenant has had, or hereafter acquires, any such right or option, the same is hereby acknowledged to be subject and subordinate to the Mortgage and is hereby waived and released as against Lender.

3.    Attornment.  Subtenant does hereby agree with Lender that, in the event Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise and the Overlease is terminated, then Subtenant shall attorn to and recognize Lender as the sublandlord under the Sublease for the remainder of the term thereof (and any extensions, if exercised), and Subtenant shall perform and observe its obligations thereunder, subject only to the terms and conditions of the Sublease, except as modified herein. Subtenant further covenants and agrees to execute and deliver upon request of Lender an appropriate agreement of attornment to Lender and any subsequent titleholder of the Premises.

4.    Sublease Defaults.  In the event Sublandlord shall fail to perform or observe any of the terms, conditions or agreements in the Sublease, Subtenant shall give written notice thereof to Lender and Lender shall have the right (but not the obligation) to cure such default. Subtenant shall not take any action with respect to such default under the Sublease, including without limitation any action in order to terminate, rescind or avoid the Sublease or to withhold any rent or other monetary obligations thereunder, for a period of thirty (30) days following receipt of such written notice by Lender; provided, however, that in the case of any default which cannot with diligence be cured within said thirty (30) day period, if Lender shall proceed promptly to cure such default and thereafter prosecute the curing of such default with diligence and continuity, the time within which such default may be cured shall be extended for such period as may be necessary to complete the curing of such default with diligence and continuity.

5.    Obligations and Liability of Lender.  Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Sublease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, hazardous wastes or environmental laws, Sublandlord's title, Sublandlord's authority, habitability, fitness for purpose or possession. Furthermore, if Lender shall acquire Sublandlord's interest in the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Property, and Subtenant shall look exclusively

to such equity interest of Lender, if any, in the Property for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Sublease (or under any new sublease with Subtenant), and Lender is hereby released and relieved of any other obligations or liability hereunder, under the Sublease or under any such new sublease. Lender shall not, either by virtue of the Mortgage, the Assignment of Leases or this Agreement, be or become a mortgagee in possession or be or become subject to any liability or obligation under the Sublease or otherwise until Lender shall have acquired the Sublandlord's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Lender under the Sublease (as modified by the terms of this Agreement) shall extend only to those liabilities or obligations accruing subsequent to the date that Lender has acquired Sublandlord's interest in the Property. Without limiting the generality of the following, neither the Mortgage, the Assignment of Leases nor this Agreement shall, prior to Lender's acquisition of Sublandlord's interest in the Property, by foreclosure or otherwise, operate to place responsibility for the control, care, management or repair of the Property upon Lender or impose upon Lender responsibility for the carrying out of any of the terms or conditions of the Sublease, and Lender shall not be responsible or liable for any waste committed on either the Premises or the Property by any party whatsoever, for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of either the Premises or the Property.

6. <u>Severability</u>. If any portion or portions of this Agreement shall be held invalid or inoperative, then all of the remaining portions shall remain in full force and effect, and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion or portions held to be invalid or inoperative.

7. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State in which the Premises is located.

8. <u>Notices</u>. So long as the Mortgage remains outstanding and unsatisfied, Subtenant will mail or deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to the Sublandlord by Subtenant under and pursuant to the terms and provisions of the Sublease. All notices or other communications required or permitted to be given pursuant to the provisions hereof shall be in writing and shall be considered as properly given if (i) mailed to the addressee by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the addressee, or (iii) by delivery to a third party commercial delivery service for same day or next day delivery to the office of the addressee with proof of delivery. Notice so given shall be effective, as applicable, upon (i) the third (3rd) day following the day such notice is deposited with the U.S. Postal Service, (ii) delivery to the addressee, or (iii) upon delivery to such third party delivery service. Notice given in any other manner shall be effective only if and when received by the addressee. For purposes of notice, the addresses of the parties shall be:

Lender:    Bank of America, N.A.
           One Bryant Park, 35th Floor
           New York, New York 10036
           Attn: Mr. Peter Panagoulius

With a copy to:

Bank of America, N.A.
Hearst Tower
214 N. Tryon Street
Mail Code:  NC1-027-21-04
Charlotte, North Carolina 28255
Attn:  Mr. Robert R. Wood

and

Schiff Hardin LLP
900 Third Avenue, 23rd Floor
New York, New York 10019
Attn: Paul Mackey, Esq.

Sublandlord:  The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon drive
Montvale, New Jersey 07645
Attn: General Counsel


Subtenant:  _____
_____
_____
_____


Notwithstanding the foregoing, any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other parties in the manner set forth herein.

9.  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, successors-in-title and assigns.  When used herein, the term "sublandlord" refers to Sublandlord and to any successor to the interest of Sublandlord under the Sublease and "Lender" refers to Lender and to any assignee of the note secured by the Mortgage and Lender's servicer of the Loan, if any.

10.  <u>Subtenant's Personal Property</u>.  In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Subtenant's moveable trade fixtures, business equipment, furniture, signs or other personal property at any time placed on or about the Premises.

11.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

12.     Headings. The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the date first above written.

**LENDER:**

BANK OF AMERICA, N.A.
a national banking association, as administrative agent

By: _____
      Name:
      Title:

**SUBTENANT:**

_____
a _____

By: _____
      Name:
      Title:

**SUBLANDLORD:**

_____
a _____

By: _____
      Name:
      Title:

_____, as guarantor of the obligations of Subtenant under the Sublease, has executed this Agreement under seal for the purpose of acknowledging and consenting to the same.

**GUARANTOR:**

_____
a _____

By: _____
      Name:
      Title:

STATE OF _____ )
                                    :
COUNTY OF _____ )


       On the _____ day of _____, before me, the undersigned, a notary in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon belief of which the individual acted, executed the instrument.


_____
Notary Public


STATE OF _____ )
                                    :
COUNTY OF _____ )

This instrument was ACKNOWLEDGED before me on _____, _____, by _____, as _____ of _____, a _____, on behalf of said _____.


[SEAL]                              Notary Public – Seal of _____

My Commission Expires:          Printed Name of Notary Public

_____

STATE OF _____)
                                        :
COUNTY OF _____)

This instrument was ACKNOWLEDGED before me on _____, _____, by
_____, as _____ of
_____, a _____, on behalf of said
_____.


[SEAL]                                    Notary Public – Seal of _____

My Commission Expires:                    Printed Name of Notary Public

_____

EXHIBIT A

(The Property)

## EXHIBIT B

## QUALIFIED SUBLEASE DEFINITION

"Qualified Sublease" means a Sublease which satisfies one of the following criteria:

(i)     the Sublease of a certain portion of the Retail Space as in effect on the date of this Lease and identified on Schedule B annexed hereto;

(ii)     with respect to Retail Space, the sublessee is a Person with a regional or national presence of at least fifty (50) locations which has a net worth (calculated in accordance with GAAP. but excluding goodwill) or at least $50 million (as such amount may be increased on each anniversary of the date hereof in the proportion that the CPI increases over each annual period) and such Sublease demises at least 5,000 square feet of Retail Space; and

(iii)     with respect to the Supermarket Space, one (1) or more (but not more than three (3)) Subleases which each satisfy all of the following criteria:

(a) each sublessee is a Person with. a local, regional or national presence of at least fifty (50) locations and has a net worth (calculated in accordance with GAAP. but excluding goodwill) of at least $50 million (as such amount may be increased on each anniversary of the date hereof in the same proportion that the CPI increases over each annual period);

(b) each sublessee, individually, subleases at least 20,000 rentable square feet and, collectively, such sublessees sublease substantially all the Supermarket Space (i.e. all of the Supermarket Space but excluding only rear storage or mechanical space deemed unmarketable by Lessee)

(c) each subleased space must be rectangular in configuration (other than adjustments to provide access to the rear loading areas and any rear storage or mechanical space deemed unmarketable by Lessee) and no sublessee may sublease less than *25%* of the frontage of the Supermarket Space;

(d) each sublessee must have an investment grade credit rating by Standard & Poor's and Moody's but in no event may any sublessee have a credit rating less than the then existing credit rating of A&P;

(e) the initial term of each sublease must expire one day prior to the Lease Term in effect on the date of such sublease and if any sublease contains one or more options for renewal periods, each sublease shall contain the same number of options for renewal periods having the same duration; and

(f) in the event the Supermarket Space is subleased to more than one (1) but not more than three (3) sublessees, no such sublease shall be a Qualified Sublease unless and

until all such sublessees in the Supermarket Space meet the criteria of subsections (a), (b), (c), (d) and (e) above.

# EXHIBIT C

## CONDITIONS OF SECTION 13.4(a) OF THE OVERLEASE

"(1)    The base rent (calculated on a per square foot basis) payable by the sublessee under such Sublease shall be at a rate at least equal to the greater of (x) seventy-five percent (75%) of the then Fair Market Rental Value thereof or (y) the Base Rent payable by Lessee (calculated on a per square foot basis) pursuant to this Lease; provided, however, that the aggregate amount of the base rent paid by the sublessees of Supermarket Space must equal or exceed 110% of the then payable Base Rent under this Lease and the base rent payable under the Sublease during a renewal term shall under no circumstances be reduced below the base rent payable during the initial term of the Sublease; and

(2)    The obligations of the sublessee under the Sublease including, without limitation, obligations with respect to payment of additional rent, shall be substantially the same as the obligations of Lessee under this Lease (except for the sublessee's base rent, which shall be as set forth in subsection (1) above, except that the term of the Sublease shall be at lease one (1) day less than the Lease Term as same shall be renewed from time to time, and except that the size of the premises subleased by sublessee may be smaller than the leasable premises of the Improvements."

C:\Documents and Settings\tongb\Local Settings\Temporary Internet Files\OLK36D\SNDA - White Oak MD - Draft 2 (2).doc

## EXHIBIT C

## Letter Agreement

THE GREAT ATLANTIC & PACIFIC
TEA COMPANY, INC.
2 Paragon Drive
Montvale, New Jersey   07645

Salomon Brothers Realty Corp.
388 Greenwich Street
New York, New York   10013

White Oak-Grocery, LLC
c/o Cardinal Capital Partners, Inc.
8411 Preston Road, 8th Floor
Dallas, Texas   75225

February 13, 2001

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Lease,
dated as of February 3, 2001 (the "Lease"), between White Oak-
Grocery, LLC, a Delaware limited liability company, as lessor
("Lessor") and The Great Atlantic & Pacific Tea Company, Inc.,
a Maryland corporation, as lessee ("Lessee"), for certain prop-
erty located at 12028 Cherry Hill Road, White Oak, MD   20904
and further described in the Lease and (ii) that certain Lease
Modification, Subordination, Non-Disturbance and Attornment
Agreement, dated as of February 3, 2001 (the "SNDA"), by and
between Lessee, Lessor and Salomon Brothers Realty Corp., as
lender ("Lender").  Capitalized terms used and not otherwise
defined herein shall have the meanings set forth in the Lease,
as modified by the SNDA.

Section 6 of the SNDA contains several provisions
which modify the terms of the Lease.  These provisions are ef-
fective until the maturity date of the Indebtedness held by
Lender as of the date hereof (the "Initial Financing").  Lessee
hereby agrees to include substantially the same provisions in
the documentation relating to the refinancing (the "Initial Re-
financing") of the Initial Financing to the extent such provi-
sions are required by the lender under the Initial Refinancing
and/or in the documentation relating to the refinancing (the
"Second Refinancing") of the Initial Refinancing to the extent
such provisions are required by the lender under the Second Re-
financing; provided, however, that (i) this letter will not be

applicable in the event the lender under either the Initial Refinancing or the Second Refinancing, as applicable, does not constitute an Institutional Lender, (ii) this letter shall not be applicable to the Initial Refinancing or the Second Refinancing if Lessee has an Investment Grade Rating from Standard & Poor's and Moody's at the time of the Initial Refinancing or the Second Refinancing, as applicable, (iii) this letter shall not be applicable to the Second Refinancing if the amount of the Indebtedness under the Second Refinancing exceeds the amount of the Indebtedness under the Initial Financing (regardless of whether the amount of the Indebtedness under the Initial Refinancing exceeded the amount of the Indebtedness under the Initial Financing), (iv) subject only to clause (v) of this proviso, Lessee agrees to include substantially the same provision as Section 6(f) of the SNDA in the documentation relating to the Initial Refinancing to the extent such provision is required by the lender under the Initial Refinancing and/or in the documentation relating to the Second Refinancing to the extent such provision is required by the lender under the Second Refinancing even if Lessee is not required to include the other provisions of Section 6 as a result of the operation of clauses (i), (ii) or (iii) of this proviso and (v) in the event the provisions of Section 6 of the SNDA (including, without limitation, Section 6(f)) are included in the documentation relating to the Initial Refinancing or the Second Refinancing, the provisions shall nonetheless be null and void as of the expiration of the First Renewal Term of the Lease.

Lessee agrees to cause any assignee of Lessee's interest in the Lease to assume the obligations of Lessee hereunder.

This letter shall inure to the benefit of Lessor (as defined in the Lease), Lender and its successors and assigns and shall be binding on Lessee (as defined in the Lease) and its successors and permitted assigns.

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., as Lessee

By: _____

Name: Mitchell P Goldstein
Title: Sr. Vice President

# EXHIBIT D

**2001 SNDA**

**LEASE MODIFICATION, SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS LEASE MODIFICATION, SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") made this 13th day of February, 2001, among SALOMON BROTHERS REALTY CORP., a New York corporation ("Lender"), THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation ("Lessee" or "Guarantor") and **WHITE OAK-GROCERY, LLC**, a Delaware limited liability company ("Lessor").

RECITALS:

A. Lessor and Lessee have entered into a certain lease dated February 13, 2001 (the "Lease") relating to the premises described in Exhibit A attached hereto and by this reference made a part hereof (hereinafter referred to as the "Premises").

B. Lender has made or has committed to make a loan to Lessor (the "Loan") secured by a mortgage, deed of trust or security deed (as the same may be amended, restated, extended, or otherwise modified from time to time, the "Mortgage") and an assignment of leases and rents (as the same may be amended, restated, extended, or otherwise modified from time to time, the "Assignment of Leases") from Lessor to Lender covering certain property described therein (the "Property") including the Premises.

C. Lessee has agreed that the Lease shall be subject and subordinate to the Mortgage held by Lender, provided Lessee is assured of continued occupancy of the Premises and non-disturbance under the terms of the Lease (as modified by this Agreement).

D. As a condition to granting non-disturbance to Lessee, Lender requires that Lessee, Guarantor and Lessor consent and agree to modify and amend the Lease, to the extent and for the time periods as hereinafter provided.

E. Capitalized terms used, but not otherwise defined herein, shall have the meanings assigned to such terms in the Lease. All references in this Agreement to the Lease shall mean the Lease, as modified and amended by this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and notwithstanding anything in the Lease to the contrary, it is hereby agreed as follows:

1. Subordination and Consent. Lender, Lessee and Lessor do hereby covenant and agree that the Lease with all rights, options, liens and charges created thereby (including, without limitation, any option or rights contained in the Lease, or otherwise existing, to acquire any or all of the Premises, or any superior leasehold interest therein), is and shall continue to be subject and subordinate in all respects to the Mortgage and the Assignment of Leases, and to any renewals, modifications, consolidations, replacements and extensions thereof and to all advancements

made thereunder. Lessee acknowledges that Lessor will execute and deliver to Lender an assignment of the Lease as security for the Loan, and Lessee hereby expressly consents to such assignment. Lessee further acknowledges and agrees that Lender and Lessor have entered into a cash management agreement (the "Cash Management Agreement") in connection with the Loan pursuant to which a clearing account in the name of Lender has been established and that all Base Rent and Additional Rent payable to Lessor under the Lease shall be paid by Lessee directly to Lender at the address specified below for deposit in such clearing account, or as otherwise specified by Lender. Lessee agrees that the foregoing agreement shall constitute a Rent Directions Letter under the Lease and that, notwithstanding anything in the Lease to the contrary, Lessee shall not act on any Rent Direction Letter other than a Rent Direction Letter delivered by Lender. Such payments to Lender will constitute performance of Lessee's payment obligations under the Lease.

2. Nondisturbance. Lender does hereby agree with Lessee that, if Lender becomes the fee simple owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, so long as Lessee complies with and performs its obligations under the Lease, (a) the Lease shall continue in full force and effect as a direct Lease between the succeeding owner of the Property and Lessee, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the Lease Term (including any Renewal Terms), and Lender will not disturb the possession of Lessee, and (b) the Premises shall be subject to the Lease and Lender shall recognize Lessee as the lessee of the Premises for the remainder of the Lease Term (including any Renewal Terms) in accordance with the provisions thereof; provided, however, that Lender shall not be:

(i) subject to any claims, offsets or defenses which Lessee might have against any prior Lessor (including Lessor); or

(ii) liable for any act or omission of any prior Lessor (including Lessor), provided that the foregoing shall not limit Lender's liability for its own acts or omissions after Lender becomes the owner of the Property even if such acts or omissions are the same as those of a prior Lessor; or

(iii) bound by any rent or additional rent which Lessee might have paid for more than the current month or any security deposit or other prepaid charge paid to any prior Lessor (including Lessor); or

(iv) bound by any amendment or modification of the Lease made without its written consent, to be granted or denied in accordance with Section 3 of this Agreement.

Nothing contained herein shall prevent Lender from naming Lessee in any foreclosure or other action or proceeding initiated by Lender pursuant to the Mortgage to the extent necessary under applicable Law in order for Lender to avail itself of and complete the foreclosure or other remedy, subject to the provisions of this Section 2. If Lender shall ever become the owner of the rights and interests of Lessor in and to the Property and the Lease by reason of judicial foreclosure, nonjudicial trustee's sale or other proceedings brought by Lender to enforce its rights under the Mortgage, or through any other means or manner in connection with the Loan, Lender shall be deemed to be Lessor's successor and assignee under the Lease (notwithstanding

anything in the Lease prohibiting or restricting assignment by the Lessor or establishing conditions under which an assignment by the Lessor would be permitted) and shall be entitled to all rights, benefits and privileges of the Lessor under the Lease. Lessee acknowledges and agrees that to the extent it has any right or option of any nature whatsoever, whether pursuant to the Lease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, the same is hereby acknowledged to be subject and subordinate to the Mortgage and the Assignment of Leases, unless the Loan is paid off in connection with the exercise of such option as provided in the Lease.

3.    Attornment. Lessee does hereby agree with Lender that, if Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, then Lessee shall attorn to and recognize Lender as the Lessor under the Lease for the remainder of the term thereof, and Lessee shall perform and observe its obligations thereunder, subject only to the terms and conditions of the Lease (as modified by this Agreement). Lessee further covenants and agrees to execute and deliver upon request of Lender an appropriate agreement of attornment to Lender and any subsequent titleholder of the Premises. Lessor and Lessee agree that the Lease shall not be amended or modified in any manner or respect without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, and any purported amendment or modification made without such consent shall be ineffective and void as to Lender.

4.    Lease Defaults and Lease Submissions. (a) If Lessor shall fail to perform or observe any of the terms, conditions or agreements in the Lease, Lessee shall give written notice thereof to Lender and Lender shall have the right (but not the obligation) to cure such default.

(b)    Lessee shall deliver to Lender simultaneous with any delivery to Lessor, any notices or submissions delivered by Lessee under the Lease. To the extent a response from Lessor to such notice or submission is required or permitted and a response period is specified in the Lease, Lender shall be permitted to respond and shall have the same period of time as Lessor within which to respond and, with respect to Lender, such period shall not commence unless and until such notices or submissions have been delivered to Lender. Any response from Lender received by Lessee shall be deemed to be a response from Lessor and shall be accepted as Lessor's response by Lessee, whether or not Lessor shall similarly respond in substance or manner inconsistent with Lender's response.

5.    Obligations and Liability of Lender. Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, hazardous wastes or environmental laws, Lessor's title, Lessor's authority, habitability, fitness for purpose or possession. Furthermore, if Lender shall acquire Lessor's interest in the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Property, and Lessee shall look exclusively to such equity interest of Lender, if any, in the Property for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Lease (or under any new lease with Lessee), and in which case Lender is hereby released and relieved of any other obligations or liability hereunder, under the Lease or under any such new lease. Lender shall not, either by virtue of the Mortgage, the Assignment of Leases or this Agreement, be or become a mortgagee in possession or be or

3

become subject to any liability or obligation under the Lease or otherwise until Lender shall have acquired the Lessor's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Lender under the Lease shall extend only to those liability or obligations accruing subsequent to the date that Lender has acquired Lessor's interest in the Property. Without limiting the generality of the foregoing, neither the Mortgage, the Assignment of Leases nor this Agreement shall, prior to Lender's acquisition of Lessor's interest in the Property, by foreclosure or otherwise, operate to place responsibility for the control, care, management or repair of the Property upon Lender or impose upon Lender responsibility for the carrying out of any of the terms or conditions of the Lease, and Lender shall not be responsible or liable for any waste committed on either the Premises or the Property by any party whatsoever, for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of either the Premises or the Property. Notwithstanding anything to the contrary contained in this Agreement, for as long as the Loan remains outstanding, Lessor and Lessee agree that Lender shall have the right (but not the obligation) to enforce, in the name of Lessor or otherwise, the rights and benefits of Lessor under the Lease and under any guaranty thereof.

6. Modifications to Lease. Until the Maturity Date of the Loan (i.e. February 1, 2011) or the repayment in full of the Loan (other than as described in the last sentence of subsection 26.27(1) of the Lease), whichever is earlier, Lessor, Lessee, Guarantor and Lender acknowledge and agree that the following provisions shall apply and the Lease shall be modified and amended as follows. During such period, if any provision of this Agreement conflicts with any provision of the Lease, the terms and provisions of this Agreement shall control.

(a) Lessee's Right to Go Dark. The following language shall be added to the end of the last sentence of Article 8 of the Lease: "provided, however, if at any time after the commencement of the seventh (7th) Lease Year the Improvements go Dark, (x) A&P shall be required to deliver to Lessor and Lender a guaranty of payment of an amount equal to Lender's commercially reasonable estimate of leasing commissions and tenant improvement costs applicable to a re-letting of the Property for the remaining balance of the term of the SBRC Loan, which guaranty shall be in form and substance reasonably satisfactory to Lender and, (y) Lessee shall be required to post Escrows and Reserves in the amounts and as required by Sections 26.27, 26.28 and 26.29 of this Lease if Lessee is not then maintaining Escrows and Reserves or, if Lessee is then maintaining Escrows and Reserves, such Escrows and Reserves in the amounts and as required by Sections 26.27, 26.28 and 26.29 of this Lease shall be maintained by Lessee notwithstanding any other provision herein permitting the Escrows and Reserves to be discontinued."

(b) Alteration Limitations. In connection with the performance of Alterations by Lessee pursuant to Article 10 of the Lease, Lessee shall be required to provide Lessor with, at Lessee's option, either a payment and performance bond or a letter of credit covering the cost of the Alteration, in each case in form and substance reasonably satisfactory to Lender, if:

(1) the rating on A&P's long-term unsecured debt during the performance of such Alteration is at any time equal to or less than the A&P

4

Trigger Credit Rating and the cost of such Alteration exceeds the lesser of (x) two (2) months Base Rent under the Lease and (y) $250,000.00; or

(2)     the cost of the Alteration is in excess of 20% of the Property Value, unless A&P's long-term unsecured debt at all times during the performance of such Alteration is rated by Standard & Poor's at BBB+ or better and by Moody's at Baa1 or better and A&P is not on credit watch with either rating agency.

(c)     Leasehold Mortgages Prohibited. Article 21 of the Lease shall be deleted in its entirety and replaced with the following: "Lessee shall not, without the prior written consent of Lender (which consent may be withheld in Lender's sole and absolute discretion), mortgage, encumber, or pledge the Lease or any part thereof, or permit the Lease or any part thereof to be mortgaged, encumbered, or pledged." Clause (h) of the definition of "Permitted Liens" shall be deleted.

(d)     Restoration Limitations. If and for so long as the rating on A&P's long-term unsecured debt is equal to or less than the A&P Trigger Credit Rating, (1) the definition of "Threshold Amount" shall be changed to mean the lesser of: (i) $250,000.00 (as such amount is increased pursuant to the CPI adjustment set forth in such definition) or (ii) 25% of the Property Value and (2) the $1,000,000.00 amount set forth in Section 14.4(b)(vii) of the Lease shall be reduced to $250,000.00 (as such amount is increased pursuant to the CPI adjustment set forth in such Section).

(e)     Assignment Limitations. Section 13.1 of the Lease shall be modified to provide that Lessee may not, without the prior written consent of Lender, which consent may be withheld or conditioned in Lender's sole and absolute discretion, assign its interest in the Lease to any Person who does not have at least an Investment Grade Rating.

(f)     Use Limitations. The first sentence of Article 8 of the Lease is deleted and replaced with the following: "The Property may be used only for and as a supermarket and/or any other retail use, any office purpose, a restaurant (with or without a bar), a multi-family residential dwelling, or a warehouse or other storage facility (other than a self-storage facility); provided that such uses shall not include the prohibited uses identified on Schedule F annexed hereto. The Property may also be used for any other use in addition to or in lieu of the uses identified in the preceding sentence to the extent that the Rating Agencies covering the securitized Loan made by Lender confirm such other use will not result in a credit rating downgrade of the securities issued in connection with the Loan, or if the Loan is less than 5% of the applicable pool, confirm that, were the amount of such Loan 5% or more of the applicable pool, such other use would not result in a credit rating downgrade of the securities issued in connection with the Loan."

(g)     Escrows and Reserves. The following new Sections 26.27, 26.28 and 26.29 shall be added to the Lease:

Section 26.27 Escrows and Reserves.

(1) Lessee agrees to deposit with and deliver to Lender Escrows and Reserves on the date hereof and thereafter to maintain such Escrows and Reserves, in each case in the manner required under Section 26.28 and Section 26.29 of this Lease. Provided that no Event of Default has occurred and is continuing under this Lease and Lessee's interest in the Lease has not been assigned to a Person who does not have at least an Investment Grade Rating, upon satisfaction of the Release Condition (as hereinafter defined) all unutilized Escrows and Reserves shall be returned to Lessee and no further deposits or escrows shall be required if and for so long as A&P maintains a Minimum Rating. If at any time after Escrows and Reserves are no longer required of Lessee hereunder, A&P's credit rating falls below the Minimum Rating, Lessee shall be required, at Lender's request, to deposit and maintain Escrows and Reserves with Lender as required under Sections 26.28 and 26.29 of this Lease. Upon repayment in full of the SBRC Loan (other than through judicial or non-judicial foreclosure of the Mortgage or deed in lieu), all unutilized Escrows and Reserves shall be returned to Lessee. If the SBRC Loan is repaid in full through judicial or non-judicial foreclosure of the Mortgage or deed in lieu Lessee shall be required to maintain Escrows and Reserves until the Maturity Date of the SBRC Loan for the benefit of any successor Lessor to the extent required to do so under Section 26.28 and 26.29 of this Lease.

(2) All Escrows and Reserves (other than those delivered in the form of letters of credit) shall be deposited in interest bearing accounts at an institution or institutions selected by Lender and all interest on such Escrows and Reserves shall become part of the Escrows and Reserves and shall be held or disbursed in the same manner as other funds in such Escrows and Reserves.

(3) Lessor and Lender agree that Lender shall (i) apply the Tax and Insurance Escrow Fund (as defined in Section 26.28 below) to the payment of Taxes and Insurance Premiums as required by this Lease and (ii) make disbursements from the Replacement Reserve Fund (as defined in Section 26.29 below) to Lessee in accordance with the terms and provisions of Section 26.29 below.

Section 26.28. Tax and Insurance Escrow Fund. Beginning on the date hereof, and on the first day of each calendar month thereafter, Lessee shall pay to Lender (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months, and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (said amounts in (a) and (b) above hereinafter called the "Tax and Insurance Escrow Fund"). Lender may, in its sole discretion, retain a third party tax consultant to obtain tax certificates or other evidence or estimates of tax due or to become due or to verify the payment of taxes and Lessee will promptly reimburse Lender for the reasonable cost of retaining any such third parties or obtaining such certificates. Any such reimbursements for the aforesaid shall constitute Additional Rent payable by Lessee under this Lease. At the request of Lessee and provided no Event of Default has occurred and is continuing, Lender shall apply funds in the Tax and Insurance Escrow Fund to the payment of

· 6

Taxes or Insurance Premiums as and when due and payable, and Lender shall provide evidence of payment of Taxes or Insurance Premiums to Lessee. Payments to the Tax and Insurance Escrow Fund payable hereunder shall constitute Additional Rent under this Lease and shall be added to Base Rent and shall be paid as an aggregate sum by Lessee to Lender or Lessor in accordance with the Rent Directions Letter. Lessee hereby pledges to Lender any and all monies now or hereafter deposited in the Tax and Insurance Escrow Fund as additional security for the payment and performance of Lessee's obligations under this Lease; provided, however, such funds shall be held by Lender and shall only by applied to pay Taxes and Insurance Premiums as provided in this Section. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Lessor pursuant to the terms of this Lease. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lessee is contesting Taxes in compliance with the terms and provisions of this Lease regarding contest of Taxes then, upon request of Lessee, Lender shall retain the amount of any contested Tax payment in the Tax and Insurance Escrow Fund pending resolution of such contest or the failure by Lessee to satisfy any of the conditions in this Lease regarding the contest of Taxes. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums, Lender shall, in its discretion, credit such excess against future payments to be made to the Escrow Fund. If at any time Lender determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in (a) and (b) above, Lender shall notify Lessee of such determination and Lessee shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or expiration of the Policies, as the case may be. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Tax and Insurance Escrow Fund to the payment of Taxes and Insurance Premiums. Notwithstanding anything to the contrary contained in this Section 26.28, Lessee shall not be required to deposit the sums described in clause (b) of the first sentence of this Section 26.28 if and for so long as Lessee maintains a blanket Policy covering both the Property and properties other than the Property, provided that Lessee delivers to Lender and Lessor at least twenty (20) days prior to the end of each period through which the premiums on such blanket Policy have been paid, a certificate reasonably satisfactory to Lender evidencing that such blanket Policy has been renewed for the next succeeding period. If Lessee at any time fails to deliver to Lender and Lessor such certificate by the date required or if at any time such blanket Policy is no longer maintained, Lessee shall thereafter be required to deposit the sums described in clause (b) above.

Section 26.29  Other Reserve Funds.

(1)     Replacement Reserve Fund.  Lessee shall pay to Lender on the first day of each calendar month, an amount equal to one-twelfth (1/12th) of the Replacement Reserve Annual Amount (hereinafter defined) for replacements and repairs to the Property (the "Replacement Reserve Fund").  As used herein, "Replacement Reserve Annual Amount" shall mean an amount equal to $0.15 multiplied by the square footage of the Improvements (i.e. $9,694.00).  Lessee hereby pledges (and grants a lien and security interest) to Lender any and all monies now or hereafter deposited in the Replacement Reserve Fund as additional security for

7

the payment and performance of Lessee's obligations under this Lease, provided, however, as long as no Event of Default shall have occurred and is continuing, such funds shall be held by Lender and shall only be applied to the payment of replacements and repairs as provided in this Section 26.29. Notwithstanding the foregoing, Lender may reassess its estimate of the amount necessary for the Replacement Reserve Fund from time to time and in its reasonable discretion, and may adjust the monthly amounts required to be deposited into the Replacement Reserve Fund after giving thirty (30) days notice to Lessee. Provided that no Event of Default shall exist and remain uncured, Lender shall make disbursements from the Replacement Reserve Fund as requested, in writing, by Lessee, and approved by Lender (such approval not to be unreasonably withheld or conditioned), on a quarterly basis in increments of no less than $2,500 upon delivery by Lessee of copies of paid invoices (or with respect to requests in excess of $10,000, unpaid invoices) for the amounts requested and a certification from Lessee stating: (A) the nature and type of the related replacement or repair, (B) that the related replacement or repair has been completed in a good and workmanlike manner and (C) that the related replacement or repair has been paid for in full (or, with respect to requests in excess of $10,000, will be paid for in full from the requested disbursement). Lender may require an inspection of the Property at Lessee's reasonable expense prior to making a disbursement in order to verify completion of replacements and repairs for which reimbursement is sought in any circumstance where the total cost of the repair or replacement project exceeds $100,000. The Replacement Reserve Fund is solely for the protection of Lender and entails no responsibility or obligation on Lender's part beyond the payment of the costs and expenses described in this Section in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon the occurrence of an Event of Default, Lender may apply any sums then present in the Replacement Reserve Fund to the payment of replacements and capital repairs as provided in this Section 26.29.

        (2)     Intentionally Deleted.

        (3)     Tenant Improvement/Leasing Commission Letter of Credit. Lessee has, on the date hereof, deposited with Lender an irrevocable letter of credit (together with any renewal, extension or replacement thereof, the "TI Letter of Credit") in an amount equal to the Leasing Reserve Annual Amount (hereinafter defined) for the anticipated cost of tenant improvement expenditures and leasing commissions in connection with leases projected to be entered into by Lessee at the Property and as security for the faithful performance and observance by Lessee of the terms, conditions and provisions of this Lease. As used herein, "Leasing Reserve Annual Amount" shall mean an amount equal to $397,461.00. The TI Letter of Credit is solely for the protection of Lender and entails no responsibility or obligation on Lender's part beyond the payment of the costs and expenses described in this section in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon the occurrence of an Event of Default, Lender may apply any sums drawn from the TI Letter of Credit to the payment of leasing commissions and tenant improvement costs as provided in this Section incurred by Lender or, subject to the terms of the Mortgage, incurred by Lessor, or to the payment of any sum as to which Lessee is in default or for any sum which Lessor or Lender may have expended or may be required to expend by reason of Lessee's default, including any damages or deficiency accrued before or after summary proceedings or other re-entry by Lessor. Notwithstanding anything to the contrary contained herein, following the occurrence of an Event of Default and the repayment in full of the SBRC Loan, any proceeds from the TI Letter of Credit remaining shall be delivered to Lessor and may be applied by Lessor

8

to pay any sums due and owing from Lessee to Lessor under this Lease; provided that, Lessor shall not be entitled to receive any proceeds of the TI Letter of Credit from Lender unless and until the Lease has been terminated. Lessor shall promptly deliver a copy of any request sent to Lender for proceeds of the TI Letter of Credit to Lessee. If Lender draws upon the TI Letter of Credit and applies or retains any portion or all of the sum received upon such draw, Lessee shall forthwith take such action as is necessary to restore the face amount of the TI Letter of Credit so that at all times the amount of the TI Letter of Credit shall be equal to the Leasing Reserve Annual Amount.

(4)     Rent Letter of Credit. Lessee has, on the date hereof, delivered to Lender a letter of credit (together with any renewal, extension or replacement thereof, the "Rent Letter of Credit") issued in favor of Lender in an amount equal to $397,461.00 (the "Rent Security Amount"), as security for the faithful performance and observance by Lessee of the terms, conditions and provisions of this Lease, including without limitation the payment of Base Rent, Additional Rent and all other sums of any nature whatsoever due and payable under this Lease and the surrender of possession of the Property to Lessor as herein provided. If Lessee defaults in respect of any of the terms of this Lease including, but not limited to, the payment of Base Rent and Additional Rent after the expiration of any applicable notice and cure periods, Lender may, at its election, draw upon the Rent Letter of Credit to the extent required for the payment of any sum as to which Lessee is in default or for any sum which Lessor or Lender may have expended or may be required to expend by reason of Lessee's default, including any damages or deficiency accrued before or after summary proceedings or other re-entry by Lessor. In addition, Lender may draw upon the Rent Letter of Credit to the extent required to compensate Lender or Lessor for the actual costs incurred by Lessor or Lender in re-leasing the Property. Notwithstanding anything to the contrary contained herein, following the occurrence of an Event of Default and the repayment in full of the SBRC Loan, any proceeds from the Rent Letter of Credit remaining shall be delivered to Lessor and may be applied by Lessor to pay any sums due and owing from Lessee to Lessor under this Lease, provided that, Lessor shall not be entitled to receive any proceeds of the Rent Letter of Credit from Lender unless and until the Lease has been terminated. Lessor shall promptly deliver a copy of any request sent to Lender for proceeds of the Rent Letter of Credit to Lessee. If Lender draws upon the Rent Letter of Credit and applies or retains any portion or all of the sum received upon such draw, Lessee shall forthwith take such action as is necessary to restore the face amount of the Rent Letter of Credit so that at all times the amount of the Rent Letter of Credit shall be equal to the Rent Security Amount.

(5)     The Letters of Credit. Each Letter of Credit shall be an irrevocable, unconditional letter of credit with an initial term of not less than one year. Without further act or instrument required by Lender, each Letter of Credit shall be automatically renewed for successive one year periods throughout the remainder of the term of the SBRC Loan unless, not less than 30 days prior to the then current expiration date of the Letter of Credit the issuing bank notifies Lender of its intention not to renew the Letter of Credit. Each Letter of Credit (or any renewal, extension or replacement thereof) shall continue in full force and effect and shall be maintained in its full face amount for two full calendar months beyond the expiration of the term of the SBRC Loan. Each Letter of Credit shall (i) be negotiable and freely transferable in connection with a transfer by Lender of all or any portion of its interest in the SBRC Loan or the Property, subject to the provisions of clause (f) below; (ii) be issued by a New York City banking institution reasonably acceptable to Lender which is a member of the New York Clearing House

9

Association; (iii) provide for payment of all or any portion of the face amount of the Letter of Credit to Lender upon the receipt by the issuing bank of a statement signed by a representative of Lender that Lender is entitled to such amount pursuant to the terms of this Lease and (iv) be otherwise in form and substance reasonably satisfactory to Lender. Lender's receipt of notice from the issuing bank of its intention not to renew any Letter of Credit or Lessee's failure to deliver a renewal or replacement Letter of Credit shall entitle Lender to draw the full face amount of such Letter of Credit and retain such sum as security hereunder in lieu of the Letter of Credit. In addition, if any Letter of Credit does not permit multiple draws, Lender may draw the full face amount of each Letter of Credit for application of proceeds as provided herein and, to the extent any proceeds remain, Lender may then hold the balance of such proceeds as cash security. Lessee's failure to maintain any Letter of Credit or to substitute a cash deposit as a replacement therefor shall constitute a Default under this Lease.

(6)     Holders of the Letters of Credit. Custody of the Letters of Credit shall be retained by Lender or by one or more Permitted Holders until such time as the Letters of Credit, if any, are required to be returned to Lessee or A&P in accordance with the terms of Section 26.27 of this Lease.

(h)     Definitions. The following definitions shall be added to Section 1.2 of the Lease:

"A&P Trigger Credit Rating" shall mean a credit rating on A&P's unsecured long-term debt of either (x) B+ from Standard & Poor's or BB- on credit watch with negative implications from Standard & Poor's or (y) B1 from Moody's or Ba3 on credit watch with negative implications from Moody's.

"Dark" shall mean if neither Lessee (nor an assignee) nor a sublessee or sublessees under Subleases (whether or not Qualified Subleases) are in occupancy of substantially all of the Supermarket Space and open for business (i) during the seventh (7th) and eighth (8th) Lease Years, for a period of at least six (6) consecutive months, or (ii) during the ninth (9th) Lease Year, immediately upon the cessation of business at the Property. "Dark" shall not include cessation of occupancy as a result of permitted alterations, casualty or condemnation or cessation of occupancy if the sole cause is an Unavoidable Delay.

"Escrows" shall mean the Tax and Insurance Escrow Fund as defined in Section 26.28.

"Insurance Premiums" shall mean all premiums for insurance policies required to be maintained by Lessee under the Lease.

"Investment Grade Rating" means a credit rating of BBB- or better and not on credit watch with negative implications with Standard & Poor's and Baa3 or better and not on credit watch with negative implications with Moody's.

"Lease Year" shall mean each successive twelve month period commencing on February 1 and ending on January 31, provided that the first Lease Year shall commence on the date of this Lease and shall end on January 31, 2002.

10

"Letters of Credit" shall mean, collectively, the TI Letter of Credit and the Rent Letter of Credit, and "Letter of Credit" shall mean any one of the foregoing Letters of Credit.

"Minimum Rating" shall mean a credit rating on A&P's unsecured long term debt of BBB- or better with Standard & Poor's and Baa3 or better with Moody's.

"Mortgage" shall mean the mortgage or deed of trust covering the Property given by Lessor to secure the SBRC Loan.

"Permitted Holders" shall mean any Institutional Lender or group of Institutional Lenders, any reputable servicer or custodian acting on behalf of an Institutional Lender or Lenders.

"Policies" shall mean all insurance policies required to be maintained by Lessee under the terms of the Lease (including, without limitation, under Schedule G thereof).

"Release Condition" shall mean that A&P shall have obtained credit ratings on A&P's unsecured long-term debt of BBB+ or better from Standard & Poor's, Baa1 or better from Moody's and an equivalent credit rating from all other nationally recognized rating agencies providing a rating on A&P's unsecured long term debt.

"Reserves" shall mean the Replacement Reserve Fund as such term is defined in Section 26.29 and the Letters of Credit.

"SBRC Loan" shall mean that certain mortgage loan given by Salomon Brothers Realty Corp. to Lessor in connection with Lessor's acquisition of the Property which is secured by, among other things, the Mortgage covering the Property.

"Taxes" shall mean all Impositions.

In addition, the definition of "Default Rate" shall be modified by adding the following language after the word "mean": "the greater of (1) 5% above the annual rate announced by Citibank, N.A. in New York City, New York, as its base rate as in effect at the time of such default and (2)".

(i)     Late Charges. If, as a result of the occurrence of an Event of Default under the Lease, any sum payable under the Loan is not paid on or before the third (3rd) day after the date on which it is due, Lessee shall pay to Lessor upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lessor (or Lender) in handling and processing such delinquent payment and to compensate Lessor and Lender for the loss of the use of such delinquent payment and such amount shall constitute Additional Rent under the Lease.

(j)     Repairs. Lessee shall perform the deferred maintenance items at the Property which are described in Exhibit C to that certain Lease Modification,

11

Subordination, Non-Disturbance and Attornment Agreement dated as of February 13, 2001 between Lender, Lessee and Lessor.

(k) Cooperation. Lessee and Guarantor shall cooperate with Lender in effecting the first Secondary Market Transaction (as defined in the Mortgage) and shall cooperate to implement all requirements imposed by any Rating Agency involved in such Secondary Market Transaction, including but not limited to, (a) providing Lender an estoppel certificate in accordance with the provisions of Section 26.9 of the Lease and such reasonable information, legal opinions and documents relating to Lessee, Guarantor, if any, the Property and any tenants of the Property as Lender or the Rating Agencies may reasonably request in connection with such Secondary Market Transaction, (b) participating in bank, investors and Rating Agencies' meetings if requested by Lender, and (c) reviewing the offering documents relating to such Secondary Market Transaction to ensure that all information concerning Lessee and the Property is correct, and certifying to the accuracy thereof.

(l) Handicapped Access. (i) Lessee agrees that the Property shall at all times comply in all material respects with applicable requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws"). Lessee's obligation hereunder shall be deemed to be an obligation of Lessee under Section 10.3(a) of the Lease which is subject to Lessee's rights set forth in Sections 10.3(a) and 10.4(b) of the Lease.

(ii) Lessee agrees to give prompt notice to Lender of any material action or complaint or threat of material litigation received by Lessee related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(m) Insurance. Schedule G of the Lease is hereby supplemented by adding the following new clause (h): "(h) True and correct copies of all policies required by Section (a) above shall be made available for inspection by Lender at the offices of Lessee set forth on the first page of this Lease on at least 48 hours prior notice, provided that Lessee shall have the right to redact from such copies any proprietary information that does not relate in any way to the Property or to insurance coverage relating to the Property."

(n) Permits. Promptly following request of Lender, Lessee shall provide to Lender copies of any Governmental Licenses relating to the operation of the Property or affecting Lessor as owner of the Property.

7. Severability. If any portion or portions of this Agreement shall be held invalid or inoperative, then all of the remaining portions shall remain in full force and effect, and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion or portions held to be invalid or inoperative.

12

8.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State where the Property is located.

9.     Notices.  So long as the Mortgage remains outstanding and unsatisfied, Lessee will mail or deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to the Lessor by Lessee under and pursuant to the terms and provisions of the Lease.  All notices or other communications required or permitted to be given pursuant to the provisions hereof shall be in writing and shall be considered as properly given if (i) mailed to the addressee by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the addressee, or (iii) by delivery to a third party commercial delivery service for same day or next day delivery to the office of the addressee with proof of delivery.  Notice so given shall be effective, as applicable, upon (i) the third (3rd) day following the day such notice is deposited with the U.S. Postal Service, (ii) delivery to the addressee, or (iii) upon delivery to such third party delivery service.  Notice given in any other manner shall be effective only if and when received by the addressee.  For purposes of notice, the addresses of the parties shall be:

| Lender: | Salomon Brothers Realty Corp. |
| | 388 Greenwich Street, Floor 1 |
| | New York, NY 10013 |
| | Attn: John A. Cavanagh |
| | |
| Lessor: | White Oak-Grocery, LLC |
| | c/o Cardinal Capital Partners, Inc. |
| | 8411 Preston Road, Suite 850 |
| | Dallas, TX 75225 |
| | |
| Lessee: | The Great Atlantic & Pacific Tea Company, Inc. |
| | 2 Paragon Drive |
| | Montvale, NJ 07645 |
| | Attn:  General Counsel |

Notwithstanding the foregoing, any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other parties in the manner set forth herein.

10.     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, successors-in-title and assigns.  When used herein, the term "Lessor" refers to Lessor and to any successor to the interest of Lessor under the Lease and "Lender" refers to Lender and to any assignee of the note secured by the Mortgage and Lender's servicer of the Loan, if any.

11.     Lessee's Personal Property.  In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Lessee's Equipment and Personalty or other personal property at any time placed on or about the Premises.

13

12.     Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

13.     Headings. The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

14.     Guarantor. Guarantor, as the guarantor of Lessee's obligations under the Lease, has executed this Agreement for the purpose of acknowledging and consenting to this Agreement. Guarantor agrees to be bound by the terms of this Agreement and confirms that the guaranty executed by Guarantor includes a guaranty of all of Lessee's obligations hereunder.

15.     Sublessee SNDA's. Lender hereby agrees to execute and deliver a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit B with respect to each Qualified Sublease promptly following written request by Lessee.

**(Signature page follows)**

NY1 2058405v4
[White Oak, Maryland – SNDA]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the date first above written.

**LENDER**:

SALOMON BROTHERS REALTY CORP., a New York corporation

By: _____

Name: John A. Cavanagh

Title: Authorized Agent

**LESSEE AND GUARANTOR**:

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation

By: _____

Name: Mitchell P. Goodson

Title: Sr. VP

**LESSOR**:

WHITE OAK-GROCERY, LLC, a Delaware limited liability company

By: _____

Name: Jon Tomasson

Title: Manager

## EXHIBIT A

BEGINNING at a capped rebar found at the southerly right-of-way line of Broadbirch Drive (80 foot wide right-of-way), said point being located at the northeasterly terminus of a line connecting said Broadbirch Drive with the easterly right-of-way line of Plum Orchard Drive (80 foot wide right-of-way), and from said point of beginning running, thence;

1. Along the southerly right-of-way line of Broadbirch Drive, along the arc of a curve to the left, having radius of 1,040.00 feet, turning a central angle of 20 degrees 48 minutes 13 seconds, and arc length of 377.62 feet, the chord bearing north 82 degrees 11 minutes 17 seconds, east and a chord distance of 375.54 feet to a drill hole set at a point of tangency, thence;

2. Continuing along the southerly right-of-way line of Broadbirch Drive, north 71 degrees 47 minutes 10 seconds east, a distance of 166.09 feet to a point, thence;

3. Leaving said Broadbirch Drive, and running along the common dividing line between Parcel VVV and Parcels YYY & CCCC, along the arc of a curve to the right, having a radius of 8,273.28 feet, turning a central angle of 02 degrees 00 minutes 59 seconds, and arc length of 291.15 feet, a chord bearing south 16 degrees 55 minutes 44 seconds east and a chord distance of 291.13 feet to a P.K. nail set for a point of tangency, thence;

4. Continuing along the dividing line between Parcels VVV & CCCC, south 15 degrees 55 minutes 14 seconds east, a distance of 56.40 feet to a P.K. nail found, thence;

Running the following courses and distances along the dividing line between Parcels VVV & WWW, lands now or formerly Kohl's Department Stores, Inc.:

5. South 64 degrees 58 minutes 23 seconds West, a distance of 426.28 feet to a P.K. nail found, thence;

6. North 71 degrees 21 minutes 03 seconds West, a distance of 278.00 feet to a point, thence;

7. North 18 degrees 08 minutes 49 seconds West, a distance of 123.03 feet to a point, thence;

8. North 70 degrees 34 minutes 55 seconds West, a distance of 27.82 feet to a P.K. nail found on the aforementioned right-of-way line of Plum Orchard Drive, thence;

9. Along an easterly right-of-way line of Plum Orchard Drive, along the arc of a curve to the left, having a radius of 3,999.70 feet, turning a central angle of 02 degrees 34 minutes 57 seconds, an arc length of 180.24 feet to a drill hole set, thence;

10. Along a line connecting the easterly right-of-way line of Plum Orchard Drive, with the southerly right-of-way line of Broadbirch Drive, north 54 degrees 21 minutes 59 seconds east, a distance of 38.90 feet to the point and place of beginning.

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT (this "Agreement") made this ___ day of _____, among SALOMON
BROTHERS REALTY CORP., a New York corporation ("Lender"), _____
("Subtenant"), and _____, a _____ ("Sublandlord").

### R E C I T A L S :

A.      Sublandlord and Subtenant have entered into a certain sublease dated
_____, which sublease has been amended as follows: _____
(collectively, the "Sublease"), relating to the premises described in Exhibit A attached hereto and
by this reference made a part hereof (the "Premises").

B.      _____ ("Owner") has acquired from Sublandlord the property
(the "Property") described in Exhibit A attached hereto, which Property includes the Premises,
and Owner has subsequently leased-back the Property to Sublandlord pursuant to that certain
Agreement of Lease (the "Overlease") dated _____, between Owner and
Sublandlord.

C.      Lender has made or has committed to make a loan to Owner in the approximate
principal amount of $_____ (the "Loan") secured by a mortgage, deed of trust, or
security deed (as the same may be amended, restated, extended, or otherwise modified from time
to time, the "Mortgage") and an assignment of leases and rents (as the same may be amended,
restated, extended, or otherwise modified from time to time, the "Assignment of Leases") from
Owner to Lender covering the Property including the Premises.

D.      Subtenant has agreed that the Sublease shall be subject and subordinate to the
Overlease, the Mortgage and the Assignment of Leases held by Lender, provided Subtenant is
assured of continued occupancy of the Premises under the terms of the Sublease, except as
modified herein.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and notwithstanding anything in the Sublease to the contrary, it is hereby agreed as follows:

1.     Subordination and Consent. Lender, Subtenant and Sublandlord do hereby covenant and agree that the Sublease with all rights, options, liens and charges created thereby (including, without limitation, any option or rights contained in the Sublease, or otherwise existing, to acquire any or all of the Premises, or any superior leasehold interest therein), is and shall continue to be subject and subordinate in all respects to the Overlease, the Mortgage and the Assignment of Leases and to any renewals, modifications, consolidations, replacements and extensions thereof and to all advancements made thereunder, subject to the provisions of this Agreement and to the Lessor Subordination, Non-Disturbance, and Attornment Agreement dated as of the date hereof. Subtenant acknowledges that Owner will execute and deliver to Lender an assignment of the Overlease as security for the Loan, and Subtenant hereby expressly consents to such assignment. Subtenant agrees that if there is a default by Sublandlord in the performance and observance of any of the terms of the Overlease and the Overlease is terminated, Lender may, at its option, demand all rents due under the Sublease be paid by Subtenant directly to Lender at the address specified below, or as otherwise specified by Lender. Subtenant agrees that upon Lender's written request for payment of rent directly to Lender, Subtenant will timely remit any and all payments due under the Sublease directly to, and payable to the order of, Lender. Such payments to Lender will constitute performance of Subtenant's payment obligations under the Sublease.

2.     Nondisturbance. Lender does hereby agree with Subtenant that, if Lender or any third party becomes the fee simple owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise and if the Overlease is terminated, so long as Subtenant is not in default under the Sublease beyond the applicable cure or grace period, (a) the Sublease shall continue in full force and effect as a direct Sublease between the succeeding owner of the Property and Subtenant, upon and subject to all of the terms, covenants and conditions of the Sublease, for the balance of the term of the Sublease (as same may be extended), and Lender will not disturb the possession of Subtenant, and (b) the Premises shall be subject to the Sublease and Lender shall recognize Subtenant as the subtenant of the Premises for the remainder of the term of the Sublease (as same may be extended) in accordance with the provisions thereof; provided, however, that:

     (i) Lender or such third party shall not be subject to any claims, offsets or defenses which Subtenant might have against any prior sublandlord (including Sublandlord); or

     (ii) Lender or such third party shall not be liable for any act or omission of any prior sublandlord (including Sublandlord), provided that the foregoing shall not limit Lender's liability for its own acts or omissions after Lender becomes the owner of the Property even if such acts or omissions are the same as those of the prior sublandlord (including Sublandlord); or

2

(iii) Lender or such third party shall not be bound by any rent or additional rent which Subtenant might have paid for more than the current month or any security deposit or other prepaid charge paid to any prior sublandlord (including Sublandlord) except to the extent required by the Sublease and, unless such security deposit has physically been received by Lender; or

(iv) If, without the prior written consent of Lender, there is any amendment, cancellation, termination or modification of the Sublease which would cause the Sublease to cease to be a Qualified Sublease (as defined in the Overlease, which definition is set forth on Exhibit B attached hereto) or would cause the Qualified Sublease to meet the criteria set forth in Section 13.4(a) of the Overlease (as set forth on Exhibit "C" attached hereto), then, in either of such events, this Agreement shall automatically terminate with respect to the Sublease and the nondisturbance provisions of this Section 2, but not with respect to the subordination of the Sublease and the provisions contained in Section 1 of this Agreement.

Nothing contained herein shall prevent Lender from naming Subtenant in any foreclosure or other action or proceeding initiated by Lender pursuant to the Mortgage to the extent necessary under applicable law in order for Lender to avail itself of and complete the foreclosure or other remedy, subject to the provisions of this Article 2. Subtenant acknowledges and agrees that it has no right or option of any nature whatsoever, whether pursuant to the Sublease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, and to the extent that Subtenant has had, or hereafter acquires, any such right or option, the same is hereby acknowledged to be subject and subordinate to the Mortgage and is hereby waived and released as against Lender.

3.     Attornment. Subtenant does hereby agree with Lender that, in the event Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise and the Overlease is terminated, then Subtenant shall attorn to and recognize Lender as the sublandlord under the Sublease for the remainder of the term thereof (and any extensions, if exercised), and Subtenant shall perform and observe its obligations thereunder, subject only to the terms and conditions of the Sublease, except as modified herein. Subtenant further covenants and agrees to execute and deliver upon request of Lender an appropriate agreement of attornment to Lender and any subsequent titleholder of the Premises.

4.     Sublease Defaults. In the event Sublandlord shall fail to perform or observe any of the terms, conditions or agreements in the Sublease, Subtenant shall give written notice thereof to Lender and Lender shall have the right (but not the obligation) to cure such default. Subtenant shall not take any action with respect to such default under the Sublease, including without limitation any action in order to terminate, rescind or avoid the Sublease or to withhold any rent or other monetary obligations thereunder, for a period of thirty (30) days following receipt of such written notice by Lender; provided, however, that in the case of any default which cannot with diligence be cured within said thirty (30) day period, if Lender shall proceed promptly to cure such default and thereafter prosecute the curing of such default with diligence and continuity, the time within which such default may be cured shall be extended for such period as may be necessary to complete the curing of such default with diligence and continuity.

3

5.     Obligations and Liability of Lender. Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Sublease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, hazardous wastes or environmental laws, Sublandlord's title, Sublandlord's authority, habitability, fitness for purpose or possession. Furthermore, if Lender shall acquire Sublandlord's interest in the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Property, and Subtenant shall look exclusively to such equity interest of Lender, if any, in the Property for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Sublease (or under any new sublease with Subtenant), and Lender is hereby released and relieved of any other obligations or liability hereunder, under the Sublease or under any such new sublease. Lender shall not, either by virtue of the Mortgage, the Assignment of Leases or this Agreement, be or become a mortgagee in possession or be or become subject to any liability or obligation under the Sublease or otherwise until Lender shall have acquired the Sublandlord's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Lender under the Sublease (as modified by the terms of this Agreement) shall extend only to those liabilities or obligations accruing subsequent to the date that Lender has acquired Sublandlord's interest in the .Property. Without limiting the generality of the foregoing, neither the Mortgage, the Assignment of Leases nor this Agreement shall, prior to Lender's acquisition of Sublandlord's interest in the Property, by foreclosure or otherwise, operate to place responsibility for the control, care, management or repair of the Property upon Lender or impose upon Lender responsibility for the carrying out of any of the terms or conditions of the Sublease, and Lender shall not be responsible or liable for any waste committed on either the Premises or the Property by any party whatsoever, for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of either the Premises or the Property.

6.     Severability. If any portion or portions of this Agreement shall be held invalid or inoperative, then all of the remaining portions shall remain in full force and effect, and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion or portions held to be invalid or inoperative.

7.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State in which the Premises is located.

8.     Notices. So long as the Mortgage remains outstanding and unsatisfied, Subtenant will mail or deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to the Sublandlord by Subtenant under and pursuant to the terms and provisions of the Sublease. All notices or other communications required or permitted to be given pursuant to the provisions hereof shall be in writing and shall be considered as properly given if (i) mailed to the addressee by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the addressee, or (iii) by delivery to a third party commercial delivery service for same day or next day delivery to the office of the addressee with proof of delivery. Notice so given shall be effective, as applicable, upon (i) the third (3rd) day following the day such notice is deposited with the U.S. Postal Service, (ii) delivery to the addressee, or (iii) upon delivery to such third party delivery service. Notice given in any other manner shall be effective only if and when received by the addressee. For purposes of notice, the addresses of the parties shall be:

4

| Lender: | Salomon Brothers Realty Corp.<br>388 Greenwich Street, Floor 10<br>New York, NY 10013<br>Attn: John A. Cavanaugh |
|---|---|
| Sublandlord: | The Great Atlantic & Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, New Jersey 07645<br>Attn: General Counsel |
| Subtenant: | _____<br>_____<br>_____<br>_____ |

Notwithstanding the foregoing, any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other parties in the manner set forth herein.

9.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, successors-in-title and assigns.  When used herein, the term "sublandlord" refers to Sublandlord and to any successor to the interest of Sublandlord under the Sublease and "Lender" refers to Lender and to any assignee of the note secured by the Mortgage and Lender's servicer of the Loan, if any.

10.     Subtenant's Personal Property.  In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Subtenant's moveable trade fixtures, business equipment, furniture, signs or other personal property at any time placed on or about the Premises.

11.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

12.     Headings.  The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**(Signature page follows)**

NY1 2058624v2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the date first above written.

**LENDER:**

SALOMON BROTHERS REALTY CORP., a New York corporation

By:_____
Name:_____
Title:_____

**SUBTENANT:**

_____,
a _____

By:_____
Name:_____
Title:_____

**SUBLANDLORD:**

_____,
a _____

By:_____
Name:_____
Title:_____

_____, as guarantor of the obligations of Subtenant under the Sublease, has executed this Agreement under seal for the purpose of acknowledging and consenting to the same.

**GUARANTOR:**

_____,
a _____

By:_____
Name:_____
Title:_____

STATE OF NEW YORK )
                         ) S.S.:
COUNTY OF NEW YORK )

On the _____ day of _____, before me, the undersigned, a notary in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument

_____
Notary Public

STATE OF _____

COUNTY OF _____

This instrument was ACKNOWLEDGED before me on _____, _____, by _____, as _____ of _____, a _____, on behalf of said _____.

[S E A L]

My Commission Expires:

_____

Notary Public - State of _____

Printed Name of Notary Public

STATE OF _____

COUNTY OF _____

This instrument was ACKNOWLEDGED before me on _____, _____, by _____, as _____ of _____, a _____, on behalf of said _____.

[S E A L]

My Commission Expires:

_____

Notary Public - State of _____

Printed Name of Notary Public

·

## EXHIBIT A

(The Property)

## EXHIBIT B

## QUALIFIED SUBLEASE DEFINITION

"'Qualified Sublease' means a Sublease which satisfies one of the following criteria:

(i) the Sublease of a certain portion of the Retail Space as in effect on the date of this Lease and identified on Schedule B annexed hereto;

(ii) with respect to Retail Space, the sublessee is a Person with a regional or national presence of at least fifty (50) locations which has a net worth (calculated in accordance with GAAP, but excluding goodwill) of at least $50 million (as such amount may be increased on each anniversary of the date hereof in the same proportion that the CPI increases over each annual period) and such Sublease demises at least 5,000 square feet of Retail Space; and

(iii) with respect to the Supermarket Space, one (1) or more (but not more than three (3)) Subleases which each satisfy all of the following criteria:

(a) each sublessee is a Person with a local, regional or national presence of at least fifty (50) locations and has a net worth (calculated in accordance with GAAP, but excluding goodwill) of at least $50 million (as such amount may be increased on each anniversary of the date hereof in the same proportion that the CPI increases over each annual period);

(b) each sublessee, individually, subleases at least 20,000 rentable square feet and, collectively, such sublessees sublease substantially all the Supermarket Space (i.e. all of the Supermarket Space but excluding only rear storage or mechanical space deemed unmarketable by Lessee);

(c) each subleased space must be rectangular in configuration (other than adjustments to provide access to the rear loading areas and any rear storage or mechanical space deemed unmarketable by Lessee) and no sublessee may sublease less than 25% of the frontage of the Supermarket Space;

(d) each sublessee must have an investment grade credit rating by Standard & Poor's and Moody's but in no event may any sublessee have a credit rating less than the then existing credit rating of A&P;

(e) the initial term of each sublease must expire one day prior to the Lease Term in effect on the date of such sublease and if any sublease contains one or more options for renewal periods, each sublease shall contain the same number of options for renewal periods having the same duration; and

(f) in the event the Supermarket Space is subleased to more than one (1) but not more than three (3) sublessees, no such sublease shall be a Qualified Sublease unless and until all such sublessees in the Supermarket Space meet the criteria of subsections (a), (b), (c), (d) and (e) above."

## EXHIBIT C

## CONDITIONS OF SECTION 13.4(a) OF THE OVERLEASE

"(1) The base rent (calculated on a per square foot basis) payable by the sublessee under such Sublease shall be at a rate at least equal to the greater of (x) seventy-five percent (75%) of the then Fair Market Rental Value thereof or (y) the Base Rent payable by Lessee (calculated on a per square foot basis) pursuant to this Lease; provided, however, that the aggregate amount of the base rent paid by the sublessees of Supermarket Space must equal or exceed 110% of the then payable Base Rent under this Lease and the base rent payable under the Sublease during an renewal term shall under no circumstances be reduced below the base rent payable during the initial term of the Sublease; and

(2) The obligations of the sublessee under the Sublease including, without limitation, · obligations with respect to payment of additional rent, shall be substantially the same as the obligations of Lessee under this Lease (except for the sublessee's base rent, which shall be as set forth in subsection (1) above, except that the term of the Sublease shall be at least one (1) day less than the Lease Term as same shall be renewed from time to time, and except that the size of the premises subleased by sublessee may be smaller than the leasable premises of the Improvements."

Exhibit C

(Maintenance and Repair Items)