WACHTEL & MASYR, LLP
885 Second Avenue, 47th Floor
New York, NY 10017
(212) 909-9500
Steven J. Cohen, Esq.
*Attorneys for Landlord Charles Plaza, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:  :  Chapter 11

THE GREAT ATLANTIC & PACIFIC  :  Case No. 10-24549 (RDD)
TEA COMPANY, INC., et al.,  :  (Jointly Administered)

Debtors.  :

---

## OBJECTION OF CHARLES PLAZA, LLC TO THE ASSUMPTION AND ASSIGNMENT OF THE UNEXPIRED LEASE OF SUPER FRESH STORE NO. 101

To: Honorable Robert D. Drain
    United States Bankruptcy Judge

Charles Plaza, LLC, (the "Landlord") by its undersigned counsel, hereby objects to the Debtors' proposed assumption and assignment of the unexpired lease of Super Fresh Store No. 101 located in Baltimore, Maryland as set forth in Debtors' Notice of Assumption and Assignment of the Unexpired Lease of Store No. 101—Baltimore, Maryland (the "Assumption Notice"), and states as follows:

### Introduction

1. The Landlord is the lessor of certain real property located at 222 North Charles Street, Baltimore, Maryland 21201 (the "Premises") pursuant to a Lease dated July 14, 2005 (as amended from time to time, the "Lease") between the Landlord and Super Fresh Food Markets,

Inc. ("SFFM")[1]. The Tenant's obligations under the Lease are guaranteed by Debtor The Great Atlantic & Pacific Tea Company, Inc. ("A&P"). The Super Fresh store operated by the Tenant under the Lease (the "Charles Plaza Store") is located in a shopping center called Charles Plaza.

2. On June 1, 2011, Debtors served a copy of the Assumption Notice upon the Landlord in which they propose to assume the Lease and assign it to Mrs. Greens Management Corp. ("Mrs. Greens"). The Assumption Notice also provides that the Debtors plan to cure all outstanding defaults under the Lease in accordance with the assumption of the Lease, and that the amount necessary to cure existing defaults is $215.

3. On June 1, 2011, Debtors also served Landlord with five pages of material that it contends constitutes information demonstrating Mrs. Greens' adequate assurance of future performance under §§ 365(f)(2)(B) and 365(b)(3) of the Bankruptcy Code (the "Assurance Information").

4. The Landlord objects to the Debtors' proposed assumption of the Lease and assignment of such Lease to Mrs. Greens because (a) Landlord has not received adequate assurance of future performance by Mrs. Greens and (b) the Landlord disputes the cure amount set forth in the Debtors' Assumption Notice.

**Landlord Has Not Received Adequate Assurance of Future Performance As Required Under Section 365 of the Code**

5. Section 365(f)(2) permits a debtor to assign an unexpired lease, but only if adequate assurance of future performance by the assignee of the lease is provided. 11 U.S.C. §365(f)(2). If a lease to be assigned is part of a shopping center, the lessor under the lease must also be provided with adequate assurance that the source of rent and other consideration due under the lease and the financial condition and operating performance of the proposed assignee

---

[1] On February 26, 2010, SFFM assigned to A&P and A&P assumed all of SFFM's obligations as tenant under the Lease. The tenant under the Lease is sometimes hereinafter referred to as the "Tenant."

2

and its guarantors will be similar to the financial condition and operating performance of the debtor and its guarantors as of the time the debtor became the lessee under the lease. 11 U.S.C. §365(b)(3)(A). If a default has occurred in an unexpired lease, a debtor may not assume such a lease unless, at the time of assumption, the debtor cures or provides adequate assurance that it will promptly cure all such defaults. 11 U.S.C. § 365(b)(2)(A).

6. The determination of what constitutes adequate assurance of future performance under an unexpired lease is to be determined on a case-by-case basis. Matter of Nat'l Shoes, Inc., 20 B.R. 55, 59 (Bankr.S.D.N.Y. 1982). The term must be given a "practical, pragmatic construction... to be determined under the facts of each particular case." In re Sanshoe Worldwide Corp., 139 B.R. 585, 592 (Bankr.S.D.N.Y. 1992).

7. Adequate assurance of future performance is required so that a landlord will be protected from having to take on the burden of a tenant who may likely default on its lease obligations after assumption and assignment have occurred. *In re Natco Industries, Inc.,* 54 B.R. 436, 440-41 (Bankr.S.D.N.Y. 1995). The statutory intent is on protecting the landlord so that it receives what it originally bargained for under the original lease. *In re Ames Dep't Stores, Inc.,* 121 BR 160, 165 n.4 (Bankr.S.D.N.Y. 1990). The chief determinant of adequate assurance of future performance is whether the rent will be paid. *Natco* at 440-41

8. Prior to receiving the Assumption Notice, the Landlord's counsel sent a letter to Debtors' counsel requesting financial information regarding Mrs. Greens. A copy of the letter to Debtors' counsel requesting adequate assurance information is attached hereto as Exhibit 1. In this letter, the Landlord requested information regarding Mrs. Greens' business plan for the Charles Plaza Store, including financial projections and staffing plans. In particular, the Landlord pointed out that Mrs. Greens' existing 11 stores focus on the sale of organic and natural

foods and inquired as to whether Mrs. Greens intended to operate the Charles Plaza Store as a natural foods market or a traditional supermarket. The Landlord also requested information regarding Mrs. Greens' ownership structure, officers and financial information for Mrs. Greens, including income statements and balance sheets for the past three years. The Landlord also asked that Mrs. Greens demonstrate how it intended to finance the cost of the acquisition of the Charles Plaza Store and the other seven stores that it intends to acquire from the Debtors.

9. After Landlord sent Exhibit 1 to Debtors, it received the Assurance Information from Debtors. The Assurance Information does not come close to satisfying the adequate assurance requirements under §§ 365(f)(2) and 365(b)(3). The Assurance Information is comprised of (a) a one and one-half page letter from the chairman of Mrs. Greens' parent company, Natural Market Restaurants Corp. ("NMRC") and (b) a draft balance sheet for NMRC. The NMRC letter provides some very limited information regarding NMRC's earnings before interest, taxes and depreciation and amortization (EBITDA). NMRC also furnishes a draft, unaudited balance sheet as of December 26, 2010, but the balance sheet lacks any detailed description or notes regarding its entries. No information is provided regarding Mrs. Greens' financial performance during the past three years. Although Mrs. Greens is proposed as the assignee of the Lease, all of the limited financial information provided relates solely to NMRC.

10. Significantly, although the Assurance Information refers to a planned infusion of capital into NMRC by its parent company, The Catalyst Capital Group, Inc., there is no indication how much, if anything, of the planned cash infusion will be utilized for the Charles Plaza Store.

11. The Assurance Information fails to explain whether Mrs. Greens plans to operate the Charles Plaza Store as an organic/natural foods market or as a traditional supermarket.

4

Debtors furnish no balance sheets or income information for Mrs. Greens for the past three years – information that is instrumental in evaluating Mrs. Greens' ability to operate the Charles Plaza Store and pay the rent and other amounts due under the Lease. No financial projections for the first year of operations as a Mrs. Greens store is provided nor has any information regarding the management of Mrs. Greens been furnished. No information is furnished as to whether Mrs. Greens is in compliance with its existing loans or lines of credit, and whether it intends to rely on such loans or lines of credit to satisfy its financial obligations under the Lease.

12. The Landlord has not received sufficient documentation to demonstrate that Mrs. Greens' ability to perform its obligations under the Lease. If Mrs. Greens plans to operate an organic market, it has not furnished any documentation to demonstrate that it can operate a successful organic food market at Charles Plaza. If Mrs. Greens intends to operate a traditional supermarket similar to that operated by Debtors, it has furnished no documentation regarding its experience and ability to manage and operate such a market.

13. Debtors also fail to provide the type of adequate assurance of future performance required under § 365(b)(3)(A). This provision applies if the lease in question is part of a shopping center. The Code does not define "shopping center", but this Court has adopted the multi-factor test set forth by the Third Circuit in *In re Joshua Slocum*, 922 F.2$^d$ 1081, 1087-88 (3d Cir. 1991) to determine whether premises are a "shopping center" under § 365(b)(3). This test calls for the consideration of the following factors—whether there is:

   (1) a combination of leases;
   (2) all leases held by a single landlord;
   (3) all tenants engaged in the commercial retail distribution of goods;
   (4) the presence of a common parking area;
   (5) the purposeful development of the premises as a shopping center;
   (6) the existence of a master lease;
   (7) the existence of fixed hours during which all stores are open;
   (8) the existences of joint advertising;

(9) contractual interdependence of the tenants as evidence by restrictive use provisions in their leases;
(10) the existence of percentage rent provisions in the leases;
(11) the right of the tenants to terminate their leases if the anchor tenant terminates its lease;
(12) joint participation by the tenants in trash removal and other maintenance;
(13) the existence of a tenant mix; and
(14) the contiguity of the stores.

A party need not satisfy all of the above factors in order to be deemed a shopping center. Instead, this Court has focused on the configuration of the stores and the contractual independence of tenants. In *Ames Department Stores, Inc.*, 127 B.R. 744 (Bankr.S.D.N.Y. 1991), the Court considered whether a group of stores located together constituted a shopping center. The Court found that the location of the stores in buildings located around a common area satisfied the threshold test of a physical resemblance to a shopping center. *Id.* at 750-51. Next, the Court focused upon the contractual interdependence of the tenants by examining the restrictive use provisions in the leases. *Id.* at 751. The Court pointed out that the smaller stores are limited by use clauses in their leases as to what they can sell, but the anchor stores do not have such strict restrictions. *Id.* at 751-52. Based on the constraints of the use of the small store premises and partial constraints imposed on the anchor store, the Court held that the stores constituted a shopping center under § 365(b)(3). *Id.*

14. The contractual interdependence and store configuration at Charles Plaza is analogous to the shopping center in *Ames*. Charles Plaza was purposefully developed as a shopping center with a grocery store to be the anchor tenant and with smaller stores and food establishments to comprise the remainder of the tenants at the Plaza. The stores are contiguous to each other in that the Super Fresh is located on one side of a small plaza, and the remaining tenants are located on the other side of the plaza. As in *Ames*, there are restrictions in each of the

leases, including the Super Fresh Lease. The Lease includes a percentage rent provision and also requires that the Tenant's space be operated initially as a supermarket. Each of the other tenants at Charles Plaza is permitted to operate their establishment only for a single use, and they are not permitted to operate their establishments for any other uses. The Lease also prohibits the Landlord from leasing any other space at Charles Plaza for use as a supermarket. Charles Plaza satisfies the threshold physical resemblance test noted in *Ames*, and also has significant competition restraints on the smaller tenants. (The facts demonstrating that Charles Plaza is a shopping center are set forth in the Declaration of Edward Dosik, attached hereto as Exhibit 2.) Accordingly, Charles Plaza is a "shopping center" under § 365(b)(3).

15. Because the Lease involves space in a shopping center, the Landlord is entitled to adequate assurance of the source of rent and the financial condition and operating performance of the proposed assignee and any guarantors. 11 U.S.C. § 365(b)(3)(A). However, the Landlord has not received any such assurance. No documentation has been provided as to the source of rent to be paid by Mrs. Greens if it assumes the Lease. Debtors and Mrs. Greens also have failed to demonstrate if Mrs. Greens has the financial condition and operating performance similar to the financial condition and operating performance of the Tenant as of the time it became the lessee under the Lease. The Tenant signed the Lease in July 2005, and A&P guaranteed the performance of the Tenant's obligations under the Lease. The Landlord would not have signed the Lease if A&P did not guarantee the Tenant's obligations under the Lease. The guaranty furnished by A&P was critical to the Landlord. It is also appears that NMRC is unwilling to assume the guaranty under the Lease. Even if NMRC intends to assume the obligations as a guarantor of the Lease, Landlord has not received any information showing that the financial

condition and operating performance of NMRC is comparable to the financial condition and operating performance of A&P when the Lease was signed in July 2005.

16. The Landlord requested that Mrs. Greens provide information regarding its ability to perform its obligations under the Lease. The Assurance Information furnished by the Debtors does not constitute adequate assurance of future performance under §§ 365(f)(2)(B) and 365(b)(3). Accordingly, this Court should reject the assumption of the Lease by the Debtors and its assignment to Mrs. Greens.

### Landlord Disputes the Cure Costs Set Forth in the Assumption Notice

17. The Debtors cannot assume the Lease unless at the time of assumption of the Lease it cures all such defaults. In the Assumption Notice, Debtors allege that the outstanding defaults under the Lease amount to $215, and Debtors propose to pay this sum upon assumption of the Lease. Contrary to the Debtors' assertion, the amount required to cure defaults under the Lease is $17,885.50. This figure constitutes the amount estimated to repair damage caused by the Tenant's negligent installation of freezer and refrigeration rooms in the demised premises, and outstanding utility charges.

18. In July 2010, the Landlord observed that condensation was forming on the ceiling of a room located below the freezer and refrigeration rooms located in the Super Fresh store. The Landlord retained the services of an insulation contractor to inspect the freezer and refrigeration rooms and the room below in order to assess the problem and to devise a remedy to address it. The contractor concluded that the moisture and condensation problem was occurring because Tenant did not, prior to the installation of the freezer and refrigeration rooms, ensure that sufficient, if any, insulation was placed on the floor of those rooms. In order to remedy the condensation problem, the insulation contractor has recommended that fiberglass board

insulation be inserted into the ceiling directly below the freezer and refrigeration rooms. The contractor submitted a proposal to perform the recommended installation of insulation into the ceiling for $8,631. The Landlord notified the Tenant of the condensation problem, provided it with a copy of the contractor's proposal to address the problem and requested that it pay for the recommended repair. However, Tenant did not respond to the Landlord's request and refused to pay for the recommended repair. (See Dosik Declaration, paragraphs 11 - 13.)

19. In April 2011, the Landlord discovered that condensation also was forming on the ceiling in a second room located below the freezer and refrigeration rooms. This second room is adjacent to the room where condensation was first observed in July 2010. After observing the condensation in the second room, the Landlord requested that the insulation contractor re-visit the site and provide an updated proposal to address the condensation problem in the two rooms. The insulation contractor concluded that the cost to install insulation in the ceiling of the two rooms is $16,736. (See Dosik Declaration, paragraph 14).

20. Under the terms of the Lease, the Tenant is required to make all necessary repairs and replacements required as a result of the Tenant's negligence. Tenant requested that the freezer and refrigeration rooms be installed in its space, and the Tenant approved the design and installation of the freezer and refrigeration rooms that were installed. The Tenant also selected the contractor that installed the freezer and refrigeration rooms. Tenant is obligated to pay for the cost of the insulation repair because the problem was caused by its failure to install properly-designed, properly insulated freezer and refrigeration rooms within its leased space.

21. The Tenant also currently owes the Landlord $1,149.50 in unpaid utility charges pursuant to Section 17 of the Lease. An itemized list of the utility charges that is due and owing is set forth in the tenant delinquency report attached as Exhibit C to the Dosik Declaration.

22. If this Court determines that adequate assurance of future performance has been provided, this Court should require the Tenant to pay $17,885.50 to cure the existing defaults under the Lease.

### Conclusion

For the reasons set forth above, Charles Plaza LLC requests that this Court enter an Order denying the proposed assumption of the Lease by Debtors and assignment to Mrs. Greens. Alternatively, if this Court determines that adequate assurance of future performance has been provided, Landlord requests that this Court require the Tenant to pay $41,906.52 on or before the assumption of the Lease to cure the defaults under the Lease.

Dated: New York, New York
June 7, 2011

**WACHTEL & MASYR, LLP**

/s/ Steven J. Cohen
Steven J. Cohen
885 Second Avenue, 47th Fl.
New York, NY 10017
(212) 909-9500

-and-

**GALLAGHER EVELIUS & JONES LLP**
Thomas C. Dame (Pro Hac Vice Pending)
Matthew W. Oakey (Pro Hac Vice Pending)
218 N. Charles Street, Suite 400
Baltimore, MD 21201
(410) 347-1359
*Attorneys for Creditor*
*Charles Plaza, LLC*