> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*[1] | ) | Case No. 10-24549 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' DISCLOSURE STATEMENT FOR THE**
**DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT**
**TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock                    - and -
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

**KIRKLAND & ELLIS LLP**
James J. Mazza, Jr.
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*
Dated:  November 14, 2011

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION** .................................................................................... **8**
    A.    Rules of Interpretation ................................................................................ 8

**ARTICLE II. OVERVIEW OF THE PLAN** ................................................................. **9**
    A.    General Structure of the Plan ..................................................................... 9
    B.    Classification of Claims and Interests Under the Plan ............................... 9
    C.    Treatment of Claims and Interests Under the Plan .................................... 11
    D.    Investment Analysis, Liquidation Analysis, and Financial Projections .......... 14
    E.    Certain Factors to Be Considered Prior to Voting ..................................... 16

**ARTICLE III. VOTING PROCEDURES** .................................................................. **16**
    A.    Vote Required for Acceptance by a Class ................................................. 17
    B.    Classes Not Entitled to Vote ..................................................................... 17
    C.    Solicitation Procedures .............................................................................. 18
    D.    Voting Procedures ..................................................................................... 19
    E.    Confirmation Hearing ................................................................................ 20
    F.    Confirmation and Consummation of the Plan ........................................... 20

**ARTICLE IV. GENERAL INFORMATION** ............................................................. **20**
    A.    Overview of the Debtors' History and Industry ......................................... 20
    B.    A&P's Corporate Structure ........................................................................ 21
    C.    Competition ............................................................................................... 21
    D.    Legacy Obligations .................................................................................... 21
    E.    Executive Officers of the Debtors ............................................................. 22
    F.    The Debtors' Prepetition Capital Structure ............................................... 23
    G.    Employees ................................................................................................. 26
    H.    Benefit Plans ............................................................................................. 26

**ARTICLE V. THE CHAPTER 11 CASES** ................................................................ **30**
    A.    Events Leading to the Commencement of the Chapter 11 Cases ............... 30
    B.    Stabilization of Operations ........................................................................ 31
    C.    Postpetition Financing ............................................................................... 34
    D.    Appointment of Committees ...................................................................... 35
    E.    Operational Restructuring Initiatives ......................................................... 35
    F.    Executory Contracts and Unexpired Leases .............................................. 39
    G.    Analysis and Resolution of Claims ........................................................... 39
    H.    Maintaining Exclusive Right to File a Plan of Reorganization .................. 40
    I.    Negotiations Relating to the Development of the Plan ............................... 40

**ARTICLE VI. PLAN SUMMARY** ............................................................................ **41**
    A.    Overview of Chapter 11 ............................................................................ 41
    B.    Overall Structure of the Plan ..................................................................... 43
    C.    Substantive Consolidation Settlement ....................................................... 44
    D.    Trade Creditors ......................................................................................... 47
    E.    Administrative and Priority Claims ............................................................ 47
    F.    Classification of Claims and Interests ....................................................... 49
    G.    Treatment of Classes of Claims and Interests ........................................... 50

H.    Special Provisions Governing Vote Tabulation.................................................. 55
I.    Special Provision Governing Unimpaired Claims ........................................... 56
J.    Provisions for Implementation of the Plan .................................................... 56
K.    Treatment of Executory Contracts and Unexpired Leases.............................. 63
L.    Procedures for Resolving Disputed Claims and Interests................................ 66
M.    Provisions Governing Distributions................................................................ 69
N.    Effect of Confirmation of the Plan................................................................. 74
O.    Conditions Precedent to Consummation of the Plan ..................................... 80
P.    Retention of Jurisdiction ................................................................................ 82
Q.    Miscellaneous Provisions ............................................................................... 84

**ARTICLE VII. SECURITIES LAW MATTERS** ....................................................... **87**
A.    Securities Issued in Reliance on Section 1145 of the Bankruptcy Code ......... 87
B.    Securities Issued Pursuant to Exemptions Under the Securities Act of 1933, as
      Amended......................................................................................................... 88
C.    Resales of 1145 Securities and 4(2) Securities /Rule 144 and Rule 144A ...... 89

**ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN**................................................................................................................... **90**
A.    The Confirmation Hearing.............................................................................. 90
B.    Confirmation Standards.................................................................................. 90
C.    Liquidation Analysis....................................................................................... 92
D.    Valuation Analysis.......................................................................................... 92
E.    Financial Feasibility........................................................................................ 93
F.    Acceptance by Impaired Classes ..................................................................... 93
G.    Confirmation Without Acceptance By All Impaired Classes ......................... 93

**ARTICLE IX. PLAN-RELATED RISK FACTORS AND ALTERNATIVES  TO
CONFIRMATION AND CONSUMMATION OF THE PLAN** ......................................... **94**
A.    General............................................................................................................ 94
B.    Certain Bankruptcy Law Considerations ....................................................... 95
C.    Risk Factors That May Affect the Value  of the Securities to Be Issued Under the
      Plan ................................................................................................................ 96
D.    Risk Factors That Could Negatively Impact the Debtors' Business................ 98
E.    Risks Associated with Forward Looking Statements .................................... 105
F.    Disclosure Statement Disclaimer .................................................................. 106
G.    Liquidation Under Chapter 7 ....................................................................... 107

**ARTICLE X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES**........................ **108**
A.    Certain United States Federal Income   Tax Consequences to the Reorganized
      Debtors.......................................................................................................... 109
B.    Certain United States Federal Income  Tax Consequences to Holders of Claims ......... 111

**ARTICLE XI. RECOMMENDATION** .............................................................. **113**

K&E 20463290

## EXHIBITS

**Exhibit A**      Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code

**Exhibit B**      Approved Disclosure Statement Order [To Be Filed]

**Exhibit C**      The Reorganized Debtors' Financial Projections [To Be Filed]

**Exhibit D**      Liquidation Analysis [To Be Filed]

**Exhibit E**      Debtors' Prepetition Corporate Structure Chart

K&E 20463290

## DISCLAIMER

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN (AS DEFINED HEREIN) AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION.    THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION AND THE TERMS AND PROVISIONS OF THE PLAN REFERENCED IN THE DISCLOSURE STATEMENT, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH IN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW,

GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT AND/OR SECTION 1145 OF THE BANKRUPTCY CODE.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION COMMENTED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, ATTACHED HERETO AS **EXHIBIT C** AND DESCRIBED IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS.  THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

PLEASE REFER TO ARTICLE IX OF THE DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS, LLC, THE DEBTORS' CLAIMS AGENT ("KCC") NO LATER THAN 5:00 P.M. PREVAILING PACIFIC TIME, ON [JANUARY 26], 2012.  SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE III OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON [FEBRUARY 6], 2012 AT [10:00 A.M.] PREVAILING EASTERN TIME, BEFORE THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, 300 QUARROPAS STREET, WHITE PLAINS, NEW YORK 10601 (THE "***BANKRUPTCY COURT***").   THE DEBTORS MAY CONTINUE THE

K&E 20463290

CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.  THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING.  THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS JANUARY 26, 2012, AT 5:00 P.M. PREVAILING EASTERN TIME.  ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN  INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

K&E 20463290

**Important Information About This Disclosure Statement**

This Disclosure Statement provides information regarding the Plan of Reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court. The Debtors believe that the Plan is in the best interests of all creditors. The Debtors urge all holders of Claims entitled to vote on the Plan to vote in favor of the Plan.

**Unless the context requires otherwise, reference to "we," "our," and "us" are to the Debtors.**

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan and the exhibits attached thereto, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISION OF THE PLAN, AS IT RELATES TO SUCH INCONSISTENCY, WILL GOVERN.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any claim holder entitled to vote on the Plan.

This Disclosure Statement has not been reviewed, approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

4

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Some of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "***Securities Act***"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or other applicable exemptions. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration, other than section 1145, apply, such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs, including pension, retiree, tort and environmental costs and costs of environmental remediation;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing products and services;

- projected price increases;

- projected general market conditions;

K&E 20463290

- benefits from new technology; and

- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the ability of the Debtors to continue as going concerns;

- the ability of the Debtors to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases;

- the ability of the Debtors to prosecute, develop and consummate the proposed Plan with respect to the Chapter 11 Cases;

- the effects of the bankruptcy filing on the Debtors and the interests of various creditors, equity holders and other constituents;

- Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the cases in general;

- the length of time the Debtors will operate under the Chapter 11 Cases;

- risks associated with third-party motions in the Chapter 11 Cases, which may interfere with the ability of the Debtors to develop and consummate the proposed Plan;

- the potential adverse effects of the Chapter 11 Cases on the Debtors' liquidity or results of operations;

- the ability to execute the Debtors' business and restructuring plan and to timely and effectively implement the turnaround strategy;

- increased legal costs related to the bankruptcy filing and other litigation;

- the Debtors' ability to maintain contracts that are critical to its operation;

- the Debtors' ability to obtain and maintain normal terms with customers, suppliers and service providers;

- the Debtors' ability to retain key executives, managers and employees;

- various operating factors and general economic conditions, competitive practices and pricing in the food industry generally and particularly in our principal geographic markets;

- our relationships with our employees;

K&E 20463290

- the terms of future CBAs;

- the costs and other effects of lawsuits and administrative proceedings;

- the nature and extent of continued consolidation in the food industry;

- changes in the capital markets which may affect our cost of capital or the ability to access capital;

- supply or quality control problems with our vendors;

- regulatory compliance; and

- changes in economic conditions, which may affect the buying patterns of our customers.

Additional factors that could cause actual results to differ materially from the forward-looking statements we make in this Disclosure Statement are set forth in the reports or documents that we file from time to time with the SEC, including our most recent Annual Report on Form 10-K filed with the SEC on May 10, 2011 (File No. 001-04141), as amended by our Form 10-K/A filed with the SEC on June 24, 2011 (File No. 001-04141), and our Quarterly Report on Form 10-Q filed with the SEC on October 28, 2011 (File No. 001-04141), including any amendments thereto, each of which is hereby incorporated by reference herein.

7

# ARTICLE I.
## INTRODUCTION

On December 12, 2010, (the "***Commencement Date***"), the above captioned debtors and debtors in possession (collectively, the "***Debtors***," and with their non-Debtor affiliates, "***A&P***") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (as defined herein) in the Bankruptcy Court (the "***Chapter 11 Cases***").   On December 13, 2010, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) under the lead case:  The Great Atlantic & Pacific Tea Company, Inc.; Case No. 10-24549.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed in the Chapter 11 Cases.  On December 21, 2010, the United States Trustee for the Southern District of New York (the "***United States Trustee***") appointed an official committee of unsecured creditors (the "***Creditors' Committee***") pursuant to section 1102 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***").

The Debtors submit this disclosure statement (the "***Disclosure Statement***") pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Plan***"), filed contemporaneously herewith, a copy of which is attached to the Disclosure Statement as **Exhibit A**.[2]

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.   In addition, this Disclosure Statement discusses the requirements for Confirmation of the Plan and the voting procedures that holders of Claims and Interests entitled to vote on the Plan must follow for their votes to be counted.

## A.    **Rules of Interpretation**

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the

---

2    Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan.

rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) unless otherwise specified herein, any reference to the term "including" herein shall mean "including without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (11) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (14) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (15) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II.
## OVERVIEW OF THE PLAN

### A.    General Structure of the Plan

Pursuant to the Plan, the Investors are providing a total New Money Commitment of $490 million in the form of (i) $210 million[3] face amount of privately placed New Second Lien Notes, (ii) $210 million face amount of privately placed New Convertible Third Lien Notes, and (iii) an $80 million New Equity Investment.  The proceeds of the New Money Commitment will allow the Debtors to make distributions pursuant to the Plan, including paying secured creditors in full in cash, and will provide a $40 million cash pool for distributions to General Unsecured Creditors.

The Plan provides for a settlement and compromise of the intercreditor issues relating to whether the liabilities and assets of the Debtors should be substantively consolidated for purposes of distributions under the Plan.  Except as modified by this Substantive Consolidation Settlement, Claims are treated generally in accordance with the priorities established under the Bankruptcy Code.

### B.    Classification of Claims and Interests Under the Plan

1.        Classification

The Plan divides all Claims (except Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims) and all Interests into various Classes.  Listed below is a summary of the Classes of Claims and Interests under the Plan.

| Class | Claim or Interest |
|:---:|:---:|
| A | Second Lien Note Claims |
| B | Secured Tax Claims |
| C | Other Secured Claims |
| D | Other Priority Claims |
| E | Convertible Notes Claims |

---

[3]    The $210 million face amount of the New Second Lien Notes will be issued with a 5.0% original issue discount, therefore, the aggregate amount of the securities includes $200 million—not $210 million—in funds from the issuance of the New Second Lien Notes.

| Class | Claim or Interest |
|---|---|
| F | 9.125% Senior Note Claims |
| G | Quarterly Interest Bond Claims |
| H | Trade Claims |
| I | Guaranteed Landlord Claims |
| J | Union Claims |
| K | General Unsecured Claims |
| L | Intercompany Claims |
| M | Interests in A&P |
| N | Intercompany Interests |
| O | Section 510(b) Claims |

2.      Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Professional Claims, DIP Facility Claims, or Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in Article III of the Plan.

| Claim | Plan Treatment | Estimated Aggregate Amount of Allowed Claims Under Plan | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative and Professional Claims | Paid in full in Cash. | [__] | 100% |
| DIP Facility Claims | Paid in full in Cash. | [__] | 100% |
| Priority Tax Claims | Paid in full in Cash. | [__] | 100% |

10

**C.**    **Treatment of Claims and Interests Under the Plan**

The table below summarizes the Classes of Claims and Interests under the Plan, the treatment of such Classes, the voting rights of such Classes, the projected recovery, if any, under the Plan for such Classes, and the projected recovery, if any, under a Chapter 7 liquidation.   To the extent of any inconsistency between the summaries contained in the Disclosure Statement and those set forth in the Plan, the Plan shall govern.

| Class | Type of Claim or Interest | Estimated Range of Allowed Claims or Interests | Treatment of Claim/Interest | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| A | Second Lien Note Claims | $[__] | • Paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter; or <br> • Receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim | [100]% | [__]% |
| B | Secured Tax Claims | $[__] | • Paid in full in Cash on the Effective Date; <br> • Paid in equal semi-annual cash payments for up to five years, in aggregate amount equal to full Claim amount; or <br> • Paid in regular Cash payments in a manner not less favorable than the most favored non-priority Claim | 100% | [__]% |

K&E 20463290

| | | | | | |
|---|---|---|---|---|---|
| C | Other Secured Claims | $[__] | • Reinstated; • Paid in full (including interest), in Cash; or • Receive collateral securing full amount of Claim (including interest) | 100% | [__]% |
| D | Other Priority Claims | $[__] | Paid in full in Cash on the later of: • the Effective Date, or • the date the Claim becomes Allowed | 100% | [__]% |
| E | Convertible Notes Claims | $[__] | Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool | [__]% | 0% |
| F | 9.125% Senior Note Claims | $[__] | Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool | [__]% | 0% |
| G | Quarterly Interest Bond Claims | $[__] | Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool | [__]% | 0% |
| H | Trade Claims | $[__] | • Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool; and • If Holder enters into a trade agreement acceptable to the Debtors and the Investors before the Effective Date, paid Pro Rata share of the Trade Claims Cash Pool with total recovery on each Claim capped at [__]% of Allowed amount | [__]% | 0% |

12

| | | | | | |
|---|---|---|---|---|---|
| I | Guaranteed Landlord Claims | $[__] | • Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool; and<br>• If Holder votes in favor of the Plan, Pro Rata share of the Substantive Consolidation Settlement Cash Pool, with total recovery on each Claim capped at [__]% of Allowed amount | [__]% | 0% |
| J | Union Claims | $[__] | Paid pursuant to Union Settlement Agreement | [__]% | 0% |
| K | General Unsecured Claims | $[__] | Paid Pro Rata share of $40 million Unsecured Creditor Cash Pool | [__]% | 0% |
| L | Intercompany Claims | $[__] | No recovery, but may be Reinstated in the discretion of the Debtors | 0% - 100% | 0% |
| M | Interests in A&P | $[__] | Cancelled | 0% | 0% |
| N | Intercompany Interests | $[__] | No recovery, but may be Reinstated in the discretion of the Debtors | 0% - 100% | 0% |
| O | Section 510(b) Claims | $[__] | No recovery | 0% | 0% |

The Debtors' Claims Agent has received approximately [____] Proofs of Claim totaling approximately $[__] billion. While the Debtors have not reconciled all filed Proofs of Claim against their books and records or begun the claims objection process, they believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, have assumed for purposes of estimating recoveries that such Claims shall be reduced in amount or expunged from the Claims Register, such that the actual total amount of the claims pool is approximately [$___ billion to $___ billion]. On the other hand, additional Proofs of Claim may be filed after the Bar Date, which could be Allowed by the Bankruptcy Court. Accordingly, the ultimate number and Allowed amount of Claims asserted against the Debtors are not presently known and the final resolution of such Claims could result in a material adjustment to the recoveries and Claim estimates provided above.

K&E 20463290

D.    **Investment Analysis, Liquidation Analysis, and Financial Projections**

1.            Analysis of the Investors' New Money Commitment to the Debtors

Pursuant to the Plan and the Securities Purchase Agreements, the Investors are providing a total New Money Commitment of $490 million in the form of (i) $210 million[4] face amount privately placed New Second Lien Notes, (ii) $210 million face amount privately placed New Convertible Third Lien Notes, and (iii) an $80 million New Equity Investment.  The proceeds of the New Money Commitment will allow the Debtors to make distributions pursuant to the Plan, including paying secured creditors in full in cash, and will provide a $40 million cash pool for distributions to General Unsecured Creditors.

The Debtors and Lazard believe that this investment best maximizes the value of the Debtors' estates and provides the Debtors with the best chances of reorganizing successfully because:

o        the investment represents the culmination of several months of robust negotiations;

o        the Debtors received no viable inbound inquiries except from the Investors, which, given the high profile of the Debtors' Chapter 11 Cases and the fact that the Debtors filed for bankruptcy protection in late 2010, make it unlikely that additional parties with serious interest in providing the Debtors with the needed level of capital will emerge;

o        the investment allows the Debtors to potentially emerge from bankruptcy instead of lingering in chapter 11 and accruing extra bankruptcy-related costs every day;

o        the investment remains subject to offers on higher or better terms, specifically, the Debtors will be able to fully consider any proposal they receive from a third party and should the Board approve the negotiation of such proposal, and under circumstances delineated in the Securities Purchase Agreements, terminate such agreements, subject to a $15 million market break-up fee; and

o        the Debtors have encouraged the Creditors' Committee's advisors that they are free to market a different deal to prospective investors.

2.            Liquidation Analysis

As described in greater detail in the Liquidation Analysis attached hereto as **Exhibit D**, in a hypothetical case under chapter 7 of the Bankruptcy Code, Holders of Administrative Claims would not be paid in full. As a result of the absolute priority rule, Holders of General Unsecured Claims would not receive any recovery in a hypothetical case under chapter 7.  By comparison, under the Plan, Holders of Administrative Claims would be paid in full in Cash; Holders of General Unsecured Claims would receive their Pro Rata share of the Unsecured Creditor Cash Pool, subject to the Substantive Consolidation Settlement; Holders of Trade Claims, if they enter into a trade agreement acceptable to the Debtors and the Investors before the Effective Date, receive their Pro Rata share of the Trade Creditor Cash Pool (subject to a cap); and Holders of Guaranteed Landlord Claims, if they vote to approve the Plan, receive their Pro Rata share of the Substantive Consolidation Settlement Cash Pool (subject to a cap).  Therefore, the Debtors believe that the Plan satisfies the "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

---

4        The $210 million face amount of the New Second Lien Notes will be issued with a 5.0% original issue discount, therefore, the aggregate amount of the securities includes $200 million—not $210 million—in funds from issuance of the New Second Lien Notes.

3.            Financial Projections

        As further discussed in Article VIII of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for the financial reorganization of the Reorganized Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years of 2012 through 2015 as attached hereto as **Exhibit C** (the "*Financial Projections*"), analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business.  In general, as illustrated by the Financial Projections and the capital infusion contemplated under the Securities Purchase Agreements, the Debtors believe that the Reorganized Debtors' businesses will be viable with long-term prospects, and will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Debtors, with the assistance of Lazard, prepared the Financial Projections in good faith, based upon estimates and certain assumptions.

        THE FINANCIAL PROJECTIONS ASSUME THAT THE PLAN WILL BE CONSUMMATED IN ACCORDANCE WITH ITS TERMS AND THAT ALL TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BE CONSUMMATED BY THE ASSUMED EFFECTIVE DATE.  ANY DELAY IN THE ASSUMED EFFECTIVE DATE OF THE PLAN MAY HAVE A NEGATIVE IMPACT ON THE OPERATIONS AND FINANCIAL PERFORMANCE OF THE DEBTORS INCLUDING, BUT NOT LIMITED TO, AN INCREASED RISK OF INABILITY TO MEET SALES FORECASTS AND HIGHER REORGANIZATION EXPENSES.    ADDITIONALLY, THE ESTIMATES AND ASSUMPTIONS IN THE FINANCIAL PROJECTIONS, WHILE CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND CONTINGENCIES.   THESE ESTIMATES AND ASSUMPTIONS ALSO ARE BASED ON FACTORS SUCH AS INDUSTRY PERFORMANCE, GENERAL BUSINESS, ECONOMIC, COMPETITIVE, REGULATORY, MARKET, AND FINANCIAL CONDITIONS, ALL OF WHICH ARE SUBJECT TO CHANGE AND BEYOND THE DEBTORS' CONTROL. GIVEN THAT FUTURE EVENTS AND CIRCUMSTANCES MAY AFFECT THE DEBTORS' ESTIMATES AND ASSUMPTIONS, THE DEBTORS EXPECT THAT ACTUAL RESULTS WILL DIFFER FROM PROJECTED RESULTS IN SOME WAY AND THAT ACTUAL RESULTS MAY BE MATERIALLY GREATER OR LESS THAN THOSE CONTAINED IN THE FINANCIAL PROJECTIONS. ACCORDINGLY, NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE PURCHASER'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.   THE FINANCIAL PROJECTIONS CONTAINED HEREIN MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS.    THE INCLUSION OF THE FINANCIAL PROJECTIONS HEREIN SHOULD NOT BE REGARDED AS AN INDICATION THAT THE DEBTORS CONSIDERED OR CONSIDER THE FINANCIAL PROJECTIONS TO RELIABLY PREDICT FUTURE PERFORMANCE.   THE FINANCIAL PROJECTIONS ARE SUBJECTIVE IN MANY RESPECTS, AND THUS ARE SUSCEPTIBLE TO INTERPRETATIONS AND PERIODIC REVISIONS BASED ON ACTUAL EXPERIENCE AND RECENT DEVELOPMENTS.  THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT THE OCCURRENCE OF FUTURE EVENTS, EVEN IN THE EVENT THAT ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE NOT BORNE OUT.  THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS AND QUALIFICATIONS SET FORTH HEREIN.

K&E 20463290

E.      **Certain Factors to Be Considered Prior to Voting**

        There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  Some of these factors, which are described in more detail in Article IX and Article X, are as follows and may impact recoveries under the Plan:

      o      Unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement.

      o      Article X describes certain significant federal tax consequences of the transactions contemplated by the Plan that may affect the Debtors, including the realization of cancellation of indebtedness income, reduction of net operating loss ("***NOL***") carryforwards and unrealized built-in losses, and the limitations that may apply to the Debtors' usage of those NOLs and unrealized built-in-losses.  Article X also describes the federal tax consequences of the transactions contemplated by the Plan that may affect holders of Claims and Interests, including the recognition of taxable income by such holders.  Holders of Claims and Interests are urged to consult with their own tax advisors regarding the federal, state, local, and foreign tax consequences of the Plan.

      o      Although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors cannot assure such compliance nor that the Bankruptcy Court will confirm the Plan.

      o      The Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code.

      o      Any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

        While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "***Voting Classes***") or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

**ARTICLE III.
VOTING PROCEDURES**

        The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim | Status |
|:-----:|:-----:|:------:|
| A | Second Lien Note Claims | Unimpaired/Impaired[5] |
| E | Convertible Notes Claims | Impaired |

---

[5]      Pursuant to Article III.C.1. of the Plan, Holders of Allowed Class A Claims shall, at the option of the Debtors and the Investors, (a) be paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter or (b) receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim.  Class A is Unimpaired under option (a) above and Impaired under option (b) above; holders of Unimpaired Allowed Class A Claims are conclusively presumed to accept the Plan and holders of Impaired Allowed Class A Claims are entitled to vote to accept or reject the Plan.

16

| Class | Claim | Status |
|-------|-------|--------|
| F | 9.125% Senior Note Claims | Impaired |
| G | Quarterly Interest Bond Claims | Impaired |
| H | Trade Claims | Impaired |
| I | Guaranteed Landlord Claims | Impaired |
| J | Union Claims | Impaired |
| K | General Unsecured Claims | Impaired |

If your Claim is not included in these Classes, you are not entitled to vote and you will not receive a Solicitation Package.[6]

### A.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims or Interests is determined by calculating the number and the amount of Claims or Interests voting to accept, based on the actual total Allowed Claims or Interests voting on the Plan.  Acceptance by a Class requires more than one-half of the number of total Allowed Claims or Interests in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims or Interests in the Class to vote in favor of the Plan.

### B.    Classes Not Entitled to Vote

Under the Bankruptcy Code, Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan.  Based on this standard, the following Classes will not be entitled to vote on the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| A | Second Lien Note Claims | Unimpaired/ Impaired | Entitled to Vote/ Conclusively Presumed to Accept[7] |
| B | Secured Tax Claims | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| L | Intercompany Claims | Impaired | Deemed to Reject |
| M | Interests in A&P | Impaired | Deemed to Reject |
| N | Intercompany Interests | Impaired | Deemed to Reject |
| O | Section 510(b) Claims | Impaired | Deemed to Reject |

---

[6]   Capitalized terms used in this Article III but not defined in the Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures attached as **Exhibit [__]** to the Disclosure Statement Order, once approved.

[7]   Pursuant to Article III.C.1. of the Plan, Holders of Allowed Class A Claims shall, at the option of the Debtors and the Investors, (a) be paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter or (b) receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim.  Class A is Unimpaired under option (a) above and Impaired under option (b) above; holders of Unimpaired Allowed Class A Claims are conclusively presumed to accept the Plan and holders of Impaired Allowed Class A Claims are entitled to vote to accept or reject the Plan.

K&E 20463290

C.    **Solicitation Procedures**

1.        Claims Agent

The Debtors retained KCC to, among other things, act as Claims Agent and will request to retain KCC in connection with the solicitation of votes to accept or reject the Plan (the "***Solicitation Agent***"). The Debtors anticipate requesting authority to retain KCC as their Solicitation Agent at or prior to the hearing on the Disclosure Statement.

2.        Solicitation Package

The following materials shall constitute the Solicitation Package:

o        the appropriate Ballot(s) and Master Ballots and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;

o        the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan);

o        a letter from the Debtors to the Voting Classes recommending that holders of Claims in such Classes vote to accept the Plan; and

o        any supplemental solicitation materials the Debtors may file with the Bankruptcy Court.

3.        Distribution of the Solicitation Package and Plan Supplement

Through the Claims Agent, the Debtors intend to distribute the Solicitation Packages within five Business Days after entry of the Disclosure Statement Order, a date approximately 30 days in advance of the Voting Deadline.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures, which shall be attached as **Exhibit [___]** to the Disclosure Statement Order.  The Solicitation Package (except the Ballots and Master Ballots) may also be obtained from the Claims Agent by: (a) calling the Debtors' restructuring hotline at (877) 660-6625 within the U.S. or Canada or, outside of the U.S. or Canada, by calling (732) 645-4133; (b) visiting the Debtors' restructuring website at http://www.kccllc.net/APTea; and/or (c) writing to The Great Atlantic & Pacific Tea Company, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these Chapter 11 Cases for free by visiting the Debtors' restructuring website at http://www.kccllc.net/APTea or for a fee via PACER at http://ecf.nysb.uscourts.gov.

Prior to the Confirmation Hearing, the Debtors intend to file a Plan Supplement that includes, among other things, the list of assumed Executory Contracts (with associated Cure Amounts, if any), and a description of retained Causes of Action.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims Agent by:  (a) calling the Debtors' restructuring hotline at (877) 660- 6625 within the U.S. or Canada or, outside of the U.S. or Canada, calling (732) 645-4133; (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/APTea; and/or (c) writing to The

Great Atlantic & Pacific Tea Company, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

**D.**     **Voting Procedures**

The Voting Record Date is December 15, 2011.  The Voting Record Date is the date for determining (1) which holders of Claims or Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (2) whether Claims or Interests have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim.  The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

Under the Plan, holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  In order for the holder of a Claim in the Voting Classes to have such holder's Ballot counted as a vote to accept or reject the Plan, such holder's Ballot must be properly completed, executed, and delivered by using the return envelope provided by: (a) first class mail; (b) courier; or (c) personal delivery to The Great Atlantic & Pacific Tea Company Balloting Center c/o Kurtzman Carson Consultants LLC 2335 Alaska Avenue, El Segundo, CA 90245, so that such holder's Ballot or the Master Ballot incorporating the vote cast by such Ballot, as applicable, is **actually received** by the Claims Agent prior to 5:00 p.m. prevailing Pacific Time on January 26, 2012 (the "*Voting Deadline*").

Except as otherwise provided herein, in the motion to approve the Disclosure Statement and its related exhibits:  (a) if no holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims in such Class; and (b) any Class of Claims that does not have a holder of an Allowed Claim or Interest or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

K&E 20463290

E.    **Confirmation Hearing**

Pursuant to section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Confirmation Hearing will commence on [February 6], 2012 at [10:00 a.m.] prevailing Eastern Time, before the Honorable Robert D. Drain, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the master service list and the Entities who have filed an objection to the Plan ("***Plan Objection***"), without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The deadline to file Plan Objections is 5:00 p.m. prevailing Eastern Time on January 26, 2012.  All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the deadline to file Plan Objections.

F.    **Confirmation and Consummation of the Plan**

The Confirmation Order shall approve all provisions, terms, and conditions of the Plan unless such provisions, terms, or conditions are otherwise satisfied or waived pursuant to the Plan provisions described in Article VI.O.2 herein.

## ARTICLE IV.
## GENERAL INFORMATION

A.    **Overview of the Debtors' History and Industry**

Headquartered in Montvale, New Jersey, the Debtors are a leading supermarket retailer, operating under a variety of well-known trade names, or "banners" across the mid-Atlantic and Northeastern United States.  As of September 10, 2011, the Debtors operated approximately 336 conventional supermarkets, combination food and drug stores, and discount food stores under a variety of banners, including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars, and A&P Liquors, averaging approximately 42,000 square feet per store.  As of September 10, 2011, the Debtors reported total assets of $2.34 billion and liabilities of $3.58 billion. The Debtors employ approximately 36,000 employees of whom approximately 69 percent were employed on a part-time basis and approximately 93 percent were covered by CBAs.

The Debtors' store locations are typically leased, although the Debtors own a limited number of properties, including undeveloped land.  As of February 27, 2010, the Debtors' open stores averaged approximately 42,200 square feet.  The Debtors' retail footprint also reflects their December 2007 acquisition of Pathmark, in which the Debtors acquired 141 Pathmark-branded stores for total consideration of approximately $1.4 billion (the "***Pathmark Acquisition***").  The Debtors financed the Pathmark Acquisition through a combination of cash on hand, equity, and approximately $475 million of debt financing.

K&E 20463290

The Debtors' supermarkets typically offer a broad variety of branded and private label packaged or "shelf stable" foods, as well as fresh and frozen produce, meat, seafood, dairy, and general merchandise. Many of the Debtors' supermarkets include in-store bakeries, delis, floral departments, and fresh meat and seafood counters, and in-store pharmacies. The Debtors experience high rates of inventory turnover as a function of both customer demand and perishability.

The Debtors' operating cashflow critically depends on their ability to provide customers with high volumes of fresh, high quality, food, beverage, pharmaceutical, and other products without interruption. On average, each of the Debtors' supermarkets will sell approximately 25,000 different stock-keeping units in a given week.[8] And, while the Debtors obtain a majority of inventory from C&S Wholesale Grocers, Inc. ("**C&S**"), with whom the Debtors restructured their supply and logistics agreement as described below, the Debtors also rely on a broad network of approximately 2,600 other vendors, including suppliers of fresh dairy, meat, and seafood products, branded and private label food processors and other specialty suppliers, to fully satisfy their inventory and merchandising needs.[9]

## B.    A&P's Corporate Structure

A&P is the direct or indirect parent of each of the above-captioned Debtors. Tengelmann Warenhandelsgesellschaft KG ("**Tengelmann**") controls approximately 42 percent of A&P's issued and outstanding common shares, and is the largest holder of A&P common stock.[10] Affiliates of The Yucaipa Companies LLC (collectively, "**Yucaipa**") are the next largest holder of A&P common stock, controlling approximately 5% of its issued and outstanding common shares. As of December 13, 2010, A&P's common stock and 9 3/8% senior quarterly interest bonds trade exclusively on the Pink OTCQB market and are currently traded under the symbols GAPTQ and GAJTQ, respectively. A chart presenting the Debtors' corporate structure is illustrated below.

See **Exhibit E** for a chart illustrating A&P's Prepetition Corporate Structure.

## C.    Competition

The grocery retailing industry is highly competitive and characterized by local, regional, and national competitors operating on slim profit margins. More recently, the Debtors have faced increasing competitive challenges from mass merchandisers, warehouse clubs, drug stores, dollar stores, convenience stores and other "out-of-channel" sellers of grocery merchandise, including Costco, Dollar Tree, Sam's Club, and Target. The Debtors' in-store pharmacy operations also face growing competition from mail-order and Internet-based prescription processors, as well as traditional brick and mortar pharmacies. This challenging operating environment has been compounded by falling producer and retail food prices, and competitors' increased willingness to engage in price-based competition.

## D.    Legacy Obligations

Prior to the Commencement Date, the Debtors' cost structure reflected an unsustainable level of legacy obligations that placed the Debtors at a competitive disadvantage to their traditional and

---

[8]    Stock-keeping units (or "**SKU**") are commonly used measurements for classifying and tracking separate inventory types in the retail industry. For example, 24 can packages of America's Choice Diet Cola™, 12 can packages of America's Choice Diet Cola™, and 6 can packages of America's Choice Diet Cola™ are each assigned unique SKUs in the Debtors' inventory management system.

[9]    By way of reference, 30 percent of the Debtors' cost of goods sold was approximately $1.8 billion in fiscal 2009. *See* The Great Atlantic & Pac. Tea Co., Inc. (Annual Report), at 48 (May 6, 2010).

[10]   As discussed more fully below, Tengelmann also controls certain Convertible Preferred Stock (as defined herein) that provides voting rights equivalent to 12,000,000 common shares.

non-traditional peers. The Debtors were also parties to a number of materially unfavorable supply and services contracts. Longevity in the retail food industry—the result of a consistent focus on customer satisfaction—saddled the company with three significant prepetition legacy costs:

- substantial obligations arising from "dark store" leases—i.e., locations where the Debtors have ceased ongoing operations but have been unable to sublease, assign, or terminate the relevant lease;

- unfavorable supply and logistics agreements, including (a) a supply and logistics contract with C&S through which C&S supplied approximately 70 percent of the Debtors' total inventory; and (b) a transportation and logistics contract with Grocery Haulers Inc. (*"GHI"*) under which GHI provided certain transportation and logistics services to the Debtors' 120 Pathmark-branded stores, and certain transportation services to other Debtor stores; and

- significant employee related obligations, including underfunded single- and multi-employer pensions, expensive health and welfare programs, and high store labor costs as a percentage of sales.

**E.     Executive Officers of the Debtors**

| Name | Title |
|---|---|
| Samuel Martin | President and Chief Executive Officer |
| Frederic F. Brace | Chief Administrative Officer, Chief Restructuring Officer and Chief Financial Officer |
| Paul Hertz | Executive Vice President, Operations |
| Thomas O'Boyle | Executive Vice President, Merchandising, Marketing and Supply & Logistics |
| Christopher W. McGarry | Senior Vice President and General Counsel |
| Carter Knox | Senior Vice President, Human Resources & Communications |

Mr. Martin was appointed President and Chief Executive Officer on July 29, 2010. Prior to joining A&P, Mr. Martin served as Executive Vice President and Chief Operating Officer of OfficeMax Incorporated, from September 2007 to July 2010. Prior to joining OfficeMax, Mr. Martin served as Senior Vice President of Operations for Wild Oats Markets, Inc. from January 2006 to September 2007. Prior to joining Wild Oats, Mr. Martin served as Senior Vice President of Supply Chain at Shopko from April 2003 to April 2006. From 1998 until 2003, he was Regional Vice President, Western Region and General Manager for Toys "R" Us, Inc., where he was responsible for operations, including stores, distribution, and logistics.

Mr. Brace was appointed Chief Financial Officer on March 28, 2011, Chief Restructuring Officer on December 9, 2010 and Chief Administrative Officer on August 20, 2010. Mr. Brace was a member of

K&E 20463290

the Board of Directors of the Company from August 4, 2009 to August 20, 2010. Mr. Brace served as Executive Vice President and the Chief Financial Officer of UAL Corp., an air transportation company, from August 2002 until his retirement from UAL Corp. in October 2008. From 2004 to 2008, Mr. Brace also served as a member of the Board of Directors, chair of the audit and finance committees, and member of the executive committee of SIRVA, Inc., a relocation logistics services provider, from 2004 through 2008. During 2009, Mr. Brace also served as a member of the Board of Directors and of the audit committee of BearingPoint, Inc., a leading global management and technology consulting services firm during 2009. Currently, Mr. Brace is also a member of the Board of Directors, the audit committee and the compensation committee of Anixter International, a communications, electrical wire and cable products distribution company.

Mr. Hertz was appointed Executive Vice President of Operations on August 18, 2010. Prior to joining A&P, Mr. Hertz was Executive Vice President of Retail Stores for OfficeMax, which he joined in September 2007. Previously, Mr. Hertz served as Vice President of Stores for Wild Oats Markets, Inc. from August 2006 to September 2007. Prior to joining Wild Oats, Mr. Hertz served as Vice President of Store Operations for ShopKo Stores Inc. from April 2003 to August 2006. For the 16 years prior to joining Shopko, Mr. Hertz held positions of increasing responsibility with Fred Meyer Stores, a division of The Kroger Company including, Vice President, Regional Director of Stores.

Mr. O'Boyle was appointed Executive Vice President, Merchandising and Marketing on August 25, 2010. Prior to joining A&P, Mr. O'Boyle was President and Senior Vice President, Food and Drug, for Sears Holdings from 2008 to 2010. Before joining Sears, Mr. O'Boyle was Senior Vice President, Merchandising and Marketing for Albertson's from 2005 to 2006. Before that he held merchandising and marketing management positions at Jewel Food Stores and American Stores.

Mr. McGarry was appointed Senior Vice President, General Counsel and Secretary on October 7, 2009. Mr. McGarry joined A&P in March 2006 as Vice President of Legal Services. From July 2006 to October 2009, he served as Vice President, Legal Compliance Officer and Assistant Secretary. Prior to joining A&P, Mr. McGarry was General Counsel from 2003 to 2005 for Exel, Inc., successor-in-interest to Tibbett & Britten Group Americas, a major international logistics service provider for the food and beverage, fashion and other consumer product sectors. From 1992 to 1998 and from 2001 to 2003, he was a Partner and attorney in various New Jersey based law firms. From 1998 to 2001, Mr. McGarry served as Assistant General Counsel and Corporate Secretary for The Grand Union Company.

Mr. Knox was appointed Senior Vice President of Human Resources and Communications on August 19, 2010. Prior to joining A&P, Mr. Knox was Senior Vice President of Human Resources for OfficeMax from 2005 to August 2010. Before joining OfficeMax, Mr. Knox held roles of increasing responsibility at Fred Meyer, a division of The Kroger Company, over more than 30 years. His responsibilities spanned store operations, merchandising, marketing and human resources.

## F.    The Debtors' Prepetition Capital Structure

As of the Commencement Date, the Debtors were obligated on approximately $1.0 billion in funded debt, comprised of: (a) obligations under the Secured Credit Facility; (b) the Second Lien Notes; (c) four series of Unsecured Notes; and (d) a $10.0 million unsecured Promissory Note (each as defined herein). The Debtors also have 175,000 shares of convertible preferred stock issued and outstanding, with a $1,000 per share liquidation preference.

23

The Debtors' prepetition indebtedness and preferred equity capital can be summarized as follows:

| ($ millions)<br>Debt/Preferred Equity | Funded Debt/<br>Liquidation Preference | |
|---|---|---|
| Secured Credit Facility - ABL | $ | 38.0 |
| Secured Credit Facility - Term | | 97.5 |
| Second Lien Notes | | 260.0 |
| Unsecured Notes | | 632.8 |
| Promissory Note | | 10.0 |
| **Total Funded Debt** | **$** | **1,038.3** |
| Convertible Preferred Stock | | 175.0 |

1.       Secured Credit Facility

Prior to the Commencement Date, the Debtors, Bank of America, N.A., as administrative agent (the "*First Lien Agent*"), and the lenders party thereto were parties to that certain Amended and Restated Credit Agreement, dated as of December 27, 2007 (as amended, supplemented, modified, or amended and restated from time to time, the "*First Lien Credit Agreement*").   The First Lien Credit Agreement provided the Debtors with $620 million in total availability through:   (a) a "Tranche A" revolver (providing $502 million in maximum availability, with no balance drawn as of December 11, 2010); (b) a "Tranche A-1" revolver (providing $20 million in maximum availability, with no balance drawn as of December 11, 2010); (c) a $47.5 million "Term Loan"; and (d) a $50 million "Term A-2" Loan (collectively, the "*Secured Credit Facility*").  The Secured Credit Facility also provided for, among other things, a $400 million letter of credit subfacility under which approximately $196.2 million in letters of credit is issued and outstanding as of December 11, 2010.[11]

Generally, the payment waterfall incorporated into the First Lien Credit Agreement provided that obligations arising under the Term Loan have a senior interest in certain "Principal Properties" (as defined in the First Lien Credit Agreement) versus other claims arising under the Term Loan.[12]  The payment waterfall further provided that proceeds from non-Principal Properties collateral is used: first to satisfy claims arising under the Tranche A revolver and Term Loan (ratably); second to cash collateralize issued but undrawn letters of credit issued by lenders under the Tranche A revolver; third to satisfy the Tranche A-1 revolver; and fourth to satisfy claims arising under the Term A-2 Loan.

2.       Second Lien Notes

A&P as issuer, and each of the above-captioned Debtors, as guarantors, have issued senior secured notes (collectively, the "*Second Lien Notes*") pursuant to that indenture dated as of August 4, 2009 (the "*Second Lien Notes Indenture*") by and between the Debtors and Wilmington Trust Company in its capacity as trustee (the "*Second Lien Indenture Trustee*").   The Second Lien Notes bear interest at 11.375% per annum, and approximately $260.0 million in Second Lien Notes remained outstanding as of the Commencement Date.  The Second Lien Notes mature on August 4, 2015.

The Second Lien Notes are secured by second priority liens on substantially all the Debtors' personal property, including inventory and receivables, pursuant to that certain security agreement dated

---

[11]     Generally, letters of credit issued under the Secured Credit Facility reduce availability under the Tranche A revolver.

[12]     Principal Properties are three parcels of real property owned or leased by the Debtors.

24

as of August 4, 2009, by and between the Debtors and the Second Lien Indenture Trustee (the "***Second Lien Security Agreement***").    The Second Lien Notes are also secured by certain of the Debtors' leaseholds and owned real property other than the Principal Properties.

3.                Intercreditor Agreement

On August 4, 2009, the First Lien Agent, in its capacity as collateral agent under the Secured Credit Facility, and the Second Lien Agent, in its capacity as collateral agent under the Second Lien Security Agreement, entered into an agreement that, among other things, assigned relative priorities to claims arising under the Secured Credit Facility and the Second Lien Indenture (the "***Intercreditor Agreement***").    Among other things, the Intercreditor Agreement provides that claims arising under the Second Lien Notes or the Second Lien Indenture are subordinate to claims arising under the Secured Credit Facility.    The Intercreditor Agreement also imposes certain limitations on:   (a) the rights and remedies available to the Second Lien Agent in an event of default; (b) the ability of the Second Lien Agent or holders of Second Lien Notes (collectively, the "***Second Lien Noteholders***") to challenge the validity or priority of liens arising under the Secured Credit Facility; and (c) the extent to which the Second Lien Noteholders and Second Lien Agent may (i) contest a postpetition financing provided by or consented-to by lenders (or their successors) under the Secured Credit Facility (including a refinanced facility) or the First Lien Agent (or its successors) and (ii) request adequate protection during a bankruptcy proceeding.    The Debtors expressly are not third party beneficiaries of the Intercreditor Agreement.

4.                Unsecured Notes

In addition to its secured debt, A&P has issued four series of unsecured notes:  (a) $165.0 million in 5.125% unsecured convertible notes (collectively, the "***5.125% Convertible Notes***"); (b) $12.8 million in 9.125% unsecured notes due 2011 (collectively, the "***9.125% Senior Notes***"); (c) $255.0 million in 6.75% unsecured convertible notes due 2012 (collectively, the "***6.75% Convertible Notes***"); and (d) $200.0 million in unsecured quarterly interest notes due 2039 (collectively, the "***Quarterly Interest Bonds***," and together with the 5.125% Convertible Notes, the 9.125% Senior Notes, and the 6.75% Convertible Notes, the "***Unsecured Notes***").    The Unsecured Notes are unsecured obligations of A&P.

5.                Promissory Note

As of the Commencement Date, A&P had issued a $10.0 million unsecured promissory note payable to Erivan Karl Haub (the "***Promissory Note***").    Mr. Haub is the father of Christian Wilhelm Erich Haub, the Debtors' former Executive Chairman.    Interest on the Promissory Note accrued at 6.00% per year, and the Promissory Note matures in August 2011.

6.                Convertible Preferred Stock

In 2009, the Debtors issued 175,000 outstanding shares of convertible preferred stock, $1,000 per share liquidation preference, in two separate series:   (a) 115,000 shares of "Series A- Y" convertible preferred stock; and (b) 60,000 shares of convertible preferred stock issued through a "Series A-T" (collectively, the "***Convertible Preferred Stock***").    Mandatory quarterly dividends are payable on the Convertible Preferred Stock at either 8.00% (cash) or 9.50% (paid-in-kind).    The Convertible Preferred Stock is convertible to common A&P stock under certain conditions, and holders of the Convertible Preferred Stock vote on matters requiring shareholder approval on an "as converted" basis.

Affiliates of Yucaipa control the Debtors' Series A-Y Convertible Preferred Stock. Yucaipa is also entitled to appoint 2 directors to the A&P board by virtue of its control of the Series A-Y Convertible Preferred Stock.[13] Tengelmann controls the Series A-T Convertible Preferred Stock, and Tengelmann is entitled to appoint 4 directors to the A&P board by virtue of its control of the Series A-T Convertible Preferred Stock.[14]

## G.    Employees

As of February 26, 2011, the Debtors employed approximately 40,700 Employees, of whom approximately 68% are employed on a part-time basis. As of the Commencement Date approximately 38,742 of the employees are members of unions, and the Debtors are party to 34 collective bargaining agreements ("*CBAs*") with the various bargaining units of certain international and local unions, including (a) the Retail and Wholesale Union, (b) the Retail, Wholesale and Department Store Union, (c) the United Food and Commercial Workers International Union, (d) the 1199 National Health and Human Services Employees Union, (e) the United Pharmacists Guild and (f) the International Union of Operating Engineers. In addition to their employees, the Debtors supplement their workforce by utilizing (a) approximately three temporary employees who are provided to the Debtors and (b) approximately 13 independent contractors that provide services related to many aspects of the Debtors' operations and are vital to the Debtors' businesses.

## H.    Benefit Plans

As of the Commencement Date, the Debtors sponsored, maintained or contributed to the following employee pension benefit plans: (1) an A&P-sponsored, single employer defined benefit plan, entitled The Great Atlantic & Pacific Tea Company, Inc. Pension Plan ("*A&P Plan*"), that covers certain non-union and union-represented employees of A&P; (2) a single employer defined benefit pension plan sponsored and administered by a joint board of trustees for the benefit of certain eligible full-time employees of A&P who are represented by United Food and Commercial Workers ("*UFCW*") Local 464A and certain retirees who were represented by UFCW Locals 342-50 and 174 , entitled the New York-New Jersey Amalgamated Pension Plan for A&P Employees ( the "Amalgamated Plan"); (3) an A&P-sponsored multiple employer defined benefit pension plan that covers certain A&P employees and certain collectively bargained employees of GHI, entitled the Pathmark Stores, Inc. Pension Plan (the "*Pathmark Plan*"); (4) an A&P-sponsored single employer defined benefit pension plan covering only seven retirees from a former A&P subsidiary, entitled the Delaware County Dairies, Inc. Hourly Employees' Pension Plan (the "*Delaware Dairies Plan*," with the A&P Plan, the Amalgamated Plan, the Pathmark Plan and the Delaware Dairies Plan, collectively the "*Pension Plans*"); and (5) 12 multiemployer defined benefit pension plans (the "*Multiemployer Plans*"). Each of the Pension Plans and Multiemployer Plans are governed by provisions of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") and the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"). Further, the Pension Plans and Multiemployer Plans are covered by the termination insurance program described in Title IV of ERISA. The Pension Benefit Guaranty Corporation ("*PBGC*") is a wholly-owned United States government corporation created by ERISA to administer the mandatory pension plan termination insurance program. The PBGC's principal purpose is to guarantee the payment of certain pension benefits to participants upon termination of a pension plan.[15]

---

[13]    The Series A-Y Convertible Preferred Stock also provides Yucaipa with voting rights equivalent to 23,000,000 shares of common stock.

[14]    The Series A-T Convertible Preferred Stock also provides Tengelmann with voting rights equivalent to 12,000,000 shares of common stock.

[15]    *See* 29 U.S.C. § 1302.

K&E 20463290

The Debtors also provide health and welfare benefits to eligible active employees (and their eligible dependents) under various benefit plans sponsored and maintained by A&P. The A&P-sponsored medical plans are primarily self-funded, although certain medical and other welfare coverage options are fully insured.   A&P also provides retiree health and retiree life insurance to certain closed groups of retirees and their spouses.   Pursuant to certain CBAs, the Debtors also contribute to certain multiemployer health and welfare funds that provide medical and other health and welfare benefits for union-represented employees and retirees.

1.        Single Employer Pension Plans

        a.              The A&P Plan

         As of January 1, 2010, the A&P Plan covered approximately 15,000 participants, including approximately 6,500 active employees.  Both union and non-union employees and former employers participate in the A&P Plan.  Benefit accruals for non-union employees under the A&P Plan were frozen in 2010, but benefit accruals for eligible union employees continue in accordance with the applicable CBAs.

        The A&P Plan includes the ability of certain participants to receive benefits in a lump sum. However, due to the payment restrictions imposed by Section 436 of the Internal Revenue Code and Section 206(g) of ERISA, lump sum benefit payments are currently not available from the A&P Plan.

        A&P's projected annual minimum required contributions to the A&P Plan, which were due in fiscal year 2011 and cover the 2010 and 2011 plan years, are approximately $15.56 million. This includes a contribution of approximately $8.4 million that was due on September 15, 2011 with respect to the A&P Plan's 2010 plan year and quarterly contributions of approximately $1.79 million with respect to the A&P Plan's 2011 plan year that were due on each of April 15, July 15, and October 15, 2011, as well as a similar contribution which will be due on January 15, 2012. Because of the Chapter 11 Cases, these contributions remain unpaid to date.  Under ERISA, these contributions are joint and several liabilities of each of the Debtors who are part of the same "controlled group."[16] Absent termination of the A&P Plan in accordance with ERISA, the Debtors anticipate making any missed contributions (plus applicable interest) to the A&P Plan prior to the Effective Date.

        b.              The Amalgamated Plan

        The Amalgamated Plan is a single employer plan under ERISA, and A&P is the employer obligated to contribute to the Amalgamated Plan. However, A&P does not sponsor or administer the Amalgamated Plan.  A&P contributes monthly to the Amalgamated Plan based on the requirements set forth in the applicable CBAs.  The Amalgamated Plan's actuaries estimated the minimum funding contribution for the calendar year 2011 to total $1.9 million.

        c.              Delaware Dairies Plan

        The Delaware Dairies Plan is a single employer defined benefit pension plan. As of December 31, 2010, there were only seven participants in this plan, all of whom were retirees.   The assets of the Delaware Dairies Plan totaled approximately $73,000 as of December 31, 2010, and no minimum contributions have been due during the Chapter 11 Cases.

---

16        *See* 29 U.S.C. § 1082(b)(2) and (d)(3).

2.          Multiple Employer Plan - The Pathmark Plan

As of January 1, 2010, the Pathmark Plan covered approximately 6,700 participants, including approximately 1,500 active employees.  Both union and non-union employees and former employees of A&P participate in the Pathmark Plan.  Benefit accruals for A&P employees under the Pathmark Plan were frozen as of December 31, 2007, and many such participants under the Pathmark Plan began accruing benefits under the A&P Plan on January 1, 2008.

Effective August 31, 2008 and prior to the rejection of the GHI Contract (described below) and the subsequent termination by GHI of the employment of relevant employees, benefit accruals under the Pathmark Plan were provided only to certain eligible employees of GHI who were represented by the International Brotherhood of Teamsters Local 863 ("***Teamsters 863***").  GHI is an unrelated company that formerly handled transportation and logistics services for the  Pathmark stores. The participation of GHI employees in the Pathmark Plan is the basis for the classification of the Pathmark Plan as a multiple employer plan.

GHI employees' participation in the Pathmark Plan was negotiated simultaneously with GHI's withdrawal from the Local Union No. 863 I.B. of T. Pension Fund ("***Local 863 Fund***"), a multiemployer pension plan.  Such negotiation triggered withdrawal liability of GHI.  In satisfaction of such withdrawal liability, A&P, GHI and the Local 863 Fund trustees negotiated an arrangement whereby the Pathmark Plan received a transfer of pension assets and liabilities for GHI employees from the Local 863 Fund.  In January 2009, approximately $12 million in assets and approximately $81 million in liabilities were transferred from the Local 863 Fund to the Pathmark Plan.  Under an August 29, 2008 letter agreement between GHI and A&P, A&P assumed economic responsibility with respect to the GHI employees in the Pathmark Plan.

A&P's projected annual minimum required contributions to the Pathmark Plan, which were due in fiscal year 2011 and cover the 2010 and 2011 plan years, are approximately $5.2 million. This includes a contribution of approximately $3.1 million that was due on September 15, 2011 with respect to the Pathmark Plan's 2010 plan year and quarterly contributions of approximately $0.7 million with respect to the Pathmark Plan's 2011 plan year that were due on each of April 15, July 15, and October 15, 2011, as well as a similar contribution which will be due on January 15, 2012. Because of the Chapter 11 Cases, these contributions remain unpaid to date.  Under ERISA, these contributions are joint and several liabilities of each of the Debtors who are part of the same "controlled group"[17]  Absent termination of the Pathmark Plan in accordance with ERISA, the Debtors anticipate making any missed contributions (plus applicable interest) to the Pathmark Plan prior to the Effective Date.

3.          Multiemployer Plans

A&P currently contributes to 12 multiemployer defined benefit pension plans under a number of existing CBAs between various labor unions and A&P. Pursuant to the CBAs, A&P contributes monthly amounts to the Multiemployer Plans on behalf of A&P's active employees. A&P's projected annual contributions for fiscal year 2011 to all of the Multiemployer Plans are approximately $48.7 million. A&P's annual contributions to the Multiemployer Plans vary widely by plan, ranging from $0.2 million with respect to one Multiemployer Plan to $8 million with respect to another Multiemployer Plan.

In addition to periodic contributions required by the CBAs, additional liability, known as "withdrawal liability," can be imposed on an employer (and its controlled group) under ERISA in the

---

[17]      *See* 29 U.S.C. § 1082(b)(2) and (d)(3).

event of a "withdrawal" by the employer from a multiemployer pension plan.[18] Until a contributing employer withdraws from a multiemployer plan, withdrawal liability is a contingent liability of the employer.  Under ERISA, a withdrawal occurs when an employer stops contributing – or significantly reduces its contributions over a period of time – to a multiemployer pension plan.[19] In general terms, withdrawal liability is the employer's pro rata share of the plan's unfunded vested benefits.   The multiemployer plans have filed several Proofs of Claim against the Debtors for (a) contingent withdrawal liability and (b) prepetition withdrawal liability.  The Debtors have received 11 Proofs of Claim on account of contingent withdrawal liability totaling approximately $406 million.   The Debtors have received five Proofs of Claim on account of prepetition withdrawal liability totaling approximately $153 million.

4.        PBGC Claims

On or about June 17, 2011, the PBGC filed 13 separate Proofs of Claim against the Debtors with respect to the A&P Plan, the Amalgamated Plan and the Pathmark Plan.  In accordance with the *Order Approving Stipulation Permitting Pension Benefit Guaranty Corporation To File Consolidated Claims Under A Single Case Number* [Docket No. 1949], a single Proof of Claim was deemed to constitute the filing of a Proof of Claim against each and every Debtor in the Chapter 11 Cases.  Specifically, the PBGC filed Claims for:

- o    the estimated amount of such Pension Plans' unfunded benefit liabilities if the Pension Plans were to terminate ("***Underfunded Liability Claims***");[20]

- o    the estimated amount of unpaid minimum funding contributions that may be owed to such Pension Plans (the "***Funding Claims***"); [21]

- o    the estimated amount of premium payments owed to the PBGC with respect to such Pension Plans (including the plan termination PBGC premium added to ERISA by the Deficit Reduction Act of 2005, [22]  which could apply if such Pension Plans were terminated) (the "Premium Claims");[23]

- o    the shortfall and waiver amortization charges that may be owed to the Pension Plans (the "***Waiver Amortization Claims***");[24] and

---

[18]    *See* 29 U.S.C. § 1381 *et seq.*

[19]    *See* 29 U.S.C. §§ 1383, 1385.

[20]    Specifically, the PBGC filed Underfunded Liability Claims for:  (a) the A&P Plan in the amount of the $82.1 million; and (b) the Amalgamated Plan in the amount of $39.4 million. The PBGC filed an Underfunded Liability Claim for the Pathmark Plan in an unliquidated amount.  The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

[21]    Specifically, the PBGC filed Funding Claims for:  (a) the A&P Plan in the amount of $13, 745,517; (b) the Amalgamated Plan in the amount of $1,489,241; and (c) the Pathmark Plan in the amount of $7,578,513. The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

[22]    *See* 29 U.S.C. §1306(a)(7).

[23]    Specifically, the PBGC filed Premium Claims that included the contingent termination premium estimated by the PBGC as follows:  (a) the A&P Plan in the amount of $56,220,000; (b) the Amalgamated Plan in the amount of $15,896,250; and (c) the Pathmark Plan in an unliquidated amount. The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

[24]    Specifically, the PBGC filed Waiver Amortization Claims for: (a) the A&P Plan in the amount of $45,543,464; (b) the Amalgamated Plan in the amount of $23,230,041; and (c) the Pathmark Plan in the amount of $63,558,032, each asserted as a general unsecured claim.

K&E 20463290

o    the estimated amount of liability that may have resulted if the Debtors withdrew from the Pathmark Plan (the "***Pathmark Plan Withdrawal Claim***").[25]

## ARTICLE V.
## THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases, the stabilization of the Debtors' operations, and the Debtors' restructuring initiatives implemented since the Commencement Date.

## A.    Events Leading to the Commencement of the Chapter 11 Cases

1.        Challenging Operating Environment

Ongoing challenges facing the U.S. economy and the corresponding slowdown in consumer purchasing negatively impacted the Debtors' revenues and operating cashflow.  Falling consumer spending rates were exacerbated by declines in producer and retail food prices, resulting in retail price deflation across the grocery industry as a whole.  This deflationary cycle was compounded by the intense competitive pressure found in the supermarket industry.  The Debtors' $8.4 billion in revenues over the twelve months ended September 11, 2010 reflected an 8.9 percent decline over the period ended September 10, 2009, with the Debtors generating only $104 million in EBITDA over this time.  The reduction in EBITDA left the Debtors with diminished capacity to invest in long-term capital projects, with projected capital expenditures for the current fiscal year reduced over $10 million from fiscal 2009 and over $40 million from fiscal 2008.  The Debtors' comparable store sales growth was also down approximately 6.9 percent on a year to date basis.

Margin pressure imposed by declining operating cashflow had, in turn, amplified the bottom line effects of the Debtors' leveraged balance sheet and significant legacy costs.  The Debtors estimated that "dark store" leases would impose approximately $77 million of costs in fiscal 2011 alone.  Further, unfavorable contracts with parties such as C&S and GHI continued to weigh on the Debtors, and ongoing pension and post-retirement obligations had contributed to the Debtors' declining performance.

2.        Restructuring Initiatives

Prior to the Commencement Date, the Debtors took steps to both increase liquidity and reduce costs.  In August 2009, the Debtors raised approximately $162.2 million in preferred equity capital through their sale of Convertible Preferred Stock.  Also in August 2009, the Debtors raised an additional $253.0 million through the sale of the Second Lien Notes.

In July 2010, the Debtors publicly launched a comprehensive, five-point turnaround plan to increase profitability and stakeholder value.  This plan was focused on:  (a) installing a strong management team;  (b) reducing structural and operating costs;  (c) improving customer value; (d) enhancing the overall customer experience; and (e) increasing liquidity.  Through this plan, the Debtors implemented wholesale changes to their management team in 2010, including their appointment of a new chief executive officer, the appointment of three new executive officers with significant industry expertise, and the appointment of a new Chief Administrative Officer in August 2010.

---

[25]    Specifically, the PBGC filed the Withdrawal Claim for the Pathmark Plan in an unliquidated amount. The Withdrawal Claim assumes a withdrawal on June 30, 2011, and in such claim the PBGC demands payment of the liability to the PBGC to be held in escrow pursuant to 29 U.S.C. §1363(b).

K&E 20463290

Liquidity-enhancing initiatives included the sale of non-core or underperforming assets and liquidity-enhancing transactions such as an $89.8 million sale-leaseback of six owned store locations. The Debtors also sought to increase operating cash flow by optimizing inventory mix, increasing sales training initiatives, and introducing new higher margin, "owned label" brands and products across their store fleet.

The Debtors initiated a major liquidity enhancing initiative in July 2010, when they retained Bank of America, the First Lien Agent, to secure a leasehold mortgage financing to upsize the First Lien Credit Facility ABL by approximately $200 million. Yet, in the days after Thanksgiving when it became clear that certain of the Debtors' business partners could not provide meaningful cost concessions—an important part of the business plan underlying this facility—the Debtors were forced to abandon this financing initiative.

The Debtors took additional prepetition steps to address their uncompetitive cost structure. The Debtors conducted multiple reductions in force, cut corporate spending, and reduced general and administrative costs. These initiatives have already generated total cost savings of approximately $40 million on an annualized basis, including over $10 million in annual salary savings.

The Debtors sought to work constructively with their business partners in this process. In particular, the Debtors made repeated efforts to engage C&S, given C&S's undeniable importance to the Debtors' supply chain and cost structure as a whole. Prior to filing these Chapter 11 Cases, it became clear that C&S was unwilling or unable to provide meaningful cost or trade concessions outside of the chapter 11 process.

The Debtors ultimately determined that the combination of falling revenues, a leveraged balance sheet, legacy costs, and unfavorable supply relationships could not be fixed outside of chapter 11. Of course, the Debtors were acutely aware of the operational and financial challenges facing chapter 11 debtors in general, and the unique challenges facing retail debtors in particular. As a result, the Debtors immediately took actions to make sure they had more than sufficient liquidity to fund their in-court restructuring, including obtaining a debtor-in-possession financing facility. Based on these efforts, the Debtors secured a fully-committed, $800 million credit facility (the "***DIP Facility***") from JPMorgan Chase Bank ("***JPM***"), which is described in greater detail below.

## B.    Stabilization of Operations

Upon commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to ensure a smooth transition of their operations into chapter 11 and facilitate the administration of the Chapter 11 Cases. Several of these orders are briefly summarized below.

### 1.    Administrative Motions

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural orders: (a) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket No. 68]; (b) granting the Debtors an extension of time to file their schedules of assets and liabilities and statement of financial affairs (collectively, the "***Schedules and Statements***") [Docket No. 496];[26] (c) establishing certain notice, case management and administrative procedures [Docket No. 75]; (d) preparing a list of creditors in lieu of a formatted mailing matrix and consolidating the list of creditors to the 40 largest

---

[26]    On March 25 2011, the Debtors filed their Schedules and Statements with the Bankruptcy Court [Docket No. 1080].

unsecured creditors [Docket No. 79]; and (e) authorizing the employment and retention of KCC as notice and claims agent [Docket No 207].

2.          Motion to Continue Using Existing Cash Management System [Docket No. 17]

The Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts, business forms, and investment practices by a Final Order dated February 7, 2011 [Docket No. 733].  The cash management order also approved the Debtors' investment and deposit guidelines and permitted the Debtors to set off both prepetition and postpetition intercompany obligations between Debtors, or between Debtors and non-Debtor Affiliates.

3.          Motion to Pay Shippers and Lienholder Prepetition Claims [Docket No. 8]

The Bankruptcy Court authorized the Debtors to pay the prepetition Secured Claims of, among other parties, shippers, warehousemen, and lienholders up to $3.4 million.

4.          Motion to Pay Employee Wages and Benefits [Docket No. 3]

The Debtors obtained authorization from the Bankruptcy Court to:  (a) pay certain prepetition wages, salaries and other compensation, taxes withholdings and reimbursable expenses of their employees; (b) to pay and honor obligations relating to employee medical and other benefit programs; and (c) to continue their employee benefits programs on a postpetition basis.

5.          Motion to Pay Critical Trade Vendors [Docket No. 15]

By interim order granted on December 14, 2010 [Docket No. 54], and Final Order granted on January 12, 2011 [Docket No. 374], the Bankruptcy Court authorized the Debtors to pay prepetition Claims of certain critical vendors.  Specifically, the Debtors were authorized to pay (a) $61 million in prepetition Claims to a highly select group of vendors, that are not party to Executory Contracts, who supply the Debtors' stores with product on trade terms and (b) up to $5 million in Section 503(b)(9) Claims.

6.          Motion to Authorize Maintenance of Customer Programs [Docket No. 4]

By interim order granted on December 14, 2010 [Docket No. 73], and Final Order granted on January 12, 2011 [Docket No. 498], the Bankruptcy Court authorized the Debtors to continue to maintain and administer prepetition customer programs, promotions and practices and pay and otherwise honor their obligations to customers relating thereto in the ordinary course of business consistent with past practice.

7.          Motion to Establish Notification and
            Hearing Procedures for Trading in Equity Securities [Docket No. 10]

As of the Commencement Date, the Debtors' NOLs and certain other tax attributes were estimated to be approximately $979 million.  Under the Internal Revenue Code, NOLs that accumulate prior to emergence from bankruptcy may be used to offset post-emergence taxable income.  Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the Chapter 11 Cases.  Consequently, trading in the equity securities of the Debtors could have jeopardized the Debtors' ability to use those NOLs.  To protect these valuable NOL carryforwards for future use to offset taxable income, the Debtors sought and obtained an interim order from the Bankruptcy Court on December 15, 2010

[Docket No. 82],  and a Final Order on January 12, 2011 [Docket No. 502] restricting trading of their equity securities.

8.      Motion Determining Adequate Assurance of
        Payment for Future Utility Services [Docket No. 11]

By Final Order granted on January 12, 2011 [Docket No. 503], the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service in recognition of the severe impact even a brief disruption of utility services would have on the Debtors.  Subsequently, certain of the Debtors' utility providers appealed the Bankruptcy Court's final order.  As of the filing of this Disclosure Statement, the appeal is pending.

9.      Motion to Pay Prepetition Sales, Use, and Franchise Taxes [Docket No. 6]

By interim order granted on December 14, 2010 [Docket No. 76], and Final Order granted on January 12, 2011 [Docket No. 499], the Bankruptcy Court authorized the Debtors to pay prepetition sales, use, franchise, income, property, and other taxes and any tax-related fees charges, and assessments accrued prepetition.

10.     Motion For Entry of An Order Authorizing Debtors to Release Certain
        Funds Held in Trust and to Continue Performance of and Honor Obligations
        Under Consignment Arrangements and Deposit Arrangements [Docket No. 9]

By Final Order granted on January 12, 2011 [Docket No. 501], the Bankruptcy Court authorized the Debtors to release certain funds held in trust and to continue to perform and honor obligations under their pre-petition consignment and deposit arrangements in the ordinary course of business, in a manner consistent with past practice, in order to uphold the Debtors' reputation for reliability and to preserve the loyalty, goodwill and support of their Customers.

11.     Motions for Entry of an Order Authorizing Rejection of Certain
        Unexpired Nonresidential Real Property Leases [Docket Nos. 18, 164]

By Final Order granted on December 14, 2010 [Docket No. 81] and Final Orders granted on January 12, 2011 [Docket Nos. 507, 508], the Bankruptcy Court authorized the Debtors to reject certain "dark store" leases where they have ceased ongoing operations and have been unable to sublease, assign, or terminate the relevant leases and reject certain underperforming nonresidential leases and related subleases.

12.     Applications for Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Bankruptcy Court has approved the Debtors' retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases.  These Professionals include, among others: (a) Kirkland & Ellis LLP as counsel for the Debtors (order granted January 12, 2011) [Docket No. 488]; (b) Huron Consulting Services LLC, as Financial Advisory (order granted January 12, 2011) [Docket No. 486]; and (c) Lazard Freres & Co. LLC ("*Lazard*") as investment bankers for the Debtors (order granted January 12, 2011) [Docket No. 487].

## C.    Postpetition Financing

### 1.    DIP Financing

As noted above, at the outset of the Chapter 11 Cases, the Debtors focused on negotiating and obtaining a DIP financing facility that would provide liquidity and ensure continued operations throughout the Chapter 11 Cases, and upon emergence from bankruptcy.  With the assistance of their investment banker, Lazard, the Debtors' management team engaged in a competitive process to procure the best available postpetition financing facility which resulted in competing DIP financing proposals.  Ultimately, the Debtors' entered into a credit agreement with JPM (the "***DIP Agreement***") to obtain the $800 million DIP Facility.  The Debtors filed a motion for approval of the DIP Facility on December 12, 2010 [Docket No. 19].  Over several objections, the Bankruptcy Court, by interim order [Docket No. 43] and Final Order [Docket No. 479] (collectively, the "***DIP Orders***"), authorized the Debtors to:  (a) enter into the DIP Facility, consisting of (i) a $350 million term loan facility to refinance the Debtors' prepetition senior secured credit facility and provide approximately $187 million in incremental liquidity and (ii) a $450 million revolving facility, including access to a $250 million letter of credit sublimit; and (b) grant adequate protection to the Debtors' secured lenders.

As approved on January 11, 2011 [Docket No. 479], the DIP Facility and accompanying DIP Orders provided the following relief:

a.    Financing:  authority to enter into the DIP Agreement for an $800 million debtor-in-possession financing facility, which:

o    repaid approximately $135.5 million outstanding under the prepetition Secured Credit Facility upon entry of the interim order;

o    provided approximately $187 million in incremental liquidity to fund the Debtors' operations through a secured superpriority priming senior term loan facility upon entry of the interim order and approximately $263 million of incremental liquidity upon entry of the Final Order; and

o    provided a $450 million secured superpriority priming senior revolving borrowing base facility with approximately $200 million in letters of available credit upon entry of the interim order, the remainder of which was made available upon entry of the Final Order.

b.    DIP Liens:  authority to grant:

o    a first-priority, fully perfected lien on all unencumbered assets (primarily consisting of certain of the Debtors' leasehold interests);

o    a first-priority, fully perfected priming lien on all assets of the Debtors subject to the lien securing the notes issued by A&P under the indenture dated as of August 4, 2009, pursuant to section 364(d) of the Bankruptcy Code; and

o    a fully perfected junior lien on all property subject to other pre-existing, validly perfected, non-avoidable liens existing as of the Commencement Date.

34

      c.        <u>Adequate Protection</u>:  approval of the form and manner of adequate protection provided to the Second Lien Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code.

      d.        <u>DIP Claims</u>:  authority to grant a superpriority administrative claim with respect to all loans made and obligations incurred by the Debtors on or after the Commencement Date pursuant to the DIP Agreement, subject only to the Carve Out set forth in the DIP Orders, pursuant to section 364(c)(1) of the Bankruptcy Code.

      e.        <u>Cash Collateral</u>:  authority to use cash collateral within the meaning of section 361 of the Bankruptcy Code.

As of the date hereof, the DIP Agreement has been twice amended.  The first amendment to the DIP Agreement, among other things, provided that the Debtors' disposition of the Southern Stores (as defined herein) would not result in a Prepayment Event, as defined under the DIP Agreement, thereby allowing the Debtors to retain the $40 million in proceeds generated from the sale of the Southern Stores without having to pay down the DIP Facility.  The second amendment to the DIP Agreement modified certain financial covenants which, among other things, waived and allows for the waiver of the minimum cumulative EBITDA requirements for December 31, 2011 and January 28, 2012, *provided, that*, the Debtors file a plan of reorganization by January 30, 2012 that contemplates full indefeasible repayment of the obligations under the DIP Agreement, in cash, upon the effective date of such plan.  The filing of the Plan satisfies the requirement entitling the Debtors to the EBITDA waiver described in the previous sentence.

## D.      Appointment of Committees

1.            The Creditors' Committee

On December 21, 2010, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On January 18, 2011, the United States Trustee amended the appointed Creditors' Committee.  The current members of the Creditors' Committee are:  (a) the Wilmington Trust Company; (b) the PBGC; (c) United Food & Commercial Workers International Union, CLC; (d) Central States, Southeast and Southwest Areas Pension Fund; (e) 1199 SEIU Healthcare Employees Pension Fund; (f) Kimco Realty Corporation; (g) McKesson Pharmaceutical; (h) C&S Wholesale Grocers, Inc.; and (i) Kraft Foods, Inc.

The Bankruptcy Court has approved the Creditors' Committees' retention of the following professionals:  (a) Milbank, Tweed, Hadley & McCloy LLP as counsel [Docket No. 998]; (b) Klestadt & Winters, LLP as conflicts-counsel [Docket No. 1048]; and (c) FTI Consulting, Inc. as restructuring and financial advisors [Docket No. 999].

## E.      Operational Restructuring Initiatives

The Debtors have used the tools of chapter 11 to implement certain operational restructuring initiatives to successfully reorganize their business, including: (a) rationalizing their store footprint; (b) strategically replacing and improving their supply and logistics arrangements; and (c) executing labor cost savings initiatives.

K&E 20463290

10-24549-rdd    Doc 2867    Filed 11/14/11    Entered 11/14/11 13:20:35    Main Document
Pg 40 of 193

1.          Rationalization of Store Portfolio

A fundamental component of the Debtors' operational restructuring plan has been the rationalization of the Debtors' footprint. The Debtors, with the assistance of their advisors and in consultation with the Creditors' Committee, engaged in a comprehensive review of their store portfolio with the objective of identifying and closing unprofitable and non-core store locations.

a.          Dark Stores Leases

In accordance with the Debtors' operational restructuring activities, the Debtors, with the assistance of their advisors, began the process of reviewing and analyzing their contractual obligations so as to identify the contracts and leases that are burdensome to the Estates and may be rejected pursuant to section 365 of the Bankruptcy Code. By the Commencement Date, the Debtors had identified 73 "dark store" leases where the Debtors had ceased ongoing operations and were unable to sublease, assign, or terminate the relevant leases (collectively, the "***Dark Store Leases***"). The Debtors' estimated that the Dark Store Leases would have imposed tens of millions of accrued actual costs in the fiscal year 2011 alone, with the full economic impact on the Estates potentially even more dramatic. The Dark Store Leases represented an unnecessary expense to the Estates and effectively contributed no value to the Debtors' balance sheet. Thus, pursuant to the *Debtors' First Omnibus Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Nonresidential Real Property Leases Nunc Pro Tunc to the Date Hereof* [Docket No. 18] and the *Debtors' Second Omnibus Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Nonresidential Real Property Leases and Related Subleases* [Docket No. 164], the Debtors obtained authority from the Bankruptcy Court to reject 73 Dark Store Leases, another 25 underperforming leases and 26 subleases [Docket Nos. 81, 507, and 508].

b.          Southern Stores

In the process of evaluating their store portfolio, the Debtors identified 25 stores in the mid-Atlantic region operating under the SuperFresh banner (collectively, the "***Southern Stores***") as non-core assets. Following a robust marketing process and a two-day public auction, on June 20, 2011, and June 23, 2011, the Bankruptcy Court entered orders approving the sales of assets associated with the Southern Stores including, grocery stores, lease assignments and pharmacy assets to the highest bidders [Docket Nos. 1947, 1944, 1962, and 1965]. The sale of the Southern Stores generated more than $40 million in cash proceeds (excluding additional proceeds for inventory) for the Estates and freed the Debtors from the costs of operating underperforming stores that are not part of their going-forward business plan. Further, pursuant to the first amendment to the DIP Agreement, the Debtors were not obligated to use the proceeds from the Southern Store sales to pay down the DIP Facility.

c.          Store Closing Sales

To facilitate the Debtors' efforts to rationalize their store footprint, the Debtors sought authority from the Bankruptcy Court to: (i) commence store closing sales at stores the Debtors identify from time to time for closure in accordance with certain EBITDA related store rationalization procedures, notwithstanding any contractual provisions or state and local laws restricting such sales (the "***Store Closing Sales***"); (ii) sell certain of the Debtors assets in connection with the Store Closing Sales free and clear of all liens, claims and encumbrances; (iii) enter into a consulting agreement with a liquidation consultant; and (iv) assume, assign or reject unexpired leases subject to the Store Closing Sales [Docket No. 1004]. To date, the Debtors have executed approximately 32 Store Closing Sales, generating approximately $24 million in annual EBITDA improvement.

K&E 20463290

2.        Implementing Improved Supply and Logistics Arrangements

Another key aspect of the Debtors' operational restructuring plan has been the replacement of costly, out-dated supply and logistics arrangements with new agreements tailored to the Debtors' revised store footprint that provide significant cost savings.

a.        The New C&S Agreement

C&S is the Debtors' primary supplier, supplying approximately 70% of the merchandise sold by the Debtors, as of the Commencement Date.   On March 7, 2008, A&P and C&S entered into an agreement under which C&S provided warehousing, transportation, and procurement services supporting virtually all of the Debtors' operations (the "**C&S Agreement**").

The Debtors thoroughly analyzed the C&S Agreement and concluded that it was materially unfavorable to A&P and incompatible with an emergence strategy.   In December of 2010, the Debtors hired Marie Robinson, an experienced supply and logistics executive, who developed and supervised a substantial effort to re-engineer A&P's supply and logistics arrangements and analyze all alternatives.

In early 2011, the Debtors initiated a multi-month and multi-round request for proposal process ("**RFP**") from several supply and logistics providers, including C&S.   The Debtors and their advisors considered C&S's bid and also assembled composite bids based on a multi-provider solution that split the services that C&S currently provides among multiple suppliers.   After analyzing all of the bids and following several weeks of negotiations with C&S, and with input from the Creditors' Committee and the Debtors' other key constituents, the Debtors concluded that the best option was to accept C&S's bid offering a replacement contract and enter into a new supply and logistics contract with C&S (the "**New C&S Agreement**").

On June 23, 2011, the Bankruptcy Court authorized the Debtors to reject the C&S Agreement and enter into the New C&S Agreement and to settle certain prepetition claims between the Debtors and C&S related thereto, including rejection damages [Docket No. 1964].   The projected net cost savings from the New C&S Agreement exceeds $50 million in the first year following emergence, alone, which, upon the Effective Date of the Plan, will become operative.   In addition, the New C&S Agreement provides for immediate and improved operational efficiencies and controls, flexibility to remain effective upon implementation of the Plan and more favorable payment terms.   Further, the New C&S Agreement contemplates C&S waiving its damages claim arising from the Debtors' rejection of the C&S Agreement.[27]   The New C&S Agreement also resolves the setoff dispute among the parties embodied in the *Stipulation and Agreed Order Regarding Setoff Rights* [Docket No. 1483], entered by the Court on May 2, 2011 whereby the parties reserved all rights to litigate the disputed amounts and categories of claims at a later date.   The Debtors shall retain the $5.8 million already remitted by C&S, and C&S shall retain the remaining $12.2 million and apply that amount in satisfaction of C&S's liquidated prepetition claim.

---

[27]     C&S's rejection damages claim waiver is voided if the New C&S Agreement is terminated prior to the Debtors' emergence from chapter 11 and C&S may terminate the New C&S Agreement if the Debtors fail to emerge from chapter 11 by June 12, 2012 as an operating enterprise.  Notably, this is the same date upon which the DIP facility matures and becomes fully payable.

K&E 20463290

b.                  Rejection of GHI Trucking Agreement

On February 4, 2011, the Bankruptcy Court entered an order authorizing the Debtors' rejection of the trucking agreement with GHI (the "**GHI Contract**") upon entering into an alternative transportation logistics arrangement [Docket No. 721] (the "**GHI Contract Order**").[28]

The GHI Contract was inherited in the Pathmark Acquisition. The GHI Contract gave GHI the exclusive right to service the Pathmark-branded stores regardless of the origin of the volume of products to be delivered. The Debtors analyzed the costs and benefits of the GHI Contract and found that they paid substantially more for the services they receive under the GHI Contract than the prices they could negotiate with other parties in the current marketplace for comparable logistics. In response to the general need to economically restructure their third-party logistics arrangements, and, in the short-term, secure a less costly provider of interim trucking services to the Pathmark-branded stores, the Debtors circulated RFPs to numerous transportation services, including GHI and C&S. Ultimately, C&S's bid for interim trucking services was the most favorable and the Debtors entered into an interim trucking agreement with C&S. The interim trucking agreement with C&S permitted the Company to realize material transportation cost savings immediately upon rejection of the GHI Contract. The interim trucking agreement was later incorporated into the New C&S Agreement.

3.          Reducing Labor Costs

The final piece of the Debtors' operational restructuring plan has been the development of a sustainable labor solution that sufficiently accommodates the Debtors' needs to: (a) control labor costs; (b) attract and maintain a qualified and motivated workforce; (c) have sufficient flexibility to adapt their labor arrangements to their business needs; and (d) achieve a sustainable balance between the Debtors' capital structure and pension obligations to ensure the availability of favorable exit financing options.

The Debtors are parties to 34 CBAs, which cover approximately 92% of their workforce. Among other things, these agreements require the Debtors to make significant pension, and health care-related contributions on their employees' behalf. The Debtors contributed $56.6 million, $62.3 million and $48.2 million to the Multiemployer Pension Plans in the fiscal years 2010, 2009 and 2008, respectively. Moreover, the Debtors believe their collectively bargained wage, pension, and health care obligations placed them at a competitive disadvantage and were unsustainable at existing levels.

To develop a sustainable labor solution, the Debtors worked with their labor constituencies for months in extensive, arm's-length negotiations. The Debtors and their advisors devised term sheets for each of their 34 CBAs and delivered them to the local unions on May 5, 2011. In the several months following the delivery of the term sheets, the Debtors' senior management engaged in multiple negotiations with union representatives and exchanged counteroffers and term sheet revisions.

A key factor in the Debtors' acceptance of the deal with the Investors was the UFCW's support of the Debtors' and the Investors' work towards a successful restructuring transaction.

---

[28]      On February 3, 2011, in anticipation of the GHI Contract Order, GHI filed an emergency motion for stay pending appeal of the GHI Contract Order [Docket No. 714]. On February 4, 2011, the Debtors filed an opposition to GHI's motion for stay pending appeal of the GHI Contract Order [Docket No. 720]. On February 7, 2011, the Bankruptcy Court denied GHI's motion for appeal of the GHI Contract Order [Docket No. 730].

**F.        Executory Contracts and Unexpired Leases**

        The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume and assign, or reject Executory Contracts and Unexpired Leases.  In conjunction with their overall asset rationalization efforts, the Debtors have engaged in a comprehensive evaluation of their Executory Contracts and Unexpired Leases.

        The overwhelming majority of the Debtors' store locations are leased, and as of the Commencement Date, the Debtors were parties to more than 700 unexpired leases of nonresidential real property, including subleases and leases on account of vacant properties, or locations previously assigned by the Debtors.  The Leases are also a key component of the collateral package supporting the Debtors' postpetition lending facility and borrowing base.  In order to right-size their store footprint, the Debtors, with the assistance of their advisors, have engaged in a comprehensive review of their store portfolio with the objective of identifying and selling non-core store locations.

        On March 8, 2011 the Debtors sought and received approval of streamlined procedures to assume, assign or reject Unexpired Leases [Docket No. 1004].  During the course of the Chapter 11 Cases, the Debtors and their Professionals have evaluated Executory Contracts and Unexpired Leases in the context of the Debtors' business plan.  For each of these Executory Contracts and Unexpired Leases, the Debtors determined, based on the economics of the specific contract and their overall restructuring efforts, whether the contract was a candidate for assumption, rejection, or amendment and assumption.

        To date, the Debtors have filed five omnibus motions to assume certain unexpired nonresidential leases [Docket Nos. 1959, 2271, 2486, 2656, and 2780].  The Bankruptcy Court, pursuant to sections 363(b) and 365(a) of the Bankruptcy Code, has granted the Debtors authority to assume approximately 380 unexpired nonresidential leases and related subleases pertaining to approximately 230 operating stores, which compromise is the cornerstone for the Debtors' ongoing business operations [Docket Nos. 2181, 2372, and 2636].

**G.        Analysis and Resolution of Claims**

        The Debtors' Schedules and Statements provide information pertaining to the Claims against the Estates.  On March 25, 2011, the Debtors filed their Schedules and Statements with the Bankruptcy Court.  Interested parties may review the Schedules and Statements at the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, White Plains Division, 300 Quarropas Street, White Plains, New York 10601 or online at http://www.kccllc.net/APTea.

1.             Claims Bar Date

        On May 2, 2011 the Bankruptcy Court entered an order (the "***Bar Date Order***") [Docket No. 1476] requiring all persons or entities, except as otherwise provided in the Bar Date Order, that can assert a Claim against the Debtors that arose or is deemed to have arisen prior to the Commencement Date, including all claims, as defined in section 101(5) of the Bankruptcy Code, all claims pursuant to section 503(b)(9) of the Bankruptcy Code and all claims held by governmental units, to submit a written Proof of Claim so as to be actually received on or before June 17, 2011 at 5:00 p.m. (prevailing Eastern Time) by KCC, the Debtors' Claims Agent, in accordance with the Bar Date Order.

        To date, KCC has received approximately [_____] Proofs of Claim in the approximate aggregate amount of $[__] billion.  Based upon a general reconciliation of the Debtors' books and records, the Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, have therefore calculated the recoveries under the Plan with the assumption that such Claims will be

K&E 20463290

expunged from the Claims Register. Based on this general reconciliation effort, the Debtors believe the actual total amount of the Claims Pool is approximately $[___] billion to $[___] billion.

2.        De Minimis Settlement Procedures

On March 10, 2011, the Bankruptcy Court approved the Debtors' motion seeking approval of certain procedures (the "***De Minimis Settlement Procedures***") for settling *de minimis* Claims [Docket No. 1002] (the "***De Minimis Claims Order***"). Under the De Minimis Settlement Procedures, where the proposed settlement amount is of a Claim or Cause of Action by a third party against one or more of the Debtors (the "***Third Party Claims***") and is equal to or less than $75,000, the Debtors, in their reasonable business judgment, may settle such Claim without prior notice to any third parties or further notice or action by the Bankruptcy Court. Where the proposed settlement amount is of a Third Party Claim and is greater than $75,000 but less than $2,250,000, the Debtors, in their reasonable business judgment, may settle such Claim without further action of the Bankruptcy Court, *provided*, *that* the Debtors provide ten days written notice to certain parties in interest pursuant to the De Minimis Claims Order and no objection is received from such parties within those ten days.

**H.      Maintaining Exclusive Right to File a Plan of Reorganization**

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan. Without further order of the Bankruptcy Court, the Debtors' initial exclusivity period to file a plan would have expired on April 9, 2011. By order dated March 10, 2011, the Bankruptcy Court extended the Debtors' exclusivity periods through and including December 31, 2011 (to file a plan) and through and including February 29, 2011 (to solicit acceptances) [Docket No. 1003]. The order authorizing these extensions reserved the Debtors' right to seek additional extensions of these exclusivity periods.

On August 1, 2011 the Debtors filed their second motion to extend their exclusive periods [Docket No. 2268]. On August 18, 2011, the Bankruptcy Court approved the motion and extended the Debtors exclusive periods to both file and solicit votes for their plan of reorganization to January 16, 2012 and March 16, 2012, respectively [Docket No. 2370].

**I.      Negotiations Relating to the Development of the Plan**

Beginning several months ago, at the same time that the Debtors were executing their substantial reorganization initiatives, the Debtors engaged in plan discussions with the Convertible Noteholders, which resulted in substantial dialogue during the months of August, September and October regarding capital investments to support a plan of reorganization, and which contributed to the terms memorialized in the Securities Purchase Agreements (the "***Noteholders' Proposal***"). The Convertible Noteholders represent the Debtors' largest unsecured creditor group and had demonstrated the financial wherewithal to deliver the capital infusion the Debtors needed to emerge from chapter 11. The material terms of the Noteholders' Proposal were nearly finalized as of the end of October and the Debtors were prepared to file a motion for approval of the agreement on October 28, 2011, with the proposed investment contingent upon obtaining labor savings that the Debtors had yet to secure.

However, on October 24, 2011, Yucaipa submitted to A&P's Board of Directors a letter of interest to provide an alternative investment. At 8:30 AM on October 26, 2011, the Board formed an independent restructuring committee, excluding those directors that could be perceived as having an affiliation with Yucaipa (the "***Restructuring Committee***"), to evaluate both the Convertible Noteholders' Proposal and Yucaipa's proposal. The first meeting of the Restructuring Committee took place thirty

minutes later, at 9:00 AM on October 26, 2011, for the purpose of evaluating Yucaipa's proposal. Following the October 26, 2011 Restructuring Committee meeting, the Debtors' management and professionals engaged in parallel, around-the clock negotiations with the Convertible Noteholders and Yucaipa, providing updates to the Restructuring Committee on October 28, October 31 and November 1, 2011.  Before submission of the joint proposal, the Debtors' believed Yucaipa's proposal offered certain advantages to the Convertible Noteholders--namely that a Yucaipa-sponsored plan of reorganization was more likely to garner support from the Debtors' unions, Yucaipa's general familiarity with the Debtors' operations, and Yucaipa had the supermarket industry experience that could benefit the Debtors' going-forward operations and efforts to obtain exit financing.  On the other hand, that the sale of certain assets to Yucaipa in conjunction with the Debtors' emergence from chapter 11 apart from the rest of the corporate enterprise could possibly have made outside financing more costly to obtain.

Ultimately, the convertible noteholders and Yucaipa expressed an interest in submitting a joint proposal early in the morning hours of November 1, and it became clear to the Debtors and the Restructuring Committee that the best solution for the Debtors and their estates would be to allow the Convertible Noteholders and Yucaipa to jointly invest, harnessing the benefits of each proposal.  The Securities Purchase Agreements embody the results of these negotiations.  Lazard and Kirkland updated the Restructuring Committee on November 1 of the developments overnight and moved forward with documenting a joint proposal.  Specifically, as a result of these negotiations, the Convertible Noteholders agreed to, among other things, (a) decrease the $26 million agreed-to break-up fee to $20 million and (b) a include a "fiduciary out" provision which would allow the Debtors to consider unsolicited proposals upon execution of the Securities Purchase Agreements.  For its part, Yucaipa agreed to forgo its earlier plan to purchase certain assets concurrently with the Debtors' emergence.

On November 2, 2011, the Restructuring Committee recommended that the Board authorize the Debtors' management to enter into the Securities Purchase Agreements, and the Board gave such authorization on that same day.  The Debtors' management and professionals then finalized the Securities Purchase Agreements, and the parties signed the Securities Purchase Agreements on November 3, 2011. The Securities Purchase Agreements are the backbone of the Plan, which the Debtors believe represents their best option to maximize value for the estates, exit chapter 11 as expeditiously as possible, and provide their reorganized enterprise with the capital needed to implement their post-reorganization business plan.

### ARTICLE VI.
### PLAN SUMMARY

#### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders. Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity holder

in the debtor, whether or not such creditor or equity holder is impaired under or has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such unimpaired classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR

K&E 20463290

ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

**B.**    **Overall Structure of the Plan**

Pursuant to the Plan, the Investors are providing a total New Money Commitment of $490 million in the form of (i) $210 million[29] face amount of privately placed New Second Lien Notes, (ii) $210 million face amount of privately placed New Convertible Third Lien Notes, and (iii) an $80 million New Equity Investment.  Pursuant to the Substantive Consolidation Settlement described herein, holders of allowed General Unsecured Claims will receive their Pro Rata share of the $40 million General Unsecured Cash Pool.

As part of the Plan, on November 3, 2011, the Debtors and the Investors entered into security purchase agreements in respect of the New Second Lien Notes, the New Convertible Third Lien Notes and the New Equity Investment (collectively, the "*Securities Purchase Agreements*"). The Securities Purchase Agreements each provide that the parties will support the Plan in all aspects. Each of the Investors has agreed that, subject to certain exceptions, so long as the Company is in compliance with its obligations under the Securities Purchase Agreements and the Securities Purchase Agreements have not been terminated, the Investors will, subject to the receipt by the Investors of a Disclosure Statement approved by the Bankruptcy Court, timely vote or cause to be voted all of their Claims against the Debtors to accept the Plan, and not to change or withdraw such vote.

The Securities Purchase Agreements contain customary representations, warranties and covenants. In certain limited circumstances, the Investors have the right to terminate the Securities Purchase Agreements and withdraw their support for the Plan.  For example, the Investors may terminate the Securities Purchase Agreements and will not be required to support the Plan if (a) the representations and warranties made by the Debtors in connection with the Securities Purchase Agreements fail to be true and correct in all material respects or (b) the Debtors fail to materially perform or comply with any covenants contained in the Securities Purchase Agreements.

The Securities Purchase Agreements contain both exclusivity and non-solicitation covenants that prohibit the Debtors from soliciting alternative transactions; however, they also contain a limited fiduciary out in connection with unsolicited superior offers.

The Securities Purchase Agreements provide that the Debtors will pay the Investors a commitment fee and, under certain circumstances, a break-up fee to the Investors.  They also provide that the Debtors will pay the Investors' reasonable fees and expenses.

The Securities Purchase Agreements are the backbone of the Plan, which the Debtors believe represents their best option to maximize value for the estates, exit chapter 11 as expeditiously as possible, and provide their reorganized enterprise with the capital needed to implement their post-reorganization business plan.

The preceding description is a summary of the Securities Purchase Agreements and does not purport to be complete. This summary is subject to and is qualified by reference to all the provisions of Securities Purchase Agreements, which are attached as exhibits to Exhibit A hereto.

---

[29]    The $210 million face amount of the New Second Lien Notes will be issued with a 5.0% original issue discount, therefore, the aggregate amount of the securities includes $200 million—not $210 million—in funds from the issuance of the New Second Lien Notes.

## C.    Substantive Consolidation Settlement

The Plan provides for a settlement and compromise of the intercreditor issues relating to whether the liabilities and assets of the Debtors should be substantively consolidated for purposes of distributions under the Plan.    These issues include:    (a) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Chapter 11 Case; (b) the value of the Debtors' Estates on an individual and a consolidated basis, and the proper method of determining such value; (c) whether the Estate of each Debtor should be treated separately for purposes of making payments to holders of Claims; (d) whether it is possible to attribute particular Claims asserted in the Chapter 11 Cases to a specific Debtor; (e) the value to be accorded to guarantees issued by one Debtor in favor of another Debtor; (f) the strength of the relative rights and positions of the different Classes of unsecured Claims with respect to disputes over substantive consolidation; (g) other issues having to do with the rights of certain Estates, Claims, or Classes of Claims vis-à-vis other Estates, Claims, or Classes of Claims; and (h) the amount and priority of Intercompany Claims and the potential voidability of certain intercompany transfers.

Substantive consolidation is a judicially-created remedy whereby the assets and liabilities of two or more related entities are pooled, and the pooled assets are used to satisfy the claims of creditors of all the consolidated entities.    After extensive discussions with the Creditors' Committee, the Debtors concluded that, absent the proposed settlement, complex substantive consolidation litigation was likely. Therefore, the Plan proposes a compromise that would eliminate the necessity of such costly and time-consuming litigation and that best approximates the equitable distribution of the Debtors, assets after taking into account the issues described in the preceding paragraph.

### 1.    Legal Standard for Substantive Consolidation

Substantive consolidation is a unique equitable remedy that pools the assets and liabilities of entities with different debt-to-asset ratios.    The proponent of substantive consolidation bears a heavy burden of proof to establish that it would be appropriate to apply the doctrine of substantive consolidation.

The Second Circuit, in *Union Sav. Bank v. Augie/Restivo Baking Co.* (*In re Augie/Restivo Baking Co.*), 860 F.2d 515, 518 (2d Cir. 1988) established a two-pronged test for determining whether the equitable remedy of substantive consolidation is appropriate:  (i) did creditors deal with the entities as a single economic unit and not on the separate identity of the debtors in extending credit or (ii) are the affairs of the debtors so hopelessly entangled that consolidation will benefit all creditors.    *See Augie/Restivo*, 860 F.2d at 518.    Bankruptcy courts generally consider the same set of factors when determining whether to grant substantive consolidation of debtors in chapter 11, including: (a) the presence or absence of consolidated financial statements; (b) the unity of interests and ownership between the various entities; (c) the existence of intercompany guarantees; (d) the degree of difficulty in segregating and ascertaining the assets and liabilities of the various entities; (e) the informal transfer of assets among the entities; (f) the commingling of assets, liabilities, and business functions; (g) the profitability of consolidation at a single location; (h) whether a parent owns a majority of its subsidiary's stock; (i) whether the entities have common officers and directors; (j) whether a subsidiary is grossly undercapitalized; (k) whether a subsidiary solely conducts business with its parent; (l) disregard of the legal requirements of a subsidiary as a corporation separate from its parent; (m) the existence of a single cash management system; (n) whether different entities were created only to provide tax benefits; (o) assumption by a parent of contractual obligations of its subsidiaries; (p) sharing of overhead, management, accounting, and other related expenses among different corporate entities; (q) failure to distinguish between property of each entity; (r) a parent paying salaries of employees of subsidiaries; (s) a parent or its affiliates financing the subsidiary; (t) a parent shifting people on and off its subsidiary's board of directors; (u) a parent referring to its subsidiary as a department or division; (v) directors of a

44

subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent; and (w) a parent acting from the same business location as its affiliates and subsidiaries. *See, e.g., In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980); *Pension Benefit. Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983); *In re Drexel Lambert Grp., Inc.*, 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992); *In re Eagle-Picher Indus., Inc.*, 192 B.R. 903, 907 (Bankr. S.D. Ohio 1996); *In re Lionel L.L.C.*, Case No. 04-17324, 2008 WL 905928, at *11 (Bankr. S.D.N.Y. Mar. 31, 2008). As the above-mentioned factors indicate, substantive consolidation analysis is extremely fact-intensive.

2.          The Debtors' Analysis of Substantive Consolidation

The Debtors' management and advisors undertook a comprehensive analysis of many of the factors listed in Article VI.C.1 that Courts consider in a substantive consolidation analysis. The Debtors reviewed, among other things, the Debtors books and records, public filings, accounting and cash management systems, intercompany claims, intercompany guarantees, and expense allocations. Through this extensive analysis, the Debtors determined that substantive consolidation may be feasible, but that several factors in the substantive consolidation analysis were subject to dispute, either as to their factual underpinnings or as to the relative weight a court should ascribe to such factor.

The Debtors met with advisors to the Creditors' Committee on numerous occasions to keep them apprised of the Debtors' analysis, and also to provide the Creditors' Committee with the opportunity to test the Debtors' legal and factual determinations. Through these discussions, the Debtors proposed the framework for the Substantive Consolidation Settlement in consultation with the Creditors' Committee. Without the Substantive Consolidation Settlement, the Chapter 11 Cases would be substantially prolonged, and the Debtors would face the increased costs of not just the substantial contribution litigation but also the additional costs inherent in lingering in bankruptcy.

3.          The Substantive Consolidation Settlement

Pursuant to the Substantive Consolidation Settlement embodied in the Plan, Allowed Unsecured Claims will receive their pro rata share of the $40 million Unsecured Creditor Cash Pool. In addition to their recovery from the $40 million Unsecured Creditor Cash Pool, Holders of Allowed Guaranteed Landlord Claims who vote to approve the Plan will receive their pro rata share of the $[__] million Substantive Consolidation Settlement Cash Pool, however, the total recovery on each Guaranteed Landlord Claim shall not exceed [___]% of the Allowed amount of such Claim. If the aggregate recovery of Holders of Guaranteed Landlord Claims from the Substantive Consolidation Settlement Cash Pool is less than $[__] million, the remaining balance will be added to Unsecured Creditor Cash Pool and distributed Pro Rata to holders of Allowed Unsecured Claims.

As a result of the Substantive Consolidation Settlement, and only for purposes of Voting and Distributions under the Plan, (a) the separate Chapter 11 Cases of the Debtors will be consolidated into the case of A&P as a single consolidated case; (b) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (c) all Claims against each Estate will be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors will be deemed to be a single claim filed against the consolidated Estates, and all duplicate Proofs of Claim for the same claim filed against more than one Debtors will be deemed expunged; (d) except as otherwise provided in the Plan, no distributions under the Plan will be made on account of Intercompany Claims; (e) except as provided by the compromise treatment of Unsecured Claims in Article III of the Plan, all Claims based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors or other basis of co-Debtor liability will be eliminated (other than guarantees existing under assumed Executory Contracts or Unexpired Leases), and no distributions under the Plan will be made on account of Claims based upon such guarantees or other basis of co-Debtor liability; (f) for purposes of

K&E 20463290

determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of Section 553, pre-petition debts due to any of the Debtors may be set off against the pre-petition debts of any other of the Debtors; and (g) no distributions under this Plan will be made on account of any Intercompany Interests.

The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan. The compromise plan structure will not (a) impair the validity or enforceability of guarantees that exist under or with respect to assumed executor contracts or unexpired leases; (b) affect valid, enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan, except for Liens that secure a Claim that is eliminated by virtue of the plan structure and Liens against collateral that are extinguished by virtue of such plan structure; (c) have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of such structure; or (d) affect the obligation of each of the Reorganized Debtors, pursuant to Section 1930 or Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as each particular Debtor's case is closed.

4.        The Substantive Consolidation Settlement is in the Best Interests of all Creditors

As indicated above, pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules, the Plan incorporates the proposed Substantive Consolidation Settlement. In order to approve a compromise or settlement, a court must find that the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997). In the context of evaluating a settlement, the court may approve a settlement so long as the settlement does not "fall below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). In considering a settlement, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct an extended full independent investigation. *In re Drexel Burnham*, 134 B.R. at 496.

Courts in this Circuit consider the following factors when determining whether to approve a settlement under Rule 9019: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay;" (c) "the paramount interests of the creditors;" (d) whether other parties in interest support the settlement; (e) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (f) "the nature and breadth of releases to be obtained by officers and directors"; and (g) "the extent to which the settlement is the product of arm's length bargaining." *See In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

The decision to approve a settlement lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). The court may give weight to the informed judgment of the debtor that a compromise is fair and equitable. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

The Debtors believe that the proposed Substantive Consolidation Settlement is in the best interests of the Debtors' Estates because of the complexity of potential substantive consolidation litigation, the Debtors' corporate and operational structure, and the available proceeds for distribution to unsecured creditors. The Debtors, the Creditors' Committee, and major creditor constituencies

recognized that litigation would likely require a detailed, fact-intensive inquiry that would require substantial time, energy and expense to discover and adjudicate. Such lengthy litigation would significantly delay confirmation of the Plan and could significantly impair the Debtors' ability to consummate the Securities Purchase Agreements on which the Debtors' restructuring efforts hinge. Indeed, the benefit to the Debtors' Estates is derived not only from the aforementioned benefits, but also from the fact that without the Debtors' negotiation of the terms of the Substantive Consolidation Settlement, the Plan likely would not exist.

Finally, the Debtors recognized that preserving the Debtors' corporate structure (a) was essential to the Debtors' success after the Effective Date, (b) would ultimately enhance creditor recoveries, and (c) avoided potentially inaccurate valuations of entities that did not have historical stand-alone values.

Therefore, after taking into account the aforementioned facts, the Debtors conclude that the Substantive Consolidation Compromise and the related features embodied in the Plan are equitable and in the best interests of the Debtors' Estates.

## D.    <u>Trade Creditors</u>

Trade Creditors indentified by the Debtors and the Investors as having ongoing go-forward business relationships with Reorganized A&P as of the Effective Date shall receive an enhanced recovery on their applicable Allowed Trade Claim, pursuant to the Trade Claims Cash Pool, if such Trade Creditor votes in favor of the Plan.

## E.    <u>Administrative and Priority Claims</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article VI.

1.                <u>Administrative Claims</u>

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim), including any Allowed Administrative Claim of the Notes Trustee or Second Lien Trustee, will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Commencement Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the holders of such Allowed Administrative Claims, or (4) for any amounts owed pursuant to the Securities Purchase Agreements, in accordance with the Securities Purchase Agreements or as allowed pursuant to the Securities Purchase Agreements Order. For the avoidance of doubt, all reasonable fees and expenses of the (a) Notes Trustee (and its counsel, agents, and advisors) that are provided for under the Notes Indentures, as applicable, shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims only if Classes E, F and G (defined below) each vote in favor of the Plan and (b) Second Lien Trustee (and its counsel, agents, and advisors) that are provided for under the Second Lien Indenture, as applicable, shall be paid in full in Cash on the Effective Date, or as soon as

practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims <u>only</u> <u>if</u> Class A (defined below) votes in favor of the Plan (to the extent such Claims in Class A are Impaired).

Except as otherwise provided in this Article II.A, unless previously filed, requests for payment of Administrative Claims (other than requests for the payment of Transaction Expenses, which shall be governed pursuant to the terms of the Securities Purchase Agreements and the Securities Purchase Agreements Order) must be filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property and Estates and such Administrative Claims shall be deemed discharged as of the Effective Date.  For the avoidance of doubt, the payment of the Break-Up Fee and any Transaction Expenses shall be governed by the Securities Purchase Agreements and the Securities Purchase Agreements Order.

2.      Professional Claims

        a.              Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed and served no later than 60 days after the Confirmation Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

        b.              Professional Fee Escrow Account

In accordance with Article VI.E.2.c hereof, on the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the estates of the Debtors or Reorganized Debtors, as applicable.  The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account within 10 days after such Claims are Allowed by a Final Order.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

        c.              Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall provide a good faith estimate of their Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 10 days prior to the Confirmation Hearing, provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

        d.              Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, without any further notice to or action, order, or

approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Debtors or Reorganized Debtors, as applicable.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.            DIP Facility Claims

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed DIP Facility Claim, each such Allowed Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, provided such payments shall be distributed to the DIP Facility Administrative Agent on behalf of holders of such Allowed Claims.

4.            Priority Tax Claims

With the reasonable consent of the Investors, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to by the Debtor or Reorganized Debtor (on the Effective Date), as applicable, and such holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date), Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date) and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

F.    **Classification of Claims and Interests**

The Plan constitutes a separate plan of reorganization for each Debtor, provided, however, that the classifications and recoveries set forth below reflect the Substantive Consolidation Settlement described in Article IV.B.  Except for the Claims addressed in Article II above, all Claims and Interests are classified in the Classes set forth below pursuant to section 1122 of the Bankruptcy Code.  As set forth above, in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Claims, DIP Facility Claims and Priority Tax Claims.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of voting and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a letter for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | Second Lien Note Claims | Impaired/ Unimpaired | Entitled to Vote/ Conclusively Presumed to Accept [30] |
| B | Secured Tax Claims | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| E | Convertible Notes Claims | Impaired | Entitled to Vote |
| F | 9.125% Senior Note Claims | Impaired | Entitled to Vote |
| G | Quarterly Interest Bond Claims | Impaired | Entitled to Vote |
| H | Trade Claims | Impaired | Entitled to Vote |
| I | Guaranteed Landlord Claims | Impaired | Entitled to Vote |
| J | Union Claims | Impaired | Entitled to Vote |
| K | General Unsecured Claims | Impaired | Entitled to Vote |
| L | Intercompany Claims | Impaired | Deemed to Reject |
| M | Interests in A&P | Impaired | Deemed to Reject |
| N | Intercompany Interests | Impaired | Deemed to Reject |
| O | Section 510(b) Claims | Impaired | Deemed to Reject |

## G.    Treatment of Classes of Claims and Interests

1.    Class A — Second Lien Note Claims

    a.    *Classification*:  Class A consists of all Second Lien Note Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Class A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A Claim, each such holder of an Allowed Class A Claim shall, at the option of the Debtors and the Investors, (a) be paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter or (b) receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim.

    c.    *Voting*:  Class A is Unimpaired under option (a) above and Impaired under option (b) above; holders of Unimpaired Allowed Class A Claims are conclusively presumed to accept the Plan and holders of Impaired Allowed Class A Claims are entitled to vote to accept or reject the Plan.

---

[30]    Pursuant to Article III.C.1. of the Plan, Holders of Allowed Class A Claims shall, at the option of the Debtors and the Investors, (a) be paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter or (b) receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim.  Class A is Unimpaired under option (a) above and Impaired under option (b) above; holders of Unimpaired Allowed Class A Claims are conclusively presumed to accept the Plan and holders of Impaired Allowed Class A Claims are entitled to vote to accept or reject the Plan.

2.          <u>Class B — Secured Tax Claims</u>

  a.          *Classification*:  Class B consists of all Secured Tax Claims.

  b.          *Treatment*:  Except to the extent that a holder of an Allowed Class B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class B Claim, each such holder of an Allowed Class B Claim shall receive, at the option of the Debtors or the Reorganized Debtors (with the reasonable consent of the Investors), as applicable:

   (i)          Cash on the Effective Date, or as soon as practicable thereafter, in an amount equal to such Allowed Class B Claim; or

   (ii)          at the option of the holder of an Allowed Class B Claim, commencing on the Effective Date and continuing over a period not exceeding five years from the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Class B Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the option of the Debtors or the Reorganized Debtors to prepay the entire amount of such Allowed Claim during such time period; or

   (iii)          at the option of the holder of an Allowed Class B Claim, regular Cash payments by the Debtors (on the Effective Date) or the Reorganized Debtors (in the ordinary course of business after the Effective Date) in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

  c.          *Voting*:  Class B is Unimpaired, and holders of Allowed Class B Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class B Claims are not entitled to vote to accept or reject the Plan.

3.          <u>Class C — Other Secured Claims</u>

  a.          *Classification*:  Class C consists of all Other Secured Claims.

  b.          *Treatment*:  Except to the extent that a holder of an Allowed Class C Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class C Claim, each such holder of an Allowed Class C Claim shall, at the option of the Debtors or the Reorganized Debtors, as applicable, and the Investors:

   (i)          have its Allowed Class C Claim Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Class C Claim to demand or receive payment of such Allowed Class C Claim prior to the stated maturity of such Allowed Class C Claim from and after the occurrence of a default; or

(ii)         receive Cash in an amount equal to such Allowed Class C Claim, including any interest on such Allowed Class C Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Class C Claim becomes an Allowed Class C Claim, or as soon as practicable thereafter; or

(iii)        at the option of the holder of an Allowed Class C Claim, receive the collateral securing its Allowed Class C Claim and any interest on such Allowed Class C Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

c.          *Voting*: Class C is Unimpaired, and holders of Allowed Class C Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class C Claims are not entitled to vote to accept or reject the Plan.

4.      Class D — Other Priority Claims

a.          *Classification*: Class D consists of all Other Priority Claims.

b.          *Treatment*: Except to the extent that a holder of an Allowed Class D Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class D Claim, each such holder of an Allowed Class D Claim shall be paid in full in Cash on the later of (i) the Effective Date, or as soon as practicable thereafter and (ii) the date such Class D Claim becomes Allowed, or as soon as practicable thereafter.

c.          *Voting*: Class D is Unimpaired, and holders of Allowed Class D Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class D Claims are not entitled to vote to accept or reject the Plan.

5.      Class E — Convertible Notes Claims

a.          *Classification*: Class E consists of all Convertible Note Claims.

b.          *Treatment*: Except to the extent that a holder of an Allowed Class E Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class E Claim, each holder of an Allowed Class E Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c.          *Voting*: Class E is Impaired and holders of Allowed Class E Claims are entitled to vote to accept or reject the Plan.

6.      Class F — 9.125% Senior Note Claims

a.          *Classification*: Class F consists of all 9.125% Senior Note Claims.

52

b. *Treatment*:  Except to the extent that a holder of an Allowed Class F Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class F Claim, each holder of an Allowed Class F Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c. *Voting*:  Class F is Impaired and holders of Allowed Class F Claims are entitled to vote to accept or reject the Plan.

7.   Class G — Quarterly Interest Bond Claims

a. *Classification*:  Class G consists of all Quarterly Interest Bond Claims.

b. *Treatment*:  Except to the extent that a holder of an Allowed Class G Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class G Claim, each holder of an Allowed Class G Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c. *Voting*:  Class G is Impaired and holders of Allowed Class G Claims are entitled to vote to accept or reject the Plan.

8.   Class H — Trade Claims

a. *Classification*:  Class H consists of all Trade Claims.

b. *Treatment*:  Except to the extent that a holder of an Allowed Class H Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class H Claim, each holder of an Allowed Class H Claim shall receive on the Effective Date, or as soon as practicable thereafter:  (a) Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool and (b) if such holder enters into a trade agreement acceptable to the Debtors and the Investors before the Effective Date, Cash equal to its Pro Rata portion of the Trade Claims Cash Pool, provided, however, that the total recovery on each Allowed Class H Claim does not exceed [__]% of the Allowed amount of such Allowed Class H Claim.

c. *Voting*:  Class H is Impaired and holders of Allowed Class H Claims are entitled to vote to accept or reject the Plan.

9.   Class I — Guaranteed Landlord Claims

a. *Classification*:  Class I consists of all Guaranteed Landlord Claims.

b. *Treatment*:  Except to the extent that a holder of an Allowed Class I Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class I Claim, each holder of an Allowed Class I Claim shall receive on the Effective Date, or as soon as practicable thereafter:  (a) Cash equal to its Pro Rata portion of

53

the Unsecured Creditor Cash Pool and (b) if such holder votes in favor of the Plan, Cash equal to its Pro Rata portion of the Substantive Consolidation Settlement Cash Pool, provided, however, that the total recovery on each Allowed Class I Claim does not exceed [___%] of the Allowed amount of such Allowed Class I Claim.

c.        *Voting*:  Class I is Impaired and holders of Allowed Class I Claims are entitled to vote to accept or reject the Plan.

10.        Class J — Union Claims

a.        *Classification*:  Class J consists of all Union Claims.

b.        *Treatment*:  Except to the extent that a holder of an Allowed Class J Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class J Claim, each holder of an Allowed Class J Claim shall receive a recovery pursuant to the Union Settlement Agreement.

c.        *Voting*:  Class J is Impaired and holders of Allowed Class J Claims are entitled to vote to accept or reject the Plan.

11.        Class K — General Unsecured Claims

a.        *Classification*:  Class K consists of all General Unsecured Claims.

b.        *Treatment*:  Except to the extent that a holder of an Allowed Class K Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class K Claim, each holder of an Allowed Class K Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c.        *Voting*:  Class K is Impaired and holders of Allowed Class K Claims are entitled to vote to accept or reject the Plan.

12.        Class L — Intercompany Claims

a.        *Classification*:  Class L consists of all Intercompany Claims.

b.        *Treatment*:  Subject to the provisions of Article IV.T. ("Restructuring Transactions"), holders of Allowed Class L Claims shall not receive any distributions on account of such Allowed Class L Claims; provided, however, the Debtors and Reorganized Debtors reserve the right to Reinstate any or all Allowed Class L Claims on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code.

c.        *Voting*:  Class L is Impaired, and holders of Allowed Class L Claims are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class L Claims are not entitled to vote to accept or reject the Plan.

54

13.    Class M — Interests in A&P

a.        *Classification*:  Class M consists of all Interests in A&P.

b.        *Treatment*:  Holders of Allowed Class M Interests shall not receive any distributions on account of such Allowed Class M Interests.  On the Effective Date, all Class M Interests shall be canceled and extinguished.

c.        *Voting*:  Class M is Impaired, and holders of Allowed Class M Interests are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class M Interests are not entitled to vote to accept or reject the Plan.

14.    Class N — Intercompany Interests

a.        *Classification*:  Class N consists of all Intercompany Interests.

b.        *Treatment*:  Subject to the provisions of Article IV.T. ("Restructuring Transactions"), holders of Allowed Class N Interests shall not receive any distributions on account of such Allowed Class N Interests; provided, however, the Debtors and the Reorganized Debtors reserve the right to Reinstate any or all Allowed Class N Interests on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code.

c.        *Voting*:  Class N is Impaired, and holders of Allowed Class N Interests are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class N Interests are not entitled to vote to accept or reject the Plan.

15.    Class O — Section 510(b) Claims

a.        *Classification*:  Class O consists of all Section 510(b) Claims.

b.        *Treatment*:  Holders of Allowed Class O Claims shall not receive any distributions on account of such Allowed Class O Claims.  On the Effective Date, all Class O Claims shall be discharged.

c.        *Voting*:  Class O is Impaired and holders of Allowed Class O Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Class O Claims are not entitled to vote to accept or reject the Plan.

## H.    **Special Provisions Governing Vote Tabulation**

Except as otherwise provided herein, in the motion to approve the Disclosure Statement and its related exhibits:  (a) if no holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims in such Class; and (b) any Class of Claims that does not have a holder of an Allowed Claim or Interest or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

K&E 20463290

I.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against the holder of any such Unimpaired Claim.

J.    **Provisions for Implementation of the Plan**

1.    Use of Proceeds from New Money Commitment and Exit Facility

Unless otherwise provided in the Plan or the Securities Purchase Agreements, the Debtors and Reorganized Debtors, as applicable, shall use the proceeds received from the New Money Commitment, together with proceeds from the Exit Facility and other funds held by the Debtors on the Effective Date, (i) to make cash distributions required by the Plan, (ii) to pay Transaction Expenses not previously paid, (iii) to pay other expenses of the Chapter 11 Cases, to the extent so ordered by the Bankruptcy Court, and (iv) for general corporate purposes.

2.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

3.    NewCo Equity

The issuance of the NewCo Equity by Reorganized A&P is authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized A&P, as applicable. Pursuant to the Plan, the Reorganized A&P Charter shall authorize the issuance and distribution on or after the Effective Date of shares of NewCo Equity to the Investors (to the extent practicable, directly, or else through a Distribution Agent) to satisfy the Debtors' obligations under the Securities Purchase Agreements, subject to dilution by the Management Equity Incentive Program and/or other agreement or as otherwise provided by the Securities Purchase Agreements. All of the shares of NewCo Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. On the Effective Date, each of Reorganized A&P and the other Reorganized Debtors shall be a private company. As such, the Reorganized Debtors will not list the NewCo Equity on a national securities exchange as of the Effective Date.

4.    Registration Exemptions

The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein are expected to be exempt from applicable federal and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 4(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof, subject to (1) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the Reorganized A&P Charter and the Securities Purchase Agreements and (2) any other applicable regulatory and legal requirements.

5.          Subordination

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

6.          Vesting of Assets in the Reorganized Debtors

Except as specifically or expressly provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtors' Estates, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, that may be specifically granted to secure the Exit Facility, the New Second Lien Notes and the New Convertible Third Lien Notes, and if applicable, the Replacement Second Lien Notes and the Other Secured Claims).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

7.          Cancellation of Notes, Instruments, Certificates and Other Documents

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, and the Second Lien Indenture, and any other certificate, share, note bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest, and any options, or other securities exercisable or exchangeable for, or convertible into Interests or equity of the Debtors (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled as to the Debtors; (2) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, and the Second Lien Indenture, shall be fully released, settled, and compromised as to the Debtors and the non-Debtor Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors, the Reorganized Debtors and the non-Debtor Affiliates, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, however, that notwithstanding Consummation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing holders to receive distributions under the Plan, (2) allowing and preserving the rights of the DIP Facility Administrative Agent, Second Lien Trustee, and Wilmington Trust, as applicable, to make distributions on account of Claims as provided in Article VI.M herein.

8.          Issuance of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan or the Securities Purchase Agreements, the Reorganized Debtors shall issue on the Effective Date all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan and the Securities Purchase Agreements (as approved by the Securities Purchase Agreements Order).

9.          Post-Confirmation Property Sales

            To the extent the Debtors or Reorganized Debtors, as applicable, purchase or sell any property after the Confirmation Date and prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

10.         Corporate Action

            Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors or the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized, approved and ratified without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, holders of Claims or Interests, directors, managers or officers of the Debtors, the Reorganized Debtors, or the Investors, or any other Entity or Person, as applicable.  Such actions include (1) the adoption and filing of the Reorganized A&P Charter and the adoption of the Reorganized A&P Bylaws, (2) the appointment of the New Board, (3) the adoption and implementation of the Management Equity Incentive Program, (4) the adoption of severance agreements (as applicable) without action by the New Board as, and to the extent, provided in section 1.11 of the Securities Purchase Agreements, (5) entering into the Management Services Agreement, (6) the authorization, issuance and distribution of the New Second Lien Notes, New Convertible Third Lien Notes, NewCo Equity, Investment Warrants and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and (7) the consummation and implementation of the Exit Financing.

11.         Certificate of Incorporation and Bylaws

            The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than A&P) shall be amended in a form as may be required to be consistent with the provisions of the Plan, the Securities Purchase Agreements and the Bankruptcy Code, and shall be in form and substance acceptable to the Investors.  The certificate of incorporation and bylaws of A&P shall be as contained in the Plan Supplement and as acceptable to the Investors.  The Reorganized A&P Charter will, among other things, (1) authorize the issuance of the shares of NewCo Equity; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

            After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective states, provinces, or countries of formation and its respective charters and bylaws.

12.         Effectuating Documents, Further Transactions

            On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements and the Securities issued pursuant thereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan or the Securities Purchase Agreements.

13.             <u>Section 1146(a) Exemption</u>

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. Such exemption specifically applies, without limitation, to (1) the Restructuring Transactions; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) the issuance and/or distribution of NewCo Equity, the Second Lien Notes, the Convertible Third Lien Notes, the Investment Warrants and any other securities of the Debtors or the Reorganized Debtors; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Securities Purchase Agreements, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignment executed in connection with any Restructuring Transaction occurring pursuant to the Plan or the Securities Purchase Agreements.

14.             <u>Directors and Officers of Reorganized A&P</u>

On the Effective Date, the term of the current members of the board of directors of A&P shall expire, and the New Board shall be appointed pursuant to the Securities Purchase Agreements. On and after the Effective Date, each director or officer of Reorganized A&P shall serve pursuant to the terms of the Reorganized A&P Charter, the Reorganized A&P Bylaws, or other constituent documents, the Management Services Agreement, as applicable, and applicable state corporation law. Pursuant to the terms of the Securities Purchase Agreements, the New Board shall be reconstituted to consist of seven (7) directors (or such larger number of directors as may be determined by the Investors in their discretion), of whom at least five (5) directors shall be persons designated by the Investors, one (1) person shall be a person designated by certain unions (who (x) shall be an independent director and a grocery industry expert, and (y) shall not serve on behalf of, or take directions from, the Unions), and one (1) person shall be the Chief Executive Officer of the Reorganized Debtors. The Reorganized A&P Bylaws and the Reorganized A&P Charter shall provide that the New Board will be divided into three classes serving staggered three-year terms. Pursuant to the Securities Purchase Agreements, on or before the Confirmation Hearing, the Investors may provide for employment offers for the Executive Management Team (as defined in the Securities Purchase Agreements).

15.             <u>Directors and Officers of Reorganized Debtors Other Than A&P</u>

Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers of each of the Reorganized Debtors, other than Reorganized A&P, shall continue to serve in their current capacities after the Effective Date. The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized A&P shall be consistent with their respective new certificates of incorporation and bylaws. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law.

K&E 20463290

16.        Compensation, Pensions, and Benefits Programs

      a.        Management Equity Incentive Program.  The Reorganized Company shall be deemed to have adopted the Management Equity Incentive Program on the Effective Date pursuant to the Securities Purchase Agreements.

      b.        Employee and Retiree Benefits.  Except with respect to any equity based awards, rejected employment agreements and any other rejected benefit or compensation plans, and subject to the terms and conditions of the Securities Purchase Agreements, on and after the Effective Date, the Reorganized Debtors may (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for compensation, including bonus compensation, health care benefits, disability benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Commencement Date; provided, however, that the Debtors' or Reorganized Debtors' performance pursuant to any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, Reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan; provided, further that any such assumed plans and obligation shall be subject to modification in accordance with their terms.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans, nor shall Confirmation of the Plan and/or Consummation of the Restructuring Transactions constitute a change of control under any such contracts, agreements, policies, programs, and plans.

      c.        Pensions.  As of the Effective Date, the Reorganized Debtors shall continue the A&P Pension Plans in accordance with, and subject to, their terms, ERISA, and the Internal Revenue Code, and shall preserve all of their rights thereunder.  The A&P Pension Claims and all Proofs of Claims filed on account thereof shall be deemed disallowed and expunged as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court.

      d.        Workers' Compensation Programs.  As of the Effective Date, except as set forth in the Securities Purchase Agreements and Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

17.        Intercompany Account Settlement

      The Debtors and the Reorganized Debtors, and their respective Affiliates, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any

changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

18.          Preservation of Rights of Action

Subject to the releases set forth in Article VI.N.4 and Article VI.N.5 below, unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Further, subject to the releases set forth in Article VI.N.4 and Article VI.N.5 below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

19.          Avoidance Actions

The Debtors and the Reorganized Debtors waive all Avoidance Actions, provided, however, that any Avoidance Actions against an Entity that has filed a Claim against the Debtors is expressly preserved for the purposes described in Article VI.L.6 and pursuant thereto.

20.          Restructuring Transactions

On or prior to the Effective Date, the Debtors or the Reorganized Debtors may enter into such transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein, with the consent of the Investors.  The Restructuring Transactions may include one or more inter-company mergers, consolidations,

amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, asset sales, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, and the Investors, to be necessary or appropriate to implement the transactions provided for in the Securities Purchase Agreements.  None of the Restructuring Transactions contemplated herein or in the Securities Purchase Agreements shall constitute a change of control under any agreement, contract or document of the Debtors or Reorganized Debtors, as applicable.  Subject to the Securities Purchase Agreements, the actions to effect the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Securities Purchase Agreements and that satisfy the requirements of applicable law and any other terms to which the relevant entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Securities Purchase Agreements and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) pledging, granting of liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of the Plan; and (5) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions or that are otherwise provided for in the Securities Purchase Agreements.

21.          Corporate Existence

        Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law), provided, however, that the Investors may request the formation of a new holding company pursuant to the Securities Purchase Agreements.

22.          Tax Reporting Matters

        All parties (including the Reorganized Debtors and holders of Claims and Interests) shall report for all federal income tax purposes in a manner consistent with the Plan.

23.          Management Services Agreement

        On the Effective Date, and pursuant to the terms of the Securities Purchase Agreements, [Reorganized A&P] shall enter into the Management Services Agreement with Yucaipa.

K.    **Treatment of Executory Contracts and Unexpired Leases**

1.              Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (1) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (3) is the subject of a motion to assume or reject pending as of the Effective Date; (4) is an Intercompany Contract, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Final Order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; or (5) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.  All Executory Contracts and Unexpired Leases rejected by the Debtors on or prior to the Confirmation Date will not be continuing obligations of the Debtors or Reorganized Debtors.

Further, the Plan Supplement will contain a schedule of "Rejected Executory Contracts and Unexpired Leases," as may be amended from time to time with the consent, as provided in the Securities Purchase Agreements, of the Investors; provided, however, that any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed in the schedule of "Rejected Executory Contracts and Unexpired Leases" will be rejected on the Effective Date, notwithstanding its exclusion from such schedule.

2.              Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, the Reorganized Debtors shall assume all of the Executory Contracts and Unexpired Leases (a) previously assumed by the Debtors and (b) listed on the schedule of "Assumed Executory Contracts and Unexpired leases," as may be amended from time to time, in the Plan Supplement and otherwise identified for assumption pursuant to Article VI.K.1 above. With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code, however, parties shall not be precluded from filing objections to the Debtors' proposed Cure by the Cure Objection Deadline.

a.              Modifications, Amendments, Supplements,
Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or

Unexpired Lease, and all rights  related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder, provided, however, that any anti-assignment provision in any assumed Executory Contract and/or Unexpired Lease shall be deemed invalid.  Confirmation of the Plan and Consummation of the Restructuring Transactions shall not constitute a change of control under any Unexpired Lease or Executory Contract assumed by the Debtors on or prior to the Effective Date.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

b.    Proofs of Claim Based on Executory
Contracts or Unexpired Leases that Have Been Assumed

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cures, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

3.         Indemnification Obligations

Each Indemnification Obligation shall, so long as the releases in the Plan are approved in accordance with the terms of the Plan, be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date. The Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by a prior or subsequent order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation.  Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

4.         Insurance Policies

Each insurance policy shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is included in the schedule of "Rejected Executory Contracts and Unexpired Leases" contained in the Plan Supplement.

5.         Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.  Such Cure shall be satisfied by the Debtors or their

64

assignee, if any, by payment of the Cure in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

Prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (1) list the applicable Cure, if any, (2) describe the procedures for filing objections to the proposed assumption or Cure, and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court. Except with respect to Executory Contracts and Unexpired Leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be filed with the Claims Agent on or before the Cure Objection Deadline. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before the Cure Objection Deadline.

Any request for payment of Cure that is not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order or approval of the Bankruptcy Court and any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease and associated Cure will be deemed to have consented to such assumption and Cure. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption, or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

K&E 20463290

6.          Preexisting Obligations to the Debtors
            Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

7.          Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court no later than 30 days after the later of the Effective Date or the effective date of rejection.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.

8.          Contracts, Intercompany Contracts, and
            Leases Entered Into After the Commencement Date

Contracts, Intercompany Contracts, and leases entered into after the Commencement Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

9.          Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is any objection filed to the rejection of an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, shall have 45 days after entry of a Final Order resolving such objection to alter their treatment of such contract or lease.

**L.      Procedures for Resolving Disputed Claims and Interests**

1.          Allowance of Claims and Interests

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article VI.J.18.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2.          Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan or the Securities Purchase Agreements, after the Effective Date, the Reorganized Debtors shall have the sole authority (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests, (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.          Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

4.          Expungement or Adjustment to Paid,
            Satisfied, or Superseded Claims and Interests

Any Claim or Interest that has been paid, satisfied, or superseded, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

5.          No Interest

Unless otherwise specifically provided for in the Plan, required under applicable bankruptcy law, or agreed to by the Debtors, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a holder of a Claim, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim or right.   Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

6.          DISALLOWANCE OF CLAIMS OR INTERESTS

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

67

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

7.        Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

8.        No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim

9.        Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the holder of such Allowed Claim, however, the timing of such distribution(s) shall be at the sole reasonable discretion of the Debtors or Reorganized Debtors, and otherwise in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution, if any, to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

10.        Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall deposit in the Disputed Claims Reserve an amount of cash, as determined by the Debtors or Reorganized Debtors (with the reasonable consent of the Investors), from the Unsecured Creditor Cash Pool, Substantive Consolidation Settlement Cash Pool and Trade Claims Cash Pool that would likely have been distributed to the holders of all applicable Disputed Claims (that, if Allowed, would be entitled to participate in such Claims pools) as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be (a) the lesser of (i) the asserted amount of each Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or as provided by the parties to the Debtors as further information with respect to the Proof of Claim, or (if no Proof of Claim was filed) scheduled by the Debtors, and (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (b) the amount otherwise agreed to by the Debtors, the Creditors' Committee, the Investors and the holder of such Disputed Claim for reserve purposes.

68

11.                Distributions Following Resolution of All Claims

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent cash remains in the Disputed Claims Reserve after all holders of Disputed Claims that have become Allowed and have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then that excess cash shall be distributed to the Unsecured Creditor Cash Pool and holders of Allowed Unsecured Claims (to the extent they have not been paid in full) shall receive their Pro Rata share of the Unsecured Creditor Cash Pool.

**M.    Provisions Governing Distributions**

1.                Distributions on Account of Claims Allowed as of the Effective Date

a.        Delivery of Distributions in General.  Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (b) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

b.        Delivery of Distributions on account of DIP Facility Claims.  The DIP Facility Administrative Agent:  (a) shall be deemed to be the holder of all DIP Facility Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such DIP Facility Claims to or on behalf of the DIP Facility Administrative Agent; (b) shall hold or direct such distributions for the benefit of the holders of Allowed DIP Facility Claims, as applicable; and (c) shall arrange to deliver such distributions to or on behalf of such holders of Allowed DIP Facility Claims; provided, however, the DIP Facility Administrative Agent shall retain all rights as administrative agent under the DIP Facility Credit Agreement in connection with delivery of distributions to DIP Facility Lenders; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.E.3 shall be deemed satisfied upon delivery of distributions to the DIP Facility Administrative Agent.

c.        Delivery of Distributions on account of the Second Lien Note Claims.  The Second Lien Trustee:  (a) shall be deemed to be the holder of the Second Lien Note Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Second Lien Note Claims to or on behalf of the Second Lien Trustee; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Second Lien Note Claims, as applicable; (c) shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Second Lien Note Claims; provided, however, the Second Lien Trustee shall retain all rights as administrative agent under the Second Lien Indenture in connection with delivery of distributions to the holders of Allowed Second Lien Note Claims; and provided further, however, that the Debtors'

69

obligations to make distributions in accordance with Article VI.G.1 above shall be deemed satisfied upon delivery of distributions to the Second Lien Trustee.

d. _Delivery of Distributions on account of Indenture Claims_.  Wilmington Trust, as indenture trustee for the Notes Indentures:  (a) shall be deemed to be the holder of the Indenture Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Indenture Claims to or on behalf of the Wilmington Trust; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Indenture Claims, as applicable; (c) shall arrange to deliver such distributions to or on behalf of the holder of the Allowed Indenture Claims; provided, however, Wilmington Trust shall retain all rights as the indenture trustee for the Convertible Notes, 9.125% Senior Notes and Quarterly Interest Bonds under the Notes Indentures in connection with delivery of distributions; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.G.5, Article VI.G.6, and Article VI.G.7 shall be deemed satisfied upon delivery of distributions to Wilmington Trust.

2.        _Distributions on Account of Claims Allowed After the Effective Date_

a. _Payments and Distributions on Disputed Claims_.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date selected at the sole reasonable discretion of the Debtors or Reorganized Debtors; provided, however, that (a) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Claims that are Priority Tax Claims or Secured Tax Claims that become Allowed Priority Tax Claims or Allowed Secured Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

b. _Special Rules for Distributions to Holders of Disputed Claims_.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law.

3.        _Delivery of Distributions_

a. _Record Date for Distributions_.  On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only

those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

          b.    <u>Distribution Process</u>.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (c) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004 if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; (d) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

          c.    <u>Accrual of Dividends and Other Rights</u>.  For purposes of determining the accrual of dividends or other rights after the Effective Date, NewCo Equity shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of NewCo Equity actually take place.

          d.    <u>Compliance Matters</u>.  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

          e.    <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Monday, December 13, 2010 as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on Monday, December 13, 2010.

K&E 20463290

f.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions.

(i)    Fractional Distributions.    Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of NewCo Equity shall not be made and shall be deemed to be zero, and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars.    Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(ii)    De Minimis Distributions.    Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $250,000, or (ii) the amount to be distributed to the specific holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such holder.    The Distribution Agent need not make any distribution on account of an Allowed Claim to a specific holder if such distribution on such Allowed Claim is less than $[50.00].

(iii)    Undeliverable Distributions.    If any distribution to a holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed distributions shall be made to such holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.M.3.f(iv) above, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iv)    Reversion.    Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is NewCo Equity, shall be deemed cancelled.    Upon such revesting, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.    The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(v)    Surrender of Cancelled Instruments or Securities.    On the Effective Date or as soon as reasonably practicable thereafter, each holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).    Such

72

Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of Article VI.M.3.f(vi). Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary. Notwithstanding the foregoing paragraph, this Article VI.M.3.f(v) shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

(vi) <u>Lost, Stolen, Mutilated, or Destroyed Debt Securities</u>. Any holder of Allowed Claims evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim. Upon compliance with this procedure by a holder of an Allowed Claim evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

4.        <u>Claims Paid or Payable by Third Parties</u>

<u>Claims Paid by Third Parties</u>. The Claims Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

<u>Claims Payable by Insurance Carriers</u>. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Applicability of Insurance Policies. Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

5.          Setoffs

Except as otherwise expressly provided for in the Plan or a Final Order of the Bankruptcy Code, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff.

6.          Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any permitted pursuant to the Plan, accrued through the Effective Date.

**N.      Effect of Confirmation of the Plan**

1.          DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EFFECTIVE AS OF THE EFFECTIVE DATE:  (1) THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON SUCH CLAIMS FROM AND AFTER THE COMMENCEMENT DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES; (2) THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDERS FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN; (3) ALL CLAIMS AND INTERESTS SHALL BE SATISFIED, DISCHARGED, AND RELEASED IN FULL, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE; AND (4) ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES ANY OTHER CLAIMS OR INTERESTS**

**BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.**

2.          Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

3.          Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement, including the Substantive Consolidation Settlement, is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

4.          RELEASES BY THE DEBTORS

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDIENT IMPLEMENTATION OF THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY, EACH OF THE DEBTORS, THE REORGANIZED DEBTORS AND THE DEBTORS' ESTATES (INCLUDING ALL PARTIES CLAIMING DERIVATIVELY OR THROUGH THE DEBTOR OR THE REORGANIZED DEBTORS OR THEIR ESTATES) OR THEIR AFFILIATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH RELEASED PARTY AND THEIR RESPECTIVE PROPERTY (THE "DEBTOR RELEASE") FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, RIGHTS OF SETOFF, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, MATURE OR UNMATURED, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED,**

K&E 20463290

CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, CONTRACT VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES PURCHASE AGREEMENTS, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING DEBTOR RELEASE SHALL NOT OPERATE TO WAIVER OR RELEASE ANY CLAIMS OR LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS, INCLUDING UNDER THE SECURITIES PURCHASE AGREEMENTS; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.    NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST NON-RELEASED PARTIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND    FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE REORGANIZED DEBTOR ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

5.        RELEASES BY HOLDERS OF CLAIMS

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED

K&E 20463290

SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) (THE "THIRD PARTY RELEASE") THE REORGANIZED DEBTORS, THEIR ESTATES, THEIR RESPECTIVE PROPERTY, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, MATURE OR UNMATURED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF FEDERAL OR STATE SECURITIES LAW OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES PURCHASE AGREEMENTS, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO RELEASE CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A RELEASING PARTY OR A PARTY RELEASING UNDER THIS THIRD PARTY RELEASE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY OR LIABILITIES OF ANY RELEASING PARTY; (2) ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; OR (4) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE REORGANIZED DEBTORS MAY HAVE NOW OR IN THE FUTURE AGAINST NON-RELEASED PARTIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY (1) POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR (2) CLAIMS ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL IN ANY WAY AFFECT THE OPERATION OF ARTICLE VIII.A OF THE PLAN, PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE.

K&E 20463290

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

6.        EXCULPATION

THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR EFFECTING THE EFFECTIVE DATE OF THE PLAN, THE DISCLOSURE STATEMENT, THE SECURITIES PURCHASE AGREEMENTS, THE RESTRUCTURING TRANSACTIONS, THE ISSUANCE AND/OR DISTRIBUTION OF NEWCO EQUITY, THE NEW SECOND LIEN NOTES, THE REPLACEMENT SECOND LIEN NOTE AS APPLICABLE, THE NEW CONVERTIBLE THIRD LIEN NOTES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; PROVIDED, THAT THE FOREGOING PROVISIONS OF THIS EXCULPATION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, FURTHER, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN; PROVIDED FURTHER, THAT THE FOREGOING "EXCULPATION" SHALL NOT APPLY TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, EXCEPT FOR ACTS OR OMISSIONS OF RELEASING PARTIES.

7.        INJUNCTION

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.F); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER

78

**THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A TIMELY PROOF OF CLAIM WITH THE BANKRUPTCY COURT PRESERVING SUCH RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE INVESTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED THAT</u> NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; <u>PROVIDED, FURTHER, THAT</u> NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

8.      <u>Protection Against Discriminatory Treatment</u>

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to,

condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.          Indemnification

Notwithstanding anything in the Plan to the contrary, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, board resolutions, contracts, or otherwise) for the directors, officers, employees, attorneys, other professionals, and agents of the Debtors that served in such capacity from and after the Commencement Date and such directors' and officers' respective affiliates, shall be Reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan.

10.          Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

11.          Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

12.          Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**O.          Conditions Precedent to Consummation of the Plan**

1.          Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article VI.O.2 hereof:

           a.          the Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Investors, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy

Code and such order shall be in full force and effect and shall have become a Final Order;

b.       the Confirmation Order: (i) shall be entered by the Bankruptcy Court on or before February 14, 2012 (as such date may be extended with the consent of the Debtors and the Investors, which consent shall not be unreasonably withheld or delayed); (ii) shall include the provisions in Exhibit D to the Securities Purchase Agreements and otherwise be in form and substance acceptable to the Investors; and (iii) shall be in full force and effect and, unless waived by the Investors, shall have become a Final Order;

c.       the Plan and Plan Supplement, including any amendments, modifications, or supplements thereto, shall be in form and substance reasonably acceptable to the Investors and shall not have been modified without the consent of the Investors (such consent not to have been unreasonably withheld in the case of a modification that is not adverse to the Investors);

d.       the Transaction Expenses (as defined and provided in the Securities Purchase Agreements), to the extent not previously paid, shall be paid concurrently with the Effective Date in Cash in accordance with the terms of the Securities Purchase Agreements;

e.       the Commitment Fee shall be paid concurrently with the Effective Date to Liberty Harbor and Mount Kellett, as provided in the Securities Purchase Agreements;

f.       the Debtors shall have obtained an Exit Facility on terms as provided in the Securities Purchase Agreements and the Plan, and on terms and conditions reasonably acceptable to the Investors, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing the Exit Facility shall have occurred;

g.       with respect to all actions, documents, Certificates, and agreements necessary to implement the Plan (a) all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, (c) to the extent required, been filed with and approved by any applicable Governmental Units in accordance with applicable laws, and (d) been effected or executed;

h.       all conditions to the effectiveness of the Securities Purchase Agreements shall have been satisfied or waived in accordance with the terms thereof; and

i.       all other "Conditions to Investors' Obligations at Closing" identified in section 5.1 of the Securities Purchase Agreements shall have been satisfied or waived by the Investors in accordance with the terms thereof.

2.       <u>Waiver of Conditions Precedent</u>

Subject to the terms of the Securities Purchase Agreements, the Debtors and the Investors may jointly waive any of the conditions to the Effective Date set forth in Article VI.O.1 at any time without

K&E 20463290

any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

3.          Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## P.    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

> a.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

> b.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

> c.     resolve any matters related to Executory Contracts or Unexpired Leases, including:  (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to Article VI.K, of the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

> d.     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

> e.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

K&E 20463290

f.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

g.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

h.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

i.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

j.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

k.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

l.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of all contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases;

m.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

n.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VI.N above and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

o.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VII.D.1 of the Plan;

p.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

q.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

r.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

K&E 20463290

s.       consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

t.       determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

u.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

v.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

w.       hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

x.       hear and determine matters related to the Securities Purchase Agreements and related agreements;

y.       enforce all orders previously entered by the Bankruptcy Court; and

z.       hear any other matter not inconsistent with the Bankruptcy Code.

## Q.    **Miscellaneous Provisions**

1.           No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h) and 7062.

2.           Modification of Plan

Subject to the limitations contained in the Plan and the terms and conditions of the Securities Purchase Agreements: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

3.           Revocation or Withdrawal of Plan

The Debtors reserve the right, subject to, and in accordance with, the terms and conditions of each of the Securities Purchase Agreements and the Securities Purchase Agreements Order, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors

84

revoke or withdraw the Plan, or if Confirmation, Consummation or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects, and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

4.          Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

5.          Additional Documents

On or before the Effective Date and subject to the terms and conditions of the Securities Purchase Agreements, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Securities Purchase Agreements.

6.          Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. §1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

7.          Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases.

8.          Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

9.          Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

85

10.            Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| The Great Atlantic & Pacific Tea Company, Inc. 2 Paragon Drive Montvale, NJ 07645 Attn.:   Christopher W. McGarry, General Counsel | Kirkland & Ellis LLP 601 Lexington Avenue New York, NY 10022 Attn.:   James H.M. Sprayregen, P.C. Paul M. Basta, Esq. Ray C. Schrock, Esq.  Kirkland & Ellis LLP 300 North LaSalle Chicago, IL 60654 Attn.:   James J. Mazza, Jr., Esq. |
| **Counsel to the Creditors' Committee** | **Counsel to the Convertible Noteholders** |
| Milbank, Tweed, Hadley & McCloy LLP 1 Chase Manhattan Plaza New York, NY 10005 Attn.:   Dennis F. Dunne, Esq. Matthew S. Barr, Esq. Abhilash M. Raval, Esq. Michael E. Comerford, Esq. | Stroock & Stroock & Lavan LLP 180 Maiden Lane New York, NY 10038 Attn.:   Kristopher M. Hansen, Esq. Jayme T. Goldstein, Esq. |
| **Counsel to the Second Lien Noteholders** | **Counsel to DIP Facility Lenders** |
| Brown Rudnick LLP 7 Times Square New York, NY 10036 Attn:    Edward S. Weisfelner, Esq. | Davis Polk & Wardwell LLP 450 Lexington Avenue New York, NY 10022 Attn.:  Donald S. Bernstein, Esq. |
| **United States Trustee** | **Counsel to Yucaipa** |
| Office of the United States Trustee U.S. Department of Justice 33 Whitehall Street, 21st Floor Attn.:   Susan Golden, Esq. Richard Morrissey, Esq. | Latham & Watkins LLP 355 S. Grand Ave, Suite 100 Los Angeles, CA 90071 Attn:  Robert Klyman, Esq. |

11.            TERM OF INJUNCTIONS OR STAYS

**UNLESS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL INJUNCTIONS OR STAYS IN EFFECT IN THE CHAPTER 11 CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY CODE OR ANY ORDER OF THE BANKRUPTCY COURT, AND EXISTING ON THE CONFIRMATION DATE**

K&E 20463290

**(EXCLUDING ANY INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER) SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.  ALL INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR TERMS.**

12.        Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Notwithstanding anything to the contrary in the Plan (including any amendments, supplements, or modifications to the Plan) or the Confirmation Order (and any amendments, supplements, or modifications thereto) or an affirmative vote to accept the Plan submitted by any Investor, nothing contained in the Plan (including any amendments, supplements, or modifications thereto) shall alter, amend, or modify the rights of the Investors under the Securities Purchase Agreements.

13.        Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://www.kccllc.net/APTEA or the Bankruptcy Court's website at www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

14.        Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted (subject to the reasonable consent of the Investors).  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation (subject to the reasonable consent of the Investors).  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (3) nonseverable and mutually dependent.

**ARTICLE VII.
SECURITIES LAW MATTERS**

**A.        Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**

The Replacement Second Lien Notes are being issued under Section 1145 of the Bankruptcy Code ("**_1145 Securities_**").

87

As described in detail below, such securities will be "freely tradeable."

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for Claims or principally in exchange for Claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- o    purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- o    offers to sell securities offered under a plan of reorganization for the holders of those securities;

- o    offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- o    is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive Replacement Second Lien Notes are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell Replacement Second Lien Notes without registration if they are able to comply with the provisions of Rule 144 or Rule 144A under the Securities Act, as described further below.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

**B.    <u>Securities Issued Pursuant to Exemptions Under the Securities Act of 1933, as Amended</u>**

The following securities are being issued under Section 4(2) of Securities Act (collectively, the "*4(2) Securities*"):

- o    The NewCo Equity

- o    The New Second Lien Notes

- o    The New Convertible Third Lien Notes

- o    The Investment Warrants

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering is exempt from registration under the Securities Act. The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

K&E 20463290

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

## C.    Resales of 1145 Securities and 4(2) Securities /Rule 144 and Rule 144A

To the extent that persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "***Restricted 1145 Holders***"), resales of such securities by Restricted 1145 Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Restricted 1145 Holders would, however, be permitted to sell 1145 Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission.  Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities (other than a holder of "restricted securities") is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

To the extent that persons receive 4(2) Securities (collectively, the "***Restricted 4(2) Holders***" and together with the Restricted 1145 Holders, the "***Restricted Holders***"), such securities will be considered "restricted securities," and Restricted 4(2) Holders are permitted to sell 4(2) Securities without registration if the applicable provisions of Rule 144 or Rule 144A under the Securities Act are complied with, as described further below, or if such securities are registered with the Securities and Exchange Commission.

### 1.    Rule 144

Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (for example, the availability of current public information with respect to the issuer, and compliance with volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities, or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that:

o    a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and

o    an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

As noted in this Disclosure Statement, it is not contemplated that the Debtors or the Reorganized Debtors will be a public reporting company and, therefore, it is not expected that current public information will be available to permit resales pursuant to Rule 144 during the one-year period following the Effective Date.

2.        Rule 144A

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system).

WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED DEBTORS WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON.  ACCORDINGLY, THE DEBTORS AND REORGANIZED DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED DEBTORS THE DEBTORS AND REORGANIZED DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED DEBTORS. **ACCORDINGLY, IT IS RECOMMENDED THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

### ARTICLE VIII.
### STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**A.        The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**B.        Confirmation Standards**

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a

plan of reorganization. The Debtors believe that the Plan fully complies with the statutory requirements for Confirmation of the Plan listed below.

1.    The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.    The Plan has been proposed in good faith and not by any means forbidden by law.

3.    Any payment made or to be made by the proponent, by the Debtors, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

4.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in a joint Plan with the Debtor or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

5.    The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6.    With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

7.    With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8.    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

    o    with respect to a Claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

    o    with respect to a Class of Claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (a) if such Class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

91

o   with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

9.    If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.   All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## C.    **Liquidation Analysis**

As described in greater detail in the Liquidation Analysis attached hereto as **Exhibit D**, in a hypothetical case under chapter 7 of the Bankruptcy Code, Holders of Administrative Claims would not be paid in full and Holders of General Unsecured Claims would not receive any recovery.   By comparison, under the Plan, Holders of Administrative Claims are paid in full in Cash, Holders of General Unsecured Claims receive their Pro Rata share of the $40 million Unsecured Creditor Cash Pool, Holders of Trade Creditor Claims receive their Pro Rata share of the $[__] million Trade Creditor Cash Pool, and Holders of Guaranteed Landlord Claims receive their Pro Rata share of the $[__] million Substantive Consolidation Settlement Cash Pool (subject to a cap).   Therefore, the Debtors believe that the Plan satisfies the "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

## D.    **Valuation Analysis**

The Plan and the Securities Purchase Agreements represent the culmination of several months of negotiations concerning capital investments in the Debtors.   Throughout the process, the Debtors and their advisors have responded to all inbound investment inquiries.

Pursuant to the Plan, the Investors are providing a total New Money Commitment of $490 million in the form of (i) $210 million face amount privately placed New Second Lien Notes, (ii) $210 million face amount privately placed New Convertible Third Lien Notes, and (iii) an $80 million New Equity Investment.

Lazard believes the value provided under the Plan is currently the best measure of the Debtors' value in light of, among other things, (a) the robust and comprehensive nature of the investment process, described in greater detail in Article V.I, and (b) the Debtors' deal with the Investors is subject to higher or better offers.   Pursuant to the Securities Purchase Agreements, the Debtors can continue to negotiate with parties who want to invest and make an offer.   Further, the Creditors' Committee and other parties are free to test the market for higher or better investment offers.

The valuation described herein does not constitute a recommendation to any Holder of Claims against the Debtors as to how to vote on the Plan.   The estimated reorganized value also does not

92

constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## E.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain Financial Projections. These Financial Projections and the assumptions upon which they are based, are attached hereto as **Exhibit C**. Based on these Financial Projections, the Debtors believe that given the deleveraging contemplated by the Plan, they will be able to make all payments required pursuant to the Plan and, therefore, that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## F.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below. A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest to, or the Debtors cure any default and Reinstate the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (1) an Impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan and (2) an Impaired Class of Interests has accepted the Plan the holders of at least two-thirds in amount of the Allowed interests of such Class actually voting have voted to accept the plan.

## G.    Confirmation Without Acceptance By All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes entitled to vote on the Plan, so long as the Plan has been accepted by at least one Impaired Class, excluding any Insider Classes, entitled to vote. Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class of Claims or Interests that voted to reject the plan.

1.        No Unfair Discrimination

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

93

2.            <u>Fair and Equitable Treatment</u>

The test to determine whether the Plan affords fair and equitable treatment applies to Classes of different priority and status (e.g., Secured Claims versus General Unsecured Claims) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such Class.  As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class.  Specifically, in order to demonstrate that the Plan is fair and equitable, the Debtors must demonstrate that:

  o        Each holder of a Secured Claim either (a) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

  o        Either (a) each holder of an Impaired General Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (b) the holders of Claims and Interests that are junior to the Claims of the rejecting Classes will not receive any property under the Plan.

  o        Either (a) each holder of an Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the Interest or (b) the holder of an Interest that is junior to the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes L, M, N and O are not receiving a distribution because there is no Class of equal priority receiving more favorable treatment and no junior Classes to Classes L, M, N and O that will receive or retain any property on account of the Claims or Interests in such Class.

**ARTICLE IX.**
**PLAN-RELATED RISK FACTORS AND ALTERNATIVES**
**TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE OF THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH IN THIS ARTICLE IX AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

A.      **General**

The following provides a summary of important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, holders of Claims and Interests that are Impaired and entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in A&P's Annual Report on Form 10-K for the fiscal year ended February 26, 2011 the entirety of which is publicly available at the Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, located at http://www.sec.gov/edgar.shtml.

K&E 20463290

B.    **Certain Bankruptcy Law Considerations**

1.              Undue Delay in Confirmation May
                Significantly Disrupt the Operations of the Debtors

        The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Debtors' operations and relationships with the Debtors' customers, vendors, and employees.  If Confirmation and Consummation do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased Administrative Claims or Professional Claims, and similar expenses.  Prolonged Chapter 11 Cases may also make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' business.

2.              Debtors May Not Be Able to Secure Confirmation or Consummation of the Plan

        Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (b) the value of distributions to non-accepting holders of Claims and Interests within a particular Class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

        Furthermore, under section 1129(b)(2)(A) of the Bankruptcy Code, the Plan must provide a Class of Secured Claims that votes to reject the Plan with:  (a) retention of Liens securing the Secured Claim to the extent of the Allowed amount of such Claims, whether the property subject to those Liens is retained by the Debtor or transferred to another Entity, and deferred Cash payments having a present value, as of the Effective Date of the plan of reorganization, at least equal to the value of such holder's interest in the Estate's interest in such property; or (b) the realization of the "indubitable equivalent" of its Allowed Secured Claim; or (c) the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing the Claims included in the rejecting Class, free and clear of such Liens, with such Liens to attach to the proceeds of the sale and the treatment of such Liens on proceeds in accordance with clause (a) or (b) of this paragraph.

        The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any rejecting Class, as well as of any Classes junior to such rejecting Class, than the treatment currently provided in the Plan.  Any less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

3.              Parties in Interest May Object to Classification of Claims and Interests

        Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

4.          <u>Nonconsensual Confirmation</u>

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan of reorganization, a Bankruptcy Court may nevertheless confirm such a plan at the proponent's request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any Insider in such Class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Impaired Classes. In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan of reorganization, the Debtors will request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will find the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

5.          <u>Debtors May Object to Claims Before or After the Effective Date</u>

Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors reserve the right to object to the amount or priority status of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim. Any holder of a Claim that is or becomes subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.          <u>Risk of Nonoccurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

**C.      Risk Factors That May Affect the Value
        of the Securities to Be Issued Under the Plan**

1.          Debtors Cannot Guarantee What Recovery
            <u>Will Be Available to Holders of Allowed Claims in Voting Classes</u>

No less than three unknown factors make certainty in Creditor recoveries impossible:   (a) how much money will remain after paying all Allowed Claims that are senior to the Allowed Claims in Voting Classes or unclassified Allowed Claims; (b) the number or amount of Claims in Voting Classes that will ultimately be Allowed; and (c) the number or size of Claims senior to the Claims in the Voting Classes or unclassified Claims that will ultimately be Allowed.

2.          As a Result of Approval and Implementation of the Plan,
            Certain Changes in Ownership of A&P Could Occur, Which
            Could Adversely Affect the Debtors' Ability to Utilize Significant
            <u>Net Operating Loss Carry-Forwards Upon Emergence From Chapter 11</u>

There are certain tax attributes, such as net operating loss carry-forwards, that may be limited or lost altogether in the event of an ownership change as defined under Section 382 of the Internal Revenue Code. If a change of ownership were to occur as a result of the implementation of the Plan, upon our emergence from chapter 11 there could be significant valuation allowances placed on deferred tax assets.

3.          The Reorganized Debtors May Not Achieve Projected Financial
            Results or Meet Post-Reorganization Debt Obligations and Finance
            All Operating Expenses, Working Capital Needs, and Capital Expenditures

The Reorganized Debtors may not be able to meet their projected financial results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the interests of the holders of the then-outstanding Newco Equity (and options or other rights to acquire Newco Equity) could be diluted. While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

4.          Estimated Valuation of the Reorganized Debtors
            and the NewCo Equity and the Estimated
            Recoveries to Holders of Allowed Claims Are Not Intended
            to Represent the Private Sale Values of the NewCo Equity

The Debtors' estimated recoveries to holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

5.          The Reorganized Debtors May Be Controlled By a Small Number of Holders

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding shares of Newco Equity. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestures, and other material corporate transactions, including the sale of the Reorganized Debtors. The Debtors can make no assurances regarding the future actions of the holders of Newco Equity and the impact such actions may have on the value of the Newco Equity.

K&E 20463290

6.          Certain Tax Implications of the Debtors' Bankruptcy
            and Reorganization May Increase the Tax Liability of the Reorganized Debtors

Holders of Allowed Claims should carefully review Article X herein, "Certain Federal Income Tax Consequences," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

7.          Impact of Interest Rates

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

**D.    Risk Factors That Could Negatively Impact the Debtors' Business**

1.          The Debtors Are Subject to the Risks
            and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- o       the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

- o       the Debtors' ability to sell and/or assign, assume or reject commercial leases and executor contracts;

- o       the Debtors' ability to obtain and maintain normal trade terms with suppliers and service providers and maintain contracts that are critical to their operations;

- o       the Debtors' ability to favorably negotiate approximately 34 CBAs with local unions;

- o       the Debtors' ability to attract, motivate, and retain key employees;

- o       the Debtors' ability to attract and retain customers;

- o       the Debtors' ability to fund and execute their business plan; and

- o       the Debtors' ability to obtain Creditor and Bankruptcy Court approval for, and then to consummate, a Plan to emerge from bankruptcy.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the Creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' restructuring and business goals.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' sales and relationships with their customers, as well as with their suppliers and employees, which in turn could adversely affect the Debtors' operations and financial condition. In addition, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events

K&E 20463290

or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty.  While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in the Form 10-K for the year ended that February 26, 2011.  Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements.  The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation of a Plan.

2.          Various Operating Factors and General Economic
            Conditions Affecting the Food Industry May Affect the Debtors'
            Business and May Adversely Affect Ongoing Operating Results

The retail food and food distribution industries and the operation of A&P's business, specifically in the New York, New Jersey and Philadelphia regions, are sensitive to a number of economic conditions and other factors such as:  (a) food price deflation or inflation; (b) softness in local and national economies; (c) the availability of favorable credit and trade terms; (d) changes in business plans, operations, results and prospects; and (e) other economic conditions that may affect consumer buying habits.  Any one or more of these economic conditions can affect the Debtors' retail sales, the demand for products A&P distributes to their retail customers, operating costs and other aspects of our business. Failure to achieve sufficient levels of cash flow at reporting units could also result in additional impairment charges on goodwill, intangible assets and/or long-lived assets.

Changes in the general business and economic conditions in A&P's markets, including the rate of inflation, population growth, the fluctuating prices of oil and gas, the nature and extent of continued consolidation in the food industry and the unemployment rate in the markets in which the Debtors' operate, may negatively affect earnings and sales growth.  General economic changes may also affect the shopping habits and buying patterns of the Debtors' customers, which could affect sales and earnings.

The Debtors' ability to achieve profitability may be affected by, among other things:  (a) the Debtors' success in executing their category management and purchasing programs, which are designed to improve gross margins and reduce product costs; (b) the effectiveness of efforts to improve value proposition for the Debtors' customers through merchandising and marketing programs and to enhance customers' experience in the Debtors' stores; (c) the Debtors' ability to achieve productivity improvements and reduce shrink in their stores; (d) the Debtors' success in generating efficiencies in supporting activities; (e) the Debtors' ability to eliminate or maintain a minimum level of supply and/or quality control problems with vendors; (f) the rebidding of the Debtors' warehousing, logistics, procurement, and purchasing services; and (g) the results of negotiations with the Debtors' union partners to alter existing CBAs.

3.          The Debtors Face a High Level of Competition, Including
            the  Threat of Further Consolidation in the Food Industry,
            Which Could Adversely Affect the Debtors' Sales and Future Profits

The retail food business is extremely competitive and is characterized by high inventory turnover and narrow profit margins.  The retail food business is subject to competitive practices that may affect the

prices at which the Debtors are able to sell products at retail locations, sales volume, and their ability to attract and retain customers. In addition, the nature and extent of consolidation in the retail food industry could affect the Debtors' competitive position in the markets they serve.

The Debtors' retail food business and the grocery retailing industry continue to experience aggressive competition from mass merchandisers, warehouse clubs, drug stores, convenience stores, discount merchandisers, dollar stores, restaurants, other retail chains, nontraditional competitors and emerging alternative formats in the markets where the Debtors have retail operations. Competition with these outlets is based on price, store location, advertising and promotion, product mix, quality and service. Some of these competitors may have greater financial resources, lower merchandise acquisition costs and lower operating expenses than the Debtors, and the Debtors may be unable to compete successfully in the future. Increasingly competitive markets have made it difficult generally for grocery store operators to achieve comparable store sales gains. Because sales growth has been difficult to attain, the Debtors' competitors have attempted to maintain market share through increased levels of promotional activities and discount pricing, creating a more difficult environment in which to consistently increase year-over-year sales. Price-based competition has also, from time to time, adversely affected the Debtors' operating margins. Competitors' greater financial strengths enable them to participate in aggressive pricing strategies such as selling inventory below costs to drive overall increased sales. The Debtors' continued success is dependent upon their ability to effectively compete in the food industry and to reduce operating expenses, including managing health care and pension costs contained in the Debtors' CBAs. The competitive practices and pricing in the food industry generally and particularly in A&P's principal markets may cause the Debtors to reduce their prices in order to gain or maintain market share of sales, thus reducing margins.

The Debtors' in-store pharmacy business is also subject to intense competition. In particular, an adverse trend for drug retailing has been the significant growth in mail-order and Internet-based prescription processors, including importation from Canada and other countries. Due to the rapid rise in drug costs experienced in recent years, mail-order prescription distribution methods are perceived by employers and insurers as being less costly than traditional distribution methods and are being mandated by an increasing number of third party pharmacy benefit managers, many of which also own and manage mail-order distribution operations. As a result, some labor unions and employers are requiring, and others may encourage, that their members or employees obtain medications from mail-order pharmacies which offer drug prescriptions at prices that are lower than the Debtors' are able to offer. In addition to these forms of mail-order distribution, there has also been increasing competition from a number of Internet-based prescription distributors, which specialize in offering certain high demand lifestyle drugs at deeply discounted prices, and importers from Canada and other foreign countries. These alternate distribution channels have acted to restrain the rate of sales growth for traditional chain drug retailers in the last few years. There can be no assurance that the Debtors' efforts to offset the effects of alternate distribution channels and eligibility changes will be successful.

4.       The Debtors are Concentrated in the New York, New Jersey and Philadelphia
         Metropolitan Areas and, As a Result, Their Business is Significantly Influenced by the
         Economic Conditions and other Characteristics of these Areas

The Debtors are vulnerable to economic downturns in the New York, New Jersey and Philadelphia metropolitan areas, in addition to those that may affect the country as a whole, as well as other factors that may impact that region, such as the regulatory environment, the cost of real estate, insurance, taxes and rent, reliance on the financial industry, increasing unemployment, weather and natural catastrophes, demographics, the availability of labor, and geopolitical factors.

K&E 20463290

The Debtors cannot predict economic conditions in this region, and factors such as interest rates, energy costs and unemployment rates may adversely affect our sales which may lead to higher losses. Any unforeseen events or circumstances that affect the area could also materially adversely affect our revenues and profitability.  Further, since the Debtors are concentrated in densely populated metropolitan areas, opportunities for future store expansion may be limited, which may adversely affect their business and results of operations.

5.          The Debtors' Vendors May Shorten Their Payment Terms, Which
            Would Impair Their Ability to Effectively Manage Their Cash Flow

The Debtors have negotiated payment terms with most of their vendors.  However, there can be no assurance that the Debtors will be able to maintain such terms in the future.

6.          The Debtors Rely on C&S for a Substantial Amount of Products

Pursuant to the terms of the New C&S Agreement, the Debtors currently acquire most of our saleable inventory, including groceries and perishables, from one supplier, C&S. During fiscal 2010, products supplied from C&S accounted for approximately 74% of A&P's supermarket inventory purchases.  Recently, the Debtors have experienced some difficulty in the supply of isolated products to certain stores and supply interruptions by C&S could occur in the future.  Any significant interruption in this supply chain, either as a result of disruptions at C&S or if the New C&S Agreement were terminated for any reason, could have a material adverse effect on the Debtors' business and results of operations. The Debtors' are therefore subject to the risks of C&S's business, including potential labor disruptions at C&S facilities, increased regulatory obligations and distribution problems which may affect C&S's ability to obtain products.  Further, C&S may terminate the New C&S Agreement if the Debtors fail to emerge from chapter 11 bankruptcy as an operating enterprise by June 12, 2012.  In the event of disruptions to the supply chain, the Debtors believe that other suppliers could provide similar products on reasonable terms, but they are limited in number and a change in suppliers could cause a delay in distribution and a possible loss of sales, which would affect operating results adversely.

7.          The Debtors May be Adversely Affected by Unexpected Changes in the Insurance
            Market or Changes in Factors Affecting Their Self-Insurance Reserve Estimates

The Debtors use a combination of self-insurance and insurance coverage to provide for the potential liabilities for general liability, property losses, fleet liability, workers' compensation, employee benefits and directors and officers.  There is no assurance that the Debtors will be able to continue to maintain their insurance coverage or obtain comparable coverage at a reasonable cost.  Self-insurance reserves are determined based on actual claims experience and actuarially estimated claims incurred but not reported.  Actuarial projections are subject to a high degree of variability, due to fluctuations in future interest and inflation rates, future economic conditions, litigation trends, benefit level changes, changes in state regulations, and changes in other factors.   An increase in the frequency of claims, cost of claims or changes in actuarial assumptions could adversely affect the Debtors' results of operations and financial condition.

8.          We May be Adversely Affected by Rising Utility and Fuel Costs

Rising fuel costs may adversely affect the Debtors' operating costs since they incur the cost of fuel in connection with the transportation of goods from their warehouse and distribution facilities to their stores. In addition, operations at the Debtors' stores are sensitive to rising utility fuel costs due to the amount of electricity and gas required to operate their stores. In the event of rising fuel costs, the Debtors may not be able to recover rising utility and fuel costs through increased prices charged to their

customers. Oil prices directly affect the Debtors' product transportation costs and fuel costs due to the amount of electricity and gas required to operate their stores as well as their utility and petroleum-based supply costs, including plastic bags.

9.          The Debtors May be Affected by Loss of Consumer Confidence
            in their Food Supply Chain or the Quality and Safety of their Products

The Debtors could be adversely affected if consumers lose confidence in the safety and quality of the food supply chain.  Adverse publicity about these concerns, whether or not ultimately based on fact, and whether or not involving products sold at our stores, could discourage consumers from buying the Debtors' products.  he real or perceived sale of contaminated food products by A&P could result in a loss of consumer confidence and product liability claims, which could have a material adverse effect on the Debtors' sales and operations.

To the extent the Debtors are unable to maintain appropriate sanitation and quality standards in our stores, food safety and quality issues could involve expense and damage to the Debtors' various brand names. Additionally, concerns about the safety or effectiveness of certain drugs or negative publicity surrounding certain categories of drugs may have a negative impact on pharmacy sales.

10.         Threats or Potential Threats to Security of Food and
            Drug Safety may Adversely Affect the Debtors' Business

Acts or threats of war or terror or other criminal activity directed at the grocery or drug store industry, the transportation industry, or computer or communications systems, whether or not directly involving the Debtors' stores, could increase security costs, adversely affect operations, or impact general consumer behavior and spending as well as customer orders and the Debtors' supply chain. Other events that give rise to actual or potential food contamination, drug contamination, or food-borne illnesses could have an adverse effect on operating results.

11.         Various Aspects of the Debtors' Business are Subject to Federal,
            State and Local Laws and Regulations.  The Debtors Compliance with These
            Regulations May Require Additional Expenditures and Could Adversely
            Affect the Debtors' Ability to Conduct Business as Planned.  Changes
            in These Laws and Regulations Could Increase the Debtors' Compliance Costs

The Debtors are subject to federal, state and local laws and regulations relating to zoning, land use, environmental protection, work place safety, public health, community right-to-know, beer and wine sales, pharmaceutical sales and gasoline station operations.  A number of states and local jurisdictions regulate the licensing of supermarkets, including beer and wine license grants.  In addition, under certain local regulations, we are prohibited from selling beer and wine in certain of our stores.  Employers are also subject to laws governing their relationship with employees, including minimum wage requirements, overtime, working conditions, disabled access and work permit requirements.  Compliance with these laws could reduce the revenue and profitability of the Debtors' supermarkets and could otherwise adversely affect their business, financial condition or results of operations.  In addition, any changes in these laws or regulations could significantly increase the Debtors' compliance costs and adversely affect results of operations, financial condition and liquidity.

A number of federal state and local laws exist that impose burdens or restrictions on owners with respect to access by disabled persons.  Our compliance with these laws may result in modifications to our properties, or prevent us from performing certain further renovations.

K&E 20463290

The Debtors' pharmacy business is subject to certain government laws and regulations, including those administered and enforced by Medicare, Medicaid, the Drug Enforcement Administration ("**DEA**"), Consumer Product Safety Commission, U.S. Federal Trade Commission and Food and Drug Administration.   For example, the conversion of various prescription drugs to over-the-counter medications may reduce the Debtors' pharmacy sales, and if the rate at which new prescription drugs become available slows or if new prescription drugs that are introduced into the market fail to achieve popularity, the Debtors' pharmacy sales may be adversely affected.  The withdrawal of certain drugs from the market may also adversely affect the Debtors' pharmacy business.   Changes in third party reimbursement levels for prescription drugs, including changes in Medicare Part D or state Medicaid programs, could also reduce margins and have a material adverse effect on the Debtors' business.  In order to dispense controlled substances, the Debtors' are required to register their pharmacies with the DEA and to comply with security, recordkeeping, inventory control and labeling standards.

In addition, the Debtors' pharmacy business is subject to local regulations in the states where their pharmacies are located, applicable Medicare and Medicaid regulations and state and federal prohibitions against certain payments intended to induce referrals of patients or other health care business. Failure to properly adhere to these and other applicable regulations could result in the imposition of civil, administrative and criminal penalties including suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in, or exclusion from, government reimbursement programs such as Medicare and Medicaid; loss of licenses; significant fines or monetary penalties for anti-kickback law violations, submission of false claims or other failures to meet reimbursement program requirements and could adversely affect the continued operation of the Debtors' business.  The Debtors' pharmacy business is also subject to the Health Insurance Portability and Accountability Act, including its obligations to protect the confidentiality of certain patient information and other obligations. Failure to properly adhere to these requirements could result in the imposition of civil as well as criminal penalties.

12.        Certain Risks Are Inherent in Providing Pharmacy Services and the Debtors' Insurance
           May Not Be Adequate to Cover All Claims Associated With Pharmacy Services

Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products.  Although the Debtors' maintain professional liability insurance and errors and omissions liability insurance, coverage limits under their insurance programs may not be adequate to protect against all future claims, or that they will be able to maintain this insurance on acceptable terms in the future.   The Debtors' results of operations, financial condition or cash flows may be adversely affected if in the future the insurance coverage proves to be inadequate or unavailable, or there is an increase in liability for which the Debtors self-insure, or suffer harm to their reputation as a result of an error or omission.

13.        Litigation, legal or Administrative Proceedings
           and Other Claims Could Expose the Debtors to Significant Liability

The Debtors, from time to time, are subject to various claims, administrative proceedings and litigation, which if determined adversely to them could negatively affect their financial results.  The Debtors have estimated their exposure to claims, administrative proceedings and litigation and believe they have made adequate provisions for them, where appropriate. Unexpected outcomes in both the costs and effects of these matters could result in an adverse effect on the Debtors' business and results of operation and earnings.

K&E 20463290

14.         The Debtors are Affected By Increasing Labor,
            Benefit and Other Operating Costs and a  Competitive
            Labor Market and are Subject to the Risks of Workforce Disruptions

The Debtors' financial performance is greatly influenced by increasing wage and benefit costs, including pension and health care costs, a competitive labor market and the risk of labor disruption of our highly unionized workforce.

The Debtors have approximately 39,000 employees, of whom approximately 68% are employed on a part-time basis. Over the last few years, increased benefit costs have caused A&P's labor costs to increase and may continue to do so.  Any significant failure to attract and retain qualified employees, to control labor costs or to recover any increased labor costs through increased prices charged to customers could have a material adverse effect on the Debtors' results of operations.

As of February 26, 2011, approximately 92% of the Debtors' employees were represented by unions and covered by CBAs or similar agreements that are subject to periodic renegotiations.  Although the Debtors believe that they will/have successfully negotiated new CBAs, these negotiations may not prove successful, may result in a significant increase in the cost of labor or may result in the disruption of the Debtors' operations.

15.         The Debtors Participate in Various Multi-Employer
            Pension Plan for Substantially All Employees Represented by Unions

The Debtors will be required to make contributions to multiemployer pension plans in amounts established under CBAs.  Pension expenses for these plans, which are recognized as contributions, are currently funded.  Benefits generally are based on a fixed amount for each year of service.  The Debtors contributed $56.6 million, $62.3 million and $48.2 million to multiemployer pension plans in fiscal 2010, fiscal 2009 and fiscal 2008, respectively.  The Debtors could, under certain circumstances, be liable for unfunded vested benefits or other expenses of jointly administered union/management plans, which liabilities could be significant and material for the Debtors.  To date, the Debtors have not established any liabilities for future withdrawals because such withdrawals from these plans are not probable and the amount cannot be estimated.  As a result, the Debtors expect that contributions to these plans may increase.  Additionally, the benefit levels and related items will be issues in the negotiation of future CBAs. Under current law, an employer that withdraws or partially withdraws from a multi-employer pension plan may incur withdrawal liability to the plan, which represents the portion of the plan's underfunding that is allocable to the withdrawing employer under complex actuarial and allocation rules. The amount of any increase or decrease in the Debtors' required contributions to these multi-employer pension plans will depend upon the outcome of collective bargaining, actions taken by trustees who manage the plans affecting the costs of future service benefits, government regulations and the actual return on assets held in the plans, among other factors.

16.         The Debtors May be Held Liable for Environmental Damages

The Debtors operations subject them to various laws and regulations relating to the protection of the environment, including those governing the management and disposal of hazardous materials and the cleanup of contaminated sites.   Under some environmental laws, such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, also known as CERCLA or the Superfund law, and similar state statutes, responsibility for the entire cost of cleanup of a contaminated site can be imposed upon any current or former site owners or operators, or upon any party who sent waste to the site, regardless of the lawfulness of the original activities that led to the contamination.  From time to time the Debtors have been named as one of many potentially responsible parties at Superfund

K&E 20463290

sites, although their share of liability has typically been de minimis. Although the Debtors believe that they are currently in substantial compliance with applicable environmental requirements, future developments such as more aggressive enforcement policies, new laws or discoveries of unknown conditions may require expenditures that may have a material adverse effect on their business and financial condition.

17.     The Debtors' Ability to Effectively Operate
        Could be Hindered if They Fail to Attract and Retain Key Personnel

The Debtors' ability to operate their business and implement their strategies effectively depends, in part, on the efforts of their executive officers and other key employees. In addition, the Debtors' future success will depend on, among other factors, the ability to attract and retain qualified personnel, particularly engineers and other employees with critical expertise and skills that support key customers and products. The loss of the services of any key employees or the failure to attract or retain other qualified personnel could have a material adverse effect on the Debtors' business.

**E.      Risks Associated with Forward Looking Statements**

1.      Financial Information Is Based on the Debtors' Books and
        Records and, Unless Otherwise Stated, No Audit Was Performed

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      Financial Projections and Other Forward Looking
        Statements Are Not Assured, Are Subject to Inherent
        Uncertainty Due to Numerous Assumptions Upon Which
        They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future financial results of the Reorganized Debtors may turn out to be different from the Financial Projections. The Financial Projections do not reflect emergence adjustments, including the impact of "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

K&E 20463290

F.    **Disclosure Statement Disclaimer**

1.          This Disclosure Statement Was Not
            Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws.  Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

2.          Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws.  The offer of NewCo Equity to holders of certain Classes of Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Debtors Common Stock (including the shares reserved for issuance under the Management Equity Incentive Program) will be exempt from registration under the Securities Act by virtue of Section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or Regulation D promulgated thereunder, Rule 701 of the Securities Act or a "no sale" under the Securities Act as described herein.

3.          This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The Liquidation Analyses, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

4.          No Legal or Tax Advice Is Provided to You by this Disclosure Statement

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.          No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, holders of Allowed Claims or Interests, or any other parties in interest.

6.            <u>Failure to Identify Litigation Claims or Projected Objections</u>

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

7.            <u>No Waiver of Right to Object or Right to Recover Transfers and Assets</u>

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8.            Information Was Provided by the Debtors
             <u>and Was Relied Upon by the Debtors' Advisors</u>

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

9.            <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.          <u>No Representations Outside this Disclosure Statement Are Authorized</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors, the counsel for the Creditors Committee and the United States Trustee.

**G.    Liquidation Under Chapter 7**

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy

Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and the Debtors' Liquidation Analyses is described herein and attached hereto as **Exhibit D**.

## ARTICLE X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Claims.  This summary is based on the Internal Revenue Code, Treasury Regulations thereunder ("***Treasury Regulations***") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not United States Persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies).  Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and holders of Allowed Claims based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

K&E 20463290

### A.    Certain United States Federal Income Tax Consequences to the Reorganized Debtors

1.                Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**CODI**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the Adjusted Issue Price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, and (ii) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business and minimum tax credit carryovers; (c) capital loss carryovers; (d) tax basis in assets; and (e) foreign tax credit carryovers.  A debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Internal Revenue Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess CODI over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these regulations, the tax attributes of each member of an affiliated group of corporations that is excluding CODI is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower tier member.  If a debtor member's excluded CODI exceeds its tax attributes, the excess CODI is applied to the reduction of certain remaining consolidated tax attributes of the affiliated group.  Because the Plan provides for only partial Cash payment of certain Claims (those in Class B and Class F through Class M), the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend on the Adjusted Issue Price of all such impaired Claims and the amount of Cash available for partial payment of such Claims.  These values cannot be known with certainty until the Effective Date.  However, as a result of Consummation, the Debtors expect that there could be material reductions in NOLs, NOL carryforwards, or other tax attributes.

2.                Limitation of NOL Carry Forwards and Other Tax Attributes

The Reorganized Debtors may have NOL carryovers and other tax attributes at emergence.  The amount of such NOL carryovers and other tax attributes, such as tax basis, that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available NOLs include: (a) the amount of tax losses incurred by the Debtors in 2011; (b) the extent to which gain is recognized on any of the Debtors' assets in connection with the preliminary asset transfer option under the Plan; and (c) the amount of CODI incurred by the Debtors in connection with Consummation.  Some of the factors that will impact the amount of tax basis available to the Reorganized Debtors include: (a) the extent to which gain is recognized and tax basis increased on any of the Debtors' assets in connection with the preliminary asset transfer option under the Plan and (b) the amount of CODI incurred by the Debtors in connection with Consummation.  The Debtors anticipate that subsequent utilization of any losses and NOL carryovers

remaining and possibly certain other tax attributes may be restricted as a result of and upon Consummation.

Following Consummation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers and, possibly, certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, the "Pre Change Losses") may be subject to limitation under sections 382 and 383 of the Internal Revenue Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the NewCo Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their NOL carryovers and other Pre Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Internal Revenue Code applies.

3.        General Section 382 Annual Limitation

In general, the annual limitation that applies to a corporation that undergoes an "ownership change" is equal to the product of (a) the fair market value of the corporation's equity immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long term tax exempt rate." Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

4.        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after Consummation, then the Reorganized Debtors' Pre Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the Reorganized Debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  The 382(l)(6) Exception differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it, the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three year

110

period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

While it is not certain, it is doubtful at this point that the Debtors will be eligible to utilize the 382(l)(5) Exception.  In that case, the Debtors expect that their use of any remaining NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.

**B.**     **Certain United States Federal Income**
          **Tax Consequences to Holders of Claims**

1.                    Consequences to Holders of Certain Claims

Holders of Class A Second Lien Note Claims, Class B Secured Tax Claims, Class C Other Secured Claims and Class D Other Priority Claims will either receive Cash or collateral in full payment of their Claims or have their Claims Reinstated and rendered unimpaired.  Pursuant to the Plan, Holders of Class E, Class F, Class G, Class H, Class I, Class J, and Class K Claims will receive a partial Cash payment in exchange for their Claims.  Holders of Class L, Class M, Class N, and Class o Claims will receive no recovery and their Claims will be cancelled.  Thus, each Claim will either be extinguished and deemed satisfied in exchange for a full or partial payment of Cash or property (including zero recovery in the case of Class L, M, N, and O) or will be Reinstated in full.

A Holder who receives Cash or collateral in exchange for its Claim pursuant to the Plan generally will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash (or the value of any collateral) received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below.

2.                    Accrued Interest

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income (to the extent not already taken into income by the Holder).  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should

111

consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

3.        Market Discount

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

4.        Limitations on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, capital losses may only be used to offset capital gains.  A corporate Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, but may carry over unused capital losses for the five years following the capital loss year.

5.        Information Reporting and Back-up Withholding

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding (currently at a rate of 28%).  Backup withholding of taxes will generally apply to Payments in respect of an Allowed Claim under the Plan if the Holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XI.
## RECOMMENDATION

The Debtors recommend the Plan because it provides for greater distributions to the holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the holders of Claims. **Accordingly, the Debtors recommend that holders of Claims and Interests entitled to vote on the Plan support Confirmation and vote to accept the Plan.**

*The remainder of this page is intentionally left blank.*

113

Respectfully submitted,

**THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.**
(For itself and all other Debtors)

Montvale, New Jersey                    By:  _/s/ *Frederic F. Brace*_____
Dated:  November 14, 2011              Name:  Frederic F. Brace
                                       Title:    Chief Financial Officer, Chief Administrative Officer,
                                                 and Chief Restructuring Officer

114

## <u>EXHIBIT A</u>

**Debtors' Joint Plan of Reorganization Pursuant to
Chapter 11 of the United States Bankruptcy Code**

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone       (312) 862-2000
Facsimile       (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*[1] | ) ) ) | Case No. 10-24549 (RDD) |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Dated:  November 14, 2011

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ............................1
    A.    Defined Terms .................................................................................1
    B.    Rules of Interpretation ..................................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP
    FACILITY CLAIMS PRIORITY TAX CLAIMS AND UNITED STATES
    TRUSTEE STATUTORY FEES ...............................................................17
    A.    Administrative Claims ...................................................................17
    B.    Professional Claims ......................................................................18
    C.    DIP Facility Claims.......................................................................18
    D.    Priority Tax Claims.......................................................................19

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS
    AND INTERESTS .................................................................................19
    A.    Substantive Consolidation Settlement ..........................................19
    B.    Classification of Claims and Interests...........................................21
    C.    Treatment of Classes of Claims and Interests................................22
    D.    Special Provision Governing Vote Tabulation ...............................27
    E.    Special Provision Governing Unimpaired Claims..........................27

ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN .........................28
    A.    Use of Proceeds from New Money Commitment and Exit Facility. ....................28
    B.    General Settlement of Claims and Interests....................................28
    C.    NewCo Equity..............................................................................28
    D.    Registration Exemptions ...............................................................28
    E.    Subordination...............................................................................29
    F.    Vesting of Assets in the Reorganized Debtors ...............................29
    G.    Cancellation of Notes, Instruments, Certificates and Other Documents .............29
    H.    Issuance of New Securities; Execution of Plan Documents .................................30
    I.    Post-Confirmation Property Sales..................................................30
    J.    Corporate Action..........................................................................30
    K.    Certificate of Incorporation and Bylaws........................................30
    L.    Effectuating Documents, Further Transactions ...............................31
    M.    Section 1146(a) Exemption...........................................................31
    N.    Directors and Officers of Reorganized A&P ..................................31
    O.    Officers and Directors of Reorganized Debtors Other Than A&P.....................32
    P.    Compensation, Pensions and Benefits Programs.............................32
    Q.    Intercompany Account Settlement..................................................33
    R.    Preservation of Rights of Action....................................................33
    S.    Avoidance Actions........................................................................34
    T.    Restructuring Transactions ............................................................34

i

### TABLE OF CONTENTS (cont'd)

U.   Corporate Existence ...................................................................................35
V.   Tax Reporting Matters ...............................................................................35
W.   Management Services Agreement ..............................................................35

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .........................................................................................................35**
A.   Rejection of Executory Contracts and Unexpired Leases............................36
B.   Assumption of Executory Contracts and Unexpired Leases.................................36
C.   Indemnification Obligations ......................................................................37
D.   Insurance Policies ....................................................................................37
E.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .........38
F.   Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases.......................................................................................39
G.   Claims Based on Rejection of Executory Contracts or Unexpired Leases.............39
H.   Contracts, Intercompany Contracts, and Leases Entered Into After the
Commencement Date ...................................................................................39
I.   Reservation of Rights................................................................................40

**ARTICLE VI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
INTERESTS ................................................................................................40**
A.   Allowance of Claims and Interests ...........................................................40
B.   Claims and Interests Administration Responsibilities .............................40
C.   Estimation of Claims and Interests ..........................................................40
D.   Expungement or Adjustment to Paid, Satisfied, or Superseded Claims and
Interests....................................................................................................41
E.   No Interest................................................................................................41
F.   **DISALLOWANCE OF CLAIMS OR INTERESTS** ......................................41
G.   Amendments to Claims.............................................................................41
H.   No Distributions Pending Allowance ........................................................42
I.   Distributions After Allowance ..................................................................42
J.   Disputed Claims Reserve ..........................................................................42
K.   Distributions Following Resolution of All Claims .....................................42

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .........................43**
A.   Distributions on Account of Claims Allowed as of the Effective Date ................43
B.   Distributions on Account of Claims Allowed After the Effective Date ...............44
C.   Delivery of Distributions ..........................................................................45
D.   Claims Paid or Payable by Third Parties ..................................................48
E.   Setoffs .....................................................................................................48
F.   Allocation Between Principal and Accrued Interest....................................49

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN...........................49**
A.   **DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS** .........49
B.   Subordinated Claims.................................................................................49
C.   Compromise and Settlement of Claims and Controversies ..................................50
D.   **RELEASES BY THE DEBTORS** .................................................................50
E.   **RELEASES BY HOLDERS OF CLAIMS** ...................................................52

## TABLE OF CONTENTS (cont'd)

F.  **EXCULPATION** .................................................................................53

G.  **INJUNCTION** ..................................................................................54

H.  Protection Against Discriminatory Treatment ...................................55

I.  Indemnification ....................................................................................55

J.  Recoupment .........................................................................................56

K.  Release of Liens ..................................................................................56

L.  Reimbursement or Contribution .........................................................56

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**..................................................................................................**56**

A.  Conditions Precedent to the Effective Date .......................................56

B.  Waiver of Conditions Precedent .........................................................57

C.  Effect of Non-Occurrence of Conditions to Consummation ...............58

**ARTICLE X. RETENTION OF JURISDICTION**.....................................**58**

**ARTICLE XI. MISCELLANEOUS PROVISIONS** ...................................**60**

A.  No Stay of Confirmation Order ...........................................................60

B.  Modification of Plan ...........................................................................60

C.  Revocation or Withdrawal of Plan......................................................60

D.  Confirmation of the Plan.....................................................................61

E.  Additional Documents .........................................................................61

F.  Payment of Statutory Fees ..................................................................61

G.  Dissolution of Creditors' Committee ..................................................61

H.  Reservation of Rights...........................................................................61

I.  Successors and Assigns........................................................................62

J.  Service of Documents ..........................................................................62

K.  **TERM OF INJUNCTIONS OR STAYS**........................................63

L.  Entire Agreement .................................................................................63

M.  Plan Supplement Exhibits ...................................................................63

N.  Severability ..........................................................................................64

**INTRODUCTION**[2]

The Great Atlantic & Pacific Tea Co., Inc. and the other Debtors in the above-captioned Chapter 11 Cases jointly propose the following Plan.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of potential litigation regarding certain issues, including, without limitation, the substantive consolidation of the Debtors' estates and the resolution of outstanding Claims against, and Interests in, the Debtors.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in ARTICLE III hereof shall be deemed to apply to all Debtors, unless otherwise specified.  Reference is made to the Disclosure Statement (as defined herein), distributed contemporaneously herewith, and all exhibits to the Disclosure Statement.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, will govern, provided, that in the event of any inconsistency between this Plan and the Securities Purchase Agreements, the relevant provision of the Securities Purchase Agreements, as it relates to such inconsistency, will govern.

Nothing in the Disclosure Statement, this Plan, the Plan Supplement or the exhibits attached thereto shall be modified, amended or supplemented without the express consent of the Investors.  Notwithstanding anything in the Plan to the contrary, any decision, option, consent right or election (including with respect to Claims and distributions on Claims) shall be subject to the consent of the Investors, including but not limited to any decision to Reinstate a Claim or Interest.

**ARTICLE I.**

**DEFINED TERMS AND RULES OF INTERPRETATION**

A.    Defined Terms

1.    5.125% Convertible Notes:    The 5.125% convertible senior notes, with an aggregate face amount of $165,000,000, due in 2011 and issued pursuant to the 2007 Indenture.

2.    5.125% Convertible Note Claims:  Any and all Claims arising under the 5.125% Convertible Notes or the 2007 Indenture with respect to the 5.125% Convertible Notes.

3.    6.75% Convertible Notes: The 6.75% convertible senior notes, with an aggregate face amount of $255,000,000, due in 2012 and issued pursuant to the 2007 Indenture.

4.    6.75% Convertible Note Claims:  Any and all Claims arising under the 6.75% Convertible Notes or the 2007 Indenture with respect to the 6.75% Convertible Notes.

5.    9.125% Senior Notes:  The 9.125% senior notes, with an aggregate face amount of $12,840,000, due in 2011 and issued pursuant to the 1991 Indenture.

---

[2]    Capitalized terms used in this Introduction are defined in ARTICLE I herein.

6.      9.125% Senior Note Claims:  Any and all Claims arising under the 9.125% Senior Notes or the 1991 Indenture with respect to the 9.125% Senior Notes.

7.      1991 Indenture:  That certain indenture dated as of January 1, 1991, as amended, supplemented, or modified from time to time, by and between A&P, as issuer, and Wilmington Trust.

8.      2007 Indenture:  That certain indenture dated as of December 18, 2007, as amended, supplemented, or modified from time to time, by and between A&P, as issuer, and Wilmington Trust.

9.      A&P:  The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation.

10.     A&P Pension Claims: All Claims against the Debtors asserted by or on behalf of the PBGC or any other Person in respect of the A&P Pension Plans.

11.     A&P Pension Plans:  (a) The Great Atlantic & Pacific Tea Company, Inc. Pension Plan; (b) the Pathmark Stores, Inc. Pension Plan; (c) the New York-New Jersey Amalgamated Pension Plan for A&P Employees; and (d) the Delaware County Dairies, Inc Hourly Employees' Pension Plan.

12.     Administrative Claim:  A Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Claims; (c) the reasonable fees and expenses of the Notes Trustee and Second Lien Trustee incurred in connection with the Chapter 11 Cases; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; (e) the Transaction Expenses of the Investors (as set forth in the Securities Purchase Agreements); (f) the Break-Up Fee, to the extent triggered and due pursuant to the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order; and (g) all claims approved as administrative claims pursuant to an order of the Bankruptcy Court.

13.     Administrative Claim Bar Date:  The deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to (i) Professional Claims, which shall be subject to the provisions of ARTICLE II.B herein; or (ii) Transaction Expenses and the Break-Up Fee, which shall be allowed as provided by the Securities Purchase Agreements and approved by the Securities Purchase Agreements Order.

14.     Affiliate:  As defined in section 101(2) of the Bankruptcy Code and as it pertains to the Debtors or Reorganized Debtors, as applicable.

15.     Allowed:  Except as otherwise provided herein:  (a) a Claim or Interest that is (i) listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, or (ii) evidenced by a valid Proof of Claim, filed by the applicable Bar Date and not subject to the Debtors or Reorganized Debtors right to file an objection to such Proof of

Claim, or (b) a Claim that is Allowed pursuant to the Plan or any stipulation approved by, or Final Order of, the Bankruptcy Court.

16.    <u>Avoidance Actions</u>:  Any and all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

17.    <u>Bankruptcy Code</u>:  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended from time to time.

18.    <u>Bankruptcy Court</u>:  The United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or order of a district court pursuant to section 157(a) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

19.    <u>Bankruptcy Rules</u>:  The Federal Rules of Bankruptcy Procedure as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

20.    <u>Bar Date</u>:  (a) June 17, 2011; or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing Claims.

21.    <u>Break-Up Fee</u>:  As defined in the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order.

22.    <u>Business Day</u>:  Any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

23.    <u>Causes of Action</u>:  Any and all Claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims of any of the Debtors, the debtors in possession, and/or the Estates (including those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

24.    <u>Certificate</u>:  Any instrument evidencing a Claim or an Interest.

25.    <u>Chapter 11 Cases</u>:  The jointly administered chapter 11 cases commenced by the Debtors, with case numbers 10-24548 through 10-24601, and styled *In re The Great Atlantic & Pacific Tea Company, Inc., et al.*, Case No. 10-24549 (RDD), which are currently pending before the Bankruptcy Court.

26.     <u>Claim</u>:  As defined in section 101(5) of the Bankruptcy Code.

27.     <u>Claims Agent</u>:   Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (877) 660-6625, retained as the Debtors' claims agent by order dated December 28, 2010, entitled *Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent for Debtors* [Docket No. 207]; the Debtors anticipate requesting authority to retain Kurtzman Carson Consultants LLC as their solicitation agent at or prior to the Disclosure Statement Hearing.

28.     <u>Claims Register</u>:  The official register of Claims maintained by the Claims Agent.

29.     <u>Class</u>:  A category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

30.     <u>Commencement Date</u>:  December 12, 2010.

31.     <u>Confirmation</u>:  The entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified having been satisfied or waived.

32.     <u>Confirmation Date</u>:   The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33.     <u>Confirmation Hearing</u>: The hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code on the motion for entry of the Confirmation Order.

34.     <u>Confirmation Order</u>:  The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall include the provisions described on Exhibit D to the Securities Purchase Agreements and otherwise be in form and substance acceptable to the Investors.

35.     <u>Consummation</u>:  The occurrence of the Effective Date.

36.     <u>Convertible Notes</u>:  The 5.125% Convertible Notes and 6.75% Convertible Notes.

37.     <u>Convertible Notes Claims</u>:   Any and all Claims arising under the Convertible Notes.

38.     <u>Creditor</u>:  As defined in section 101(10) of the Bankruptcy Code.

39.     <u>Creditors' Committee</u>:  The official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the United States Trustee for the Southern District of New York on December 21, 2010, as amended on June 3, 2011 and as it may be reconstituted from time to time.

40.     <u>Cure</u>:  A Claim for all unpaid monetary obligations, or such lesser amount as may be agreed upon by the parties, under an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to section 365 of the Bankruptcy Code or the Plan.

41.    Cure Objection Deadline:  The deadline for filing objections to a proposed Cure, which shall be the earlier of: (a) 30 days after the Effective Date or (b) 30 days after the assumption of the applicable Executory Contract or Unexpired Lease upon approval of the Confirmation Order, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

42.    Debtors:  Each of the following Entities, collectively:  The Great Atlantic & Pacific Tea Company, Inc.; 2008 Broadway, Inc.; AAL Realty Corporation; Adbrett Corporation; Amsterdam Trucking Corporation; APW Supermarket Corporation; APW Supermarkets, Inc.; Bergen Street Pathmark, Inc.; Best Cellars DC Inc.; Best Cellars Inc.; Best Cellars Licensing Corp; Best Cellars Massachusetts, Inc.; Best Cellars VA Inc.; Bev, Ltd.; Borman's Inc.; Bridge Stuart, Inc.; Clay-Park Realty Co., Inc.; Compass Foods, Inc.; East Brunswick Stuart, LLC; Farmer Jack's of Ohio, Inc.; Food Basics, Inc.; Gramatan Foodtown Corp.; Grape Finds At DuPont, Inc.; Grape Finds Licensing Corp.; Grapefinds, Inc.; Greenlawn Land Development Corp.; Hopelawn Property I, Inc.; Kohl's Food Stores, Inc.; Kwik Save Inc.; Lancaster Pike Stuart, LLC; LBRO Realty, Inc.; Lo-Lo Discount Stores, Inc.; Mac Dade Boulevard Stuart, LLC; McLean Avenue Plaza Corp.; Milik Service Company, LLC; Montvale Holdings, Inc.; North Jersey Properties, Inc. VI; Onpoint, Inc.; Pathmark Stores, Inc.; Plainbridge, LLC; SEG Stores, Inc.; Shopwell, Inc.; Shopwell, Inc.; Spring Lane Produce Corp.; Super Fresh/Sav-A-Center, Inc.; Super Fresh Food Markets, Inc.; Super Market Service Corp.; Super Plus Food Warehouse, Inc.; Supermarkets Oil Company, Inc.; The Food Emporium, Inc.; The Old Wine Emporium of Westport, Inc.; The South Dakota Great Atlantic & Pacific Tea Company, Inc; Tradewell Foods of Conn., Inc.; Upper Darby Stuart, LLC; and Waldbaum, Inc.

43.    DIP Facility:  The debtor in possession financing facility approved by *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364*, entered on January 11, 2011 [Docket No. 479].

44.    DIP Facility Administrative Agent:  JPMorgan Chase Bank, N.A., or its successor, in its capacity as administrative agent and collateral agent under the DIP Facility.

45.    DIP Facility Claims:  Any Claim derived from, or based upon, the DIP Facility.

46.    DIP Facility Credit Agreement:  That certain Third Amended and Restated Superpriority Debtor-in-Possession Credit Agreement, dated January 13, 2011, as amended, supplemented, or modified from time to time, between The Great Atlantic & Pacific Tea Company, Inc. and each subsidiary of The Great Atlantic & Pacific Tea Company, Inc. party thereto, as borrowers, the lenders party thereto, and the DIP Facility Administrative Agent.

47.    DIP Facility Lenders:  The lenders under the DIP Facility.

48.    Disclosure Statement:  The disclosure statement for the Plan, as amended, supplemented or modified from time to time, in form and substance reasonably acceptable to the

Investors, including all exhibits and schedules thereto, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

49.    Disclosure Statement Hearing:  The hearing before the Bankruptcy Court on the motion for approval of the Disclosure Statement and related solicitation procedures and exhibits.

50.    Disputed Claim:  Any Claim or Interest that is not yet Allowed.

51.    Disputed Claims Reserve:  An appropriate cash reserve, to be determined by the Debtors or Reorganized Debtors (with the reasonable consent of the Investors), unless otherwise ordered by the Bankruptcy Court, of the Unsecured Creditor Cash Pool, Substantive Consolidation Settlement Cash Pool and Trade Claims Cash Pool, for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date.

52.    Distribution Agent:  The Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors, as applicable, to make or to facilitate distributions pursuant to the Plan.

53.    Distribution Date:    Any of the Initial Distribution Date or the Periodic Distribution Dates.

54.    Distribution Record Date:  The date for determining which holders of Allowed Claims are eligible to receive distributions hereunder, which shall be (a) ten Business Days after entry of the Confirmation Order or (b) such other date as designated in a Bankruptcy Court order.

55.    Effective Date:  The date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date have been satisfied or waived.

56.    Entity:  As defined in section 101(15) of the Bankruptcy Code.

57.    Equity Security:  As defined in section 101(16) of the Bankruptcy Code.

58.    Estate:  The bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

59.    Exculpated Claim:  Any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Securities Purchase Agreements, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other agreement.

60.    Exculpated Party:  Each of the following in its capacity as such:  (a) the Debtors and their Affiliates; (b) the Reorganized Debtors and their Affiliates; (c) the DIP Facility Lenders and the DIP Facility Administrative Agent; (d) the Investors; (e) the Second Lien Trustee; (f) the

Notes Trustee; (g) the Prepetition Credit Facility Lenders and Prepetition Credit Facility Administrative Agent; (h) UFCW; (i) UFCW Local Unions; (j) Liberty Harbor; (k) Mount Kellett; (l) Yucaipa; (m) with respect to each of the foregoing Entities in clauses (a) through (l), such Entities' successors and assigns; (n) the Creditors' Committee and the members thereof, and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' parents, subsidiaries, affiliates, officers, directors, principals, partners, members, managers, employees, agents, professionals, financial advisors, attorneys, accountants, investment bankers, advisors, consultants, representatives, and other professionals (whether current or former).

61.    <u>Executory Contract</u>:  A contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

62.    <u>Exit Facility</u>:  A financing facility to be entered into by the Reorganized Debtors on the Effective Date on terms and conditions reasonably acceptable to the Debtors and the Investors, which shall be secured by a first priority lien on substantially all of the Reorganized Debtors' assets other than any leasehold interests that may prohibit encumbrance as provided in the Securities Purchase Agreements.

63.    <u>Final Decree</u>:  The decree contemplated under Bankruptcy Rule 3022.

64.    <u>Final Order</u>:  An order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

65.    <u>General Unsecured Claim</u>:    Any Claim, other than Administrative Claims, Professional Claims, DIP Facility Claims, Priority Tax Claims, Prepetition Credit Facility Claims, Second Lien Note Claims, Secured Tax Claims, Other Secured Claims, Other Priority Claims, Convertible Notes Claims, 9.125% Senior Note Claims, Quarterly Interest Bond Claims, Trade Claims, Guaranteed Landlord Claims, Union Claims, Intercompany Claims and Section 510(b) Claims.

66.    <u>Governmental Unit</u>:  As defined in section 101(27) of the Bankruptcy Code.

67.    Guaranteed Landlord Claims:  Any and all Claims against any Debtor as primary obligee and/or as guarantor (or secondary obligee) arising from or related to any nonresidential real property lease rejected by the Debtors pursuant to section 365 of the Bankruptcy Code, provided, that, the rejected lease relates to one of the Debtors' operating stores at the time of rejection, provided, further, that, pursuant to the Substantive Consolidation Settlement described in ARTICLE III.A herein, the primary obligee and guarantor (or secondary obligee) Claims related to the same lease rejection shall be combined into a single Guaranteed Landlord Claim for the purposes of voting and distributions under the Plan.

68.    Impaired:  With respect to any Class of Claims or Interests, a Claim or Interest that is not Unimpaired.

69.    Indemnification Obligation:  A Debtor's obligation under an Executory Contract, a corporate or other document, a postpetition agreement, through the Plan, or otherwise, including as set forth in the Securities Purchase Agreements, to indemnify any Person, including directors, officers, attorneys, other professionals and agents, or employees of the Debtors who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtors' respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

70.    Indenture Claims:  Any and all Claims arising pursuant to the Convertible Notes Claims, 9.125% Senior Note Claims and Quarterly Interest Bond Claims, in accordance with the respective Notes Indentures.

71.    Initial Distribution Date:  The date occurring, at the sole reasonable discretion of the Reorganized Debtors, after the Effective Date when distributions under the Plan shall commence.

72.    Insider:  As defined in section 101(31) of the Bankruptcy Code.

73.    Intercompany Claim:  A Claim by a Debtor against another Debtor or a Claim by an Affiliate of the Debtors against a Debtor.

74.    Intercompany Contract:  A contract between two or more Debtors or a contract between one or more Affiliates and one or more Debtors.

75.    Intercompany Interest:  An Interest held by a Debtor in another Debtor or an Affiliate other than A&P.

76.    Interest:  Any Equity Security of a Debtor existing immediately prior to the Effective Date.

77.    Interim Compensation Order:  The *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered by the Bankruptcy Court on January 12, 2011 [Docket No. 505].

78.    <u>Investment Warrants</u>: Those certain warrants to be acquired by Yucaipa in connection with its purchase of the NewCo Equity and the New Convertible Third Lien Notes, pursuant to the terms of the Securities Purchase Agreements.

79.    <u>Investors</u>:  Those certain funds affiliated with the Liberty Harbor business unit of Goldman Sachs Asset Management, L.P. (collectively, "<u>Liberty Harbor</u>"), certain funds affiliated with The Yucaipa Companies, LLC ("<u>Yucaipa</u>") and certain funds affiliated with Mount Kellett Capital Management LP (collectively, "<u>Mount Kellett</u>"), that are signatories to the Securities Purchase Agreements.

80.    <u>IRS</u>:  Internal Revenue Service.

81.    <u>Lien</u>:  As defined in section 101(37) of the Bankruptcy Code.

82.    <u>Management Equity Incentive Program</u>:  A post-Effective Date compensation program in accordance with the terms and conditions set forth in the "Management Equity Incentive Program," attached as an **<u>Exhibit</u>** to the Plan Supplement.

83.    <u>Management Services Agreement</u>:  A management services agreement to be entered into by [Reorganized A&P] and Yucaipa on the Effective Date in the form to be attached as an **<u>Exhibit</u>** to the Plan Supplement which shall be on terms and conditions acceptable to Yucaipa.

84.    <u>Multiemployer Pension Claims</u>:  All Claims against the Debtors asserted by or on behalf of Multiemployer Pension Plans, including claims arising from the Debtors' withdrawal from such plans.

85.    <u>Multiemployer Pension Plans</u>:  Any multiemployer plan as defined in section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), 29 U.S.C. §1002(3)(37), in which the Debtors are or were a contributing employer.

86.    <u>New Board</u>:  The initial board of directors of Reorganized A&P, which shall as of the Effective Date consist of members selected in accordance with the Securities Purchase Agreements and as may be provided in the Plan Supplement.

87.    <u>New Convertible Third Lien Notes</u>:  Notes issued by Reorganized A&P and guaranteed by every other Reorganized Debtor, of which an aggregate principal amount of $210.0 million shall be purchased by the Investors on the terms and conditions set forth in the Securities Purchase Agreements, which notes shall include the terms set forth in Exhibit C to the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

88.    <u>NewCo Equity</u>:  The authorized shares of common stock of Reorganized A&P, par value $0.01 per share.

89.    <u>New Equity Investment</u>:  NewCo Equity issued by Reorganized A&P to the Investors for an aggregate purchase price of $80.0 million, which shall be purchased by the Investors pursuant to the terms of the Securities Purchase Agreements and shall include the terms

set forth in the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

90.    <u>New Money Commitment</u>:  The obligation of the Investors severally and not jointly, to purchase, or cause one or more of their affiliates to purchase, on the Effective Date, certain of the New Second Lien Notes, certain of the New Convertible Third Lien Notes, and the New Equity Investment on the terms and conditions set forth in the Securities Purchase Agreements and Securities Purchase Agreements Order.

91.    <u>New Second Lien Notes</u>:  Notes issued by Reorganized A&P and guaranteed by every other Reorganized Debtor, of which an aggregate principal amount of $210.0 million (inclusive of a 5% original issue discount) shall be purchased by the Investors on the terms and conditions set forth in the Securities Purchase Agreements, which notes shall include the terms set forth set forth in Exhibit B to the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

92.    <u>Notes Indentures</u>:  Collectively, the 1991 Indenture and the 2007 Indenture.

93.    <u>Notes Trustee</u>:  Wilmington Trust, or its successor, in its capacity as successor trustee under the Notes Indentures.

94.    <u>Other Priority Claim</u>:  Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

95.    <u>Other Secured Claim</u>:  Any Secured Claim, including PACA Claims, other than (a) a DIP Facility Claim, (b) a Prepetition Credit Facility Claim, (c) a Second Lien Note Claim, or (d) a Secured Tax Claim.

96.    <u>PACA Claims</u>:  Any and all Claims against the Debtors entitled to priority or secured status pursuant to the Perishable Agricultural Commodities Act.

97.    <u>PBGC</u>:  The Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, created by ERISA, to administer the mandatory pension plan termination insurance program established under Title IV of ERISA.

98.    <u>Periodic Distribution Date</u>:  Unless otherwise ordered by the Bankruptcy Court, the first business day that is 120 days after the Initial Distribution Date, and for the first year thereafter, the first business day that is 120 days after the immediately preceding Periodic Distribution Date.  After one year following the Distribution Date, the Periodic Distribution Date will occur on the first business day that is 180 days after the immediately preceding Periodic Distribution Date.

99.    <u>Person</u>:  As defined in section 101(41) of the Bankruptcy Code.

100.    <u>Plan</u>:  This chapter 11 plan of reorganization, as it may be altered, amended, modified, or supplemented from time to time, in accordance with the terms set forth herein and in the Securities Purchase Agreements, including the Plan Supplement and all exhibits,

supplements, appendices, and schedules, and which shall be in form and substance reasonably acceptable to the Investors.

101.    Plan Supplement:  The supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Investors, and which shall include, but not be limited to: (i) a listing of the members of the New Board; (ii) the indenture and form of New Second Lien Notes (and related ancillary documents); (iii) the indenture and form of New Convertible Third Lien Notes (and related ancillary documents); (iv) the indenture and form of Replacement Second Lien Notes (and related ancillary documents) as applicable; (v) the Reorganized A&P Charter; (vi) the Reorganized A&P Bylaws; (vii) a term sheet for the Exit Facility; (viii) the terms of the Management Equity Incentive Program; (ix) any new employment agreements; (x) a list of Executory Contracts and Unexpired Leases to be assumed or rejected (with related notices); (xi) a list of retained Causes of Action; (xii) a form warrant agreement for the Investment Warrants; and (xiii) the Management Services Agreement.

102.    Prepetition Credit Agreement:  That certain Amended and Restated Credit Agreement dated as of December 27, 2007 as amended, supplemented, or amended and restated from time to time by and between the Debtors, the Prepetition Credit Facility Agent, and the Prepetition Credit Facility Lenders.

103.    Prepetition Credit Facility Agent:  Bank of America, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement.

104.    Prepetition Credit Facility Claims:  Any and all claims arising under the Prepetition Credit Agreement.

105.    Prepetition Credit Facility Lenders:  Those lenders and issuing banks party to the Prepetition Credit Agreement from time to time, each in their capacities as such.

106.    Priority Claim:  Collectively, Priority Tax Claims and Other Priority Claims.

107.    Priority Tax Claim:  Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

108.    Professional:  An Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

109.    Professional Claims:  A Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

110.    Professional Compensation:  All accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Confirmation Date to

11

the extent any such fees and expenses have not been paid and regardless of whether a fee application has been filed for such fees and expenses. To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Professional Compensation.

111. <u>Professional Fee Escrow Account</u>: An interest-bearing account to be funded upon the Effective Date in an amount equal to professional fees that are estimated to be accrued but unpaid by the Debtors or Reorganized Debtors as of the Effective Date; the terms and conditions of the Professional Fee Escrow Account shall be otherwise acceptable to the Debtors, Reorganized Debtors and the Investors.

112. <u>Professional Fee Reserve Amount</u>: Professional Compensation through the Confirmation Date as estimated in accordance with ARTICLE II.B.3 herein and as acceptable to the Investors.

113. <u>Proof of Claim</u>: A proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

114. <u>Pro Rata</u>: The proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

115. <u>Quarterly Interest Bond Claims</u>: Any and all Claims arising under the Quarterly Interest Bonds or the 1991 Indenture with respect to the Quarterly Interest Bonds.

116. <u>Quarterly Interest Bonds</u>: The 9.375% quarterly interest bonds, with an aggregate face amount of $200,000,000, due in 2039 and issued pursuant to the 1991 Indenture.

117. <u>Reinstate or Reinstated</u>: Has the meaning pursuant to all applicable sections of the Bankruptcy Code.

118. <u>Released Party</u>: Each of the following in its capacity as such, and only in its capacity as such: (a) the Debtors' and the Reorganized Debtors' current and former affiliates, subsidiaries, officers, directors, principals, partners, members, employees, agents, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals; (b) the DIP Facility Lenders and the DIP Facility Administrative Agent; (c) the Investors; (d) the Creditors' Committee and the members thereof; (e) Tengelmann; (f) Yucaipa; (g) Liberty Harbor; (h) Mount Kellett; (i) UFCW; (j) UFCW Local Unions; and (k) with respect to each of the foregoing Entities in clauses (b) through (j), their respective current and former parents, affiliates, subsidiaries, officers, directors, principals, employees, members, managers, agents, partners, professionals, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in their capacities as such.

119. <u>Releasing Party</u>: Each of the following in its capacity as such: (a) the Debtors and the Reorganized Debtors (and all parties claiming derivatively or through the Debtors); (b) the DIP Facility Lenders and the DIP Facility Administrative Agent; (c) the Investors; (d) the Creditors' Committee and the members thereof; and (e) each holder of a Claim voting to accept the Plan.

120.    <u>Reorganized A&P</u>:  The Great Atlantic & Pacific Tea Co., Inc., or any successor thereto by merger, consolidation, or otherwise, including any holding company created as part of the Restructuring Transactions that holds, directly or indirectly, substantially all of the assets of the Reorganized Debtors, on or after the Effective Date.

121.    <u>Reorganized A&P Bylaws</u>:  The bylaws of Reorganized A&P, substantially in the form contained in the Plan Supplement.

122.    <u>Reorganized A&P Charter</u>:  The amended and restated certificate of incorporation of Reorganized A&P, substantially in the form contained in the Plan Supplement.

123.    <u>Reorganized Debtors</u>:  The Debtors, in each case, or any successor thereto by merger, consolidation, or otherwise, on or after the Effective Date.

124.    <u>Replacement Second Lien Notes</u>:  Notes that may be issued by the Debtors or Reorganized Debtors on terms, to be disclosed no later than two days before the objection deadline to the Disclosure Statement, attached as an **<u>Exhibit</u>** to the Plan Supplement and as otherwise acceptable to the Investors.

125.    <u>Restructuring Transactions</u>:  Those certain transactions described in ARTICLE IV.T of the Plan, including the sale and issuance of the NewCo Equity, the New Second Lien Notes and the New Convertible Third Lien Notes pursuant to the Securities Purchase Agreements.

126.    <u>Schedules</u>:  The schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the Bankruptcy Rules.

127.    <u>Second Lien Indenture</u>:  That certain indenture dated as of August 4, 2009, as amended, supplemented, or modified from time to time, by and between by and between the Debtors and the Second Lien Trustee.

128.    <u>Second Lien Note Claims</u>:  Any and all claims arising under the Second Lien Notes or the Second Lien Indenture.

129.    <u>Second Lien Notes</u>:  The 11.375% senior second lien notes due 2015 issued pursuant to the Second Lien Indenture.

130.    <u>Second Lien Trustee</u>:  Wells Fargo Bank, N.A., in its capacity as successor trustee under the Second Lien Indenture.

131.    <u>Section 510(b) Claim</u>:  Any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

132.    <u>Secured Claim</u>:  A Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

133.    <u>Secured Tax Claim</u>:  Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

134.    <u>Securities Act</u>:  The Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

135.    <u>Securities Purchase Agreements</u>:  Those certain agreements dated November 3, 2011, as may be amended, between the Debtors and the Investors documenting the New Money Commitment and filed on November 4, 2011 [Docket No. 2820] and attached as an **Exhibit** to the Plan Supplement.

136.    <u>Securities Purchase Agreements Order</u>: The *Order Authorizing The Debtors To (A) Enter Into Certain Securities Purchase Agreements For A $490 Million New Capital Investment And (B) Pay Certain Fees In Connection Therewith, Each To Support Debtors' Plan Of Reorganization* entered by the Bankruptcy Court on [_____].  [Docket No. _____].

137.    <u>Security</u>:  As defined in section 2(a)(1) of the Securities Act, which as provided herein, shall include the NewCo Equity, the New Second Lien Notes, the New Convertible Third Lien Notes and the Investment Warrants issued on the terms and conditions set forth therein and as provided in the Securities Purchase Agreements and the Management Services Agreement (and as approved by the Securities Purchase Agreements Order).

138.    <u>Servicer</u>:  An indenture trustee, agent, servicer, or other authorized representative of holders of Claims or Interests recognized by the Debtors.

139.    <u>Solicitation Procedures Order</u>:  That certain Final Order approving certain procedures for solicitation of votes on the Plan.

140.    <u>Substantive Consolidation Settlement</u>:   The compromise and settlement of substantive consolidation issues, as described in ARTICLE III.A herein.

141.    <u>Substantive Consolidation Settlement Cash Pool</u>:  A total of up to $[__] million of Cash to be distributed Pro Rata to holders of Allowed Guaranteed Landlord Claims in Class [_] who vote in favor the Plan, <u>provided</u>, <u>that</u>, the sum of the recoveries for each (a) Allowed Guaranteed Landlord Claim and (b) underlying Allowed primary lease rejection claim, does not exceed [__%] of such Allowed Guaranteed Landlord Claim; any excess undistributed portion of the Substantive Consolidation Settlement Cash Pool shall be distributed to the Unsecured Creditor Cash Pool for distribution to the holders of remaining Allowed Unsecured Claims.

142.    <u>Tengelmann</u>:   Tengelmann Warenhandelsgesellschaft KG, a partnership organized under the laws of the Federal Republic of Germany, and its affiliates.

14

143.    <u>Trade Claims</u>:  All Claims held by Trade Creditors against the Debtors; <u>provided</u>, <u>that</u>, Trade Claims shall not include Administrative Claims.

144.    <u>Trade Claims Cash Pool</u>:  A total of up to $[__] million of Cash to be distributed Pro Rata to holders of Allowed Trade Claims in Class [_] who enter into a trade agreement acceptable to the Debtors and the Investors prior to the Effective Date (to take effect upon and following the Effective Date), <u>provided</u>, <u>that</u>, the total recovery on account of each Allowed Trade Claim does not exceed [__%] of such Allowed Trade Claim; any excess undistributed portion of the Trade Claims Cash Pool shall be distributed to the Unsecured Creditor Cash Pool for distribution to holders of remaining Allowed Unsecured Claims.

145.    <u>Trade Creditors</u>:  All trade creditors who will have ongoing go-forward business relationships with the Reorganized Debtors as of and after the Effective Date.

146.    <u>Transaction Expenses</u>:  As defined in the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order.

147.    <u>UFCW</u>:  The United Food and Commercial Workers.

148.    <u>UFCW Local Unions</u>:  The following local unions affiliated with the UFCW:  27; 100R; 152; 338; 342; 371; 464A; 1034; 1245; 1262; 1360; 1500; and 1776.

149.    <u>Unclaimed Distribution</u>:  Any distribution under the Plan on account of an Allowed Claim to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

150.    <u>Unexpired Lease</u>:  A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

151.    <u>Unimpaired</u>:  With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

152.    <u>Union Claims</u>:  [_____]

153.    <u>Union Settlement Agreement</u>:  That certain postpetition settlement agreement reached among the Debtors, the UFCW, the UFCW Local Unions and certain Multiemployer Pension Plans on terms and conditions acceptable to the Investors**.**

154.    <u>United States Trustee</u>:  The United States Trustee for the Southern District of New York.

155.    <u>Unsecured Claims</u>:  Collectively, Convertible Notes Claims, 9.125% Senior Note Claims, Quarterly Interest Bond Claims, Trade Claims, Guaranteed Landlord Claims, [Union Claims] and General Unsecured Claims.

156.    <u>Unsecured Creditor Cash Pool</u>:  A total of $40 million of Cash to be distributed Pro Rata to holders of Allowed Unsecured Claims, and any unused portions of the Substantive Consolidation Settlement Cash Pool and Trade Claims Cash Pool as provided herein.

157.    <u>Voting Deadline</u>:  That date which shall be the final date by which a holder of a Claim may vote to accept or reject the Plan, which date is set forth in the Solicitation Procedures Order.

158.    <u>Voting Record Date</u>:  That date for determining which holders of Claims and Interests are entitled to vote to accept or reject the Plan, which date is set forth in the Solicitation Procedures Order.

159.    <u>Wilmington Trust</u>: Wilmington Trust Company, N.A., in its capacity as indenture trustee under the 1991 Indenture and the 2007 Indenture, as applicable.

B.    <u>Rules of Interpretation</u>

1.    For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) unless otherwise specified herein, any reference to the term "including" herein shall mean "including without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.    Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP FACILITY CLAIMS PRIORITY TAX CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III herein.

A.    <u>Administrative Claims</u>

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim), including any Allowed Administrative Claim of the Notes Trustee or Second Lien Trustee, will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Commencement Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the holders of such Allowed Administrative Claims, or (4) for any amounts owed pursuant to the Securities Purchase Agreements, in accordance with the Securities Purchase Agreements or as allowed pursuant to the Securities Purchase Agreements Order.  For the avoidance of doubt, all reasonable fees and expenses of the (a) Notes Trustee (and its counsel, agents, and advisors) that are provided for under the Notes Indentures, as applicable, shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims <u>only</u> <u>if</u> Classes E, F and G (defined below) each vote in favor of the Plan and (b) Second Lien Trustee (and its counsel, agents, and advisors) that are provided for under the Second Lien Indenture, as applicable, shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims <u>only</u> <u>if</u> Class A (defined below) votes in favor of the Plan (to the extent such Claims in Class A are Impaired).

Except as otherwise provided in this Article II.A, unless previously filed, requests for payment of Administrative Claims (other than requests for the payment of Transaction Expenses, which shall be governed pursuant to the terms of the Securities Purchase Agreements and the Securities Purchase Agreements Order) must be filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property and Estates and such Administrative Claims shall be deemed discharged as of the Effective Date.  For the avoidance of doubt, the payment of the Break-Up Fee and any Transaction Expenses shall be governed by the Securities Purchase Agreements and the Securities Purchase Agreements Order.

17

B.    <u>Professional Claims</u>

1.    <u>Final Fee Applications</u>.  All final requests for payment of Claims of a Professional shall be filed and served no later than 60 days after the Confirmation Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>.  In accordance with ARTICLE II.B.3 hereof, on the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the estates of the Debtors or Reorganized Debtors, as applicable.  The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account within 10 days after such Claims are Allowed by a Final Order.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

3.    <u>Professional Fee Reserve Amount</u>.  To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall provide a good faith estimate of their Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 10 days prior to the Confirmation Hearing, <u>provided</u>, <u>however</u>, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.    <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Debtors or Reorganized Debtors, as applicable.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    <u>DIP Facility Claims</u>

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed DIP Facility Claim, each such Allowed Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, provided such

payments shall be distributed to the DIP Facility Administrative Agent on behalf of holders of such Allowed Claims.

D.      Priority Tax Claims

       With the reasonable consent of the Investors, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim (1) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to by the Debtor or Reorganized Debtor (on the Effective Date), as applicable, and such holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date), Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date) and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      Substantive Consolidation Settlement

       1.      Issues Subject to Compromise:  The Plan proposes, and its terms embody, a compromise and settlement of intercreditor issues relating to whether the liabilities and properties of the Debtors should be substantively consolidated for purposes of voting and distributions under the Plan.  These issues include:  (a) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Chapter 11 Case; (b) the value of the Debtors' Estates on an individual and a consolidated basis, and the proper method of determining such value; (c) whether the Estate of each Debtor should be treated separately for purposes of making payments to holders of Claims; (d) whether it is possible to attribute particular Claims asserted in the Chapter 11 Case to a specific Debtor; (e) the value to be accorded to guarantees issued by one Debtor in favor of another Debtor; (f) the strength of the relative rights and positions of the different Classes of unsecured Claims with respect to disputes over substantive consolidation; (g) other issues having to do with the rights of certain Estates, Claims, or Classes of Claims vis-à-vis other Estates, Claims, or Classes of Claims; and (h) the amount and priority of Intercompany Claims and the potential voidability of certain intercompany transfers.

       2.      Effect of Substantive Consolidation Settlement:  Pursuant to the Substantive Consolidation Settlement embodied in the Plan, Allowed Unsecured Claims will receive their Pro Rata share of the Unsecured Creditor Cash Pool.  In addition to their recovery from the Unsecured Creditor Cash Pool, Holders of Allowed Guaranteed Landlord Claims who vote to approve the Plan will receive their pro rata share of the Substantive Consolidation Settlement

Cash Pool, however, the total recovery on each Guaranteed Landlord Claim shall not exceed [___]% of the Allowed amount of such Claim. If the aggregate recovery of Holders of Guaranteed Landlord Claims from the Substantive Consolidation Settlement Cash Pool is less than the amount of the Substantive Consolidation Claims Settlement Cash Pool, the remaining balance of the Substantive Consolidation Claims Settlement Cash Pool will be added to Unsecured Creditor Cash Pool and distributed Pro Rata to holders of Allowed Unsecured Claims.

As a result of the Substantive Consolidation Settlement, and only for purposes of voting and distributions under the Plan, (a) the separate Chapter 11 Cases of the Debtors will be consolidated into the case of A&P as a single consolidated case; (b) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (c) all Claims against each Estate will be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors will be deemed to be a single claim filed against the consolidated Estates, and all duplicate Proofs of Claim for the same claim filed against more than one Debtor will be deemed expunged; (d) except as otherwise provided in the Plan, no distributions under the Plan will be made on account of Intercompany Claims; (e) except as provided in the Plan with respect to the treatment of Guaranteed Landlord Claims, all Claims based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors or other basis of co-Debtor liability will be eliminated (other than guarantees existing under assumed Executory Contracts or Unexpired Leases), and no distributions under the Plan will be made on account of Claims based upon such guarantees or other basis of co-Debtor liability; (f) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of Section 553, pre-petition debts due to any of the Debtors may be set off against the pre-petition debts of any other of the Debtors; and (g) no distributions under this Plan will be made on account of any Intercompany Interests.

The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan. The compromise plan structure will not (a) impair the validity or enforceability of guarantees that exist under or with respect to assumed Executory Contracts or Unexpired Leases; (b) affect valid, enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan, except for Liens that secure a Claim that is eliminated by virtue of the plan structure and Liens against collateral that are extinguished by virtue of such plan structure; (c) have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of such structure; or (d) affect the obligation of each of the Reorganized Debtors, pursuant to Section 1930 or Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as each particular Debtor's case is closed.

3.    Approval of Substantive Consolidation Settlement: The Plan is deemed to be a motion under sections 105, 363 and 1123 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for approval of the compromise and settlement of the issues described above. The confirmation of the Plan shall constitute approval of this motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

B.    Classification of Claims and Interests

The Plan constitutes a separate plan of reorganization for each Debtor, provided, however, that the classifications and recoveries set forth below reflect the Substantive Consolidation Settlement described above.  Except for the Claims addressed in ARTICLE II above, all Claims and Interests are classified in the Classes set forth below pursuant to section 1122 of the Bankruptcy Code.  As set forth above, in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Claims, DIP Facility Claims and Priority Tax Claims.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of voting and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    Class Identification:  Below is a chart assigning each Class a letter for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | Second Lien Note Claims | Impaired/Unimpaired | Entitled to Vote/Conclusively Presumed to Accept |
| B | Secured Tax Claims | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| E | Convertible Notes Claims | Impaired | Entitled to Vote |
| F | 9.125% Senior Note Claims | Impaired | Entitled to Vote |
| G | Quarterly Interest Bond Claims | Impaired | Entitled to Vote |
| H | Trade Claims | Impaired | Entitled to Vote |
| I | Guaranteed Landlord Claims | Impaired | Entitled to Vote |
| J | Union Claims | Impaired | Entitled to Vote |
| K | General Unsecured Claims | Impaired | Entitled to Vote |
| L | Intercompany Claims | Impaired | Deemed to Reject |
| M | Interests in A&P | Impaired | Deemed to Reject |
| N | Intercompany Interests | Impaired | Deemed to Reject |
| O | Section 510(b) Claims | Impaired | Deemed to Reject |

C.    Treatment of Classes of Claims and Interests

    1.    Class A — Second Lien Note Claims

        a.    *Classification*:  Class A consists of all Second Lien Note Claims.

        b.    *Treatment*:  Except to the extent that a holder of an Allowed Class A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A Claim, each such holder of an Allowed Class A Claim shall, at the option of the Debtors and the Investors, (a) be paid in full, including accrued interest at the contract rate, in Cash on the Effective Date, or as soon as practicable thereafter or (b) receive Replacement Second Lien Notes of equivalent value to their Allowed Class A Claim.

        c.    *Voting*:  Class A is Unimpaired under option (a) above and Impaired under option (b) above; holders of Unimpaired Allowed Class A Claims are conclusively presumed to accept the Plan and holders of Impaired Allowed Class A Claims are entitled to vote to accept or reject the Plan.

    2.    Class B — Secured Tax Claims

        a.    *Classification*:  Class B consists of all Secured Tax Claims.

        b.    *Treatment*:  Except to the extent that a holder of an Allowed Class B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class B Claim, each such holder of an Allowed Class B Claim shall receive, at the option of the Debtors or the Reorganized Debtors (with the reasonable consent of the Investors), as applicable:

           (i)    Cash on the Effective Date, or as soon as practicable thereafter, in an amount equal to such Allowed Class B Claim; or

           (ii)    at the option of the holder of an Allowed Class B Claim, commencing on the Effective Date and continuing over a period not exceeding five years from the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Class B Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the option of the Debtors or the Reorganized Debtors to prepay the entire amount of such Allowed Claim during such time period; or

           (iii)    at the option of the holder of an Allowed Class B Claim, regular Cash payments by the Debtors (on the Effective Date) or the Reorganized Debtors (in the ordinary course of business after the Effective Date) in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

c.   *Voting*:  Class B is Unimpaired, and holders of Allowed Class B Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class B Claims are not entitled to vote to accept or reject the Plan.

3.   <u>Class C — Other Secured Claims</u>

a.   *Classification*:  Class C consists of all Other Secured Claims.

b.   *Treatment*:  Except to the extent that a holder of an Allowed Class C Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class C Claim, each such holder of an Allowed Class C Claim shall, at the option of the Debtors or the Reorganized Debtors, as applicable, and the Investors:

(i)   have its Allowed Class C Claim Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Class C Claim to demand or receive payment of such Allowed Class C Claim prior to the stated maturity of such Allowed Class C Claim from and after the occurrence of a default; or

(ii)   receive Cash in an amount equal to such Allowed Class C Claim, including any interest on such Allowed Class C Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Class C Claim becomes an Allowed Class C Claim, or as soon as practicable thereafter; or

(iii)   at the option of the holder of an Allowed Class C Claim, receive the collateral securing its Allowed Class C Claim and any interest on such Allowed Class C Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

c.   *Voting*:  Class C is Unimpaired, and holders of Allowed Class C Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class C Claims are not entitled to vote to accept or reject the Plan.

4.   <u>Class D — Other Priority Claims</u>

a.   *Classification*:  Class D consists of all Other Priority Claims.

b.   *Treatment*:  Except to the extent that a holder of an Allowed Class D Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every

23

Allowed Class D Claim, each such holder of an Allowed Class D Claim shall be paid in full in Cash on the later of (i) the Effective Date, or as soon as practicable thereafter and (ii) the date such Class D Claim becomes Allowed, or as soon as practicable thereafter.

c.    *Voting*:  Class D is Unimpaired, and holders of Allowed Class D Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class D Claims are not entitled to vote to accept or reject the Plan.

5.    Class E — Convertible Notes Claims

a.    *Classification*:  Class E consists of all Convertible Note Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class E Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class E Claim, each holder of an Allowed Class E Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c.    *Voting*:  Class E is Impaired and holders of Allowed Class E Claims are entitled to vote to accept or reject the Plan.

6.    Class F — 9.125% Senior Note Claims

a.    *Classification*:  Class F consists of all 9.125% Senior Note Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class F Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class F Claim, each holder of an Allowed Class F Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c.    *Voting*:  Class F is Impaired and holders of Allowed Class F Claims are entitled to vote to accept or reject the Plan.

7.    Class G — Quarterly Interest Bond Claims

a.    *Classification*:  Class G consists of all Quarterly Interest Bond Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class G Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class G Claim, each holder of an Allowed Class G Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

    c.    *Voting*:  Class G is Impaired and holders of Allowed Class G Claims are entitled to vote to accept or reject the Plan.

8.    <u>Class H — Trade Claims</u>

    a.    *Classification*:  Class H consists of all Trade Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Class H Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class H Claim, each holder of an Allowed Class H Claim shall receive on the Effective Date, or as soon as practicable thereafter:  (a) Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool; and (b) if such holder enters into a trade agreement acceptable to the Debtors and the Investors before the Effective Date, Cash equal to its Pro Rata portion of the Trade Claims Cash Pool, <u>provided</u>, <u>however</u>, that the total recovery on each Allowed Class H Claim does not exceed [__%] of the Allowed amount of such Allowed Class H Claim.

    c.    *Voting*:  Class H is Impaired and holders of Allowed Class H Claims are entitled to vote to accept or reject the Plan.

9.    <u>Class I — Guaranteed Landlord Claims</u>

    a.    *Classification*:  Class I consists of all Guaranteed Landlord Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Class I Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class I Claim, each holder of an Allowed Class I Claim shall receive on the Effective Date, or as soon as practicable thereafter:  (a) Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool and (b) if such holder votes in favor of the Plan, Cash equal to its Pro Rata portion of the Substantive Consolidation Settlement Cash Pool, <u>provided</u>, <u>however</u>, that the total recovery on each Allowed Class I Claim does not exceed [__%] of the Allowed amount of such Allowed Class I Claim.

    c.    *Voting*:  Class I is Impaired and holders of Allowed Class I Claims are entitled to vote to accept or reject the Plan.

10.    <u>Class J — Union Claims</u>

    a.    *Classification*:  Class J consists of all Union Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Class J Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every

Allowed Class J Claim, each holder of an Allowed Class J Claim shall receive a recovery pursuant to the Union Settlement Agreement.

c.   *Voting*:  Class J is Impaired and holders of Allowed Class J Claims are entitled to vote to accept or reject the Plan.

11.   Class K — General Unsecured Claims

a.   *Classification*:  Class K consists of all General Unsecured Claims.

b.   *Treatment*:  Except to the extent that a holder of an Allowed Class K Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class K Claim, each holder of an Allowed Class K Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to its Pro Rata portion of the Unsecured Creditor Cash Pool.

c.   *Voting*:  Class K is Impaired and holders of Allowed Class K Claims are entitled to vote to accept or reject the Plan.

12.   Class L — Intercompany Claims

a.   *Classification*:  Class L consists of all Intercompany Claims.

b.   *Treatment*:   Subject to the provisions of Article IV.T. ("Restructuring Transactions"), holders of Allowed Class L Claims shall not receive any distributions on account of such Allowed Class L Claims; provided, however, the Debtors and Reorganized Debtors reserve the right to Reinstate any or all Allowed Class L Claims on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code.

c.   *Voting*:  Class L is Impaired, and holders of Allowed Class L Claims are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class L Claims are not entitled to vote to accept or reject the Plan.

13.   Class M — Interests in A&P

a.   *Classification*:  Class M consists of all Interests in A&P.

b.   *Treatment*:  Holders of Allowed Class M Interests shall not receive any distributions on account of such Allowed Class M Interests.   On the Effective Date, all Class M Interests shall be canceled and extinguished.

c.   *Voting*:  Class M is Impaired, and holders of Allowed Class M Interests are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class M Interests are not entitled to vote to accept or reject the Plan.

14. Class N — Intercompany Interests

  a.  *Classification*:  Class N consists of all Intercompany Interests.

  b.  *Treatment*:  Subject to the provisions of Article IV.T. ("Restructuring Transactions"), holders of Allowed Class N Interests shall not receive any distributions on account of such Allowed Class N Interests; provided, however, the Debtors and the Reorganized Debtors reserve the right to Reinstate any or all Allowed Class N Interests on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code.

  c.  *Voting*:  Class N is Impaired, and holders of Allowed Class N Interests are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class N Interests are not entitled to vote to accept or reject the Plan.

15. Class O — Section 510(b) Claims

  a.  *Classification*:  Class O consists of all Section 510(b) Claims.

  b.  *Treatment*:  Holders of Allowed Class O Claims shall not receive any distributions on account of such Allowed Class O Claims.  On the Effective Date, all Class O Claims shall be discharged.

  c.  *Voting*:  Class O is Impaired and holders of Allowed Class O Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Class O Claims are not entitled to vote to accept or reject the Plan.

D.  Special Provision Governing Vote Tabulation

Except as otherwise provided in the Disclosure Statement and the motion to approve the Disclosure Statement and its related exhibits:  (a) if no holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims in such Class; and (b) any Class of Claims that does not have a holder of an Allowed Claim or Interest or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.  Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against the holder of any such Unimpaired Claim.

# ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.       Use of Proceeds from New Money Commitment and Exit Facility.

Unless otherwise provided in the Plan or the Securities Purchase Agreements, the Debtors and Reorganized Debtors, as applicable, shall use the proceeds received from the New Money Commitment, together with proceeds from the Exit Facility and other funds held by the Debtors on the Effective Date, (i) to make cash distributions required by the Plan, (ii) to pay Transaction Expenses not previously paid, (iii) to pay other expenses of the Chapter 11 Cases, to the extent so ordered by the Bankruptcy Court, and (iv) for general corporate purposes.

B.       General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

C.       NewCo Equity

The issuance of the NewCo Equity by Reorganized A&P is authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized A&P, as applicable.  Pursuant to the Plan, the Reorganized A&P Charter shall authorize the issuance and distribution on or after the Effective Date of shares of NewCo Equity to the Investors (to the extent practicable, directly, or else through a Distribution Agent) to satisfy the Debtors' obligations under the Securities Purchase Agreements, subject to dilution by the Management Equity Incentive Program and/or other agreement or as otherwise provided by the Securities Purchase Agreements.  All of the shares of NewCo Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, each of Reorganized A&P and the other Reorganized Debtors shall be a private company.  As such, the Reorganized Debtors will not list the NewCo Equity on a national securities exchange as of the Effective Date.

D.       Registration Exemptions

The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein are expected to be exempt from applicable federal and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 4(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof, subject to (1) the restrictions, if any, on the transferability of such Securities

and instruments, including restrictions contained in the Reorganized A&P Charter and the Securities Purchase Agreements and (2) any other applicable regulatory and legal requirements.

E.      Subordination

        The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

F.      Vesting of Assets in the Reorganized Debtors

        Except as specifically or expressly provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtors' Estates, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, that may be specifically granted to secure the Exit Facility, the New Second Lien Notes and the New Convertible Third Lien Notes, and if applicable, the Replacement Second Lien Notes and the Other Secured Claims).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      Cancellation of Notes, Instruments, Certificates and Other Documents

        On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, and the Second Lien Indenture, and any other certificate, share, note bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest, and any options, or other securities exercisable or exchangeable for, or convertible into Interests or equity of the Debtors (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled as to the Debtors; (2) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, and the Second Lien Indenture, shall be fully released, settled, and compromised as to the Debtors and the non-Debtor Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors, the Reorganized Debtors and the non-Debtor Affiliates, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, however, that notwithstanding Consummation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim or Interest shall

29

continue in effect solely for purposes of (1) allowing holders to receive distributions under the Plan, (2) allowing and preserving the rights of the DIP Facility Administrative Agent, Second Lien Trustee, and Wilmington Trust, as applicable, to make distributions on account of Claims as provided in ARTICLE VII herein.

H.     Issuance of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan or the Securities Purchase Agreements, the Reorganized Debtors shall issue on the Effective Date all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan and the Securities Purchase Agreements (as approved by the Securities Purchase Agreements Order).

I.     Post-Confirmation Property Sales

To the extent the Debtors or Reorganized Debtors, as applicable, purchase or sell any property after the Confirmation Date and prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

J.     Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors or the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized, approved and ratified without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, holders of Claims or Interests, directors, managers or officers of the Debtors, the Reorganized Debtors, or the Investors, or any other Entity or Person, as applicable.  Such actions include (1) the adoption and filing of the Reorganized A&P Charter and the adoption of the Reorganized A&P Bylaws, (2) the appointment of the New Board, (3) the adoption and implementation of the Management Equity Incentive Program, (4) the adoption of severance agreements (as applicable) without action by the New Board as, and to the extent, provided in section 1.11 of the Securities Purchase Agreements, (5) entering into the Management Services Agreement, (6) the authorization, issuance and distribution of the New Second Lien Notes, New Convertible Third Lien Notes, NewCo Equity, Investor Warrants and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and (7) the consummation and implementation of the Exit Financing.

K.     Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than A&P) shall be amended in a form as may be required to be consistent with the provisions of the Plan, the Securities Purchase Agreements and the Bankruptcy Code, and shall be in form and substance acceptable to the Investors.  The certificate of incorporation and bylaws of A&P shall be as contained in the Plan Supplement and as acceptable to the Investors.  The Reorganized A&P Charter will, among other things, (1) authorize the issuance of the shares of NewCo Equity;

and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective states, provinces, or countries of formation and its respective charters and bylaws.

L.    Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements and the Securities issued pursuant thereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan or the Securities Purchase Agreements.

M.    Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the Restructuring Transactions; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) the issuance and/or distribution of NewCo Equity, the Second Lien Notes, the Convertible Third Lien Notes, the Investment Warrants and any other securities of the Debtors or the Reorganized Debtors; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Securities Purchase Agreements, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignment executed in connection with any Restructuring Transaction occurring pursuant to the Plan or the Securities Purchase Agreements.

N.    Directors and Officers of Reorganized A&P

On the Effective Date, the term of the current members of the board of directors of A&P shall expire, and the New Board shall be appointed pursuant to the Securities Purchase Agreements.  On and after the Effective Date, each director or officer of Reorganized A&P shall serve pursuant to the terms of the Reorganized A&P Charter, the Reorganized A&P Bylaws, or other constituent documents, and applicable state corporation law.  Pursuant to the terms of the Securities Purchase Agreements, the New Board shall be reconstituted to consist of seven (7) directors (or such larger number of directors as may be determined by the Investors in their

discretion), of whom at least five (5) directors shall be persons designated by the Investors, one (1) person shall be a person designated by certain unions (who (x) shall be an independent director and a grocery industry expert, and (y) shall not serve on behalf of, or take directions from, the unions), and one (1) person shall be the Chief Executive Officer of the Reorganized Debtors.  The Reorganized A&P Bylaws and the Reorganized A&P Charter shall provide that the New Board will be divided into three classes serving staggered three-year terms.  Pursuant to the Securities Purchase Agreements, on or before the Confirmation Hearing, the Investors may provide for employment offers for the Executive Management Team (as defined in the Securities Purchase Agreements).

O.      Officers and Directors of Reorganized Debtors Other Than A&P

Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers of each of the Reorganized Debtors, other than Reorganized A&P, shall continue to serve in their current capacities after the Effective Date.  The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized A&P shall be consistent with their respective new certificates of incorporation and bylaws.  Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law.

P.      Compensation, Pensions and Benefits Programs

1.      Management Equity Incentive Program.  The Reorganized Company shall be deemed to have adopted the Management Equity Incentive Program on the Effective Date pursuant to the Securities Purchase Agreements.

2.      Employee and Retiree Benefits.  Except with respect to any equity based awards, rejected employment agreements and any other rejected benefit or compensation plans, and subject to the terms and conditions of the Securities Purchase Agreements, on and after the Effective Date, the Reorganized Debtors may (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for compensation, including bonus compensation, health care benefits, disability benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Commencement Date; provided, however, that the Debtors' or Reorganized Debtors' performance pursuant to any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, Reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan; provided, further that any such assumed plans and obligation shall be subject to modification in accordance with their terms.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans, nor shall Confirmation

of the Plan and/or Consummation of the Restructuring Transactions constitute a change of control under any such contracts, agreements, policies, programs, and plans.

3.      Pensions:  As of the Effective Date, the Reorganized Debtors shall continue the A&P Pension Plans in accordance with, and subject to, their terms, ERISA, and the Internal Revenue Code, and shall preserve all of their rights thereunder.  The A&P Pension Claims and all Proofs of Claims filed on account thereof shall be deemed disallowed and expunged as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court.

4.      Workers' Compensation Programs.  As of the Effective Date, except as set forth in the Securities Purchase Agreements and Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

Q.      Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

R.      Preservation of Rights of Action

Subject to the releases set forth in ARTICLE VIII.D and ARTICLE VIII.E below and waiver in ARTICLE IV.S, unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the**

**Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Further, subject to the releases set forth in ARTICLE VIII.D and ARTICLE VIII.E below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

S.   Avoidance Actions

The Debtors and Reorganized Debtors waive all Avoidance Actions, provided, however, that any Avoidance Action against an Entity that has filed a Claim against the Debtors is expressly preserved for the purposes described in ARTICLE VI.F and pursuant thereto.

T.   Restructuring Transactions

On or prior to the Effective Date, the Debtors or the Reorganized Debtors may enter into such transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein, with the consent of the Investors. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, asset sales, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, and the Investors, to be necessary or appropriate to implement the transactions provided for in the Securities Purchase Agreements. None of the Restructuring Transactions contemplated herein or in the Securities Purchase Agreements shall constitute a change of control under any agreement, contract or document of the Debtors or Reorganized Debtors, as applicable. Subject to the Securities Purchase Agreements, the actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance,

dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Securities Purchase Agreements and that satisfy the requirements of applicable law and any other terms to which the relevant entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Securities Purchase Agreements and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) pledging, granting of liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of the Plan; and (5) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions or that are otherwise provided for in the Securities Purchase Agreements.

U.      Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law), provided, however, that the Investors may request the formation of a new holding company pursuant to the Securities Purchase Agreements.

V.      Tax Reporting Matters

All parties (including the Reorganized Debtors and holders of Claims and Interests) shall report for all federal income tax purposes in a manner consistent with the Plan.

W.      Management Services Agreement

On the Effective Date, and pursuant to the terms of the Securities Purchase Agreements, [Reorganized A&P] shall enter into the Management Services Agreement with Yucaipa.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (1) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (3) is the subject of a motion to assume or reject pending as of the Effective Date; (4) is an Intercompany Contract, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Final Order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; or (5) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.   All Executory Contracts and Unexpired Leases rejected by the Debtors on or prior to the Confirmation Date will not be continuing obligations of the Debtors or Reorganized Debtors.

Further, the Plan Supplement will contain a schedule of "Rejected Executory Contracts and Unexpired Leases," as may be amended from time to time with the consent, as provided in the Securities Purchase Agreements, of the Investors; provided, however, that any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed in the schedule of "Rejected Executory Contracts and Unexpired Leases" will be rejected on the Effective Date, notwithstanding its exclusion from such schedule.

B.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, the Reorganized Debtors shall assume all of the Executory Contracts and Unexpired Leases (a) previously assumed by the Debtors and (b) listed on the schedule of "Assumed Executory Contracts and Unexpired leases," as may be amended from time to time, in the Plan Supplement and otherwise identified for assumption pursuant to ARTICLE V.A above.  With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code, however, parties shall not be precluded from filing objections to the Debtors' proposed Cure by the Cure Objection Deadline.

1.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder, <u>provided</u>, <u>however</u>, that any anti-assignment provision in any assumed Executory Contract and/or Unexpired Lease shall be deemed invalid. Confirmation of the Plan and Consummation of the Restructuring Transactions shall not constitute a change of control under any Unexpired Lease or Executory Contract assumed by the Debtors on or prior to the Effective Date

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

2.    <u>Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed</u>. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cures, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

C.    <u>Indemnification Obligations</u>

Each Indemnification Obligation shall, so long as the releases in the Plan are approved in accordance with the terms of the Plan, be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date. The Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by a prior or subsequent order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation. Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

D.    <u>Insurance Policies</u>

Each insurance policy shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the

Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is included in the schedule of "Rejected Executory Contracts and Unexpired Leases" contained in the Plan Supplement.

E.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

Prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (1) list the applicable Cure, if any, (2) describe the procedures for filing objections to the proposed assumption or Cure, and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court. Except with respect to Executory Contracts and Unexpired Leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be filed with the Claims and Solicitation Agent on or before the Cure Objection Deadline. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before the Cure Objection Deadline.

Any request for payment of Cure that is not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a

Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease and associated Cure will be deemed to have consented to such assumption and Cure. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption, or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

F.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

G.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court no later than 30 days after the later of the Effective Date or the effective date of rejection. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.

H.    Contracts, Intercompany Contracts, and Leases Entered Into After the Commencement Date

Contracts, Intercompany Contracts, and leases entered into after the Commencement Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

I.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is any objection filed to the rejection of an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, shall have 45 days after entry of a Final Order resolving such objection to alter their treatment of such contract or lease.

## ARTICLE VI.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.      Allowance of Claims and Interests

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to ARTICLE IV.R above. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

B.      Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan or the Securities Purchase Agreements, after the Effective Date, the Reorganized Debtors shall have the sole authority (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests, (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant

Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    Expungement or Adjustment to Paid, Satisfied, or Superseded Claims and Interests

Any Claim or Interest that has been paid, satisfied, or superseded, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    No Interest

Unless otherwise specifically provided for in the Plan, required under applicable bankruptcy law, or agreed to by the Debtors, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a holder of a Claim, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.    **DISALLOWANCE OF CLAIMS OR INTERESTS**

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.    Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall

be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

H.    No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

I.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the holder of such Allowed Claim, however, the timing of such distributions(s) shall be at the sole reasonable discretion of the Debtors or Reorganized Debtors, and otherwise in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution, if any, to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

J.    Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall deposit in the Disputed Claims Reserve an amount of cash, as determined by the Debtors or Reorganized Debtors (with the reasonable consent of the Investors), from the Unsecured Creditor Cash Pool, Substantive Consolidation Settlement Cash Pool and Trade Claims Cash Pool that would likely have been distributed to the holders of all applicable Disputed Claims (that, if Allowed, would be entitled to participate in such Claims pools) as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be (a) the lesser of (i) the asserted amount of each Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or as provided by the parties to the Debtors as further information with respect to the Proof of Claim, or (if no Proof of Claim was filed) scheduled by the Debtors, and (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (b) the amount otherwise agreed to by the Debtors, the Creditors' Committee, the Investors and the holder of such Disputed Claim for reserve purposes.

K.    Distributions Following Resolution of All Claims

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent cash remains in the Disputed Claims Reserve after all holders of Disputed Claims that have become Allowed and have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then that excess cash shall be distributed to the Unsecured Creditor Cash Pool and holders of Allowed Unsecured Claims (to the extent they have not been paid in full) shall receive their Pro Rata share of the Unsecured Creditor Cash Pool.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    <u>Distributions on Account of Claims Allowed as of the Effective Date</u>

1.    <u>Delivery of Distributions in General</u>.  Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; <u>provided</u>, <u>however</u>, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (b) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

2.    <u>Delivery of Distributions on account of DIP Facility Claims</u>.  The DIP Facility Administrative Agent:  (a) shall be deemed to be the holder of all DIP Facility Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such DIP Facility Claims to or on behalf of the DIP Facility Administrative Agent; (b) shall hold or direct such distributions for the benefit of the holders of Allowed DIP Facility Claims, as applicable; and (c) shall arrange to deliver such distributions to or on behalf of such holders of Allowed DIP Facility Claims; <u>provided</u>, <u>however</u>, the DIP Facility Administrative Agent shall retain all rights as administrative agent under the DIP Facility Credit Agreement in connection with delivery of distributions to DIP Facility Lenders; and <u>provided</u> <u>further</u>, <u>however</u>, that the Debtors' obligations to make distributions in accordance with ARTICLE II.C shall be deemed satisfied upon delivery of distributions to the DIP Facility Administrative Agent.

3.    <u>Delivery of Distributions on account of the Second Lien Note Claims</u>.  The Second Lien Trustee:  (a) shall be deemed to be the holder of the Second Lien Note Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Second Lien Note Claims to or on behalf of the Second Lien Trustee; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Second Lien Note Claims, as applicable; (c) shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Second Lien Note Claims; <u>provided</u>, <u>however</u>, the Second Lien Trustee shall retain all rights as administrative agent under the Second Lien Indenture in connection with delivery of distributions to the holders of Allowed Second Lien Note Claims; and <u>provided</u> <u>further</u>, <u>however</u>, that the Debtors' obligations to make

distributions in accordance with ARTICLE III.C.1 above shall be deemed satisfied upon delivery of distributions to the Second Lien Trustee.

4.    Delivery of Distributions on account of Indenture Claims.  Wilmington Trust as indenture trustee for the Notes Indentures:  (a) shall be deemed to be the holder of the Indenture Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Indenture Claims to or on behalf of the Wilmington Trust; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Indenture Claims, as applicable; (c) shall arrange to deliver such distributions to or on behalf of the holder of the Allowed Indenture Claims; provided, however, Wilmington Trust shall retain all rights as the indenture trustee for the Convertible Notes, 9.125% Senior Notes and Quarterly Interest Bonds under the Notes Indentures in connection with delivery of distributions; and provided further, however, that the Debtors' obligations to make distributions in accordance with ARTICLE III.C.5, ARTICLE III.C.6 and ARTICLE III.C.7 shall be deemed satisfied upon delivery of distributions to Wilmington Trust.

B.    Distributions on Account of Claims Allowed After the Effective Date

1.    Payments and Distributions on Disputed Claims.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date selected at the sole reasonable discretion of the Debtors or Reorganized Debtors; provided, however, that (a) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Claims that are Priority Tax Claims or Secured Tax Claims that become Allowed Priority Tax Claims or Allowed Secured Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

2.    Special Rules for Distributions to Holders of Disputed Claims.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates

44

distributions were previously made to holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law.

C.    Delivery of Distributions

1.    Record Date for Distributions.    On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.    Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Distribution Process.    The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.    Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate:    (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (c) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004 if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; (d) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.    The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

3.    Accrual of Dividends and Other Rights.    For purposes of determining the accrual of dividends or other rights after the Effective Date, NewCo Equity shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of NewCo Equity actually take place.

4.    Compliance Matters.    In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the

Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.    <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Monday, December 13, 2010 as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on Monday, December 13, 2010.

6.    <u>Fractional, De Minimis, Undeliverable, and Unclaimed Distributions</u>.

a.    <u>Fractional Distributions</u>.  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of NewCo Equity shall not be made and shall be deemed to be zero, and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars.  Whenever any payment of Cash or a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

b.    <u>De Minimis Distributions</u>.  Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $250,000, or (ii) the amount to be distributed to the specific holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such holder.  The Distribution Agent need not make any distribution on account of an Allowed Claim to a specific holder if such distribution on such Allowed Claim is less than $[50.00].

c.    <u>Undeliverable Distributions</u>.  If any distribution to a holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed distributions shall be made to such holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to ARTICLE VII.C.6.d below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

d.    <u>Reversion</u>.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed

property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is NewCo Equity, shall be deemed cancelled. Upon such revesting, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

7.      <u>Surrender of Cancelled Instruments or Securities</u>.  On the Effective Date or as soon as reasonably practicable thereafter, each holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of ARTICLE VII.C.8 below. Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary. Notwithstanding the foregoing paragraph, this ARTICLE VII.C.7 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

8.      <u>Lost, Stolen, Mutilated, or Destroyed Debt Securities</u>.  Any holder of Allowed Claims evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim. Upon compliance with this procedure by a holder of an Allowed Claim evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

D.     Claims Paid or Payable by Third Parties

1.     Claims Paid by Third Parties.  The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.     Claims Payable by Insurance Carriers.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

E.     Setoffs

Except as otherwise expressly provided for in the Plan or a Final Order of the Bankruptcy Code, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable,

unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff.

F.    Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any permitted pursuant to the Plan, accrued through the Effective Date.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

A.    **DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EFFECTIVE AS OF THE EFFECTIVE DATE:  (1) THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON SUCH CLAIMS FROM AND AFTER THE COMMENCEMENT DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES; (2) THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDERS FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN; (3) ALL CLAIMS AND INTERESTS SHALL BE SATISFIED, DISCHARGED, AND RELEASED IN FULL, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE; AND (4) ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.**

B.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-

classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

C.     Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement, including the Substantive Consolidation Settlement, is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

D.     **RELEASES BY THE DEBTORS**

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDIENT IMPLEMENTATION OF THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY, EACH OF THE DEBTORS, THE REORGANIZED DEBTORS AND THE DEBTORS' ESTATES (INCLUDING ALL PARTIES CLAIMING DERIVATIVELY OR THROUGH THE DEBTOR OR THE REORGANIZED DEBTORS OR THEIR ESTATES) OR THEIR AFFILIATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH RELEASED PARTY AND THEIR RESPECTIVE PROPERTY (THE "DEBTOR RELEASE") FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, RIGHTS OF SETOFF, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, MATURE OR UNMATURED, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, CONTRACT VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES**

**PURCHASE AGREEMENTS, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR ANY OF THEIR ESTATES; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING DEBTOR RELEASE SHALL NOT OPERATE TO WAIVER OR RELEASE ANY CLAIMS OR LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS, INCLUDING UNDER THE SECURITIES PURCHASE AGREEMENTS; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST NON-RELEASED PARTIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE REORGANIZED DEBTOR ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

E.     **RELEASES BY HOLDERS OF CLAIMS**

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) (THE "THIRD PARTY RELEASE") THE REORGANIZED DEBTORS, THEIR ESTATES, THEIR RESPECTIVE PROPERTY, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, MATURE OR UNMATURED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF FEDERAL OR STATE SECURITIES LAW OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES PURCHASE AGREEMENTS, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR ANY OF THEIR ESTATES; <u>PROVIDED, HOWEVER</u>, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO RELEASE CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A RELEASING PARTY OR A PARTY RELEASING UNDER THIS THIRD PARTY RELEASE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY OR LIABILITIES OF ANY RELEASING PARTY; (2) ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; OR (4) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF

ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE
REORGANIZED DEBTORS MAY HAVE NOW OR IN THE FUTURE AGAINST NON-
RELEASED PARTIES ARISING OUT OF OR RELATING TO ANY ACT OR
OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL
MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL
ORDER OF THE BANKRUPTCY COURT.  NOTWITHSTANDING ANYTHING TO
THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO
NOT RELEASE ANY (1) POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY
UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT
(INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO
IMPLEMENT THE PLAN, OR (2) CLAIMS ARISING UNDER THE SECURITIES
PURCHASE AGREEMENTS.  FOR THE AVOIDANCE OF DOUBT, NOTHING IN
THIS PARAGRAPH SHALL IN ANY WAY AFFECT THE OPERATION OF ARTICLE
VIII.A OF THE PLAN, PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY
CODE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE
BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019,
OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF
THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND
FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT
THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND
VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A
GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY
THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS
AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND
REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY
FOR HEARING; AND (6) A BAR TO ANY RELEASING PARTIES ASSERTING ANY
CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY
RELEASE.

F.    **EXCULPATION**

THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY
LIABILITY TO ANY ENTITY FOR ANY PRE-PETITION OR POST-PETITION ACT
TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO
FORMULATING,    NEGOTIATING,    PREPARING,    DISSEMINATING,
IMPLEMENTING, ADMINISTERING, CONFIRMING OR EFFECTING THE
EFFECTIVE DATE OF THE PLAN, THE DISCLOSURE STATEMENT, THE
SECURITIES    PURCHASE    AGREEMENTS,    THE    RESTRUCTURING
TRANSACTIONS, THE ISSUANCE AND/OR DISTRIBUTION OF NEWCO EQUITY,
THE NEW SECOND LIEN NOTES, THE REPLACEMENT SECOND LIEN NOTE AS
APPLICABLE, THE NEW CONVERTIBLE THIRD LIEN NOTES OR ANY
CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT
CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY
OTHER PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE
TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE

RESTRUCTURING OF THE DEBTORS; **PROVIDED**, THAT THE FOREGOING PROVISIONS OF THIS EXCULPATION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; **PROVIDED**, **FURTHER**, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN; **PROVIDED FURTHER**, THAT THE FOREGOING "**EXCULPATION**" SHALL NOT APPLY TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, EXCEPT FOR ACTS OR OMISSIONS OF RELEASING PARTIES.

G.    **INJUNCTION**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.F); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF

**OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A TIMELY PROOF OF CLAIM WITH THE BANKRUPTCY COURT PRESERVING SUCH RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE INVESTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED THAT</u> NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; <u>PROVIDED, FURTHER, THAT</u> NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

H.    <u>Protection Against Discriminatory Treatment</u>

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    <u>Indemnification</u>

Notwithstanding anything in the Plan to the contrary, all indemnification provisions currently in place (whether in the Securities Purchase Agreements, by-laws, certificates of incorporation, articles of limited partnership, board resolutions, contracts, or otherwise) for the

55

directors, officers, employees, attorneys, other professionals, and agents of the Debtors that served in such capacity from and after the Commencement Date and such directors' and officers' respective affiliates, shall be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan.

J.    Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

L.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to ARTICLE IX.B hereof:

1.    the Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Investors, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code and such order shall be in full force and effect and shall have become a Final Order;

2.      the Confirmation Order: (i) shall be entered by the Bankruptcy Court on or before February 14, 2012 (as such date may be extended with the consent of the Debtors and the Investors, which consent shall not be unreasonably withheld or delayed); (ii) shall include the provisions in Exhibit D to the Securities Purchase Agreements and otherwise be in form and substance acceptable to the Investors; and (iii) shall be in full force and effect and, unless waived by the Investors, shall have become a Final Order.

3.      the Plan and Plan Supplement, including any amendments, modifications, or supplements thereto, shall be in form and substance reasonably acceptable to the Investors and shall not have been modified without the consent of the Investors (such consent not to have been unreasonably withheld in the case of a modification that is not adverse to the Investors);

4.      the Transaction Expenses (as defined and provided in the Securities Purchase Agreements), to the extent not previously paid, shall be paid concurrently with the Effective Date in Cash in accordance with the terms of the Securities Purchase Agreements.

5.      the Commitment Fee shall be paid concurrently with the Effective Date to Liberty Harbor and Mount Kellett, as provided in the Securities Purchase Agreements;

6.      the Debtors shall have obtained an Exit Facility on terms as provided in the Securities Purchase Agreements and the Plan, and on terms and conditions reasonably acceptable to the Investors, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing the Exit Facility shall have occurred.

7.      with respect to all actions, documents, Certificates, and agreements necessary to implement the Plan (a) all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, (c) to the extent required, been filed with and approved by any applicable Governmental Units in accordance with applicable laws, and (d) been effected or executed; and

8.      all conditions to the effectiveness of the Securities Purchase Agreements shall have been satisfied or waived in accordance with the terms thereof.

9.      all other "Conditions to Investors' Obligations at Closing" identified in section 5.1 of the Securities Purchase Agreements shall have been satisfied or waived by the Investors in accordance with the terms thereof.

B.      <u>Waiver of Conditions Precedent</u>

Subject to the terms of the Securities Purchase Agreements, the Debtors and the Investors may jointly waive any of the conditions to the Effective Date set forth in ARTICLE IX.A at any time without any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

C.    Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to ARTICLE V, of the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of all contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases;

13.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII above and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

15.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to ARTICLE VII.D.1 above;

16.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

17.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

18.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

19.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

24.     hear and determine matters related to the Securities Purchase Agreements and related agreements;

25.     enforce all orders previously entered by the Bankruptcy Court; and

26.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

A.     <u>No Stay of Confirmation Order</u>

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h) and 7062.

B.     <u>Modification of Plan</u>

Subject to the limitations contained in the Plan and the terms and conditions of the Securities Purchase Agreements: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

C.     <u>Revocation or Withdrawal of Plan</u>

The Debtors reserve the right, subject to, and in accordance with, the terms and conditions of each of the Securities Purchase Agreements and the Securities Purchase Agreements Order, to revoke or withdraw the Plan before the Confirmation Date and to file

subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation, Consummation or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects, and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

D.      Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.      Additional Documents

On or before the Effective Date and subject to the terms and conditions of the Securities Purchase Agreements, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Securities Purchase Agreements.

F.      Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. §1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

G.      Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases.

H.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed

to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

I.      Successors and Assigns

        The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

J.      Service of Documents

        1.      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| The Great Atlantic & Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, NJ 07645<br>Attn.:  Christopher W. McGarry, General<br>         Counsel | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn.:  James H.M. Sprayregen, P.C.<br>         Paul M. Basta, Esq.<br>         Ray C. Schrock, Esq.<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Attn.:  James J. Mazza, Jr., Esq. |
| **Counsel to the Creditors' Committee** | **Counsel to the Convertible Noteholders** |
| Milbank, Tweed, Hadley & McCloy LLP<br>1 Chase Manhattan Plaza<br>New York, NY 10005<br>Attn.:  Dennis F. Dunne, Esq.<br>         Matthew S. Barr, Esq.<br>         Abhilash M. Raval, Esq<br>         Michael E. Comerford, Esq. | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038<br>Attn.:  Kristopher M. Hansen, Esq.<br>         Jayme T. Goldstein, Esq. |
| **Counsel to the Second Lien Noteholders** | **Counsel to DIP Facility Lenders** |
| Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attn:  Edward S. Weisfelner, Esq. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10022<br>Attn.:  Donald S. Bernstein, Esq. |

| United States Trustee | Counsel to Yucaipa |
|---|---|
| Office of the United States Trustee<br>U.S. Department of Justice<br>33 Whitehall Street, 21st Floor<br>Attn.:  Susan Golden, Esq.<br>        Richard Morrissey, Esq. | Latham & Watkins LLP<br>355 S. Grand Ave, Suite 100<br>Los Angeles, CA 90071<br>Attn:  Robert Klyman, Esq. |

K.      **TERM OF INJUNCTIONS OR STAYS**

**UNLESS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL INJUNCTIONS OR STAYS IN EFFECT IN THE CHAPTER 11 CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY CODE OR ANY ORDER OF THE BANKRUPTCY COURT, AND EXISTING ON THE CONFIRMATION DATE (EXCLUDING ANY INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER) SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.  ALL INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR TERMS.**

L.      Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Notwithstanding anything to the contrary in the Plan (including any amendments, supplements, or modifications to the Plan) or the Confirmation Order (and any amendments, supplements, or modifications thereto) or an affirmative vote to accept the Plan submitted by any Investor, nothing contained in the Plan (including any amendments, supplements, or modifications thereto) shall alter, amend, or modify the rights of the Investors under the Securities Purchase Agreements.

M.      Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://www.kccllc.net/APTEA or the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

N.    <u>Severability</u>

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted (subject to the reasonable consent of the Investors).    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation (subject to the reasonable consent of the Investors).    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (3) nonseverable and mutually dependent.

*The remainder of this page is intentionally left blank.*

Montvale, New Jersey
Dated:  November 14, 2011

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**
(For itself and all other Debtors)

By:    /s/  *Frederic F. Brace*
Name:  Frederic F. Brace
Title:   Chief Financial Officer, Chief Administrative Officer, and Chief
        Restructuring Officer

## EXHIBIT B

**Approved Disclosure Statement Order**

**[To Be Filed]**

## EXHIBIT C

**The Reorganized Debtors' Financial Projections**

**[To Be Filed]**

## **EXHIBIT D**

**Liquidation Analysis**


**[To Be Filed]**

**<u>EXHIBIT E</u>**

**Prepetition Corporate Structure Chart**

**The Great Atlantic & Pacific Tea Company, Inc.**
**Prepetition Corporate Structure Chart**



*  The summary provided herein is presented for illustrative purposes only and is qualified in its entirety by reference to the relevant, operative documents.  The Debtors reserve all rights to amend, modify or supplement the information presented herein.
** Certain of the Debtors' insignificant non-operating subsidiaries were not included in this organizational chart.

20459330v1