James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 10-24549 (RDD) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF EXHIBITS TO THE PLAN SUPPLEMENT
FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that The Great Atlantic & Pacific Tea Company, Inc.

("***A&P***") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"***Debtors***"),[1] hereby file the following exhibits to the Plan Supplement for the *Debtors' Joint*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best

*Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated

December 19, 2011 [Docket No. 3063] (the "***Plan***"):[2]

- **Exhibit I** – form of indenture for New Second Lien Notes

- **Exhibit J** – form of indenture for New Convertible Third Lien Notes

- **Exhibit K** – form of agreement for Investment Warrants

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to alter,

amend, modify, or supplement any document in the Plan Supplement as provided by the Plan;

provided that if any document in the Plan Supplement is altered, amended, modified, or

supplemented in any material respect, the Debtors will file a blackline of such document with the

Bankruptcy Court.

---

Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc. (1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2]    Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

2

New York, New York                       */s/ Ray C. Schrock*
Dated:  February 3, 2012                  James H.M. Sprayregen, P.C.
                                          Paul M. Basta
                                          Ray C. Schrock
                                          Brian S. Lennon
                                          KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
                                          New York, New York  10022-4611
                                          Telephone:  (212) 446-4800
                                          Facsimile:  (212) 446-4900

                                                  - and -

                                          James J. Mazza Jr.
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle
                                          Chicago, Illinois  60654
                                          Telephone:  (312) 862-2000
                                          Facsimile:  (312) 862-2200

                                          Counsel to the Debtors and Debtors in Possession

<div align="center">3</div>

K&E 21346110

**<u>Exhibit I</u>**

[Form of indenture for New Second Lien Notes]

K&E 21346110

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

[*DELAWARE HOLDING COMPANY*][1]

SENIOR SECURED NOTES DUE 2017

INDENTURE

DATED AS OF [●], 2012

[*TRUSTEE*],

AS TRUSTEE AND COLLATERAL AGENT

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN [INTERCREDITOR AGREEMENT DATED AS OF [●], 2012 AMONG [INTERCREDITOR PARTIES], [*DELAWARE HOLDING COMPANY*][1], [THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.] AND THE OTHER SUBSIDIARIES OF [*DELAWARE HOLDING COMPANY*] PARTY THERETO] (THE "INTERCREDITOR AGREEMENT"), AND EACH PARTY TO OR HOLDER UNDER THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE OF THIS INDENTURE OR ANY NOTES ISSUED HEREUNDER, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

---

[1] Name of new Delaware holding company to be inserted.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**Table of Contents**

Page

ARTICLE I. DEFINITIONS AND INCORPORATION BY REFERENCE...............................1
    Section 1.01.    Definitions.............................................................................1
    Section 1.02.    Incorporation by Reference of Trust Indenture Act.....................................22
    Section 1.03.    Rules of Construction. .........................................................22
    Section 1.04.    Acts of Holders. ................................................................23

ARTICLE II. THE NOTES ...........................................................................24
    Section 2.01.    Form and Dating. ...............................................................24
    Section 2.02.    Execution and Authentication................................................25
    Section 2.03.    Registrar and Paying Agent. .................................................26
    Section 2.04.    Paying Agent to Hold Money in Trust.......................................26
    Section 2.05.    Holder Lists......................................................................27
    Section 2.06.    Transfer and Exchange. .......................................................27
    Section 2.07.    Replacement Notes. ............................................................38
    Section 2.08.    Outstanding Notes..............................................................39
    Section 2.09.    Treasury Notes. .................................................................39
    Section 2.10.    Temporary Notes. ..............................................................39
    Section 2.11.    Cancellation. ....................................................................40
    Section 2.12.    Defaulted Interest..............................................................40

ARTICLE III. REDEMPTION AND PREPAYMENT...........................................40
    Section 3.01.    Notices to Trustee. ............................................................40
    Section 3.02.    Selection of Notes to Be Redeemed.........................................40
    Section 3.03.    Notice of Redemption. ........................................................41
    Section 3.04.    Effect of Notice of Redemption..............................................42
    Section 3.05.    Deposit of Redemption Price. ................................................42
    Section 3.06.    Notes Redeemed in Part.......................................................42
    Section 3.07.    Optional Redemption..........................................................42
    Section 3.08.    Mandatory Redemption. ......................................................43

ARTICLE IV. COVENANTS .......................................................................44
    Section 4.01.    Payment of Notes...............................................................44
    Section 4.02.    Maintenance of Office or Agency............................................45
    Section 4.03.    Investment Company Act. ....................................................45
    Section 4.04.    Compliance Certificate. .......................................................45
    Section 4.05.    Taxes.............................................................................46
    Section 4.06.    Stay, Extension and Usury Laws. ...........................................46
    Section 4.07.    Restricted Payments............................................................46
    Section 4.08.    Incurrence of Indebtedness. ..................................................46
    Section 4.09.    Asset Sales. .....................................................................47
    Section 4.10.    Liens..............................................................................47
    Section 4.11.    Dividend and Other Payment Restrictions Affecting Restricted
                     Subsidiaries.....................................................................47

i

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.12.    Events of Loss...................................................................................47
Section 4.13.    Corporate Existence............................................................................47
Section 4.14.    Offer to Repurchase upon Change of Control. .................................47
Section 4.15.    Transactions with Affiliates................................................................47
Section 4.16.    Designation of Restricted and Unrestricted Subsidiaries...................47
Section 4.17.    Guarantees...........................................................................................47
Section 4.18.    Business Activities...............................................................................47
Section 4.19.    Financial Reporting and Delivery of Certain Information...................48
Section 4.20.    Impairment of Security Interest. .......................................................48
Section 4.21.    After-Acquired Property. ...................................................................48
Section 4.22.    Creation and Perfection of Liens Securing Collateral; Further
                 Assurances. .........................................................................................49
Section 4.23.    Insurance..............................................................................................50
Section 4.24.    Real Estate. ........................................................................................51
Section 4.25.    Sale and Lease-Back Transactions......................................................51
Section 4.26.    Incurrence of Senior Subordinated Debt............................................51
Section 4.27.    Suspension of Certain Covenants. .....................................................51

ARTICLE V. SUCCESSORS.........................................................................................51
Section 5.01.    Merger, Consolidation or Sale of Assets. .........................................51
Section 5.02.    Successor Corporation Substituted. ...................................................52

ARTICLE VI. DEFAULTS AND REMEDIES ...............................................................53
Section 6.01.    Events of Default. ..............................................................................53
Section 6.02.    Acceleration. ......................................................................................54
Section 6.03.    Other Remedies...................................................................................55
Section 6.04.    Waiver of Past Defaults. ....................................................................55
Section 6.05.    Control by [Majority].........................................................................56
Section 6.06.    Limitation on Suits..............................................................................56
Section 6.07.    Rights of Holders of Notes to Receive Payment. .............................56
Section 6.08.    Collection Suit by Trustee. .................................................................57
Section 6.09.    Trustee May File Proofs of Claim. .....................................................57
Section 6.10.    Priorities..............................................................................................57
Section 6.11.    Undertaking for Costs. ........................................................................58
Section 6.12.    Restoration of Rights and Remedies....................................................58
Section 6.13.    Rights and Remedies Cumulative........................................................58
Section 6.14.    Delay or Omission Not Waiver...........................................................58

ARTICLE VII. TRUSTEE................................................................................................59
Section 7.01.    Duties of Trustee.................................................................................59
Section 7.02.    Rights of Trustee.................................................................................60
Section 7.03.    Individual Rights of Trustee. ..............................................................61
Section 7.04.    Trustee's Disclaimer. ..........................................................................61
Section 7.05.    Notice of Defaults. .............................................................................61
Section 7.06.    Reports by Trustee to Holders of the Notes.......................................61
Section 7.07.    Compensation and Indemnity. ............................................................62
Section 7.08.    Replacement of Trustee. .....................................................................63

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 7.09.    Successor Trustee by Merger, Etc. ...............................................................64
Section 7.10.    Eligibility; Disqualification. ..........................................................................64
Section 7.11.    Preferential Collection of Claims Against Company.....................................64

ARTICLE VIII. LEGAL DEFEASANCE AND COVENANT DEFEASANCE.........................65
Section 8.01.    Option to Effect Legal Defeasance or Covenant Defeasance......................65
Section 8.02.    Legal Defeasance and Discharge. ..................................................................65
Section 8.03.    Covenant Defeasance......................................................................................65
Section 8.04.    Conditions to Legal or Covenant Defeasance.................................................66
Section 8.05.    Deposited Money and Government Securities to Be Held in Trust;
                 Other Miscellaneous Provisions. ..................................................................67
Section 8.06.    Repayment to Company...................................................................................68
Section 8.07.    Reinstatement..................................................................................................68

ARTICLE IX. AMENDMENT, SUPPLEMENT AND WAIVER.............................................69
Section 9.01.    Without Consent of Holders of Notes..............................................................69
Section 9.02.    With Consent of Holders of Notes....................................................................70
Section 9.03.    Revocation and Effect of Consents..................................................................72
Section 9.04.    Notation on or Exchange of Notes...................................................................72
Section 9.05.    Trustee to Sign Amendments, Etc. ..................................................................72

ARTICLE X. NOTE GUARANTEES ........................................................................................73
Section 10.01.   Note Guarantees...............................................................................................73
Section 10.02.   Execution and Delivery of Note Guarantee. ...................................................74
Section 10.03.   Guarantors May Consolidate or Merge on Certain Terms............................74
Section 10.04.   Releases of Note Guarantees. .........................................................................75
Section 10.05.   Trustee to Include Paying Agent......................................................................76
Section 10.06.   Limits on Note Guarantees. ............................................................................76

ARTICLE XI. COLLATERAL AND SECURITY .....................................................................76
Section 11.01.   Collateral Documents.......................................................................................76
Section 11.02.   Release of Collateral........................................................................................77
Section 11.03.   Disposition of Collateral Without Release. .....................................................78
Section 11.04.   Authorization of Actions to Be Taken by the Trustee and the
                 Collateral Agent Under the Collateral Documents. ......................................79
Section 11.05.   Authorization of Receipt of Funds by the Trustee under the Security
                 Agreement.......................................................................................................80
Section 11.06.   Intercreditor Agreement...................................................................................80
Section 11.07.   Limitation on Duty of Trustee and Collateral Agent in Respect of
                 Collateral.........................................................................................................80
Section 11.08.   Powers Exercisable by Receiver or Trustee.....................................................81
Section 11.09.   Collateral Agent. .............................................................................................81

ARTICLE XII. SATISFACTION AND DISCHARGE ..............................................................85
Section 12.01.   Satisfaction And Discharge Of Indenture. ......................................................85
Section 12.02.   Application of Trust Money..............................................................................86

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ARTICLE XIII. MISCELLANEOUS ................................................................................87
    Section 13.01.    Notices. .......................................................................................87
    Section 13.02.    Certificate and Opinion As to Conditions Precedent....................................88
    Section 13.03.    Statements Required in Certificate or Opinion.............................................88
    Section 13.04.    Rules by Trustee and Agents. ..................................................................89
    Section 13.05.    No Personal Liability of Directors, Officers, Employees and
                       Stockholders.................................................................................89
    Section 13.06.    Governing Law. .....................................................................................89
    Section 13.07.    No Adverse Interpretation of Other Agreements...........................................89
    Section 13.08.    Successors. ............................................................................................89
    Section 13.09.    Severability. ..........................................................................................90
    Section 13.10.    Counterpart Originals..............................................................................90
    Section 13.11.    Table of Contents, Headings, Etc. ..............................................................90
    Section 13.12.    Further Instruments and Acts....................................................................90

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | FORM OF NOTE |
| Exhibit B | FORM OF CERTIFICATE OF TRANSFER |
| Exhibit C | FORM OF CERTIFICATE OF EXCHANGE |
| Exhibit D | FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR |
| Exhibit E | FORM OF NOTE GUARANTEE |
| Exhibit F | FORM OF SUPPLEMENTAL INDENTURE |
| | |
| Schedule I | List of Guarantors |

v

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## INDENTURE

THIS INDENTURE is dated as of [●], 2012 (this "Indenture"), by and among
[*DELAWARE HOLDING COMPANY*] [2], a Delaware corporation (the "Company"), THE
GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation ("A&P"),
and the other corporations and limited liability companies listed on the signature pages hereto
(together with A&P, each, a "Guarantor" and collectively, the "Guarantors", as more fully
defined below) and [*TRUSTEE*], as trustee (the "Trustee") and as collateral agent (the "Collateral
Agent").

## RECITALS

The Company has duly authorized the creation and issuance of its Senior Secured Notes
due 2017 of substantially the tenor and amount hereinafter set forth, and to provide therefor, the
Company has duly authorized the execution and delivery of this Indenture.

All things necessary to make the Notes (as defined below), when executed by the
Company and authenticated and delivered by the Trustee hereunder and duly issued by the
Company, the valid obligations of the Company and this Indenture a valid instrument of the
Company, in accordance with their respective terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that, each party agrees as
follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as
defined below) of the Notes:

## ARTICLE I.

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.    Definitions.

"144A Global Note" means a global note substantially in the form of Exhibit A hereto
bearing the Global Note Legend and the Private Placement Legend and deposited with or on
behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a
denomination equal to the outstanding principal amount of the Notes sold in reliance on
Rule 144A.

["ABL Credit Facility" means the asset-based revolving credit facility provided under the
[Senior Secured Asset-Based Revolving Credit Agreement dated as of the Initial Issuance Date
by and among A&P, the other borrowers party thereto, the Company and the other guarantors
party thereto, the lenders party thereto in their capacities as lenders thereunder and JPMorgan
Chase Bank, N.A., as administrative agent and collateral agent], including any notes, mortgages,
guarantees, collateral documents, instruments and agreements executed in connection therewith,

---

[2] Name of new Delaware holding company to be inserted.

and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any one or more indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that extend, replace, refund, refinance, renew or defease any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount that may be borrowed thereunder or alters the maturity of the loans thereunder or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or other agent, lender or group of lenders or investors.]

["Acquired Indebtedness" means, with respect to any specified Person, (1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or becomes a Restricted Subsidiary of such specified Person, and (2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.]

"Affiliate" of any specified Person means (1) any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person or (2) any executive officer or director of such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

"Affiliate Transaction" has the meaning set forth in [Section 4.15] hereof.

"After-Acquired Property" means any and all assets or property (other than Excluded Assets) acquired after the Initial Issuance Date, including any property or assets acquired by the Company or a Guarantor from another Guarantor, which in each case constitutes Collateral as defined in this Indenture.

"Agent" means any Registrar, Paying Agent or co-registrar.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and/or Clearstream that apply to such transfer or exchange.

"Asset Sale" means [●].

"Asset Sale Offer" has the meaning set forth in [Section 4.09] hereof.

"Attributable Debt" means [●]

"Authentication Order" has the meaning set forth in Section 2.02 hereof.

["Bank Products" means any services or facilities on account of credit or debit cards, purchase cards or merchant services constituting a line of credit, and any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, electronic funds transfer and any other cash management arrangement.]

2

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors as now or hereinafter constituted.

"Board of Directors" means (1) with respect to a corporation, the board of directors of the corporation or, except in the context of the definitions of "Change of Control", a duly authorized committee thereof, (2) with respect to a partnership, the Board of Directors of the general partner of the partnership or, if the partnership has more than one general partner, the managing general partner of the partnership and (3) with respect to any other Person, the board or committee of such Person serving a similar function.

"Board Resolution" means a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors of the Company and to be in full force and effect on the date of such certification.

["Borrowing Base" means [•].]

"Business Day" means any day other than a Legal Holiday.

"Capital Stock" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or other business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person [; provided, however, the term "Capital Stock" shall exclude any debt securities convertible into Capital Stock, whether or not such debt securities include any right of voting or other participation with Capital Stock].

"Capital Lease" means any capital lease as determined in accordance with GAAP, as in effect on the Initial Issuance Date.

"Capital Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capital Lease that would at that time be required to be capitalized and reflected as a liability on a balance sheet in accordance with GAAP as in effect on the Initial Issuance Date.

"Cash Election Deadline" has the meaning set forth in Section 4.01 hereof.

"Cash Equivalents" means (i) United States dollars, (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof), maturing not more than one year from the date of acquisition, (iii) commercial paper rated at least P-2 by Moody's Investors Service, Inc. or at least A-2 by Standard & Poor's Rating Services and in each case maturing within one year after the date of the acquisition thereof, (iv) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of the acquisition thereof, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank organized under the laws of the United States (or any state, province or territory thereof) or any foreign branch thereof having capital and surplus aggregating at least $250.0 million, and any corporation or

3

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing, and any department, agency, board, commission, tribunal, committee or instrumentality of any of the foregoing, (v) direct obligations issued by any state, commonwealth or territory of the United States of America or any political subdivision of any such state, any public instrumentality or taxing authority thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (v) of this definition, (vii) repurchase obligations of any commercial bank organized under the laws of the United States of America or any state thereof having capital and surplus aggregating at least $250.0 million, having a term of not more than 30 days, with respect to securities referred to in clause (ii) of this definition; and (viii) instruments equivalent to those referred to in clauses (i) to (vii) above denominated in euro or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by a Restricted Subsidiary organized in such jurisdiction.

"Cash Interest Payment" has the meaning set forth in Section 4.01 hereof.

"Cash Management Agreement" means any agreement with a Cash Management Bank to provide (i) Automated Clearing House (ACH) transactions, (ii) cash management services, including controlled disbursement services, treasury, depositary, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements and/or (iii) foreign exchange facilities.

"Cash Management Bank" means any Person that, at the time it enters into a Cash Management Agreement, is a Credit Facility Lender or an Affiliate of a Credit Facility Lender, in its capacity as a party to such Cash Management Agreement.

"Cash Management Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person under or in respect of a Cash Management Agreement.

"Casualty" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"Change of Control" means the occurrence of any of the following: [●].

"Change of Control Offer" has the meaning set forth in [Section 4.14] hereof.

"Change of Control Payment" has the meaning set forth in [Section 4.14] hereof.

"Change of Control Payment Date" has the meaning set forth in [Section 4.14] hereof.

"Clearstream" means Clearstream, société anonyme Luxembourg (or any successor securities clearing agency).

4

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

"Collateral" means, collectively, the assets and property (and rights and interests in assets and property), now owned or hereafter acquired, of any Person subject to, or intended or required to be subject to, the Liens created by the Collateral Documents; provided, that Collateral shall not include any Excluded Assets so long as such assets and property (or rights and interests in assets and property) are Excluded Assets.

"Collateral Agent" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Collateral Documents" means, collectively, [●].[3]

"Commission" means the United States Securities and Exchange Commission.

"Condemnation" means any taking by a Governmental Authority of property or assets, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any public improvement or condemnation or in any other manner.

"Condemnation Award" means all proceeds of any Condemnation or transfer in lieu thereof.

"Confirmation Order" means that certain order confirming the Plan of Reorganization pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended, entered by the United States Bankruptcy Court for the Southern District of New York on [●].

["Consolidated Cash Flow" means [●]]

["Consolidated Net Income" means [●]]

["Consolidated Net Tangible Assets" means [●]]

"Corporate Trust Office of the Trustee" shall be at the address of the Trustee specified in Section 13.01 hereof or such other address as to which the Trustee may give notice to the Company.

"Covenant Defeasance" has the meaning set forth in Section 8.03 hereof.

"Credit Facilities" means one or more debt facilities, commercial paper facilities or other debt instruments, indentures or agreements (including, without limitation, the ABL Credit Facility and the Term Loan Credit Facility), providing for revolving credit loans, term loans,

---

[3] Collateral Documents to secure liens on substantially all assets of the Company and the Guarantors, including substantially all assets securing the Exit Facility.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), letters of credit or other debt obligations, in each case, as amended, restated, modified, renewed, refunded, restructured, supplemented, replaced or refinanced in whole or in part from time to time, including without limitation any amendment increasing the amount of Indebtedness incurred or available to be borrowed thereunder, extending the maturity of any Indebtedness incurred thereunder or contemplated thereby or deleting, adding or substituting one or more parties thereto (whether or not such added or substituted parties are banks or other institutional lenders) and "Credit Facility" means each of the foregoing.

"Credit Facility Collateral" means all of the collateral which secures obligations under the Credit Facilities together with the proceeds thereof.

"Credit Facility Collateral Agent" means [JPMorgan Chase Bank, N.A.] or such other financial institution or entity which serves as collateral agent under the Credit Facilities.

"Credit Facility Hedging Obligations" means all Hedging Obligations of the Company or any of its Restricted Subsidiaries and Cash Management Obligations of the Company or any of its Restricted Subsidiaries in each case owing to a Person that is a holder of Indebtedness under a Credit Facility or an Affiliate of such holder at the time of entry into such Hedging Obligations or Cash Management Obligations.

"Credit Facility Lenders" means each lender under a Credit Facility and any other Person that shall have become a party thereto as a lender pursuant to an assignment and assumption, other than any person that ceases to be a party thereto pursuant to an assignment and assumption.

"Credit Facility Loan Obligations" means the payment of the principal of and interest on the loans under the Credit Facilities, together with all fees and other obligations then due to the Credit Facility Lenders under such Credit Facilities.

"Custodian" means any receiver, trustee, assignee, liquidator, sequester or similar official under any Bankruptcy Law.

"Debtor Relief Laws" means the Title 11 of the U.S. Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Definitive Note" means a Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of the Notes attached hereto as Exhibit A, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, until a successor shall have been appointed and become such pursuant to the applicable provision of this Indenture, and, thereafter, "Depositary" shall mean or include such successor.

"Designated Amount" has the meaning set forth in [Section 4.16] hereof.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the earlier of the date on which the Notes mature or the date the Notes are no longer outstanding; provided, however, that (i) only the portion of such Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Capital Stock issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control, fundamental change or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Domestic Subsidiary" means, with respect to any Person, each Subsidiary of such Person that is organized under the laws of the United States or any political subdivision thereof, and "Domestic Subsidiaries" means any two or more of them.

"DTC" has the meaning set forth in Section 2.03 hereof.

7

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means a public or private issuance of Capital Stock (other than Disqualified Stock) of the Company, other than (1) pursuant to a registration statement on Form S-8 or otherwise relating to Equity Interests issuable under an employee benefit plan of the Company or (2) any such public or private issuance that constitutes an Excluded Contribution.

"Euroclear" means Euroclear Bank, SA/NV as operator of the Euroclear Clearance System (or any successor securities clearing agency).

"Event of Default" has the meaning set forth in Section 6.01 hereof.

"Event of Loss" means, with respect to any Collateral, any (1) Casualty of such Collateral, (2) Condemnation or seizure (other than pursuant to foreclosure or confiscation or requisition of the use of such Collateral) or (3) settlement in lieu of clause (2) above.

"Excess Proceeds" has the meaning set forth in [Section 4.09] hereof.

"Excess Proceeds Trigger Date" has the meaning set forth in [Section 4.09] hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute.

"Excluded Assets" means [●].

["Excluded Contribution" means net cash proceeds received by the Company and its Restricted Subsidiaries as capital contributions after the Initial Issuance Date or from the issuance or sale (other than to a Restricted Subsidiary or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Company or any Restricted Subsidiary) of Equity Interests (other than Disqualified Stock) of the Company, in each case to the extent designated as an Excluded Contribution pursuant to an Officers' Certificate and not previously included in the calculation set forth in clause [●] of [Section 4.07] hereof.]

"Existing Indebtedness" means Indebtedness of the Company and its Restricted Subsidiaries (other than Indebtedness under a Credit Facility or the Notes and the related Guarantees) in existence on the Initial Issuance Date (or to be issued on the Initial Issuance Date), as approved in the Plan of Reorganization.

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by an executive officer of the Company. Notwithstanding the foregoing, if the Fair Market Value exceeds $[●], the determination of Fair Market Value must be made by the Board of Directors of the Company based upon [●] and be evidenced by a Board Resolution attached to an Officers' Certificate delivered to the Trustee.

8

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

["Fixed Charge Coverage Ratio" means with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than Indebtedness Incurred, repaid, repurchased or redeemed under any revolving credit facility in the ordinary course of business for working capital purposes) or issues, repurchases or redeems Disqualified Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (for purposes of this definition, the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock, and the use of the proceeds therefrom as if the same had occurred at the beginning of such period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio, (i) acquisitions and dispositions of business entities or property and assets constituting a division or line of business of any Person that have been made by the specified Person or any of its Restricted Subsidiaries (including any Person that becomes a Restricted Subsidiary as a result of a Permitted Investment), including through mergers or consolidations and including any related financing transactions, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be given pro forma effect as if they had occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated on a *pro forma* basis in accordance with Regulation S-X under the Securities Act, (ii) the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with GAAP, shall be excluded, (iii) the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP shall be excluded as if such discontinued operation occurred at the beginning of the applicable four-quarter reference period and (iv) consolidated interest expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a *pro forma* basis and bearing a floating interest rate shall be computed as if the rate in effect on the Calculation Date (taking into account any interest rate option, swap, cap or similar agreement applicable to such Indebtedness) had been the applicable rate for the entire period, and for purposes of making the computations referred to above, interest on any Indebtedness under a revolving credit facility (to the extent not excluded from the calculation of the Fixed Charge Coverage Ratio due to the operation of the first parenthetical phrase of this definition) computed on a *pro forma* basis shall be computed based on the weighted average daily balance of such Indebtedness during the applicable period.]

["Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of (i) the consolidated interest expense in respect of Indebtedness of such Person and its Restricted Subsidiaries for such period (excluding any non-cash interest expense arising from the application of Statement of Financial Accounting Standards No. 133 or the adoption of FASB Staff Position No. APB 14-1), whether paid or accrued, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letters of credit (other than trade letters of credit in the ordinary course of business) or bankers' acceptance financings, excluding any commissions, discounts, yield and other fees and charges or interest expense related to any Qualified Receivables Transaction, and net of the effect of all payments made or received

9

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

pursuant to Hedging Obligations, plus (ii) the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period, plus (iii) any cash interest expense on Indebtedness of another Person that is Guaranteed by such Person or any of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, to the extent such Guarantee or Lien is called upon, plus (iv) the product of (A) all dividends, whether paid or accrued and whether or not in cash, on any series of Disqualified Stock or Preferred Stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests (other than Disqualified Stock) of the Person or to the Person or a Restricted Subsidiary of the Person, times (B) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, minus (v) interest income actually received by the Company or any Restricted Subsidiary in cash during such period, in each case, on a consolidated basis.]

"Foreign Subsidiary" means, with respect to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants, the opinions and pronouncements of the Public Company Accounting Oversight Board and the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession in the United States, which are in effect on the Initial Issuance Date.

"Global Note" means a Note substantially in the form attached hereto as Exhibit A that bears the Global Note Legend and has the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.

"Global Note Legend" means the legend set forth in Section [●], which is required to be placed on all Global Notes issued under this Indenture.

"Government Securities" means securities that are direct obligations of the United States of America for the timely payment of which its full faith and credit are pledged.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central bank).

"Grantors" means the Company and the Guarantors.

"Guarantee" means, as to any Person, a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or

10

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

reimbursement agreements in respect thereof, of all or any part of any Indebtedness of another Person.

"Guarantors" means any Subsidiary that executes a Note Guarantee in accordance with the provisions of this Indenture, and their respective successors and assigns until released from their obligations under their Note Guarantees and this Indenture in accordance with the terms of this Indenture.

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under (i) interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and other agreements or arrangements with respect to interest rates, (ii) commodity swap agreements, commodity option agreements, forward contracts and other agreements or arrangements with respect to commodity prices and (iii) foreign exchange contracts, currency swap agreements and other agreements or arrangements with respect to foreign currency exchange rates, including without limitation, the Hedging Obligations as such term is defined under the Intercreditor Agreement, the ABL Credit Facility, the Term Loan Credit Facility or any security agreement related thereto.

"Hedging Providers" means counterparties to any Credit Facility Hedging Obligations, including any Cash Management Bank with respect to Cash Management Obligations.

"Holder" means a Person in whose name a Note is registered.

"IAI Global Note" mean the global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Restricted Note Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that will be issued on the Initial Issuance Date or thereafter in a denomination equal to the outstanding principal amount of the Notes sold to Institutional Accredited Investors.

"Immaterial Subsidiary" means any Subsidiary of the Company whose Total Assets equal $[●]or less, so long as the Total Assets of all Immaterial Subsidiaries do not exceed in the aggregate $[●].

"Incur" means, with respect to any Indebtedness, to incur (by merger, conversion, exchange or otherwise), create, issue, assume, Guarantee or otherwise become directly or indirectly liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness (and "Incurrence" and "Incurred" shall have meanings correlative to the foregoing); provided that (1) any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary of the Person will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary of the Person and (2) neither the accrual of interest nor the accretion of original issue discount nor the payment of interest in the form of additional Indebtedness and the payment of dividends on Disqualified Stock or Preferred Stock in the form of additional shares of Disqualified Stock or Preferred Stock (to the extent provided for when the Indebtedness or Disqualified Stock or Preferred Stock on which such interest or dividend is paid was originally issued) shall be considered an Incurrence of Indebtedness; provided that in each case the amount thereof is included in the Fixed Charges and

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Indebtedness of the Person or such Restricted Subsidiary as accrued to the extent required by the definitions of Fixed Charges and Indebtedness, respectively.

"Indebtedness" means, with respect to any specified Person, all obligations of such Person, whether or not contingent (i) in respect of borrowed money, (ii) evidenced by bonds, notes, debentures, surety bonds or similar instruments or letters of credit (or reimbursement agreements in respect thereof), (iii) in respect of bankers' acceptances, (iv) in respect of Capital Lease Obligations, (v) in respect of the balance deferred and unpaid of the purchase price of any property or services, except any such balance that constitutes an accrued expense, trade payable or earn-out, or (vi) representing Hedging Obligations.

In addition, the term "Indebtedness" includes (x) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person), provided that the amount of such Indebtedness shall be the lesser of (A) the Fair Market Value of such asset at such date of determination and (B) the amount of such Indebtedness, (y) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person, and (z) Preferred Stock of any Restricted Subsidiary of such Person valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued dividends, provided that the "maximum fixed repurchase price" of any Preferred Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Preferred Stock, as applicable, as if such Preferred Stock were repurchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture.

The amount of the Indebtedness in respect of any Hedging Obligations at any time shall be equal to the net amount payable as a result of the termination of such Hedging Obligations at such time. The amount of Indebtedness in respect of any letter of credit (or reimbursement agreement in respect thereof) at any time shall be equal to the amount drawn but not yet reimbursed at such time. Notwithstanding the foregoing, no operating lease of any store of the Company or any Restricted Subsidiary or residual liabilities with respect to assigned leaseholds shall be deemed to be Indebtedness. The amount of any Indebtedness outstanding as of any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation, and shall be (1) the accreted value thereof, in the case of any Indebtedness issued with original issue discount and (2) the principal amount thereof, in the case of any other Indebtedness.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Issuance Date" means [●], 2012, the date of original issuance of the Notes under this Indenture.

"Initial Notes" has the meaning set forth in Section 2.01(a) hereof.

12

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Institutional Accredited Investor" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3), (7) under the Securities Act, who is not also a QIB.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of [●], by and among [INTERCREDITOR PARTIES] and acknowledged by the Company, A&P and the other Guarantors, as it may be amended, modified, supplemented, restated, amended and restated or replaced from time to time in accordance with its terms.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of loans or other extensions of credit (including Guarantees), advances, capital contributions (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP (excluding in each case accounts receivable, credit card and debit card receivables, trade credit and advances to customers made in the ordinary course of business and residual liabilities with respect to assigned leaseholds). If the Person or any of its Restricted Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Person such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Person, then the Person shall be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Investment in such Subsidiary not sold or disposed of. The acquisition by the Person or any of its Restricted Subsidiaries of a Person that holds an Investment in a third Person shall be deemed to be an Investment by the Person or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investment held by the acquired Person in such third Person on the date of such acquisition.

"Junior Lien Indebtedness" means any Indebtedness of the Company or any Guarantor which is or will be secured by a Lien on the Collateral on a basis that is junior to the Notes.

"Leased Real Property" has the meaning set forth in [Section 4.24] hereof.

"Leasing Deliverables" shall include (i) (A) a memorandum of lease in recordable form with respect to such leasehold interest, executed and acknowledged by the lessor of such leasehold interest, or (B) evidence that the applicable lease with respect to such leasehold interest or a memorandum thereof has been recorded in all places necessary, in the Trustee's or the Collateral Agent's reasonable judgment, to give constructive notice to third-party purchasers of such leasehold interest, and (ii) any lessor consent or approval of such mortgage as may be required pursuant to the terms of the applicable lease with respect to such leasehold interest.

"Legal Defeasance" has the meaning set forth in Section 8.02 hereof.

13

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in The City of New York or at a place of payment are authorized or required by law, regulation or executive order to remain closed.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement and any lease in the nature thereof.

"Loss Proceeds Offer" has the meaning set forth in Section [●] hereof.

"Make-Whole Amount" means, with respect to any Note on any redemption date, the excess, if any, of (a) the present value, as of such redemption date, of (1) 105% of the principal amount of such Note, plus (2) all required interest payments that would have been payable with respect to such Note following such redemption date through [●], 2014 , determined by discounting, on a semi-annual basis, such amounts at the Reinvestment Rate (determined as of the third business day preceding the date notice of such redemption is given), from [●], 2014  (or any earlier date on which such required interest payments would have been payable if such redemption had not been made), to such redemption date, over (b) the principal amount of the Note being redeemed.

"Management Agreement" means the management agreement dated as of the Initial Issuance Date between [Yucaipa] and [A&P/the Company].

"Mortgage" means a mortgage, deed of trust, deed to secure debt or similar document, together with any assignment of leases and rents referred to therein, in each case in form and substance reasonably satisfactory to the Collateral Trustee.

"Net Loss Proceeds" means, with respect to any Event of Loss, the proceeds in the form of (a) cash or Cash Equivalents and (b) insurance proceeds from Condemnation Awards or damages awarded by any judgment, in each case received by the Company or any of its Restricted Subsidiaries from such Event of Loss, net of (i) reasonable out-of-pocket expenses and fees relating to such Event of Loss (including without limitation legal, accounting and appraisal or insurance adjuster fees), (ii) taxes paid or payable after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements, (iii) any repayment of Indebtedness that is secured by, or directly related to, the property or assets that are the subject of such Event of Loss, (iv) amounts required to be paid to any Person (other than the Company or any Restricted Subsidiary) owning a beneficial interest in the assets subject to the Event of Loss or having a Lien thereon, and (v) appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Event of Loss and retained by the Company or any Restricted Subsidiary, as the case may be, after such Event of Loss, including, without limitation, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Event of Loss.

"Net Proceeds" means the aggregate cash proceeds, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not the interest

14

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

component, thereof), received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the costs relating to such Asset Sale, including, without limitation, legal, accounting, investment banking and brokerage fees, and sales commissions, and any relocation expenses incurred as a result thereof, (ii) taxes paid or payable as a result thereof, (iii) amounts required to be applied to the repayment of Indebtedness or other liabilities secured by a Lien on the asset or assets that were the subject of such Asset Sale or required to be paid as a result of such sale, (iv) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, (v) in the case of any Asset Sale by a Restricted Subsidiary of the Company, payments to holders of Equity Interests in such Restricted Subsidiary in such capacity (other than such Equity Interests held by the Company or any of its Restricted Subsidiaries) and (vi) appropriate amounts to be provided by the Company or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in accordance with GAAP; provided that (A) excess amounts set aside for payment of taxes pursuant to clause (ii) above remaining after such taxes have been paid in full or the statute of limitations therefor has expired and (B) amounts initially held in reserve pursuant to clause (vi) no longer so held, will, in the case of each of subclauses (A) and (B), at that time become Net Proceeds.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Notes" means the Initial Notes and any other Notes (including any PIK Notes) authenticated and delivered under this Indenture, as amended or supplemented from time to time, substantially in the form set forth in Exhibit A.  For purposes of this Indenture, all references to "principal amount" of the Notes shall include any increase in the principal amount of the Notes as a result of the payment of PIK Interest.

"Note Custodian" means the Trustee, as custodian with respect to the Global Notes, or any successor entity thereto.

"Note Guarantee" means a Guarantee of the Notes pursuant to Article X hereof, including a notation in the Notes substantially in the form included in Exhibit E.

"Note Obligations" means (i) all principal of, interest (including, without limitation, any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding), and premium, if any, on any Note, (ii) all fees, expenses, indemnification obligations and other amounts of whatever nature now or hereafter payable by the Company or any Guarantor (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) pursuant to this Indenture, the Notes, the Intercreditor Agreement or any Collateral Document, (iii) all expenses of the Trustee or the Collateral Agent (or any agent or sub-agent thereof) under this Indenture as to which the Trustee or the Collateral Agent or one or more of such agents have a right to reimbursement or under any other similar provision of any Collateral Document,

15

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

including, without limitation, any and all sums advanced by the Trustee or the Collateral Agent to preserve the Collateral or preserve its security interests, mortgages or Liens in the Collateral to the extent permitted under this Indenture, the Notes, the Intercreditor Agreement or any other Collateral Document or applicable law, and (iv) in the case of each Guarantor, all amounts now or hereafter payable by such Guarantor and all other obligations or liabilities now existing or hereafter arising or incurred (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or such Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the part of such Guarantor pursuant to the Notes, this Indenture, the Note Guarantees, the Intercreditor Agreement or any other Collateral Document, together in each case with all renewals, modifications, consolidations or extensions thereof.

"Note Register" has the meaning set forth in Section 2.03 hereof.

"Obligations" means any principal, interest, penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"Offer Amount" has the meaning set forth in Section [4.09] hereof.

"Offer Period" has the meaning set forth in Section [4.09] hereof.

"Officer" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary, any Assistant Secretary or any Vice-President of such Person.

"Officers' Certificate" means a certificate signed on behalf of the Company by at least two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the controller, the treasurer, the assistant treasurer or the principal accounting officer of the Company, that meets the requirements of Section 13.03 hereof.

"Opinion of Counsel" means an opinion from legal counsel (who may be counsel to, in-house counsel for or an employee of, the Company) that meets the requirements of Section 13.03 hereof.

"Pari Passu Indebtedness" has the meaning set forth in Section [●] hereof.

"Pari Passu Lien Indebtedness" means any Indebtedness of the Company or any of its Restricted Subsidiaries (including Additional Note Obligations) that is secured by a Lien on the Collateral ranking pari passu with the Liens securing the Notes.

"Pari Passu Obligations" means the payment of principal of and interest on the Pari Passu Indebtedness, together with all fees due and other obligations thereunder.

"Partial PIK Payment" has the meaning set forth in Section 4.01 hereof.

NY 73758471v5

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Paying Agent" has the meaning set forth in Section 2.03 hereof.

"Payment Default" has the meaning set forth in Section 6.01 hereof.

["Permitted Business" means [●].]

["Permitted Business Acquisition" means [●]].

"Permitted Debt" has the meaning set forth in [Section 4.08] hereof.

"Permitted Holders" means (i) [Liberty Harbor], (ii) [Mount Kellett], (iii) [Yucaipa], and (iv) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a majority or more controlling interest of which consist of any one or more of the Persons described in the preceding clauses (i), (ii) and (iii).

["Permitted Investments" means [●]]

["Permitted Liens" means [●].]

["Permitted Refinancing Indebtedness" means [●].]

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or Governmental Authority or other entity.

"PIK Interest" means interest paid in the form of (1) an increase in the outstanding principal amount of the Notes or (2) the issuance of PIK Notes.

"PIK Interest Payment" has the meaning set forth in Section 4.01 hereof.

"PIK Notes" has the meaning set forth in Section 2.01(c) hereof.

"Plan of Reorganization" means that certain Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Pursuant to Chapter 11 of the United States Bankruptcy Code filed by The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates on [December 19, 2011] [Docket No. 3063] in the United States Bankruptcy Court for the Southern District of New York, as it may be altered, amended, modified, or supplemented from time to time prior to entry of the Confirmation Order, including any exhibits, supplements, annexes, appendices and schedules thereto, as confirmed by such Bankruptcy Court pursuant to the Confirmation Order.

"Pledge Agreement" means [the pledge agreement, dated as of the Initial Issuance Date, among the Company, the other parties thereto from time to time, and the Collateral Agent, as

17

such agreement may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time].

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions upon liquidation.

"Private Placement Legend" means the legend set forth in Section 2.06(g)(iii) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Purchase Date" has the meaning set forth in Section [4.09] hereof.

"Purchase Money Obligation" means Indebtedness of the Company or any Restricted Subsidiary incurred for the purpose of financing all or any part of the purchase price of property, plant or equipment used in the business of the Company or any Restricted Subsidiary or the cost of installation, construction or improvement thereof, and the payment of any sales or other taxes associated therewith; provided, however, that (i) the amount of such Indebtedness shall not exceed such purchase price or cost and payment plus applicable taxes, and (ii) such Indebtedness shall be incurred within one year of such acquisition of such asset by the Company or such Restricted Subsidiary or such installation, construction or improvement.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Proceeds" means [●].

"Rating Agency" means (i) each of Moody's Investors Service, Inc. (or any successor to the rating agency business thereof) ("Moody's") and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (or any successor to the rating agency business thereof) ("S&P") and (ii) if Moody's or S&P ceases to rate the Notes for reasons outside of the Company's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(f) under the Exchange Act selected by the Company as a replacement agency for Moody's or S&P, as the case may be.

"Registrar" has the meaning set forth in Section 2.03 hereof.

"Reinvestment Rate" will mean, as of any redemption date, the yield to maturity on United States Treasury securities with a constant maturity corresponding to the period from the date of redemption to [the second anniversary of the Initial Issuance Date], and rounded to the nearest month (the "Treasury Yield"), plus [0.50%]. For this purpose, the Treasury Yield will equal the arithmetic mean of the yields shown in the most recent H.15 (519) statistical release published by the Federal Reserve System under the heading "Week Ending" for "U.S. Government Securities — Treasury Constant Maturities" with a maturity corresponding to the period from the date of redemption to [the second anniversary of the Initial Issuance Date] (or determined by interpolation or extrapolation if no published maturity exactly corresponds to such remaining life); provided, however, that if the period from such redemption date to [the second anniversary of the Initial Issuance Date] is less than one year, the weekly average yield on

18

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Related Business Investment" means [●].

"Related Party" means [●].

["Replacement Assets" means (i) assets (other than cash or Cash Equivalents) that will be used or useful in a Permitted Business, (ii) substantially all the assets of a Permitted Business or a majority of the Voting Stock of any Person engaged in a Permitted Business that will become on the date of acquisition thereof a Restricted Subsidiary of such Person or (iii) a combination thereof.]

"Responsible Officer," when used with respect to the Trustee, means any officer within the Corporate Trust Administration of the Trustee (or any successor group of the Trustee) or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer or employee to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" has the meaning set forth in Section 4.07 hereof.

"Restricted Subsidiary" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.  Unless otherwise specified, a "Restricted Subsidiary" shall be deemed to be a Restricted Subsidiary of the Company.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"Sale and Lease-Back Transaction" means any arrangement with any Person providing for the leasing by the Company or a Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person in contemplation of such leasing.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Security Agreement" means the security agreement, dated as of the Initial Issuance Date, among the Company, the other parties thereto from time to time, and the Collateral Agent, as such agreement may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time.

"Significant Subsidiary" means any Subsidiary that would constitute a "significant subsidiary" within the meaning of Article 1 of Regulation S-X of the Securities Act, as in effect on the Initial Issuance Date.

"Specified Holder"  means (i) any Permitted Holder, and (ii) any future holder of Notes that may be considered an Affiliate of the Company but is approved to be a "Specified Holder" by the Board of Directors.

"Stated Maturity" means, with respect to any installment of interest or principal on any Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof. The Stated Maturity of any intercompany Indebtedness payable upon demand shall be the date of demand of payment under such Indebtedness.

"Subordinated Indebtedness" means, with respect to the Notes, (1) any Indebtedness of the Company which is by its terms subordinated in right of payment to the Notes, and (2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"Subsidiary" means, with respect to any specified Person (i) any corporation, association, limited liability company or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof) and (ii) any partnership (A) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (B) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"Surviving Entity" has the meaning set forth in Section 5.01 hereof.

"Suspended Covenants" has the meaning set forth in [Section 4.27(a)] hereof.

"Suspension Date" has the meaning set forth in [Section 4.27(a)] hereof.

"Suspension Period" has the meaning set forth in [Section 4.27(b)] hereof.

["Tenderable Indebtedness" has the meaning set forth in [Section 4.09] hereof.]

["Term Loan Credit Facility" means the term loan credit facility provided under the [Senior Secured Term Loan Credit Agreement dated as of the Initial Issuance Date] by and

20

NY 73758471v5

among [A&P, the co-borrowers party thereto, the Company and the other guarantors party thereto, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent], including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any one or more indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that extend, replace, refund, refinance, renew or defease any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount that may be borrowed thereunder or alters the maturity of the loans thereunder or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or other agent, lender or group of lenders or investors.]

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C.ss.ss.77aaa-77bbbb) as in effect on the date on which this Indenture is qualified under the TIA.

"Total Assets" means, with respect to any Person, the total amount of all assets of such Person and its Subsidiaries, determined on a consolidated basis in accordance with GAAP as shown on the most recent balance sheet of such Person.

"Trustee" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note substantially in the form of Exhibit A attached hereto that bears the Global Note Legend and that has the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing a series of Notes that do not bear the Private Placement Legend.

"Unrestricted Subsidiary" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a Board Resolution in compliance with Section 4.16, and any Subsidiary of such Subsidiary.

"U.S. Person" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock, as the case may be, at any date, the quotient obtained by dividing (i) the sum of the products of the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock (excluding any

21

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

payment of interest or dividends thereon) multiplied by the amount of such payment, by (ii) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or Investments by foreign nationals mandated by applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person.

Section 1.02.    Incorporation by Reference of Trust Indenture Act.

The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes and the Note Guarantees;

"indenture security Holder" means a Holder of a Note;

"indenture to be Qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee;

"obligor" on the Notes means the Company and any successor obligor upon the Notes or any Guarantor.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule under the TIA have the meanings so assigned to them.

Section 1.03.    Rules of Construction.

Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    words in the singular include the plural, and in the plural include the singular;

(d)    provisions apply to successive events and transactions;

(e)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement of successor sections or rules adopted by the Commission from time to time; and

(f)    references to "property and assets" or "property" or "assets" means any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

22

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 1.04.    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer. Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01 hereof) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.04.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)    The ownership of Notes shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(e)    The Issuer may, in the circumstances permitted by the Trust Indenture Act, set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

(f)    Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this Section 1.05(f) shall have the same effect as if given or taken by separate Holders of each such different part.

23

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(g)    Without limiting the generality of the foregoing, a Holder, including DTC, that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and any Person that is the Holder of a Global Note, including DTC, may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

(h)    The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders. If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

## ARTICLE II.

## THE NOTES

Section 2.01.    <u>Form and Dating.</u>

(a)    <u>General</u>.  The Notes and the certificate of authentication of the Trustee thereon shall be substantially in the form included in <u>Exhibit A</u> hereto, which is incorporated in and expressly made a part of this Indenture.  The notations of the Note Guarantees shall be substantially in the form of <u>Exhibit E</u> hereto, the terms of which are incorporated in and made part of this Indenture.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.  The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage.  Each Note shall be dated the date of its authentication.  The Notes shall be in minimum denominations of $1,000 and integral multiples of $1,000 in excess thereof, except that PIK Notes which are Definitive Notes may be issued in $1.00 increments.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

The aggregate principal amount of the Notes which may be authenticated and delivered under this Indenture is [$210,000,000] in principal amount of Notes (the "<u>Initial Notes</u>") plus any PIK Notes and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to the terms of this Indenture.

<div align="center">24</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b)      Global Notes.  Notes issued in global form shall be substantially in the form of Exhibit A attached hereto bearing the Global Note Legend and with the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.  Notes issued in certificated form shall be substantially in the form of Exhibit A attached hereto but without the Global Note Legend and without the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.  Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate amount of outstanding Notes from time to time endorsed thereon and that the aggregate amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions, transfers of Notes and payments of PIK Interest.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Note Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(c)      PIK Notes.  In connection with the payment of PIK Interest in respect of the Notes, the Company is entitled, without the consent of the Holders, to increase the outstanding principal amount of the Notes or issue additional Notes (the "PIK Notes") under this Indenture on the same terms and conditions as the Notes issued on the Initial Issuance Date (other than the issuance dates and the date from which interest will accrue).  The Initial Notes and any PIK Notes, subsequently issued under this Indenture shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase, except as provided in Article IX hereof. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture shall include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment, and references to "principal amount" of the Notes include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment.

(d)      Euroclear and Clearstream Procedures Applicable.  The provisions of Euroclear and Clearstream shall be applicable to transfers of beneficial interests in Global Notes that are held by Participants through Euroclear or Clearstream.

Section 2.02.      Execution and Authentication.

Two Officers shall sign the Notes for the Company by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee.  The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

On the Initial Issuance Date, the Trustee shall, upon receipt of a written order of the Company signed by two Officers ("Authentication Order"), authenticate the Initial Notes in an aggregate principal amount of [$210,000,000].  In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any PIK Notes for an aggregate principal amount specified in such Authentication Order for such PIK Notes issued hereunder.  The Trustee shall authenticate and deliver any PIK Notes (or increases in the

25

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

principal amount of any Global Notes) as a result of a payment of PIK Interest, for an aggregate principal amount specified in such Authentication Order for such PIK Notes (or increases in the principal amount of any Global Notes) issued or increased hereunder, for original issue upon receipt of an Authentication Order.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

Section 2.03.     <u>Registrar and Paying Agent.</u>

The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("<u>Registrar</u>") and an office or agency where Notes may be presented for payment ("<u>Paying Agent</u>"). The Registrar shall keep a register of the Notes (the "<u>Notes Register</u>") and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

[The Company initially appoints The Depository Trust Company ("<u>DTC</u>") to act as Depositary with respect to the Global Notes.]

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Note Custodian with respect to the Global Notes.

Section 2.04.     <u>Paying Agent to Hold Money in Trust.</u>

The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or interest on the Notes, and will notify the Trustee of any default by the Company or any Guarantor in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) shall have no further liability for the money received from the Company or a Subsidiary. If the Company or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company or a Guarantor, the Trustee shall serve as Paying Agent for the Notes.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 2.05.    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders.  If the Trustee is not the Registrar, the Company shall, or shall cause the Registrar to, furnish to the Trustee at least seven Business Days before each interest payment date, and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes.

Section 2.06.    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes. A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. Global Notes will not be exchanged by the Company for Definitive Notes unless (i) the Depositary (A) notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes and the Company fails to appoint a successor depositary within ninety (90) days of delivery of such notice or (B) has ceased to be a clearing agency registered under the Exchange Act, and the Company fails to appoint a successor depositary within ninety (90) days of delivery of such notice or (ii) there shall have occurred and be continuing a Default or Event of Default with respect to the Notes. Beneficial interests in a Global Note may also be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of the Depositary in accordance with this Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)    Transfer and Exchange of Beneficial Interests in the Global Notes. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who

27

NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS

take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)     All Other Transfers and Exchanges of Beneficial Interests in Global Notes. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) above, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(iii)     Transfer of Beneficial Interests to Another Restricted Global Note. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) above and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)     if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C)     if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications and certificates and opinion of counsel required by item (3) thereof, if applicable.

(iv)     Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in the Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest

28

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) above and the Registrar receives the following:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(B)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(v)    Through and including the 40th day after the Initial Issuance Date, beneficial interests in the Regulation S Global Note may be held only through Euroclear or Clearstream, unless transferred to a person that takes delivery through a Rule 144A Global Note.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)    Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)    Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a

29

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable;

(F) if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount.

Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii) Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes. A holder of a beneficial interest in a Restricted Global Note may exchange such

30

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Definitive Note that does not bear the Private Placement Legend, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(B)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a Definitive Note that does not bear the Private Placement Legend, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iii) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iii) shall not bear the Private Placement Legend.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests in a Global Note.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

31

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(A)     if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)     if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)     if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)     if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable;

(F)     if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof;

(G)     if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof;

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, in the case of clause (C) above, the Regulation S Global Note, and in all other cases, the IAI Global Note.

(ii)     Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

32

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(A)   if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(c) thereof; or

(B)   if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this <u>Section 2.06(d)(ii)</u>, the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)   <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with <u>Section 2.02</u> hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)   <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this <u>Section 2.06(e)</u>, the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this <u>Section 2.06(e)</u>.

33

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(i)    <u>Restricted Definitive Notes to Restricted Definitive Notes</u>. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof; and

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable.

(ii)    <u>Restricted Definitive Notes to Unrestricted Definitive Notes</u>. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A)    if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(d) thereof; or

(B)    if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof; and, in each such case set forth in this subparagraph (D), if the Registrar so requests, an opinion of counsel in form reasonably acceptable to the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u>. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)    <u>Legends</u>. The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

34

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(i)        Intercreditor Agreement. Each Global Note and each Definitive Note (and all Notes issued in exchange therefore or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN INTERCREDITOR AGREEMENT DATED AS OF [●], 2012, AMONG [INTERCREDITOR PARTIES], THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. AND THE SUBSIDIARIES OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. PARTY THERETO (THE "INTERCREDITOR AGREEMENT"), AND EACH HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT."

(ii)       Tax Legend.

(A)       Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED. THE ISSUE PRICE OF THIS NOTE WAS 95.0% OF ITS PRINCIPAL AMOUNT; THE TOTAL AMOUNT OF ORIGINAL ISSUE DISCOUNT IS $[●] PER NOTE WITH A PRINCIPAL AMOUNT OF $1,000; THE ISSUE DATE IS [●]; AND THE YIELD TO MATURITY IS [●%]."

(iii)      Private Placement Legend.

(A)       Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF [*NEW DELAWARE HOLDING COMPANY*] (THE "COMPANY") THAT (A) SUCH

35

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY IF THE COMPANY SO REQUESTS), (2) TO THE COMPANY OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY."

(B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(ii), (c)(iii), (d) (ii), (d)(iii), (e)(ii), (e)(iii) or (f) to this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(iv)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

"UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN CERTIFICATED FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED

36

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(g) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY."

(g)    *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)    General Provisions Relating to Transfers and Exchanges.

(i)    To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon the Company's order or at the Registrar's request.

(ii)    No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.07, 3.08, 4.09, 4.14 and 9.05 hereof).

37

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(iii)    The Registrar shall not be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    The Company shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(vi)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(vii)    The Trustee shall authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(viii)    All certifications, certificates and opinions of counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(ix)    The Trustee shall have no obligation or duty to monitor, determine of inquire as to compliance with any restrictions on transfer that may be imposed under this Indenture with respect to the Notes or under applicable law, other than to require delivery of such certificates, documentation or other evidence as are expressly required by, and to do so if and when expressly required by, this Indenture. The Trustee shall have no responsibility for any actions taken or not taken by the Depositary.

Section 2.07.    Replacement Notes.

If any mutilated Note is surrendered to the Trustee, or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon the written order of the Company signed by two Officers of the Company, shall authenticate a replacement Note if the Trustee's requirements are met.  If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a

38

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Note is replaced.  The Company and the Trustee each may charge for their respective expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

The provisions of this Section 2.07 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.08.    Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, such Note ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, the Note ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09.    Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company, any Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company (other than a Specified Holder), shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Trustee knows are so owned shall be so disregarded.

Section 2.10.    Temporary Notes.

Until definitive Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes upon a written order of the Company signed by two Officers of the Company.  Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes and as shall be

39

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

reasonably acceptable to the Trustee.  Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

Section 2.11.    Cancellation.

The Company at any time may deliver Notes to the Trustee for cancellation.  The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee (and no one else) shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall destroy cancelled Notes (subject to the record retention requirement of the Exchange Act).  Certification of the destruction of all cancelled Notes shall be delivered to the Company.  The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12.    Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof, and such defaulted interest shall cease to be payable to the Persons who were Holders on the relevant regular record date.  The Company shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Company shall fix or cause to be fixed each such special record date and payment date; provided, that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest.  At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) shall mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

## ARTICLE III.

## REDEMPTION AND PREPAYMENT

Section 3.01.    Notices to Trustee.

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, the Company shall furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth (i) the clause of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price.

Section 3.02.    Selection of Notes to Be Redeemed.

If less than all of the Notes are to be redeemed at any time, the Trustee shall select the Notes for redemption as follows:

40

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(1)     if applicable, in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed; or

(2)     if the Notes are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

The Trustee shall promptly notify the Company in writing of the Notes selected for redemption.  No Notes of $1,000 or less shall be redeemed in part.  Notices of redemption shall be electronically delivered or mailed by first class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address. Notices of redemption may not be conditional.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note shall state the portion of the principal amount thereof to be redeemed.  A new Note in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the Holder thereof upon cancellation of the original Note.  Notes called for redemption will become due on the date fixed for redemption.  On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption as long as the Company has deposited with the Paying Agent funds in satisfaction of the applicable redemption price.

Section 3.03.     Notice of Redemption.

At least 30 days but not more than 60 days before a redemption date, the Company shall electronically deliver or cause to be electronically delivered or mail or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address.

The notice shall identify the Notes to be redeemed and shall state:

(a)     the redemption date;

(b)     the redemption price;

(c)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion shall be issued upon cancellation of the original Note;

(d)     the name and address of the Paying Agent;

(e)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)     that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)     the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(h)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee shall give the notice of redemption in the Company's name and at its expense; provided, however, that the Company shall have delivered to the Trustee, at least 45 days prior to the redemption date (unless a shorter period shall be satisfactory to the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04.    Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.  A notice of redemption may not be conditional.

Section 3.05.    Deposit of Redemption Price.

On or prior to the redemption date, the Company shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest on all Notes to be redeemed on that date.  The Trustee or the Paying Agent shall promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption price of, and accrued interest on, all Notes to be redeemed.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption.  If a Note is redeemed on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date.  If any Note called for redemption shall not be so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06.    Notes Redeemed in Part.

Upon surrender of a Note that is redeemed in part, the Company shall issue and, upon the Company's written request, the Trustee shall authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

Section 3.07.    Optional Redemption.

(a)    At any time, or from time to time, prior to [the second anniversary of the Initial Issuance Date], the Company may redeem up to [35]% of the aggregate principal amount of Notes issued under this Indenture (including any PIK Notes), minus the aggregate principal

42

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

amount of Notes previously redeemed pursuant to this <u>Section 3.07(a)</u>, at a redemption price of [110]% of the principal amount thereof, plus accrued and unpaid interest, if any, thereon to the redemption date, with the net cash proceeds of one or more Equity Offerings; <u>provided</u> that:

(i)      at least [50]% of the aggregate principal amount of Notes issued under this Indenture (including any PIK Notes) remains outstanding immediately after the occurrence of such redemption (excluding Notes held by the Company or its Affiliates); and

(ii)      the redemption must occur within [60] days of the date of the closing of such Equity Offering.

(b)      Prior to [the second anniversary of the Initial Issuance Date], the Company may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice electronically delivered or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Make-Whole Amount as of, and accrued and unpaid interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(c)      On or after [the second anniversary of the Initial Issuance Date], the Company may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest, if any, thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on [●] of the years indicated below:

| YEAR | PERCENTAGE |
| --- | --- |
| 2014 | 105.0 % |
| 2015 | 102.5 % |
| 2016 and thereafter | 100.0 % |

(d)      Any redemption pursuant to this <u>Section 3.07</u> shall be made in accordance with the provisions of <u>Sections 3.01</u> through <u>3.06</u>.

(e)      Notwithstanding anything contained in this <u>Section 3.07</u> to the contrary, the provisions of this <u>Section 3.07</u> shall not apply to any open market, privately negotiated or other purchases of the Notes by the Company or any of its Subsidiaries from time to time and such purchases shall not be deemed a redemption of Notes subject to the provisions of this <u>Article III</u>.

Section 3.08.      <u>Mandatory Redemption.</u>

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE IV.

## COVENANTS

Section 4.01.    Payment of Notes.

The Company shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 11:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

An installment of PIK Interest shall be considered paid on the due date if on such date (1) if PIK Notes (including PIK Notes that are Global Notes) have been issued therefor, such PIK Notes have been authenticated in accordance with the terms of this Indenture and (2) if the payment is made by increasing the principal amount of Global Notes then authenticated, the Trustee has increased the principal amount of Global Notes then authenticated by the required amount.

With respect to interest on the Notes for a semi-annual period due on an Interest Payment Date, the Company may elect, at its option, to pay interest due on the Notes on such Interest Payment Date (i) entirely in cash at the rate of 10% per annum ("Cash Interest Payment"), (ii) entirely to in PIK Interest at the rate of 12.50% per annum ("PIK Interest Payment"), or (iii) 50% as a Cash Interest Payment and 50% as a PIK Interest Payment ("Partial PIK Payment").  In order to elect to pay cash interest on any Interest Payment Date, the Company must deliver a notice of its election to the Trustee no later than 15 days prior to any Interest Payment Date (the "Cash Election Deadline") specifying that it is electing a Cash Interest Payment or Partial PIK Payment (and if the Company does not deliver such notice on or prior to the Cash Election Deadline, then a PIK Interest Payment shall be made on such Interest Payment Date).

No later than five (5) Business Days prior to any Interest Payment Date on which the Company is paying PIK Interest, the Company shall deliver to the Trustee and the Paying Agent (if other than the Trustee), (i) with respect to Notes represented by Definitive Notes, the required amount of new PIK Notes (rounded up to the nearest whole dollar) and an Authentication Order to authenticate and deliver such PIK Notes or (ii) with respect to Notes represented by one or more Global Notes, an Authentication Order to increase the outstanding principal amount of such Global Note by the required amount (rounded up to the nearest whole dollar) (or, if necessary, pursuant to the requirements of the Depositary or otherwise, the required amount of new Notes represented by Global Notes (rounded up to the nearest whole dollar) and an Authentication Order to authenticate and deliver such new Global Notes).

The Company shall pay interest (including without limitation any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in such proceeding) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful.  The Company shall pay interest (including without

44

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

limitation any interest in any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in such proceeding) on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02.      Maintenance of Office or Agency.

The Company shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar, or Paying Agent) where Notes may be surrendered for registration of transfer, exchange, purchase or redemption and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company also from time to time may designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and from time to time may rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency for such purposes.  The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.03.

Section 4.03.      Investment Company Act.

The Company shall not, and shall not permit any of its Subsidiaries to, become an investment company subject to registration under the Investment Company Act of 1940, as amended.

Section 4.04.      Compliance Certificate.

(a)      The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year, a certificate signed by the Company's principal executive officer, principal financial officer or principal accounting officer stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing officer with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture and further stating, as to the officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has

45

NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS

occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)      So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants or the Public Company Accounting Oversight Board, the year-end financial statements delivered pursuant to Section 4.19 shall be accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article IV or Article V hereof insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)      The Company shall, so long as any of the Notes are outstanding, deliver to the Trustee, forthwith upon the Company or any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.05.      Taxes.

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies, except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06.      Stay, Extension and Usury Laws.

The Company and each Guarantor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power granted herein (or in any Collateral Document) to the Trustee or the Collateral Agent, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07.      Restricted Payments.

[TO COME]

Section 4.08.      Incurrence of Indebtedness.

[TO COME]

46

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.09.    Asset Sales.

[TO COME]

Section 4.10.    Liens.

[TO COME]

Section 4.11.    Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

[TO COME]

Section 4.12.    Events of Loss.

[TO COME]

Section 4.13.    Corporate Existence.

Subject to Article V hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect (a) its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary and (b) the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided, however, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors of the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.14.    Offer to Repurchase upon Change of Control.

[TO COME]

Section 4.15.    Transactions with Affiliates.

[TO COME]

Section 4.16.    Designation of Restricted and Unrestricted Subsidiaries.

[TO COME]

Section 4.17.    Guarantees.

[TO COME]

Section 4.18.    Business Activities.

[TO COME]

47

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.19.        Financial Reporting and Delivery of Certain Information.

(a)        Holders will be entitled to receive (subject to such Holder's agreement to the terms of a confidentiality agreement acceptable to the Company): (1) within 120 days after the end of each fiscal year, audited consolidated financial statements of the Company for such fiscal year and the prior fiscal year, certified by a national accounting firm and prepared in accordance with GAAP; and (2) within 60 days after the end of each of the first three fiscal quarters, unaudited condensed consolidated financial statements of the Company for such quarter and the year-to-date period and the comparable quarter and year-to-date periods of the prior fiscal year, certified by the Company's chief financial officer and prepared in accordance with GAAP.

(b)        The Company shall be deemed to have furnished to the Holders the reports referred to in Section 4.19(a) if the Company has posted such reports on the Company Website. For purposes of this Section 4.19, the term "Company Website" means the collection of web pages that may be accessed on the World Wide Web using the URL address http://www.aptea.com or such other address as the Company may from time to time designate in writing to the Trustee.

(c)        If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries (other than Unrestricted Subsidiaries that, when taken together with all other Unrestricted Subsidiaries, are "minor" within the meaning of Rule 3-10 of Regulation S-X, substituting 5% for 3% where applicable), then the quarterly and annual financial information required by this Section 4.19 shall include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(d)        The Company and the Guarantors have agreed that, for so long as any Notes remain outstanding, they will furnish to the Holders, beneficial owners of Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(e)        In no event shall the Company be required to include separate financial statements or consolidating footnote information for any Guarantors or non-guarantor Subsidiaries.

Section 4.20.        Impairment of Security Interest.

Subject to the rights of the holders of Permitted Liens, the Company and the Guarantors shall not take or omit to take any action, which action or omission would impair or could reasonably be expected to have the result of impairing, the security interest or Lien with respect to the Collateral for the benefit of the Trustee and the Holders of the Notes, except to the extent otherwise permitted by Article IX and Article XI of this Indenture or by the Collateral Documents, including the Intercreditor Agreement.

Section 4.21.        After-Acquired Property.

(a)        [Promptly following the acquisition by the Company or any Guarantor of any After-Acquired Property, the Company or such Guarantor shall execute and deliver such

48

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

mortgages, deeds of trust, security instruments, financing statements and certificates, title insurance and Opinions of Counsel as shall be reasonably necessary to vest in the Trustee or the Collateral Agent a perfected security interest, mortgage or other Lien in such After-Acquired Property that is of second (subject only (x) if and to the extent of the Liens of first priority required by the Intercreditor Agreement and (y) other Permitted Liens) priority and to have such After-Acquired Property added to the Collateral including, but not limited to, those items set forth in Section 4.24 hereof, *mutatis mutandis*, and, to the extent commercially reasonable, the Leasing Deliverables, where applicable, in each case, in respect of such After-Acquired Property and thereupon all provisions of this Indenture and the Collateral Documents relating to the Collateral shall be deemed to relate to such After-Acquired Property to the same extent and with the same force and effect.]

(b)      [Notwithstanding Section 4.21(a), if granting or perfecting any Lien to secure the Note Obligations on any Collateral that consists of rights that are licensed or leased from a third-party requires the consent of such third party pursuant to the terms of an applicable license or lease agreement, and such terms are enforceable under applicable law, the Company or the Guarantors, as the case may be, will use all commercially reasonable efforts to obtain such consent with respect to the granting or perfecting of such Lien, but if the third party does not consent to the granting or perfecting of such Lien after the use of commercially reasonable efforts, none of the Company or the Guarantors will be required to do so.]

Section 4.22.      Creation and Perfection of Liens Securing Collateral; Further Assurances.

(a)      On or prior to the Initial Issuance Date, the Company and the Guarantors shall have granted, created and perfected the security interests, mortgages and other Liens created or intended to be created in the Collateral Documents in the Collateral in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes; provided, that to the extent any such security interest, mortgage or other Lien was not perfected by the Initial Issuance Date, the Company and the Guarantors shall use commercially reasonable efforts to have all security interests, mortgages and other Liens granted, created and perfected, to the extent required by the Collateral Documents, as promptly as practicable following the Initial Issuance Date.

(b)      The Company and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Trustee or the Collateral Agent may reasonably request, in order to grant, create, preserve, enforce, protect and perfect the validity and priority of the security interests, mortgages and other Liens created or intended to be created by this Indenture or the Collateral Documents in the Collateral.

(c)      In addition, from time to time, the Company and the Guarantors shall reasonably promptly secure the Note Obligations by pledging or creating, or causing to be pledged or created, perfected security interests, mortgages and other Liens with respect to the Collateral. Such security interests, mortgages and Liens shall be created under the Collateral Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Trustee or the Collateral Agent.

49

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(d)    The Company and each of the Guarantors shall do or cause to be done all acts and things that may be required, or that the Trustee or the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the Trustee and the Holders of the Notes, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Initial Issuance Date), in each case, as contemplated by, and with the lien priority required under, this Indenture and the Collateral Documents; <u>provided</u> that the Company and the Guarantors shall not be required to provide, and the Collateral Agent shall not request, any additional Liens in respect of any Excluded Assets.

(e)    Upon request of the Trustee or the Collateral Agent at any time after an Event of Default has occurred and is continuing, the Company and the Guarantors shall, and shall cause the Restricted Subsidiaries to, (i) permit the Trustee or the Collateral Agent or any advisor, auditor, consultant, attorney or representative acting for the Trustee or the Collateral Agent, upon reasonable notice to the Company and during normal business hours, to visit and inspect any of the property of the Company and its Subsidiaries, to review, make extracts from and copy the books and records of the Company and its Subsidiaries relating to any such property, and to discuss any matter pertaining to any such property with the officers and employees of the Company and its Subsidiaries, and (ii) deliver to the Trustee or the Collateral Agent such reports, including valuations, relating to any such property or any Lien thereon as the Trustee or the Collateral Agent may reasonably request.  The Company shall promptly reimburse the Trustee and Collateral Agent for all reasonable costs and expenses incurred by the Trustee or Collateral Agent in connection therewith, including all reasonable fees and charges of any advisors, auditors, consultants, attorneys or representatives acting for the Trustee or for the Collateral Agent.

Section 4.23.    <u>Insurance.</u>

(a)    The Company and the Guarantors shall:

(i)    keep their properties adequately insured at all times by financially sound and reputable insurers;

(ii)    maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by them;

(iii)    maintain such other insurance as may be required by law; and

(iv)    maintain such other insurance as may be required by the Collateral Documents.

(b)    The Collateral Agent shall be named as an additional insured and loss payee as its interests may appear, and the Company and the Guarantors shall within sixty (60) calendar days

NY 73758471v5

following the end of each six month period ending on March 31 or September 30 of any year, furnish to the Collateral Agent copies of certificates of insurance and copies of insurance policies (or endorsements thereof) showing compliance with this sentence. Upon the request of the Trustee or the Collateral Agent, the Company and the Guarantors shall furnish to the Collateral Agent full information as to their property and liability insurance carriers.

Section 4.24.      Real Estate.

[TO COME]

Section 4.25.      Sale and Lease-Back Transactions.

[TO COME]

Section 4.26.      Incurrence of Senior Subordinated Debt.

[TO COME]

Section 4.27.      Suspension of Certain Covenants.

[TO COME]

### ARTICLE V.
### SUCCESSORS

Section 5.01.      Merger, Consolidation or Sale of Assets.

The Company shall not: (i) consolidate or merge with or into another Person (whether or not the Company is the surviving corporation) or (2) sell, assign, transfer, convey, lease or otherwise dispose of all or substantially all of the properties and assets of the Company, in one or more related transactions, to another Person, unless at the time and after giving effect thereto:

(1)      either: (a) the Company is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition will have been made (the "Surviving Entity") (i) is a corporation organized or existing under the laws of the United States, any state thereof or the District of Columbia and (ii) assumes all the obligations of the Company under the Notes, this Indenture and the Collateral Documents;

(2)      immediately after giving effect to such transaction on a *pro forma* basis (and treating any Indebtedness not previously an obligation of the Company or any of its Restricted Subsidiaries which becomes the obligation of the Company or any of its Restricted Subsidiaries as a result of such transaction as having been incurred at the time of such transaction), no Default or Event of Default exists;

51

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(3)      immediately after giving *pro forma* effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period, the Company or the Surviving Entity (if other than the Company) would, on the date of such transaction, be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section [4.08(a)];

(4)      each Guarantor, unless such Guarantor is the Person with which the Company has entered into a transaction under this Section 5.01, will have by amendment to its Note Guarantee confirmed that its Note Guarantee will apply to the obligations of the Company or the Surviving Entity in accordance with the Notes and this Indenture;

(5)      the Company delivers to the Trustee an Officers' Certificate stating that such transaction and such agreement comply with this Section 5.01 and that all conditions precedent provided for herein relating to such transaction have been complied with;

(6)      the Collateral transferred to the Surviving Entity will (a) continue to constitute Collateral under this Indenture and the Collateral Documents, (b) be subject to the Lien in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes, and (c) not be subject to any Lien, other than Permitted Liens; and

(7)      to the extent that the assets of the Person which is merged or consolidated with or into the Surviving Entity are assets of the type which would constitute Collateral under the Collateral Documents, the Surviving Entity will take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the Collateral Documents in the manner and to the extent required in this Indenture and the Collateral Documents.

Clauses (2), (3) and (5) of this Section 5.01 will not apply to any merger, consolidation or sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and any of its Wholly Owned Restricted Subsidiaries.

Section 5.02.      Successor Corporation Substituted.

Upon any consolidation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the assets of the Company or the Company and its Restricted Subsidiaries taken as a whole, in accordance with Section 5.01 hereof, the Surviving Entity will succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the Surviving Entity and not to the Company), and may exercise every right and power of, the Company under this Indenture with the same effect as if such Surviving Entity had been named as the Company herein.  In any such event (other than any transfer by way of lease), the predecessor Company shall be released and discharged from all liabilities and obligations in respect of the Notes and this Indenture and the predecessor Company may be dissolved, wound up or liquidated at any time thereafter.

52

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE VI.

## DEFAULTS AND REMEDIES

Section 6.01.    Events of Default.

Each of the following shall constitute an "Event of Default":

(a)    default for 30 days in the payment when due of interest on the Notes;

(b)    default in payment when due (whether at maturity, upon acceleration, redemption or otherwise) of the principal of, or premium, if any, on the Notes;

(c)    failure by the Company or any of its Restricted Subsidiaries to comply with (i) the provisions described in [Section 4.09], [Section 4.12] or [Section 4.14], for a period of more than 30 days, or (ii) the provisions described under Article V;

(d)    failure by the Company or any of its Restricted Subsidiaries for [45 days] after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes outstanding to comply with any of the other agreements in this Indenture;

(e)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries whether such Indebtedness or Guarantee now exists, or is created after the Initial Issuance Date, if that default (A) is caused by a failure to make any payment when due at the Stated Maturity of such Indebtedness (a "Payment Default") or (B) results in the acceleration of such Indebtedness prior to its Stated Maturity, and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $[•] million or more;

(f)    failure by the Company or any of its Restricted Subsidiaries to pay final judgments (to the extent such judgments are not paid or covered by insurance provided by a carrier that has not denied coverage in writing) aggregating in excess of $[•] million, to the extent such judgments are not discharged or stayed for a period of more than 60 days after such judgments have become final and non-appealable;

(g)    except as permitted by this Indenture, any Note Guarantee of a Guarantor that is a Significant Subsidiary, or the Note Guarantees of any group of Guarantors that, taken together, would constitute a Significant Subsidiary, shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of any Guarantor, shall deny or disaffirm its obligations under its Note Guarantee;

(h)    the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary):

(i)    commences a voluntary case,

53

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(ii) consents to the entry of an order for relief against it in an involuntary case,

(iii) consents to the appointment of a Custodian of it or for all or substantially all of its property,

(iv) makes a general assignment for the benefit of its creditors, or

(v) generally is not paying its debts as they become due;

(i) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary) in an involuntary case;

(ii) appoints a Custodian of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary) or for all or substantially all of the property of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary); or

(iii) orders the liquidation of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary);

and the order or decree remains unstayed and in effect for 60 consecutive days; or

(j) (i) there shall be a default in the performance, or breach, of any covenant or agreement of the Company or any Guarantor, which materially adversely affects the Lien on or the value of the Collateral taken as a whole, under any Collateral Document and such default or breach shall continue for a period of 30 days after written notice has been given, by certified mail, (A) to the Company by the Trustee or (B) to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the then outstanding Notes, (ii) any Collateral Document shall for any reason cease to be in full force and effect and enforceable in accordance with its terms with respect to a Lien on Collateral with a Fair Market Value of more than $[●] million, if not remedied within 30 days after written notice has been given, by certified mail, (A) to the Company by the Trustee or (B) to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the then outstanding Notes except to the extent contemplated by this Indenture and any such Collateral Document or due to any act or omission of the Trustee or Credit Facility Collateral Agent, or (iii) the Company or any Guarantor denies, repudiates or disaffirms in writing any material obligation under any Collateral Document.

Section 6.02.    <u>Acceleration.</u>

If any Event of Default (other than an Event of Default specified in clause [(h)] or [(i)] of <u>Section 6.01</u> hereof with respect to the Company) occurs and is continuing, the Trustee may (and if so directed in writing by Holders of at least [25]% in aggregate principal amount of the then

<div align="center">54</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

outstanding Notes, the Trustee shall) declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default(s).  Upon any such declaration, the Notes shall become due and payable in cash on the [second (2nd)] Business Day following delivery of such notice in writing.  Notwithstanding the foregoing, if an Event of Default specified in clause [(h)] or [(i)] of Section 6.01 hereof occurs with respect to the Company, all outstanding Notes shall become due and payable immediately without further action, notice or declaration on the part of the Trustee or any Holder.

After a declaration of acceleration, but before any exercise of remedies by the Trustee, the holders of [a majority] in aggregate principal amount of Notes outstanding, by written notice to the Company and the Trustee, may rescind and annul such declaration and its consequences if (a) the Company has paid or deposited with the Trustee a sum sufficient to pay (1) all sums paid or advanced by the Trustee under this Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, (2) all overdue interest on all Notes then outstanding, (3) the principal of, and premium, if any, on any Notes then outstanding which have become due otherwise than by such declaration of acceleration and interest thereon at the rate borne by the Notes and (4) to the extent that payment of such interest is lawful, interest upon overdue interest at the rate borne by the Notes, (b) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (c) all Events of Default, other than the non-payment of principal of, premium, if any, and interest on the Notes which have become due solely by such declaration of acceleration, have been cured or waived as provided in this Indenture.  No such rescission shall affect any subsequent default or impair any right consequent thereon.

Section 6.03.      Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or any Collateral Document.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee, the Collateral Agent or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04.      Waiver of Past Defaults.

Subject to Section 6.07 and 9.02 hereof, the Holders of [a majority] in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences under this Indenture or the Collateral Documents except a continuing Default or Event of Default in the payment of interest on, or the principal of, the Notes (including in connection with an offer to purchase); provided, however, that the Holders of [a majority] in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.05.    Control by [Majority].

Holders of [a majority] in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it; provided, however, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders of Notes not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders of Notes.

Section 6.06.    Limitation on Suits.

Subject to Section 6.07 hereof, Holders of the Notes may not enforce this Indenture or the Notes except as provided herein.  A Holder of a Note may not pursue any remedy with respect to this Indenture or the Notes unless:

(a)    the Holder of a Note gives to the Trustee written notice of a continuing Event of Default;

(b)    the Holders of at least [●]% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)    such Holder of a Note or Holders of Notes offer the Trustee indemnity satisfactory to the Trustee against any costs, liability or expense;

(d)    the Trustee does not comply with the request within sixty (60) days after receipt of the request and the offer of indemnity; and

(e)    during such sixty (60) -day period, the Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07.    Rights of Holders of Notes to Receive Payment.

Notwithstanding any other provision of this Indenture (including Section 6.06) or any Collateral Document, the right of any Holder of a Note to receive payment of principal of, and premium, if any, or interest on, such Note or to bring suit for the enforcement of any such payment, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), shall be absolute and unconditional and shall not be impaired or affected without the consent of such Holder, except to the extent that the institution or prosecution thereof

56

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

or the entry of judgment thereon would, under applicable law, result in the surrender, impairment, waiver or loss of any Lien of a Collateral Document upon any property subject to such Lien.

Section 6.08.      Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company or any Guarantor for the whole amount of principal of, premium, if any, and interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09.      Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.      Priorities.

If the Trustee collects any money pursuant to this Article VI, it shall pay out the money in the following order:

FIRST: to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

57

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SECOND: to Holders of Notes for amounts due and unpaid on the Notes for principal of, premium, if any, and interest on, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal of, premium, and interest on, respectively; and

THIRD: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11.    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

Section 6.12.    Restoration of Rights and Remedies.

If the Trustee or any Holder of Notes has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case the Company, the Trustee and the Holders shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.13.    Rights and Remedies Cumulative.

Except as otherwise provided in Section 2.07 hereof, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.14.    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

by this Article VI or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

## ARTICLE VII.

## TRUSTEE

Section 7.01.      Duties of Trustee.

(a)      If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(b)      Except during the continuance of an Event of Default:

(i)      the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.

However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)      The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)      this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)      Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01. No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holder, unless such Holder shall have

59

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(e)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)     The Trustee shall not be deemed to have knowledge of any Default or Event of Default unless (i) the Trustee or a Responsible Officer shall have actual knowledge of a Default or an Event of Default, (ii) the Trustee or a Responsible Officer shall have received notice of a Default or an Event of Default in accordance with the provisions of this Indenture or (iii) a Default or an Event of Default occurred or is occurring pursuant to Section 4.01 hereof.

Section 7.02.     Rights of Trustee.

(a)     The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  Except as provided in Section 7.01(b), the Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Trustee acts or refrains from acting, the Trustee may require an Officers' Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.  The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture; provided, that the Trustee's conduct does not constitute willful misconduct or negligence.

(d)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company or Guarantor shall be sufficient if signed by an Officer of the Company or such Guarantor.

(e)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order, demand or direction of any of the Holders unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that might be incurred by it in compliance with such request, order, demand or direction.

(f)     Except with respect to Section 4.01, the Trustee shall have no duty to inquire as to the performance of the Company with respect to the covenants contained in Article IV.  In addition, the Trustee shall not be deemed to have knowledge of an Event of Default except (i) any Default or Event of Default occurring pursuant to Sections 4.01, 6.01(a) or 6.01(b) or (ii) any

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Default or Event of Default of which the Trustee shall have received written notification or obtained actual knowledge.

(g)    Delivery of reports, information and documents to the Trustee under Section 4.19 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 7.03.    Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee; provided, however, in the event that the Trustee acquires any conflicting interest, the Trustee must (a) eliminate such conflict within 90 days, (b) if a registration statement with respect to the Notes is effective, apply to the Commission for permission to continue as Trustee or (c) resign as Trustee.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04.    Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05.    Notice of Defaults.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs.  Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06.    Reports by Trustee to Holders of the Notes.

Within 60 days after May 15 of each year commencing with the year 2013, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date:

(a)    that would comply with TIA §313(a) if this Indenture had been qualified under the TIA (but if no event described in TIA §313(a) has occurred within the 12 months preceding the reporting date, no report need be transmitted), and

61

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b)      describing the character and amount of any advances made by it as such since the date of the last report transmitted pursuant to this Section 7.06 (or if no such report has yet been so transmitted, since the Initial Issuance Date), for the reimbursement of which it claims or may claim a lien or charge, prior to that of the Notes, on the trust estate or on property or funds held or collected by it as such trustee, and which it has not previously reported pursuant to this Section 7.06, if such advances remaining unpaid at any time aggregate more than 10 per centum of the principal amount of the Notes outstanding at such time, such report to be so transmitted within 90 days after such time.

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Company and filed with each stock exchange on which the Notes are listed, if any.  The Company shall promptly notify the Trustee when the Notes are listed on any stock exchange.

Section 7.07.      Compensation and Indemnity.

The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Company shall indemnify the Trustee against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.07) and defending itself against any claim (whether asserted by the Company or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith.  The Trustee shall notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations hereunder (except to the extent such failure prejudices the Company).  The Company shall defend the claim and the Trustee shall cooperate in the defense.  The Trustee may have separate counsel, and the Company shall pay the reasonable fees and expenses of one such counsel.  The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

The obligations of the Company under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.

To secure the Company's payment obligations in this Section 7.07, the Trustee shall have a Lien (which Lien shall be a Permitted Lien) prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes.  Such Lien shall survive the satisfaction and discharge of this Indenture.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01[(h)] or [(i)] hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

Section 7.08.     Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company.  The Holders of Notes of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing.  The Company may remove the Trustee if:

(a)      the Trustee fails to comply with Section 7.10 hereof;

(b)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)      a Custodian or public officer takes charge of the Trustee or its property; or

(d)      the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.  Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

If a successor Trustee does not take office within 90 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of Notes of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10, such Holder of a Note may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to Holders of the Notes.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided, all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof.  Notwithstanding replacement

63

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09.    Successor Trustee by Merger, Etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee; provided, that such corporation shall be otherwise qualified and eligible under this Article VII, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Notes shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.  In the event that any Notes shall not have been authenticated by such predecessor Trustee, any such successor Trustee may authenticate and deliver such Notes, in either its own name or that of its predecessor Trustee, with the full force and effect which this Indenture provides for the certificate of authentication of the Trustee.

Section 7.10.    Eligibility; Disqualification.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus (with its affiliates) of at least $50.0 million as set forth in its most recent published annual report of condition.

If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 7.10, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. None of the Company or any of its Affiliates shall serve as Trustee hereunder.  If at any time the Trustee shall cease to be eligible to serve as Trustee hereunder pursuant to the provisions of this Section 7.10, it shall resign immediately in the manner and with the effect specified in this Article VII.

This Indenture shall always have a Trustee who satisfies the requirements of TIA §310(a)(1), (2) and (5).  The Trustee shall be subject to the requirements of TIA §310(b) as if this Indenture had been qualified under the TIA.

Section 7.11.    Preferential Collection of Claims Against Company.

The Trustee shall be subject to the requirements of TIA §311(a) as if this Indenture had been qualified under the TIA, excluding any creditor relationship listed in TIA §311(b).  A Trustee who has resigned or been removed shall still be subject to the requirements of TIA §311(a) to the extent indicated therein.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE VIII.

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01.        Option to Effect Legal Defeasance or Covenant Defeasance.

The Company may, at the option of its Board of Directors evidenced by a resolution set forth in an Officers' Certificate, at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article VIII.

Section 8.02.        Legal Defeasance and Discharge.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations with respect to all outstanding Notes (and the Guarantors shall be deemed to have been discharged from their Note Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture, and all Obligations of the Guarantors with respect to their Note Guarantees shall be discharged (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders of outstanding Notes to receive from the trust fund described in Section 8.04 hereof, and as more fully set forth in such Section, payments in respect of the principal of or interest or premium, if any, on such Notes when such payments are due; (b) the Company's obligations with respect to such Notes under Article II and Section 4.02 hereof; (c) the rights, powers, trusts, duties and immunities of the Trustee hereunder, and the Company's and the Guarantors' obligations in connection therewith; and (d) this Article VIII (and applicable provisions of Article III insofar as the Notes are to be defeased through a redemption date). Subject to compliance with this Article VIII, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03.        Covenant Defeasance.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in [Sections 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.14, 4.15, 4.16, 4.17, 4.18, 4.20, 4.21, 4.22, 4.23, 4.24, 4.25, 4.26, 4.27 and 5.01] hereof with respect to the outstanding Notes on and after the date the conditions set forth below are satisfied (hereinafter, "Covenant Defeasance"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other

65

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenants, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenants or by reason of any reference in any such covenants to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby.  In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03 hereof, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(c) through 6.01[(g)] and 6.01[(j)] hereof shall not constitute Events of Default.  Notwithstanding any Covenant Defeasance hereunder, however, the rights, powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations in connection therewith, shall survive until otherwise terminated or discharged hereunder.

Section 8.04.        Conditions to Legal or Covenant Defeasance.

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the outstanding Notes:

(a)        the Company must irrevocably deposit or cause to be deposited with the Trustee, in trust, for the benefit of the Holders, cash in United States dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, or interest and premium, on the outstanding Notes on the Stated Maturity or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to maturity or to a particular redemption date;

(b)        in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that (i) the Company has received from, or there has been published by, the Internal Revenue Service a ruling or (ii) since the Initial Issuance Date, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders and beneficial owners of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)        in the case of Covenant Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that the Holders and the beneficial owners of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

66

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(d)      no Default or Event of Default shall have occurred and be continuing either (i) on the date of such deposit or (ii) insofar as Sections 6.01[(h)] or 6.01[(i)] hereof are concerned, at any time in the period ending on the 91st day after the date of deposit;

(e)      such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, any material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(f)      the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that (i) assuming no intervening bankruptcy of the Company or any Guarantor between the date of deposit and the 91st day following the deposit and assuming that no Holder is an "insider" of the Company under applicable bankruptcy law, after the 91st day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, including Section 547 of the United States Bankruptcy Code and Section 15 of the New York Debtor and Creditor Law, and (ii) the creation of the defeasance trust does not violate the Investment Company Act of 1940;

(g)      the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others;

(h)      if the Notes are to be redeemed prior to their Stated Maturity, the Company shall deliver to the Trustee irrevocable instructions to redeem all of the Notes on the specified redemption date; and

(i)      the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05.      Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non- callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than

67

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article VIII to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the request of the Company any money or noncallable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06.    Repayment to Company.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest, on any Note and remaining unclaimed for two years after such principal, and premium, if any, or interest has become due and payable shall be paid to the Company on its request (unless any abandoned property law designates that such amounts be paid to another Person) or, if then held by the Company, shall be discharged from such trust; and the Holder of such Note shall thereafter, as a secured creditor, look only to the Company for payments thereof (unless any abandoned property law designates another Person), and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment to the Company, may at the expense of the Company cause to be published once, in *The New York Times* and *The Wall Street Journal* (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

Section 8.07.    Reinstatement.

If the Trustee or Paying Agent is unable to apply any United States dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; provided, however, that, if the Company makes any payment of principal of, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE IX.

## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01.        Without Consent of Holders of Notes.

Notwithstanding Section 9.02 of this Indenture, the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Note Guarantees or any of the Collateral Documents without the consent of any Holder of a Note:

(a)      to cure any ambiguity, defect or inconsistency;

(b)      to provide for uncertificated Notes in addition to or in place of certificated Notes;

(c)      to provide for the assumption of the Company's or any Guarantor's obligations to Holders of Notes in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Guarantor's assets;

(d)      to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not materially adversely affect the legal rights under this Indenture or any Collateral Document of any such Holder;

(e)      to comply with the provisions of Section 4.17;

(f)      to comply with the rules of any applicable securities depositary;

(g)      to evidence and provide for the acceptance of appointment by a successor Trustee;

(h)      to add a Guarantor under this Indenture;

(i)      to mortgage, pledge, hypothecate or grant a security interest in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes as additional security for the payment and performance of the Company's and any Guarantor's obligations under this Indenture, in any property, or assets, including any of which are required to be mortgaged, pledged or hypothecated, or in which a security interest is required to be granted to the Trustee or the Collateral Agent pursuant to this Indenture or otherwise;

(j)      to provide for the succession of any parties to the Collateral Documents (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of the Credit Facilities or any other agreement that is not prohibited by this Indenture;

(k)      to provide for the release or addition of Collateral or Guarantees in accordance with the terms of this Indenture and the Collateral Documents;

(l)      to provide security for borrowings under a Credit Facility that are incurred in accordance with this Indenture; or

69

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(m)    to comply with the requirements of the Commission in order to effect or maintain the qualification of this Indenture under the TIA.

Upon the request of the Company and the Guarantors accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental Indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Company and the Guarantors in the execution of any amended or supplemental Indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental Indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02.    With Consent of Holders of Notes.

Except as provided below in this Section 9.02, this Indenture, any of the Collateral Documents, the Notes and the Note Guarantees may be amended or supplemented with the consent of the Holders of at least [a majority] in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes).

Upon the request of the Company and the Guarantors accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental Indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Company and the Guarantors in the execution of such amended or supplemental Indenture unless such amended or supplemental Indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental Indenture. It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Trustee and the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental Indenture or waiver.

However, without the consent of each Holder affected, an amendment or waiver may not (with respect to any Notes held by a non-consenting Holder):

70

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(a)      reduce the percentage of principal amount of Notes whose Holders must consent to an amendment, supplement or waiver of this Indenture or the Collateral Documents; reduce the principal of or change the fixed maturity of any Note or alter the provisions, or waive any payment, with respect to the redemption of the Notes other than provisions relating to covenants described under Section 4.09 and Section 4.14 (except to the extent provided in clause (h) below);

(b)      reduce the rate of or change the time for payment of interest on any Note;

(c)      waive a Default or Event of Default in the payment of principal of, or interest, or premium, if any, on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment Default that resulted from such acceleration);

(d)      make any Note payable in money other than U.S. dollars;

(e)      make any change in the provisions of this Indenture or the Collateral Documents relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, or interest or premium, if any, on, the Notes;

(f)      release all or substantially all of the value of the Note Guarantees of the Guarantors from any of their obligations under their Note Guarantees or this Indenture, except in accordance with the terms of this Indenture;

(g)      impair the right to institute suit for the enforcement of any payment on or with respect to the Notes or the Note Guarantees;

(h)      amend, change or modify the obligation of the Company to make and consummate a Change of Control Offer in the event of a Change of Control in accordance with the covenant described under Section 4.14 after such Change of Control has occurred, including, amending, changing or modifying any definition relating thereto;

(i)      subordinate, in right of payment, the Notes to any other Indebtedness of the Company; or

(j)      make any change in this Section 9.02, except to increase any such percentage required for such actions or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each outstanding Note affected thereby.

Notwithstanding anything to the contrary in this Article IX, an amendment or waiver may not amend, change or modify the obligation of the Company to make and consummate an Asset Sale Offer with respect to any Asset Sale in accordance with the covenant described under Section 4.09 after the obligation to make such Asset Sale Offer has arisen, including, amending, changing or modifying any definition relating thereto, without the consent of Holders of the Notes representing at least [●]% of the aggregate principal amount of the outstanding Notes.

Collateral may be released in accordance with this Indenture (including without limitation Sections 11.03 and 11.04 hereof) and to the extent that such a release is not prohibited

71

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

by the Intercreditor Agreement.  Notwithstanding anything to the contrary in this Article IX, except as provided in the Intercreditor Agreement, any Guarantor that is a Significant Subsidiary may not be released from any of its obligations under its Note Guarantee or this Indenture (except in accordance with the terms of this Indenture) without the consent of Holders of the Notes representing at least [•]% of the aggregate principal amount of the outstanding Notes.

Upon the execution of any supplemental indenture under this Article IX, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 9.03.    Revocation and Effect of Consents.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.04.    Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Company in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.05.    Trustee to Sign Amendments, Etc.

The Trustee shall sign any amended or supplemental indenture authorized pursuant to this Article IX if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company and each Guarantor may not sign an amendment or supplemental Indenture until each of their respective Boards of Directors approves it.  In executing any amended or supplemental indenture, the Trustee shall be entitled to receive and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE X.

## NOTE GUARANTEES

Section 10.01.   Note Guarantees.

Each of the Guarantors hereby, jointly and severally, fully and unconditionally, guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that: (a) the principal of and interest (including without limitation any interest which accrues under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest (including without limitation any interest which accrues under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately.  The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture and as otherwise provided in this Indenture.  If any Holder or the Trustee is required by any court or otherwise to return to the Company or Guarantors, or any Custodian, Trustee, liquidator or other similar official acting in relation to either the Company or Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.  Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article VI, such obligations (whether or not due and payable) shall forthwith become

73

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 10.02.    Execution and Delivery of Note Guarantee.

To evidence its Note Guarantee set forth in Section 10.01, each Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form included in Exhibit E hereto shall be endorsed by an officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture shall be executed on behalf of such Guarantor by its President or one of its Vice Presidents.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 10.01, shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

If an officer or Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Subsidiary Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 10.03.    Guarantors May Consolidate or Merge on Certain Terms.

(a)    A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than the Company or another Guarantor, unless:

(1)    immediately after giving effect to that transaction, no Event of Default exists; and

(2)    either:

(A)    the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor) is organized or existing under the laws of the United States, any state thereof or the District of Columbia and assumes all the obligations of that Guarantor under this Indenture and its Note Guarantee pursuant to a supplemental indenture satisfactory to the Trustee and under the Collateral Documents pursuant to a joinder or accession agreement or agreements satisfactory to the Collateral Agent; or

(B)    such sale or other disposition or consolidation or merger complies with Section 4.09.

NY 73758471v5

(b)      Nothing contained in this Indenture or in any of the Notes shall prevent any consolidation or merger of a Guarantor with or into the Company or shall prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety, to the Company.

(c)      Except as set forth in Section 10.04, in the case of any consolidation, merger, sale or conveyance of a Guarantor pursuant to Section 10.03(a)(2)(A), upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person shall succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor.  Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee.  All the Note Guarantees so issued shall in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

Section 10.04.     Releases of Note Guarantees.

(a)      The Note Guarantee of a Guarantor will be released automatically:

(1)      in connection with any sale or other disposition of all of the Capital Stock, or all or substantially all of the assets, of such Guarantor to a Person that is not (either before or after giving effect to such transaction) a Restricted Subsidiary of the Company, if the sale of all such Capital Stock, or all or substantially all of the assets, of that Guarantor complies with Section 4.09; or

(2)      if the Company designates the Restricted Subsidiary that is such Guarantor as an Unrestricted Subsidiary under and in compliance with this Indenture.

(b)      If all or substantially all of the assets of any Guarantor or all of the capital stock of any Guarantor are sold or disposed of in compliance with Section 10.04(a)(1), then such Guarantor (in the event of a sale or other disposition of all of the capital stock of such Guarantor) or the corporation acquiring the property (in the event of a sale or other disposition of all or substantially all of the assets of a Guarantor) shall be released and relieved of its obligations under its Note Guarantee or Section 10.03, hereof, as the case may be; provided, that in the event of an Asset Sale, the Net Proceeds from such sale or other disposition are treated in accordance with the provisions of Section 4.09 hereof.  Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that such sale or other disposition was made by the Company in accordance with the provisions of this Indenture, including without limitation Section 4.09 hereof, the Trustee shall execute any documents reasonably required in order to evidence the release of any Guarantor from its obligations under its Note Guarantee.

(c)      Any Guarantor not released from its obligations under its Note Guarantee pursuant to this Section 10.04 shall remain liable for the full amount of principal of and interest

75

on the Notes and for the other obligations of any Guarantor under this Indenture as provided in this Article X.

Section 10.05.    Trustee to Include Paying Agent.

In case at any time any Paying Agent other than the Trustee shall have been appointed by the Company and be then acting hereunder, the term "Trustee" as used in this Article X, shall in such case (unless the context shall otherwise require) be construed as extending to and including such Paying Agent within its meaning as fully and for all intents and purposes as if such Paying Agent were named, in this Article X, in place of the Trustee.

Section 10.06.    Limits on Note Guarantees.

Notwithstanding anything to the contrary in this Article X, the aggregate amount of the Obligations guaranteed under this Indenture by any Guarantor shall be reduced to the extent necessary to prevent the Note Guarantee of such Guarantor from violating or becoming voidable under any law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors.

# ARTICLE XI.

# COLLATERAL AND SECURITY

Section 11.01.    Collateral Documents.

The due and punctual payment of the principal of, premium, if any, on and interest on, the Notes (including, without limitation, any interest which accrues after the commencement of any proceedings under any Debtor Relief Laws with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest (including, without limitation, any interest which accrues after the commencement of any proceedings under any Debtor Relief Laws with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the overdue principal of, premium on, if any, and interest, on the Notes and any other Note Obligations and performance of all other Obligations of the Company and the Guarantors to the Holders of Notes, the Trustee or the Collateral Agent under this Indenture, the Notes (including, without limitation, the Note Guarantees) or the Collateral Documents according to the terms hereunder or thereunder, are secured as provided in the Security Agreement and the Pledge Agreement, which the Company and the Guarantors have entered into simultaneously with the execution of this Indenture, and the other Collateral Documents in effect from time to time.  Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Collateral Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended, supplemented or otherwise modified from time to time in accordance with their terms and authorizes and directs the Collateral Agent and/or the Trustee (as the case may be) to enter into the Collateral Documents (including Mortgages) and to perform their obligations and exercise their rights thereunder in accordance therewith.  The Company and the

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Guarantors will deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Collateral Documents, and will do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Collateral Documents, to assure and confirm to the Trustee and the Collateral Agent the security interest, mortgage or other Lien in the Collateral contemplated hereby or by the Collateral Documents, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed.  The Company and the Guarantors shall comply with the terms and provisions of the Collateral Documents and shall take, upon request of the Trustee or the Collateral Agent, any and all actions reasonably required to cause the Collateral Documents to create and maintain, as security for the Note Obligations of the Company and the Guarantors hereunder, a valid and enforceable perfected Lien in and on all the Collateral, in favor of the Collateral Agent for the benefit of the Trustee and the Holders of Notes, superior to and prior to the rights of all third Persons and subject to no other Liens other than Permitted Liens.

Section 11.02.    Release of Collateral.

(a)     The Collateral Agent's Liens upon the Collateral will no longer secure the Notes and Note Guarantees outstanding under this Indenture or any other Obligations under this Indenture, and the right of the Holders of the Notes and such Obligations to the benefits and proceeds of the Collateral Agent's Liens on the Collateral will terminate and be discharged:

(1)     in whole, as to all property subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(2)     in whole, as to all property subject to such Liens, upon:

(A)     payment in full of the principal of, accrued and unpaid interest and premium, if any, on the Notes; or

(B)     satisfaction and discharge of this Indenture as set forth in Article XII hereof; or

(C)     Legal Defeasance or Covenant Defeasance of this Indenture as set forth in Article VIII hereof;

(3)     in part, as to any property that (A) is sold, transferred or otherwise disposed of by the Company or one of its Subsidiaries in a transaction not prohibited by this Indenture, at the time of such sale, transfer or disposition, to the extent of the interest sold, transferred or disposed of or (B) is owned or at any time acquired by a Guarantor that has been released from its Note Guarantee (and any guarantee of other Note Obligations), concurrently with the release of such Note Guarantee (and any guarantee of other Note Obligations);

(4)     on any or all of the Credit Facility Collateral, upon any release of a first priority Lien thereon by the Credit Facility Collateral Agent or as otherwise authorized or directed by the Credit Facility Collateral Agent unless the Credit Facility Loan Obligations have been paid in full and the Credit Facility is terminated without it being

77

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

refinanced; provided, however, that if a Lien is reinstated securing obligations under the Credit Facility on any or all of the Credit Facility Collateral upon which the Lien securing Obligations has been released pursuant to this clause (4), then the Lien securing the Note Obligations on such Credit Facility Collateral will also be deemed reinstated on the same basis (including as to priority) that it was immediately prior to the release;

(5)    as to property that constitutes all or substantially all of the Collateral securing the Note Obligations, with the consent of the Holders of **[80%]** of the aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, Notes);

(6)    as to property that constitutes less than all or substantially all of the Collateral securing the Note Obligations, with the consent of the Holders of at least [●]% of the aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, purchase of, the Notes); or

(7)    in whole or in part, in accordance with the applicable provisions of the Collateral Documents, including the Intercreditor Agreement.

Upon receipt of an Officers' Certificate and an Opinion of Counsel certifying that all conditions precedent under this Indenture and the Collateral Documents, if any, to such release have been met and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Trustee shall, or shall cause the Collateral Agent to, execute, deliver or acknowledge (at the Company's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents. Neither the Trustee nor the Collateral Agent shall be liable for any such release undertaken in good faith in reliance upon any such Officers' Certificate or Opinion of Counsel, and notwithstanding any term hereof or in any Collateral Document to the contrary, the Trustee and Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until it receives such Officers' Certificate and Opinion of Counsel.

(b)    The release of any Collateral from the terms of the Collateral Documents, or the release, in whole or in part, of the Liens created by the Collateral Documents, will not be deemed to impair the security under this Indenture in contravention of the provisions hereof and of the Collateral Documents if and to the extent that the Collateral is released pursuant to this Indenture and the Collateral Documents, including the Intercreditor Agreement.

Section 11.03.    Disposition of Collateral Without Release.

(a)    Notwithstanding Section 11.02 hereof relating to releases of Collateral, but subject to and in accordance with the provisions of the Collateral Documents and this Indenture, so long as the Collateral Agent, the Trustee, the Credit Facility Collateral Agent or the Credit Facility Lenders have not exercised their rights with respect to the Collateral upon the occurrence and during the continuance of an Event of Default, the Company and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral, to operate the

78

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Collateral, to alter and repair the Collateral and to collect, invest and dispose of any income therefrom.

(b)     Notwithstanding the foregoing, the Company and the Guarantors may, among other things, without any release or consent by the Trustee or the Collateral Agent, use and dispose of the Collateral in any lawful manner not inconsistent with the provisions of this Indenture or any of the Collateral Documents, including, without limitation, (i) selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Collateral Documents which has become worn out, defective or obsolete or that would no longer be used or useful in the business; (ii) abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of this Indenture or any of the Collateral Documents; (iii) surrendering or modifying any franchise, license or permit subject to the Lien of this Indenture or any of the Collateral Documents which it may own or under which it may be operating; altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances; (iv) granting a license of any intellectual property; (v) selling, transferring or otherwise disposing of inventory in the ordinary course of business; (vi) selling, collecting, liquidating, factoring or otherwise disposing of accounts receivable in the ordinary course of business; (vii) making cash payments (including for the scheduled repayment of Indebtedness) from cash that is at any time part of the Collateral in the ordinary course of business that are not otherwise prohibited by this Indenture and the Collateral Documents; and (viii) abandoning any intellectual property which is no longer used or useful in the Company's business.

Section 11.04.     Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Under the Collateral Documents.

(a)     Subject to the provisions of the Collateral Documents, the Trustee may (but without any obligation to do so), in its sole discretion and without the consent of the Holders of Notes, direct, on behalf of the Holders of Notes, the Collateral Agent to, take all actions it deems necessary or appropriate in order to:

(1)     enforce any of the terms of the Security Agreement, the Pledge Agreement and any other Collateral Document (including Mortgages); and

(2)     collect and receive any and all amounts payable in respect of the Note Obligations of the Company and the Guarantors hereunder.

(b)     Subject to the provisions of the Collateral Documents, the Trustee will have power (but without any obligation) to institute and maintain, or to direct, on behalf of the Holders of the Notes, the Collateral Agent to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of this Indenture or any of the Collateral Documents, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the

79

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee).

(c)      Unless otherwise provided herein, all instructions to the Trustee are to be made pursuant to the vote of the Holders of [a majority] in aggregate principal amount of Notes.

Section 11.05.      Authorization of Receipt of Funds by the Trustee under the Security Agreement.

The Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under any of the Collateral Documents, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

Section 11.06.      Intercreditor Agreement.

The Trustee agrees for itself and on behalf of the Holders of the Notes, and by holding Notes each such Holder shall be deemed to agree:

(a)      that the holders of Obligations in respect of this Indenture, the Notes and the Note Guarantees are bound by the provisions of the Intercreditor Agreement, including the provisions relating to the ranking of Liens and the order of application of proceeds from enforcement of Liens; and

(b)      to consent to and direct the Collateral Agent to enter into and perform its obligations under the Intercreditor Agreement and the other Collateral Documents.

Section 11.07.      Limitation on Duty of Trustee and Collateral Agent in Respect of Collateral.

(a)      Beyond the exercise of reasonable care in the custody thereof, the Trustee and the Collateral Agent shall have no duty as to any Collateral in their possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Trustee and the Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in their possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any agent or bailee selected by the Trustee or the Collateral Agent in good faith.

(b)      The Trustee and the Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Company or any Guarantor to the

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Trustee and the Collateral Agent shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or the Collateral Documents by the Company, the Guarantors or the Collateral Agent (if the Trustee is not the Collateral Agent).

Section 11.08.    Powers Exercisable by Receiver or Trustee.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Company or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

Section 11.09.    Collateral Agent.

(a)    The Trustee and each of the Holders by acceptance of the Notes hereby designates and appoints the Collateral Agent as its agent under this Indenture and the Collateral Documents and the Trustee and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Collateral Agent to take such action on its behalf under the provisions of this Indenture and the Collateral Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture and the Collateral Documents, together with such powers as are reasonably incidental thereto.  The Collateral Agent agrees to act as such on the express conditions contained in this Section 11.09.  The provisions of this Section 11.09 are solely for the benefit of the Collateral Agent and none of the Trustee, any of the Holders nor any of the Grantors shall have any rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in this Section 11.09.  Notwithstanding any provision to the contrary contained elsewhere in this Indenture and the Collateral Documents, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Collateral Agent have or be deemed to have any fiduciary relationship with the Trustee, any Holder, the Company or any Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture and the Collateral Documents or otherwise exist against the Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Indenture, the Collateral Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the Collateral Agent is expressly entitled to take or assert under this Indenture and the Collateral Documents, including the exercise of remedies pursuant to Article VI, and any action so taken or not taken shall be deemed consented to by the Trustee and the Holders.

81

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b)    The Collateral Agent may execute any of its duties under this Indenture or the Collateral Documents by or through agents, employees, attorneys-in-fact or through its Affiliates and shall be entitled to an Officers' Certificate or an Opinion of Counsel or both concerning all matters pertaining to such duties.  The Collateral Agent shall not be responsible for the negligence or misconduct of any agent, employee, attorney-in-fact or Affiliate that it selects as long as such selection was made without negligence or willful misconduct.

(c)    None of the Collateral Agent or any of its Affiliates shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own negligence or willful misconduct) or under or in connection with the Collateral Documents or the transactions contemplated thereby (except for its own negligence or willful misconduct), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Company or Guarantor, or any officer thereof, contained in this Indenture, or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture or the Collateral Documents, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture or the Collateral Documents, or for any failure of the Company any Guarantor or any other party to this Indenture or the Collateral Documents to perform its obligations hereunder or thereunder.  None of the Collateral Agent or any of its Affiliates shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture or the Collateral Documents or to inspect the properties, books, or records of the Company, any Guarantor or their respective Affiliates.

(d)    The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, facsimile or other document believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Company), independent accountants and other experts and advisors selected by the Collateral Agent.  The Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture or the Collateral Documents unless it shall first receive such advice or concurrence of the Trustee as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture or the Collateral Documents in accordance with a request or consent of the Trustee and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)    The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Collateral Agent shall have received written notice from the Trustee, Holders of Notes, the Company or a Guarantor referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." Subject to the terms of the Intercreditor Agreement, the Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article VI (subject to this Section 11.09); provided, however, that unless and

82

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

until the Collateral Agent has received any such request, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

(f)    The Collateral Agent and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Company, any Guarantor or their respective Affiliates as though it was not the Collateral Agent hereunder and without notice to or consent of the Trustee.  The Trustee and the Holders acknowledge that, pursuant to such activities, the Collateral Agent or its respective Affiliates may receive information regarding the Company or any Guarantor or any of their Affiliates (including information that may be subject to confidentiality obligations in favor of the Company or any Guarantor or any of their Affiliates) and acknowledge that the Collateral Agent shall not be under any obligation to provide such information to the Trustee or the Holders.  Nothing herein shall impose or imply any obligation on the part of the Collateral Agent to advance funds.

(g)    The Collateral Agent may resign at any time upon thirty (30) days prior written notice to the Trustee and the Company, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent.  If the Collateral Agent resigns under this Indenture, the Trustee, subject to the consent of the Company (which shall not be unreasonably withheld and which shall not be required during a continuing Default or Event of Default), shall appoint a successor collateral agent.  If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Collateral Agent (as stated in the notice of resignation), the Collateral Agent may appoint, after consulting with the Trustee, subject to the consent of the Company (which shall not be unreasonably withheld and which shall not be required during a continuing Default or Event of Default), a successor collateral agent.  If no successor collateral agent is appointed and consented to by the Company pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor.  Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated.  After the retiring Collateral Agent's resignation hereunder, the provisions of this Section 11.09 (and Section 7.07) shall continue to inure to its benefit and the retiring Collateral Agent shall not by reason of such resignation be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(h)    The Trustee shall initially act as Collateral Agent and shall be authorized to appoint co-Collateral Agents as necessary in its sole discretion.  Except as otherwise explicitly provided herein or in the Collateral Documents, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other Affiliates shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of

NY 73758471v5

NOTE: *THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own willful misconduct, gross negligence or bad faith.

(i)    The Trustee, as such and as Collateral Agent, is authorized and directed to (i) enter into the Collateral Documents, (ii) bind the Holders on the terms as set forth in the Collateral Documents and (iii) perform and observe its obligations under the Collateral Documents.

(j)    The Trustee agrees that it shall not (and shall not be obliged to), and shall not instruct the Collateral Agent to, unless specifically requested to do so by a majority of the Holders, take or cause to be taken any action to enforce its rights under this Indenture or against the Company or the Guarantors, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article VII, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent.

(k)    The Trustee is each Holder's agent and the Collateral Agent is the Trustee's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession or control. Should the Trustee obtain possession of any such Collateral, upon request from the Company, the Trustee shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(l)    The Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Grantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all or any part of the Grantor's property constituting collateral intended to be subject to the Lien and security interest of the Collateral Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture or any Collateral Document, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no other duty or liability whatsoever to the Trustee or any Holder as to any of the foregoing.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(m)    No provision of this Indenture or any Collateral Document shall require the Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Collateral Agent) if it shall have reasonable grounds for believing that repayment of such funds is not assured to it.

(n)    The Collateral Agent (i) shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers, or for any error of judgment made in good faith by a an officer thereof, unless it is proved that the Collateral Agent was negligent in ascertaining the pertinent facts, (ii) shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Company or any Guarantor (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel.  The grant of permissive rights or powers to the Collateral Agent shall not be construed to impose duties to act.  The Collateral Agent shall be indemnified by the Company and the Guarantors to the same extent as the indemnification of the Trustee herein.

(o)    Neither the Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters.  Neither the Collateral Agent nor the Trustee shall be liable for any indirect, special or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(p)    The Collateral Agent shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holder, unless such Holder shall have offered to the Collateral Agent security and indemnity satisfactory to it against any loss, liability or expense.

(q)    Notwithstanding anything herein to the contrary, in acting as Collateral Agent, the Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article VII hereof.

## ARTICLE XII.

## SATISFACTION AND DISCHARGE

Section 12.01.    Satisfaction And Discharge Of Indenture.

This Indenture will be discharged and will cease to be of further effect as to all outstanding Notes hereunder, and the Trustee, upon receipt from the Company of an Officers'

85

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Certificate and an Opinion of Counsel stating that all conditions precedent to satisfaction and discharge have been satisfied, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when either

(1)    all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company) have been delivered to the Trustee for cancellation; or

(2)    (A) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest, to pay and discharge the entire indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(B)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound;

(C)    the Company or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture and not provided for by the deposit required by clause (A) above; and

(D)    the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

Notwithstanding the satisfaction and discharge hereof, the rights, powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations in connection therewith, the obligations of the Company to the Trustee under Section 7.07 and, if United States dollars shall have been deposited with the Trustee pursuant to subclause (2) of subsection (a) of this Section 12.01, the obligations of the Trustee under Section 12.02 and Section 8.06, shall survive.

Section 12.02.    Application of Trust Money.

Subject to the provisions of Section 8.06, all United States dollars deposited with the Trustee pursuant to Section 12.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to

86

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

the Persons entitled thereto, of the principal of, premium, if any, and interest on, the Notes for whose payment such United States dollars have been deposited with the Trustee.

## ARTICLE XIII.

## MISCELLANEOUS

Section 13.01.    Notices.

Any notice or communication by the Company, a Guarantor or the Trustee to the others is duly given if in writing and delivered in person or mailed by first class mail (registered or certified, return receipt requested), facsimile or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company or a Guarantor:

> [*DELAWARE HOLDING COMPANY*][4]
> [2 Paragon Drive
> Montvale, New Jersey  07645]
> Facsimile No.: [(201) 571-8715]
> Attention: [●]

If to the Trustee:

> [*TRUSTEE NAME*]
> [*TRUSTEE ADDRESS*]
> Facsimile No.: [●]
> Attention: [●]

The Company, a Guarantor or the Trustee, by notice to the others may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if sent by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder shall be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar.  Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

---

[4] Name of new holding company to be inserted.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 13.02.    Certificate and Opinion As to Conditions Precedent.

Upon any request or application by the Company and/or any Guarantor to the Trustee to take any action or refrain from taking any action under this Indenture, the Company and/or such Guarantor, as the case may be, shall furnish to the Trustee:

(a)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such eligible and qualified Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company stating the information on which counsel is relying unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Section 13.03.    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to Section 4.04(a)) shall include:

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition;

88

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)      a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 13.04.    Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions; provided, that no such rule shall conflict with the terms of this Indenture.

Section 13.05.    No Personal Liability of Directors, Officers, Employees and Stockholders.

No director, officer, employee, incorporator, stockholder, member, manager or partner of the Company or any Guarantor, as such, shall have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

Section 13.06.    Governing Law.

THE INDENTURE, THE NOTES, ANY NOTE GUARANTEES AND THE COLLATERAL DOCUMENTS WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

Section 13.07.    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture, the Notes or the Note Guarantees.

Section 13.08.    Successors.

All agreements of the Company and the Guarantors in this Indenture, the Note Guarantees and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind its successors.

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 13.09.    Severability.

In case any provision in this Indenture, the Note Guarantees or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.10.    Counterpart Originals.

The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.11.    Table of Contents, Headings, Etc.

The Table of Contents and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.12.    Further Instruments and Acts.

Upon request of the Trustee, the Company and the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

[Signatures on following pages]

90

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

COMPANY:

[*DELAWARE HOLDING COMPANY*]**,** a Delaware corporation

By: _____

    Name:
    Title:

GUARANTORS:

**[GUARANTORS]**

TRUSTEE:

**[TRUSTEE]**

By: _____

    Name:
    Title:

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT A

CUSIP NUMBER [●]

ISIN NUMBER [●]

(Face of Note)

[*DELAWARE HOLDING COMPANY*]

SENIOR SECURED NOTES DUE 2017

No. _____

$_____

  [*DELAWARE HOLDING COMPANY*], a Delaware corporation, for value received, hereby promises to pay to _____ or registered assigns, the principal sum of _____ Dollars [, or such greater or lesser amount as may from time to time be endorsed on the Schedule of Increases and Decreases of Interests in the Global Note attached hereto (but in no event may such amount exceed the aggregate principal amount of Notes authenticated pursuant to Section 2.02 of the Indenture referred to below and then outstanding pursuant to Section 2.08 of the Indenture][1] on [●], 2017.

Interest Payment Dates: [●] and [●]

First Interest Payment Date: [●]

Record Dates: [●] and [●]

        [*DELAWARE HOLDING COMPANY*]

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

---

[1] Applicable if Global Note.

Exh. A-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

This is one of the [Global] Notes referred
to in the within mentioned Indenture:

Dated: _____, ____

[TRUSTEE],
as Trustee


By: _____

    Authorized Signatory

Exh. A-2

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(Back of Note)

[*DELAWARE HOLDING COMPANY*]

SENIOR SECURED NOTES DUE 2017

THIS NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN [INTERCREDITOR AGREEMENT DATED AS OF [●], 2012 AMONG [INTERCREDITOR PARTIES], [*DELAWARE HOLDING COMPANY*], [THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.] ("A&P") AND THE OTHER SUBSIDIARIES OF [*DELAWARE HOLDING COMPANY*] PARTY THERETO] (THE "INTERCREDITOR AGREEMENT"), AND EACH HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

[THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED.  THE ISSUE PRICE OF THIS NOTE WAS [●]% OF ITS PRINCIPAL AMOUNT; THE TOTAL AMOUNT OF ORIGINAL ISSUE DISCOUNT IS $[●] PER NOTE WITH A PRINCIPAL AMOUNT OF $1,000; THE ISSUE DATE IS [●], 2012; AND THE YIELD TO MATURITY IS [●]%.]

[UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN CERTIFICATED FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(g) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III)

Exh. A-3

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.][2]

[THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM.  EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. (THE "COMPANY") THAT (a) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(A) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY IF THE COMPANY SO REQUESTS), (2) TO THE COMPANY OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE.  NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.][3]

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.  The Notes are general obligations of the Company, secured by Liens on the Collateral as described in the Indenture.  This Note is entitled to the benefits of the Note Guarantees by the Guarantors on the terms set forth in the Indenture.

---

[2] Applicable if Global Note.

[3] Applicable if Transfer Restricted Security.

Exh. A-4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

1.      Interest. [*Delaware Holding Company*], a Delaware corporation (such corporation, and its successors and assigns under the Indenture, being herein called the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum set forth below from [*Initial Issuance Date*] until maturity.  The Company shall pay interest semi-annually on [●] and [●] of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date").  Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided, that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; provided further, that the first Interest Payment Date shall be [●].  The Company shall pay, to the extent lawful, interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

With respect to interest on the Notes for a semi-annual period due on an Interest Payment Date, the Company may elect, at its option, to pay interest due on the Notes on such Interest Payment Date (i) as a Cash Interest Payment, (ii) as a PIK Interest Payment, or (iii) as a Partial PIK Payment.  In order to elect to pay cash interest on any Interest Payment Date, the Company must deliver a notice of its election to the Trustee no later than the Cash Election Deadline specifying that it is electing a Cash Interest Payment or Partial PIK Payment (and if the Company does not deliver such notice on or prior to the Cash Election Deadline, then a PIK Interest Payment shall be made on such Interest Payment Date).

2.      Method of Payment.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on [●] or [●] next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  The Notes will be payable as to principal, premium, if any, and interest (to the extent payable in cash), at the office or agency of the Company maintained for such purpose, or, at the option of the Company, payment of cash interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders, and provided that payment by wire transfer of immediately available funds will be required with respect cash payments of principal of and interest (to the extent payable in cash) and premium, if any, on all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Company or the Paying Agent.  Except with respect to PIK Interest, such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

In accordance with the Indenture, the Company may, at its option, elect to pay interest on the Notes (1) entirely in cash ("Cash Interest"), (2) entirely by increasing the principal amount of the outstanding Notes by an amount equal to the amount of interest for the applicable semiannual interest period (rounded up to the nearest whole dollar) (or, if necessary, pursuant to

Exh. A-5

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

requirements of the Depositary or otherwise, by authenticating a new Global Note executed by the Company with such increased principal amount or by issuing PIK Notes in an aggregate principal amount equal to the amount of interest for such semiannual interest period (rounded up to the nearest whole dollar) ("PIK Interest") or (3) 50.0% as Cash Interest and 50.0% as PIK Interest. The Company must elect the form of interest payment with respect to each interest period by delivering a notice to the Trustee prior to the beginning of such interest period; provided, however, in the absence of such an election for any interest period, interest on the Notes will be payable by increasing the principal amount of the outstanding Notes.  The Trustee shall promptly notify the Holders of any election.  If the Company does not elect to pay cash interest on any Interest Payment Date it must deliver, not less than five Business Days prior to such Interest Payment Date, an Authentication Order to the Trustee specifying the aggregate amount of PIK Interest to be paid through increases in the Global Note and through the issuance of PIK Notes.  On the relevant Interest Payment Date, the Trustee shall record increases in the Global Note and authenticate PIK Notes, as appropriate, in the aggregate principal amounts required to pay the PIK Interest then due.

3.      Paying Agent and Registrar.  Initially, the Trustee under the Indenture will act as Paying Agent and Registrar.  The Company may change any Paying Agent or Registrar without notice to any Holder.  The Company or any of its Subsidiaries may act in any such capacity; provided that if the Company or such Subsidiary is acting as Paying Agent, the Company or such Subsidiary shall segregate all funds held by it as Paying Agent and hold them in a separate trust fund for the benefit of the Holders.

4.      Indenture.  The Company issued the Notes under an Indenture dated as of **[●]**, 2012 (the "Indenture"), among the Company, the Guarantors and the Trustee.  The terms of the Notes include those stated in the Indenture.  The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms.

The summary of the terms of this Note contained herein does not purport to be complete and is qualified by reference to the Indenture.  To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture shall control.

The Indenture restricts, among other things, the Company's and the Guarantors' ability to incur additional indebtedness, pay dividends or make certain other restricted payments, incur liens, apply net proceeds from certain asset sales, merge or consolidate with any other person, sell, assign, transfer, lease, convey or otherwise dispose of substantially all of the assets of the Company or enter into certain transactions with affiliates.

5.      Optional Redemption.

Prior to [SECOND ANNIVERSARY OF THE ISSUE DATE], the Company may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice electronically delivered or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Make-Whole Amount as of, and accrued and unpaid interest, if

Exh. A-6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

On or after [SECOND ANNIVERSARY OF THE ISSUE DATE], the Company may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest, if any, thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on [•] of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2014 | 105.0% |
| 2015 | 102.5% |
| 2016 and thereafter | 100.0% |

At any time, or from time to time, prior to [SECOND ANNIVERSARY OF THE ISSUE DATE], the Company may redeem up to [35%] of the aggregate principal amount of Notes issued under the Indenture at a redemption price of [110.0%] of the principal amount thereof, plus accrued and unpaid interest, if any, thereon to the redemption date, with the net cash proceeds of one or more Equity Offerings; provided that (i) at least [50%] of the aggregate principal amount of Notes issued under the Indenture remains outstanding immediately after the occurrence of such redemption (excluding Notes held by the Company or its Affiliates) and (ii) the redemption must occur within [60 days] of the date of the closing of such Equity Offering.

6.      Mandatory Redemption.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7.      Repurchase at Option of Holder.

[TO COME]

8.      Notice of Redemption.  Notice of redemption will be electronically delivered or mailed at least 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address.  Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed.  On and after the redemption date, interest ceases to accrue on Notes or portions thereof called for redemption.

9.      Denominations, Transfer, Exchange.  Subject to the issuance of certificated PIK Notes as set forth in Section 1(b) hereof, the Notes are in registered form without coupons in denominations of $1,000 and integral multiples of $1,000 in excess thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture.  The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture.  The Company need not exchange or

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part.  Also, it need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or register the transfer of or to exchange a Note during the period between a record date and the corresponding Interest Payment Date.

10.    Persons Deemed Owners.  The registered Holder of a Note may be treated as its owner for all purposes.

11.    Amendment, Supplement and Waiver.  Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees and the Collateral Documents may be amended or supplemented with the consent of the Holders of at least [a majority] in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for the Notes), and, subject to the terms of the Indenture, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of the Indenture or the Notes may be waived with the consent of the Holders of [a majority] in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a tender offer or exchange offer for the Notes).  Certain provisions in the Indenture, Notes, Notes Guarantees and Collateral Documents may be amended or supplemented without the consent of any Holder of a Note.  Certain provisions in the Indenture, Notes, Notes Guarantees and Collateral Documents may not be amended or supplemented without the consent of every Holder affected thereby.

12.    Defaults and Remedies.  The Indenture contains certain Events of Default.

If any Event of Default (other than an Event of Default specified in clause [(h)] or [(i)] of Section 6.01 of the Indenture with respect to the Company) occurs and is continuing, the Trustee may (and if so directed by the Holders of at least 25% in aggregate principal amount of the then outstanding Notes, the Trustee shall) declare all the Notes to be due and payable immediately. Notwithstanding the foregoing, if an Event of Default specified in clause [(h)] or [(i)] of Section 6.01 of the Indenture occurs with respect to the Company, all outstanding Notes will become due and immediately payable without further action or notice.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of the Notes notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in their interest.  The Company is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Company is required upon becoming aware of any Default or Event of Default, to deliver to the Trustee a statement specifying such Default or Event of Default.

13.    Trustee and Collateral Agent Dealings with Company.  Each of the Trustee and the Collateral Agent, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the

Exh. A-8

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Company or its Affiliates, as if it were not the Trustee and/or the Collateral Agent, as the case may be.

14.     <u>No Recourse Against Others</u>.  No director, officer, employee, incorporator, stockholder, member, manager or partner of the Company or any Guarantor, as such, shall have any liability for any obligations of the Company or the Guarantors under the Notes, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

15.     <u>Authentication</u>.  This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

16.     <u>Abbreviations</u>.  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JE TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

17.     <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to:

> [*Delaware Holding Company*]
> 2 Paragon Drive
> Montvale, New Jersey  07645
> Attention: Secretary

18.     <u>Unclaimed Money</u>.  Subject to certain conditions, if money for the payment of principal, premium, if any, or interest, remains unclaimed for two years, the Trustee or Paying Agent shall pay the money back to the Company at its request in accordance with the Indenture unless any abandoned property law designates another Person.  After any such payment, Holders entitled to the money must look only to the Company and not to the Trustee for payment unless such abandoned property law designates another Person.

19.     <u>Discharge and Defeasance</u>.  Subject to certain conditions, the Company at any time may terminate some or all of the obligations of the Company under the Notes and the Indenture if the Company irrevocably deposits in trust with the Trustee an amount in United States dollars sufficient to pay and discharge the entire Indebtedness on the Notes, not theretofore delivered for cancellation, including the principal of, premium, if any, and accrued interest on such Notes at such maturity, Stated Maturity or redemption date, as the case may be.

<div align="center">Exh. A-9</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

20.     <u>Governing Law</u>.  THE INDENTURE AND THIS NOTE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

(Insert Assignee's legal name)

_____

(Insert assignee's soc, sec, or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____

to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee: _____

Participant in a recognized Signature Guarantee Medallion Program
(or other signature guarantor acceptable to the Trustee).

Exh. A-11

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section [4.09] or [4.14] of the Indenture, check the appropriate box below:

☐ Section [4.09]        ☐ Section [4.14]

If you want to elect to have only part of the Note purchased by the Company pursuant to Section [4.09] or Section [4.14] of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No: _____

Signature Guarantee[*]: _____

---

[*] Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

Exh. A-12

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SCHEDULE OF INCREASES AND DECREASES OF INTERESTS

IN THE GLOBAL NOTE[4]

The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

---

[4] Applicable if Global Note.

Exh. A-13

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

[*TRUSTEE]*
[*TRUSTEE ADDRESS*]

      Re:    Senior Secured Notes due 2017

      Reference is hereby made to the Indenture, dated as of [*Initial Issuance Date*] (the "Indenture"), among [*DELAWARE HOLDING COMPANY*], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

      _____, (the "Transferor") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "Transfer"), to _____ (the "Transferee"), as further specified in Annex A hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[TO COME]

Exh. B-1

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

       This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

<div align="right">

_____

[Insert Name of Transferor]

By: _____

Name:

Title:

</div>

Dated: _____

<div align="center">

Exh. B-2

</div>

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[TO COME]

Exh. B-3

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT C

## FORM OF CERTIFICATE OF EXCHANGE

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

  Re:  <u>Senior Secured Notes due 2017</u>

(CUSIP _____)

  Reference is hereby made to the Indenture, dated as of [*Initial Issuance Date*] (the "Indenture"), by and among [*DELAWARE HOLDING COMPANY*], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

  _____, (the "Owner") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "Exchange").  In connection with the Exchange, the Owner hereby certifies that:

[TO COME]

  This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

          _____

            [Insert Name of Transferor]

      By: _____

         Name:
         Title:

Dated: _____

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT D

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

[TRUSTEE]
[TRUSTEE ADDRESS]

> Re:     Senior Secured Notes due 2017

Reference is hereby made to the Indenture, dated as of [*Initial Issuance Date*] (the "Indenture"), among [Delaware Holding Company], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(a)      ☐ a beneficial interest in a Global Note, or

(b)      ☐ a Definitive Note,

we confirm that:

1.      We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

2.      We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter and, if such transfer is in respect of a principal amount of Notes, at the time of transfer of less than $250,000, an opinion of counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to and in accordance with the provisions of Rule 144 under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or

Exh. D-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501 (a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

[Insert Name of Accredited Investor]

By:  _____
Name:
Title:

Dated:

Exh. D-2

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT E

FORM OF NOTE GUARANTEE

For value received, each Guarantor (which term includes any successor Person under the Indenture) has, jointly and severally, fully and unconditionally, guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture, (a) the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on overdue principal and premium, and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.  The obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Note Guarantee and the Indenture are expressly set forth in Article X of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guarantee.

GUARANTORS:

**[GUARANTORS]**

By: _____
     Name:
     Title:

Exh. E-1

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT F

FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture"), dated as of _____, among _____ (the "Guaranteeing Subsidiary"), a subsidiary of [*Delaware Holding Company*], a Delaware corporation (the "Company"), the Company, The Great Atlantic & Pacific Tea Company, Inc. and the other Guarantors (as defined in the Indenture referred to herein) and [*TRUSTEE*], as trustee under the indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of [*Initial Issuance Date*] providing for the issuance of its Senior Secured Notes due 2017 (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "Note Guarantee"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.     CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.     AGREEMENT TO GUARANTEE.  The Guaranteeing Subsidiary hereby agrees as follows:

(a)     Along with all Guarantors named in the Indenture, to jointly and severally Guarantee to each Holder of a Note authenticated and delivered by the Trustee, and to the Trustee and its successors and assigns, that:

(i)     the principal of and interest on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

Exh. F-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(ii)    in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.  Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately.

(b)    The obligations hereunder shall be full and unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(c)    The following is hereby waived: diligence presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever.

(d)    This Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and the Indenture, and the Guaranteeing Subsidiary accepts all obligations of a Guarantor under the Indenture.

(e)    If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors, or any Custodian, Trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(f)    The Guaranteeing Subsidiary shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.

(g)    As between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI of the Indenture for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article VI of the Indenture, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee.

(h)    The Guarantors shall have the right to seek contribution from any nonpaying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Exh. F-2

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

3.      EXECUTION AND DELIVERY.  Each Guaranteeing Subsidiary agrees that the Note Guarantees shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

4.      GUARANTEEING SUBSIDIARY MAY CONSOLIDATE, ETC. ON CERTAIN TERMS.  A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than the Company or another Guarantor, except in accordance the Indenture.

5.      RELEASES.  A Note Guarantee shall be released in accordance with Section 10.04 of the Indenture.

6.      NO RECOURSE AGAINST OTHERS.  No director, officer, employee, incorporator, stockholder, member, manager or partner of the Guaranteeing Subsidiary, as such, shall have any liability for any obligations of the Company or any Guaranteeing Subsidiary under the Notes, the Indenture, this Supplemental Indenture or the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.  Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the Commission that such a waiver is against public policy.

7.      NEW YORK LAW TO GOVERN.  THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

8.      COUNTERPARTS.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

9.      EFFECT OF HEADINGS.  The Section headings herein are for convenience only and shall not affect the construction hereof.

10.     THE TRUSTEE.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

Exh. F-3

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____

[*Guaranteeing Subsidiary*]

By: _____
      Name:
      Title:

[*Delaware Holding Company*]

By: _____
      Name:
      Title:

[*Existing Guarantors*]

By: _____
      Name:
      Title:

[*TRUSTEE*],
as Trustee

By: _____
      Authorized Signatory

Exh. F-4

NY 73758471v5

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**Schedule I**

SCHEDULE OF GUARANTORS

The following schedule lists each Guarantor under the Indenture as of the Initial Issuance Date:


[TO COME]


Sch. I-1

**Exhibit J**

[Form of indenture for New Convertible Third Lien Notes]

K&E 21346110

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

[*DELAWARE HOLDING COMPANY*][1]

CONVERTIBLE SECURED PIK NOTES DUE 2018

INDENTURE

DATED AS OF [●], 2012

[*TRUSTEE*],

AS TRUSTEE AND COLLATERAL AGENT

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN [INTERCREDITOR AGREEMENT DATED AS OF [●], 2012 AMONG [INTERCREDITOR PARTIES], [*DELAWARE HOLDING COMPANY*], [THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.] AND THE OTHER SUBSIDIARIES OF [*DELAWARE HOLDING COMPANY*] PARTY THERETO] (THE "INTERCREDITOR AGREEMENT"), AND EACH PARTY TO OR HOLDER UNDER THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE OF THIS INDENTURE OR ANY NOTES ISSUED HEREUNDER, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

---

[1] Name of new Delaware holding company to be inserted.

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**Table of Contents**

Page

ARTICLE I. DEFINITIONS AND INCORPORATION BY REFERENCE..................................1
    Section 1.01.    Definitions.....................................................1
    Section 1.02.    Incorporation by Reference of Trust Indenture Act....................22
    Section 1.03.    Rules of Construction. ..................23
    Section 1.04.    Acts of Holders. ..................23

ARTICLE II. THE NOTES ....................25
    Section 2.01.    Form and Dating. ..................25
    Section 2.02.    Execution and Authentication....................26
    Section 2.03.    Registrar, Paying Agent and Conversion Agent....................26
    Section 2.04.    Paying Agent to Hold Money in Trust...................27
    Section 2.05.    Holder Lists....................27
    Section 2.06.    Transfer and Exchange. ..................27
    Section 2.07.    Replacement Notes. ..................39
    Section 2.08.    Outstanding Notes....................40
    Section 2.09.    Treasury Notes. ..................40
    Section 2.10.    Temporary Notes. ..................40
    Section 2.11.    Cancellation. ..................41
    Section 2.12.    Defaulted Interest. ..................41

ARTICLE III. REDEMPTION AND PREPAYMENT....................41
    Section 3.01.    Optional Redemption....................41
    Section 3.02.    Mandatory Redemption. ..................41

ARTICLE IV. COVENANTS ....................41
    Section 4.01.    Payment of Notes....................41
    Section 4.02.    Maintenance of Office or Agency....................42
    Section 4.03.    Investment Company Act. ..................43
    Section 4.04.    Compliance Certificate. ..................43
    Section 4.05.    Taxes....................44
    Section 4.06.    Stay, Extension and Usury Laws. ..................44
    Section 4.07.    Restricted Payments....................44
    Section 4.08.    Incurrence of Indebtedness. ..................44
    Section 4.09.    Asset Sales. ..................44
    Section 4.10.    Liens....................44
    Section 4.11.    Dividend and Other Payment Restrictions Affecting Restricted
                  Subsidiaries....................44
    Section 4.12.    Events of Loss....................45
    Section 4.13.    Corporate Existence....................45
    Section 4.14.    [Intentionally Omitted] ..................45
    Section 4.15.    Transactions with Affiliates....................45
    Section 4.16.    Designation of Restricted and Unrestricted Subsidiaries....................45
    Section 4.17.    Guarantees....................45

i

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.18.    Business Activities.................................................................................45
Section 4.19.    Financial Reporting and Delivery of Certain Information..........................45
Section 4.20.    Impairment of Security Interest. ..............................................................46
Section 4.21.    After-Acquired Property. .........................................................................46
Section 4.22.    Creation and Perfection of Liens Securing Collateral; Further
                 Assurances. .............................................................................................47
Section 4.23.    Insurance.................................................................................................48
Section 4.24.    Real Estate. .............................................................................................48
Section 4.25.    Sale and Lease-Back Transactions............................................................49
Section 4.26.    Incurrence of Senior Subordinated Debt...................................................49
Section 4.27.    Suspension of Certain Covenants. ............................................................49

ARTICLE V. SUCCESSORS.................................................................................................49
Section 5.01.    Merger, Consolidation or Sale of Assets. .................................................49
Section 5.02.    Successor Corporation Substituted. ..........................................................50

ARTICLE VI. DEFAULTS AND REMEDIES .........................................................................50
Section 6.01.    Events of Default. ...................................................................................50
Section 6.02.    Acceleration. ...........................................................................................52
Section 6.03.    Other Remedies.......................................................................................53
Section 6.04.    Waiver of Past Defaults. ..........................................................................53
Section 6.05.    Control by [Majority]...............................................................................53
Section 6.06.    Limitation on Suits..................................................................................54
Section 6.07.    Rights of Holders of Notes to Receive Payment. ......................................54
Section 6.08.    Collection Suit by Trustee. ......................................................................55
Section 6.09.    Trustee May File Proofs of Claim. ...........................................................55
Section 6.10.    Priorities.................................................................................................55
Section 6.11.    Undertaking for Costs..............................................................................56
Section 6.12.    Restoration of Rights and Remedies.........................................................56
Section 6.13.    Rights and Remedies Cumulative.............................................................56
Section 6.14.    Delay or Omission Not Waiver.................................................................56

ARTICLE VII. TRUSTEE......................................................................................................57
Section 7.01.    Duties of Trustee.....................................................................................57
Section 7.02.    Rights of Trustee.....................................................................................58
Section 7.03.    Individual Rights of Trustee. ...................................................................59
Section 7.04.    Trustee's Disclaimer. ..............................................................................59
Section 7.05.    Notice of Defaults....................................................................................59
Section 7.06.    Reports by Trustee to Holders of the Notes...............................................59
Section 7.07.    Compensation and Indemnity. .................................................................60
Section 7.08.    Replacement of Trustee. ..........................................................................61
Section 7.09.    Successor Trustee by Merger, Etc. ...........................................................62
Section 7.10.    Eligibility; Disqualification. ....................................................................62
Section 7.11.    Preferential Collection of Claims Against Company...................................62

ARTICLE VIII. LEGAL DEFEASANCE AND COVENANT DEFEASANCE.........................63
Section 8.01.    Option to Effect Legal Defeasance or Covenant Defeasance.......................63

ii

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 8.02.    Legal Defeasance and Discharge. .................................................................63
Section 8.03.    Covenant Defeasance. ..........................................................................................63
Section 8.04.    Conditions to Legal or Covenant Defeasance. ...............................................64
Section 8.05.    Deposited Money and Government Securities to Be Held in Trust;
Other Miscellaneous Provisions. ..................................................................65
Section 8.06.    Repayment to Company. .....................................................................................66
Section 8.07.    Reinstatement. ......................................................................................................66

ARTICLE IX. AMENDMENT, SUPPLEMENT AND WAIVER ...............................................67
Section 9.01.    Without Consent of Holders of Notes. ............................................................67
Section 9.02.    With Consent of Holders of Notes. ...................................................................68
Section 9.03.    Revocation and Effect of Consents. .................................................................70
Section 9.04.    Notation on or Exchange of Notes. ..................................................................70
Section 9.05.    Trustee to Sign Amendments, Etc. ...................................................................70

ARTICLE X. CONVERSION ..........................................................................................................71
Section 10.01.    Conversion Privilege. .........................................................................................71
Section 10.02.    Conversion Procedure. ........................................................................................71
Section 10.03.    Adjustments Below Par Value. ..........................................................................72
Section 10.04.    Taxes on Conversion. ..........................................................................................72
Section 10.05.    Company to Provide Stock. ................................................................................73
Section 10.06.    Adjustment of Conversion Rate. .......................................................................73
Section 10.07.    No Adjustment. ....................................................................................................77
Section 10.08.    Equivalent Adjustments. ....................................................................................78
Section 10.09.    Adjustment for Tax Purposes. ...........................................................................78
Section 10.10.    Notice of Adjustment. .........................................................................................78
Section 10.11.    Notice of Certain Transactions. ........................................................................78
Section 10.12.    Effect of Reclassification, Consolidation, Merger, Share Exchange
or Sale on Conversion Privilege. ..................................................................79
Section 10.13.    Trustee's Disclaimer. ..........................................................................................80
Section 10.14.    Voluntary Increase of the Conversion Rate. ..................................................81
Section 10.15.    Simultaneous Adjustments. ................................................................................81

ARTICLE XI. EQUITY VOTING RIGHTS AND DIVIDENDS ...............................................81
Section 11.01.    Equity Voting Rights. .........................................................................................81
Section 11.02.    Dividends. .............................................................................................................82
Section 11.03.    Amendments to Certificate of Incorporation. ................................................82

ARTICLE XII. NOTE GUARANTEES ..........................................................................................82
Section 12.01.    Note Guarantees. .................................................................................................82
Section 12.02.    Execution and Delivery of Note Guarantee. ...................................................83
Section 12.03.    Guarantors May Consolidate or Merge on Certain Terms. ...........................84
Section 12.04.    Releases of Note Guarantees. ............................................................................85
Section 12.05.    Trustee to Include Paying Agent. ......................................................................85
Section 12.06.    Limits on Note Guarantees. ...............................................................................85

ARTICLE XIII. COLLATERAL AND SECURITY .......................................................................86

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 13.01.   Collateral Documents....................................................................................86
Section 13.02.   Release of Collateral. ...................................................................................86
Section 13.03.   Disposition of Collateral Without Release. ..................................................88
Section 13.04.   Authorization of Actions to Be Taken by the Trustee and the
Collateral Agent Under the Collateral Documents. .......................................89
Section 13.05.   Authorization of Receipt of Funds by the Trustee under the Security
Agreement.....................................................................................................89
Section 13.06.   Intercreditor Agreement...............................................................................89
Section 13.07.   Limitation on Duty of Trustee and Collateral Agent in Respect of
Collateral.......................................................................................................90
Section 13.08.   Powers Exercisable by Receiver or Trustee..................................................90
Section 13.09.   Collateral Agent. ..........................................................................................91

ARTICLE XIV. SATISFACTION AND DISCHARGE..............................................................95
Section 14.01.   Satisfaction And Discharge Of Indenture. ...................................................95
Section 14.02.   Application of Trust Money..........................................................................96

ARTICLE XV. MISCELLANEOUS............................................................................................96
Section 15.01.   Notices. ........................................................................................................96
Section 15.02.   Certificate and Opinion As to Conditions Precedent.....................................97
Section 15.03.   Statements Required in Certificate or Opinion..............................................98
Section 15.04.   Rules by Trustee and Agents. .......................................................................98
Section 15.05.   No Personal Liability of Directors, Officers, Employees and
Stockholders..................................................................................................99
Section 15.06.   Governing Law. ............................................................................................99
Section 15.07.   No Adverse Interpretation of Other Agreements...........................................99
Section 15.08.   Successors. ...................................................................................................99
Section 15.09.   Severability. .................................................................................................99
Section 15.10.   Counterpart Originals....................................................................................99
Section 15.11.   Table of Contents, Headings, Etc. ................................................................99
Section 15.12.   Further Instruments and Acts......................................................................100

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

LIST OF EXHIBITS

Exhibit A       FORM OF NOTE
Exhibit B       FORM OF CERTIFICATE OF TRANSFER
Exhibit C       FORM OF CERTIFICATE OF EXCHANGE
Exhibit D       FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL
                ACCREDITED INVESTOR
Exhibit E       FORM OF NOTE GUARANTEE
Exhibit F       FORM OF SUPPLEMENTAL INDENTURE

Schedule I      List of Guarantors

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## INDENTURE

THIS INDENTURE is dated as of [●], 2012 (this "Indenture"), by and among
[*DELAWARE HOLDING COMPANY*] [2], a Delaware corporation (the "Company"), THE
GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation ("A&P"),
and the other corporations and limited liability companies listed on the signature pages hereto
(together with A&P, each, a "Guarantor" and collectively, the "Guarantors", as more fully
defined below) and [*TRUSTEE*], as trustee (the "Trustee") and as collateral agent (the "Collateral
Agent").

## RECITALS

The Company has duly authorized the creation and issuance of its Convertible Secured
PIK Notes due 2018 of substantially the tenor and amount hereinafter set forth, and to provide
therefor, the Company has duly authorized the execution and delivery of this Indenture.

All things necessary to make the Notes (as defined below), when executed by the
Company and authenticated and delivered by the Trustee hereunder and duly issued by the
Company, the valid obligations of the Company and this Indenture a valid instrument of the
Company, in accordance with their respective terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that, each party agrees as
follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as
defined below) of the Notes:

## ARTICLE I.

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.   Definitions.

"144A Global Note" means a global note substantially in the form of Exhibit A hereto
bearing the Global Note Legend and the Private Placement Legend and deposited with or on
behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a
denomination equal to the outstanding principal amount of the Notes sold in reliance on
Rule 144A.

["ABL Credit Facility" means the asset-based revolving credit facility provided under the
[Senior Secured Asset-Based Revolving Credit Agreement dated as of the Initial Issuance Date
by and among A&P, the other borrowers party thereto, the Company and the other guarantors
party thereto, the lenders party thereto in their capacities as lenders thereunder and JPMorgan
Chase Bank, N.A., as administrative agent and collateral agent], including any notes, mortgages,
guarantees, collateral documents, instruments and agreements executed in connection therewith,

---

[2] Name of new Delaware holding company to be inserted.

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any one or more indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that extend, replace, refund, refinance, renew or defease any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount that may be borrowed thereunder or alters the maturity of the loans thereunder or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or other agent, lender or group of lenders or investors.]

["Acquired Indebtedness" means, with respect to any specified Person, (1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or becomes a Restricted Subsidiary of such specified Person, and (2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.]

"Affiliate" of any specified Person means (1) any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person or (2) any executive officer or director of such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

"Affiliate Transaction" has the meaning set forth in [Section 4.15] hereof.

"After-Acquired Property" means any and all assets or property (other than Excluded Assets) acquired after the Initial Issuance Date, including any property or assets acquired by the Company or a Guarantor from another Guarantor, which in each case constitutes Collateral as defined in this Indenture.

"Agent" means any Registrar, Paying Agent, Conversion Agent or co-registrar.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"As Converted Basis" means [●].

"Asset Sale" means [●].

"Asset Sale Offer" has the meaning set forth in [Section 4.09] hereof.

"Attributable Debt" means [●].

"Authentication Order" has the meaning set forth in Section 2.02 hereof.

["Bank Products" means any services or facilities on account of credit or debit cards, purchase cards or merchant services constituting a line of credit, and any agreement or

2

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

arrangement to provide cash management services, including treasury, depository, overdraft, electronic funds transfer and any other cash management arrangement.]

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors as now or hereinafter constituted.

"Board of Directors" means (1) with respect to a corporation, the board of directors of the corporation or, except in the context of the definitions of "Change of Control", a duly authorized committee thereof, (2) with respect to a partnership, the Board of Directors of the general partner of the partnership or, if the partnership has more than one general partner, the managing general partner of the partnership and (3) with respect to any other Person, the board or committee of such Person serving a similar function.

"Board Resolution" means a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors of the Company and to be in full force and effect on the date of such certification.

["Borrowing Base" means [•].]

"Business Day" means any day other than a Legal Holiday.

"Capital Lease" means any capital lease as determined in accordance with GAAP as in effect on the Initial Issuance Date.

"Capital Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capital Lease that would at that time be required to be capitalized and reflected as a liability on a balance sheet in accordance with GAAP as in effect on the Initial Issuance Date.

"Capital Stock" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or other business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person [; provided, however, the term "Capital Stock" shall exclude any debt securities convertible into Capital Stock, whether or not such debt securities include any right of voting or other participation with Capital Stock].

"Cash Equivalents" means (i) United States dollars, (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof), maturing not more than one year from the date of acquisition, (iii) commercial paper rated at least P-2 by Moody's Investors Service, Inc. or at least A-2 by Standard & Poor's Rating Services and in each case maturing within one year after the date of the acquisition thereof, (iv) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of the acquisition thereof, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank organized under the laws of the United States (or any state, province or territory thereof) or any foreign branch

3

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

thereof having capital and surplus aggregating at least $250.0 million, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing, and any department, agency, board, commission, tribunal, committee or instrumentality of any of the foregoing, (v) direct obligations issued by any state, commonwealth or territory of the United States of America or any political subdivision of any such state, any public instrumentality or taxing authority thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (v) of this definition, (vii) repurchase obligations of any commercial bank organized under the laws of the United States of America or any state thereof having capital and surplus aggregating at least $250.0 million, having a term of not more than 30 days, with respect to securities referred to in clause (ii) of this definition; and (viii) instruments equivalent to those referred to in clauses (i) to (vii) above denominated in euro or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by a Restricted Subsidiary organized in such jurisdiction.

"Cash Management Agreement" means any agreement with a Cash Management Bank to provide (i) Automated Clearing House (ACH) transactions, (ii) cash management services, including controlled disbursement services, treasury, depositary, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements and/or (iii) foreign exchange facilities.

"Cash Management Bank" means any Person that, at the time it enters into a Cash Management Agreement, is a Credit Facility Lender or an Affiliate of a Credit Facility Lender, in its capacity as a party to such Cash Management Agreement.

"Cash Management Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person under or in respect of a Cash Management Agreement.

"Casualty" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"Certificate of Incorporation" means the Company's certificate of incorporation, as it may be amended from time to time.

"Change of Control" means the occurrence of any of the following: [●].

["Change of Control Offer" has the meaning set forth in [Section 4.14] hereof.]

["Change of Control Payment" has the meaning set forth in [Section 4.14] hereof.]

["Change of Control Payment Date" has the meaning set forth in [Section 4.14] hereof.]

4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Clearstream" means Clearstream, société anonyme Luxembourg (or any successor securities clearing agency).

"Closing Sale Price" means, with respect to Common Stock on any date, the closing sale price per share (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) on such date as reported in composite transactions for the principal national or regional securities exchange on which the Common Stock is traded, or if no closing price is available, the last quoted bid price for such Common Stock in the over-the-counter market as reported by Pink Sheets LLC or similar organization, or, if that bid price is not available, Closing Sale Price per share shall be the Fair Market Value of a share of Common Stock as determined in good faith by the Board of Directors (which determination shall be conclusive and shall be evidenced by an Officer's Certificate delivered to the Trustee).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

"Collateral" means, collectively, the assets and property (and rights and interests in assets and property), now owned or hereafter acquired, of any Person subject to, or intended or required to be subject to, the Liens created by the Collateral Documents; provided, that Collateral shall not include any Excluded Assets so long as such assets and property (or rights and interests in assets and property) are Excluded Assets.

"Collateral Agent" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Collateral Documents" means, collectively, [●].[3]

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" shall mean shares of the Company's common stock, [$0.01 par value per share] (as of the Initial Issuance Date), as they exist on the Initial Issuance Date or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

"Condemnation" means any taking by a Governmental Authority of property or assets, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any public improvement or condemnation or in any other manner.

"Condemnation Award" means all proceeds of any Condemnation or transfer in lieu thereof.

---

[3] Collateral Documents to secure liens on substantially all assets of the Company and the Guarantors, including substantially all assets securing the Exit Facility.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Confirmation Order" means that certain order confirming the Plan of Reorganization pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended, entered by the United States Bankruptcy Court for the Southern District of New York on [•].

["Consolidated Cash Flow" means [•].]

["Consolidated Net Income" means [•].]

["Consolidated Net Tangible Assets" means [•].]

"Conversion Agent" has the meaning set forth in Section 2.03 hereof.

"Conversion Date" has the meaning set forth in [Section 10.02] hereof.

"Conversion Price" means, in respect of each Note, as of any date, $1.00 divided by the Conversion Rate as of such date.

"Conversion Rate" means the initial conversion rate set forth in the Note as adjusted from time to time by the Company in accordance with Section 10.06 hereof.

"Conversion Shares" means, in respect of each Note, the shares of Common Stock issuable upon conversion of such Note.

"Corporate Trust Office of the Trustee" shall be at the address of the Trustee specified in Section 15.01 hereof or such other address as to which the Trustee may give notice to the Company.

"Covenant Defeasance" has the meaning set forth in Section 8.03 hereof.

"Credit Facilities" means one or more debt facilities, commercial paper facilities or other debt instruments, indentures or agreements (including, without limitation, the ABL Credit Facility and the Term Loan Credit Facility), providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), letters of credit or other debt obligations, in each case, as amended, restated, modified, renewed, refunded, restructured, supplemented, replaced or refinanced in whole or in part from time to time, including without limitation any amendment increasing the amount of Indebtedness incurred or available to be borrowed thereunder, extending the maturity of any Indebtedness incurred thereunder or contemplated thereby or deleting, adding or substituting one or more parties thereto (whether or not such added or substituted parties are banks or other institutional lenders) and "Credit Facility" means each of the foregoing.

"Credit Facility Collateral" means all of the collateral which secures obligations under the Credit Facilities together with the proceeds thereof.

"Credit Facility Collateral Agent" means [JPMorgan Chase Bank, N.A.] or such other financial institution or entity which serves as collateral agent under the Credit Facilities.

6

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Credit Facility Hedging Obligations" means all Hedging Obligations of the Company or any of its Restricted Subsidiaries and Cash Management Obligations of the Company or any of its Restricted Subsidiaries in each case owing to a Person that is a holder of Indebtedness under a Credit Facility or an Affiliate of such holder at the time of entry into such Hedging Obligations or Cash Management Obligations.

"Credit Facility Lenders" means each lender under a Credit Facility and any other Person that shall have become a party thereto as a lender pursuant to an assignment and assumption, other than any person that ceases to be a party thereto pursuant to an assignment and assumption.

"Credit Facility Loan Obligations" means the payment of the principal of and interest on the loans under the Credit Facilities, together with all fees and other obligations then due to the Credit Facility Lenders under such Credit Facilities.

"Current Market Price" means (i) at such times as the Common Stock is not listed on a Qualified Exchange, the applicable Conversion Price then in effect, and (ii) at such times as the Common Stock is listed on a Qualified Exchange, the average of the daily Closing Sale Prices per share of Common Stock for the ten consecutive Trading Days ending on the earlier of the date of determination of the Common Stock holders entitled to receive such issuance or distribution and the day before the "Ex-Date" with respect to the issuance or distribution requiring such computation immediately prior to the date in question.

"Custodian" means any receiver, trustee, assignee, liquidator, sequester or similar official under any Bankruptcy Law.

"Debtor Relief Laws" means the Title 11 of the U.S. Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Definitive Note" means a Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of the Notes attached hereto as Exhibit A, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, until a successor shall have been appointed and become such pursuant to the applicable provision of this Indenture, and, thereafter, "Depositary" shall mean or include such successor.

"Designated Amount" has the meaning set forth in [Section 4.16] hereof.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or any of its Restricted Subsidiaries in connection with

7

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the earlier of the date on which the Notes mature or the date the Notes are no longer outstanding; provided, however, that (i) only the portion of such Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Capital Stock issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control, fundamental change or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Domestic Subsidiary" means, with respect to any Person, each Subsidiary of such Person that is organized under the laws of the United States or any political subdivision thereof, and "Domestic Subsidiaries" means any two or more of them.

"DTC" has the meaning set forth in Section 2.03 hereof.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means a public or private issuance of Capital Stock (other than Disqualified Stock) of the Company, other than (1) pursuant to a registration statement on Form S-8 or otherwise relating to Equity Interests issuable under an employee benefit plan of the Company or (2) any such public or private issuance that constitutes an Excluded Contribution.

<div align="center">8</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Euroclear" means Euroclear Bank, SA/NV as operator of the Euroclear Clearance System (or any successor securities clearing agency).

"Event of Default" has the meaning set forth in Section 6.01 hereof.

"Event of Loss" means, with respect to any Collateral, any (1) Casualty of such Collateral, (2) Condemnation or seizure (other than pursuant to foreclosure or confiscation or requisition of the use of such Collateral) or (3) settlement in lieu of clause (2) above.

"Excess Proceeds" has the meaning set forth in [Section 4.09] hereof.

"Excess Proceeds Trigger Date" has the meaning set forth in [Section 4.09] hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute.

"Excluded Assets" means [●].

["Excluded Contribution" means net cash proceeds received by the Company and its Restricted Subsidiaries as capital contributions after the Initial Issuance Date or from the issuance or sale (other than to a Restricted Subsidiary or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Company or any Restricted Subsidiary) of Equity Interests (other than Disqualified Stock) of the Company, in each case to the extent designated as an Excluded Contribution pursuant to an Officers' Certificate and not previously included in the calculation set forth in clause [●] of [Section 4.07] hereof.]

"Existing Indebtedness" means Indebtedness of the Company and its Restricted Subsidiaries (other than Indebtedness under a Credit Facility or the Notes and the related Guarantees) in existence on the Initial Issuance Date (or to be issued on the Initial Issuance Date), as approved in the Plan of Reorganization.

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by an executive officer of the Company. Notwithstanding the foregoing, if the Fair Market Value exceeds $[●], the determination of Fair Market Value must be made by the Board of Directors of the Company based upon [●] and be evidenced by a Board Resolution attached to an Officers' Certificate delivered to the Trustee.

["Fixed Charge Coverage Ratio" means with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than Indebtedness Incurred, repaid, repurchased or redeemed under any revolving credit facility in the ordinary course of business for working capital purposes) or issues, repurchases or redeems Disqualified Stock subsequent to the commencement of the period for which the Fixed Charge

9

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (for purposes of this definition, the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock, and the use of the proceeds therefrom as if the same had occurred at the beginning of such period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio, (i) acquisitions and dispositions of business entities or property and assets constituting a division or line of business of any Person that have been made by the specified Person or any of its Restricted Subsidiaries (including any Person that becomes a Restricted Subsidiary as a result of a Permitted Investment), including through mergers or consolidations and including any related financing transactions, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be given *pro forma* effect as if they had occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated on a *pro forma* basis in accordance with Regulation S-X under the Securities Act, (ii) the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with GAAP, shall be excluded, (iii) the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP shall be excluded as if such discontinued operation occurred at the beginning of the applicable four-quarter reference period and (iv) consolidated interest expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a *pro forma* basis and bearing a floating interest rate shall be computed as if the rate in effect on the Calculation Date (taking into account any interest rate option, swap, cap or similar agreement applicable to such Indebtedness) had been the applicable rate for the entire period, and for purposes of making the computations referred to above, interest on any Indebtedness under a revolving credit facility (to the extent not excluded from the calculation of the Fixed Charge Coverage Ratio due to the operation of the first parenthetical phrase of this definition) computed on a *pro forma* basis shall be computed based on the weighted average daily balance of such Indebtedness during the applicable period.]

["Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of (i) the consolidated interest expense in respect of Indebtedness of such Person and its Restricted Subsidiaries for such period (excluding any non-cash interest expense arising from the application of Statement of Financial Accounting Standards No. 133 or the adoption of FASB Staff Position No. APB 14-1), whether paid or accrued, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letters of credit (other than trade letters of credit in the ordinary course of business) or bankers' acceptance financings, excluding any commissions, discounts, yield and other fees and charges or interest expense related to any Qualified Receivables Transaction, and net of the effect of all payments made or received pursuant to Hedging Obligations, plus (ii) the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period, plus (iii) any cash interest expense on Indebtedness of another Person that is Guaranteed by such Person or any of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, to the extent such Guarantee or Lien is called upon, plus (iv) the product of (A) all dividends, whether paid or accrued and whether or not in cash, on any series of Disqualified Stock or Preferred Stock of such Person or any of its Restricted Subsidiaries, other than

10

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

dividends on Equity Interests payable solely in Equity Interests (other than Disqualified Stock) of the Person or to the Person or a Restricted Subsidiary of the Person, times (B) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, minus (v) interest income actually received by the Company or any Restricted Subsidiary in cash during such period, in each case, on a consolidated basis.]

"Foreign Subsidiary" means, with respect to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants, the opinions and pronouncements of the Public Company Accounting Oversight Board and the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession in the United States, which are in effect on the Initial Issuance Date.

"Global Note" means a Note substantially in the form attached hereto as Exhibit A that bears the Global Note Legend and has the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.

"Global Note Legend" means the legend set forth in Section [●], which is required to be placed on all Global Notes issued under this Indenture.

"Government Securities" means securities that are direct obligations of the United States of America for the timely payment of which its full faith and credit are pledged.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central bank).

"Grantors" means the Company and the Guarantors.

"Guarantee" means, as to any Person, a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness of another Person.

"Guarantors" means any Subsidiary that executes a Note Guarantee in accordance with the provisions of this Indenture, and their respective successors and assigns until released from their obligations under their Note Guarantees and this Indenture in accordance with the terms of this Indenture.

11

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under (i) interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and other agreements or arrangements with respect to interest rates, (ii) commodity swap agreements, commodity option agreements, forward contracts and other agreements or arrangements with respect to commodity prices and (iii) foreign exchange contracts, currency swap agreements and other agreements or arrangements with respect to foreign currency exchange rates, including without limitation, the Hedging Obligations as such term is defined under the Intercreditor Agreement, the ABL Credit Facility, the Term Loan Credit Facility or any security agreement related thereto.

"Hedging Providers" means counterparties to any Credit Facility Hedging Obligations, including any Cash Management Bank with respect to Cash Management Obligations.

"Holder" means a Person in whose name a Note is registered.

"IAI Global Note" mean the global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Restricted Note Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that will be issued on the Initial Issuance Date or thereafter in a denomination equal to the outstanding principal amount of the Notes sold to Institutional Accredited Investors.

"Immaterial Subsidiary" means any Subsidiary of the Company whose Total Assets equal $[●]or less, so long as the Total Assets of all Immaterial Subsidiaries do not exceed in the aggregate $[●].

"Incur" means, with respect to any Indebtedness, to incur (by merger, conversion, exchange or otherwise), create, issue, assume, Guarantee or otherwise become directly or indirectly liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness (and "Incurrence" and "Incurred" shall have meanings correlative to the foregoing); provided that (1) any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary of the Person will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary of the Person and (2) neither the accrual of interest nor the accretion of original issue discount nor the payment of interest in the form of additional Indebtedness and the payment of dividends on Disqualified Stock or Preferred Stock in the form of additional shares of Disqualified Stock or Preferred Stock (to the extent provided for when the Indebtedness or Disqualified Stock or Preferred Stock on which such interest or dividend is paid was originally issued) shall be considered an Incurrence of Indebtedness; provided that in each case the amount thereof is included in the Fixed Charges and Indebtedness of the Person or such Restricted Subsidiary as accrued to the extent required by the definitions of Fixed Charges and Indebtedness, respectively.

"Indebtedness" means, with respect to any specified Person, all obligations of such Person, whether or not contingent (i) in respect of borrowed money, (ii) evidenced by bonds, notes, debentures, surety bonds or similar instruments or letters of credit (or reimbursement agreements in respect thereof), (iii) in respect of bankers' acceptances, (iv) in respect of Capital Lease Obligations, (v) in respect of the balance deferred and unpaid of the purchase price of any

12

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

property or services, except any such balance that constitutes an accrued expense, trade payable or earn-out, or (vi) representing Hedging Obligations.

In addition, the term "Indebtedness" includes (x) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person), <u>provided</u> that the amount of such Indebtedness shall be the lesser of (A) the Fair Market Value of such asset at such date of determination and (B) the amount of such Indebtedness, (y) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person, and (z) Preferred Stock of any Restricted Subsidiary of such Person valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued dividends, provided that the "maximum fixed repurchase price" of any Preferred Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Preferred Stock, as applicable, as if such Preferred Stock were repurchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture.

The amount of the Indebtedness in respect of any Hedging Obligations at any time shall be equal to the net amount payable as a result of the termination of such Hedging Obligations at such time. The amount of Indebtedness in respect of any letter of credit (or reimbursement agreement in respect thereof) at any time shall be equal to the amount drawn but not yet reimbursed at such time. Notwithstanding the foregoing, no operating lease of any store of the Company or any Restricted Subsidiary or residual liabilities with respect to assigned leaseholds shall be deemed to be Indebtedness. The amount of any Indebtedness outstanding as of any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation, and shall be (1) the accreted value thereof, in the case of any Indebtedness issued with original issue discount and (2) the principal amount thereof, in the case of any other Indebtedness.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Issuance Date" means [●], 2012, the date of original issuance of the Initial Notes under this Indenture.

"Initial Notes" has the meaning set forth in Section 2.01(a) hereof.

"Institutional Accredited Investor" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3), (7) under the Securities Act, who is not also a QIB.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of [●], by and among [INTERCREDITOR PARTIES] and acknowledged by the Company and the Guarantors, as it may be amended, modified, supplemented, restated, amended and restated or replaced from time to time in accordance with its terms.

13

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of loans or other extensions of credit (including Guarantees), advances, capital contributions (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP (excluding in each case accounts receivable, credit card and debit card receivables, trade credit and advances to customers made in the ordinary course of business and residual liabilities with respect to assigned leaseholds). If the Person or any of its Restricted Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Person such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Person, then the Person shall be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Investment in such Subsidiary not sold or disposed of. The acquisition by the Person or any of its Restricted Subsidiaries of a Person that holds an Investment in a third Person shall be deemed to be an Investment by the Person or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investment held by the acquired Person in such third Person on the date of such acquisition.

"Junior Lien Indebtedness" means any Indebtedness of the Company or any Guarantor which is or will be secured by a Lien on the Collateral on a basis that is junior to the Notes.

"Leased Real Property" has the meaning set forth in [Section 4.24] hereof.

"Leasing Deliverables" shall include (i) (A) a memorandum of lease in recordable form with respect to such leasehold interest, executed and acknowledged by the lessor of such leasehold interest, or (B) evidence that the applicable lease with respect to such leasehold interest or a memorandum thereof has been recorded in all places necessary, in the Trustee's or the Collateral Agent's reasonable judgment, to give constructive notice to third-party purchasers of such leasehold interest, and (ii) any lessor consent or approval of such mortgage as may be required pursuant to the terms of the applicable lease with respect to such leasehold interest.

"Legal Defeasance" has the meaning set forth in Section 8.02 hereof.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in The City of New York or at a place of payment are authorized or required by law, regulation or executive order to remain closed.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement and any lease in the nature thereof.

14

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Loss Proceeds Offer" has the meaning set forth in Section [●] hereof.

"Management Agreement" means the management agreement dated as of the Initial Issuance Date between [Yucaipa] and [A&P/the Company].

"Market Disruption Event" means [●].

"Mortgage" means a mortgage, deed of trust, deed to secure debt or similar document, together with any assignment of leases and rents referred to therein, in each case in form and substance reasonably satisfactory to the Collateral Agent.

"Net Loss Proceeds" means, with respect to any Event of Loss, the proceeds in the form of (a) cash or Cash Equivalents and (b) insurance proceeds from Condemnation Awards or damages awarded by any judgment, in each case received by the Company or any of its Restricted Subsidiaries from such Event of Loss, net of (i) reasonable out-of-pocket expenses and fees relating to such Event of Loss (including without limitation legal, accounting and appraisal or insurance adjuster fees), (ii) taxes paid or payable after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements, (iii) any repayment of Indebtedness that is secured by, or directly related to, the property or assets that are the subject of such Event of Loss, (iv) amounts required to be paid to any Person (other than the Company or any Restricted Subsidiary) owning a beneficial interest in the assets subject to the Event of Loss or having a Lien thereon, and (v) appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Event of Loss and retained by the Company or any Restricted Subsidiary, as the case may be, after such Event of Loss, including, without limitation, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Event of Loss.

"Net Proceeds" means the aggregate cash proceeds, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not the interest component, thereof), received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the costs relating to such Asset Sale, including, without limitation, legal, accounting, investment banking and brokerage fees, and sales commissions, and any relocation expenses incurred as a result thereof, (ii) taxes paid or payable as a result thereof, (iii) amounts required to be applied to the repayment of Indebtedness or other liabilities secured by a Lien on the asset or assets that were the subject of such Asset Sale or required to be paid as a result of such sale, (iv) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, (v) in the case of any Asset Sale by a Restricted Subsidiary of the Company, payments to holders of Equity Interests in such Restricted Subsidiary in such capacity (other than such Equity Interests held by the Company or any of its Restricted Subsidiaries) and (vi) appropriate amounts to be provided by the Company or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in accordance with GAAP; provided that (A) excess amounts set aside for payment of taxes pursuant to clause (ii) above

15

remaining after such taxes have been paid in full or the statute of limitations therefor has expired and (B) amounts initially held in reserve pursuant to clause (vi) no longer so held, will, in the case of each of subclauses (A) and (B), at that time become Net Proceeds.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Notes" means the Initial Notes and any other Notes (including any PIK Notes) authenticated and delivered under this Indenture, as amended or supplemented from time to time, substantially in the form set forth in Exhibit A.  For purposes of this Indenture, all references to "principal amount" of the Notes shall include any increase in the principal amount of the Notes as a result of the payment of PIK Interest.

"Note Custodian" means the Trustee, as custodian with respect to the Global Notes, or any successor entity thereto.

"Note Guarantee" means a Guarantee of the Notes pursuant to Article XII hereof, including a notation in the Notes substantially in the form included in Exhibit E.

"Note Obligations" means (i) all principal of, interest (including, without limitation, any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding), and premium, if any, on any Note, (ii) all fees, expenses, indemnification obligations and other amounts of whatever nature now or hereafter payable by the Company or any Guarantor (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) pursuant to this Indenture, the Notes, the Intercreditor Agreement or any Collateral Document, (iii) all expenses of the Trustee or the Collateral Agent (or any agent or sub-agent thereof) under this Indenture as to which the Trustee or the Collateral Agent or one or more of such agents have a right to reimbursement or under any other similar provision of any Collateral Document, including, without limitation, any and all sums advanced by the Trustee or the Collateral Agent to preserve the Collateral or preserve its security interests, mortgages or Liens in the Collateral to the extent permitted under this Indenture, the Notes, the Intercreditor Agreement or any other Collateral Document or applicable law, and (iv) in the case of each Guarantor, all amounts now or hereafter payable by such Guarantor and all other obligations or liabilities now existing or hereafter arising or incurred (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or such Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the part of such Guarantor pursuant to the Notes, this Indenture, the Note Guarantees, the Intercreditor Agreement or any other Collateral Document, together in each case with all renewals, modifications, consolidations or extensions thereof.

"Note Register" has the meaning set forth in Section 2.03 hereof.

"Obligations" means any principal, interest, penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

<div align="center">16</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Offer Amount" has the meaning set forth in Section [4.09] hereof.

"Offer Period" has the meaning set forth in Section [4.09] hereof.

"Officer" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary, any Assistant Secretary or any Vice-President of such Person.

"Officers' Certificate" means a certificate signed on behalf of the Company by at least two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the controller, the treasurer, the assistant treasurer or the principal accounting officer of the Company, that meets the requirements of Section 15.03 hereof.

"Opinion of Counsel" means an opinion from legal counsel (who may be counsel to, in-house counsel for or an employee of, the Company) that meets the requirements of Section 15.03 hereof.

"Pari Passu Indebtedness" has the meaning set forth in Section [●] hereof.

"Pari Passu Lien Indebtedness" means any Indebtedness of the Company or any of its Restricted Subsidiaries that is secured by a Lien on the Collateral ranking pari passu with the Liens securing the Notes.

"Pari Passu Obligations" means the payment of principal of and interest on the Pari Passu Indebtedness, together with all fees due and other obligations thereunder.

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Paying Agent" has the meaning set forth in Section 2.03 hereof.

"Payment Default" has the meaning set forth in Section 6.01 hereof.

["Permitted Business" means [●].]

["Permitted Business Acquisition" means [●].]

"Permitted Debt" has the meaning set forth in [Section 4.08] hereof.

"Permitted Holders" means (i) [Liberty Harbor], (ii) [Mount Kellett], (iii) [Yucaipa], and (iv) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a majority or more controlling interest of which consist of any one or more of the Persons described in the preceding clauses (i), (ii) and (iii).

["Permitted Investments" means [●].]

17

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

["Permitted Liens" means [●].]

["Permitted Refinancing Indebtedness" means [●].]

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or Governmental Authority or other entity.

"PIK Interest" means interest paid in the form of (1) an increase in the outstanding principal amount of the Notes or (2) the issuance of PIK Notes.

"PIK Notes" has the meaning set forth in Section 2.01(c) hereof.

"Plan of Reorganization" means that certain Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Pursuant to Chapter 11 of the United States Bankruptcy Code filed by The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates on [December 19, 2011] [Docket No. 3063] in the United States Bankruptcy Court for the Southern District of New York, as it may be altered, amended, modified, or supplemented from time to time prior to entry of the Confirmation Order, including any exhibits, supplements, annexes, appendices and schedules thereto, as confirmed by such Bankruptcy Court pursuant to the Confirmation Order.

"Pledge Agreement" means [the pledge agreement, dated as of the Initial Issuance Date, among the Company, the other parties thereto from time to time, and the Collateral Agent, as such agreement may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time].

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions upon liquidation.

"Private Placement Legend" means the legend set forth in Section [●] to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Purchase Date" has the meaning set forth in Section [4.09] hereof.

"Purchase Money Obligation" means Indebtedness of the Company or any Restricted Subsidiary incurred for the purpose of financing all or any part of the purchase price of property, plant or equipment used in the business of the Company or any Restricted Subsidiary or the cost of installation, construction or improvement thereof, and the payment of any sales or other taxes associated therewith; provided, however, that (i) the amount of such Indebtedness shall not exceed such purchase price or cost and payment plus applicable taxes, and (ii) such Indebtedness shall be incurred within one year of such acquisition of such asset by the Company or such Restricted Subsidiary or such installation, construction or improvement.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

18

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Qualified Proceeds" means [●].

"Qualified Public Offering" means [●].

"Rating Agency" means (i) each of Moody's Investors Service, Inc. (or any successor to the rating agency business thereof) ("Moody's") and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (or any successor to the rating agency business thereof) ("S&P") and (ii) if Moody's or S&P ceases to rate the Notes for reasons outside of the Company's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(f) under the Exchange Act selected by the Company as a replacement agency for Moody's or S&P, as the case may be.

"Record Date" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of stockholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors of the Company or by statute, contract or otherwise.

"Registrar" has the meaning set forth in Section 2.03 hereof.

"Related Business Investment" means [●].

"Related Party" means [●].

["Replacement Assets" means (i) assets (other than cash or Cash Equivalents) that will be used or useful in a Permitted Business, (ii) substantially all the assets of a Permitted Business or a majority of the Voting Stock of any Person engaged in a Permitted Business that will become on the date of acquisition thereof a Restricted Subsidiary of such Person or (iii) a combination thereof.]

"Responsible Officer," when used with respect to the Trustee, means any officer within the Corporate Trust Administration of the Trustee (or any successor group of the Trustee) or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer or employee to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" has the meaning set forth in Section 4.07 hereof.

19

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Restricted Subsidiary" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary. Unless otherwise specified, a "Restricted Subsidiary" shall be deemed to be a Restricted Subsidiary of the Company.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"Sale and Lease-Back Transaction" means any arrangement with any Person providing for the leasing by the Company or a Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person in contemplation of such leasing.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute.

"Security Agreement" means the security agreement, dated as of the Initial Issuance Date, among the Company, the other parties thereto from time to time, and the Collateral Agent, as such agreement may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time.

"Significant Subsidiary" means any Subsidiary that would constitute a "significant subsidiary" within the meaning of Article 1 of Regulation S-X of the Securities Act, as in effect on the Initial Issuance Date.

"Specified Holder"  means (i) any Permitted Holder, and (ii) any future holder of Notes that may be considered an Affiliate of the Company but is approved to be a "Specified Holder" by the Board of Directors.

"Stated Maturity" means, with respect to any installment of interest or principal on any Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof. The Stated Maturity of any intercompany Indebtedness payable upon demand shall be the date of demand of payment under such Indebtedness.

"Subordinated Indebtedness" means, with respect to the Notes, (1) any Indebtedness of the Company which is by its terms subordinated in right of payment to the Notes, and (2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"Subsidiary" means, with respect to any specified Person (i) any corporation, association, limited liability company or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency)

20

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof) and (ii) any partnership (A) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (B) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"Surviving Entity" has the meaning set forth in Section 5.01 hereof.

"Suspended Covenants" has the meaning set forth in [Section 4.27(a)] hereof.

"Suspension Date" has the meaning set forth in [Section 4.27(a)] hereof.

"Suspension Period" has the meaning set forth in [Section 4.27(b)] hereof.

["Tenderable Indebtedness" has the meaning set forth in [Section 4.09] hereof.]

["Term Loan Credit Facility" means the term loan credit facility provided under the [Senior Secured Term Loan Credit Agreement dated as of the Initial Issuance Date] by and among [A&P, the co-borrowers party thereto, the Company and the other guarantors party thereto, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent], including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any one or more indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that extend, replace, refund, refinance, renew or defease any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount that may be borrowed thereunder or alters the maturity of the loans thereunder or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or other agent, lender or group of lenders or investors.]

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C.ss.ss.77aaa-77bbbb) as in effect on the date on which this Indenture is qualified under the TIA.

"Total Assets" means, with respect to any Person, the total amount of all assets of such Person and its Subsidiaries, determined on a consolidated basis in accordance with GAAP as shown on the most recent balance sheet of such Person.

"Trading Day" means any day on which (i) there is no Market Disruption Event and (ii) any day on which the principal national or regional securities exchange on which the Common Stock is listed is open for trading, or, if the Common Stock is not listed on a national or regional securities exchange, any Business Day. A "Trading Day" only includes those days that have a scheduled closing time of 4:00 p.m. (New York City time) or the then standard closing time for regular trading on the relevant exchange or trading system.

"Trigger Event" has the meaning set forth in [Section 10.06(b)] hereof.

21

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Trustee" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Underlying Shares" has the meaning set forth in [Section 10.06(b)] hereof.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note substantially in the form of Exhibit A attached hereto that bears the Global Note Legend and that has the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing a series of Notes that do not bear the Private Placement Legend.

"Unrestricted Subsidiary" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a Board Resolution in compliance with Section 4.16, and any Subsidiary of such Subsidiary.

"U.S. Person" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock, as the case may be, at any date, the quotient obtained by dividing (i) the sum of the products of the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock (excluding any payment of interest or dividends thereon) multiplied by the amount of such payment, by (ii) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or Investments by foreign nationals mandated by applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person.

Section 1.02.    Incorporation by Reference of Trust Indenture Act.

The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes and the Note Guarantees;

"indenture security Holder" means a Holder of a Note;

"indenture to be Qualified" means this Indenture;

22

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"indenture trustee" or "institutional trustee" means the Trustee;

"obligor" on the Notes means the Company and any successor obligor upon the Notes or any Guarantor.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule under the TIA have the meanings so assigned to them.

Section 1.03.    Rules of Construction.

Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    words in the singular include the plural, and in the plural include the singular;

(d)    provisions apply to successive events and transactions;

(e)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement of successor sections or rules adopted by the Commission from time to time; and

(f)    references to "property and assets" or "property" or "assets" means any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

Section 1.04.    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer. Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01 hereof) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.04.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by or on behalf of any legal entity other than an individual,

23

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

such certificate or affidavit shall also constitute proof of the authority of the Person executing the same. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)       The ownership of Notes shall be proved by the Note Register.

(d)       Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(e)       The Issuer may set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

(f)       Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this Section 1.05(f) shall have the same effect as if given or taken by separate Holders of each such different part.

(g)       Without limiting the generality of the foregoing, a Holder, including DTC, that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and any Person that is the Holder of a Global Note, including DTC, may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

(h)       The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders. If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date. No

24

such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

## ARTICLE II.

## THE NOTES

Section 2.01.      Form and Dating.

(a)      General. The Notes and the certificate of authentication of the Trustee thereon shall be substantially in the form included in Exhibit A hereto, which is incorporated in and expressly made a part of this Indenture. The notations of the Note Guarantees shall be substantially in the form of Exhibit E hereto, the terms of which are incorporated in and made part of this Indenture. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note shall be dated the date of its authentication. The Notes shall be in minimum denominations of $1,000 and integral multiples of $1,000 in excess thereof, except that PIK Notes which are Definitive Notes may be issued in $1.00 increments.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

The aggregate principal amount of the Notes which may be authenticated and delivered under this Indenture is $250,000,000 in principal amount of Notes (the "Initial Notes") plus any PIK Notes and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to the terms of this Indenture.

(b)      Global Notes. Notes issued in global form shall be substantially in the form of Exhibit A attached hereto bearing the Global Note Legend and with the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.  Notes issued in certificated form shall be substantially in the form of Exhibit A attached hereto but without the Global Note Legend and without the "Schedule of Increases and Decreases of Interests in the Global Note" attached thereto.  Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate amount of outstanding Notes from time to time endorsed thereon and that the aggregate amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions, transfers of Notes, conversions and payments of PIK Interest.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Note Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(c)      PIK Notes.  In connection with the payment of PIK Interest in respect of the Notes, the Company shall increase the outstanding principal amount of the Notes or issue

<div align="center">25</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

additional Notes (the "PIK Notes") under this Indenture on the same terms and conditions as the Notes issued on the Initial Issuance Date (other than the issuance dates and the date from which interest will accrue). The Initial Notes and any PIK Notes, subsequently issued under this Indenture shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase, except as provided in Article IX hereof. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture shall include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment, and references to "principal amount" of the Notes include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment.

(d)    Euroclear and Clearstream Procedures Applicable. The provisions of Euroclear and Clearstream shall be applicable to transfers of beneficial interests in Global Notes that are held by Participants through Euroclear or Clearstream.

Section 2.02.    Execution and Authentication.

Two Officers shall sign the Notes for the Company by manual or facsimile signature. If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

On the Initial Issuance Date, the Trustee shall, upon receipt of a written order of the Company signed by two Officers ("Authentication Order"), authenticate the Initial Notes in an aggregate principal amount of $250,000,000. In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any PIK Notes for an aggregate principal amount specified in such Authentication Order for such PIK Notes issued hereunder. The Trustee shall authenticate and deliver any PIK Notes (or increases in the principal amount of any Global Notes) as a result of a payment of PIK Interest, for an aggregate principal amount specified in such Authentication Order for such PIK Notes (or increases in the principal amount of any Global Notes) issued or increased hereunder, for original issue upon receipt of an Authentication Order.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

Section 2.03.    Registrar, Paying Agent and Conversion Agent.

The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar"), an office or agency where Notes may be presented for payment ("Paying Agent") and an office or agency where Notes may be presented for conversion ("Conversion Agent"). The Registrar shall keep a register of the Notes (the

26

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

"Notes Register") and of their transfer and exchange. The Company may appoint one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term "Registrar" includes any co-registrar, the term "Paying Agent" includes any additional paying agent and the term "Conversion Agent" includes any additional conversion agents. The Company may change any Paying Agent, Registrar or Conversion Agent without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar, Paying Agent or Conversion Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent, Registrar or Conversion Agent.

[The Company initially appoints The Depository Trust Company ("DTC") to act as Depositary with respect to the Global Notes.]

The Company initially appoints the Trustee to act as the Registrar, Paying Agent and Conversion Agent, and to act as Note Custodian with respect to the Global Notes.

Section 2.04.    Paying Agent to Hold Money in Trust.

The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or interest on the Notes, and will notify the Trustee of any default by the Company or any Guarantor in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) shall have no further liability for the money received from the Company or a Subsidiary. If the Company or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company or a Guarantor, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05.    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Company shall, or shall cause the Registrar to, furnish to the Trustee at least seven Business Days before each interest payment date, and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes.

Section 2.06.    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes. A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. Global Notes will not be exchanged by the Company for Definitive Notes unless (i) the Depositary

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(A) notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes and the Company fails to appoint a successor depositary within ninety (90) days of delivery of such notice or (B) has ceased to be a clearing agency registered under the Exchange Act, and the Company fails to appoint a successor depositary within ninety (90) days of delivery of such notice or (ii) there shall have occurred and be continuing a Default or Event of Default with respect to the Notes. Beneficial interests in a Global Note may also be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of the Depositary in accordance with this Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)     Transfer and Exchange of Beneficial Interests in the Global Notes. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)     Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)     All Other Transfers and Exchanges of Beneficial Interests in Global Notes. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) above, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or

28

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(iii)     Transfer of Beneficial Interests to Another Restricted Global Note. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) above and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)     if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C)     if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications and certificates and opinion of counsel required by item (3) thereof, if applicable.

(iv)     Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in the Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) above and the Registrar receives the following:

(A)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(B)     if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

29

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

and, if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(v)     Through and including the 40th day after the Initial Issuance Date, beneficial interests in the Regulation S Global Note may be held only through Euroclear or Clearstream, unless transferred to a person that takes delivery through a Rule 144A Global Note.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)     Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)     Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B)     if such beneficial interest is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)     if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

30

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(E)      if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable;

(F)      if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount.

Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)      Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(A)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Definitive Note that does not bear the Private Placement Legend, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(B)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a Definitive Note that does not bear the Private Placement Legend, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

31

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

and, if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)     Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iii) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iii) shall not bear the Private Placement Legend.

(d)     Transfer and Exchange of Definitive Notes for Beneficial Interests in a Global Note.

(i)     Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)     if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

32

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(D)      if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)      if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable;

(F)      if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof;

(G)      if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof;

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, in the case of clause (C) above, the Regulation S Global Note, and in all other cases, the IAI Global Note.

(ii)      Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A)      if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(B)      if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an opinion of counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer

<div align="center">33</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(ii), the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)     Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)     Transfer and Exchange of Definitive Notes for Definitive Notes. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(i)     Restricted Definitive Notes to Restricted Definitive Notes. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)     if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)     if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C)     if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver

34

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

a certificate in the form of Exhibit B hereto, including the certifications, certificates and opinion of counsel required by item (3) thereof, if applicable.

(ii)     Restricted Definitive Notes to Unrestricted Definitive Notes. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A)     if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(B)     if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof; and, in each such case set forth in this subparagraph (D), if the Registrar so requests, an opinion of counsel in form reasonably acceptable to the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)     Unrestricted Definitive Notes to Unrestricted Definitive Notes. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)     Legends. The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(i)     Intercreditor Agreement. Each Global Note and each Definitive Note (and all Notes issued in exchange therefore or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN INTERCREDITOR AGREEMENT DATED AS OF [●], 2012, AMONG [INTERCREDITOR PARTIES], THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. AND THE SUBSIDIARIES OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. PARTY THERETO (THE "INTERCREDITOR AGREEMENT"), AND EACH HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT."

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(ii)     Tax Legend.

(A)     Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED. THE ISSUE PRICE OF THIS NOTE WAS 100.0% OF ITS PRINCIPAL AMOUNT; THE TOTAL AMOUNT OF ORIGINAL ISSUE DISCOUNT IS $[●] PER NOTE WITH A PRINCIPAL AMOUNT OF $1,000; THE INITIAL ISSUANCE DATE IS [●]; AND THE YIELD TO MATURITY IS [●%]."

(iii)    Private Placement Legend.

(A)     Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF [*DELAWARE HOLDING COMPANY*] (THE "COMPANY") THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT

36

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY IF THE COMPANY SO REQUESTS), (2) TO THE COMPANY OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY."

(B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(ii), (c)(iii), (d) (ii), (d)(iii), (e)(ii), (e)(iii) or (f) to this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(iv)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

"UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN CERTIFICATED FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(g) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART

37

PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY."

(g)    Cancellation and/or Adjustment of Global Notes. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)    General Provisions Relating to Transfers and Exchanges.

(i)    To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon the Company's order or at the Registrar's request.

(ii)    No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.07, 3.08, 4.09, 4.14 and 9.05 hereof).

(iii)    The Registrar shall not be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    The Company shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and

38

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(vi)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(vii)     The Trustee shall authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(viii)     All certifications, certificates and opinions of counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(ix)     The Trustee shall have no obligation or duty to monitor, determine of inquire as to compliance with any restrictions on transfer that may be imposed under this Indenture with respect to the Notes or under applicable law, other than to require delivery of such certificates, documentation or other evidence as are expressly required by, and to do so if and when expressly required by, this Indenture. The Trustee shall have no responsibility for any actions taken or not taken by the Depositary.

Section 2.07.     Replacement Notes.

If any mutilated Note is surrendered to the Trustee, or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon the written order of the Company signed by two Officers of the Company, shall authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company and the Trustee each may charge for their respective expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

The provisions of this Section 2.07 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

39

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 2.08.       Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, such Note ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, the Note ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

If a Note is converted in accordance with Article X, then from and after the time of conversion on the Conversion Date, such Note shall cease to be outstanding and interest, if any, shall cease to accrue on such Note.

Section 2.09.       Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company, any Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company (other than a Specified Holder), shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Trustee knows are so owned shall be so disregarded.

Section 2.10.       Temporary Notes.

Until definitive Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes upon a written order of the Company signed by two Officers of the Company. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

40

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 2.11.    Cancellation.

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar, Paying Agent and Conversion Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange, conversion or payment. The Trustee (and no one else) shall cancel all Notes surrendered for registration of transfer, exchange, conversion, payment, replacement or cancellation and shall destroy cancelled Notes (subject to the record retention requirement of the Exchange Act). Certification of the destruction of all cancelled Notes shall be delivered to the Company. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12.    Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof, and such defaulted interest shall cease to be payable to the Persons who were Holders on the relevant regular record date. The Company shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company shall fix or cause to be fixed each such special record date and payment date; provided, that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) shall mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

## ARTICLE III.

## REDEMPTION AND PREPAYMENT

Section 3.01.    Optional Redemption.

The Notes may not be redeemed at the option of the Company.

Section 3.02.    Mandatory Redemption.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

## ARTICLE IV.

## COVENANTS

Section 4.01.    Payment of Notes.

The Company shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any,

41

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

and interest shall be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 11:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

An installment of PIK Interest shall be considered paid on the due date if on such date (1) if PIK Notes (including PIK Notes that are Global Notes) have been issued therefor, such PIK Notes have been authenticated in accordance with the terms of this Indenture and (2) if the payment is made by increasing the principal amount of Global Notes then authenticated, the Trustee has increased the principal amount of Global Notes then authenticated by the required amount.

With respect to interest on the Notes for an annual period due on an Interest Payment Date, the Company shall pay the interest due on the Notes on such Interest Payment Date by payment of PIK Interest for such annual period at the rate of 14% per annum.

[No later than five (5) Business Days prior to any Interest Payment Date on which the Company is paying PIK Interest, the Company shall deliver to the Trustee and the Paying Agent (if other than the Trustee), (i) with respect to Notes represented by Definitive Notes, the required amount of new PIK Notes (rounded up to the nearest whole dollar) and an Authentication Order to authenticate and deliver such PIK Notes or (ii) with respect to Notes represented by one or more Global Notes, an Authentication Order to increase the outstanding principal amount of such Global Note by the required amount (rounded up to the nearest whole dollar) (or, if necessary, pursuant to the requirements of the Depositary or otherwise, the required amount of new Notes represented by Global Notes (rounded up to the nearest whole dollar) and an Authentication Order to authenticate and deliver such new Global Notes).]

[The Company shall pay interest (including without limitation any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in such proceeding) on overdue principal at the rate equal to 16% per annum, in cash.  Prior to an Event of Default, the Company shall pay interest (including without limitation any interest in any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in such proceeding) on overdue installments of interest at the rate equal to 14% per annum, in cash.  During the continuance of an Event of Default, the Company shall pay interest (including without limitation any interest in any proceeding under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in such proceeding) on overdue installments of interest at the rate equal to 16% per annum, in cash.]

Section 4.02.    Maintenance of Office or Agency.

The Company shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar, Paying Agent or Conversion Agent) where Notes may be surrendered for registration of transfer, exchange, purchase, redemption or conversion and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of

42

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company also from time to time may designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and from time to time may rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.03.

Section 4.03.    Investment Company Act.

The Company shall not, and shall not permit any of its Subsidiaries to, become an investment company subject to registration under the Investment Company Act of 1940, as amended.

Section 4.04.    Compliance Certificate.

(a)    The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year, a certificate signed by the Company's principal executive officer, principal financial officer or principal accounting officer stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing officer with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture and further stating, as to the officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)    So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants or the Public Company Accounting Oversight Board, the year-end financial statements delivered pursuant to Section 4.19 shall be accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article IV or Article V hereof insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and

43

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)    The Company shall, so long as any of the Notes are outstanding, deliver to the Trustee, forthwith upon the Company or any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.05.    Taxes.

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies, except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06.    Stay, Extension and Usury Laws.

The Company and each Guarantor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power granted herein (or in any Collateral Document) to the Trustee or the Collateral Agent, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07.    Restricted Payments.

[TO COME]

Section 4.08.    Incurrence of Indebtedness.

[TO COME]

Section 4.09.    Asset Sales.

[TO COME]

Section 4.10.    Liens.

[TO COME]

Section 4.11.    Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

[TO COME]

44

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.12.    Events of Loss.

[TO COME]

Section 4.13.    Corporate Existence.

Subject to Article V hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect (a) its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary and (b) the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided, however, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors of the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.14.    [Intentionally Omitted]

Section 4.15.    Transactions with Affiliates.

[TO COME]

Section 4.16.    Designation of Restricted and Unrestricted Subsidiaries.

[TO COME]

Section 4.17.    Guarantees.

[TO COME]

Section 4.18.    Business Activities.

[TO COME]

Section 4.19.    Financial Reporting and Delivery of Certain Information.

(a)    Holders will be entitled to receive (subject to such Holder's agreement to the terms of a confidentiality agreement acceptable to the Company): (1) within 120 days after the end of each fiscal year, audited consolidated financial statements of the Company for such fiscal year and the prior fiscal year, certified by a national accounting firm and prepared in accordance with GAAP; and (2) within 60 days after the end of each of the first three fiscal quarters, unaudited condensed consolidated financial statements of the Company for such quarter and the year-to-date period and the comparable quarter and year-to-date periods of the prior fiscal year, certified by the Company's chief financial officer and prepared in accordance with GAAP.

45

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b)      The Company shall be deemed to have furnished to the Holders the reports referred to in Section 4.19(a) if the Company has posted such reports on the Company Website. For purposes of this Section 4.19, the term "Company Website" means the collection of web pages that may be accessed on the World Wide Web using the URL address http://www.aptea.com or such other address as the Company may from time to time designate in writing to the Trustee.

(c)      If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries (other than Unrestricted Subsidiaries that, when taken together with all other Unrestricted Subsidiaries, are "minor" within the meaning of Rule 3-10 of Regulation S-X, substituting 5% for 3% where applicable), then the quarterly and annual financial information required by this Section 4.19 shall include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(d)      The Company and the Guarantors have agreed that, for so long as any Notes remain outstanding, they will furnish to the Holders, beneficial owners of Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(e)      In no event shall the Company be required to include separate financial statements or consolidating footnote information for any Guarantors or non-guarantor Subsidiaries.

Section 4.20.      Impairment of Security Interest.

Subject to the rights of the holders of Permitted Liens, the Company and the Guarantors shall not take or omit to take any action, which action or omission would impair or could reasonably be expected to have the result of impairing, the security interest or Lien with respect to the Collateral for the benefit of the Trustee, the Collateral Agent and the Holders of the Notes, except to the extent otherwise permitted by Article IX and Article XIII of this Indenture or by the Collateral Documents, including the Intercreditor Agreement.

Section 4.21.      After-Acquired Property.

(a)      [Promptly following the acquisition by the Company or any Guarantor of any After-Acquired Property, the Company or such Guarantor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates, title insurance and Opinions of Counsel as shall be reasonably necessary to vest in the Trustee or the Collateral Agent a perfected security interest, mortgage or other Lien in such After-Acquired Property that is of second (subject only (x) if and to the extent of the Liens of first priority required by the Intercreditor Agreement and (y) other Permitted Liens) priority and to have such After-Acquired Property added to the Collateral including, but not limited to, those items set forth in Section 4.24 hereof, *mutatis mutandis*, and, to the extent commercially reasonable, the Leasing Deliverables, where applicable, in each case, in respect of such After-Acquired Property and thereupon all provisions of this Indenture and the Collateral Documents relating to the

46

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Collateral shall be deemed to relate to such After-Acquired Property to the same extent and with the same force and effect.]

(b)      [Notwithstanding Section 4.21(a), if granting or perfecting any Lien to secure the Note Obligations on any Collateral that consists of rights that are licensed or leased from a third-party requires the consent of such third party pursuant to the terms of an applicable license or lease agreement, and such terms are enforceable under applicable law, the Company or the Guarantors, as the case may be, will use all commercially reasonable efforts to obtain such consent with respect to the granting or perfecting of such Lien, but if the third party does not consent to the granting or perfecting of such Lien after the use of commercially reasonable efforts, none of the Company or the Guarantors will be required to do so.]

Section 4.22.      Creation and Perfection of Liens Securing Collateral; Further Assurances.

(a)      On or prior to the Initial Issuance Date, the Company and the Guarantors shall have granted, created and perfected the security interests, mortgages and other Liens created or intended to be created in the Collateral Documents in the Collateral in favor of the Collateral Agent for the benefit of the Trustee, the Collateral Agent and the Holders of the Notes; provided, that to the extent any such security interest, mortgage or other Lien was not perfected by the Initial Issuance Date, the Company and the Guarantors shall use commercially reasonable efforts to have all security interests, mortgages and other Liens granted, created and perfected, to the extent required by the Collateral Documents, as promptly as practicable following the Initial Issuance Date.

(b)      The Company and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Trustee or the Collateral Agent may reasonably request, in order to grant, create, preserve, enforce, protect and perfect the validity and priority of the security interests, mortgages and other Liens created or intended to be created by this Indenture or the Collateral Documents in the Collateral.

(c)      In addition, from time to time, the Company and the Guarantors shall reasonably promptly secure the Note Obligations by pledging or creating, or causing to be pledged or created, perfected security interests, mortgages and other Liens with respect to the Collateral. Such security interests, mortgages and Liens shall be created under the Collateral Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Trustee or the Collateral Agent.

(d)      The Company and each of the Guarantors shall do or cause to be done all acts and things that may be required, or that the Trustee or the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the Trustee, the Collateral Agent and the Holders of the Notes, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Initial Issuance Date), in each case, as contemplated by, and with the lien priority required under, this Indenture and the Collateral Documents; provided that the Company and the Guarantors shall not be required to provide, and the Collateral Agent shall not request, any additional Liens in respect of any Excluded Assets.

47

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(e)      Upon request of the Trustee or the Collateral Agent at any time after an Event of Default has occurred and is continuing, the Company and the Guarantors shall, and shall cause the Restricted Subsidiaries to, (i) permit the Trustee or the Collateral Agent or any advisor, auditor, consultant, attorney or representative acting for the Trustee or the Collateral Agent, upon reasonable notice to the Company and during normal business hours, to visit and inspect any of the property of the Company and its Subsidiaries, to review, make extracts from and copy the books and records of the Company and its Subsidiaries relating to any such property, and to discuss any matter pertaining to any such property with the officers and employees of the Company and its Subsidiaries, and (ii) deliver to the Trustee or the Collateral Agent such reports, including valuations, relating to any such property or any Lien thereon as the Trustee or the Collateral Agent may reasonably request. The Company shall promptly reimburse the Trustee and Collateral Agent for all reasonable costs and expenses incurred by the Trustee or Collateral Agent in connection therewith, including all reasonable fees and charges of any advisors, auditors, consultants, attorneys or representatives acting for the Trustee or for the Collateral Agent.

Section 4.23.      Insurance.

(a)      The Company and the Guarantors shall:

(i)      keep their properties adequately insured at all times by financially sound and reputable insurers;

(ii)      maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by them;

(iii)      maintain such other insurance as may be required by law; and

(iv)      maintain such other insurance as may be required by the Collateral Documents.

(b)      The Collateral Agent shall be named as an additional insured and loss payee as its interests may appear, and the Company and the Guarantors shall within sixty (60) calendar days following the end of each six month period ending on March 31 or September 30 of any year, furnish to the Collateral Agent copies of certificates of insurance and copies of insurance policies (or endorsements thereof) showing compliance with this sentence. Upon the request of the Trustee or the Collateral Agent, the Company and the Guarantors shall furnish to the Collateral Agent full information as to their property and liability insurance carriers.

Section 4.24.      Real Estate.

[TO COME]

48

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.25.    Sale and Lease-Back Transactions.

[TO COME]

Section 4.26.    Incurrence of Senior Subordinated Debt.

[TO COME]

Section 4.27.    Suspension of Certain Covenants.

[TO COME]

# ARTICLE V.

## SUCCESSORS

Section 5.01.    Merger, Consolidation or Sale of Assets.

The Company shall not: (i) consolidate or merge with or into another Person (whether or not the Company is the surviving corporation) or (2) sell, assign, transfer, convey, lease or otherwise dispose of all or substantially all of the properties and assets of the Company, in one or more related transactions, to another Person, unless at the time and after giving effect thereto:

(1)     either: (a) the Company is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition will have been made (the "Surviving Entity") (i) is a corporation organized or existing under the laws of the United States, any state thereof or the District of Columbia and (ii) assumes all the obligations of the Company under the Notes, this Indenture and the Collateral Documents;

(2)     immediately after giving effect to such transaction on a *pro forma* basis (and treating any Indebtedness not previously an obligation of the Company or any of its Restricted Subsidiaries which becomes the obligation of the Company or any of its Restricted Subsidiaries as a result of such transaction as having been incurred at the time of such transaction), no Default or Event of Default exists;

(3)     immediately after giving *pro forma* effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period, the Company or the Surviving Entity (if other than the Company) would, on the date of such transaction, be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in [Section 4.08(a)];

(4)     each Guarantor, unless such Guarantor is the Person with which the Company has entered into a transaction under this Section 5.01, will have by amendment to its Note Guarantee confirmed that its Note Guarantee will apply to the obligations of the Company or the Surviving Entity in accordance with the Notes and this Indenture;

49

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(5)      the Company delivers to the Trustee an Officers' Certificate stating that such transaction and such agreement comply with this Section 5.01 and that all conditions precedent provided for herein relating to such transaction have been complied with;

(6)      the Collateral transferred to the Surviving Entity will (a) continue to constitute Collateral under this Indenture and the Collateral Documents, (b) be subject to the Lien in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes, and (c) not be subject to any Lien, other than Permitted Liens; and

(7)      to the extent that the assets of the Person which is merged or consolidated with or into the Surviving Entity are assets of the type which would constitute Collateral under the Collateral Documents, the Surviving Entity will take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the Collateral Documents in the manner and to the extent required in this Indenture and the Collateral Documents.

Clauses (2), (3) and (5) of this Section 5.01 will not apply to any merger, consolidation or sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and any of its Wholly Owned Restricted Subsidiaries.

Section 5.02.      Successor Corporation Substituted.

Upon any consolidation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the assets of the Company or the Company and its Restricted Subsidiaries taken as a whole, in accordance with Section 5.01 hereof, the Surviving Entity will succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the Surviving Entity and not to the Company), and may exercise every right and power of, the Company under this Indenture with the same effect as if such Surviving Entity had been named as the Company herein. In any such event (other than any transfer by way of lease), the predecessor Company shall be released and discharged from all liabilities and obligations in respect of the Notes and this Indenture and the predecessor Company may be dissolved, wound up or liquidated at any time thereafter.

## ARTICLE VI.

## DEFAULTS AND REMEDIES

Section 6.01.      Events of Default.

Each of the following shall constitute an "Event of Default":

(a)      default for 30 days in the payment when due of interest on the Notes;

(b)      default in payment when due (whether at maturity, upon acceleration, redemption or otherwise) of the principal of, or premium, if any, on the Notes;

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(c)      failure by the Company or any of its Restricted Subsidiaries to comply with (i) the provisions described in [Section 4.09], [Section 4.12] or [Section 4.14], for a period of more than 30 days, or (ii) the provisions described under Article V;

(d)      failure by the Company or any of its Restricted Subsidiaries for [45 days] after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes outstanding to comply with any of the other agreements in this Indenture;

(e)      default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries whether such Indebtedness or Guarantee now exists, or is created after the Initial Issuance Date, if that default (A) is caused by a failure to make any payment when due at the Stated Maturity of such Indebtedness (a "Payment Default") or (B) results in the acceleration of such Indebtedness prior to its Stated Maturity, and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $[●] million or more;

(f)      failure by the Company or any of its Restricted Subsidiaries to pay final judgments (to the extent such judgments are not paid or covered by insurance provided by a carrier that has not denied coverage in writing) aggregating in excess of $[●] million, to the extent such judgments are not discharged or stayed for a period of more than 60 days after such judgments have become final and non-appealable;

(g)      except as permitted by this Indenture, any Note Guarantee of a Guarantor that is a Significant Subsidiary, or the Note Guarantees of any group of Guarantors that, taken together, would constitute a Significant Subsidiary, shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of any Guarantor, shall deny or disaffirm its obligations under its Note Guarantee;

(h)      failure by the Company to issue Common Stock upon automatic conversion of the Notes or voluntary conversion of Notes by a Holder in accordance with the provisions of this Indenture and the Notes;

(i)      the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary):

(i)      commences a voluntary case,

(ii)      consents to the entry of an order for relief against it in an involuntary case,

(iii)      consents to the appointment of a Custodian of it or for all or substantially all of its property,

(iv)      makes a general assignment for the benefit of its creditors, or

(v)      generally is not paying its debts as they become due;

51

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(j)      a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)      is for relief against the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary) in an involuntary case;

(ii)      appoints a Custodian of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary) or for all or substantially all of the property of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary); or

(iii)      orders the liquidation of the Company, any Guarantor or any Significant Subsidiary of the Company (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary);

and the order or decree remains unstayed and in effect for 60 consecutive days; or

(k)      (i) there shall be a default in the performance, or breach, of any covenant or agreement of the Company or any Guarantor, which materially adversely affects the Lien on or the value of the Collateral taken as a whole, under any Collateral Document and such default or breach shall continue for a period of 30 days after written notice has been given, by certified mail, (A) to the Company by the Trustee or (B) to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the then outstanding Notes, (ii) any Collateral Document shall for any reason cease to be in full force and effect and enforceable in accordance with its terms with respect to a Lien on Collateral with a Fair Market Value of more than $[●] million, if not remedied within 30 days after written notice has been given, by certified mail, (A) to the Company by the Trustee or (B) to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the then outstanding Notes except to the extent contemplated by this Indenture and any such Collateral Document or due to any act or omission of the Trustee or Credit Facility Collateral Agent, or (iii) the Company or any Guarantor denies, repudiates or disaffirms in writing any material obligation under any Collateral Document.

Section 6.02.      Acceleration.

If any Event of Default (other than an Event of Default specified in clause (i) or (j) of Section 6.01 hereof with respect to the Company) occurs and is continuing, the Trustee may (and if so directed in writing by Holders of at least 25% in aggregate principal amount of the then outstanding Notes, the Trustee shall) declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default(s). Upon any such declaration, the Notes shall become due and payable in cash on the [second (2nd)] Business Day following delivery of such notice in writing. Notwithstanding the foregoing, if an Event of Default specified in clause [i] or [j] of Section 6.01 hereof occurs with respect to the Company, all outstanding Notes shall become due and payable immediately in cash without further action, notice or declaration on the part of the Trustee or any Holder.

52

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

After a declaration of acceleration, but before any exercise of remedies by the Trustee, the holders of [a majority] in aggregate principal amount of Notes outstanding, by written notice to the Company and the Trustee, may rescind and annul such declaration and its consequences if (a) the Company has paid or deposited with the Trustee a sum in cash sufficient to pay (1) all sums paid or advanced by the Trustee under this Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, (2) all overdue interest on all Notes then outstanding, (3) the principal of, and premium, if any, on any Notes then outstanding which have become due otherwise than by such declaration of acceleration and interest thereon at the rate borne by the Notes and (4) to the extent that payment of such interest is lawful, interest upon overdue interest at the rate borne by the Notes, (b) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (c) all Events of Default, other than the non-payment of principal of, premium, if any, and interest on the Notes which have become due solely by such declaration of acceleration, have been cured or waived as provided in this Indenture. No such rescission shall affect any subsequent default or impair any right consequent thereon.

Section 6.03.    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or any Collateral Document.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee, the Collateral Agent or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04.    Waiver of Past Defaults.

Subject to Section 6.07 and 9.02 hereof, the Holders of [a majority] in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences under this Indenture or the Collateral Documents except a continuing Default or Event of Default in the payment of interest on, or the principal of, the Notes (including in connection with an offer to purchase); provided, however, that the Holders of [a majority] in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.05.    Control by [Majority].

Holders of [a majority] in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

available to the Trustee or exercising any trust or power conferred on it; provided, however, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders of Notes not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders of Notes.

Section 6.06.     Limitation on Suits.

Subject to Section 6.07 hereof, Holders of the Notes may not enforce this Indenture or the Notes except as provided herein. A Holder of a Note may not pursue any remedy with respect to this Indenture or the Notes unless:

(a)     the Holder of a Note gives to the Trustee written notice of a continuing Event of Default;

(b)     the Holders of at least [●]% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)     such Holder of a Note or Holders of Notes offer the Trustee indemnity satisfactory to the Trustee against any costs, liability or expense;

(d)     the Trustee does not comply with the request within sixty (60) days after receipt of the request and the offer of indemnity; and

(e)     during such sixty (60)-day period, the Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07.     Rights of Holders of Notes to Receive Payment.

Notwithstanding any other provision of this Indenture (including Section 6.06) or any Collateral Document, the rights of any Holder of a Note to receive payment of principal of, and premium, if any, or interest on, such Note or to bring suit for the enforcement of any such payment on or after the respective due dates expressed in the Note (including in connection with an offer to purchase) or to convert the Notes in accordance with Article X, to vote or receive dividends or distributions with respect to Common Stock in accordance with Article XI, shall be absolute and unconditional and shall not be impaired or affected without the consent of such Holder, except to the extent that the institution or prosecution thereof or the entry of judgment thereon would, under applicable law, result in the surrender, impairment, waiver or loss of any Lien of a Collateral Document upon any property subject to such Lien.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 6.08.    Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company or any Guarantor for the whole amount of principal of, premium, if any, and interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09.    Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.    Priorities.

If the Trustee collects any money pursuant to this Article VI, it shall pay out the money in the following order:

FIRST: to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

SECOND: to Holders of Notes for amounts due and unpaid on the Notes for principal of, premium, if any, and interest on, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal of, premium, and interest on, respectively; and

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

THIRD: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11.    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

Section 6.12.    Restoration of Rights and Remedies.

If the Trustee or any Holder of Notes has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case the Company, the Trustee and the Holders shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.13.    Rights and Remedies Cumulative.

Except as otherwise provided in Section 2.07 hereof, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.14.    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article VI or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE VII.

## TRUSTEE

Section 7.01.    Duties of Trustee.

(a)    If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.

However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01. No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holder, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(e)    The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)    The Trustee shall not be deemed to have knowledge of any Default or Event of Default unless (i) the Trustee or a Responsible Officer shall have actual knowledge of a Default or an Event of Default, (ii) the Trustee or a Responsible Officer shall have received notice of a Default or an Event of Default in accordance with the provisions of this Indenture or (iii) a Default or an Event of Default occurred or is occurring pursuant to Section 4.01 hereof.

Section 7.02.    Rights of Trustee.

(a)    The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. Except as provided in Section 7.01(b), the Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, the Trustee may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care. The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture; provided, that the Trustee's conduct does not constitute willful misconduct or negligence.

(d)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company or Guarantor shall be sufficient if signed by an Officer of the Company or such Guarantor.

(e)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order, demand or direction of any of the Holders unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that might be incurred by it in compliance with such request, order, demand or direction.

(f)    Except with respect to Section 4.01, the Trustee shall have no duty to inquire as to the performance of the Company with respect to the covenants contained in Article IV. In addition, the Trustee shall not be deemed to have knowledge of an Event of Default except (i) any Default or Event of Default occurring pursuant to Sections 4.01, 6.01(a) or 6.01(b) or (ii) any Default or Event of Default of which the Trustee shall have received written notification or obtained actual knowledge.

58

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(g)    Delivery of reports, information and documents to the Trustee under Section 4.19 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 7.03.    Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee; provided, however, in the event that the Trustee acquires any conflicting interest, the Trustee must (a) eliminate such conflict within 90 days, (b) if a registration statement with respect to the Notes is effective, apply to the Commission for permission to continue as Trustee or (c) resign as Trustee. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04.    Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05.    Notice of Defaults.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06.    Reports by Trustee to Holders of the Notes.

Within 60 days after May 15 of each year commencing with the year 2013, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date:

(a)    that would comply with TIA §313(a) if this Indenture had been qualified under the TIA (but if no event described in TIA §313(a) has occurred within the 12 months preceding the reporting date, no report need be transmitted), and

(b)    describing the character and amount of any advances made by it as such since the date of the last report transmitted pursuant to this Section 7.06 (or if no such report has yet been so transmitted, since the Initial Issuance Date), for the reimbursement of which it claims or may

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

claim a lien or charge, prior to that of the Notes, on the trust estate or on property or funds held or collected by it as such trustee, and which it has not previously reported pursuant to this Section 7.06, if such advances remaining unpaid at any time aggregate more than 10 per centum of the principal amount of the Notes outstanding at such time, such report to be so transmitted within 90 days after such time.

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Company and filed with each stock exchange on which the Notes are listed, if any. The Company shall promptly notify the Trustee when the Notes are listed on any stock exchange.

Section 7.07.    Compensation and Indemnity.

The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Company shall indemnify the Trustee against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.07) and defending itself against any claim (whether asserted by the Company or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations hereunder (except to the extent such failure prejudices the Company). The Company shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel, and the Company shall pay the reasonable fees and expenses of one such counsel. The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

The obligations of the Company under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.

To secure the Company's payment obligations in this Section 7.07, the Trustee shall have a Lien (which Lien shall be a Permitted Lien) prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(i) or (j) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

60

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 7.08.    Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company. The Holders of Notes of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing. The Company may remove the Trustee if:

(a)    the Trustee fails to comply with Section 7.10 hereof;

(b)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)    a Custodian or public officer takes charge of the Trustee or its property; or

(d)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.  Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

If a successor Trustee does not take office within 90 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of Notes of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10, such Holder of a Note may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders of the Notes. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided, all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

61

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 7.09.      Successor Trustee by Merger, Etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee; provided, that such corporation shall be otherwise qualified and eligible under this Article VII, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any Notes shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes. In the event that any Notes shall not have been authenticated by such predecessor Trustee, any such successor Trustee may authenticate and deliver such Notes, in either its own name or that of its predecessor Trustee, with the full force and effect which this Indenture provides for the certificate of authentication of the Trustee.

Section 7.10.      Eligibility; Disqualification.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus (with its affiliates) of at least $50.0 million as set forth in its most recent published annual report of condition.

If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 7.10, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. None of the Company or any of its Affiliates shall serve as Trustee hereunder. If at any time the Trustee shall cease to be eligible to serve as Trustee hereunder pursuant to the provisions of this Section 7.10, it shall resign immediately in the manner and with the effect specified in this Article VII.

This Indenture shall always have a Trustee who satisfies the requirements of TIA §310(a)(1), (2) and (5). The Trustee shall be subject to the requirements of TIA §310(b) as if this Indenture had been qualified under the TIA.

Section 7.11.      Preferential Collection of Claims Against Company.

The Trustee shall be subject to the requirements of TIA §311(a) as if this Indenture had been qualified under the TIA, excluding any creditor relationship listed in TIA §311(b). A Trustee who has resigned or been removed shall still be subject to the requirements of TIA §311(a) to the extent indicated therein.

62

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE VIII.

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01.      Option to Effect Legal Defeasance or Covenant Defeasance.

The Company may, at the option of its Board of Directors evidenced by a resolution set forth in an Officers' Certificate, at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article VIII.

Section 8.02.      Legal Defeasance and Discharge.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations with respect to all outstanding Notes (and the Guarantors shall be deemed to have been discharged from their Note Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance"). For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture, and all Obligations of the Guarantors with respect to their Note Guarantees shall be discharged (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders of outstanding Notes to receive from the trust fund described in Section 8.04 hereof, and as more fully set forth in such Section, payments in respect of the principal of or interest or premium, if any, on such Notes when such payments are due; (b) the Company's obligations with respect to such Notes under Article II and Section 4.02 hereof; (c) the rights, powers, trusts, duties and immunities of the Trustee hereunder, and the Company's and the Guarantors' obligations in connection therewith; and (d) this Article VIII (and applicable provisions of Article III insofar as the Notes are to be defeased through a redemption date). Subject to compliance with this Article VIII, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03.      Covenant Defeasance.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in [Sections 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.15, 4.16, 4.17, 4.18, 4.20, 4.21, 4.22, 4.23, 4.24, 4.25, 4.26, 4.27 and 5.01] hereof with respect to the outstanding Notes on and after the date the conditions set forth below are satisfied (hereinafter, "Covenant Defeasance"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder

63

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenants, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenants or by reason of any reference in any such covenants to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03 hereof, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(c) through 6.01[(g)] and 6.01[(k)] hereof shall not constitute Events of Default. Notwithstanding any Covenant Defeasance hereunder, however, the rights, powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations in connection therewith, shall survive until otherwise terminated or discharged hereunder.

Section 8.04.      Conditions to Legal or Covenant Defeasance.

        The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the outstanding Notes:

        (a)      the Company must irrevocably deposit or cause to be deposited with the Trustee, in trust, for the benefit of the Holders, cash in United States dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, or interest and premium, on the outstanding Notes on the Stated Maturity or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to maturity or to a particular redemption date;

        (b)      in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that (i) the Company has received from, or there has been published by, the Internal Revenue Service a ruling or (ii) since the Initial Issuance Date, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders and beneficial owners of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

        (c)      in the case of Covenant Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that the Holders and the beneficial owners of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(d)      no Default or Event of Default shall have occurred and be continuing either (i) on the date of such deposit or (ii) insofar as Sections 6.01[(i)] or 6.01[(j)] hereof are concerned, at any time in the period ending on the 91st day after the date of deposit;

(e)      such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, any material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(f)      the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that (i) assuming no intervening bankruptcy of the Company or any Guarantor between the date of deposit and the 91st day following the deposit and assuming that no Holder is an "insider" of the Company under applicable bankruptcy law, after the 91st day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, including Section 547 of the United States Bankruptcy Code and Section 15 of the New York Debtor and Creditor Law, and (ii) the creation of the defeasance trust does not violate the Investment Company Act of 1940;

(g)      the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others;

(h)      if the Notes are to be redeemed prior to their Stated Maturity, the Company shall deliver to the Trustee irrevocable instructions to redeem all of the Notes on the specified redemption date; and

(i)      the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05.      Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non- callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than

65

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article VIII to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the request of the Company any money or noncallable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06.    Repayment to Company.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest, on any Note and remaining unclaimed for two years after such principal, and premium, if any, or interest has become due and payable shall be paid to the Company on its request (unless any abandoned property law designates that such amounts be paid to another Person) or, if then held by the Company, shall be discharged from such trust; and the Holder of such Note shall thereafter, as a secured creditor, look only to the Company for payments thereof (unless any abandoned property law designates another Person), and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment to the Company, may at the expense of the Company cause to be published once, in *The New York Times* and *The Wall Street Journal* (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

Section 8.07.    Reinstatement.

If the Trustee or Paying Agent is unable to apply any United States dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; provided, however, that, if the Company makes any payment of principal of, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE IX.

## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01.    <u>Without Consent of Holders of Notes</u>.

Notwithstanding <u>Section 9.02</u> of this Indenture, the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Note Guarantees or any of the Collateral Documents without the consent of any Holder of a Note:

(a)    to cure any ambiguity, defect or inconsistency;

(b)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(c)    to provide for the assumption of the Company's or any Guarantor's obligations to Holders of Notes in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Guarantor's assets;

(d)    to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not materially adversely affect the legal rights under this Indenture or any Collateral Document of any such Holder;

(e)    to comply with the provisions of <u>Section 4.17</u>;

(f)    to comply with the rules of any applicable securities depositary;

(g)    to evidence and provide for the acceptance of appointment by a successor Trustee;

(h)    to add a Guarantor under this Indenture;

(i)    to mortgage, pledge, hypothecate or grant a security interest in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes as additional security for the payment and performance of the Company's and any Guarantor's obligations under this Indenture, in any property, or assets, including any of which are required to be mortgaged, pledged or hypothecated, or in which a security interest is required to be granted to the Trustee or the Collateral Agent pursuant to this Indenture or otherwise;

(j)    to provide for the succession of any parties to the Collateral Documents (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of the Credit Facilities or any other agreement that is not prohibited by this Indenture;

(k)    to provide for the release or addition of Collateral or Guarantees in accordance with the terms of this Indenture and the Collateral Documents;

(l)    to provide security for borrowings under a Credit Facility that are incurred in accordance with this Indenture;

67

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(m)      to comply with the requirements of the Commission in order to effect or maintain the qualification of this Indenture under the TIA; or

(n)      to make provisions with respect to the conversion right of the Holders pursuant to the requirements of Article X.

Upon the request of the Company and the Guarantors accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental Indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Company and the Guarantors in the execution of any amended or supplemental Indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental Indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02.      With Consent of Holders of Notes.

Except as provided below in this Section 9.02, this Indenture, any of the Collateral Documents, the Notes and the Note Guarantees may be amended or supplemented with the consent of the Holders of at least [a majority] in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes).

Upon the request of the Company and the Guarantors accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental Indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Company and the Guarantors in the execution of such amended or supplemental Indenture unless such amended or supplemental Indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental Indenture. It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Trustee and the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental Indenture or waiver.

68

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

However, without the consent of each Holder affected, an amendment or waiver may not (with respect to any Notes held by a non-consenting Holder):

(a)     reduce the percentage of principal amount of Notes whose Holders must consent to an amendment, supplement or waiver of this Indenture or the Collateral Documents; reduce the principal of or change the fixed maturity of any Note or alter the provisions, or waive any payment, with respect to the redemption of the Notes other than provisions relating to covenants described under Section 4.09;

(b)     reduce the rate of or change the time for payment of interest on any Note;

(c)     waive a Default or Event of Default in the payment of principal of, or interest, or premium, if any, on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment Default that resulted from such acceleration);

(d)     make any Note payable in money other than U.S. dollars;

(e)     make any change in the provisions of this Indenture or the Collateral Documents relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, or interest or premium, if any, on, the Notes;

(f)     release all or substantially all of the value of the Note Guarantees of the Guarantors from any of their obligations under their Note Guarantees or this Indenture, except in accordance with the terms of this Indenture;

(g)     impair the right to institute suit for the enforcement of any payment on or with respect to the Notes or the Note Guarantees;

(h)     amend, change or modify the obligation of the Company to convert the Notes into Common Stock at maturity or in the event of a Change of Control in accordance with the covenants described under Section 4.01 and Section 4.14 following maturity or after such Change of Control has occurred, including, amending, changing or modifying any definition relating thereto;

(i)     subordinate, in right of payment, the Notes to any other Indebtedness of the Company;

(j)     adversely affect the conversion rights provided in Article X or equity voting and dividend rights provided in Article XI; or

(k)     make any change in this Section 9.02, except to increase any such percentage required for such actions or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each outstanding Note affected thereby.

Notwithstanding anything to the contrary in this Article IX, an amendment or waiver may not amend, change or modify the obligation of the Company to make and consummate an Asset Sale Offer with respect to any Asset Sale in accordance with the covenant described under

69

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 4.09 after the obligation to make such Asset Sale Offer has arisen, including, amending, changing or modifying any definition relating thereto, without the consent of Holders of the Notes representing at least [●]% of the aggregate principal amount of the outstanding Notes.

Collateral may be released in accordance with this Indenture (including without limitation Sections 11.03 and 11.04 hereof) and to the extent that such a release is not prohibited by the Intercreditor Agreement. Notwithstanding anything to the contrary in this Article IX, except as provided in the Intercreditor Agreement, any Guarantor that is a Significant Subsidiary may not be released from any of its obligations under its Note Guarantee or this Indenture (except in accordance with the terms of this Indenture) without the consent of Holders of the Notes representing at least [●]% of the aggregate principal amount of the outstanding Notes.

Upon the execution of any supplemental indenture under this Article IX, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 9.03.    Revocation and Effect of Consents.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.04.    Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.05.    Trustee to Sign Amendments, Etc.

The Trustee shall sign any amended or supplemental indenture authorized pursuant to this Article IX if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company and each Guarantor may not sign an amendment or supplemental Indenture until each of their respective Boards of Directors approves it. In executing any amended or supplemental indenture, the Trustee shall be entitled to receive and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE X.

## CONVERSION

Section 10.01.    Conversion Privilege.

Subject to the provisions of this Indenture, a Holder of a Note shall have the right, at such Holder's option, at any time prior to the close of business on the Business Day immediately preceding [●][4], to convert such Note into Common Stock at any time at the Conversion Price then in effect.

The number of shares of Common Stock issuable upon conversion of a Note shall be determined by the Company by dividing the principal amount of the Note or portion thereof surrendered for conversion by the Conversion Price in effect on the Conversion Date. The initial Conversion Price is set forth in the Notes and is subject to adjustment as provided in this Article X.

A Holder may convert the principal amount of a Note in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. Provisions of this Indenture that apply to conversion of all of a Note also apply to conversion of less than all of a Note.

A Note in respect of which a Holder has exercised the option of such Holder to require the Company to repurchase such Note pursuant to an Asset Sale Offer may be converted only if such Holder withdraws such Note from such Asset Sale Offer in accordance with the terms of such Asset Sale Offer.

Section 10.02.    Conversion Procedure.

To convert a Note, a Holder must satisfy the requirements of the Note and (i) complete and manually sign the conversion notice on the back of the Note and deliver such notice to the Conversion Agent, (ii) surrender the Note to the Conversion Agent, (iii) furnish appropriate endorsements and transfer documents if required by the Registrar or the Conversion Agent, (iv) pay any transfer or other tax, if required by Section 10.04, and (v) if the Note is held in book-entry form, complete and deliver to the Depositary appropriate instructions pursuant to the Depositary's book-entry conversion programs. The date on which the Holder satisfies all of the foregoing requirements is the "Conversion Date". As soon as practicable, but in no event more than three (3) Business Days after the Conversion Date, the Company shall deliver to the Holder through the Conversion Agent a book-entry notation of the number of whole shares of Common Stock issuable upon the conversion.

The Person in whose name the certificate is registered shall be deemed to be a stockholder of record on the Conversion Date; provided, however, that no surrender of a Note on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the Person or Persons entitled to receive the shares of Common Stock upon such conversion as the record holder or holders of such shares of Common Stock on such date, but

---

[4] Maturity Date.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

such surrender shall be effective to constitute the Person or Persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open; provided, however, that such conversion shall be at the Conversion Price in effect on the date that such Note shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Note, such Person shall no longer be a Holder of such Note.

No payment or adjustment will be made for accrued interest, if any, on a converted Note or for dividends or distributions on shares of Common Stock issued upon conversion of a Note, but if any Holder surrenders a Note for conversion between the record date for the payment of an installment of interest and the next interest payment date, then, notwithstanding such conversion, the interest payable on such interest payment date shall be paid to the Holder of such Note on such record date. In such event, such Note, when surrendered for conversion, must be accompanied by delivery of a check payable to the Conversion Agent in an amount equal to the interest payable on such interest payment date on the portion so converted. If such payment does not accompany such Note, the Note shall not be converted; provided, however, that no such check shall be required if such Note is surrendered for conversion on the interest payment date. If the Company defaults in the payment of interest payable on the interest payment date, the Conversion Agent shall repay such funds to the Holder. The Conversion Rate and the Conversion Price shall be calculated by the Company and communicated to the Trustee and Conversion Agent in the form of an Officers' Certificate.

If a Holder converts more than one Note at the same time, the number of shares of Common Stock issuable upon the conversion shall be based on the aggregate principal amount of Notes converted.

Upon surrender of a Note that is converted in part, the Company shall execute, and the Trustee shall, upon receipt of a Company Order, authenticate and deliver to the Holder, a new Note equal in principal amount to the unconverted portion of the Note surrendered.

Section 10.03.    Adjustments Below Par Value.  Before taking any action which would cause an adjustment decreasing the Conversion Price so that the shares of Common Stock issuable upon conversion of the Notes would be issued for less than the par value of such Common Stock, the Company will take all corporate action which may be necessary in order that the Company may validly and legally issue fully paid and non-assessable shares of such Common Stock at such adjusted Conversion Price.

Section 10.04.    Taxes on Conversion.

If a Holder converts a Note, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of shares of Common Stock upon such conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Company may refuse to deliver the certificates representing the Common Stock being issued in a name other than the Holder's name until the Company receives a sum sufficient to pay any tax which will be due because the shares

72

NY 73759456v6

NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS

are to be issued in a name other than the Holder's name. Nothing herein shall preclude any tax withholding required by law or regulations.

Section 10.05.    Company to Provide Stock.

The Company shall from time to time as may be necessary, reserve, out of its authorized but unissued Common Stock a sufficient number of shares of Common Stock to permit the conversion of all outstanding Notes for shares of Common Stock.

No fractional shares of Common Stock shall be issued upon conversion of Notes. If more than one Note is surrendered for conversion at one time by the same Holder, the number of full shares which shall be issuable upon conversion shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted hereby) so surrendered, with any fractional share of Common Stock that would have been issuable upon the conversion of any Notes rounded up to the nearest whole share of Common Stock.

The Company covenants that all shares of Common Stock delivered upon conversion of the Notes shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and non-assessable and shall be free from preemptive rights and free of any lien or adverse claim.

The Company will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon conversion of Notes, if any, and will list or cause to be approved for listing or included for quotation, as the case may be, such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the Common Stock is then listed or quoted, if any.

Section 10.06.    Adjustment of Conversion Rate.

The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs:

(a)    If the Company, at any time or from time to time while any of the Notes are outstanding, exclusively issues shares of Common Stock as a dividend or distribution on shares of Common Stock, or if the Company effects a share split or share combination, then the Conversion Rate will be adjusted based on the following formula:

$$CR' = \frac{CR_0 \times OS'}{OS_0}$$

where

$CR_0$ =  the Conversion Rate in effect immediately prior to the Ex-Date of such dividend or distribution, or the effective date of such share split or share combination, as applicable;

$CR'$ =  the Conversion Rate in effect immediately after such Ex-Date or effective date;

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

$OS_0$  =  the number of shares of Common Stock outstanding immediately prior to such Ex-Date or effective date; and

$OS'$  =  the number of shares of Common Stock outstanding immediately after such Ex-Date or effective date.

Such adjustment shall become effective immediately after the opening of business on the day following the Record Date for such dividend or distribution, or the date fixed for determination for such share split or share combination. If any dividend or distribution of the type described in this Section 10.06(a) is declared but not so paid or made, the Conversion Rate shall again be adjusted to the Conversion Rate which would then be in effect if such dividend or distribution had not been declared.

(b)  If the Company, at any time or from time to time while any of the Notes are outstanding, issues to all holders of Common Stock any rights, options or warrants entitling them for a period of not more than 60 calendar days to subscribe for or purchase shares of Common Stock at a price per share less than the Current Market Price calculated using the declaration date as the date for determination of stockholders entitled to receive such rights, options or warrants, the Conversion Rate shall be adjusted based on the following formula (provided that the Conversion Rate will be readjusted to the extent such rights, options or warrants are not exercised prior to their expiration):

$$CR' = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where

$CR_0$  =  the Conversion Rate in effect immediately prior to the Ex-Date for such issuance;

$CR'$  =  the Conversion Rate in effect immediately after such Ex-Date;

$OS_0$  =  the number of shares of Common Stock outstanding immediately after such Ex-Date;

$X$  =  the total number of shares of Common Stock issuable pursuant to such rights, options and warrants (the "Underlying Shares"); and

$Y$  =  the number of shares of Common Stock which the aggregate exercise price at which the Underlying Shares may be subscribed for or purchased pursuant to such rights, options or warrants would purchase at such Current Market Price.

To the extent such rights, options or warrants are not exercised prior to their expiration or termination, the Conversion Rate shall be readjusted to the Conversion Rate which would then be in effect had the adjustments made upon the issuance of such rights, options or warrants been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In the event that such rights, options or warrants are not so issued, the Conversion Rate shall again be adjusted to be the Conversion Rate which would then be in effect if the date fixed for the determination of stockholders entitled to receive such rights, options or warrants had not been fixed. In determining whether any rights, options or warrants entitle the holders to subscribe for or purchase shares of Common Stock at less than such Current Market Price, and in

74

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received for such rights, options or warrants and the value of such consideration, if other than cash, as shall be determined in good faith by the Board of Directors of the Company.

For the purposes of this Section 10.06(b), rights, options or warrants distributed by the Company to all holders of Common Stock entitling them to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events (a "Trigger Event"): (i) are deemed to be transferred with such shares of Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of Common Stock, shall be deemed not to have been distributed for purposes of this Section 10.06(b), (and no adjustment to the Conversion Rate under this Section 10.06(b) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 10.06(b). If any such right or warrant, including any such existing rights, options or warrants distributed prior to the Initial Issuance Date, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of Indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights, options or warrants with such rights (and a termination or expiration of the existing rights, options or warrants without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 10.06(b) was made, (x) in the case of any such rights, options or warrants which shall all have been redeemed or purchased without exercise by any holders thereof, the Conversion Rate shall be readjusted upon such final purchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or purchase price received by a holder of Common Stock with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all applicable holders of Common Stock as of the date of such redemption or purchase, and (y) in the case of such rights, options or warrants which shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been issued.

(c)     If the Company or any of its Subsidiaries makes a payment in respect of a tender offer or exchange offer for Common Stock, to the extent that the cash and Fair Market Value (as determined by the Board of Directors of the Company acting in good faith, whose determination shall be conclusive and described in a resolution) of any other consideration included in the payment per share of Common Stock exceeds the Closing Sale Price per share of Common Stock on the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer, the Conversion Rate shall be increased based on the following formula:

$$CR' = CR_0 \times \frac{AC + (SP' \times OS')}{OS_o \times SP'}$$

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

$CR_0$ =   the Conversion Rate in effect on the date the tender or exchange offer expires;

$CR'$ =   the Conversion Rate in effect on the day next succeeding the date the tender or exchange offer expires;

$AC$ =   the aggregate value of all cash and Fair Market Value (determined as aforesaid) of any other consideration paid or payable for shares purchased in such tender or exchange offer;

$OS_0$ =   the number of shares of Common Stock outstanding immediately prior to the date such tender or exchange offer expires;

$OS'$ =   the number of shares of Common Stock outstanding immediately after the date such tender or exchange offer expires; and

$SP'$ =   the Closing Sale Price per share of Common Stock on the Trading Day (or, if a Qualified Public Offering has not yet occurred, the Business Day) next succeeding the date such tender or exchange offer expires.

The adjustment to the Conversion Rate under this Section 10.06(c) shall occur on the Business Day following the date such tender or exchange offer expires.

If the Company is obligated to purchase shares pursuant to any such tender or exchange offer, but the Company is permanently prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such tender or exchange had not been made.

(d)      All calculations under this Article X shall be made by the Company.

(e)      For purposes of this Section 10.06, the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company so long as the Company does not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

(f)      Notwithstanding the foregoing, if the application of the foregoing formulas would result in a decrease in the Conversion Rate (other than as a result of a reverse stock split or a stock combination), no adjustment to the Conversion Rate (or the Conversion Price) shall be made.

(g)      In any case in which this Section 10.06 shall require that an adjustment be made immediately following a Record Date established for purposes of Section 10.06, the Company may elect to defer (but only until five (5) Business Days following the filing by the Company with the Trustee and the Conversion Agent of the certificate described in Section 10.06) issuing to the Holder of any Note converted after such Record Date the shares of Common Stock and other Capital Stock of the Company issuable upon such conversion over and above the shares of Common Stock and other Capital Stock of the Company issuable upon such conversion only on the basis of the Conversion Price prior to adjustment; and, in lieu of the shares the issuance of

76

NY 73759456v6

which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(h)    If after an adjustment a Holder of a Note upon conversion of such Note may receive shares of two or more classes of Capital Stock of the Company, the Conversion Price shall thereafter be subject to adjustment upon the occurrence of an action taken with respect to any such class of Capital Stock as is contemplated by this Article X with respect to the Common Stock, on terms comparable to those applicable to Common Stock in this Article X.

Section 10.07.    No Adjustment.

(a)    No adjustment to the Conversion Rate (or the Conversion Price) will be required unless the adjustment would require an increase or decrease of at least 1% of the Conversion Rate. If the adjustment is not made because the adjustment does not change the Conversion Rate by at least 1%, then the adjustment that is not made will be carried forward and taken into account in any future adjustment. All calculations under this Article X will be made to the nearest cent or to the nearest 1/1,000th of a share of Common Stock, as the case may be.

(b)    No adjustment to the Conversion Rate shall be made pursuant to Section 10.06 if the Holders of the Notes may participate in the transaction (based on the Conversion Rate or the Conversion Price) that would otherwise give rise to an adjustment pursuant to Section 10.06 without having to convert their Notes; provided that an adjustment shall be made at such time as the Holders are no longer entitled to participate.

(c)    Notwithstanding anything to the contrary in this Article X, no adjustment to the Conversion Rate (or the Conversion Price) shall be made:

(1)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(2)    upon the issuance of any shares of Common Stock or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of its Subsidiaries;

(3)    upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (2) above outstanding as of the Initial Issuance Date;

(4)    for a change in the par value of the Common Stock or a change to no par value of the Common Stock;

(5)    for accrued and unpaid interest; or

(6)    to the extent that the Notes become convertible into cash in accordance with the terms and conditions of this Indenture and the Notes, no adjustment need be made thereafter as to the cash, and interest will not accrue on the cash.

77

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(d)      No adjustment to the Conversion Rate (or the Conversion Price) shall be made for the Company's issuance of Common Stock or securities convertible into or exchangeable for shares of Common Stock or rights to purchase Common Stock or convertible or exchangeable securities, other than as provided in this Article X.

Section 10.08.    Equivalent Adjustments.

In the event that, as a result of an adjustment made pursuant to Section 10.06 above, the Holder of any Note thereafter surrendered for conversion shall become entitled to receive any shares of Capital Stock of the Company other than shares of its Common Stock, thereafter the Conversion Rate (and the Conversion Price) for such other shares so receivable upon conversion of any Notes shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Article X.

Section 10.09.    Adjustment for Tax Purposes.

The Company shall be entitled to make such increases in the Conversion Rate (and resulting reductions in the Conversion Price), in addition to any adjustments made pursuant to Section 10.06, as the Board of Directors of the Company considers to be advisable in order that any stock dividends, subdivision of shares, distribution of rights to purchase stock or securities, or a distribution or securities convertible into or exchangeable for shares of Common Stock or other Capital Stock hereafter made by the Company to its stockholders shall not be taxable or such tax shall be diminished.

Section 10.10.    Notice of Adjustment.

Whenever the Conversion Rate (or the Conversion Price) is adjusted, the Company shall promptly file with the Trustee and any Conversion Agent an Officers' Certificate setting forth the Conversion Rate and the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee and the Conversion Agent shall have received such Officers' Certificate at the Corporate Trust Office of the Trustee and the Conversion Agent, neither the Trustee nor the Conversion Agent shall be deemed to have knowledge of any adjustment of the Conversion Rate and the Conversion Price and may assume without inquiry that the last Conversion Rate and Conversion Price of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate and the Conversion Price setting forth the adjusted Conversion Rate and the adjusted Conversion Price and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Rate and the Conversion Price to each Holder at such Holder's last address appearing on the list of Holders, within 20 days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

Section 10.11.    Notice of Certain Transactions.

In case:

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(a)      the Company shall declare a dividend (or any other distribution) on its Common Stock (other than in cash out of retained earnings); or

(b)      the Company shall authorize the granting to the holders of its Common Stock of rights, warrants or options to subscribe for or purchase any share of any class or any other rights, warrants or options; or

(c)      of any reclassification of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value, or from par value to no par value, or from no par value to par value), or of any consolidation, merger, or share exchange to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(d)      of the voluntary or involuntary dissolution, liquidation or winding-up of the Company;

then the Company shall cause to be filed with the Trustee and the Conversion Agent and to be mailed to each Holder, as promptly as possible but in any event at least ten (10) days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights, warrants or options, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, share exchange, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, share exchange, sale, transfer, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, share exchange, transfer, dissolution, liquidation or winding-up.

Section 10.12.      Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on Conversion Privilege.

If any of the following shall occur, namely: (i) any reclassification or change of outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination); (ii) any consolidation, combination, merger or share exchange to which the Company is a party other than a merger in which the Company is the continuing corporation and which does not result in any reclassification of, or change (other than a change in name, or par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination) in, outstanding shares of Common Stock; or (iii) any sale or conveyance of all or substantially all of the assets of the Company, then the Company, or such successor or purchasing corporation, as the case may be, shall, as a condition precedent to such reclassification, change, consolidation, merger, share exchange, sale or conveyance, execute and deliver to the Trustee a supplemental indenture providing that the Holder of each Note then outstanding shall have the right to convert

79

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

such Note into the kind and amount of shares of Capital Stock and other securities and property (including cash) receivable upon such reclassification, change, consolidation, merger, share exchange, sale or conveyance by a holder of the number of shares of Common Stock deliverable upon conversion of such Note immediately prior to such reclassification, change, consolidation, merger, share exchange, sale or conveyance. Such supplemental indenture shall provide for adjustments of the Conversion Price which shall be as nearly equivalent as may be practicable to the adjustments of the Conversion Price provided for in this Article X. If, in the case of any such consolidation, merger, share exchange, sale or conveyance, the stock or other securities and property (including cash) receivable thereupon by a holder of Common Stock includes shares of Capital Stock or other securities and property of a corporation other than the successor or purchasing corporation, as the case may be, in such consolidation, merger, share exchange, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the Holders of the Securities as the Board of Directors of the Company shall reasonably consider necessary by reason of the foregoing.

The provisions of this Section 10.12 shall similarly apply to successive consolidations, mergers, share exchanges, sales or conveyances. Notwithstanding the foregoing, a distribution by the Company to all holders of its Common Stock for which an adjustment to the Conversion Price or provision for conversion of the Notes may be made pursuant to Section 10.06 shall not be deemed to be a sale or conveyance of all or substantially all of the assets of the Company for purposes of this Section 10.12.

In the event the Company shall execute a supplemental indenture pursuant to this Section 10.12, the Company shall promptly file with the Trustee an Opinion of Counsel stating that such supplemental indenture is authorized or permitted by this Indenture and an Officers' Certificate briefly stating the reasons therefor, the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any such reclassification, change, consolidation, merger, share exchange, sale or conveyance, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.

Section 10.13.    Trustee's Disclaimer.

The Trustee has no duty to determine any calculations in this Article X nor shall it have any duty to determine when an adjustment under this Article X should be made, how it should be made or what such adjustment should be made, but may accept as conclusive evidence of the correctness of any such adjustment, and shall be protected in relying upon, the Officers' Certificate with respect thereto which the Company is obligated to file with the Trustee pursuant to Section 10.10 or upon request therefor. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Notes, and the Trustee shall not be responsible for the Company's failure to comply with any provisions of this Article X. The Company will make all these calculations in good faith and, absent manifest error, its calculations will be final and binding on the Holders.  The Trustee and/or Conversion Agent will forward such calculations to any Holder upon the request of such Holder. Each Conversion Agent (other than the Company or an Affiliate of the Company) shall have the same protection under this Section 10.13 as the Trustee.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

The Trustee shall not be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture executed pursuant to Section 10.12, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officers' Certificate and Opinion of Counsel with respect thereto which the Company is obligated to file with the Trustee pursuant to Section 10.12.

Section 10.14.    Voluntary Increase of the Conversion Rate.

The Company from time to time may increase the Conversion Rate (and thereby reduce the Conversion Price) by any amount for a period of at least twenty (20) days and the Board of Directors of the Company shall have made a determination that such increase would be in the best interests of the Company, which determination shall be conclusive. Whenever the Conversion Rate is increased (and the Conversion Price reduced) pursuant to this Section 10.14, a notice of the increase in the Conversion Rate and resulting decrease in the Conversion Price must be disclosed in accordance with Section 10.10 and must be mailed to Holders at least fifteen (15) days prior to the date the increased Conversion Rate and decreased Conversion Price takes effect, which notice shall state the increased Conversion Rate, the decreased Conversion Price and the period during which such Conversion Rate and Conversion Price will be in effect.

Section 10.15.    Simultaneous Adjustments.

If more than one event requiring adjustment pursuant to this Article X shall occur before completing the determination of the Conversion Rate and the Conversion Price for the first event requiring such adjustment, then the Board of Directors of the Company (whose determination shall, if made in good faith, be conclusive) shall make such adjustments to the Conversion Rate (and the calculation thereof) after giving effect to all such events as shall preserve for Holders the Conversion Rate and Conversion Price protection provided in this Article X.

## ARTICLE XI.

## EQUITY VOTING RIGHTS AND DIVIDENDS

Section 11.01.    Equity Voting Rights.

Except as may be otherwise expressly provided in the Certificate of Incorporation or as expressly required by the [General Corporation Law of the State of Delaware], Holders shall be entitled, for so long as any Notes remain outstanding, to vote on all matters on which holders of Common Stock generally are entitled to vote (or to take action by written consent of the stockholders), voting together as a single class with the shares of Common Stock and not as a separate class, on an As-Converted-to-Common-Stock-Basis, at any annual or special meeting of stockholders of the Company and each Holder shall be entitled to such number of votes as such Holder would receive on an As-Converted-to-Common-Stock-Basis on the record date for such vote; provided, that, if the Common Stock is listed on a national securities exchange, such number of votes shall be limited to the extent necessary to comply with any listing requirement

81

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

similar to NASDAQ Listing Rule 5640 and the policies promulgated thereunder unless compliance therewith has been waived by NASDAQ or the Company has received a waiver of any comparable requirement of any other exchange on which it is listed.  The Holders also shall be entitled to receive notice of any stockholders' meeting in accordance with the Certificate of Incorporation and bylaws of the Company.  As used herein, "As-Converted-to-Common-Stock-Basis" gives effect immediately prior to the applicable record date, with respect to an annual or special meeting of the Company's stockholders, to the conversion of the Notes into Common Stock in accordance with this Indenture.

Section 11.02.    Dividends.

If the Company, at any time or from time to time while the Notes are outstanding, makes a cash dividend or distributes shares of any class of Capital Stock of the Company, evidences of Indebtedness or other assets or property of the Company, to all holders of its Common Stock, excluding: (i) dividends or distributions referred to in Section 10.06(a); and (ii) rights, options or warrants referred to in Section 10.06(b); then each Holder shall also receive such cash dividend or other distribution as such Holder would receive on an As-Converted-to-Common-Stock-Basis on the record date for such cash dividend or other distribution.

Section 11.03.    Amendments to Certificate of Incorporation.

For so long as any Notes remain outstanding, the Company shall not take any action, directly or indirectly (including without limitation by merger or recapitalization), to amend, alter or repeal, or adopt any provision as part of the Certificate of Incorporation inconsistent with the purpose and intent of, [Section 4] of the Certificate of Incorporation and Section 11.01 of this Indenture, except upon the affirmative vote of Holders of a majority in aggregate principal amount of Notes.

## ARTICLE XII.

## NOTE GUARANTEES

Section 12.01.    Note Guarantees.

Each of the Guarantors hereby, jointly and severally, fully and unconditionally, guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that: (a) the principal of and interest (including without limitation any interest which accrues under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest (including without limitation any interest which accrues under any Debtor Relief Law with respect to the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture and as otherwise provided in this Indenture. If any Holder or the Trustee is required by any court or otherwise to return to the Company or Guarantors, or any Custodian, Trustee, liquidator or other similar official acting in relation to either the Company or Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect. Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article VI, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 12.02.    Execution and Delivery of Note Guarantee.

To evidence its Note Guarantee set forth in Section 12.01, each Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form included in Exhibit E hereto shall be endorsed by an officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture shall be executed on behalf of such Guarantor by its President or one of its Vice Presidents.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 12.01, shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

If an officer or Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Subsidiary Guarantee shall be valid nevertheless.

83

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 12.03.    Guarantors May Consolidate or Merge on Certain Terms.

(a)    A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than the Company or another Guarantor, unless:

(1)    immediately after giving effect to that transaction, no Event of Default exists; and

(2)    either:

(A)    the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor) is organized or existing under the laws of the United States, any state thereof or the District of Columbia and assumes all the obligations of that Guarantor under this Indenture and its Note Guarantee pursuant to a supplemental indenture satisfactory to the Trustee and under the Collateral Documents pursuant to a joinder or accession agreement or agreements satisfactory to the Collateral Agent; or

(B)    such sale or other disposition or consolidation or merger complies with Section 4.09.

(b)    Nothing contained in this Indenture or in any of the Notes shall prevent any consolidation or merger of a Guarantor with or into the Company or shall prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety, to the Company.

(c)    Except as set forth in Section 12.04, in the case of any consolidation, merger, sale or conveyance of a Guarantor pursuant to Section 12.03(a)(2)(A), upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person shall succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee. All the Note Guarantees so issued shall in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 12.04.    Releases of Note Guarantees.

(a)    The Note Guarantee of a Guarantor will be released automatically:

(1)    in connection with any sale or other disposition of all of the Capital Stock, or all or substantially all of the assets, of such Guarantor to a Person that is not (either before or after giving effect to such transaction) a Restricted Subsidiary of the Company, if the sale of all such Capital Stock, or all or substantially all of the assets, of that Guarantor complies with Section 4.09; or

(2)    if the Company designates the Restricted Subsidiary that is such Guarantor as an Unrestricted Subsidiary under and in compliance with this Indenture.

(b)    If all or substantially all of the assets of any Guarantor or all of the capital stock of any Guarantor are sold or disposed of in compliance with Section 12.04(a)(1), then such Guarantor (in the event of a sale or other disposition of all of the capital stock of such Guarantor) or the corporation acquiring the property (in the event of a sale or other disposition of all or substantially all of the assets of a Guarantor) shall be released and relieved of its obligations under its Note Guarantee or Section 12.03, hereof, as the case may be; provided, that in the event of an Asset Sale, the Net Proceeds from such sale or other disposition are treated in accordance with the provisions of Section 4.09 hereof. Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that such sale or other disposition was made by the Company in accordance with the provisions of this Indenture, including without limitation Section 4.09 hereof, the Trustee shall execute any documents reasonably required in order to evidence the release of any Guarantor from its obligations under its Note Guarantee.

(c)    Any Guarantor not released from its obligations under its Note Guarantee pursuant to this Section 12.04 shall remain liable for the full amount of principal of and interest on the Notes and for the other obligations of any Guarantor under this Indenture as provided in this Article XII.

Section 12.05.    Trustee to Include Paying Agent.

In case at any time any Paying Agent other than the Trustee shall have been appointed by the Company and be then acting hereunder, the term "Trustee" as used in this Article XII, shall in such case (unless the context shall otherwise require) be construed as extending to and including such Paying Agent within its meaning as fully and for all intents and purposes as if such Paying Agent were named, in this Article XII, in place of the Trustee.

Section 12.06.    Limits on Note Guarantees.

Notwithstanding anything to the contrary in this Article XII, the aggregate amount of the Obligations guaranteed under this Indenture by any Guarantor shall be reduced to the extent necessary to prevent the Note Guarantee of such Guarantor from violating or becoming voidable under any law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors.

85

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## ARTICLE XIII.

## COLLATERAL AND SECURITY

Section 13.01.    Collateral Documents.

The due and punctual payment of the principal of, premium, if any, on and interest on, the Notes (including, without limitation, any interest which accrues after the commencement of any proceedings under any Debtor Relief Laws with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest (including, without limitation, any interest which accrues after the commencement of any proceedings under any Debtor Relief Laws with respect to any of the Company or any Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the overdue principal of, premium on, if any, and interest, on the Notes and any other Note Obligations and performance of all other Obligations of the Company and the Guarantors to the Holders of Notes, the Trustee or the Collateral Agent under this Indenture, the Notes (including, without limitation, the Note Guarantees) or the Collateral Documents according to the terms hereunder or thereunder, are secured as provided in the Security Agreement and the Pledge Agreement, which the Company and the Guarantors have entered into simultaneously with the execution of this Indenture, and the other Collateral Documents in effect from time to time. Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Collateral Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended, supplemented or otherwise modified from time to time in accordance with their terms and authorizes and directs the Collateral Agent and/or the Trustee (as the case may be) to enter into the Collateral Documents (including Mortgages) and to perform their obligations and exercise their rights thereunder in accordance therewith. The Company and the Guarantors will deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Collateral Documents, and will do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Collateral Documents, to assure and confirm to the Trustee and the Collateral Agent the security interest, mortgage or other Lien in the Collateral contemplated hereby or by the Collateral Documents, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. The Company and the Guarantors shall comply with the terms and provisions of the Collateral Documents and shall take, upon request of the Trustee or the Collateral Agent, any and all actions reasonably required to cause the Collateral Documents to create and maintain, as security for the Note Obligations of the Company and the Guarantors hereunder, a valid and enforceable perfected Lien in and on all the Collateral, in favor of the Collateral Agent for the benefit of the Trustee and the Holders of Notes, superior to and prior to the rights of all third Persons and subject to no other Liens other than Permitted Liens.

Section 13.02.    Release of Collateral.

(a)    The Collateral Agent's Liens upon the Collateral will no longer secure the Notes and Note Guarantees outstanding under this Indenture or any other Obligations under this

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Indenture, and the right of the Holders of the Notes and such Obligations to the benefits and proceeds of the Collateral Agent's Liens on the Collateral will terminate and be discharged:

(1)     in whole, as to all property subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(2)     in whole, as to all property subject to such Liens, upon:

(A)     payment in full of the principal of, accrued and unpaid interest and premium, if any, on the Notes; or

(B)     satisfaction and discharge of this Indenture as set forth in Article XIV hereof; or

(C)     Legal Defeasance or Covenant Defeasance of this Indenture as set forth in Article VIII hereof;

(3)     in part, as to any property that (A) is sold, transferred or otherwise disposed of by the Company or one of its Subsidiaries in a transaction not prohibited by this Indenture, at the time of such sale, transfer or disposition, to the extent of the interest sold, transferred or disposed of or (B) is owned or at any time acquired by a Guarantor that has been released from its Note Guarantee (and any guarantee of other Note Obligations), concurrently with the release of such Note Guarantee (and any guarantee of other Note Obligations);

(4)     on any or all of the Credit Facility Collateral, upon any release of a first priority Lien thereon by the Credit Facility Collateral Agent or as otherwise authorized or directed by the Credit Facility Collateral Agent unless the Credit Facility Loan Obligations have been paid in full and the Credit Facility is terminated without it being refinanced; provided, however, that if a Lien is reinstated securing obligations under the Credit Facility on any or all of the Credit Facility Collateral upon which the Lien securing Obligations has been released pursuant to this clause (4), then the Lien securing the Note Obligations on such Credit Facility Collateral will also be deemed reinstated on the same basis (including as to priority) that it was immediately prior to the release;

(5)     as to property that constitutes all or substantially all of the Collateral securing the Note Obligations, with the consent of the Holders of **[80%]** of the aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, Notes);

(6)     as to property that constitutes less than all or substantially all of the Collateral securing the Note Obligations, with the consent of the Holders of at least [●]% of the aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, purchase of, the Notes); or

(7)     in whole or in part, in accordance with the applicable provisions of the Collateral Documents, including the Intercreditor Agreement.

87

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Upon receipt of an Officers' Certificate and an Opinion of Counsel certifying that all conditions precedent under this Indenture and the Collateral Documents, if any, to such release have been met and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Trustee shall, or shall cause the Collateral Agent to, execute, deliver or acknowledge (at the Company's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents. Neither the Trustee nor the Collateral Agent shall be liable for any such release undertaken in good faith in reliance upon any such Officers' Certificate or Opinion of Counsel, and notwithstanding any term hereof or in any Collateral Document to the contrary, the Trustee and Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until it receives such Officers' Certificate and Opinion of Counsel.

(b) The release of any Collateral from the terms of the Collateral Documents, or the release, in whole or in part, of the Liens created by the Collateral Documents, will not be deemed to impair the security under this Indenture in contravention of the provisions hereof and of the Collateral Documents if and to the extent that the Collateral is released pursuant to this Indenture and the Collateral Documents, including the Intercreditor Agreement.

Section 13.03. Disposition of Collateral Without Release.

(a) Notwithstanding Section 13.02 hereof relating to releases of Collateral, but subject to and in accordance with the provisions of the Collateral Documents and this Indenture, so long as the Collateral Agent, the Trustee, the Credit Facility Collateral Agent or the Credit Facility Lenders have not exercised their rights with respect to the Collateral upon the occurrence and during the continuance of an Event of Default, the Company and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral, to operate the Collateral, to alter and repair the Collateral and to collect, invest and dispose of any income therefrom.

(b) Notwithstanding the foregoing, the Company and the Guarantors may, among other things, without any release or consent by the Trustee or the Collateral Agent, use and dispose of the Collateral in any lawful manner not inconsistent with the provisions of this Indenture or any of the Collateral Documents, including, without limitation, (i) selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Collateral Documents which has become worn out, defective or obsolete or that would no longer be used or useful in the business; (ii) abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of this Indenture or any of the Collateral Documents; (iii) surrendering or modifying any franchise, license or permit subject to the Lien of this Indenture or any of the Collateral Documents which it may own or under which it may be operating; altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances; (iv) granting a license of any intellectual property; (v) selling, transferring or otherwise disposing of inventory in the ordinary course of business; (vi) selling, collecting, liquidating, factoring or otherwise disposing of accounts receivable in the ordinary course of business; (vii) making cash payments (including for the scheduled repayment of Indebtedness) from cash that is at any time part of the Collateral in the ordinary course of business that are not

88

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

otherwise prohibited by this Indenture and the Collateral Documents; and (viii) abandoning any intellectual property which is no longer used or useful in the Company's business.

Section 13.04.  <u>Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Under the Collateral Documents</u>.

(a)    Subject to the provisions of the Collateral Documents, the Trustee may (but without any obligation to do so), in its sole discretion and without the consent of the Holders of Notes, direct, on behalf of the Holders of Notes, the Collateral Agent to, take all actions it deems necessary or appropriate in order to:

(1)    enforce any of the terms of the Security Agreement, the Pledge Agreement and any other Collateral Document (including Mortgages); and

(2)    collect and receive any and all amounts payable in respect of the Note Obligations of the Company and the Guarantors hereunder.

(b)    Subject to the provisions of the Collateral Documents, the Trustee will have power (but without any obligation) to institute and maintain, or to direct, on behalf of the Holders of the Notes, the Collateral Agent to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of this Indenture or any of the Collateral Documents, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee).

(c)    Unless otherwise provided herein, all instructions to the Trustee are to be made pursuant to the vote of the Holders of [a majority] in aggregate principal amount of Notes.

Section 13.05.  <u>Authorization of Receipt of Funds by the Trustee under the Security Agreement</u>.

The Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under any of the Collateral Documents, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture and the Intercreditor Agreement.

Section 13.06.  <u>Intercreditor Agreement</u>.

The Trustee agrees for itself and on behalf of the Holders of the Notes, and by holding Notes each such Holder shall be deemed to agree:

(a)    that the holders of Obligations in respect of this Indenture, the Notes and the Note Guarantees are bound by the provisions of the Intercreditor Agreement, including the provisions

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

relating to the ranking of Liens and the order of application of proceeds from enforcement of Liens; and

(b)      to consent to and direct the Collateral Agent to enter into and perform its obligations under the Intercreditor Agreement (including, without limitation, entering into instruments or releases to evidence the release of any Collateral permitted to be released) and the other Collateral Documents.

Section 13.07.    <u>Limitation on Duty of Trustee and Collateral Agent in Respect of Collateral</u>.

(a)      Beyond the exercise of reasonable care in the custody thereof, the Trustee and the Collateral Agent shall have no duty as to any Collateral in their possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee and the Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in their possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any agent or bailee selected by the Trustee or the Collateral Agent in good faith.

(b)      The Trustee and the Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Company or any Guarantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee and the Collateral Agent shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or the Collateral Documents by the Company, the Guarantors or the Collateral Agent (if the Trustee is not the Collateral Agent).

Section 13.08.    <u>Powers Exercisable by Receiver or Trustee</u>.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this <u>Article XIII</u> upon the Company or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any officer or officers thereof required by the provisions of this <u>Article XIII</u>; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 13.09.    Collateral Agent.

(a)    The Trustee and each of the Holders by acceptance of the Notes hereby designates and appoints the Collateral Agent as its agent under this Indenture and the Collateral Documents and the Trustee and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Collateral Agent to take such action on its behalf under the provisions of this Indenture and the Collateral Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture and the Collateral Documents, together with such powers as are reasonably incidental thereto. The Collateral Agent agrees to act as such on the express conditions contained in this Section 13.09. The provisions of this Section 13.09 are solely for the benefit of the Collateral Agent and none of the Trustee, any of the Holders nor any of the Grantors shall have any rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in this Section 13.09. Notwithstanding any provision to the contrary contained elsewhere in this Indenture and the Collateral Documents, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Collateral Agent have or be deemed to have any fiduciary relationship with the Trustee, any Holder, the Company or any Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture and the Collateral Documents or otherwise exist against the Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Indenture, the Collateral Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the Collateral Agent is expressly entitled to take or assert under this Indenture and the Collateral Documents, including the exercise of remedies pursuant to Article VI, and any action so taken or not taken shall be deemed consented to by the Trustee and the Holders.

(b)    The Collateral Agent may execute any of its duties under this Indenture or the Collateral Documents by or through agents, employees, attorneys-in-fact or through its Affiliates and shall be entitled to an Officers' Certificate or an Opinion of Counsel or both concerning all matters pertaining to such duties. The Collateral Agent shall not be responsible for the negligence or misconduct of any agent, employee, attorney-in-fact or Affiliate that it selects as long as such selection was made without negligence or willful misconduct.

(c)    None of the Collateral Agent or any of its Affiliates shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own negligence or willful misconduct) or under or in connection with the Collateral Documents or the transactions contemplated thereby (except for its own negligence or willful misconduct), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Company or Guarantor, or any officer thereof, contained in this Indenture, or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture or the Collateral

91

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Documents, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture or the Collateral Documents, or for any failure of the Company any Guarantor or any other party to this Indenture or the Collateral Documents to perform its obligations hereunder or thereunder. None of the Collateral Agent or any of its Affiliates shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture or the Collateral Documents or to inspect the properties, books, or records of the Company, any Guarantor or their respective Affiliates.

(d)    The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, facsimile or other document believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Company), independent accountants and other experts and advisors selected by the Collateral Agent. The Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture or the Collateral Documents unless it shall first receive such advice or concurrence of the Trustee as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture or the Collateral Documents in accordance with a request or consent of the Trustee and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)    The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Collateral Agent shall have received written notice from the Trustee, Holders of Notes, the Company or a Guarantor referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." Subject to the terms of the Intercreditor Agreement, the Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article VI (subject to this Section 13.09); provided, however, that unless and until the Collateral Agent has received any such request, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

(f)    The Collateral Agent and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Company, any Guarantor or their respective Affiliates as though it was not the Collateral Agent hereunder and without notice to or consent of the Trustee. The Trustee and the Holders acknowledge that, pursuant to such activities, the Collateral Agent or its respective Affiliates may receive information regarding the Company or any Guarantor or any of their Affiliates (including information that may be subject to confidentiality obligations in favor of the Company or any Guarantor or any of their Affiliates) and acknowledge that the Collateral Agent shall not be under any obligation to provide such information to the Trustee or the Holders. Nothing herein shall impose or imply any obligation on the part of the Collateral Agent to advance funds.

92

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(g)    The Collateral Agent may resign at any time upon thirty (30) days prior written notice to the Trustee and the Company, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent. If the Collateral Agent resigns under this Indenture, the Trustee, subject to the consent of the Company (which shall not be unreasonably withheld and which shall not be required during a continuing Default or Event of Default), shall appoint a successor collateral agent. If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Collateral Agent (as stated in the notice of resignation), the Collateral Agent may appoint, after consulting with the Trustee, subject to the consent of the Company (which shall not be unreasonably withheld and which shall not be required during a continuing Default or Event of Default), a successor collateral agent. If no successor collateral agent is appointed and consented to by the Company pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor. Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated. After the retiring Collateral Agent's resignation hereunder, the provisions of this Section 13.09 (and Section 7.07) shall continue to inure to its benefit and the retiring Collateral Agent shall not by reason of such resignation be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(h)    The Trustee shall initially act as Collateral Agent and shall be authorized to appoint co-Collateral Agents as necessary in its sole discretion. Except as otherwise explicitly provided herein or in the Collateral Documents, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other Affiliates shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own willful misconduct, gross negligence or bad faith.

(i)    The Trustee, as such and as Collateral Agent, is authorized and directed to (i) enter into the Collateral Documents, (ii) bind the Holders on the terms as set forth in the Collateral Documents and (iii) perform and observe its obligations under the Collateral Documents.

(j)    The Trustee agrees that it shall not (and shall not be obliged to), and shall not instruct the Collateral Agent to, unless specifically requested to do so by a majority of the Holders, take or cause to be taken any action to enforce its rights under this Indenture or against the Company or the Guarantors, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

93

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article VII, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent.

(k)    The Trustee is each Holder's agent and the Collateral Agent is the Trustee's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession or control. Should the Trustee obtain possession of any such Collateral, upon request from the Company, the Trustee shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(l)    The Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Grantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all or any part of the Grantor's property constituting collateral intended to be subject to the Lien and security interest of the Collateral Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture or any Collateral Document, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no other duty or liability whatsoever to the Trustee or any Holder as to any of the foregoing.

(m)    No provision of this Indenture or any Collateral Document shall require the Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Collateral Agent) if it shall have reasonable grounds for believing that repayment of such funds is not assured to it.

(n)    The Collateral Agent (i) shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers, or for any error of judgment made in good faith by a an officer thereof, unless it is proved that the Collateral Agent was negligent in ascertaining the pertinent facts, (ii) shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Company or any Guarantor (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be

94

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel. The grant of permissive rights or powers to the Collateral Agent shall not be construed to impose duties to act. The Collateral Agent shall be indemnified by the Company and the Guarantors to the same extent as the indemnification of the Trustee herein.

(o)      Neither the Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. Neither the Collateral Agent nor the Trustee shall be liable for any indirect, special or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(p)      The Collateral Agent shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holder, unless such Holder shall have offered to the Collateral Agent security and indemnity satisfactory to it against any loss, liability or expense.

(q)      Notwithstanding anything herein to the contrary, in acting as Collateral Agent, the Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article VII hereof.

## ARTICLE XIV.

## SATISFACTION AND DISCHARGE

Section 14.01.   Satisfaction And Discharge Of Indenture.

This Indenture will be discharged and will cease to be of further effect as to all outstanding Notes hereunder, and the Trustee, upon receipt from the Company of an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent to satisfaction and discharge have been satisfied, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when either

(1)      all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company) have been delivered to the Trustee for cancellation; or

(2)      (A) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest, to pay and discharge the entire

95

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(B)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound;

(C)    the Company or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture and not provided for by the deposit required by clause (A) above; and

(D)    the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

Notwithstanding the satisfaction and discharge hereof, the rights, powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations in connection therewith, the obligations of the Company to the Trustee under Section 7.07 and, if United States dollars shall have been deposited with the Trustee pursuant to subclause (2) of subsection (a) of this Section 14.01, the obligations of the Trustee under Section 14.02 and Section 8.06, shall survive.

Section 14.02.    Application of Trust Money.

Subject to the provisions of Section 8.06, all United States dollars deposited with the Trustee pursuant to Section 14.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal of, premium, if any, and interest on, the Notes for whose payment such United States dollars have been deposited with the Trustee.

## ARTICLE XV.

## MISCELLANEOUS

Section 15.01.    Notices.

Any notice or communication by the Company, a Guarantor or the Trustee to the others is duly given if in writing and delivered in person or mailed by first class mail (registered or certified, return receipt requested), facsimile or overnight air courier guaranteeing next day delivery, to the others' address:

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

If to the Company or a Guarantor:

[*DELAWARE HOLDING COMPANY*]⁵
[2 Paragon Drive
Montvale, New Jersey  07645]
Facsimile No.: [(201) 571-8715]
Attention: [●]

If to the Trustee:

[*TRUSTEE NAME*]
[*TRUSTEE ADDRESS*]
Facsimile No.: [●]
Attention: [●]

The Company, a Guarantor or the Trustee, by notice to the others may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if sent by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder shall be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 15.02.    Certificate and Opinion As to Conditions Precedent.

Upon any request or application by the Company and/or any Guarantor to the Trustee to take any action or refrain from taking any action under this Indenture, the Company and/or such Guarantor, as the case may be, shall furnish to the Trustee:

(a)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 15.03 hereof) stating that, in the

---

⁵ Name of new holding company to be inserted.

97

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 15.03 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such eligible and qualified Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company stating the information on which counsel is relying unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Section 15.03.    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to Section 4.04(a)) shall include:

(a)      a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)      a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 15.04.    Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar, Paying Agent or Conversion Agent may make reasonable rules and set reasonable

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

requirements for its functions; provided, that no such rule shall conflict with the terms of this Indenture.

Section 15.05.    No Personal Liability of Directors, Officers, Employees and Stockholders.

No director, officer, employee, incorporator, stockholder, member, manager or partner of the Company or any Guarantor, as such, shall have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

Section 15.06.    Governing Law.

THE INDENTURE, THE NOTES, ANY NOTE GUARANTEES AND THE COLLATERAL DOCUMENTS WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

Section 15.07.    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture, the Notes or the Note Guarantees.

Section 15.08.    Successors.

All agreements of the Company and the Guarantors in this Indenture, the Note Guarantees and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors.

Section 15.09.    Severability.

In case any provision in this Indenture, the Note Guarantees or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 15.10.    Counterpart Originals.

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 15.11.    Table of Contents, Headings, Etc.

The Table of Contents and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Section 15.12.    Further Instruments and Acts.

Upon request of the Trustee, the Company and the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

[Signatures on following pages]

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

<div style="margin-left: 40%;">

COMPANY:

[*DELAWARE HOLDING COMPANY*], a Delaware corporation

By: _____
       Name:
       Title:

GUARANTORS:

**[GUARANTORS]**

TRUSTEE:

[*TRUSTEE*]

By: _____
       Name:
       Title:

</div>

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT A

CUSIP NUMBER [●]

ISIN NUMBER [●]

(Face of Note)

[*DELAWARE HOLDING COMPANY*]

CONVERTIBLE SECURED PIK NOTES DUE 2018

No. _____

$_____

[*DELAWARE HOLDING COMPANY*], a Delaware corporation, for value received, hereby promises to pay to _____ or registered assigns, the principal sum of _____ Dollars [, or such greater or lesser amount as may from time to time be endorsed on the Schedule of Increases and Decreases of Interests in the Global Note attached hereto (but in no event may such amount exceed the aggregate principal amount of Notes authenticated pursuant to Section 2.02 of the Indenture referred to below and then outstanding pursuant to Section 2.08 of the Indenture][1] (the "Principal Amount") on [●], 2018; provided that if such payment is made on exactly [MATURITY DATE] and no Event of Default is then in existence, such payment shall be made in the form of duly issued and fully paid shares of Common Stock as if this Note were converted on such date.

Interest Payment Date: [●]

First Interest Payment Date: [●]

Record Date: [●]

[*DELAWARE HOLDING COMPANY*]

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

---

[1] Applicable if Global Note.

A-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

This is one of the [Global] Notes referred
to in the within mentioned Indenture:

Dated: _____, ____

[*TRUSTEE*],
as Trustee


By:   _____
          Authorized Signatory

A-2

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(Back of Note)

[*DELAWARE HOLDING COMPANY* ]

CONVERTIBLE SECURED PIK NOTES DUE 2018

THIS NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBJECT TO THAT CERTAIN [INTERCREDITOR AGREEMENT DATED AS OF [●], 2012 AMONG [INTERCREDITOR PARTIES], [*DELAWARE HOLDING COMPANY*], [THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.] ("A&P") AND THE OTHER SUBSIDIARIES OF [*DELAWARE HOLDING COMPANY*] PARTY THERETO] (THE "INTERCREDITOR AGREEMENT"), AND EACH HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

[THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED. THE ISSUE PRICE OF THIS NOTE WAS [●]% OF ITS PRINCIPAL AMOUNT; THE TOTAL AMOUNT OF ORIGINAL ISSUE DISCOUNT IS $[●] PER NOTE WITH A PRINCIPAL AMOUNT OF $1,000; THE INITIAL ISSUANCE DATE IS [●], 2012; AND THE YIELD TO MATURITY IS [●]%.]

[UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN CERTIFICATED FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(g) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III)

A-3

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.][2]

[THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. (THE "COMPANY") THAT (a) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(A) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY IF THE COMPANY SO REQUESTS), (2) TO THE COMPANY OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.][3]

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated. The Notes are general obligations of the Company, secured by Liens on the Collateral as described in the Indenture. This Note is entitled to the benefits of the Note Guarantees by the Guarantors on the terms set forth in the Indenture.

---

[2] Applicable if Global Note.

[3] Applicable if Transfer Restricted Security.

A-4

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

1.      Interest. [[*Delaware Holding Company*], a Delaware corporation (such corporation, and its successors and assigns under the Indenture, being herein called the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum set forth below from [Initial Issuance Date] until maturity. The Company shall pay interest annually on [●] of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided, that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; provided further, that the first Interest Payment Date shall be [●]. [The Company shall pay, to the extent lawful, interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at 16% per annum, in cash; prior to an Event of Default, the Company shall pay interest on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at 14% per annum, in cash; during the continuance of an Event of Default, the Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) from time to time on demand at 16% per annum, in cash. Interest will be computed on the basis of a 360-day year of twelve 30-day months.]

[With respect to interest on the Notes for the annual period due on an Interest Payment Date, the Company will pay the interest due on the Notes on such Interest Payment Date by payment of PIK Interest for such annual period at the rate of 14% per annum.]

2.      Method of Payment. The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on [●] next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest (to the extent payable in cash), at the office or agency of the Company maintained for such purpose. Except with respect to PIK Interest, such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts; provided that such payment is made on exactly [MATURITY DATE] and no Event of Default is then in existence, such payment shall be made in the form of duly issued and fully paid shares of Common Stock.

In accordance with the Indenture, the Company shall elect to pay interest on the Notes entirely by increasing the principal amount of the outstanding Notes by an amount equal to the amount of interest for the applicable annual interest period (rounded up to the nearest whole dollar) (or, if necessary, pursuant to requirements of the Depositary or otherwise, by authenticating a new Global Note executed by the Company with such increased principal amount or by issuing PIK Notes in an aggregate principal amount equal to the amount of interest for such annual interest period (rounded up to the nearest whole dollar) ("PIK Interest"). The Company must deliver, not less than five Business Days prior to such Interest Payment Date, an Authentication Order to the Trustee specifying the aggregate amount of PIK Interest to be paid through increases in the Global Note and through the issuance of PIK Notes.  On the relevant Interest Payment Date, the Trustee shall record increases in the Global Note and authenticate

A-5

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

PIK Notes, as appropriate, in the aggregate principal amounts required to pay the PIK Interest then due.

At maturity, unless an Event of Default has occurred and is continuing, the Company shall mail a notice to each Holder stating that the Notes have matured and that the Notes have mandatorily converted into shares of Common Stock. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes for conversion. The Company and the Holders shall comply with the procedures for conversion specified in Article X.

3.      Paying Agent, Conversion Agent and Registrar. Initially, the Trustee under the Indenture will act as Paying Agent, Conversion Agent and Registrar. The Company may change any Paying Agent, Conversion Agent or Registrar without notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity; provided that if the Company or such Subsidiary is acting as Paying Agent, the Company or such Subsidiary shall segregate all funds held by it as Paying Agent and hold them in a separate trust fund for the benefit of the Holders.

4.      Indenture. The Company issued the Notes under an Indenture dated as of [●], 2012 (the "Indenture"), among the Company, the Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms.

The summary of the terms of this Note contained herein does not purport to be complete and is qualified by reference to the Indenture. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture shall control.

The Indenture restricts, among other things, the Company's and the Guarantors' ability to incur additional indebtedness, pay dividends or make certain other restricted payments, incur liens, apply net proceeds from certain asset sales, merge or consolidate with any other person, sell, assign, transfer, lease, convey or otherwise dispose of substantially all of the assets of the Company or enter into certain transactions with affiliates.

5.      Conversion.

[TO COME]

6.      No Redemption.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes. The Notes may not be redeemed at the option of the Company.

7.      Equity Voting Rights and Dividends.

[TO COME]

A-6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

8.      Repurchase at Option of Holder.

[TO COME]

9.      Notice of Redemption. Notice of redemption will be electronically delivered or mailed at least 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the redemption date, interest ceases to accrue on Notes or portions thereof called for redemption.

10.     Denominations, Transfer, Exchange. Subject to the issuance of certificated PIK Notes as set forth in Section 1(b) hereof, the Notes are in registered form without coupons in denominations of $1,000 and integral multiples of $1,000 in excess thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, it need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or register the transfer of or to exchange a Note during the period between a record date and the corresponding Interest Payment Date.

11.     Persons Deemed Owners. The registered Holder of a Note may be treated as its owner for all purposes.

12.     Amendment, Supplement and Waiver. Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees and the Collateral Documents may be amended or supplemented with the consent of the Holders of at least [a majority] in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a tender offer or exchange offer for the Notes), and, subject to the terms of the Indenture, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of the Indenture or the Notes may be waived with the consent of the Holders of [a majority] in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a tender offer or exchange offer for the Notes). Certain provisions in the Indenture, Notes, Notes Guarantees and Collateral Documents may be amended or supplemented without the consent of any Holder of a Note. Certain provisions in the Indenture, Notes, Notes Guarantees and Collateral Documents may not be amended or supplemented without the consent of every Holder affected thereby.

13.     Defaults and Remedies. The Indenture contains certain Events of Default.

If any Event of Default (other than an Event of Default specified in clause [(i)] or [(j)] of Section 6.01 of the Indenture with respect to the Company) occurs and is continuing, the Trustee

A-7

may (and if so directed by the Holders of at least 25% in aggregate principal amount of the then outstanding Notes, the Trustee shall) declare all the Notes to be due and payable immediately. Notwithstanding the foregoing, if an Event of Default specified in clause [(i)] or [(j)] of Section 6.01 of the Indenture occurs with respect to the Company, all outstanding Notes will become due and immediately payable without further action or notice. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in their interest. The Company is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Company is required upon becoming aware of any Default or Event of Default, to deliver to the Trustee a statement specifying such Default or Event of Default.

14.    Trustee and Collateral Agent Dealings with Company. Each of the Trustee and the Collateral Agent, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee and/or the Collateral Agent, as the case may be.

15.    No Recourse Against Others. No director, officer, employee, incorporator, stockholder, member, manager or partner of the Company or any Guarantor, as such, shall have any liability for any obligations of the Company or the Guarantors under the Notes, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

16.    Authentication. This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

17.    Abbreviations. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JE TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

18.    CUSIP Numbers. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

<div align="center">A-8</div>

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]
Attention: Secretary

19.     Unclaimed Money. Subject to certain conditions, if money for the payment of principal, premium, if any, or interest, remains unclaimed for two years, the Trustee or Paying Agent shall pay the money back to the Company at its request in accordance with the Indenture unless any abandoned property law designates another Person. After any such payment, Holders entitled to the money must look only to the Company and not to the Trustee for payment unless such abandoned property law designates another Person.

20.     Discharge and Defeasance. Subject to certain conditions, the Company at any time may terminate some or all of the obligations of the Company under the Notes and the Indenture if the Company irrevocably deposits in trust with the Trustee an amount in United States dollars sufficient to pay and discharge the entire Indebtedness on the Notes, not theretofore delivered for cancellation, including the principal of, premium, if any, and accrued interest on such Notes at such maturity, Stated Maturity or redemption date, as the case may be.

21.     Governing Law. THE INDENTURE AND THIS NOTE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

A-9

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____
(Insert Assignee's legal name)


_____
(Insert assignee's soc, sec, or tax I.D. no.)

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____
to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Signature Guarantee: _____

Participant in a recognized Signature Guarantee Medallion Program
(or other signature guarantor acceptable to the Trustee).

A-10

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

CONVERSION NOTICE

To convert this Note into Common Stock of the Company, check the box: ☐

To convert only part of this Note, state the principal amount to be converted (which must be $1.00 or an integral multiple of $1.00 thereof):  $_____

If you want the stock certificate made out in another Person's name fill in the form below:

_____

(Insert the other Person's soc. sec. tax ID no.)

_____

_____

_____

(Print or type other Person's name, address and zip code)


Your Signature: _____

Date: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guaranteed

Participant in a Recognized Signature Guarantee Medallion Program

By:_____
         Authorized Signatory

A-11

NY 73759456v6

***NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS***

OPTION OF HOLDER TO ELECT PURCHASE

      If you want to elect to have the Note or a part of the Note purchased by the Company pursuant to Section [4.09] of the Indenture, check the appropriate box below, and if applicable, state the amount you elect to have purchased:

☐ All of the Note

☐ Part of the Note in the following amount: $_____

      Date: _____

                                   Your Signature: _____
                            (Sign exactly as your name appears on the face of this Note)

                                   Tax Identification No: _____

Signature Guarantee[*]: _____

---

[*] Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-12

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SCHEDULE OF INCREASES AND DECREASES OF INTERESTS

IN THE GLOBAL NOTE[4]

The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

---

[4] Applicable if Global Note.

A-13

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

[*TRUSTEE*]
[*TRUSTEE ADDRESS*]

Re:   Convertible Secured PIK Notes due 2018

Reference is hereby made to the Indenture, dated as of [Initial Issuance Date] (the "Indenture"), among [*DELAWARE HOLDING COMPANY*], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "Transferor") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "Transfer"), to _____ (the "Transferee"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[TO COME]

Exh. B-1

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

 

 

|  |  |
|---|---|
|  | _____ |
|  | [Insert Name of Transferor] |

By: _____

Name:

Title:

 

Dated: _____

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[TO COME]

Exh. B-3

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT C

## FORM OF CERTIFICATE OF EXCHANGE

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

Re:    Convertible Secured PIK Notes due 2018

(CUSIP \_\_\_\_\_)

Reference is hereby made to the Indenture, dated as of [Initial Issuance Date] (the "Indenture"), by and among [*DELAWARE HOLDING COMPANY*], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "Owner") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "Exchange"). In connection with the Exchange, the Owner hereby certifies that:

[TO COME]

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

<div style="margin-left:50%">

[Insert Name of Transferor]

By:  _____
    Name:
    Title:

</div>

Dated: _____

Exh. C-1

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT D

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

[*Delaware Holding Company*]
[2 Paragon Drive
Montvale, New Jersey  07645]

[*TRUSTEE*]
[*TRUSTEE ADDRESS*]

Re:      Convertible Secured PIK Notes due 2018

Reference is hereby made to the Indenture, dated as of [Initial Issuance Date] (the "Indenture"), among [*DELAWARE HOLDING COMPANY*], as issuer (the "Company"), the guarantors named therein and [*TRUSTEE*], as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(a)      ☐ a beneficial interest in a Global Note, or

(b)      ☐ a Definitive Note,

we confirm that:

1.      We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

2.      We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence. We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter and, if such transfer is in respect of a principal amount of Notes, at the time of transfer of less than $250,000, an opinion of counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to and in accordance with the provisions of Rule 144 under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or

Exh. D-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501 (a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

[Insert Name of Accredited Investor]


By:   _____

Name:
Title:


Dated:


Exh. D-2

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT E

## FORM OF NOTE GUARANTEE

For value received, each Guarantor (which term includes any successor Person under the Indenture) has, jointly and severally, fully and unconditionally, guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture, (a) the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on overdue principal and premium, and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. The obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Note Guarantee and the Indenture are expressly set forth in Article XII of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guarantee.

GUARANTORS:

**[GUARANTORS]**

By: _____

      Name:
      Title:

Exh. E-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

EXHIBIT F

FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture"), dated as of _____, among _____ (the "Guaranteeing Subsidiary"), a subsidiary of [*Delaware Holding Company*], a Delaware corporation (the "Company"), the Company, The Great Atlantic & Pacific Tea Company, Inc. and the other Guarantors (as defined in the Indenture referred to herein) and [*TRUSTEE*], as trustee under the indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of [Initial Issuance Date] providing for the issuance of its Convertible Secured PIK Notes due 2018 (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "Note Guarantee"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.      CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.      AGREEMENT TO GUARANTEE. The Guaranteeing Subsidiary hereby agrees as follows:

(a)      Along with all Guarantors named in the Indenture, to jointly and severally Guarantee to each Holder of a Note authenticated and delivered by the Trustee, and to the Trustee and its successors and assigns, that:

(i)      the principal of and interest on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

Exh. F-1

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(ii)     in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately.

(b)     The obligations hereunder shall be full and unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(c)     The following is hereby waived: diligence presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever.

(d)     This Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and the Indenture, and the Guaranteeing Subsidiary accepts all obligations of a Guarantor under the Indenture.

(e)     If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors, or any Custodian, Trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(f)     The Guaranteeing Subsidiary shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.

(g)     As between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI of the Indenture for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article VI of the Indenture, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee.

(h)     The Guarantors shall have the right to seek contribution from any nonpaying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

3.      EXECUTION AND DELIVERY. Each Guaranteeing Subsidiary agrees that the Note Guarantees shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

4.      GUARANTEEING SUBSIDIARY MAY CONSOLIDATE, ETC. ON CERTAIN TERMS. A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than the Company or another Guarantor, except in accordance the Indenture.

5.      RELEASES. A Note Guarantee shall be released in accordance with Section 12.04 of the Indenture.

6.      NO RECOURSE AGAINST OTHERS. No director, officer, employee, incorporator, stockholder, member, manager or partner of the Guaranteeing Subsidiary, as such, shall have any liability for any obligations of the Company or any Guaranteeing Subsidiary under the Notes, the Indenture, this Supplemental Indenture or the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the Commission that such a waiver is against public policy.

7.      NEW YORK LAW TO GOVERN. THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).

8.      COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

9.      EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

10.     THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

Exh. F-3

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____

[*Guaranteeing Subsidiary*]

By: _____
      Name:
      Title:

[*DELAWARE HOLDING COMPANY*]

By: _____
      Name:
      Title:

[*Existing Guarantors*]

By: _____
      Name:
      Title:

[*TRUSTEE*],
as Trustee

By: _____
      Authorized Signatory

Exh. F-4

NY 73759456v6

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**Schedule I**

SCHEDULE OF GUARANTORS

The following schedule lists each Guarantor under the Indenture as of the Initial Issuance Date:


[TO COME]

Sch. I-1

## **Exhibit K**

[Form of agreement for Investment Warrants]

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## WARRANT AGREEMENT

This WARRANT AGREEMENT (the "Agreement") is dated as of [_____], 2012, between [*DELAWARE HOLDING COMPANY*], a Delaware corporation][1] (the "Company"), and [*WARRANT AGENT*], as warrant agent (the "Warrant Agent").

### W I T N E S S E T H

WHEREAS, pursuant to the joint plan of reorganization (the "Plan") filed by The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation and certain of its subsidiaries under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), the Company proposes to issue warrants (the "Warrants") entitling the holders thereof to purchase shares of the Company's common stock, par value $[0.01] per share (the "Common Stock") at the exercise price and on the other terms hereinafter set forth; and

WHEREAS, the maximum number of shares of Common Stock that may be purchased upon exercise of the Warrants in accordance with the terms of this Agreement and the Warrants will be [_____] shares (which amount shall be subject to adjustment as set forth herein), representing 7% of the total Common Stock outstanding on the effective date of the Plan (the "Effective Date") on a fully-diluted basis (after exercise of the Warrants and after any conversion of the Company's [14% Convertible Third Lien Notes due 2018] (the "Third Lien Notes") issued pursuant to the Plan, including any interest accruing on such Third Lien Notes after the Effective Date and paid by increasing the principal amount thereof, but prior to any dilution resulting from any awards under the Management Equity Incentive Program (as defined in the Plan)); and

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, exercise and conversion of the Warrants.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1. Appointment of Warrant Agent. The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions hereinafter in this Agreement set forth; and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

SECTION 2. Issuances. Subject to the provisions of this Agreement, on the Effective Date (as defined in the Plan), Warrants to purchase a total of up to [_____] shares of Common Stock (the "Shares") will be issued and delivered by the Company in accordance with the Plan. The Company will deliver to Yucaipa American Alliance Fund II, LP and Yucaipa

---

[1] Name of new Delaware holding company to be inserted.

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

American Alliance (Parallel) Fund II, LP (collectively, and together with their respective successors and assigns, the "Warrant Holders") Warrant Certificates (as defined below) evidencing the portion of the Warrants issued to each such Warrant Holder, based upon the Warrant Holders' respective commitments to purchase Common Stock of the Company.

SECTION 3. Form of Warrant Certificates.  The certificates evidencing the Warrants (the "Warrant Certificates") to be delivered pursuant to this Agreement and the forms of election to exercise and of assignment to be printed on the reverse thereof shall be in substantially the form set forth in Exhibit A hereto, together with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rules made pursuant thereto or with any rules of any securities exchange on which the Company's Common Stock may be listed or as may, consistently herewith, be determined by the officers executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates.

SECTION 4. Execution of Warrant Certificates.  Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board of Directors, its Chief Executive Officer, its President, a Vice President or its Treasurer (each, an "Officer") and attested by its Secretary or an Assistant Secretary (each, an "Attesting Officer"), under its corporate seal.  Each such signature upon the Warrant Certificates may be in the form of a facsimile signature of any such Officer and attested by its Secretary or an Assistant Secretary and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Officer and attested by its Secretary or an Assistant Secretary.  The corporate seal of the Company may be in the form of a facsimile thereof and may be impressed, affixed, imprinted or otherwise reproduced on the Warrant Certificates.

If any Officer or Attesting Officer who shall have signed any of the Warrant Certificates shall cease to be an Officer or Attesting Officer before the Warrant Certificates so signed shall have been countersigned by the Warrant Agent or delivered by the Company, such Warrant Certificates nevertheless may be countersigned and delivered as though such Officer or Attesting Officer had not ceased to be an Officer or Attesting Officer; and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Officer or Attesting Officer to sign such Warrant Certificate, although at the date of the execution of this Agreement any such person was not such an officer.

SECTION 5. Registration and Countersignature.  Warrant Certificates shall be manually countersigned and dated the date of countersignature by the Warrant Agent and shall not be valid for any purpose unless so countersigned.  The Warrants shall be numbered and shall be registered in a register (the "Warrant Register") to be maintained by the Warrant Agent.

The Company and the Warrant Agent may deem and treat a registered Warrant Holder as the absolute owner of the applicable Warrant (notwithstanding any notation of ownership or other writing thereon made by anyone), for the purpose of any exercise thereof or any distribution to the holder thereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

-2-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SECTION 6.  Registration of Transfers and Exchanges.

(a)  Subject to paragraphs (b) and (c) of this Section 6, the Warrant Agent shall from time to time register the transfer of any outstanding Warrant Certificates in the Warrant Register, upon surrender of such Warrant Certificates at the Warrant Agent Office (as defined below), duly endorsed, and accompanied by a completed form of assignment, duly signed by the registered Warrant Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by (i) a bank or trust company, (ii) a broker or dealer that is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") or (iii) a member of a national securities exchange.  Upon any such registration of transfer, a new Warrant Certificate shall be issued to the transferee.

Warrant Certificates may be exchanged at the option of the holder or holders thereof, when surrendered to the Warrant Agent at its offices or agency maintained at [_____] (or at such other offices or agencies as may be designated by the Warrant Agent) for the purpose of exchanging, transferring and exercising the Warrants (a "Warrant Agent Office"), or at the offices of any successor Warrant Agent appointed as provided in Section 16 hereof, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like number of Warrants.

(b)  No Warrants may be sold or otherwise transferred in violation of the Securities Act of 1933, as amended (the "Securities Act"), or state securities laws.  Further, no sale or other transfer of any Warrants shall be permitted if (i) the Company is not, at the time of such transfer, a reporting company under the Securities Exchange Act of 1934 (the "Exchange Act") and (ii) after giving effect to such sale or transfer, the Company would be, or would be obligated to become, a reporting company under the Exchange Act.  The Company and/or the Warrant Agent, if they reasonably deem it to be necessary, may require, as a condition to any sale or transfer of a Warrant, that the holder deliver to the Company and the Warrant Agent an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that such sale or transfer is made in compliance with the Securities Act and all applicable state securities laws or pursuant to an exempt transaction under the Securities Act and state securities laws.  In addition, prior to any such transfer, the Warrant Holder and the transferee shall have delivered to the Company representation letters substantially in the forms attached to the Company's Amended and Restated Certificate of Incorporation, as may be in effect at such time (or such other forms as may be approved from time to time by the Board of Directors and available from the Secretary of the Company).  The provisions of this paragraph (b) shall not apply to the exercise of any Warrant to the extent that the Shares issued upon such exercise (and any unexercised portion of the Warrant so exercised) shall be issued to the same registered holder that exercised such Warrant.

(c)  The Warrant Certificates shall bear such legends as the Company shall determine reflecting the restrictions in the immediately preceding paragraph (b).  In addition, the Warrants may bear such legend as the Company may determine with respect to the Stockholders Agreement (as hereinafter defined).

(d)  The Warrant Agent is hereby authorized to countersign, in accordance with the provisions of Section 5 and this Section 6, and deliver the new Warrant Certificates

-3-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

required pursuant to the provisions of this Section 6, and for the purpose of any distribution of Warrant Certificates contemplated by Section 12.

(e)   In the event of any purported transfer in violation of the provisions of this Agreement, such purported transfer shall be void and of no effect and the Warrant Agent and the Company shall not give effect to such transfer.

SECTION 7.   Duration and Exercise of Warrants.

(a)   The Warrants shall expire, to the extent not previously exercised, at 5:00 p.m., Eastern time, on [_____], 2022 (the tenth (10th) anniversary of the Effective Date) [,subject to earlier cancellation in accordance with Section 8(c) hereof] (the "Expiration Time").  After the Expiration Time, unexercised Warrants will be void and of no value.

(b)   Subject to the provisions of this Agreement, including the provisions of this Section 7 and Section 11 hereof, each Warrant shall entitle the Warrant Holder to purchase from the Company (and the Company, upon valid exercise of such Warrant in accordance with the terms of this Agreement, shall issue and sell to such holder) one fully paid and nonassessable Share at a price per Share equal to the Initial Exercise Price (as the same may be hereafter adjusted pursuant to Section 11 hereof)(as so adjusted, the "Exercise Price").  As used herein, "Initial Exercise Price" shall mean [        ].

(c)   From and after the Effective Date and until the Expiration Time, any Warrant Holder may exercise such Warrant Holder's Warrants by depositing on any Business Day with the Warrant Agent, at a Warrant Agent Office, the Warrant Certificate evidencing such Warrants, with the form of election to exercise on the reverse thereof duly completed and signed by the registered Warrant Holder or by the duly appointed legal representative thereof or by a duly authorized attorney (such signature to be guaranteed by a bank or trust company, by a broker or dealer which is a member of FINRA or by a member of a national securities exchange), and upon payment of the applicable Exercise Price multiplied by the number of Shares in respect of which such Warrant Certificate is then being exercised (the "Exercise Amount").  The Exercise Amount may be payable as follows: [TO COME].

(d)   Exercise of the Warrants shall be subject to the following restrictions and conditions: [TO COME].

(e)   Whenever less than all the Warrants evidenced by a Warrant Certificate delivered upon the exercise of Warrants are exercised at any time prior to the Expiration Time, if any Warrants evidenced by such Warrant Certificate them remain outstanding, a new Warrant Certificate shall be issued for the remaining number of Warrants evidenced by the Warrant Certificate so delivered, and the Warrant Agent is hereby authorized to countersign the required new Warrant Certificate pursuant to the provisions of Section 6 and this Section 7.

(f)   Upon surrender of a Warrant Certificate and payment of the Exercise Price by any Warrant Holder, such Warrant Holder shall execute a joinder agreement (the "Joinder Agreement") in the form attached hereto as Exhibit B, binding such Warrant Holder to the terms and conditions of the Stockholders Agreement dated as of the Effective Date entered

-4-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

into by and among the Company and certain holders of the Common Stock of the Company (the "Stockholders Agreement"); provided, however, that a Joinder Agreement need not be executed by any exercising Warrant Holder that is already a party to the Stockholders Agreement.

(g) Upon valid exercise of a Warrant and execution by the exercising Warrant Holder of the Joinder Agreement (if applicable), the Warrant Agent shall requisition from the Company's Common Stock transfer agent (the "Transfer Agent") for issuance and delivery to, and in the name of, the registered holder of such Warrant Certificate, a certificate or certificates for the number of Shares issuable upon the exercise of the Warrant or Warrants then being exercised and evidenced by such Warrant Certificate. Upon receipt thereof, the Company shall, as promptly as practicable, and in any event within five (5) business days thereafter, cause to be issued to such holder the aggregate number of whole Shares issuable upon such exercise and deliver to such holder written confirmation that such Shares have been duly issued and recorded on the books of the Company as hereinafter provided. The Shares so issued shall be registered in the name of the Warrant Holder. Such certificate or certificates shall be deemed to have been issued and the Warrant Holder shall be deemed to have become the holder of record of such Share or Shares as of the date of delivery of such duly executed Warrant Certificate and Joinder Agreement (if applicable) at the Warrant Agent Office and payment of the Exercise Price.

(h) Notwithstanding any provision herein to the contrary, the Company shall not be required to register Shares in the name of any person who acquired any Warrant or any Shares otherwise than in accordance with this Agreement.

(i) To the extent any issuance of Shares upon an exercise of Warrants would require pre-clearance pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), the exercise of such Warrants shall be deemed a representation by the Warrant Holder to the Company and the Warrant Agent that such pre-clearance has been obtained. If reasonably requested by any Warrant Holder in connection with any planned exercise of Warrants by a Warrant Holder, the Company shall cooperate with such Warrant Holder in making any filings that are reasonably appropriate to seek any necessary pre-clearance under the HSR Act from the Federal Trade Commission and the U.S. Department of Justice.

(j) The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay or deliver to the Company all moneys and other consideration received by it in connection with the purchase of Shares through the exercise of Warrants.

SECTION 8. Cancellation of Warrants.

(a) The Warrant Agent shall cancel all Warrant Certificates delivered to it for exchange, substitution, transfer or exercise in whole or in part.

(b) Prior to the Expiration Time, in the event the Company (if authorized by a resolution of the Board) and any Warrant Holder reach agreement with respect to the terms of a repurchase by the Company (or any of its subsidiaries) of all or any portion of the Warrants held by such Warrant Holder, then upon consummation of such purchase, the Warrant

-5-

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Certificates representing such Warrants shall thereupon be delivered to the Warrant Agent and be cancelled by it and retired.

(c)  [TO COME.]

(d)  Cancelled Warrant Certificates, to the extent delivered to the Warrant Agent, shall thereafter be disposed of in a manner satisfactory to the Company.

SECTION 9.  Mutilated or Missing Warrant Certificates.  If any of the Warrant Certificates shall be mutilated, lost, stolen or destroyed, the Company shall issue, and the Warrant Agent shall countersign and deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence reasonably satisfactory to the Company and the Warrant Agent of the loss, theft or destruction of such Warrant Certificate and the posting of an indemnity or bond, if requested by either the Company or the Warrant Agent, also reasonably satisfactory to them.  Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

SECTION 10.  Reservation of Shares.  For the purpose of enabling it to satisfy any obligation to issue Shares upon exercise of Warrants, the Company will at all times through the Expiration Time, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the total number of Shares deliverable upon the exercise of all outstanding Warrants, and the Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose. The Company will keep a copy of this Agreement on file with such Transfer Agent and with every transfer agent for any shares of the Company's capital stock issuable upon the exercise of Warrants pursuant to Section 7. The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

SECTION 11.  Adjustment of Exercise Price and Number of Shares Purchasable or Number of Warrants.  The Exercise Price, the number of shares of Common Stock purchasable upon the exercise of each Warrant and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Section 11.  [TO COME.]

SECTION 12.  Fractional Shares.  Notwithstanding any adjustment pursuant to Section 11 in the number of Shares or other securities purchasable upon the exercise of a

-6-

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Warrant, the Company shall not be required to issue Warrants to purchase fractions of Shares or other securities, or to issue fractions of Shares or other securities upon exercise of the Warrants, or to distribute certificates which evidence fractional Shares.  In the event of an adjustment that results in a Warrant becoming exercisable for fractional Shares, the number of Shares or other securities subject to such Warrant shall be adjusted upward or downward to the nearest whole number of Shares or other securities.

SECTION 13.  Notices to Warrant Holders.

(a) Upon any adjustment of the number of Shares purchasable upon exercise of each Warrant, any Exercise Price or the number of Warrants outstanding, including any adjustment pursuant to Section 11, the Company, within twenty (20) calendar days thereafter, shall (i) cause to be filed with the Warrant Agent a certificate of a firm of independent public accountants of recognized standing selected by the Company (who may be the regular auditors of the Company) setting forth the event giving rise to such adjustment, such Exercise Price and either the number of Shares purchasable upon exercise of each Warrant or the additional number of Warrants to be issued for each previously outstanding Warrant, as the case may be, after such adjustment and setting forth in reasonable detail the method of calculation and the facts upon which such adjustment was made, which certificate shall be conclusive evidence of the correctness of the matters set forth therein, and (ii) cause to be given to each of the registered Warrant Holders, at such holder's address appearing on the Warrant Register, written notice of such adjustments by first-class mail, postage prepaid.  Where appropriate, such notice may be given in advance and included as a part of the notice required to be mailed under the other provisions of this Section 13.

(b) If there shall be a dissolution, liquidation or winding up of the Company (other than in connection with a consolidation, merger or sale of all or substantially all of its property, assets and business as an entirety), then the Company shall cause written notice of such event to be filed with the Warrant Agent and shall cause written notice of such event to be given to each of the registered Warrant Holders at such holder's address appearing on the Warrant Register, by first-class mail, postage prepaid, such giving of notice to be completed at least thirty (30) calendar days prior to the date fixed as a record date or the date of closing the transfer books for the determination of stockholders entitled to vote on such proposed dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of closing the transfer books, as the case may be.  The failure to give the notice required by this Section 13 or any defect therein shall not affect the legality or validity of any distribution, right, warrant, dissolution, liquidation or winding up or the vote upon or any other action taken in connection therewith.

(c) The Company shall not (i) declare or pay any dividend or distribution payable in cash or securities (other than dividends or distributions payable solely in shares of Common Stock) to holders of Common Stock or make any other distribution of property to holders of Common Stock or (ii) offer holders of Common Stock rights to subscribe for or to purchase Common Stock or securities convertible into Common Stock or any other securities, rights or options, unless, in any such case, [TO COME].

-7-

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SECTION 14. <u>Merger, Consolidation or Change of Name of Warrant Agent</u>. Any company into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any company resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any company succeeding to the shareholder services business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such company would be eligible for appointment as a successor Warrant Agent under the provisions of Section 16.  If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

SECTION 15. <u>Warrant Agent</u>.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the following terms and conditions, by all of which the Company and the holders of Warrants, by their acceptance thereof, shall be bound:

(a) The statements contained herein and in the Warrant Certificates shall be taken as statements of the Company, and the Warrant Agent assumes no responsibility for the accuracy of any of the same except such as describe the Warrant Agent or action taken or to be taken by it.  Except as herein otherwise provided, the Warrant Agent assumes no responsibility with respect to the execution, delivery or distribution of the Warrant Certificates.

(b) The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Agreement or in the Warrant Certificates to be complied with by the Company nor shall it at any time be under any duty or responsibility to any Warrant Holder to make or cause to be made any adjustment in any Exercise Price or in the number of Shares issuable upon exercise of any Warrant (except as instructed by the Company), or to determine whether any facts exist which may require any such adjustments, or with respect to the nature or extent of or method employed in making any such adjustments when made.

(c) The Warrant Agent may consult at any time with counsel satisfactory to it (who may be counsel for the Company) and the Warrant Agent shall incur no liability or responsibility to the Company or any Warrant Holder in respect of any action taken, suffered or

-8-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

omitted by it hereunder in good faith and in accordance with the opinion or the advice of such counsel.

(d) The Warrant Agent shall incur no liability or responsibility to the Company or to any Warrant Holder for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.

(e) The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent under this Agreement, to reimburse the Warrant Agent upon demand for all reasonable and documented expenses, taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in the performance of its duties under this Agreement and to indemnify the Warrant Agent and save it harmless against any and all losses, liabilities and expenses, including judgments, costs and reasonable counsel fees and expenses, for anything done or omitted by the Warrant Agent arising out of or in connection with this Agreement except as a result of its negligence or bad faith.

(f) The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more registered holders of Warrant Certificates shall furnish the Warrant Agent with reasonable security and indemnity for any costs or expenses which may be incurred. All rights of action under this Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrant Certificates or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery or judgment shall be for the ratable benefit of the registered Warrant Holders, as their respective rights or interests may appear.

(g) The Warrant Agent, and any stockholder, director, officer or employee thereof, may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though they were not the Warrant Agent under this Agreement, or a stockholder, director, officer or employee of the Warrant Agent, as the case may be. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(h) The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the provisions hereof. The Warrant Agent shall not be liable for anything which it may do or refrain from doing in connection with this Agreement except for its own negligence or bad faith.

(i) The Company agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

(j) The Warrant Agent shall not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant Certificate (except its countersignature thereof), nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of the Shares to be issued pursuant to this Agreement or any Warrant Certificate or as to whether the Shares will when issued be validly issued, fully paid and nonassessable or as to the Exercise Price or the number of Shares issuable upon exercise of any Warrant.

(k) The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Treasurer, the Secretary or an Assistant Secretary of the Company, as applicable, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer or in good faith reliance upon any statement signed by any one of such officers of the Company with respect to any fact or matter (unless other evidence in respect thereof is herein specifically prescribed) which may be deemed to be conclusively proved and established by such signed statement.

SECTION 16.  Change of Warrant Agent.  If the Warrant Agent shall resign (such resignation to become effective not earlier than sixty (60) days after the giving of written notice thereof to the Company and the registered Warrant Holders) or shall become incapable of acting as Warrant Agent or if the Board shall by resolution remove the Warrant Agent (such removal to become effective not earlier than thirty (30) days after the filing of a certified copy of such resolution with the Warrant Agent and the giving of written notice of such removal to the registered holders of Warrant Certificates), the Company shall appoint a successor to the Warrant Agent.  If the Company shall fail to make such appointment within a period of thirty (30) days after such removal or after it has been so notified in writing of such resignation or incapacity by the Warrant Agent or by a registered Warrant Holder (in the case of incapacity), then any registered Warrant Holder may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Unless the Company carries out the duties of the Warrant Agent in accordance with the preceding sentence, any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a bank or trust company, in good standing, incorporated under the laws of any state or of the United States of America.  As soon as practicable after appointment of the successor Warrant Agent, the Company shall cause written notice of the change in the Warrant Agent to be given to each of the registered Warrant Holder at such holder's address appearing on the Warrant Register.  After appointment, the successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed.  The former Warrant Agent shall deliver and transfer to the successor Warrant Agent any property at the time held by it hereunder and execute and deliver, at the expense of the Company, any further assurance, conveyance, act or deed necessary for the purpose.  Failure to give any notice provided for in this Section 16 or any defect therein, shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

-10-

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

SECTION 17.  Stockholder Rights.  [TO COME].

SECTION 18.  Notices to Company and Warrant Agent.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Warrant Holder to or on the Company to be effective shall be in writing (including by facsimile), and shall be deemed to have been duly given or made when delivered by hand, or two (2) business days after being delivered to a recognized courier (whose stated terms of delivery are two (2) business days or less to the destination of such notice), or five (5) days after being deposited in the mail, first class and postage prepaid or, in the case of facsimile, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> *[DELAWARE HOLDING COMPANY]*
> [_____]
> [_____]
> Tel :   [_____]
> Fax :   [_____]
> Attention:  [_____]

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Warrant Holder to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> *[WARRANT AGENT]*
> [_____]
> [_____]
> Tel :   [_____]
> Fax :   [_____]
> Attention:  [_____]

SECTION 19.  Supplements and Amendments.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) with the prior written consent of Warrant Holders exercisable for a majority of the Shares then issuable upon exercise of the Warrants then outstanding; provided that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent or (b) with the prior written consent of each Warrant Holder adversely affected, in the case of any amendment to Section 2, Section 7(a) or Section 7(b).

SECTION 20.  Successors.   Subject to Section 6(b), all the covenants and provisions of this Agreement by or for the benefit of the Company, the Warrant Agent or the

-11-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

Warrant Holders shall bind and inure to the benefit of their respective successors and assigns hereunder.

SECTION 21. <u>Termination</u>.  This Agreement shall terminate at the Expiration Time (or on any earlier date when all Warrants have been exercised).  The provisions of Section 15 shall survive such termination.

SECTION 22. <u>Governing Law</u>.  This Agreement and each Warrant Certificate issued hereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  The Company, each Warrant Holder and the Warrant Agent hereby submit to the exclusive jurisdiction of (i) the Bankruptcy Court, (ii) the courts of the State of Delaware, (iii) the United States District Court for the District of Delaware, (iv) the United States District Court for the Southern District of New York and (v) any New York State Court sitting in the City of New York (and in each case any appellate court with respect to any of the foregoing), and any judicial proceeding brought against the Company, any Warrant Holder or the Warrant Agent with respect to any dispute arising out of this Agreement, each Warrant Certificate and any matter related thereto, shall be brought only in such courts. The Company, each Warrant Holder and the Warrant Agent hereby irrevocably waive, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Company, each Warrant Holder and the Warrant Agent hereby consent to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 18 or appearing on the Warrant Register, or in any other manner permitted by law.  THE COMPANY, EACH WARRANT HOLDER AND THE WARRANT AGENT HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

SECTION 23. <u>Benefits of this Agreement</u>.  Nothing in this Agreement shall be construed to give to any person or corporation other than the Company, the Warrant Agent and the Warrant Holders any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the Warrant Holders.

SECTION 24. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 25. <u>Headings</u>.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**IN WITNESS WHEREOF**, the parties hereto have caused this Warrant Agreement to be executed and delivered as of the day and year first above written.

[*DELAWARE HOLDING COMPANY*]

By _____
[Title]

ATTEST:

_____

[*WARRANT AGENT*]

By _____
[Title]

ATTEST:

_____

-13-

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**EXHIBIT A**

*[FORM OF FACE OF WARRANT CERTIFICATE]*

**VOID AFTER [ ] __, 2022**

**THE WARRANTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A WARRANT AGREEMENT BETWEEN [*DELAWARE HOLDING COMPANY*] (THE "<u>COMPANY</u>") AND [*WARRANT AGENT*], AS WARRANT AGENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH WARRANT AGREEMENT, INCLUDING SECTION 17 RELATING TO VOTING AND OTHER STOCKHOLDER RIGHTS.**

No.                                          WARRANT TO PURCHASE _____
                                             SHARES OF COMMON STOCK

**[NEW HOLDING COMPANY]**

**WARRANT TO PURCHASE COMMON STOCK**

This Warrant Certificate certifies that [_____], or registered assigns, is the registered holder of a warrant (the "<u>Warrant</u>") of [NEW HOLDING COMPANY], a Delaware corporation (the "<u>Company</u>"), to purchase the number of shares (the "<u>Shares</u>") of common stock, par value $[.01] per share (the "<u>Common Stock</u>"), of the Company set forth above. This Warrant expires on [_____], 2022, the tenth anniversary of the Effective Date of the Plan (as defined in the Warrant Agreement referred to on the reverse hereof), or any earlier Expiration Time (as set forth in such Warrant Agreement), and entitles the holder to purchase from the Company from time to time, on the terms and subject to the conditions and other restrictions set forth in such Warrant Agreement, the number of fully paid and nonassessable Shares set forth above at the applicable per share exercise price (the "<u>Exercise Price</u>") multiplied by the number of Shares set forth above (the "<u>Exercise Amount</u>"). The initial Exercise Price shall be [_____].

Subject to the terms and conditions set forth herein and in the Warrant Agreement referred to on the reverse hereof, this Warrant may be exercised by the holder thereof upon surrender of this Warrant Certificate during normal business hours on any Business Day in the period commencing upon the Effective Date (the "<u>Initial Exercise Date</u>") and ending at the Expiration Time, with the form of Election to Exercise and Joinder Agreement (if applicable) duly executed by the holder, and payment of the Exercise Amount, at the office or agency of the Warrant Agent (which office is currently located at [ADDRESS]) (such office, a "<u>Warrant Agent Office</u>").

The Exercise Price and the number of Shares purchasable upon exercise of this Warrant are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

A-1

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

No Warrant may be exercised prior to the Initial Exercise Date or after the Expiration Time.  After [_____], 2022, the Warrants will become wholly void and of no value.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

Capitalized terms used herein and not defined shall have the respective meanings ascribed to such terms in the Warrant Agreement.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed by its duly authorized officers, and the corporate seal hereunto affixed.

Dated:  _____

[*DELAWARE HOLDING COMPANY*]


By_____
[Title]

[Corporate Seal]



ATTEST:

By_____



Countersigned:

[*WARRANT AGENT*]
AS WARRANT AGENT

By_____

A-2

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

### *[FORM OF REVERSE OF WARRANT CERTIFICATE]*

### [NEW HOLDING COMPANY]

The warrant evidenced by this warrant certificate is a part of a duly authorized issue of Warrants to purchase a maximum of [_____] Shares issued pursuant to a Warrant Agreement, dated as of [Effective Date of the Plan] (the "Warrant Agreement"), duly executed and delivered by the Company to [*WARRANT AGENT*], as warrant agent (the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent Office and is available upon written request addressed to the Company. All terms used herein that are defined in the Warrant Agreement have the meanings assigned to them therein.

Warrants may be exercised to purchase Shares from the Company from the Effective Date and prior to 5:00 p.m., Eastern time, on [_____], 2022 (the tenth (10th) anniversary of the Effective Date), unless earlier cancelled in accordance with the Warrant Agreement (the "Expiration Time"), at the Initial Exercise Price referred to on the face hereof, subject to adjustment as described in the Warrant Agreement. The holder of the Warrant evidenced by this Warrant Certificate may exercise such Warrant by surrendering during normal business hours on any Business Day the Warrant Certificate at the Warrant Agent Office, with the form of election to purchase set forth hereon properly completed and executed and the Joinder Agreement referred to in the Warrant Agreement properly completed and executed (if applicable), together with payment of the Exercise Amount. The Exercise Amount may be payable as follows: [_____].

Whenever less than all the Warrants evidenced by a Warrant Certificate delivered upon the exercise of Warrants are exercised at any time prior to the Expiration Time, if any Warrants evidenced by such Warrant Certificate remain outstanding, a new Warrant Certificate shall be issued for the remaining number of Warrants evidenced by the Warrant Certificate so delivered. No adjustment shall be made for any cash dividends on any Shares issuable upon exercise of Warrants. After the Expiration Time, unexercised Warrants shall become wholly void and of no value.

The Company shall not be required to issue fractions of Shares or any certificates that evidence fractional Shares.

Warrant Certificates, when surrendered at the Warrant Agent Office by the registered holder thereof in person or by a legal representative or attorney duly authorized in writing, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of Shares.

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

No Warrants may be sold or otherwise transferred in violation of the Securities Act or state securities laws. Further, no sale or other transfer of any Warrants shall be permitted if (i) the Company is not, at the time of such transfer, a reporting company under the Securities Exchange Act of 1934 (the "Exchange Act") and (ii) after giving effect to such sale or transfer, the Company would be, or would be obligated to become, a reporting company under the Exchange Act. The Company, may require that, as a condition to any sale or transfer of a Warrant, that the holder furnish the Company and the Warrant Agent with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, that such sale or transfer is exempt from the provisions of Section 5 of the Securities Act, and the rules and regulations thereunder. In addition, prior to any such transfer, the Warrant Holder and the transferee shall have delivered to the Company representation letters substantially in the forms attached to the Company's Amended and Restated Certificate of Incorporation, as may be in effect at such time (or such other forms as may be approved from time to time by the Board and available from the Secretary of the Company). The provisions of this paragraph shall not apply to the exercise of any Warrant to the extent that the Shares issued upon such exercise (and any unexercised portion of the Warrant so exercised) shall be issued to the same registered holder that exercised such Warrant. The Company and the Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

In the event of any conflict or inconsistency between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

## FORM OF ELECTION TO EXERCISE

*(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)*

The undersigned hereby irrevocably elects to exercise the right, represented by this Warrant Certificate, to purchase _____ Shares and herewith tenders in payment for such Shares $_____, payable as follows [SPECIFY].

The undersigned requests that a certificate representing the Shares be registered and delivered in the name of the undersigned, as follows:

_____
*Name*

_____
*Address*

_____
*Delivery Address (if different)*

If such number of Shares is less than the aggregate number of Shares purchasable hereunder and any Warrants evidenced hereby remain outstanding, the undersigned requests that a new Warrant Certificate representing the balance of such Shares shall be registered and delivered in the name of the undersigned, as follows:

_____
*Name*

_____
*Address*

_____
*Delivery Address (if different)*

_____          _____
*Social Security or Other Taxpayer*                        *Signature*
*Identification Number of Holder*

*Note:  The above signature must correspond with the name as written upon the face of this Warrant Certificate in every particular, without alteration or enlargement or any change whatsoever.*

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND*
*IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

### *FORM OF ASSIGNMENT*

### *(TO BE EXECUTED BY THE REGISTERED HOLDER IF SUCH*
*HOLDER DESIRES TO TRANSFER THE WARRANT CERTIFICATE)*

**FOR VALUE RECEIVED**, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

this Warrant Certificate, together with all right, title and interest therein, and does irrevocably constitute and appoint _____ attorney, to transfer the within Warrant Certificate to purchase _____ shares of Common Stock to which the Warrant Certificate relates on the books of the Warrant Agent, with full power of substitution.

| | |
|---|---|
| _____ | _____ |
| *Dated* | *Signature* |

*Note: The above signature must correspond with the name as written upon the face of this Warrant Certificate in every particular, without alteration or enlargement or any change whatsoever.*

_____

*Social Security or Other Taxpayer*
*Identification Number of Assignee*

SIGNATURE GUARANTEED:

_____

NY 73782992v4

*NOTE: THIS DOCUMENT IS BEING FILED IN DRAFT FORM AND
IS SUBJECT TO REVISION BY THE INVESTORS AND THE DEBTORS*

**EXHIBIT B**

## *FORM OF JOINDER AGREEMENT*

### *(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)*

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Stockholders Agreement dated as of [_____], 2012 (as amended, the "Agreement"), by and among [*DELAWARE HOLDING COMPANY*] (the "Company") and the Stockholders (as defined in the Agreement), and for all purposes of the Agreement the undersigned shall, effective as of the date hereof, be bound by the terms and provisions of the Agreement applicable to Stockholders and be included within the term "Stockholder" (as defined in the Agreement).

The address and facsimile number to which notices may be sent to the undersigned is as follows:

Facsimile No.:

Date: _____                    _____

                                          Name: