**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Case No. 10-24549-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

       Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MODIFIED BENCH RULING ON THE MOTION OF HUDSON ENERGY
SERVICES, L.L.C. FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM</u>

**APPEARANCES:**

KIRKLAND & ELLIS, LLP

 Attorneys for the Reorganized Debtors

 BY: ANDREW M. GENSER, ESQ.

 and HUNTER MURDOCK, ESQ.


ANDREWS & KURTH, LLP

 Attorneys for Hudson Energy Services, L.L.C.

 BY: DAVID A. KDUNKEWICZ, ESQ.


APPEARING TELEPHONICALLY:

 DOUGLAS GOULD

 JOSHUA SIEGEL

1   **HON. ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:**

2              I have before me a motion by Hudson Energy

3   Services, LLC, which I'll refer to as "Hudson," for the

4   allowance of an administrative claim under Section 503(b)(9)

5   of the Bankruptcy Code.  Because this Court established a

6   bar date that included Section 503(b)(9) claims,

7   procedurally this is couched as an objection to Hudson's

8   claim.

9              But because it is an administrative claim, I

10  believe that the burden is on Hudson to establish its right

11  to the administrative expense.  And that's what's at issue

12  here, as opposed to the amount of the claim.

13             Section 503(b)(9) of the Bankruptcy Code was

14  enacted in 2005 as part of BAPCPA.  It states that "After

15  notice and a hearing, there shall be allowed administrative

16  expenses, including the value of any goods received by the

17  debtor within 20 days before the date of commencement of a

18  case under this title in which the goods have been sold to

19  the debtor in the ordinary course of such debtor's

20  business."

21             Hudson sold electricity to the debtor pursuant to

22  a contract that's attached as Exhibits A, B, and C (Exhibits

23  B and C referring to agreements incorporated in the contract

24  attached as Exhibit A) to the declaration of Hunter Murdock

25  in support of the debtor's opposition to the administrative

1    claim.  The debtor does not dispute that the electricity was

2    sold to the debtor in the ordinary course of the debtor's

3    business or that the electricity at issue here, for which

4    Hudson seeks an administrative claim of $875,943.90, was

5    supplied to the debtor within 20 days before the start of

6    the debtor's bankruptcy case.

7              What the debtor disputes is whether the

8    electricity provided under the contract by Hudson was, in

9    fact, "goods" within the meaning of Section 503(b)(9).  (I

10   don't believe the debtor disputes the value of the

11   electricity, either.  The amount claimed is apparently the

12   amount that was actually billed for the electricity provided

13   within 20 days of the petition date.)

14             As noted by Collier: "Section 503(b)(9)

15   fundamentally shifts the order and nature of payment to

16   creditors.  Prepetition venders eligible under Section

17   503(b)(9) now have a priority ahead of wages, taxes, and all

18   other priorities that rank below administrative expenses

19   under Section 507.  Section 503(b)(9) results in disparate

20   treatment of otherwise similarly situated creditors that

21   provided value to the debtor during the 20 day period

22   preceding the filing of the case but will not receive an

23   administrative expense priority if their prepetition claim

24   is not for the delivery of goods." 4-503 Collier Bankruptcy,

25   Paragraph 503.16 (16th Ed. 2012).

```
 1              That fundamental shift highlights even more than
 2    normally that provisions allowing administrative claims
 3    "must be tightly construed."  Howard Delivery Serv. v.
 4    Zurich Am. Ins. Co., 547 U.S. 651, 667, 669 (2006).  That is
 5    because administrative expenses that have priority under
 6    Section 507(a)(2) must be paid in full before non-priority
 7    claims are paid.  Thus, each creditor holding an unsecured
 8    claim pays a part of the administrative claim unless, as is
 9    clearly not the case here, the debtor is financially able to
10    pay all unsecured claims in full.  Id.; see also In re
11    Bethlehem Steel Corp., 479 F.3d 167, 172 (2d. Cir. 2007),
12    and In re Texaco, Inc., 2011 U.S Dist. Lexis 111533, at *21
13    (S.D.N.Y. Sept. 28, 2011).
14              Thus, a party claiming an administrative priority
15    "must fit clearly" within the priority provision of the Code
16    in order to be entitled to such a claim.  Howard Delivery,
17    547 U.S. at 677.
18              Unfortunately, at the edges -- and, clearly, the
19    provision of electricity is at the edges -- Section
20    503(b)(9) is neither clear nor has it been clearly applied
21    by the courts.
22              The courts uniformly agree that they can be guided
23    in their interpretation of what is a "good" or what are
24    "goods" for purposes of Section 503(b)(9) by the definition
25    set forth in Section 2.105 of the Uniform Commercial Code.
```

1   See In re Circuit City Stores, Inc., 416 B.R. 531, 537

2   (Bankr. E.D. Va. Sept. 22, 2009), as well as In re Grede

3   Foundries, Inc, 440 B.R. 791, 797 (W.D. Wisc. 2010), and In

4   re Goody's Family Clothing, Inc., 401 B.R. 131, 134 (Bankr.

5   D. Del. 2009).  See also In re Samaritan Alliance, LLC, 2008

6   Bankr. Lexis 1830, at *6-7 (Bankr. E.D. Ky. June 20, 2008),

7   and 4-503 Collier on Bankruptcy, Paragraph 503.16[1].

8            The basis for looking to the UCC definition of

9   "goods" is well summarized in the Goody's case in light of

10  the near unanimous nationwide adoption of Article 2 of the

11  UCC and, as Judge Sontchi says in that opinion, the fact

12  that the definition of goods set forth in the UCC is

13  consistent with the ordinary non-legal meaning of the word,

14  which he takes from the dictionary: property or possessions,

15  especially movable property.

16           As Judge Sontchi also notes in Goody's, the

17  statute, as enacted in 2005, in referring only to goods

18  leads the Court to distinguish the concept from "services,"

19  which the Bankruptcy Code uses in conjunction with goods in

20  several other contexts. 401 B.R. at 135.

21           Unfortunately, however, as noted by Collier and

22  the courts that have had to deal with this issue, the term

23  "goods" as interpreted for purposes of Article 2 of the UCC

24  has not been interpreted uniformly throughout the country,

25  even though the courts applying it are interpreting a

1   uniform law.  This has contributed to the fact that the case

2   law on the more narrow issue of the applicability of Section

3   503(b)(9) to electricity is, for my purposes, evenly divided

4   on whether electricity constitutes goods or not for purposes

5   of that provision of the Bankruptcy Code.

6              Two courts addressing the issue directly and

7   applying a UCC analysis, among others, have held that for

8   purposes of Section 503(b)(9) electricity is not a good.  In

9   re Pilgrim's Pride Corp., 421 B.R. 231 (Bankr. N.D. Tex.

10  2009), and In re Samaritan Alliance, LLC, 2008 Bankr. Lexis

11  1830 (Bankr. E.D. Ky. June 20, 2008).

12             On the other hand, two courts have concluded --

13  again, looking by analogy to Article 2 UCC case law, that

14  for purposes of Section 503(b)(9) of the Bankruptcy Code

15  electricity *is* a good for the purposes of that section.  In

16  re Erving Industries, Inc., 432 B.R. 354 (Bankr. D. Mass

17  2010), and GFI Wis., Inc. v. Reedsburg Util. Comm'n (In re

18  Grede Foundries, Inc.), 440 B.R. 791 (W.D. Wis. 2010).

19             In large measure, the conflict between those

20  decisions is driven by a conflict in the underlying UCC case

21  law.  It's probably fair to say that a majority of courts

22  interpreting Section 2.105(1) of the UCC, which defines

23  "goods," have held that electricity is a good for purposes

24  of Article 2.  However, there is a strong minority position,

25  and as the debtors' point out, the leading cases in support

1   of that minority position are from the New York Court of

2   Appeals and the Second Circuit and the District Court for

3   the Southern District of New York.

4          The case law is noted in the parties' briefs and

5   is also well summarized in two law review articles:  William

6   R. O'Connor:  "Are You Positive Electricity is a Good?  Why

7   Electricity Should Be Considered a Service Under Section

8   503(b)(9) of the Bankruptcy Code," 42 University of Memphis

9   Law Review 187 (2011), and Colby Bailey:  "Energy 'Goods':

10  Should Article 2 of the Uniform Commercial Code Apply to

11  Energy Sales in a Deregulated Environment," 37 John Marshall

12  Law Review 281 (2003).

13         The debtors contend that given all of the

14  bankruptcy courts' deference or willingness to take guidance

15  from the UCC definition of goods for purposes of the

16  503(b)(9) analysis, I should defer to the interpretation of

17  New York's UCC, which is the same, both in terms of the

18  statute and the comments, as the Uniform Act, which, as I've

19  noted, has repeatedly held, in various contexts, that

20  electricity is not a good.

21         The debtors contend that that should be end of the

22  story, particularly in light of the fact that this contract

23  is one that is wholly governed by New York law.  The

24  electricity provided here is provided only to New York

25  locations, Hudson is a New York corporation and therefore

```
 1    would reasonably expect that New York law would govern the
 2    parties' rights under the contract.
 3              The debtors cite to a number of cases that apply
 4    the law of a particular state in connection with various
 5    bankruptcy issues.  Most of those cases, however, deal with
 6    situations where there is a property interest at stake or a
 7    particular right to payment based on a claim governed by a
 8    particular state law is at issue.
 9              Here, the underlying right to payment is a claim
10    for $800,000+; but what is at issue before me is a priority,
11    which is governed by federal law, the Bankruptcy Code.
12    Again, see In re Texaco, Inc., 2011 U.S Dist. Lexis 111533,
13    at *11-13 (S.D.N.Y. Sept. 28, 2011).
14              There are cases, however, where courts have looked
15    to applicable state law when determining a bankruptcy law
16    right, such as in the area of non-dischargeability.  So
17    there is some logic to the debtors' argument that New York
18    law should, in fact, govern this dispute over what is a good
19    and that the Court would be uniformly applying or
20    interpreting the Bankruptcy Code as required by the
21    Constitution by adopting a uniform rule that where the
22    parties' reasonable expectations are governed by an
23    applicable state's law, that principle can be applied
24    uniformly throughout the country.  So that, for example, a
25    503(b)(9) claim where the underlying contract would clearly
```

1    call for the applicability of Indiana law would lead to

2    electricity being defined as a good and, therefore, an

3    administrative claim, since the Indiana courts have

4    interpreted the UCC to include electricity as a good.  See

5    In re Wabash Valley Power Ass'n, 1991 Bankr. Lexis 2213

6    (Bankr. S.D. Ind. Aug. 7, 1991), Helvy v. Wabash County

7    REMC, 278 N.E.2d 608 (Ind. App. 1972).

8                I have considered that argument carefully and have

9    decided that the Court here should not apply such a refined

10   analysis.  It is certainly conceivable to me that there

11   would be situations where sellers of electricity would have

12   a contract that would not clearly be covered by any

13   particular state's law or might provide for delivery in

14   various states, and it appears to me that it would be

15   better, therefore, to apply a uniform-throughout-the-country

16   analysis to the issue, as opposed to simply applying the New

17   York UCC's definitions to Section 503(b)(9).

18               In that sense, I agree with the analysis of this

19   issue by Judge Boroff in Erving Industries, 432 B.R. at 366,

20   note 23, in which he concludes that the definition for

21   purposes of Section 503(b)(9) is ultimately a matter of

22   federal and not state interpretation.

23               Part of that federal interpretation, I believe, is

24   the fundamental interpretive principle that I stated at the

25   beginning of this ruling, which is that administrative

1   expense claims need to be construed narrowly rather than

2   broadly, and that a claim should clearly fit within the

3   statute's provisions or definition before it is accorded

4   administrative expense treatment.

5           I conclude that this claim for the sale of

6   electricity does not clearly fall within the definition of

7   the sale of a good or goods for purposes of Section

8   503(b)(9) and, therefore, I conclude that the request for

9   the allowance of an administrative expense here should be

10  denied.

11          I do so not only because of the clear number of

12  cases that disagree, both in the narrow sense under Section

13  503(b)(9) and in the larger sense under Article 2, applying

14  the inquiry or making the inquiry as to whether electricity

15  is a good throughout the country, but I also do it because I

16  conclude that the term as used in Section 503(b)(9) does not

17  clearly apply to electricity as sold here to the debtor by

18  Hudson; that it is an ambiguous term and that the

19  legislative history and context do not support the extension

20  of the definition to include the provision of electricity,

21  whether sold by a utility or, here, by an independent non-

22  utility marketer, Hudson.

23          I am guided in large measure by the definition in

24  Section 2.105(1) of the UCC, although I do find generally

25  that it is consistent with the non-statutory definitions of

1   the term.  Again, as set forth in Section 2.105(1) of the

2   UCC, "goods" means "all things, including specially

3   manufactured goods, which are movable at the time of

4   identification to the contract for sale other than money in

5   which the price is to be paid, investment securities

6   (Article 8), and things in action.  'Goods' also includes

7   the unborn young of animals and growing crops and other

8   identifiable things attached to reality as described in the

9   section on goods to be severed from reality (Section

10  2.107)."

11           Also relevant is Subparagraph (4) of that

12  definition, which states that, "An undivided share in an

13  identified bulk of fungible goods is sufficiently identified

14  to be sold although the quantity of the bulk is not

15  determined.  Any agreed proportion of such bulk or any

16  quantity thereof agreed upon by number, weight or other

17  measure may to the extent of the seller's interest in the

18  bulk be sold to the buyer who then becomes an owner in

19  common."

20           Official Uniform Comment number one to Section

21  2.105, which appears both in the New York UCC and the

22  uniform statute, states, among other things, "The definition

23  of goods is based on the concept of movability and the term

24  'chattels personal' is not used.  It is not intended to deal

25  with things which are not fairly identifiable as movables

```
 1    before the contract is performed."
 2              The one distinction between the UCC definition and
 3    the dictionary definition, albeit definition number 2 that
 4    appears in the Court's American Heritage Dictionary, is the
 5    notion that it goes beyond personal property.  The
 6    dictionary definition defines "goods" as:  "(1) Merchandise;
 7    wares; and (2) Portable personal property."
 8              Black's Law Dictionary defines goods as "tangible
 9    or movable personal property other than money, especially
10    articles of trade or items of merchandise, goods and
11    services," and then "things that have value" is the second
12    definition: "things that have value, whether tangible or
13    not."
14              The problem with the definition as applied to
15    electricity is that in some sense, clearly, electricity is
16    bought and sold, and, in a deregulated world, which applies
17    to this transaction, bought and sold separate and apart from
18    the seller's being a utility.  It is, therefore, commonly
19    recognized to be a commodity, including for purposes of
20    Section 761(8)(n)(1) of the Bankruptcy Code.  See In re NBS
21    Management Services, Inc., 430 B.R. 750 (Bankr. E.D. La.
22    2010), in which the court states, citing numerous cases,
23    "Thus, no serious debate exists on the issue of
24    electricity's status as a commodity."
25              Anything that is bought and sold, as electricity
```

```
 1   clearly is, must be also measurable; otherwise, it cannot be
 2   such that the parties would be able to form a purchase
 3   price.  Electricity also falls into that category and it is
 4   measured at a meter, both in terms of hours used and amount
 5   of use or BTU.
 6            Broadly construed, it is also a thing.  It
 7   certainly can be felt, as anyone who has had a shock knows.
 8   And it is movable.  It's delivered from one place to
 9   another.
10            All of these things have led the courts who have
11   found that electricity is a good, either for purposes of
12   Article 2 or for Section 503(b)(9), to conclude that it is,
13   in fact, a good.  The best analysis of this view is Judge
14   Boroff's in the Erving Industries case.  He was, in
15   particular, moved by the fact that in that case the movant,
16   the seller, was, in his view, only a seller.  It was not a
17   utility.  It had bought the electricity from the generating
18   utility and it was responsible for delivering it to the
19   debtor.
20            I am less moved by the distinction between a
21   seller like Hudson, or the claimant in Erving Industries,
22   than that opinion was, however.  It appears to me that the
23   distinction simply highlights the current marketability of
24   electricity separate and apart from the creation or
25   distribution of it.
```

1          But a number of courts, including courts who have
2   taken a contrary view, do not view transactions involving
3   electricity as transactions that are pure sale transactions.
4   Rather, they involve an analysis of whether the transaction
5   is fundamentally a service.  I'm not particularly moved by
6   that distinction either, although clearly there is a
7   distinction between a service and a good.  (Obviously, as
8   set forth in Goody's, it is critical that there be a seller
9   with title to the goods for purposes of 503(b)(9), but
10  that's undisputed here.).
11         My analysis really comes down to the ambiguity as
12  to whether a thing of this nature is, in fact, a "good" as
13  intended by Congress.  Even under the UCC definition, one
14  can make a very good case, as have the New York courts
15  relied upon by the debtor as well as the two bankruptcy
16  court cases that I've cited, that electricity does not fall
17  within the UCC definition.  It is not identifiable until the
18  moment it reaches the meter, and at that point it is used.
19  So it is hard to see that it is actually movable at the time
20  of identification.  It, in essence, disappears into use at
21  that moment.
22         It also is not, I believe, an identifiable bulk of
23  fungible goods.  It is simply a stream of electrical energy.
24  It is only identified, again, at the point of delivery.  And
25  consistent with the concept set forth in the Official

```
 1    Comment that I quoted, it is not "fairly identifiable before

 2    the contract is performed."  It's only identifiable at the

 3    moment the contract is performed.

 4             Obviously, other courts with well-reasoned

 5    arguments have taken a different view, in essence delving

 6    into, although they say they needn't, physics.  I believe

 7    they are largely moved by the notion, which I think is

 8    distinguishable, that electricity is a commodity, which I do

 9    not believe clearly makes it a good, particularly for

10    purposes of Section 503(b)(9).

11             Again, the fact that something can be bought and

12    sold does not necessarily mean that it fits the definitions

13    that I've quoted.

14             In this regard, it would seem clear to me,

15    notwithstanding the directive that the Court must apply the

16    plain meaning of a statute first and foremost and never

17    inquire of the legislative history unless the statute is

18    ambiguous, that this statute, although it uses a simple

19    word, "goods," is ambiguous when applied to electricity.

20             Therefore, I believe it is incumbent to look at

21    the context of the statute when it was enacted.

22             Here, as I've noted, Congress in 2005 did

23    something unprecedented in preferring venders of goods over

24    other prepetition creditors, including taxing authorities

25    and employees, who have a more junior priority, and
```

1    certainly over other prepetition creditors who supply value

2    to a debtor within 20 days before the bankruptcy case.

3           The statute was enacted along with and in the

4    context of modifications to the Bankruptcy Code's

5    reclamation provisions, at Section 546(c) of the Code.  They

6    do not cross-reference each other and, clearly, Section

7    503(b)(9) provides a separate and independent right to the

8    right set forth in Section 546(c).  However, they were

9    considered together, as noted at pages 22 and 23 of the

10   debtors' memorandum in opposition.  Clearly, one cannot

11   reclaim electricity, just as one cannot often reclaim goods

12   that have been spoiled and are not easily identifiable.  But

13   the concept of reclamation generally applies to more

14   tangible things than electricity.

15          The rationale behind granting this form of

16   preference has also been recognized, as set forth in the

17   Samaritan case, to discourage stockpiling by a debtor or an

18   entity in financial trouble prepetition, which would further

19   skew its supply relationships and its management of its

20   cash.  2008 W.L. 2520107, pages 3-4.  Obviously, electricity

21   is not something that a debtor can stockpile.  This

22   highlights, again, the other notion that I've stated, which

23   is that it is only identified at the very moment of delivery

24   because it is then used.

25          In light of all that, it would appear to me that

```
 1    it is more likely than not that Congress intended Section

 2    503(b)(9) not to apply to something like electricity, but,

 3    rather, to the more colloquial definition of "goods," which

 4    is a tangible thing and not a tangible thing that is

 5    evanescent like electricity, but a thing that can be

 6    identified before the contract is performed in a movable

 7    quantity, a movable and measurable quantity.

 8              But even if it's not more likely than not, it's at

 9    least as likely that this was the case.  And given that, and

10    given, again, the directive to construe the statute narrowly

11    because of the preference it gives and the money it takes

12    out of other creditors' pockets, I conclude that it should

13    not be construed here broadly to equate a sale of

14    electricity with a "good."

15              I recognize that this will, in some respects,

16    inject a third element into the analysis that has already

17    taken place in the courts, which I'm reluctant to do since

18    clear guidance is the most important thing that the parties

19    need to receive from the courts in general.  But it appears

20    to me that, again, the courts have dealt with that issue in

21    Howard, Bethlehem and in other cases, i.e. where there is

22    not clear guidance with respect to an administrative expense

23    being allowable, the courts should clearly err on not

24    granting the administrative expense.  And I believe that's

25    undoubtedly the case here.
```

1          So for those reasons I'll grant the debtor's

2    objection and deny the request for payment of administrative

3    expense to Hudson.

4

5    **Dated:** White Plains, New York
           October 25, 2012

6

7                              /s/Robert D. Drain_____    __
                               **UNITED STATES BANKRUPTCY JUDGE**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25